Receipt number AUSFCC-6390234

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| OPEN TECHNOLOGY FUND,<br><br>        *Plaintiff,*<br><br>   v.<br><br>UNITED STATES OF AMERICA,<br><br>        *Defendant.* | Case No. ___20-1047 C___<br><br><br>**COMPLAINT** |

### INTRODUCTION

The day after taking the reins as head of the U.S. Agency for Global Media (USAGM), Michael Pack reneged on the agency's agreements to fund the Open Technology Fund (OTF)—an independent nonprofit organization devoted to countering repressive censorship and surveillance abroad. Simultaneously, Pack attempted a wholesale takeover of OTF's leadership, claiming previously unheard-of authority to unilaterally remove and replace its officers and directors. And when OTF pushed back against Pack's attempts to deprive it of its funding and leadership, his Senior Advisor, Mora Namdar, launched a campaign of harassment—repeatedly threatening OTF's grant funding unless it complied with a seemingly endless series of demands to immediately provide information, documents, interviews, and on-site inspections.

The D.C. Circuit has since temporarily enjoined Pack's efforts to purge OTF's leadership and take over the organization against its will. Order, *Open Technology Fund v. Pack*, No. 20-5195 (D.C. Cir. July 21, 2020). And the District of Columbia's Attorney General has filed an action to declare Pack's takeover attempt unlawful under D.C. corporate law. Those cases, however, cannot address USAGM's continued withholding of the funding that it owes OTF under its grant agreements. Those contractual issues—which fall exclusively within this Court's jurisdiction—are the subject of this action.

USAGM has breached its contracts with OTF in three ways. *First*, the agency has withheld about $9.4 million in funding that it owes under OTF's 2020 grant agreement—funding that the agency promised OTF and falsely assured both Congress and a federal court that it would provide. *Second*, the agency has also withheld an additional $9.8 million in prior OTF program grants held by Radio Free Asia, OTF's former parent organization, in violation of its agreement with OTF to transfer those funds. *Third*, Namdar has engaged in transparently pretextual efforts to force OTF into breaching its grant agreement—repeatedly insisting, for example, that OTF comply with burdensome disclosure requests under impossible timeframes. Those actions violate the agency's duty, implied in every contract, to refrain from interfering with another party's performance or with reasonable expectations of the contract's benefits.

USAGM has repeatedly flip-flopped on its justification for withholding OTF's funds. At first, Pack said he was just ordering a temporary, but indefinite, "freeze" on the use of grant funds. After OTF challenged the freeze's legality in court, however, USAGM "clarif[ed]" that there was "no freeze." A few days after that, USAGM sent OTF a unilateral "amendment" to its grant agreement, in which the agency agreed to provide OTF with funding only for the month of July. But although USAGM represented to the court that it would disburse those July funds, and told Congress that it had already done so, those claims proved to be false: July came and went, but the agency had still not paid OTF any of the promised funds.

According to Grant Turner—a longtime career civil servant who was USAGM's interim CEO and, until last week, its Chief Financial Officer—the agency's explanations are exactly what they appear to be: a "thin cover" for the "operational destruction" of OTF. Spencer Hsu, *Lawmakers warn new purge at U.S. Agency for Global Media undermines anti-censorship efforts*, Wash. Post, Aug. 14, 2020. That sentiment is shared by members of Congress across the political spectrum, who have warned that Pack is "openly, transparently trying to destroy an institution that has overwhelming,

bipartisan support on Capitol Hill and that provides critical assistance to dissidents in countries like China." *Id.* Indeed, Namdar ordered Turner last week to "cease and desist" his effort to transfer a portion of OTF's promised funding. When Turner protested Namdar's unlawful transfer of those OTF funds to another account—without required notice to Congress, OMB, or even the agency's own financial officers—Pack revoked his security clearance and put him on immediate administrative leave. The next day, Turner's replacement as Acting Chief Financial Officer, John Barkhamer, also refused to participate in this unlawful transfer of funds. Instead, he resigned in protest and reported Pack's and Namdar's conduct to the Inspector General.

This week, the agency's actions culminated in a series of events that reveal for the first time the seriousness of the existential threat OTF faces:

- On Tuesday, August 18, Namdar notified OTF that the agency deemed it to be in "material breach" of its grant agreement for failing to provide "*all* of the requested information" in response to her latest burdensome demand for 18 categories of information and documents. That notice began a ten-day period until USAGM could permanently terminate OTF's grant agreement, thus eliminating its sole source of funding for its vital internet-freedom work.

