IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BREACH OF CONTRACT AND BID PROTEST)

OPEN TECHNOLOGY FUND,

*Plaintiff,*

v.

UNITED STATES OF AMERICA,

*Defendant.*

Case No. 20-cv-1047C

Senior Judge Wolski

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

DEEPAK GUPTA
GREGORY A. BECK
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

JOSHUA D. SCHNELL
CORDATIS LLP
1011 Arlington Boulevard, Suite 375
Arlington, VA 22209
(202) 342-2550
*jschnell@cordatislaw.com*

October 1, 2020

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Table of authorities.............................................................................................................ii

Introduction ..........................................................................................................................1

Statutory and factual background ......................................................................................3

    A.    OTF is founded to advance global internet freedom. ............................................3

    B.    USAGM agrees to outsource its internet-freedom program to OTF.....................4

    C.    USAGM agrees to provide OTF $20 million in congressionally appropriated funds during the 2020 fiscal year to administer the agency's internet-freedom program. ......................................................................................6

    D.    Immediately upon his confirmation as USAGM's CEO, Michael Pack withholds OTF's funding, attempts to purge its officers and directors, and initiates a campaign of harassment against the organization. ...............................7

            1.    The D.C. Circuit enjoins Pack's attempted takeover of OTF's leadership. .........................................................................................8

            2.    USAGM misrepresents and repeatedly flip-flops on its justification for withholding OTF's fourth-quarter funding. ........9

            3.    USAGM harasses OTF with increasingly unreasonable demands and bad-faith threats to hold OTF in breach of its grant agreement.........................................................................................11

            4.    Without reasonable explanation, USAGM decides to in-source the services OTF was providing under the "grant" agreement. ....................................................................................12

Argument..............................................................................................................................13

    I.    OTF is likely to succeed on its claim that USAGM unlawfully in-sourced its contract. .............................................................................................................14

        A.    This Court has jurisdiction to resolve OTF's in-sourcing claim. ...............14

        B.    USAGM unlawfully in-sourced the services that it contracted with OTF to provide...........................................................................................17

            1.    USAGM's in-sourcing decision is contrary to law. ...........17

            2.    USAGM's decision is also arbitrary and capricious. .........18

        C.    OTF is already suffering—and will continue to suffer—irreparable harm without an injunction.......................................................................22

        D.    The balance of the equities and the public interest weigh in favor of a preliminary injunction. ..........................................................................24

Conclusion ...........................................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Advanced Data Concepts, Inc. v. United States*,
216 F.3d 1054 (Fed. Cir. 2000) ................................................................... 20

*Alabama Aircraft Industries, Inc.–Birmingham v. United States*,
586 F.3d 1372 (Fed. Cir.2009) ................................................................... 19

*Banknote Corp. of America, Inc. v. United States*,
365 F.3d 1345 (Fed. Cir. 2004) ............................................................. 18, 19

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ................................................................... 24

*Chapman Law Firm Co. v. United States*,
67 Fed. Cl. 188 (2005) ............................................................................. 22

*CMS Contract Management Services v. Massachusetts Housing Financial Agency*,
745 F.3d 1379 (Fed. Cir. 2014) ........................................................ 14, 15, 16, 17

*CSE Construction Co. v. United States*,
58 Fed. Cl. 230 (2003) ............................................................................. 13

*Distributed Solutions, Inc. v. United States*,
539 F.3d 1340 (Fed. Cir. 2008) ................................................................. 14

*FMC Corp. v. United States*,
3 F.3d 424 (Fed. Cir. 1993) ...................................................................... 13

*Hospital Klean of Texas, Inc. v. United States*,
65 Fed. Cl. 618 (2005) ............................................................................. 23

*Hymas v. United States*,
810 F.3d 1312 (Fed. Cir. 2016) ............................................................. 14, 16

*Impresa Construzioni Geometry Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001) .............. 17

*Inforeliance Corp. v. United States*,
118 Fed. Cl. 744 (2014) ............................................................................ 21

*Lion Raisins, Inc. v. United States*,
51 Fed. Cl. 238 (Fed. Cl. 2001) ................................................................. 19

*Loomacres, Inc. v. United States*,
134 Fed. Cl. 779 (2017) ............................................................................ 14

*Maintenance Engineers v. United States,*
  749 F.2d 724 (Fed. Cir. 1984) ........................................................................14

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,*
  463 U.S. 29 (1983) ........................................................................................19

*Nken v. Holder,*
  556 U.S. 418 (2009) ......................................................................................24

*Open Technology Fund v. Pack,*
  2020 WL 3605935 (D.D.C. July 2, 2020) ....................................................8, 10

*Precision Images LLC v. United States,*
  79 Fed. Cl. 598 (2007) .................................................................................19

*Professional Service Industries, Inc. v. United States,*
  129 Fed. Cl. 190 (2016) ................................................................................17

*Santa Barbara Applied Research, Inc. v. United States,*
  98 Fed. Cl. 536 (2011) .................................................................................14

*Seattle Security Services, Inc. v. United States,*
  45 Fed. Cl. 560 (2000) .................................................................................23

*Starry Associates, Inc. v. United States,*
  125 Fed. Cl. 613 (2015) ................................................................................21

*Wackenhut Services, Inc. v. United States,*
  85 Fed. Cl. 273 (2008) .................................................................................25

## Statutes

22 U.S.C. § 6204(a)(16) ....................................................................................17

28 U.S.C. § 1491(b)(1) ......................................................................................14

28 U.S.C. § 1491(b)(4) ......................................................................................17

31 U.S.C. § 1535 ..............................................................................................18

31 U.S.C. § 6303 ..............................................................................................14

31 U.S.C. § 6304(2) ..........................................................................................15

31 U.S.C. § 6305(2) ..........................................................................................15

41 U.S.C. § 111 ................................................................................................14

5 U.S.C. § 706 .................................................................................................17

5 U.S.C. § 706(2)(A) ..................................................................................................... 9, 17

31 U.S.C.A. § 1535(a) ...................................................................................................... 18

**Legislative Materials and History**

Further Consolidated Appropriations Act, 2020,
    Pub. L. 116-94, Div. G (Dec. 20, 2019)........................................................................ 6

*Oversight of the U.S. Agency for Glob. Media and U.S. Int'l Broad. Efforts Before the H. Foreign Aff. Comm.*,
    115th Cong. (Sept. 24, 2020), https://perma.cc/US7D-P2BS (statement of Grant K. Turner,
    Former Chief Financial Officer and CEO, USAGM).................................................. 7

S. Rep. No. 97–180 (1981) ............................................................................................... 15

**Other Authorities**

@MarshaBlackburn, Twitter (Aug. 17, 2020 6:45 p.m.), https://bit.ly/2QbrYcB ..................... 8, 25