- That same day, Pack announced that USAGM's Office of Internet Freedom would take over from OTF in funding future internet-freedom projects. The agency has already funded two such projects, he said, in an apparently secret selection process that had not publicly been announced and for which the selection criteria remains undisclosed. In a statement on the new project, USAGM accused OTF's "leadership," without evidence, of "attempt[ing] to line its own pockets with U.S. taxpayer dollars while insisting upon no oversight." Daniel Lippman, *U.S. global media agency demanded outlets return money for internet freedom projects*, Politico, Aug. 13, 2020. The agency itself, the statement said, was

"capable of providing the same type of funding" as OTF but "works more efficiently."
*Id.*

- The following day, August 19, Pack—facing demands for proof of the agency's claim to have already paid OTF for July and growing bipartisan insistence on full restoration of OTF's funding—finally disbursed OTF's promised funds for July. But that $1.6 million payment—just 8% of the fourth-quarter funding that USAGM owes OTF—was far too little and far too late. OTF had already been forced to issue stop-work orders to over 80 percent of its projects, largely bringing to a halt its important internet-freedom mission. A single month's payment did little to remedy that. And given that USAGM intends to terminate OTF's future funding, and that the agency is already diverting OTF's unpaid funds to other projects, it is clear that the disbursement is the last that OTF can expect to receive.

These latest actions have pushed OTF to the brink. Over the past week, members of Congress on both sides of the aisle have emphasized that Pack's unlawful campaign to destroy OTF could hardly come at a worse time: Just as repressive regimes in Belarus and Hong Kong have begun amplifying their crackdowns on journalists and protestors, Pack has pulled OTF from the fight. Senator Blackburn wrote on Monday that the situation in Belarus "demonstrates that digital censorship, surveillance and internet shutdowns are vital weapons in the authoritarian arsenal," and that the U.S. needs "every tool … to counter these tactics." OTF, she wrote, "must have access to funds." And Representative McCaul noted that OTF, until recently, "was making important progress to protect Hong Kongers" from censorship. But with "those efforts having been on hold for weeks now" because of USAGM's actions, and with China "further cracking down on freedoms in Hong Kong, the singular focus should be to restart OTF's critical programming." USAGM, he said, "needs to release OTF's funding today."

## JURISDICTION

1.    The Court has subject-matter jurisdiction under the Tucker Act. 28 U.S.C. § 1491(a)(1).

## PARTIES

2.    Open Technology Fund is an independent nonprofit organization incorporated under the laws of the District of Columbia in 2019 and dedicated to advancing internet freedom in repressive regimes around the globe. The organization supports the research, development, and implementation of technologies that provide secure, uncensored internet access. These technologies are designed to stay one step ahead of government censors, countering attempts by authoritarian governments to control the internet and restrict freedom of information and association. OTF also supports projects to protect journalists, sources, and audiences from repressive surveillance and digital attacks, ensuring that they can safely create and consume objective, unbiased reporting.

3.    The United States of America acts through the U.S. Agency for Global Media (USAGM), a federal agency charged with funding the government's international-broadcasting program and related activities. *See* 22 U.S.C. § 6204. USAGM is headed by Michael Pack, the agency's CEO.

## FACTUAL ALLEGATIONS

### I.    OTF is founded to advance global internet freedom.

4.    More than "two thirds of the world's population live in countries where internet access is restricted, and that number is growing." USAGM, *Internet Freedom FY 2020 Spend Plan* 2 (Exh. A). Restrictions on internet freedom, including "advanced censorship and surveillance technologies," are not only "designed to stifle dissent, track minorities, and manipulate content online," but they also prevent journalists and audiences from "engag[ing] in and shar[ing] fact-based news online." *Id.* at 1–2. "Technologies that provide access to blocked content, and safe and secure methods to share content," are therefore "critically important to getting information to target audiences

that would otherwise be siloed by government censorship." *Id.* at 2. OTF was founded to advance

this important mission—to support "pioneering research, development, and implementation of

cutting-edge internet freedom technologies to respond to rapidly evolving censorship threats

around the world." *Id.* at 3.

5.      OTF began in 2012 as an internet-freedom project within Radio Free Asia, one of

several organizations funded and overseen by USAGM as part of its international-broadcasting

program. In September 2019, OTF was incorporated as an independent 501(c)(3) nonprofit cor-

poration under District of Columbia law.

6.      OTF distributes funding to the internet-freedom community via grant contracts.

Through these grants, the organization funds programs in sixty countries to allow secure and un-

censored access to U.S. information sources and the internet; protect journalists, sources, and con-

sumers from digital attack; and aid researchers and technology developers. During its last call for

applications, OTF received requests for nearly $20 million in funding support.

7.      "In less than a decade," OTF "has quietly become integral to the world's repressed

communities." Pranshu Verma and Edward Wong, *New Trump Appointee Puts Global Internet Freedom

at Risk, Critics Say*, N.Y. Times, July 4, 2020. The organization "has been responsible for helping

fund some of the most widely used digital rights tools in the world, including the encrypted mes-

saging app Signal and the anonymous internet browser Tor"—software that journalists, political

activists, and ordinary citizens use to evade government censorship and surveillance. Avi Asher-

Schapiro, *Firings at U.S. non-profit spark concern among digital rights activists*, Reuters (July 2, 2020),

https://reut.rs/30FB8Dg. "Today, over two billion people globally use OTF-supported technology

daily" to freely and safely access the uncensored internet despite authoritarian government con-

trols, "and more than two-thirds of all mobile users have OTF-incubated technology on their de-

vice." *Id.* at 3.