Avi Asher-Schapiro,
    *Firings at U.S. non-profit spark concern among digital rights activists*, Reuters (July 2, 2020),
    https://reut.rs/30FB8Dg............................................................................................. 4

Spencer Hsu,
    *Lawmakers warn new purge at U.S. Agency for Global Media undermines anti-censorship efforts*, Wash.
    Post, Aug. 14, 2020...................................................................................... *passim*

Spencer Hsu,
    *Congressional leaders urge Trump administration to release funds to U.S. internet freedom organization*, Wash.
    Post, August 3, 2020................................................................................................ 8

USAGM, *CEO Pack releases OPM report detailing long-standing USAGM security failures*, Aug. 4, 2020,
    https://bit.ly/2EOLKZk.......................................................................................... 21

USAGM, *CEO Pack revives USAGM's Office of Internet Freedom; agency funds internet firewall circumvention
    technologies* (Aug. 18, 2020), https://perma.cc/AL5L-RCLZ .................................... 13, 19

USAGM, *FY2020 Congressional Budget Justification*, https://perma.cc/PCT4-LZAD ..................... 19

Pranshu Verma and Edward Wong,
    *New Trump Appointee Puts Global Internet Freedom at Risk, Critics Say*, N.Y. Times, July 4, 2020 ........ 4

# INTRODUCTION

The day after taking the reins as head of the U.S. Agency for Global Media (USAGM), Michael Pack reneged on the agency's contract with Open Technology Fund (OTF)—an independent nonprofit organization devoted to countering repressive censorship and surveillance abroad by funding global internet-freedom projects. Simultaneously, Pack attempted a wholesale takeover of OTF's leadership, claiming previously unheard-of authority to unilaterally remove and replace its officers and directors. And when OTF pushed back against Pack's attempts to deprive it of its funding and leadership, his Senior Advisor, Mora Namdar, launched a campaign of harassment—repeatedly threatening OTF's funding unless it complied with a seemingly endless series of demands to immediately provide information, documents, interviews, and on-site inspections.

Those actions culminated on August 18, when Pack announced that USAGM would entirely take over OTF's funding of internet-freedom projects. That same day, Namdar notified OTF that the agency deemed it to be in "material breach" of its agreement with USAGM for failing to provide "*all* of the requested information" in response to her latest burdensome demand for 18 categories of information and documents. Without further notice or explanation to OTF, USAGM thus began the process of in-sourcing the services that it had contracted with OTF to provide.

The D.C. Circuit has already temporarily enjoined Pack's efforts to purge OTF's leadership and take over the organization against its will. *See* Order, *Open Technology Fund v. Pack*, No. 20-5195 (D.C. Cir. July 21, 2020). And the District of Columbia's Attorney General has filed an action to declare Pack's takeover attempt unlawful under D.C. corporate law. Those cases, however, cannot address USAGM's effort to in-source OTF's work or its continued withholding

of funding that it owes under its contract with OTF—issues that fall within this Court's Tucker Act jurisdiction.

In this motion, OTF seeks a preliminary injunction to prevent Pack's unlawful in-sourcing decision from causing severe, ongoing damage to the organization and its ability to accomplish its critical mission. The purpose of USAGM's agreement with OTF is for OTF to administer the agency's internet-freedom program and related grants—a service that directly benefits the government. The agreement is thus in essence a procurement contract, which—under the International Broadcasting Act and the Economy Act—USAGM may in-source only after determining that: (1) doing so would be in the best interest of the United States, and (2) it can perform the services as effectively, conveniently, and inexpensively as OTF. Rather than making those determinations, however, the agency based its in-sourcing decision on arbitrary and shifting justifications. As a result, the critical internet-freedom programs administered by OTF have ground to a virtual halt. Absent a preliminary injunction against USAGM's continued appropriation of OTF's funds, OTF may never recover.

According to Grant Turner—a longtime career civil servant who was USAGM's interim CEO and, until recently, its Chief Financial Officer—the agency's explanations for its actions are exactly what they appear to be: a "thin cover" for the "operational destruction" of OTF. Spencer Hsu, *Lawmakers warn new purge at U.S. Agency for Global Media undermines anti-censorship efforts*, Wash. Post, Aug. 14, 2020. That sentiment is shared by members of Congress across the political spectrum, who have warned that Pack is "openly, transparently trying to destroy an institution that has overwhelming, bipartisan support on Capitol Hill and that provides critical assistance to dissidents in countries like China." *Id.* Members of Congress on both sides of the aisle have emphasized that Pack's unlawful campaign to destroy OTF could hardly come at a worse time: Just as repressive regimes in Belarus and Hong Kong have begun amplifying their crackdowns on journalists and

protestors, Pack has pulled OTF from the fight. Senator Blackburn wrote that the situation in Belarus "demonstrates that digital censorship, surveillance and internet shutdowns are vital weapons in the authoritarian arsenal," and that the U.S. needs "every tool … to counter these tactics." OTF, she wrote, "must have access to funds." And Representative McCaul noted that OTF, until recently, "was making important progress to protect Hong Kongers" from censorship. But with "those efforts having been on hold for weeks now" because of USAGM's actions, and with China "further cracking down on freedoms in Hong Kong, the singular focus should be to restart OTF's critical programming." USAGM, he said, "needs to release OTF's funding today."

## STATUTORY AND FACTUAL BACKGROUND

### A.    OTF is founded to advance global internet freedom.

More than "two thirds of the world's population live in countries where internet access is restricted, and that number is growing." Turner Decl. Ex. E, at 2. Restrictions on internet freedom, including "advanced censorship and surveillance technologies," are not only "designed to stifle dissent, track minorities, and manipulate content online," but they also prevent journalists and audiences from "engag[ing] in and shar[ing] fact-based news online." *Id.* at 1–2. "Technologies that provide access to blocked content, and safe and secure methods to share content," are therefore "critically important to getting information to target audiences that would otherwise be siloed by government censorship." *Id.* at 2.

OTF was founded to advance this important mission—to support "pioneering research, development, and implementation of cutting-edge internet freedom technologies to respond to rapidly evolving censorship threats around the world." *Id.* at 3. The organization supports the research, development, and implementation of technologies that provide secure, uncensored internet access in repressive regimes around the world. *See id* ¶¶ 3–4. These technologies are designed to stay one step ahead of government censors, countering attempts by authoritarian

governments to control the internet and restrict freedom of information and association. *See id.* OTF also supports projects to protect journalists, sources, and audiences from repressive surveillance and digital attacks, ensuring that they can safely create and consume objective, unbiased reporting. *See id.* ¶ 4.