## II.   USAGM agrees to support OTF's internet-freedom work with $30 million in funding for the 2020 fiscal year.

8.    Consistent with its mission to "inform, engage, and connect people around the world in support of freedom and democracy," USAGM has historically supported development of "tools and techniques necessary" for its international broadcasting work, "to report and disseminate content in information-restrictive markets," and for "audiences to receive and share content safely online." *Internet Freedom FY 2020 Spend Plan* at 1.

9.    In furtherance of that mission, USAGM has been OTF's sole source of funding since the project's founding in 2012. OTF is thus highly dependent on its grant agreements with USAGM for all of its critical internet-freedom work. And OTF's dependence is particularly acute because those grant agreements provide that OTF "may not engage in fundraising from other sources" without USAGM's authorization. Grant Agreement at 13 (Exh. B).

10.    For the 2020 fiscal year, USAGM agreed to grant OTF funds from two separate funding sources. First, USAGM agreed to award $20 million from the agency's congressionally appropriated internet-freedom funds. *Id.* at 2. Second, it agreed to grant an additional $9.8 million that the agency had previously awarded to support OTF's internet-freedom work but that had remained under the control of OTF's former parent organization.

### The agency grants OTF $20 million in congressionally appropriated internet-freedom funds

11.    In December 2019, Congress appropriated USAGM's funding for 2020, providing that "not less than $20,000,000 shall be for Internet freedom programs." Further Consolidated Appropriations Act, 2020, P.L. 116-94, Div. G, tit. I (Dec. 20, 2019).

12.    Congress required USAGM to set forth how it would use those appropriated funds in an "Internet Freedom FY 2020 Spend Plan," in which the agency would allocate its internet-freedom appropriations for the 2020 fiscal year and notify Congress of those allocations. Div. G,

tit. VII, § 7050(c). USAGM's spend plan informed Congress that the agency would provide $20,425,000 in appropriated internet-freedom funds "to the newly established Open Technology Fund corporation through a grant agreement." *Internet Freedom FY 2020 Spend Plan* at 2.

13.    In preparing to receive the internet-freedom funding that USAGM allocated to it, OTF requested that the agency disburse the funds on a quarterly, rather than monthly, basis. Although the agency often awards monthly grants, it is flexible about adjusting that period when needed by individual grantees. In OTF's case, the organization often needed to distribute large grants to its own grantees in amounts that could exceed a single month's funding. USAGM knew that, and thus understood that monthly disbursements would be incompatible with OTF's normal operations. Accordingly, then-acting CEO Grant Turner and CFO John Barkhammer agreed to distribute OTF's 2020 funding in quarterly disbursements—an agreement that OTF's CEO memorialized to them, without contradiction, in an April 3, 2020 email to the agency.

14.    Consistent with that understanding, the agency entered grant agreements with OTF for each quarter of the 2020 fiscal year.

15.    **First quarter (Oct. 1, 2019–Dec. 31, 2019).** In November 2019, OTF and USAGM entered a two-page "preliminary" grant agreement for 2020, providing the recently created organization with $40,000 in first-quarter funding. Preliminary Grant Agreement at 1 (Exh. C). Although Congress had not yet appropriated USAGM's 2020 funding, the agreement "anticipated that additional amounts will be made available" to OTF "as soon as such funds become legally available." *Id.*

16.    **Second quarter (Jan. 1, 2020–Mar. 31, 2020).** In January 2020, OTF and USAGM executed their first full grant agreement for 2020, providing OTF with $3,688,320 in second-quarter funding to "advance Internet Freedom overseas." Grant Agreement at 2. USAGM

"agree[d] to make," and OTF "agree[d] to accept, the grant of funds in accordance with" the agreement's terms. *Id.*

17.    The grant agreement required OTF's use of awarded funds to be "consistent with" an attached financial plan, which OTF drafted and USAGM approved. *Id.* OTF's approved financial plan set forth the organization's anticipated spending only for the second fiscal quarter.

18.    "In the event that [OTF] fails to comply with any material term of [the] Grant," the agreement requires USAGM to "provide advance notice of suspension or termination" of funding "except in urgent or compelling circumstances," "after which [OTF] will have ten (10) business days to bring itself into compliance." *Id.* at 15.

19.    The agreement also stated the parties' understanding and agreement that they were "subject to all Federal rules and regulations pertaining to grant funds, including … 2 C.F.R. § 200." *Id.* at 11. Under those regulations, promulgated by OMB, an agency may "impose additional conditions" on non-federal recipients of grant funds only if the grantee "fails to comply with Federal statutes, regulations or the terms and conditions of a Federal award." 2 C.F.R. § 200.338. The agency "must not impose additional or inconsistent requirements … unless specifically required by Federal statute, regulation, or executive order." *Id.* § 200.100(a)(1). And it may withhold funds or terminate the grant only if it "determines that noncompliance cannot be remedied by imposing" such additional conditions. *Id.* § 200.338(a), (c), (e).

20.    **Third quarter (Apr. 1, 2020–June 30, 2020).** In April 2020, OTF and USAGM executed an amendment to the grant agreement that provided OTF an additional $5,649,552 in funding under OTF's third-quarter financial plan. Grant Agreement Amend. No. 1 (Exh. D).