"In less than a decade," OTF "has quietly become integral to the world's repressed communities." Pranshu Verma and Edward Wong, *New Trump Appointee Puts Global Internet Freedom at Risk, Critics Say*, N.Y. Times, July 4, 2020. The organization "has been responsible for helping fund some of the most widely used digital rights tools in the world, including the encrypted messaging app Signal and the anonymous internet browser Tor"—software that journalists, political activists, and ordinary citizens use to evade government censorship and surveillance. Avi Asher-Schapiro, *Firings at U.S. non-profit spark concern among digital rights activists*, Reuters (July 2, 2020), https://reut.rs/30FB8Dg. "Today, over two billion people globally use OTF-supported technology daily" to freely and safely access the uncensored internet despite authoritarian government controls, "and more than two-thirds of all mobile users have OTF-incubated technology on their device." Turner Decl. Ex. E, at 3.

**B.    USAGM agrees to outsource its internet-freedom program to OTF.**

Consistent with its mission to "inform, engage, and connect people around the world in support of freedom and democracy," USAGM has since 2002 "been involved in activities to circumvent internet censorship by foreign governments in order to distribute news content and better provide a forum for free expression in closed countries." *Id.* at 3. In particular, the agency has historically supported development of "tools and techniques necessary" for its international broadcasting work, "to report and disseminate content in information-restrictive markets," and for "audiences to receive and share content safely online." *Id.* at 1. In 2016, USAGM created its Office

of Internet Freedom "to conduct governance and oversight of USAGM internet freedom activities." *Id.* at 3.

OTF began in 2012 as an internet-freedom project within Radio Free Asia, one of several organizations funded and overseen by USAGM as part of its international-broadcasting program. *See id.* ¶ 2. In September 2019, OTF was incorporated as an independent 501(c)(3) nonprofit corporation under District of Columbia law. *Id.* That same month, USAGM entered a "grant agreement" with OTF, "in furtherance of [USAGM's] mission and as authorized by the International Broadcasting Act," to "advance Internet Freedom overseas through the research, development, and implementation of technologies that enable secure and unrestricted access to news and information on the Internet." *Id.* Ex. F, at 2. USAGM announced that its own Office of Internet Freedom would "no longer directly implement[] or manage[] internet freedom projects or contracts but rather will manage projects that assess particular threats and/or OTF effectiveness in appropriate areas to inform USAGM strategy and oversight." *Id.* Ex. E, at 3. Instead, OTF would "implement the internet freedom program in full, including support for all USAGM news networks." *Id.* USAGM explained that, "[a]s an independent organization, OTF is uniquely situated to responsibly and accountably support the U.S. government's internet freedom efforts at the pace and with the flexibility needed to empower innovation and compete against adversaries to a free and open internet." *Id.* at 4. "These additional resources," it wrote "will enable OTF to increase long-term support for core internet freedom tools, expand funding for next generation solutions, and provide direct technical and digital security support to USAGM networks." *Id.*

Under its agreement with USAGM, OTF distributes agency funding to the internet-freedom community via contracts. *Id.* ¶ 5. OTF planned to award nearly $11 million in funds to projects in the fourth fiscal quarter of 2020. *Id.* ¶ 19.

**C.    USAGM agrees to provide OTF $20 million in congressionally appropriated funds during the 2020 fiscal year to administer the agency's internet-freedom program.**

In December 2019, Congress appropriated USAGM's funding for 2020, providing that "not less than $20,000,000 shall be for Internet freedom programs." Further Consolidated Appropriations Act, 2020, Pub. L. 116-94, Div. G, tit. I (Dec. 20, 2019). Congress required USAGM to set forth how it would use those appropriated funds in an "Internet Freedom FY 2020 Spend Plan," in which the agency would allocate its internet-freedom appropriations for the 2020 fiscal year and notify Congress of those allocations. *Id.*, Div. G, tit. VII, § 7050(c). USAGM's spend plan informed Congress that the agency would provide $19,825,000 in appropriated internet-freedom funds "to the newly established Open Technology Fund corporation." Turner Decl. Ex. E, at 2. The spend plan also provided that "any unobligated and obligated" OTF funding still held at Radio Free Asia "will be transferred to OTF." *Id.*

In January 2020, OTF and USAGM executed a "grant agreement" for those funds, providing OTF with an initial $3,688,320 in funding during the second fiscal quarter. *Id.* ¶ 11 & Ex. F. Importantly, the agreement provides that OTF "may not engage in fundraising from other sources" without USAGM's authorization. *Id.* Ex. F, at 13. In April 2020, OTF and USAGM executed an amendment to the grant agreement that provided OTF an additional $5,649,552 in funding under OTF's third-quarter financial plan. *Id.* ¶ 13 & Ex. G. In June 2020, USAGM emailed OTF a second amended grant agreement covering the fourth fiscal quarter. *Id.* ¶ 14 & Ex. H. The agreement awarded OTF $11,047,129 in funding for the rest of the 2020 fiscal year. *See id.* OTF accepted the terms of the grant agreement by signing and returning it to USAGM the same day— one week after Pack began as USAGM's new CEO. *See id.* ¶ 14.

**D.    Immediately upon his confirmation as USAGM's CEO, Michael Pack withholds OTF's funding, attempts to purge its officers and directors, and initiates a campaign of harassment against the organization.**

On June 8, 2020, Michael Pack was sworn in as USAGM's CEO. "Within days of Mr. Pack's arrival, he declared war on OTF." *Oversight of the U.S. Agency for Glob. Media and U.S. Int'l Broad. Efforts Before the H. Foreign Aff. Comm.*, 115th Cong. (Sept. 24, 2020), https://perma.cc/US7D-P2BS (statement of Grant K. Turner, Former Chief Financial Officer and CEO, USAGM).

Pack began by sending an email to OTF's officers stating that, "[e]ffective immediately" there was a "freeze" on use of USAGM grant funds. Turner Decl. ¶ 8 & Ex. A. Pack significantly escalated his assault the following week, announcing that, "[e]ffective immediately," he was "removing" OTF's president and CEO and replacing the independent nonprofit organization's board of directors with his own appointees. *Id.* ¶ 10 & Ex. B. And as Pack fought to deprive OTF of its leadership and only source of funding, his Senior Advisor, Mora Namdar, began a campaign of harassment, subjecting OTF to an escalating series of burdensome and unnecessary requests for information, interviews, and inspections—culminating in a pretextual claim that OTF had breached its grant agreement by failing to supply all the information she demanded. *Id.* ¶ 18 & Exs. J–N.