21.    **Fourth quarter (July 1, 2020–Sept. 30, 2020).** Following distribution of OTF's grant funds for the first three quarters of 2020, USAGM still retained $11,047,129 of OTF's 2020 funding. Based on the parties' agreement on quarterly distributions, and on their course of

performance, OTF understood that those remaining funds would be transferred at the beginning of the fourth fiscal quarter, on July 1, 2020. In April, OTF "reminde[d]" USAGM of that expectation in an email—which the agency did not contradict—noting that OTF needed the funding at the start of the quarter in anticipation of funding several large contracts.

22.    Consistent with that understanding, USAGM emailed OTF a second amended grant agreement, approved by USAGM's Chief Financial Officer, before the start of the fourth fiscal quarter in June 2020. Grant Agreement Amend. No. 2 (Exh. E). The agreement awarded OTF all of its remaining $11 million in funding for the rest of the 2020 fiscal year.

23.    OTF's CEO accepted the terms of the grant agreement by signing and returning it to USAGM the same day—one week after Pack began as USAGM's new CEO.

### *The agency agrees to transfer to OTF an additional $9.8 million in its prior funding held by Radio Free Asia*

24.    After spinning its operations off from Radio Free Asia to form an independent organization in 2019, OTF faced an immediate problem: how to disentangle the new organization's finances from those of its former parent. Radio Free Asia still held $12.9 million in funding allocated to the OTF program, and OTF had already contractually obligated $7.9 million of that funding to its own internet-freedom grantees.

25.    Both OTF and Radio Free Asia wanted to transfer those funds to the new OTF organization so that it could take over the OTF program contracts. The funds, however, were subject to USAGM's supervision under the terms of its grant agreements. Accordingly, the organizations requested USAGM's permission in December 2019 to allow Radio Free Asia to transfer all OTF program funds still in its possession directly to OTF.

26.   USAGM initially rejected those requests. Rather than transferring the funds directly, the agency told the organizations that the funds would have "to be recaptured to the agency and be reapportioned and rewarded to the newly established OTF."

27.   In February 2020, USAGM wrote to OTF that "[t]he following steps need to occur in order to transfer [the] funding":

   a.  **OTF spend plan.** OTF would have to provide a "financial/spend plan" along with "a full plan to transition" the funds to OTF. USAGM would then include OTF's plan in the Internet Freedom FY 2020 Spend Plan that it intended to submit to Congress.

   b.  **Accounting.** Radio Free Asia would "confirm and validate" remaining OTF funds not obligated by contract, "making any transaction auditable." It would also review obligated OTF funds "to determine if these obligations are still valid."

28.   OTF and Radio Free Asia agreed to those terms and satisfied all the requirements that USAGM provided.

29.   First, OTF in March 2020 submitted to USAGM a full spend plan for the 2020 fiscal year, including a plan for funds transitioned from Radio Free Asia. After reviewing and approving OTF's plan, USAGM included it in its Internet Freedom FY 2020 Spend Plan and submitted it to Congress in April 2020. Under that plan, "any unobligated and obligated funding" belonging to OTF would, on completion of Radio Free Asia's pending accounting, "be transferred to OTF." *Internet Freedom FY 2020 Spend Plan* at 2. On receiving that transfer, OTF would then be obligated to use the funds in accordance with its USAGM grant agreement and its agency-approved spend plan.

30.     Second, Radio Free Asia engaged an auditor in May 2020 to perform the required accounting. In June 2020, the auditor found that Radio Free Asia still held a total of $9,754,588 in both obligated and unobligated OTF funds.

31.     With all of USAGM's requirements for the transfer satisfied, Turner began preparing to transfer those funds to OTF in June 2020, one week after Pack became CEO.

**III.   Immediately upon his confirmation as USAGM's CEO, Michael Pack attempts to purge OTF's officers and directors, withholds its grant funding, and initiates a campaign of harassment against the organization.**

32.     On June 8, 2020, Michael Pack was sworn in as USAGM's CEO. The next day, Pack sent an email to OTF's officers stating that, "[e]ffective immediately" there was a "freeze" on use of USAGM grant funds. Pack significantly escalated his assault on OTF the following week, announcing that, "[e]ffective immediately," he was "removing" OTF's president and CEO and replacing the independent nonprofit organization's board of directors with his own appointees. As Pack fought to deprive OTF of its leadership and only source of funding, Namdar began a campaign of harassment, subjecting OTF to an escalating series of burdensome and unnecessary requests for information, interviews, and inspections—culminating in a pretextual claim that OTF had breached its grant agreement by failing to supply all the information she demanded.