Pack's assault on OTF's independence and funding has provoked broad, bipartisan condemnation. Representative Michael McCaul, the ranking Republican on the House committee that oversees USAGM, said that Pack's actions have brought OTF's "critical programming"—"a lifeline for people living under oppressive regimes"—to the "brink of collapse." Hsu, *Congressional leaders urge Trump administration to release funds*, *supra*. Representative Tom Malinowski, a Democrat on the committee, warned that Pack is "openly, transparently trying to destroy an institution that has overwhelming, bipartisan support on Capitol Hill and that provides critical assistance to dissidents in countries like China." *Id.* Reactions in the Senate were similar. Senator Robert

Menendez, a Democrat, called the funding hold "a gift to repressive governments in China, Iran and elsewhere," Spencer Hsu, *Congressional leaders urge Trump administration to release funds to U.S. internet freedom organization*, Wash. Post, August 3, 2020, while Senator Marsha Blackburn, a Republican, said that "OTF must have access to funds to continue its vital work." @MarshaBlackburn, Twitter (Aug. 17, 2020 6:45 p.m.), https://bit.ly/2QbrYcB.

### 1.    The D.C. Circuit enjoins Pack's attempted takeover of OTF's leadership.

OTF and four of its directors sued Pack in the U.S. District Court for the District of Columbia, moving to enjoin Pack's efforts to take over the organization by removing and replacing its leadership. The district court denied OTF's requested injunction. *See Open Tech. Fund v. Pack*, 2020 WL 3605935, at *1 (D.D.C. July 2, 2020). Although the court acknowledged that the "[w]idespread misgivings about Pack's actions raise troubling concerns," it concluded that OTF's own bylaws, read in conjunction with a single, ambiguous sentence in its grant agreement, give Pack unilateral authority to purge OTF's leadership and take over the organization against its will. *Id.* at *2, 9–11.

On appeal, the D.C. Circuit disagreed, granting OTF a rare injunction pending appeal of the district court's order. *See* Order, *Open Technology Fund v. Pack*, No. 20-5195 (D.C. Cir. July 21, 2020). Nothing in OTF's bylaws, the court concluded, gives USAGM or its CEO "control of OTF's board or operations." *Id.* at 1. And Pack's actions threatened OTF with irreparable harm by putting the organization's partnerships at risk and causing those who depend on its technology "to fear for their safety." *Id.* at 2. Accordingly, the court enjoined the agency "from taking any action to remove or replace any officers or directors of [OTF] during the pendency" of the appeal. *Id.*

**2.    USAGM misrepresents and repeatedly flip-flops on its justification for withholding OTF's fourth-quarter funding.**

Since Pack took office in June, USAGM has withheld almost all the funding due under its agreement with OTF for the fourth fiscal quarter of 2020. When challenged, the agency has repeatedly changed its story and misrepresented the status of that funding.

**Pack freezes OTF's use of USAGM funds.** The day after taking office as USAGM's CEO, Pack informed OTF's officers that, "[e]ffective immediately" there was a "freeze" on any use of grant funds for, among other things, "obligations for new contracts or extensions of any contract." Turner Decl. ¶ 8 & Ex. A. Because OTF operates by distributing money to the internet-freedom community via contracts with organizations working toward internet freedom, the freeze immediately halted its ability to perform its mission and the services required under the agreement. *Id.* ¶ 5.

**When challenged, USAGM next claims that there is "no freeze," and that OTF's $11 million in fourth-quarter funding is unaffected.** In its case challenging Pack's attempted takeover of its leadership, OTF also initially sought an injunction against Pack's freeze, arguing that the action was arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). USAGM responded by repeatedly changing its story and misrepresenting the status of OTF's 2020 funding.

The day after OTF moved for an injunction against the freeze, USAGM reversed course. The agency notified OTF in an email that there was actually "no freeze in funding," and that the organization "may continue taking" all the actions that the agency previously put on hold. Notice of Supp. Auth., *Open Technology Fund v. Pack*, No. 20-1710 (D.D.C. June 26, 2020). Citing that email, government counsel told the U.S. District Court that "the approximately $11 million for the fourth

quarter of FY 2020 that USAGM had not yet distributed to OTF was eligible to be disbursed." Def.'s Resp., *Open Technology Fund v. Pack*, No. 20-1710 (D.D.C. June 30, 2020).

**The agency unilaterally "amends" OTF's fourth-quarter grant agreement to provide just one month of funding.** The following business day, USAGM changed course again. The agency emailed OTF a new version of its final 2020 grant amendment that, without explanation, purported to reduce the disbursement to which OTF was entitled by 85%, from $11 million to just $1.6 million. Turner Decl. ¶ 15. In response to OTF's complaint about the missing $9.4 million in funding, agency CFO Grant Turner submitted a declaration stating that "[a]gency leadership" had decided that funds "may only be disbursed on a monthly basis." Def.'s Resp. Attach. 1, *Open Technology Fund v. Pack*, No. 20-1710 (D.D.C. June 30, 2020). The $1.6 million disbursement, he wrote, was intended to cover just OTF's July expenses, and any additional "funds not yet disbursed for the fourth quarter" would "be disbursed via subsequent amendments to the grant agreement." *Id.* Relying on USAGM's representation, the U.S. District Court denied OTF's motion for an injunction against the agency's funding freeze, concluding that the "legality of disbursing funds to plaintiffs on a monthly basis is not within the scope of plaintiffs' complaint." *Open Tech. Fund*, 2020 WL 3605935, at *5 n.7.

**The agency reneges even on its promise of monthly funding.** USAGM's promise of monthly disbursements, too, proved to be false. July came and went without any payments to OTF. Not until August 19, after weeks of intense bipartisan pressure and demands for proof of the agency's claim that it already disbursed the funds, did USAGM finally transfer the promised $1.6 million in July funding. Turner Decl. ¶ 16. And that was the only "monthly" payment that OTF received. The fourth fiscal quarter is now over, and no additional payments have arrived. *See id.*

### 3. USAGM harasses OTF with increasingly unreasonable demands and bad-faith threats to hold OTF in breach of its grant agreement.

As Pack worked to take over OTF's leadership and to deprive it of its funding, his Senior Advisor, Mora Namdar, began a parallel campaign of harassment—repeatedly threatening OTF's grant contracts unless the organization complied with a series of unreasonable and burdensome demands.

Namdar has insisted on OTF's compliance with broad and unnecessary requests for information under unreasonable timeframes. In mid-August, for example, she demanded that OTF provide answers and documents in response to 18 categories of information—including sensitive information that OTF's grant agreement gives it no right to request—within 48 hours, or risk being found in breach of the agreement. Turner Decl. Ex. K. Even though OTF responded immediately, the agency accused it in public of "refus[ing] to cooperate with reasonable requests for security-related information and oversight of taxpayer funds." Spencer Hsu, *Lawmakers warn new purge at U.S. Agency for Global Media undermines anti-censorship efforts*, Wash. Post, Aug. 14, 2020.