33.     Pack's assault on OTF's independence and funding have provoked broad, bipartisan condemnation. Representative Michael McCaul, the ranking Republican on the House committee that oversees USAGM, said last week that Pack's actions have brought OTF's "critical programming"—"a lifeline for people living under oppressive regimes"—to the "brink of collapse." Hsu, *Congressional leaders urge Trump administration to release funds*, *supra*. Representative Tom Malinowski, a Democrat on the committee, warned that Pack is "openly, transparently trying to destroy an institution that has overwhelming, bipartisan support on Capitol Hill and that provides critical assistance to dissidents in countries like China." *Id.* Reactions in the Senate were similar. Senator Robert

Menendez, a Democrat, called the funding hold "a gift to repressive governments in China, Iran and elsewhere," *id.*, while Senator Marsha Blackburn, a Republican, said that "[a]ny disruption to the work of OTF" would "undermine free speech," "restrict access to information," and "endanger activists and journalists working in the field to promote freedom in their societies."

34.    As those and other members of Congress have observed, Pack's attempt to destroy OTF comes at an inopportune time. Just as repressive regimes in Belarus and Hong Kong have begun amplifying their crackdowns on journalists and protestors, Pack has pulled OTF from the fight. Rep. McCaul noted last week that OTF "was making important progress to protect Hong Kongers" in the event that China "shut down communication in and out of the city." *Id.* But with "those efforts having been on hold for weeks now," and with China "further cracking down on freedoms in Hong Kong, the singular focus should be to restart OTF's critical programming." *Id.* USAGM, he said, "needs to release OTF's funding today." *Id.* And Sen. Blackburn wrote on Monday that Belarus "demonstrates that digital censorship, surveillance and internet shutdowns are vital weapons in the authoritarian arsenal," and that the U.S. needs "every tool … to counter these tactics." https://bit.ly/2QbrYcB. OTF, she wrote, "must have access to funds." *Id.*

### The D.C. Circuit enjoins Pack's attempted takeover of OTF's leadership

35.    Earlier this summer, OTF and four of its directors sued Pack in the U.S. District Court for the District of Columbia, moving to enjoin Pack's efforts to take over the organization by removing and replacing its leadership. The district court denied OTF's requested injunction. Although the court acknowledged that the "[w]idespread misgivings about Pack's actions raise troubling concerns," it concluded that OTF's own bylaws, read in conjunction with a single, ambiguous sentence in its grant agreement, give Pack unilateral authority to purge OTF's leadership and take over the organization against its will.

36.     On appeal, the D.C. Circuit disagreed, granting OTF a rare injunction pending appeal of the district court's order. *See* Order, *Open Technology Fund v. Pack*, No. 20-5195 (D.C. Cir. July 21, 2020). Nothing in OTF's bylaws, the court concluded, gives USAGM or its CEO "control of OTF's board or operations." *Id.* at 1. And Pack's actions threatened OTF with irreparable harm by putting the organization's partnerships at risk and causing those who depend on its technology "to fear for their safety." *Id.* at 2. Accordingly, the court enjoined the agency "from taking any action to remove or replace any officers or directors of [OTF] during the pendency" of the appeal. *Id.*

### *USAGM misrepresents and repeatedly flip-flops on its justification for withholding OTF's $11 million in 2020 grant funds*

37.     OTF initially sought an injunction in the district court against Pack's "freeze" on its use of grant funds, arguing that the action was arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). USAGM responded by repeatedly changing its story and misrepresenting the status of OTF's 2020 funding.

38.     **Pack freezes OTF's use of its grant funds.** The day after taking office as USAGM's CEO, Pack informed OTF's officers that, "[e]ffective immediately" there was a "freeze" on, among other things, "obligations for new contracts or extensions of any contract." Because OTF operates by distributing money to the internet-freedom community via contracts with organizations working toward internet freedom, the freeze immediately halted its ability to perform its mission.

39.     **When challenged, USAGM next claims that there is "no freeze," and that OTF's $11 million in fourth-quarter funding is unaffected.** The day after OTF moved for an injunction against the freeze, USAGM reversed course. The agency notified OTF in an email that there was actually "no freeze in funding," and that the organization "may continue

taking" all the actions that the agency previously put on hold. Citing that email, government counsel made a representation to the U.S. District Court that "the approximately $11 million for the fourth quarter of FY 2020 that USAGM had not yet distributed to OTF was eligible to be disbursed." That grant, the government represented at a hearing on OTF's motion, "is going to be active and will not be frozen," and the "signed and executed version" offered by USAGM and accepted by OTF "would be operative." Based on those in-court representations, the court concluded that "any freeze in effect is gone."

40.   **The agency unilaterally "amends" OTF's fourth-quarter grant agreement to provide just one month of funding.** The following business day, USAGM changed course again. The agency emailed OTF a new version of its final 2020 grant amendment that, without explanation, purported to reduce the disbursement to which OTF was entitled by 85%, from $11 million to just $1.6 million. In response to OTF's complaint about the missing $9.4 million in funding, agency CFO Grant Turner submitted a declaration stating that "[a]gency leadership" had decided that grants "may only be disbursed on a monthly basis." The $1.6 million disbursement, he wrote, was intended to cover just OTF's July expenses, and any additional "funds not yet disbursed for the fourth quarter" would "be disbursed via subsequent amendments to the grant agreement." Again relying on USAGM's representation, the U.S. District Court denied OTF's motion for an injunction against the agency's funding freeze, concluding that the "legality of disbursing funds to plaintiffs on a monthly basis is not within the scope of plaintiffs' complaint."