Namdar has also made unexplained and unjustifiable demands for on-site "inspections" of OTF's offices, even while those offices are closed during the pandemic. *See id.* Ex. J. In one case, she threatened OTF's funding unless it permitted her to physically "inspect" its closed office the next day. *See id.* Namdar has made similar unreasonable demands to interview OTF's staff. During her "inspection" of OTF's offices, Namdar (an attorney licensed in Texas and the District of Columbia) forced OTF's Vice President for Programs (a nonlawyer) to answer a series of questions, without OTF's counsel present, about the subject matter of the organization's ongoing litigation against the agency. *See id.* Ex. O. She also asked about the citizenship status of OTF employees and contractors, some of whom work to further free expression in repressive regimes and whose personal safety could have been jeopardized. *See id.* And she has repeatedly demanded, again under

threat of finding OTF in breach, contact information for "all employees, contractors, interns, and anyone else receiving a stipend or salary"—all for the acknowledged purpose of conducting more such interviews outside of OTF's ability to supervise them. *Id*. Ex. K.

On August 18, 2020, Namdar notified OTF that its seventeen-page letter and attachments responding, within seven days, to her latest raft of questions had "not provided the necessary requested information in the timeframe … set out by USAGM" and that OTF "has, therefore, failed to comply with a material term of the grant agreement." *Id.* Ex. N. Ignoring all of OTF's answers, objections, questions, and suggestions for compromise, *see id.* Ex. M, and without identifying the responses and objections she deemed insufficient, Namdar wrote that OTF has ten business days under the grant agreement "to bring itself into compliance by providing *all* of the requested information." *Id.* Ex. N (emphasis added).

In response to the claimed breach, OTF provided Namdar with 165 pages of supplemental responses and proposed a schedule under which it would provide additional documents for review by USAGM, after redaction of sensitive information. *Id.* After initially falsely claiming not to have received the documents, Namdar summarily dismissed them as inadequate. *Id.* And without responding to OTF's proposed schedule for further releases, she demanded a further response in less than 24 hours. Otherwise, she wrote, USAGM would "have no choice but to conclude that OTF refuses to comply with the grant agreement's terms and will take appropriate action at that time." *Id.*

### 4.    Without reasonable explanation, USAGM decides to in-source the services OTF was providing under the "grant" agreement.

On August 18, Pack announced that USAGM's Office of Internet Freedom would take over future OTF funding of internet-freedom projects, and that it had already funded two such projects previously funded by OTF. USAGM, *CEO Pack revives USAGM's Office of Internet Freedom; agency funds*

*internet firewall circumvention technologies* (Aug. 18, 2020), https://perma.cc/AL5L-RCLZ. USAGM gave OTF no explanation for its decision to in-source the services it had agreed OTF would provide. Instead, it made a public statement accusing OTF's "leadership," without evidence, of "attempt[ing] to line its own pockets with U.S. taxpayer dollars while insisting upon no oversight." Daniel Lippman, *U.S. global media agency demanded outlets return money for internet freedom projects*, Politico, Aug. 13, 2020. USAGM's statement claimed that the agency was "capable of providing the same type of funding" as OTF but "works more efficiently." *Id.* But the agency provided no evidence or explanation to support that claim.

On September 11, USAGM issued a pre-solicitation notice for a forthcoming request for proposals. Turner Decl. ¶ 19 & Ex. P. The agency, it said, would be considering proposals for services related to "circumvention client software," "clientless web proxies," and "data privacy and security tools"—areas that "duplicate the focus areas of OTF's own Internet Freedom Fund." *Id.* ¶ 19.

## ARGUMENT

This Court considers four factors in deciding whether to issue a preliminary injunction on a plaintiff's bid-protest claim: "(1) the likelihood of plaintiff's success on the merits of its complaint; (2) whether plaintiff will suffer irreparable harm if the procurement is not enjoined; (3) whether the balance of hardships tips in the plaintiff's favor, and (4) whether a preliminary injunction will be contrary to the public interest." *CSE Constr. Co. v. United States*, 58 Fed. Cl. 230, 261 (2003). "No one factor, taken individually, is necessarily dispositive. … [T]he weakness of the showing regarding one factor may be overborne by the strength of [] others." *FMC Corp. v. U.S.*, 3 F.3d 424, 427 (Fed. Cir. 1993). Every one of the factors is satisfied here.

## I.    OTF is likely to succeed on its claim that USAGM unlawfully in-sourced its contract.

### A.    This Court has jurisdiction to resolve OTF's in-sourcing claim.

As a preliminary matter, this Court has jurisdiction over OTF's claim that USAGM unlawfully in-sourced its contract. The Tucker Act extends the Court's bid-protest jurisdiction to any "action by an interested party objecting to … any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1). The phrase "in connection with a procurement" is "very sweeping in scope," covering "any stage of the federal contracting acquisition process" from "the process for determining a need for property or services" to "contract completion and closeout." *Distributed Sols., Inc. v. U.S.*, 539 F.3d 1340, 1345–46 (Fed. Cir. 2008); *see* 41 U.S.C. § 111. This Court thus has jurisdiction to review an agency's decisions both to terminate a procurement contract and to in-source the formerly procured services. *See Loomacres, Inc. v. United States*, 134 Fed. Cl. 779, 781 n.4 (2017); *see also Santa Barbara Applied Rsch., Inc. v. United States,* 98 Fed. Cl. 536, 537–41, 543 (2011) (holding that the Court had jurisdiction over a challenge to an agency decision to in-source services previously provided by the protestor).

To fall under that bid-protest jurisdiction, the contract at issue must be a "procurement contract." *Hymas v. U.S.*, 810 F.3d 1312, 1317 (Fed. Cir. 2016). Although the contract at issue here is labeled as a "grant" agreement, "[d]etermination of the type of contract is a matter of law—not controlled by a label in the contract." *Maint. Eng'rs v. U.S.*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984); *see CMS Cont. Mgmt. Servs. v. Mass. Hous. Fin. Agency*, 745 F.3d 1379, 1385 (Fed. Cir. 2014). Rather, the nature of the contract is a question of law that turns on "the principal purpose of the relationship." *Hymas*, 810 F.3d at 1327; *see CMS Cont. Mgmt. Servs.*, 745 F.3d at 1385. An agreement is a procurement contract if its principal purpose "is to acquire … property or services for the direct benefit or use of the United States government." 31 U.S.C. § 6303; *see CMS Cont. Mgmt. Servs.*, 745 F.3d at 1381. In

contrast, an agreement is a grant or cooperative agreement if its principal purpose is to "transfer a thing of value" to "carry out a public purpose of support or stimulation." *See* 31 U.S.C. §§ 6304(2), 6305(2); *see CMS Contract Mgmt. Servs.*, 745 F.3d at 1381–86.