41.   **The agency reneges even on its promise of monthly funding.** USAGM's promise of monthly disbursements, too, proved to be false. July came and went without any payments to OTF—even after the agency assured Congress that the funds had already been disbursed. The agency persistently ignored OTF's repeated requests for information. Not until August 19, after weeks of intense bipartisan pressure and demands for proof of the agency's claim that it

already disbursed the funds, did USAGM finally transfer $1.6 million—just 8% of the $20.8 million due.

### *Pack and Namdar actively block the efforts of USAGM staff to effectuate the agency's agreement to transfer $9.8 million from Radio Free Asia*

42.     Because OTF and Radio Free Asia had completed all of the requirements provided by USAGM for transfer of OTF's funds, Turner began to prepare the transfer to OTF. When Namdar learned what Turner was doing, however, she ordered him to "cease and desist" his preparations. Pack followed up that order by forbidding Turner—and any other agency employee except Namdar—from communicating with OTF.

43.     Last week, Namdar moved to take control of that OTF funding, demanding that Radio Free Asia hand over all unobligated OTF funds in its possession by the end of the same business day. Radio Free Asia complied, providing Namdar a paper check representing $2.9 million in OTF's allocated grant funds.

44.     Namdar did not notify Congress, OMB, or even the agency's own CFO about the $2.9 million transfer. When Turner learned about it, he told Namdar that appropriating OTF's internet-freedom funding for non-approved purposes was improper and unlawful, as was the transfer of millions of dollars in agency funds outside the CFO's office and without notice to Congress or OMB. Namdar's response to him was: "Do your fucking job."

45.     Within a day, Pack put Turner on administrative leave and revoked his security clearance. Until then, Turner had served with distinction for years as a career civil servant under administrations of both political parties, including service as the Acting CEO of USAGM during the Trump Administration.

46.     The next day, John Barkhammer, another career civil servant and now the Acting CFO of the agency, immediately raised with agency management the same concerns that Turner

expressed about Namdar's proposed transfer of OTF's funds. When Barkhammer was instructed to complete the transfer despite his concerns because it had been approved by Pack and Namdar, Barkhammer immediately resigned from USAGM and reported what he believed to be improper and unlawful conduct to the Inspector General.

47.     OTF has never received any portion of the $9.8 million of its funding held by Radio Free Asia, including the $2.9 million of its funding that Namdar took for unknown purposes.

### *USAGM harasses OTF with increasingly unreasonable demands and bad-faith threats to hold OTF in breach of its grant agreement*

48.     As Pack worked to take over OTF's leadership and to deprive it of its funding, Namdar began a parallel campaign of harassment—repeatedly threatening OTF's grant contracts unless the organization complied with a seemingly endless series of unreasonable and burdensome demands.

49.     Namdar has insisted on OTF's compliance with broad and unnecessary requests for information under unreasonable timeframes. Last week, for example, she demanded that OTF provide answers and documents in response to 18 categories of information—including sensitive information that OTF's grant agreement gives it no right to request—within 48 hours, or risk being found in breach of the agreement. Even though OTF responded immediately, the agency predictably accused it in public of "refus[ing] to cooperate with reasonable requests for security-related information and oversight of taxpayer funds." In another letter, USAGM demanded extensive documents and records about staff and operations, including, "*all* financial documents and records of OTF," within three business days.

50.     Namdar has also repeatedly made unexplained and unjustifiable demands for on-site "inspections" of its offices, even while those offices are closed during the pandemic. In one case, she threatened OTF's grant funding unless it permitted her to physically "inspect" its closed office

the next day. Namdar and other USAGM officials have even attempted to gain physical entry into OTF's offices by demanding the key to those offices, repeatedly insisting that building security allow them entry, and pressuring the building's landlord, based on questionable representations, to turn over control of the organization's office space.

51.    Namdar has made similar unreasonable demands to interview OTF's staff. During her "inspection" of OTF's offices, Namdar (an attorney licensed in Texas and the District of Columbia) forced OTF's Vice President for Programs (a nonlawyer) to answer a series of questions, without OTF's counsel present, about the subject matter of the organization's ongoing litigation against the agency. She also asked about the citizenship status of OTF employees and contractors, some of whom work to further free expression in repressive regimes and whose personal safety could have been jeopardized. And she has repeatedly demanded, again under threat of finding OTF in breach, contact information for "all employees, contractors, interns, and anyone else receiving a stipend or salary"—all for the acknowledged purpose of conducting more such interviews outside of OTF's ability to supervise them.

52.    Although OTF's grant agreement requires it to provide USAGM with certain information when "reasonably requested" by the agency, the agreement gives USAGM no right to most of the information Namdar has requested—including private and sensitive information about OTF's employees and contractors. And Namdar's demands for extensive disclosures, inspections, and interviews on short notice are far from "reasonable," especially during a time when USAGM's decision to deprive OTF of its funding have left it with severely limited resources with which to respond.