USAGM's "grant agreement" with OTF bears all the hallmarks of a procurement contract. The principal purpose of the agreement is to acquire OTF's services in administering USAGM's internet-freedom program and related grants—services that directly benefit the government. As the agency has explained: "As an independent organization, OTF is uniquely situated to responsibly and accountably support the U.S. government's internet freedom efforts at the pace and with the flexibility needed to empower innovation and compete against adversaries to a free and open internet." Turner Decl. Ex. E, at 4. Indeed, the agency's pre-solicitation notice—issued in anticipation of in-sourcing OTF's work—characterizes the internet-freedom contracts previously administered by OTF as "procurements" for "services" to "provide the agency with access to innovative and improved technologies and capabilities." *Id.* Ex. P.

Although the agreement transfers funds to OTF, that is not—as in a grant agreement—a "transfer [of] a thing of value" for "support or stimulation." The agreement binds OTF to a financial plan under which it must spend the vast majority of those funds on internet-freedom programs that directly benefit USAGM, including through contracts with third parties to develop privacy and firewall-circumvention tools. At most, the agreement thus "create[s] an intermediary relationship" under which OTF is "'not receiving assistance from the federal agency'" but "'merely used to provide a service to another entity which is eligible for assistance.'" *CMS Contract Mgmt. Servs.*, 745 F.3d at 1386 (quoting S. Rep. No. 97–180, at 5 (1981), 1982 U.S.C.C.A.N. 3, 5). And the smaller portion of funds allocated by the agreement to OTF's staffing and other costs does "not constitute a 'thing of value' either." *Id.* "While money can be a 'thing of value' under 31 U.S.C. § 6305 in certain circumstances," the funds here are not designed to support OTF but "only to cover

the operating expenses of administering" USAGM's internet-freedom funds on the agency's behalf. *Id.* "In the case of an intermediary relationship, the proper instrument is a procurement contract." *Id.*

That USAGM performs the contracted-for services itself in the absence of its agreement with OTF is further evidence that the agreement is a procurement contract. *See Hymas*, 810 F.3d at 1332 (Stoll, J., dissenting). Before contracting with OTF, USAGM's own Office of Internet Freedom performed those services. *See* Turner Decl. Ex. E, at 3. That office, however, "no longer directly implements or manages internet freedom projects or contracts." *Id.* Instead, USAGM agreed that OTF, "a non-federal entity, will implement the internet freedom program in full, including support for all USAGM news networks." *Id.* USAGM, in other words, outsourced the work of its Office of Internet Freedom to OTF. And its in-sourcing decision, conversely, returned that work from OTF to the agency. As USAGM explained in its public statement on the decision, the agency will now be "providing the same type of funding" previously provided by OTF. Lippman, *U.S. global media agency demanded outlets return money*.

In these circumstances, the conclusion that the contract at issue is a procurement contract is required by *CMS Contract Management Services*, 745 F.3d 1379. There, Congress had authorized HUD in certain cases to pay private landlords to subsidize the cost of rent. *Id.* at 1381. HUD had traditionally contracted with the landlords to pay them the subsidies directly. *Id.* at 1381–82. Later, however, HUD outsourced the granting and administration of the subsidies to local public-housing agencies, allowing those agencies to contract with the landlords and pay the subsidies with HUD-provided funds. *Id.* Although "HUD expressly characterized the [agreements] as cooperative agreements" rather than procurement contracts, the Federal Circuit rejected that characterization. *Id.* at 1383. The agreements were actually procurement contracts, it held, because their "primary

purpose" was "to procure the services" of the public-housing agencies to "provide assistance to HUD with the oversight and monitoring of Section 8 housing assistance." *Id.* at 1385.

Like HUD in *CMS Contract Management Services*, USAGM has engaged an intermediary to further the agency's mission by distributing funds to third parties. And, also like HUD, USAGM otherwise would have undertaken the contracted-for service itself. This Court thus has jurisdiction to review the agency's decisions related to the contract.

### B. USAGM unlawfully in-sourced the services that it contracted with OTF to provide.

This Court "reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706." *Prof'l Serv. Indus., Inc. v. U.S*, 129 Fed. Cl. 190, 202 (2016); *see* 28 U.S.C. § 1491(b)(4). To "successfully challenge an agency's procurement decision" under that standard, "a plaintiff must show that the agency's decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). A "bid award may be set aside," in other words, "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). USAGM's decision to in-source OTF's contract suffers from both flaws.

#### 1. USAGM's in-sourcing decision is contrary to law.

The International Broadcasting Act authorizes USAGM "[t]o procure, pursuant to section 1535 of title 31 (commonly known as the 'Economy Act'), such goods and services from other departments or agencies for the Chief Executive Officer and the International Broadcasting Bureau as the Chief Executive Officer determines are appropriate." 22 U.S.C. § 6204(a)(16). Under the plain language of that provision, a decision by USAGM to procure services from one of its

departments—such as its Office of Internet Freedom—must be made "pursuant to" the requirements of the Economy Act, 31 U.S.C. § 1535. And the Economy Act, in turn, provides that an agency head "may place an order with a major organizational unit within the same agency" only if (1) "the head of the ordering agency … decides the order is in the best interest of the United States Government"; (2) "the agency or unit to fill the order is able to provide … the ordered goods or services"; and (3) "the head of the agency decides ordered goods or services cannot be provided by contract as conveniently or cheaply by a commercial enterprise." 31 U.S.C.A. § 1535(a). Taken together, the International Broadcasting Act and the Economy Act make clear that USAGM can only in-source the services provided by OTF if it establishes that doing so is in best interests of the United States, and that its Office of Internet Freedom is capable of providing the same services as conveniently and inexpensively as OTF.

As far as OTF is aware, USAGM has not made the required findings. The closest it has come is in its public statement that the agency is "capable of providing the same type of funding" as OTF but "works more efficiently." Lippman, *U.S. global media agency demanded outlets return money*, *supra*. But USAGM's assertion is not backed up by evidence or reasoning. Rather, it appears based on the unsupported claim that OTF's "leadership" has "attempt[ed] to line its own pockets with U.S. taxpayer dollars while insisting upon no oversight." *Id.* As explained below, that claim is false, and does not provide "a coherent and reasonable explanation" sufficient to justify the agency's decision. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

## 2.    USAGM's decision is also arbitrary and capricious.

A procurement action is arbitrary and capricious  if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the action] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.–Birmingham v. United*

*States*, 586 F.3d 1372, 1375 (Fed. Cir.2009) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although review is deferential, the Court "must still conduct a careful review to satisfy itself that the agency's decision is founded on a rational basis.' *Precision Images LLC v. U.S.*, 79 Fed. Cl. 598, 615 (2007); *see Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238 (Fed. Cl. 2001) (holding that a federal agency's poorly reasoned decision to suspend a contract was arbitrary and capricious). The "test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Banknote Corp. of Am.*, 365 F.3d at 1351.