53.    Nor does USAGM have any legitimate need for the information Namdar has demanded. The only justification she has offered is that USAGM needs the information to conduct a "security review" in response to an OPM report critical of the agency's security practices. But

USAGM has never notified OTF of any problems with OTF's security. And the security issues cited in the OPM report have nothing to do with OTF, which the report never mentions. Rather, the report documents problems at USAGM itself—problems that led OPM to withdraw the agency's authorization to conduct its own background checks. Far from justifying USAGM's demand for unrestricted access to OTF's files and employees, the report instead validates OTF's concerns about entrusting USAGM with sensitive information.

54.    The real reason for Namdar's burdensome demands is transparent: to force OTF into noncompliance with her requests for information as a pretext for claiming a breach of the grant agreement.

55.    Just this week, Namdar claimed exactly that. OTF had just provided her with a seventeen-page letter and attachments responding, within seven days, to her latest raft of questions. The following day, Namdar notified OTF that it had "not provided the necessary requested information in the timeframe … set out by USAGM" and "has, therefore, failed to comply with a material term of the grant agreement." Ignoring all of OTF's answers, objections, questions, and suggestions for compromise, and without identifying the responses and objections she deemed insufficient, Namdar wrote that OTF has ten business days under the grant agreement "to bring itself into compliance by providing *all* of the requested information." (emphasis added).

**IV.   USAGM's breach of its agreements imminently threatens OTF's ability to continue advancing its critical mission.**

56.    Since Pack took office in June, USAGM has withheld almost all the fourth-quarter funding to which OTF is entitled. Of the $20.8 million due to OTF, USAGM paid just $1.6 million on August 19, or 8%.

57.    USAGM knew that OTF needed a distribution at the start of the fourth fiscal quarter in July because the organization intended to make several large grants. The agency's CFO prepared

the paperwork for that distribution and sent it to Pack. But Pack intentionally failed to act on it, distributing no funds to OTF during the entire month of July. As a direct result, OTF was forced not only to cancel its plan to award new grants but also to issue stop-work orders to 80% of its existing grantees.

58.    With the quarter now more than half over, USAGM has withheld 92% of OTF's allocated fourth-quarter funding. USAGM has pointedly ignored OTF's repeated requests for payment or for information about the status of those withheld funds. OTF's Board of Directors, for example, sent a letter to Pack on August 3 requesting that USAGM "release immediately the … appropriated funds that Congress specifically approved for OTF." The agency never responded to the Board's letter.

59.    Given USAGM's stated intent to terminate OTF's grant agreement for failing to satisfy all of Namdar's requests for information, and its announcement that it intends to take over from OTF in funding future internet-freedom projects, it now clear that USAGM's August 19 disbursement was the last that OTF will see.

**CLAIMS FOR RELIEF**

**COUNT ONE**
***Breach of contract (grant agreement)***

60.    In June 2020, USAGM sent OTF a second amendment to the parties' Grant Agreement for fiscal year 2020. The amendment "grants an additional amount of $11,047,128" to OTF, of which the bulk "shall be used to support Internet freedom projects" and the remainder "to fund OTF salaries." Grant Agreement Amend. No. 2 at 1.

61. That "grant agreement[] … satisf[ies] all of the traditional requirements for an enforceable contract—an offer, an acceptance, and consideration passing between the parties." *County of Suffolk v. U.S.*, 19 Cl. Ct. 295, 296 (1990).

    a. **Offer.** USAGM offered the terms of the amended agreement to OTF by emailing it to OTF's CEO, Libby Liu, in June 2020. USAGM's chief financial officer, Grant Turner, approved the offer and had authority to bind the agency.

    b. **Acceptance.** Liu accepted USAGM's offer on behalf of OTF by signing the agreement and emailing it back to USAGM.

    c. **Consideration.** Both parties received valuable consideration. OTF received a promise of more than $11 million in grant funds to support its internet-freedom work. And USAGM received OTF's promise that the bulk of those funds "shall be used to support Internet freedom projects" in furtherance of the agency's mission.

62. The parties also agreed that USAGM would distribute funding under the agreement in a quarterly disbursement at the start of the fiscal quarter:

    a. Liu requested a quarterly disbursement at the start of the quarter to accommodate OTF's need to distribute several large grants at that time. Turner, who was USAGM's acting CEO during that time, and John Barkhammer, who was the agency's acting CFO, agreed to Liu's request and had authority to bind the agency.

    b. Liu memorialized that agreement in an email to Turner and Barkhammer on April 3, 2020, and neither objected to the memorialization.

    c. The parties' course of performance separately establishes their agreement to a quarterly distribution. *See Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (in the absence of unambiguous terms, the "parties' own course

of performance is highly relevant"). USAGM made a single quarterly distribution to OTF at the start of each of the first three fiscal quarters of 2020. The parties would thus have reasonably expected that the final quarterly distribution would also be a quarterly distribution at the start of the quarter. In contrast, a shift to a monthly distribution schedule that applied only to the last three months of the fiscal year would have contradicted the parties' reasonable expectations and established course of performance.

63.   USAGM breached the terms of the grant agreement by failing to make a quarterly distribution of any of the $11 million that it promised to pay OTF for the fourth fiscal quarter and by instead appropriating those funds for the agency's own use. Even assuming that funding under the amended agreement was subject to a monthly distribution schedule, the agency would still have breached the agreement by failing to make any monthly distribution in July.