Earlier this year, USAGM recognized that OTF has the "expertise necessary" to implement its internet-freedom mission, and has been "demonstrably successful and an industry leader in identifying, soliciting, vetting, and fostering projects." USAGM, *FY2020 Congressional Budget Justification*, https://perma.cc/PCT4-LZAD. The agency's decision to cut off OTF's funding, however, forced the organization to issue stop-work orders to 49 of its 60 active contracts—80% of its current projects—largely bringing to a halt the services it was providing to support USAGM's important internet-freedom mission. Turner Decl. ¶ 20. "As a result, projects like those providing surveillance circumvention and secure communication tools to the citizens of Hong Kong and Belarus, and anti-censorship solutions to Iranians and Chinese citizens, are no longer receiving funds from OTF and no longer furthering the United States' internet freedom efforts in repressive countries." *Id.* And OTF has also been forced to cancel its plan to award nearly $11 million in additional project funding in the fourth fiscal quarter. *Id.* ¶ 21.

In OTF's place, USAGM's Office of Internet Freedom has resumed funding of just two projects previously funded by OTF. USAGM, *CEO Pack revives USAGM's Office of Internet Freedom*. And although it "anticipates that new task order solicitations will be issued during fiscal year 2021," it has said that those solicitations "may occur at any time of the year or may not occur at all." Turner Decl. Ex. N. The upshot is that USAGM has failed to spend the money that Congress

appropriated to it for internet-freedom programs in the 2020 fiscal year, bringing funding of numerous vital internet-freedom projects to an abrupt halt. Without the infrastructure in place to fill the funding gap that it created, USAGM could not rationally have concluded that it would be capable of providing the same services as conveniently and inexpensively as OTF, or that doing so would be in the best interests of the United States.

Rather than "evincing rational reasoning and consideration of relevant factors," the agency's decision to in-source OTF's services was based on bad faith and bias. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Since Pack took office, he has repeatedly sought to deny OTF its promised funding based on a series of shifting justifications. The day after assuming his duties as CEO, Pack ordered a temporary, but indefinite, "freeze" on OTF's use of grant funds. Turner Decl. ¶ 8. After OTF challenged the freeze's legality in court, however, USAGM "clarif[ed]" that there was "no freeze." *Id.* A few days after that, USAGM sent OTF a unilateral "amendment" to its grant agreement, in which the agency agreed to provide OTF with "monthly" funding. *Id.* ¶ 15. But although USAGM represented to the court that it would disburse $1.6 million in funding for July, and told Congress that it had already done so, those claims proved to be false: OTF did not receive payment until August 19—the only "monthly" payment for the fourth fiscal quarter. *Id.* ¶ 16. And finally, the agency publicly justified its decision to in-source OTF's services with false accusations against OTF—claiming without support that OTF's "leadership" had "attempt[ed] to line its own pockets with U.S. taxpayer dollars while insisting upon no oversight." Lippman, *U.S. global media agency demanded outlets return money*, *supra*. The agency's changing and inconsistent explanations for denying OTF's funding, and its inexplicably hostile

accusations against OTF's leadership, are "hard to explain absent bad faith." *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 747 (2014).[1]

Also hard to explain are the agency's repeated and intrusive demands for information, documents, interviews, and on-site inspections—demands that appear calculated to create a pretextual claim of breach. *See* Turner Decl. ¶ 18 & Exs. J–O. Although OTF's grant agreement requires it to provide USAGM with certain information when "reasonably requested" by the agency, the agreement gives USAGM no right to most of the information it has requested— including private and sensitive information about OTF's employees and contractors. *See id.* Ex. K. Nor does USAGM have any legitimate need for the information. The only justification it has offered is that USAGM needs the information to address "security" concerns in response to an OPM report critical of the agency's security practices. *Id.* But USAGM has never notified OTF of any problems with OTF's security. And the security issues cited in the OPM report have nothing to do with OTF—which the report never mentions. *See CEO Pack releases OPM report detailing long-standing USAGM security failures*, Aug. 4, 2020, https://bit.ly/2EOLKZk. Rather, the report documents problems at USAGM itself—problems that led OPM to withdraw the agency's authorization to conduct its own background checks. *See id.* Far from justifying USAGM's demand for unrestricted access to OTF's files and employees, the report instead validates OTF's concerns about entrusting USAGM with sensitive information.

---

[1] This Court may consider this history in reviewing the agency's decision. Although review "in a bid protest is usually restricted to the materials in the administrative record, … the administrative record may be insufficient and supplementation warranted when it is missing relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith." *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 747 (2014). "[R]are indeed would be the occasions when evidence of bad faith will be placed in an administrative record." *Starry Associates, Inc. v. United States*, 125 Fed. Cl. 613, 621–22 (2015). This Court has thus "traditionally considered extra-record evidence in assessing alleged bias or bad faith." *Id.*

And USAGM's demands for extensive disclosures within just a few business days are far from "reasonable," especially during a time when USAGM's decision to deprive OTF of its funding has left it with severely limited resources with which to respond. Although OTF made its best effort to comply under difficult circumstances, the agency summarily dismissed those efforts as insufficient on the ground that OTF had not provided "*all* of the requested information"— ignoring OTF's objections, questions, and suggestions for compromise, and without identifying the responses and objections deemed insufficient. And it publicly accused OTF of "refus[ing] to cooperate with reasonable requests for security-related information and oversight of taxpayer funds." Spencer Hsu, *Lawmakers warn new purge at U.S. Agency for Global Media undermines anti-censorship efforts*, Wash. Post, Aug. 14, 2020. That conduct does not evince good faith. The real reason for the burdensome demands is transparent: to force OTF into an appearance of noncompliance as a pretext for claiming a breach of the grant agreement.

### C. OTF is already suffering—and will continue to suffer—irreparable harm without an injunction.

USAGM's attempt to in-source the services OTF provides has already caused irreparable harm—effectively preventing OTF from acting in furtherance of its mission. Absent a preliminary injunction, this harm will be greatly magnified—"imperil[ing] virtually every aspect of Open Technology Fund's operations and existence." Turner Decl. ¶ 31.