**COUNT TWO**

***Breach of contract (funds transfer agreement)***

64.   USAGM's agreement in February 2020 to transfer $9.8 million in prior USAGM funding from Radio Free Asia to OTF also "satisf[ies] all of the traditional requirements for an enforceable contract." *County of Suffolk*, 19 Cl. Ct. 295.

a.   **Offer.** In February 2020, USAGM offered to "transfer" previously awarded funding to OTF by "recaptur[ing]" the funds from Radio Free Asia and "reward[ing]" them to OTF. It provided, however, that "the following steps would need to occur" first: (1) OTF must provide a "financial/spend plan" along with "a full plan to transition" the program funds for USAGM to include in the Internet Freedom FY 2020 Spend Plan that it intended to provide to Congress, and (2) Radio Free Asia would have to "confirm and validate" remaining unobligated OTF program

funds, "making any transaction auditable," and review obligated funds "to determine if these obligations are still valid."

b. **Acceptance.** Both OTF and Radio Free Asia accepted USAGM's offer to transfer program funds by, with prior notice to the agency, performing all the agreement's conditions: (1) in March 2020, OTF provided USAGM a spend plan and "a full plan to transition" the program funds, which USAGM included in its Internet Freedom FY 2020 Spend Plan; and (2) in June 2020, Radio Free Asia provided USAGM with its completed audit of unobligated and obligated OTF program funds.

c. **Consideration.** Regardless of whether the agreement is treated as a two-party contract between OTF and USAGM or a three-party contract that also includes Radio Free Asia, all parties received valuable consideration. OTF received a promise of $9.8 million in additional funding for its internet-freedom work. Radio Free Asia received the opportunity to clear its books not only of unusable funding, but also of the contractual liabilities for which those funds were obligated, by transferring the funds and associated contracts to OTF. And USAGM gained the benefit of OTF's use of the transferred funds to further the agency's internet-freedom mission—the purpose for which OTF was obligated to use the funds by including them in its agency-approved Internet Freedom Spend Plan.

65.   USAGM breached the terms of the transfer agreement by failing to transfer any of the $9.8 million owed to OTF under the agreement. *Trauma Service Group v. U.S.*, 104 F.3d 1321 (Fed. Cir. 1997) ("[A] breach of contract is a failure to perform a contractual duty when it is due"). Pack and Namdar ensured that those funds would never be transferred by prohibiting USAGM staff from communicating with OTF, by ordering the agency's CFO to "cease and desist" from

transferring the funds, and by appropriating the funds for the agency's own use. Rather than transferring the funds to OTF, as it had agreed, USAGM transferred them to itself.

### COUNT THREE
### *Breach of contract (duty of good faith and fair dealing)*

66.    "Implied in every contract is a duty of good faith and fair dealing that requires a party to refrain from interfering with another party's performance or from acting to destroy another party's reasonable expectations regarding the fruits of the contract." *Bell/Heery v. United States*, 739 F.3d 1324, 1334 (Fed. Cir. 2014).

67.    USAGM violated its duty of good faith and fair dealing under OTF's grant agreement by intentionally withholding and delaying disbursements without any justification; misrepresenting the status of the funds and the reasons for delay to OTF, Congress, and a federal court; invoking its rights under that agreement in bad faith to intentionally burden OTF with unreasonable and unnecessary demands; and relying on a manufactured pretext for a claim of breach—all in an effort to deprive OTF of its promised funding and to appropriate that funding for its own use. *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010) (the government violates the implied duty of good faith and fair dealing where its actions are "designed to … abrogate the government's obligations under the contract" and "reappropriate the benefits the other party expected to obtain").

68.    USAGM also violated the implied duty under its agreement to transfer funds from Radio Free Asia by prohibiting its staff from carrying out the agreement or even communicating with OTF, and by improperly and illegally appropriating those funds from Radio Free Asia—again, for the purpose of appropriating OTF's funding for itself.

69.    Plaintiff OTF demands judgment against the United States in the amount of $19,181,790.

**REQUEST FOR RELIEF**

The plaintiff requests that the Court award it:

a.   All funds due under the terms of its 2020 Grant Agreement with USAGM;

b.   All funds due under the terms of its agreement with USAGM to transfer funds currently held by Radio Free Asia;

c.   Pre-judgment and post-judgment interest;

d.   Reasonable costs, expenses, and attorney's fees under 42 U.S.C. § 2412; and

e.   All other appropriate relief.

August 20, 2020                                      Respectfully submitted,

                                                     */s/ Deepak Gupta*
                                                     DEEPAK GUPTA
                                                     GREGORY A. BECK
                                                     GUPTA WESSLER PLLC
                                                     1900 L Street, NW, Suite 312
                                                     Washington, DC 20036
                                                     Phone: (202) 888-1741
                                                     Fax: (202) 888-7792
                                                     *deepak@guptawessler.com*
                                                     *greg@guptawessler.com*

                                                     *Counsel for Plaintiff*