To begin with, economic loss alone "can rise to the level of irreparable injury" in government-contract cases because the loss may "not be compensable with money damages." *Chapman L. Firm Co. v. United States*, 67 Fed. Cl. 188, 193 (2005). Here, if USAGM is allowed to proceed with its plan to spend the funds appropriated by Congress and allocated to OTF, those funds could not easily be recovered. And OTF would also "suffer irreparable harm if an injunction is not granted because the only other available relief—the potential for recovery of bid preparation

costs—would not compensate it for its loss of valuable business on this contract." *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000). "This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm." *Id.*; *see also Hospital Klean of Texas, Inc. v. U.S.*, 65 Fed. Cl. 618, 624 (2005).

OTF's injury, however, goes far beyond economic loss. OTF operates by "distribut[ing] money to the internet-freedom community via contracts." *Id.* USAGM has been OTF's sole source of funding for those contracts since the project's founding in 2012, and the grant agreement provides that OTF "may not engage in fundraising from other sources" without USAGM's authorization. Turner Decl. ¶ 6; Grant Agreement at 13. By depriving OTF of its sole source of funding, USAGM forced the organization not only to cancel $11 million in planned funding, but to issue stop-work orders on 80% of its existing contracts too. *Id.* ¶¶ 20–21.

USAGM's actions also prevent OTF from performing the ordinary functions of a nonprofit. OTF, for example, has been "prevented from securing long term office space" or "preparing a realistic long term operational budget." *Id.* ¶ 27. Those actions have also "irreparably harmed OTF by preventing [it] from hiring key personnel" and put it at "imminent risk of losing its current expert staff." *Id.* ¶¶ 25–26. "OTF's success is heavily dependent on [its] current team, who are not only technical and regional experts, but are also deeply connected to, and trusted by, the communities [OTF] serve[s]." *Id.* ¶ 26. Losing that team "would undermine the trust OTF has built in the community, causing immediate and irreparable harm to OTF's ability to fulfill its mission." *Id.*

That harm "is not only financial, but reputational." *Id.* ¶ 29. "OTF has spent nearly ten years building a reputation as a reliable source of internet freedom funding, contributing to the growth and sustainability of this important field." *Id.* But "[c]anceling funding rounds and issuing stop work orders on existing contracts has sewn doubt among technologists and human rights

defenders in the field about OTF's ability to be a reliable and sustainable source of funding." *Id.* "That kind of reputational harm is difficult if not impossible to recover from, especially among a field of technologists and human rights defenders who work in volatile environments and are therefore justifiably skeptical about the sustainability of funding." *Id.*

In short, USAGM's actions "imperil virtually every aspect of Open Technology Fund's operations and existence," leaving it "unable to execute [its] mission" or "perform essential day-to-day corporate functions," and threatening its reputation and goodwill. *Id.* ¶ 31. All these harms are "beyond remediation" and therefore constitute irreparable injury justifying a preliminary injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

### D. The balance of the equities and the public interest weigh in favor of a preliminary injunction.

Finally, the balance of the equities and the public interest also favor an injunction. "These factors merge when the Government is the opposing party," as here. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As explained, OTF is already suffering irreparable harm as a result of the agency's challenged actions, and that harm will continue absent a preliminary injunction. The harm is also suffered by the public, because OTF is left "unable to provide continued funding and resources to protect the vulnerable communities facing repressive regimes that trust [it] to safeguard their identities and enable their important work around the world." Turner Decl. ¶ 31. As a result of USAGM's in-sourcing decision, "the human rights organizations [OTF] support[s] can no longer depend on [its] funding, [and] have been forced to significantly reduce or modify their work, pause critical activities, or abandon their OTF-funded projects altogether." *Id.*

Pack's attempt to destroy OTF has unfortunately come at a time that repressive regimes in Belarus and Hong Kong have amplified their crackdowns on journalists and protestors. The agency's actions have left OTF "unable to provide rapid response assistance" in those and other

areas of crisis and "to ensure that crucial internet freedom technologies are secure for those who rely on them in dangerous contexts." Turner Decl. ¶¶ 23–24. For example, Representative McCaul has observed that OTF "was making important progress to protect Hong Kongers" in the event that China "shut down communication in and out of the city." Hsu, *Congressional leaders urge Trump administration to release funds*, *supra*. But Pack's actions have brought such "critical programming"— "a lifeline for people living under oppressive regimes"—to the "brink of collapse." *Id.* And Senator Blackburn wrote that Belarus "demonstrates that digital censorship, surveillance and internet shutdowns are vital weapons in the authoritarian arsenal," and that the U.S. needs "every tool … to counter these tactics." @MarshaBlackburn, Twitter (Aug. 17, 2020 6:45 p.m.), https://bit.ly/2QbrYcB. OTF, she wrote, "must have access to funds." *Id.* A preliminary injunction is necessary to prevent those funds from being spent by USAGM and lost to OTF forever.

In contrast, a preliminary injunction will not cause any injury to USAGM. Although the agency has issued a pre-solicitation notice announcing a "forthcoming" request for proposals, it has yet to issue the request. USAGM, *Notice of "Open Season."* And although it "anticipates that new task order solicitations will be issued during fiscal year 2021," the "exact date for issuance of new task order solicitations is not guaranteed and may occur at any time of the year or may not occur at all." *Id.* With no schedule in place for distribution of funds, USAGM would not be prejudiced by a brief delay to allow this Court to decide the case. And it "has long been recognized that the public interest is served by an injunction that is designed to ensure that the procurement process is conducted pursuant to law." *Wackenhut Servs., Inc. v. U.S.*, 85 Fed. Cl. 273, 312 (2008).

Indeed, cutting off funding for OTF's "critical tools not only compromises OTF's mission but sabotages USAGM's as well." Turner Decl. ¶ 25. "Part of OTF's mission is … to help distribute

USAGM digital content free from censorship." *Id.* According to USAGM's own data, 85% of USAGM's audience in Iran and 40% of its audience in China rely on OTF-supported technologies to access USAGM content. *Id.* "By withholding resources for these tools," USAGM is thus "preventing its audiences from reaching its own content." *Id.* And USAGM is also "putting at risk its own journalists, who rely on secure communication technologies supported by OTF, and jeopardizing the security of its online content," which rely on OTF for secure hosting and protection from attack. *Id.*

## CONCLUSION

The motion for a preliminary injunction should be granted. Until the Court disposes of OTF's bid-protest claim on the merits, the defendant should be preliminarily enjoined from taking any action to terminate USAGM's 2020 fiscal year grant agreement with OTF, and its amendments, and from spending any of the funds allocated to OTF under the grant agreement and USAGM's Internet Freedom FY 2020 Spend Plan.

October 1, 2020                                        Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
GREGORY A. BECK
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

JOSHUA D. SCHNELL
CORDATIS LLP
1011 Arlington Boulevard, Suite 375
Arlington, VA 22209
(202) 342-2550
*jschnell@cordatislaw.com*

*Counsel for Plaintiffs*