No. 20-1047C
(Senior Judge Wolski)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

OPEN TECHNOLOGY FUND,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT'S CROSS-MOTION FOR PARTIAL DISMISSAL AND
RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ROBERT KIRSCHMAN, JR.
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

Karen Mayo
Maryellen Righi
Assistant General Counsels
USAGM

WILLIAM P. RAYEL
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0302
Fax: (202) 307-0972

October 15, 2020

Attorneys for Defendant

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................... 1

STATEMENT OF THE ISSUES............................................................................ 4

STATEMENT OF THE CASE............................................................................... 5

    I.      Nature Of The Case ................................................................................ 5

    II.     Statement Of Facts ................................................................................ 5

          A.      USAGM's Mission ................................................................. 5

          B.      OTF And USAGM's Office Of Internet Freedom...................... 7

          C.      Issues Between USAGM And OTF And District Court
                  Litigation........................................................................... 11

          D.      USAGM Revives Its Office Of Internet Freedom ................... 15

    III.    Course Of Proceedings ......................................................................... 17

ARGUMENT ........................................................................................................ 18

    I.      Standards Of Review ........................................................................... 18

          A.      Standard For A RCFC 12(b)(1) Motion To Dismiss ............... 18

          B.      Standard For A RCFC 12(b)(6) Motion To Dismiss ............... 19

          C.      Standard For A Preliminary Injunction................................... 19

          D.      Standard Of Review For Procurement Challenges ................... 20

    II.     The Court Should Dismiss Count IV Because OTF Has Not
          Demonstrated That Its Claim Is In Connection With A
          Procurement Or Proposed Procurement.............................................. 21

          A.      OTF's Argument That It Has A Procurement Contract With
                  USAGM Is Waived And Estopped ......................................... 22

          B.      The Principle Purpose Of The Relationship Between
                  USAGM And OTF Is To Transfer A Thing Of Value To
                  OTF To Support And Stimulate The Public Purpose Of
                  Promoting Internet Freedom ................................................... 25

III.    OTF Lacks Standing Because It Has Not Shown That It Is A
        Qualified Bidder For The "Procurement Contract" It Seeks ............................... 30

IV.    OTF Has Not Made A Non-Frivolous Allegation That USAGM's
        Alleged Insourcing Violated Any Statute Or Regulation ..................................... 34

V.     Count IV Fails To State A Claim Because OTF Has Not Identified
        Any Statutory Violation, And Budgeting Decisions Regarding
        How To Allocate Limited Appropriations Are Otherwise
        Committed To Agency Discretion By Law ......................................................... 38

VI.    Count IV Fails To State A Claim Because OTF Complains About
        USAGM Performing Inherently Governmental Functions For
        Which It May Not Contract ............................................................................... 39

VII.   OTF Has Not Demonstrated A Likelihood Of Success On The
        Merits Because USAGM Has A Rational Basis For Reviving Its
        Office Of Internet Freedom ............................................................................... 41

VIII.  OTF Has Failed To Demonstrate Irreparable Harm ............................................ 46

IX.    OTF Has Not Demonstrated That Its Alleged Harm Outweighs The
        Harm To The Government And The Public Interest From An
        Injunction ........................................................................................................ 47

CONCLUSION .................................................................................................................... 49

## Index to Appendix

| Document | Def. App. Page |
|---|---|
| Board of Broadcasting Governors (BBG) Memorandum regarding Performance of Inherently Governmental Functions, dated July 10, 2014 | 1 |
| United States Department of State and BBG Inspector General Audit of Radio Free Asia (RFA) Expenditures, dated June 2015 | 8 |
| Blanket Ordering Agreement (BOA) BBG50-G-15-0006, dated June 29, 2015 | 91 |
| BBG Fiscal Year (FY) 2018 Internet Freedom Spend Plan, dated July 15, 2018 | 120 |
| United States Agency for Global Media (USAGM) FY 2019 Internet Freedom Spend Plan, dated June 5, 2019 | 138 |
| Open Technology Fund (OTF) Grantee Proposal, dated July 2019 | 153 |

| | |
|---|---|
| USAGM Memorandum Regarding Awarding Federal Acquisition Regulation Exempt Special Agreements, dated August 6, 2019 | 173 |
| OTF Articles of Incorporation, dated September 20, 2019 | 177 |
| OTF Bylaws | 184 |
| OTF Grant Agreement, Federal Award Identification Number (FAIN) OT01-19-GO-00001, dated September 26, 2019 | 200 |
| Amendment 1 to FAIN OT01-19-GO-00001, dated September 27, 2019 | 227 |
| OTF Preliminary Grant Agreement, FAIN OT01-20-GO-00001, dated November 20, 2019, with letter from USAGM to Senator Lindsey Graham, dated August 29, 2019, and Approved Financial Plan, dated November 20, 2019 | 229 |
| USAGM FY 2020 Program Plan, dated February 14, 2020 | 236 |
| E-mail from USAGM to OTF regarding FY 2019 Unobligated Funds Transfer, dated February 26, 2020 | 260 |
| E-mail from USAGM to OTF transmitting draft Amendment 2 to FAIN OT01-20-GO-00001, dated June 16, 2020 | 264 |
| Excerpt from Complaint in *OTF v. Pack*, United States District Court for the District of Columbia No. 20-1710, dated June 23, 2020 | 287 |
| Office of Personnel Management Report on Follow-up Review of USAGM Suitability Program, dated July 2020 | 296 |
| E-mail from OTF to USAGM regarding Amendment 2 to FAIN OT01-20-GO-00001, dated July 6, 2020 | 393 |
| Order in *OTF v. Pack*, United States Court of Appeals for the District of Columbia Circuit No. 20-5195, dated July 21, 2020 | 400 |
| E-mail from USAGM regarding reinstating BBG50-G-15-0006, dated July 31, 2020 | 402 |
| Psiphon, Inc. (Psiphon) BOA No. 951700-20-G-0161, dated August 4, 2020 | 405 |
| Ultrareach Internet Corp. BOA No. 951700-20-G-0162, dated August 4, 2020 | 417 |
| Washington Software, Inc. BOA No. 951700-20-G-0163, dated August 4, 2020 | 429 |

| | |
|---|---|
| Intelligent Decision Partners, LLC BOA No. 951700-20-G-0165, dated August 4, 2020 | 441 |
| Advance Circuiting Inc. (ACI) BOA No. 951700-20-G-0166, dated August 4, 2020 | 453 |
| Dynamic Internet Technology Inc. BOA No. 951700-20-G-0177, dated August 4, 2020 | 465 |
| Task Order Solicitation No. 951700-20-R-0020, Task One, Circumvention Client Software, dated August 6, 2020 | 477 |
| Task Order Solicitation No. 951700-20-R-0021, Task Two, Clientless Web Proxies, dated August 6, 2020 | 505 |
| Letter from RFA to USAGM regarding Return of Funds, dated August 11, 2020 (without enclosures) | 520 |
| Check from RFA to USAGM, dated August 11, 2020 | 521 |
| Check from Middle Eastern Broadcasting Networks, Inc. to USAGM, dated August 11, 2020 | 522 |
| E-mail from USAGM to Politico, dated August 13, 2020 | 523 |
| Amendment 2 to FAIN OT01-20-GO-00001, with Approved Financial Plan, dated August 13, 2020 | 526 |
| Letter from USAGM to OTF regarding Information Requests, dated August 14, 2020 | 530 |
| USAGM Announcement regarding Revival of Office of Internet Freedom, dated August 18, 2020 | 531 |
| E-mail from USAGM to OTF transmitting fully-executed Amendment 2 to FAIN OT01-20-GO-00001, dated August 19, 2020 | 533 |
| OTF Federal Financial Report, dated August 20, 2020 | 538 |
| Notification of Cancellation of Task Order Solicitation Nos. 951700-20-R-0020 and 951700-20-R-0021, dated August 24, 2020 | 540 |
| Task Order Solicitation No. 951700-20-R-0022, Task 1, Circumvention Client Software, dated August 24, 2020 | 541 |
| Task Order Solicitation No. 951700-20-R-0023, Task 2, Clientless Web Proxies, dated August 24, 2020 | 569 |

| | |
|---|---|
| Letter from OTF to USAGM regarding Information Requests, dated August 28, 2020 | 584 |
| Excerpts from OTF Reply Brief in *OTF v. Pack*, D.C. Circuit No. 20-5195, dated August 31, 2020 | 588 |
| ACI Task Order No. 951700-20-K-0794, dated September 1, 2020 | 593 |
| ACI Task Order No. 951700-20-K-0802, dated September 1, 2020 | 616 |
| Psiphon Task Order No. 951700-20-K-0790, dated September 1, 2020 | 640 |
| Psiphon Task Order No. 951700-20-K-0791, dated September 1, 2020 | 663 |
| Psiphon Task Order No. 951700-20-K-0804, dated September 1, 2020 | 687 |
| Letter from USAGM to OTF regarding Information Requests, dated September 4, 2020 | 700 |
| Letter from USAGM to OTF regarding Information Requests, dated September 8, 2020 | 702 |
| Letter from OTF to USAGM regarding Information Requests, dated September 9, 2020 | 705 |
| Letter from USAGM to OTF regarding Information Requests, dated September 10, 2020 | 707 |
| Letter from OTF to USAGM regarding Information Requests, dated September 11, 2020 (without attachments) | 709 |
| OMB Internet-Freedom Funds Apportionment to USAGM, dated September 14, 2020 | 712 |
| USAGM Momentum Budget Query Detail of Office of Information Freedom, dated September 21, 2020 | 720 |
| Update for Open Season Solicitation for Internet Censorship Circumvention Tools BOA, dated September 30, 2020 | 724 |
| Update for Synopsis for Broad Agency Announcement for Exploratory Research for Internet Freedom Techniques, Tools, and Technologies, dated October 2, 2020 | 736 |

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(s)**

*A&D Auto Sales, Inc. v. United States*,
   748 F.3d 1142 (Fed. Cir. 2014) ...................................................................... 19, 40

*Air Transport Ass'n of Am., Inc. v. ExportImport Bank of the United States*,
   840 F. Supp. 2d 327 (D.D.C. 2012) ...................................................................... 46

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) ...................................................................... 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................... 19

*Bannum Inc. v, United States*,
   404 F.3d 1346 (Fed. Cir 2005) ...................................................................... 21

*Blue & Gold Fleet, LP v. United States*,
   492 F.3d 1308 (Fed. Cir. 2007) ...................................................................... 23

*Centech Grp., Inc. v. United States*,
   554 F.3d 1029 (Fed. Cir. 2009) ...................................................................... 31

*Cleveland Assets, LLC v. United States*,
   883 F.3d 1378 (Fed. Cir. 2018) ...................................................................... 20, 39

*CliniComp Int'l, Inc. v. United States*,
   904 F.3d 1353 (Fed. Cir. 2018) ...................................................................... 31

*CMS Contract Management Services v. Massachusetts Housing Finance Agency*,
   745 F.3d 1379 (Fed. Cir. 2014) ...................................................................... 28, 29

*Daisung Co.*,
   2004 CPD ¶ 196, 2004 WL 2199486 (Comp. Gen. 2004) ...................................... 33

*Data Monitor Sys., Inc. v. United States*,
   74 Fed. Cl. 66 (2006) ...................................................................... 37

*Distributed Solutions, Inc. v. United States*,
   539 F.3d 1340 (Fed. Cir. 2008) ...................................................................... 35

*E. Walters & Co., Inc. v. United States*,
   217 Ct. Cl. 254 (1978) ...................................................................... 23

*Electronic Space Sys. Corp.*,
   61 Comp. Gen. 428 (1982) ................................................................................................ 29

*FMC Corp. v. United States*,
   3 F.3d 424 (Fed. Cir. 1993) ............................................................................................. 20

*Frankel v. United States*,
   842 F.3d 1246 (Fed. Cir. 2016) ........................................................................................22

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ......................................................................................................... 39

*Holley v. United States*,
   124 F.3d 1462 (Fed. Cir. 1997) ....................................................................................... 18

*Hymas v. United States*,
   810 F.3d 1312 (Fed. Cir. 2016) ............................................................................. 21, 26, 30

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
   238 F.3d 1324 (Fed. Cir. 2001) ....................................................................................... 20

*Indium Corp. of America v. SemiAlloys, Inc.*,
   781 F.2d 879 (Fed. Cir. 1985) ......................................................................................... 18

*Johnston v. IVAC Corp.*,
   885 F.2d 1574 (Fed. Cir. 1989) ....................................................................................... 20

*Kalvar Corp. Inc. v. United States*,
   543 F.2d 1298 (Ct. Cl. 1976) ........................................................................................... 43

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................................... 38, 39

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................... 30, 31

*Mabus v. General Dynamics C4 Sys., Inc.*,
   633 F.3d 1356 (Fed. Cir. 2011) ....................................................................................... 25

*Maine Community Health Options v. United States*,
   140 S. Ct. 1308 (2020) ..................................................................................................... 47

*Myers Investigative & Sec. Servs., Inc. v. United States*,
   275 F.3d 1366 (Fed. Cir. 2002) ................................................................................... 30, 31

*National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*,
   357 F.3d 1319 (Fed. Cir. 2004) ....................................................................................... 19

*Open Technology Fund v. Pack*,
   No. 20-1710, 2020 WL 3605935 (Jul. 2, 2020) ................................................................ 11, 12

*Per Aarsleff A/S v. United States*,
   123 Fed. Cl. 147 (2015) ...................................................................................................... 20

*Perez v. United States*,
   156 F.3d 1366 (Fed. Cir. 1998) .......................................................................................... 19

*R & W Flammann GmbH v. United States*,
   339 F.3d 1320 (Fed. Cir. 2003) .......................................................................................... 21

*Reflectone, Inc. v. Dalton*,
   60 F.3d 1572 (Fed. Cir. 1995) ............................................................................................46

*Sanders v. United States Postal Serv.*,
   801 F.2d 1328 (Fed. Cir. 1986) ...................................................................................... 43, 47

*Savantage Fin. Servs., Inc. v. United States*,
   123 Fed. Cl. 7 (2015) ...................................................................................................... 37, 38

*Savantage Fin. Servs., Inc. v. United States*,
   595 F.3d 1282 (Fed. Cir. 2010) .......................................................................................... 20

*Sharman Co., Inc. v. United States*,
   2 F.3d 1564 (Fed. Cir. 1993) .......................................................................................... 46, 47

*Ship Analytics, Inc.*,
   871 CPD ¶ 475, 1987 WL 102305 ...................................................................................... 23

*Tech Sys., Inc. v. United States*,
   98 Fed. Cl. 228 (2011) ........................................................................................................ 43

*United States v. Grumman Aerospace Corp.*,
   927 F.2d 575 (Fed. Cir. 1991) ............................................................................................ 23

*Weeks Marine, Inc. v. United States*,
   575 F.3d 1352 (Fed. Cir. 2009) ...................................................................................... 21, 31

*Whittaker Elec. Sys. v. Dalton*,
   124 F.3d 1443 (Fed. Cir. 1997) .......................................................................................... 23

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................................ 19, 46

**STATUTES**

5 U.S.C. § 101 ........................................................................................................................ 36

5 U.S.C. § 105 ................................................................................................ 36

5 U.S.C. § 701(a)(2) ....................................................................................... 38

5 U.S.C. § 706(2)(A) ...................................................................................... 20

22 U.S.C. § 6203 ........................................................................................... 5, 6

22 U.S.C. § 6204 ....................................................................................... *passim*

22 U.S.C. § 6209(d) ........................................................................................ 11

28 U.S.C. § 1491(b) .................................................................................. *passim*

28 U.S.C. §§ 516-20 ................................................................................... 46, 47

31 U.S.C. § 1304(a) ........................................................................................ 47

31 U.S.C. § 1535 ....................................................................................... *passim*

31 U.S.C. § 3324(a) ........................................................................................ 32

31 U.S.C. § 6303(1) ............................................................................... 2, 21, 25

31 U.S.C. § 6304 ....................................................................................... *passim*

31 U.S.C. § 6305 ............................................................................................ 22

Consolidated Appropriations Act, 2020,
  P.L. 116-94, 133 Stat. 2534 (2019) ..................................................... *passim*

Consolidated Appropriations Act of 2019,
  P.L. 116-6, 133 Stat. 13 (Feb. 15, 2019) ..................................................... 9

**REGULATIONS**

FAR 7.503 ...................................................................................................... 3, 40

FAR 9.104 .................................................................................................... 31, 32

FAR 17.502-2 ............................................................................................... 35, 37

FAR 52.249-2 ................................................................................................... 47

22 C.F.R. § 518.61(a) .................................................................................. 47, 48

**RULES**

RCFC 12(b)..................................................................................................... 1, 18, 19

**OTHER AUTHORITIES**

S. Rep. No. 97-180 (1981) ........................................................................... 29

Government Accountability Office,
    *Principles of Federal Appropriations Law*, Third Ed. (2008) ..................................... 35, 36, 45

Government Accountability Office,
    *Principles of Federal Appropriations Law*, Fourth Ed. (2016)[1] ..................................... 16, 36

---

[1]  Both editions of *Principles of Federal Appropriations Law* are available at:
https://www.gao.gov/legal/appropriations-law-decisions/red-book.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

OPEN TECHNOLOGY FUND,⁣      )
                                    )
         Plaintiff,        )
                                    )
         v.             )      No. 20-1047C
                                    )      (Senior Judge Wolski)
THE UNITED STATES,       )
                                    )
         Defendant.     )

**DEFENDANT'S CROSS-MOTION FOR PARTIAL DISMISSAL AND**
**RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of

Federal Claims (RCFC), defendant, the United States, respectfully request that the Court dismiss

count IV of the complaint of plaintiff, Open Technology Fund (OTF), and deny OTF's motion

for a preliminary injunction (ECF No. 10).

## **INTRODUCTION**

OTF was formed in September 2019 with funds granted to OTF by the United States

Agency for Global Media (USAGM) and with the sole purpose of "furthering the internet

freedom objectives of USAGM." Def. App. 179.[1]  Unfortunately, OTF has rebelled against its

sole benefactor, and is currently suing the United States Government in multiple forums.  In its

most recent complaint in this Court, OTF purports to bring a "[b]id protest" pursuant 28 U.S.C.

§ 1491(b)(1), alleging that USAGM is unlawfully "in-sourcing" its "services" of "administering

[USAGM's] internet-freedom program and related grants."  Am. Compl. 27-28 (emphasis

---

[1]  "Def. App. __" refers to the appendix attached to this brief.  "Pl. Mot. __" refers to
OTF's motion for a preliminary injunction, filed on October 1, 2020.  "Pl. App. __" refers to the
ECF page number of declaration and exhibits attached to OTF's motion.

omitted).  For several reasons, the Court should dismiss count IV of OTF's complaint and deny

its motion for a preliminary injunction.

First, this Court lacks jurisdiction because OTF's complaint is not based upon a

procurement or proposed procurement.  OTF has signed a "Grant Agreement" with the United

States, "subject to all Federal rules and regulations pertaining to grants," that "grants" OTF

nearly $11 million primarily "to support Internet freedom projects."  Pl. App. 39, 41, 49; Def.

App. 526.  As late as August 31, 2020, when it suited its purposes, OTF asserted before the

United States Court of Appeals for the District of Columbia Circuit that "OTF is a 'grantee'"

whose grant "indirectly support[s] USAGM's mission[.]"  Def. App. 589, 591.  Now, in a

transparent attempt to shoehorn its breach of contract case into this Court's "bid protest"

jurisdiction, OTF has decided that its grant agreement "is in essence a procurement contract" and

that USAGM is "in-sourcing" OTF's "services."  Am. Compl. 27-28.  Under principles of waiver

and estoppel, OTF cannot now assert that its "Grant Agreement" is a "procurement contract."

OTF has also not met its burden of demonstrating that "the principal purpose" of its "Grant

Agreement" is to "acquire . . . property or services for the direct benefit or use of the United

States Government," 31 U.S.C. § 6303(1), rather than "to transfer a thing of value" to OTF "to

carry out a public purpose of support or stimulation authorized by a law[.]"  31 U.S.C. § 6304(1).

Second, if the Court (incorrectly) determines that OTF has brought a procurement protest,

then it should still dismiss count IV for lack of jurisdiction because OTF has not demonstrated

that it has standing to bring its claim.  Specifically, OTF has not demonstrated that it is a

qualified bidder for a $20 million "procurement contract" administering USAGM's Internet-

freedom programs.  OTF has not demonstrated the financial capability to maintain such a

contract or that it has a satisfactory record of performance.

Third, the Court should dismiss count IV for lack of jurisdiction or failure to state a claim upon which relief can be granted because OTF has not made a *non-frivolous* allegation of a violation of statute or regulation.  To be sure, OTF has alleged violations of statutes and a regulation related to the "Economy Act."  Am. Compl. 28.  But OTF has not alleged that USAGM entered into any Economy Act agreements related to its decision to expand the role of its Office of Internet Freedom, nor are we aware of any.  Contrary to OTF's argument, *id.*, USAGM does not need to "comply with the Economy Act" before it can in-source services.  Under its plain language, the Economy Act provides an *authority* for agencies to enter into intra-agency and inter-agency agreements.  If the agency does not invoke that authority, then it cannot violate the Economy Act.

Fourth, count IV fails to state a claim because decisions about how to allocate appropriated funds are committed to agency discretion by law, absent a statute circumscribing that discretion.  Because OTF has not identified any statute that USAGM violated in deciding to allocate Internet-freedom funds to its own Office of Internet Freedom, rather than OTF, count IV of OTF's complaint fails to state a claim.

Fifth, count IV also fails to state a claim because it objects to USAGM employees performing inherently governmental functions.  OTF's "in-sourcing" protest is odd because it seeks to prohibit USAGM from *awarding contracts*, which is the antithesis of in-sourcing.  Federal Acquisition Regulation (FAR) 7.503 and USAGM policy *prohibit* USAGM from contracting for inherently governmental functions like awarding and administering contracts.

Even if count IV of OTF's complaint were to survive our motion to dismiss, the Court should still deny its motion for a preliminary injunction because OTF has not demonstrated a likelihood of success on the merits or irreparable harm.

On the merits, USAGM's decision to revive its Office of Internet Freedom was rational. OTF has no right to nearly all of the Internet-freedom funds appropriated to USAGM. USAGM's new leadership recognizes the importance of Internet-firewall-circumvention technology, and decided to fund this and other Internet-freedom projects through its Office of Internet Freedom. USAGM's new leadership is also concerned about whether taxpayer dollars are being maximized by OTF. USAGM was willing to provide additional funding to OTF under its fiscal year (FY) 2020 grant agreement, notwithstanding the revival of the Office of Internet Freedom, if OTF could satisfy USAGM's concerns. Instead, in violation of the grant agreement, OTF refused to provide much of the information requested by USAGM and attempted to dictate the terms of USAGM's review of the limited information OTF would provide.

Also, OTF is unlikely to suffer irreparable harm in the absence of an injunction. OTF seeks to prevent USAGM from terminating its FY 2020 grant agreement and spending the approximately $9.4 million allocated to OTF in USAGM's FY 2020 Internet Freedom Spend Plan that has not been provided to OTF. But USAGM's right to terminate the agreement has nothing to do with "in-sourcing," and USAGM's spending the $9.4 million is unlikely to affect the remedies to which OTF may be entitled. Enjoining USAGM would, however, hinder USAGM's ability to promote Internet freedom and enforce its rights under the grant agreement.

Accordingly, the Court should grant our motion to dismiss and deny OTF's motion for a preliminary injunction.

## STATEMENT OF THE ISSUES

1.     Whether the Court lacks jurisdiction to entertain count IV of OTF's complaint because OTF's objection is not in connection with a procurement or proposed procurement.

2.      Whether the Court lacks jurisdiction to entertain count IV because OTF has not demonstrated that it is a qualified bidder for a "procurement contract."

3.      Whether the Court should dismiss Count IV for lack of jurisdiction or failure to state a claim because the Economy Act is inapplicable to the alleged in-sourcing.

4.      Whether count IV fails to state a claim because OTF has not identified any statutory violation and budgetary decisions are otherwise committed to agency discretion.

5.      Whether count IV fails to state a claim because OTF is challenging USAGM's use of Federal employees to perform inherently governmental functions.

6.      Whether OTF has otherwise demonstrated a likelihood of success on the merits.

7.      Whether OTF has demonstrated irreparable harm absent a preliminary injunction.

8.      Whether OTF has demonstrated that the harm to the Government and the public interest from granting a preliminary injunction would be outweighed by the harm to OTF of denying it.

## STATEMENT OF THE CASE

### I.      Nature Of The Case

In count IV of its complaint, OTF alleges that USAGM is illegally and arbitrarily in-sourcing activities that OTF engages in with funding from a grant agreement with USAGM.

### II.      Statement Of Facts

#### A.      USAGM's Mission

USAGM's mission is to "inform, engage, and connect people around the world in support of freedom and democracy[.]" Pl. App. 40.[2]  USAGM accomplishes its broadcasting mission

---

[2]  Prior to August 22, 2019, USAGM was known as the Broadcasting Board of Governors (BBG).  *See, e.g.*, *id.* at 40 n.1; 22 U.S.C. § 6203(a).

through two Federal entities, Voice of America and the Office of Cuba Broadcasting, as well as four USAGM-funded grantees, Radio Free Europe/Radio Liberty (RFE/RL), Radio Free Asia (RFA), the Middle East Broadcasting Networks, Inc. (MBN), and OTF.  Def. App. 236.  As part of its mission, USAGM supports "global internet freedom for the expansion of unrestricted access to information," which "enables not only unfettered online access to USAGM products or content, but also the full spectrum of independent news sources on the internet."  Pl. App. 21, 22.  Accordingly, "USAGM seeks to find tools to facilitate the provision and receipt of news and information to countries that have limited or no access to free press and media[.]"  *Id.* at 40.  USAGM has been involved in efforts to circumvent internet censorship since 2002.  *Id.* at 23.

The head of USAGM is a Chief Executive Officer (CEO) who is nominated by the President and confirmed by the Senate.  22 U.S.C. § 6203(b)(1).  The first presidentially-appointed and Senate-confirmed USAGM CEO is Michael Pack, who was appointed on June 8, 2020.  Pl. App. 11.  The USAGM CEO is granted a number of "authorities" by 22 U.S.C. § 6204(a), including to:  1) "make and supervise grants and cooperative agreements for broadcasting and related activities"; 2) "allocate funds appropriated for international broadcasting activities among the various elements of [USAGM] and grantees"; 3) "procure, rent, or lease supplies, services, and other property for journalism, media, production, and broadcasting, and related support services, notwithstanding any other provision of law relating to such acquisition, rental, or lease"; and 4) "procure, pursuant to section 1535 of Title 31 . . . such goods and services from other departments or agencies for the [CEO] and the International Broadcasting Bureau as the [CEO] determines are appropriate."

### B.        OTF And USAGM's Office Of Internet Freedom

OTF began in 2012 as a program within RFA and has supported research, development, and implementation of Internet-freedom technologies to respond to censorship threats.  Pl. App. 23.  In 2015, the United States Department of State Office of the Inspector General (OIG) issued a report finding that RFA, whose President at the time was Libby Liu, failed to comply with White House Office of Management and Budget (OMB) conflict-of-interest requirements and awarded millions of dollars in Internet-freedom contracts – often without proper competition and possibly above "fair value" – to "organizations that had some affiliation with either RFA officials or members of the OTF Advisory Council."  *See* Def. App. 26-34, 42, 75.

USAGM's Office of Internet Freedom was established in 2016 with a mission "to circumvent internet censorship by foreign governments in order to distribute news content and better provide a forum for free expression in closed countries."  Pl. App. 23.  Between FY 2016 and FY 2019, USAGM allocated to its Office of Internet Freedom a cumulative total of approximately $24 million appropriated by Congress specifically for Internet-freedom programs, while RFA/OTF was allocated approximately $33 million of these funds.  *See id.* at 21; Def. App. 122, 139.

In July 2019, OTF submitted a "Grantee Proposal" to USAGM, proposing "the creation of a stand-alone 501(c)(3) grantee – the Open Technology Fund Grantee – to implement the [USAGM] Internet freedom programs[.]"  *Id.* at 157.  In August 2019, USAGM informed Congress of USAGM's intent to take several actions, including a proposal "to provide funds to establish an independent non-profit grantee to implement the agency's Internet freedom programs," *i.e.*, OTF.  *Id.* at 230, 233.  USAGM stated that the "creation of an independent Internet freedom grantee would maximize USAGM's Internet freedom investments by

consolidating and streamlining the agency's Internet freedom efforts into a single entity that would enjoy the *flexibility of the grantee form*."  *Id.* at 233 (emphasis added).  USAGM estimated that incorporating OTF in FY 2019 would cost no more than $5,000.  *Id.*

On September 20, 2019, OTF filed articles of incorporation in Washington, D.C., signed by Ms. Liu, seeking to establish a non-profit corporation.  *Id.* at 177-83.  Consistent with its congressional notification, on September 26, 2019, USAGM entered into a "Grant Agreement" with OTF in FY 2019 granting to OTF $4,000 for its general and administrative expenses.  *See id.* at 200-01, 213, 226.  The FY 2019 agreement was amended the next day, but did not award any additional funds.  *Id.* at 227-28.

In November 2019, USAGM granted OTF another $40,000 "for salaries and benefits during FY 2020," as made available pursuant to a continuing resolution, subject to the terms of the FY 2019 grant agreement between USAGM and OTF.  *Id.* at 229.

In December 2019, the Further Consolidated Appropriations Act, 2020, P.L. 116-94, 133 Stat. 2534 (2019) (FY 2020 Appropriations Act), was enacted into law.  This act provided USAGM with a lump sum appropriation of $798,696,000 "to carry out international communication activities, and to make and supervise grants for radio, Internet, and television broadcasting to the Middle East[.]"  P.L. 116-94, Div. G, Title I, 133 Stat. at 2822.  As part of this appropriation, the act provided that "up to $40,708,000 of the amount appropriated under this heading may remain available until expended for satellite transmissions and Internet freedom programs, of which not less than $20,000,000 shall be for Internet freedom programs[.]"  *Id.*

In its February 2020 Program Plan and April 2020 Internet Freedom Spend Plan, USAGM notified Congress of its intent to grant OTF $19,875,000 of this $20 million and allocate the other $175,000 to USAGM's Office of Internet Freedom largely to oversee OTF's

activities.  *See* Def. App. 244-45; Pl. App. 21, 23.  USAGM also notified Congress of its intent

to grant another "$1.2 million to RFA for associated staffing costs to continue support services as

OTF builds out an administrative team."  Pl. App. 22.

In January 2020, USAGM entered into a new FY 2020 "Grant Agreement" with OTF.

Pl. App. 39, 54.  The agreement stated that "USAGM believes that it would be in the interests of

United States International Broadcasting (USIB) and the USAGM mission to take advantage of

the operational independence and flexibilities of its private nonprofit Non-Federal Entities[.]"

*Id.* at 40.  Accordingly, the agreement provided that "USAGM makes and supervises a grant to

[OTF] to advance Internet Freedom overseas through the research, development, and

implementation of technologies that enable secure and unrestricted access to news and

information on the internet, consistent with the scope and limitations of the authorization for

such activities in our annual appropriation act and other provisions of law[.]"  *Id.*

With regard to the "[a]mount of the [g]rant," the initial FY 2020 agreement stated that

"USAGM hereby grants the amount of $3,688,320 million (the 'Grant Funds') of no-year funds

to [OTF] for the purposes and subject to the terms and conditions stated herein."  *Id.* at 41.[3]  Of

this amount, $3,088,320 was from the FY 2020 Appropriations Act.  Pl. App. 41.  Of the

FY2020 Appropriations Act funds, "up to $3,000,000 shall be used to support Internet freedom

projects," while the "remainder shall be used to fund OTF salaries and operations."  *Id.*  The

other $600,000 was provided by the Consolidated Appropriations Act of 2019, P.L. 116-6,

133 Stat. 13 (2019).  Pl. App. 41.  Of these funds, "at least $400,000 shall be used to fund anti-

---

[3] "No-year funds" means that Congress has not established a time limit within which the
appropriated funds must be spent.  *See* P.L. 116-94, Div. G, Title I, 133 Stat. at 2822 ("up to
$40,708,000 of the amount appropriated under this heading *may remain available until expended*
for satellite transmissions and Internet freedom programs") (emphasis added).

censorship and secure communication tools to meet Agency and Network requirements for a period starting on May 15, 2019 and lasting for at least five months," and the "balance shall be used to provide digital security support to the USAGM networks and to provide facilitation for the USAGM Reporters Internet Freedom Dialogue event." *Id.*

In entering into the grant agreement, OTF agreed that it would comply with USAGM's governance of USIB and that "the Grant Funds are intended to promote and implement such USAGM-sponsored strategy and policy." *Id.* at 43. Accordingly, amongst other oversight provisions, OTF agreed that it "shall report such information to USAGM as may be reasonably requested by USAGM in the format and within the timeframe so requested." *Id.* at 44.

In April 2020, USAGM and OTF executed "[a]mendment number one" to the FY 2020 grant agreement. *Id.* at 70-71. USAGM granted another $5,649,552 of no-year funds to OTF. *Id.* at 70. The amendment provided that "up to $5,092,784 shall be used to support Internet freedom projects," and the "remainder shall be used to fund OTF salaries and operations." *Id.* This amendment brought "total amount USAGM has granted to [OTF] for FY 2020 [to] $9,377,872[.]" *Id.* (emphasis omitted).

On June 16, 2020, a USAGM Budget Analyst, Virginia Boateng, sent OTF a draft "[a]mendment number two" to the FY 2020 grant agreement, which would have granted OTF the remainder of the funds allocated in the FY 2020 Program Plan and Internet Freedom Spend Plan, *i.e.*, $11,047,128, which would have brought OTF's total grant to $20,425,000. Def. Mot. 264-66. The draft agreement included a signature block for CEO Pack, but it was unsigned. *Id.* at 267. Multiple versions of this document were signed by OTF, but it was not signed by CEO Pack. *See* Pl. App. 4, 76.

10

Instead, on June 29, 2020, Ms. Boateng e-mailed a "revised" "[a]mendment number two" to the FY 2020 grant agreement. *Id.* at 79, 81. This version of amendment number two was signed by OTF on July 6, 2020 and counter-signed by CEO Pack on August 13, 2020. Def. App. 527. This final version of amendment number two granted OTF an additional $1,619,926, with "up to $1,138,441 [to] be used to support Internet freedom projects" and the "remainder [to] be used to fund OTF salaries and operations." *Id.* at 526. This brought OTF's total FY 2020 award to $10,997,798, *id.*, all of which has been disbursed to OTF. *See id.* at 538 ($9,377,872 in FY 2020 Federal cash receipts through July 31, 2020); Pl. App. 4 (OTF received approximately $1.6 million from USAGM on August 19, 2020).

## C.   Issues Between USAGM And OTF And District Court Litigation

Shortly after CEO Pack's June 8, 2020 appointment, USAGM's Chief Financial Officer sent an e-mail to grantees, including OTF, stating that CEO Pack had instituted a freeze on certain actions, including any "obligations for new contracts or extensions of contracts" by USAGM or its grantees. Pl. App. 11. On June 17, 2020, pursuant his authority under 22 U.S.C. § 6209(d) and OTF's bylaws, CEO Pack removed and replaced OTF's board of directors and removed OTF's CEO and President. Pl. App. 14, 16, 18.

OTF and several of its former directors then filed suit in the United States District Court for the District of Columbia, alleging that Mr. Pack's actions of removing OTF's directors and officers were arbitrary, capricious, and unlawful. *See* Def. App. 291-94. Plaintiffs' also alleged that several of CEO Pack's early actions, including those related to OTF, "breached the grant contracts[.]" *Id.* at 293-94. OTF also moved for preliminary injunctive relief. *See Open Technology Fund v. Pack*, No. 20-1710, 2020 WL 3605935 (Jul. 2, 2020).

11

On July 2, 2020, the district court denied OTF's motion for a preliminary injunction, deciding, amongst other issues, that OTF's grant and bylaws authorize the USAGM CEO to remove and replace OTF's officers and directors.  *Id.* at *9-11.  The district court also noted that, on June 26, 2020, USAGM had notified the grantees that "[t]here is no freeze in funding" and that grantees "may continue taking" actions that had previously been identified as frozen, so OTF was "not pressing the claim regarding the freeze for purposes of this motion."  *Id.* at *5 n.7 (citations omitted).

OTF and the other plaintiffs appealed the district court's denial of the motion for a preliminary injunction, and, on July 21, 2020, the D.C. Circuit granted their motion for an injunction pending appeal, reinstated OTF's previous officers and directors, and enjoined the Government from removing or replacing them during the pendency of the expedited appeal. Def. App. 400-01.[4]  The appeal is still pending.

In the meantime, USAGM's new leadership attempted to learn about OTF's operations in order to exercise its oversight responsibilities, but was met with significant resistance.  For example, in early July 2020, OTF refused to allow USAGM personnel to physically inspect their facilities, Pl. App. 87, despite a provision of the grant agreement that allows USAGM to do just that.  *Id.* at 53.  Although OTF initially attempted to use COVID-19 to excuse its compliance with the grant agreement, OTF ultimately allowed an inspection on July 22, 2020, with social distancing and facial coverings.  *See id.* at 84-86.

On August 10, 2020, USAGM sent OTF a request for 18 categories of information, including:  1) a "copy of every contract, grant agreement, and obligation that OTF has executed to date with every organization, entity, or person to which OTF disburses funds or provides

---

[4]  Ms. Liu had already resigned as CEO, *id.* at 289, so she was not reinstated.

material support, accompanied by a detailed description of the work done by that organization, entity, or person and any deliverables they have accomplished," in order to prepare for USAGM's annual performance review of OTF, *id.* at 92; and 2) information regarding potential conflicts of interest, including "the details on any personal connection . . . to any entity or person who receives funds from OTF, and the names, details on what money they have received to date from OTF," as well as "a list of all outside earned income for each officer, employee, intern, fellow, and affiliate of OTF." *Id.*  USAGM initially requested this information by August 12, 2020, but extended the deadline to August 17, 2020.  *Id.* at 94; Def. App. 530.

Even though OTF was created with USAGM funds, *see* Def. App. 200-01, 226, 233, USAGM is OTF's sole source of funding, Am. Compl. 8, and the grant agreement provides that OTF "shall report such information to USAGM as may be reasonably requested by USAGM in the format and within the timeframe so requested," Pl. Mot. 44, OTF's responses to USAGM's information requests read more like an overzealous adversary's responses to discovery requests, than a grantee's responses to its sole benefactor's oversight.  *See* Pl. App. 96-118; Def. App. 584-87, 705-06, 709-11.  Rather than simply respond to the requests, OTF interposed numerous objections and attempted to dictate the terms of USAGM's review of the limited information OTF was willing to provide.  *See id.*

For example, with regard to USAGM's request for the contracts, grant agreements, and obligations that OTF had executed to date (*i.e.*, less than 11 months), OTF initially objected that this request was too burdensome and suggested providing a "sample" of OTF's existing contracts, redacted by OTF.  Pl. App. 107-09.  OTF also declined to provide any of the information USAGM requested regarding potential conflicts of interest, instead stating that "there are no potential conflicts of interest to disclose to USAGM at this time."  *Id.* at 109-10.

13

In light of OTF's failure to comply with USAGM's information requests, as required by the grant agreement, USAGM informed OTF, on August 18, 2020, that OTF had breached a material term of the agreement and that, under Article XIV of the agreement, OTF had 10 business days to bring itself into compliance by providing all the requested material. *Id.* at 120-21. Article XIV permits USAGM to suspend or terminate the agreement for OTF's failure to comply with a material term. *Id.* at 53-54. In response, on August 28, 2020, OTF stated that it would be willing to allow USAGM to review redacted copies of OTF's contracts at OTF's offices, over a period ending on October 1, 2020, but USAGM "may not take photos, make photocopies, or make recordings[.]" Def. App. 585-86. The August 28 letter did not substantively address any of USAGM's other requests for information, except to provide copies of e-mails that were referenced in earlier correspondence. *See id.* at 584-87.

USAGM did not receive OTF's August 28 letter until September 8, and did not receive the attachments until September 9. *Id.* at 702, 707. On September 4, USAGM granted OTF until September 9, 2020 to bring itself into compliance with the terms of the grant agreement. *Id.* at 700-01. On September 8, after receiving OTF's August 28 letter, USAGM explained to OTF why its proposal with regard to reviewing OTF's contracts was inadequate. *See id.* at 703-04. On September 9, OTF responded by stating that its "email and attached documentation originally sent on August 28, 2020 . . . constitute compliance with your information request to the greatest extent possible." *Id.* at 705-06. On September 10, USAGM granted OTF another extension until September 11, 2020 to "confirm in writing your plan for providing the balance of the requested information in a timely manner." *Id.* at 707-08. On September 11, OTF responded to USAGM's September 10 letter by referring USAGM to OTF's August 28 letter and stating that USAGM "will receive nothing further from us today on this matter." *Id.* at 709, 711.

### D.    USAGM Revives Its Office Of Internet Freedom

In June 2015, USAGM entered into a blanket ordering agreement (BOA) with several companies for Internet-freedom tools, including: 1) circumvention client software (Task Area 1); 2) clientless web proxies (Task Area 2); 3) e-mail newsletter distribution (Task Area 4); and 4) censorship circumvention technical expertise and support (Task Area 5).  *Id.* at 91, 94-96.  The BOA had a maximum ordering period of five years, including options.  *Id.* at 110.  A BOA holder was eligible to compete under task order solicitations issued for the particular task areas covered by its BOA.  *See id.* at 94-95.

On July 31, 2020, USAGM notified former BOA holders that it intended to reinstate the BOA for each company, with its consent.  *Id.* at 402-04.  Six companies agreed to the reinstatement, and USAGM entered into a new BOA with each of the six companies, for the period of August 4, 2020 through August 3, 2025.  *Id.* at 405-76.

On August 6, USAGM issued two task order solicitations under the BOA, one for Task Area 1 and one for Task Area 2.  *See id.* at 477-519.  On August 18, 2020, USAGM awarded task orders to Psiphon, Inc. (Psiphon) and Advance Circuiting, Inc. (ACI).  *See id.* at 531, 540.

Also on August 18, 2020, USAGM publicly announced the awards to Psiphon and ACI as part of a press release stating that CEO Pack has "revived" the Office of Internet Freedom.  *Id.* at 531.  USAGM explained that the Office of Internet Freedom "was created in 2016, but its operations were shelved by previous agency leadership."  *Id.*; *see also* Pl. App. 23.  USAGM further stated that because "a number of regimes restrict the exchange of information, while others ban it entirely, there is a critical need to support technologies that allow individuals to securely access and share information online."  Def. App. 531.

On August 24, 2020, USAGM cancelled the August 18 awards to Psiphon and ACI, primarily due to an error in the technical evaluation used to select the awardees. *See id.* at 540. That same day, USAGM issued new solicitations for Task Areas 1 and 2. *Id.* at 541-83. On September 1, 2020, pursuant to the August 24 solicitations, USAGM issued three task orders to Psiphon and two task orders to ACI, for a total of $1,042,500. *Id.* at 593-699.

As of September 13, 2020, the Office of Internet Freedom was allocated $1,337,205 in Internet-freedom funds, *i.e.*, $175,000 from the FY 2020 Internet Freedom Spend Plan and $1,162,205 carried over from FY 2019. *Id.* at 713, 717, 721. Additionally, on September 14, 2020, OMB apportioned approximately $3.4 million more to USAGM for the Office of Internet Freedom, which consisted of prior year unobligated funds that had been recovered from USAGM grantees, RFA and MBN. *See id.* at 520-22, 713-15, 717.[5]

On September 24, 2020, USAGM issued a solicitation for an open season to award Internet-freedom BOAs to more companies. *Id.* at 724-35. In the solicitation, USAGM stated that it "plans to hold competitive procurements for the issuance of new task orders after concluding the Open Season selection process." *Id.* at 726. On October 2, 2020, USAGM issued a synopsis for a broad agency announcement, which may result in "contracts, grants and/or cooperative agreements to firms proposing new internet freedom techniques, tools or technologies of interest to the agency[.]" *Id.* at 736-48

---

[5] An apportionment is OMB's distribution of "budgeted amounts to the executive branch agencies, thereby making funds in appropriation accounts . . . available for obligation." Government Accountability Office (GAO), *Principles of Federal Appropriations Law*, Fourth Ed., p. 2-27 (2016).

### III.    <u>Course Of Proceedings</u>

On August 20, 2020, OTF filed its initial three-count complaint in this Court, alleging that USAGM breached its FY 2020 grant agreement with OTF, as well as a purported "funds-transfer agreement."  Compl. 20-24 (emphasis omitted).  On September 17, 2020, OTF amended its complaint by making slight changes to counts I-III and adding a count IV, which OTF asserts is a "[b]id protest[.]"  Am. Compl. 22-28.

In count I, despite the most recent amendment to OTF's FY 2020 grant agreement providing that "the total amount USAGM has granted to [OTF] for FY 2020 is **$10,997,798**," Def. App. 526 (emphasis in original), an amount that USAGM has indisputably disbursed to OTF, *see id.* at 538, Pl. App. 4, OTF alleges that "USAGM breached the terms of the grant agreement by failing to make a quarterly distribution of the $11,047,128 that it promised to pay OTF for the fourth fiscal quarter and by instead paying only $1,619,926."  Am. Compl. 24.  OTF seeks $9,427,202 for this alleged breach.  *Id.* at 28.

In count II, OTF alleges that USAGM breached a purported "funds-transfer agreement," in which USAGM allegedly contractually bound itself to effect the transfer of approximately $9.8 million from RFA to OTF.  *See* Am. Compl. 24-26 (emphasis omitted).  OTF alleges that the offer constituting this alleged agreement was made in a February 26, 2020 e-mail in which USAGM's Director of Budget e-mailed OTF and stated that the "following steps need to occur in order to transfer funding from RFA to OTF," including that "No-Year funds will need to be recaptured to the agency and be reapportioned and re[a]warded to the newly established OTF Organization to fulfill the same purpose."  *Id.* at 24; Def. App. 260.  OTF does not allege that this step has been completed.  OTF seeks $9,754,588 for this alleged breach.  Am. Compl. 28.

In count III, OTF alleges that USAGM breached the implied duty of good faith and fair dealing with regard to the FY 2020 grant agreement and the alleged funds-transfer agreement. *Id.* at 26-27.  OTF seeks $19,181,790 for this alleged breach.  *Id.* at 28.

In count IV, despite alleging earlier in its amended complaint that "USAGM breached the terms of the grant agreement," *id.* at 24, OTF now alleges that "USAGM's 2020 'grant agreement' with OTF is in essence a procurement contract" and that USAGM has unlawfully "in-sourced" OTF's "services" of "administering [USAGM's] internet-freedom program and related grants."  *Id.* at 27-28.  OTF presently seeks a preliminary injunction prohibiting "USAGM from taking any action to terminate USAGM's 2020 fiscal year grant agreement with OTF, and its amendments, and from spending any of the funds allocated to OTF under the grant agreement and USAGM's Internet Freedom FY 2020 Spend Plan."  Pl. Mot. 26.

## ARGUMENT

### I.     Standards Of Review

#### A.     Standard For A RCFC 12(b)(1) Motion To Dismiss

In addressing a RCFC 12(b)(1) motion, "determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed."  *Holley v. United States*, 124 F.3d 1462, 1464 (Fed. Cir. 1997) (citations omitted).  However, in deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the Court may consider evidentiary matters outside the pleadings.  *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985).

**B.**     **Standard For A RCFC 12(b)(6) Motion To Dismiss**

A motion to dismiss for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle it to a remedy under the law. *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998).  In considering such a motion, the court assumes all well-pled factual allegations as true and makes all reasonable inferences in favor of the non-movant.  *See id.*  Although the Court "primarily consider[s] the allegations in the complaint, [it] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'"  *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (citation omitted).

**C.**     **Standard For A Preliminary Injunction**

Preliminary injunctive relief is a "drastic and extraordinary remedy that is not to be routinely granted."  *National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.,* 357 F.3d 1319, 1324 (Fed. Cir. 2004) (citation omitted).  It "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The movant must establish that: 1) it "is likely to succeed on the merits"; 2) "it will suffer irreparable harm if preliminary relief is not granted"; 3) "the balance of the hardships tips

in the movant's favor"; and 4) "a preliminary injunction will not be contrary to the public interest." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

Failure to meet the criteria of any one factor may require denial of the request for a preliminary relief. *Id.* In fact, the United States Court of Appeals for the Federal Circuit has clarified that a plaintiff *cannot* be granted a preliminary injunction "unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original); *accord, e.g., Per Aarsleff A/S v. United States*, 123 Fed. Cl. 147, 156 (2015).[6]

### D.     Standard Of Review For Procurement Challenges

The proper standard of review in a bid protest is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  To prevail, a plaintiff must demonstrate: 1) that the procurement decision "lacked a rational basis"; or 2) "a clear and prejudicial violation of applicable statutes or regulations."  *Impresa*, 238 F.3d at 1332-33.

Procurement decisions "invoke[ ] 'highly deferential' rational basis review." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (citation omitted). Accordingly, the Court should recognize that the decisions are entitled to a "presumption of regularity," *Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018), and

---

[6] Any suggestion in *FMC Corp.* that a showing of likelihood of success upon the merits and irreparable harm is not essential to the issuance of a preliminary injunction is "merely conflicting dicta" and, thus, not binding upon this Court. *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed. Cir. 1989).

that the Court should not substitute its judgment for that of the agency.  *E.g., R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003).

Additionally, if the protestor can show any errors in the procurement process, the protestor must then show that it was "significantly prejudiced" by those errors.  *Bannum Inc. v, United States*, 404 F.3d 1346, 1357 (Fed. Cir 2005).  To establish prejudice, the protestor must demonstrate, at a minimum, a "non-trivial competitive injury which can be redressed by judicial relief[.]"  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009).

## II.     The Court Should Dismiss Count IV Because OTF Has Not Demonstrated That Its Claim Is In Connection With A Procurement Or Proposed Procurement

This Court possesses jurisdiction under 28 U.S.C. § 1491(b)(1) to entertain "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  Therefore, this Court's bid protest jurisdiction is limited "exclusively" to "procurement solicitations and contracts."  *Hymas v. United States*, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (citation and emphasis omitted).  It is undisputed that, if OTF does not have a "procurement contract" with USAGM, then this Court lacks jurisdiction to entertain its allegation that USAGM is "in-sourcing" activities that have been performed by OTF.  *See* Pl. Mot. 14.

The Federal Circuit has relied upon the Federal Grant and Cooperative Agreement Act (FGCAA) to define when an agreement is a "procurement contract" that supports this Court's bid protest jurisdiction.  *Hymas*, 810 F.3d at 1324-29.  Under, the FGCAA, an agency must use a "procurement contract" when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government[.]"  31 U.S.C. § 6303(1).  In contrast, an agency must use a "grant agreement" or

"cooperative agreement" when "the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States[.]"  31 U.S.C. §§ 6304(1), 6305(1).[7]

In this case, there can be no reasonable dispute that USAGM and OTF are parties to a grant agreement, not a procurement contract.  As demonstrated below, until a few weeks ago, when OTF decided to try to shoehorn objections to USAGM's recent administration of its grant agreement into this Court's bid protest jurisdiction, OTF had consistently maintained that it was a USAGM grantee.  And OTF has obtained substantial benefits as a result of this arrangement. The principles of waiver and estoppel preclude OTF from now arguing that "USAGM's 2020 'grant agreement' with OTF is in essence a procurement contract."  Am. Compl. 27.

Additionally, the grant agreement and the FY 2020 Internet Freedom Spend Plan demonstrate that the principal purpose of the relationship between USAGM and OTF is to transfer a thing of value (money) to OTF to support and stimulate the public purpose of promoting Internet freedom, not to acquire OTF's services for USAGM's direct benefit.

### A.    OTF's Argument That It Has A Procurement Contract With USAGM Is Waived And Estopped

As an initial matter, regardless of the "principal purpose" of the FY 2020 agreement between USAGM and OTF, it is clear from the plain language of the agreement, as well as other statements by the parties, that they intended to enter into a "grant agreement," rather than a procurement contract.  Principles of waiver and estoppel preclude OTF from now asserting that its grant agreement is actually a procurement contract.

---

[7]  The distinction between a grant agreement and a cooperative agreement is the degree of involvement of the Federal agency in carrying out the activity contemplated in the agreement. 31 U.S.C. § 6304(2), 6305(2).  This distinction is not material here, since neither agreement is a procurement contract.  *See Frankel v. United States*, 842 F.3d 1246, 1251 (Fed. Cir. 2016).

"The doctrine of waiver precludes a contractor from challenging the validity of a contract . . . where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443, 1446 (Fed. Cir. 1997). For example, in *E. Walters & Co., Inc. v. United States*, the United States Court of Claims held that the plaintiff waived its claim for a price increase under its contract by waiting until after performance was complete to assert that the award based upon a lower price violated procurement regulations. 217 Ct. Cl. 254, 264-65 (1978). Similarly, in a bid protest, a plaintiff waives an objection that a solicitation improperly contemplates awarding grant or cooperative agreement, rather than a procurement contract, by failing to protest prior to the close of bidding. *See Blue & Gold Fleet, LP v. United States,* 492 F.3d 1308, 1313 (Fed. Cir. 2007); *Ship Analytics, Inc.*, 87-1 CPD ¶ 475, 1987 WL 102305, at *2 (Comp. Gen. 1987). A plaintiff may waive an argument necessary to establish the Court's jurisdiction over its claim by failing to raise the argument at the appropriate time. *See United States v. Grumman Aerospace Corp.*, 927 F.2d 575, 580 (Fed. Cir. 1991).

Here, the FY 2020 grant agreement signed by OTF is clearly labeled a "Grant Agreement[.]" Pl. App. 39. Contrary to OTF's argument, *see* Pl. Mot 14, this is more than a mere "label." The agreement "grants" OTF a certain amount of money primarily "to support Internet freedom projects." *Id.* at 41, 70; Def. App. 526. The agreement does not contain a statement of work describing property or services that OTF will be required to provide. *See* Pl. Mot. 39-73; Def. Mot. 526-29. Rather, it contains a high level financial plan and spend plan generally describing the activities upon which OTF plans to expend the grant funds. Def. App. 528-29. The agreement also provides that the "Parties acknowledge and agree that that the

Parties are subject to all Federal rules and regulations pertaining to grants," and listed several such statutes and regulations.  Pl. App. 49.

Moreover, prior to its creation as an independent grantee, OTF submitted a "*Grantee Proposal*" to USAGM, proposing "the creation of a stand-alone 501(c)(3) *grantee* – the Open Technology Fund *Grantee* – to implement the [USAGM] Internet freedom programs[.]" Def. App. 157 (emphasis added).  And, in August 2019, USAGM notified Congress of its intent "to provide funds to establish an independent non-profit *grantee* to implement the agency's Internet freedom programs," *i.e.*, OTF.  *Id.* at 233 (emphasis added).  USAGM stated that the "creation of an independent Internet freedom grantee would maximize USAGM's Internet freedom investments by consolidating and streamlining the agency's Internet freedom efforts into a single entity that would enjoy the *flexibility of the grantee form.*"  *Id.* (emphasis added).  In its FY 2020 Internet Spend Plan, OTF was frequently identified as a "grantee[.]"  Pl. App. 29. And, as recently as August 31, 2020, OTF informed that D.C. Circuit that "OTF is a 'grantee'" whose grant "indirectly support[s] USAGM's mission[.]"  Def. App. 589, 591.

In sum, up until a few weeks ago, it was the clear understanding of both USAGM and OTF that OTF was operating under a grant agreement with USAGM, not a procurement contract. By signing what is plainly a grant agreement, accepting nearly $11 million in funding under that agreement, and never protesting the form of the agreement, OTF has waived any claim that it has a procurement contract.

Similarly, the principle of estoppel bars OTF from asserting that its grant agreement is actually a procurement contract.  The elements of equitable estoppel are:  1) "misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it"; 2) "reliance upon this

conduct"; and 3) "due to this reliance, material prejudice if the delayed assertion of such rights is permitted." *Mabus v. General Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011) (citation omitted).  All these elements are met here.

USAGM funded the creation of OTF as an "an independent Internet freedom grantee," based upon a "Grantee Proposal," submitted by OTF in its prior capacity as a program within RFA.  Def. App. 153, 233.  In a notification to Congress, USAGM emphasized the "the flexibility of the grantee form."  *Id.* at 233.  USAGM then entered into multiple "Grant Agreement[s]" with OTF, granting OTF more than $11 million, including up to $4,000 for OTF's initial incorporation costs and up to $500,000 for "one-time start-up expenses to establish a fully independent organization[.]"  *See id.* at 200, 226, 528; Pl. App. 28, 39.  There is no reason to believe that USAGM would have provided more than $500,000 to fund OTF's formation if it knew that OTF would assert that it is a typical Government contractor, rather than a grantee.

Accordingly, the principles of waiver and estoppel prevent OTF from asserting that it has a "procurement contract" with USAGM.

### B.    The Principal Purpose Of The Relationship Between USAGM And OTF Is To Transfer A Thing Of Value To OTF To Support And Stimulate The Public Purpose Of Promoting Internet Freedom

OTF has also failed to show that this Court possesses jurisdiction to entertain count IV because it has not demonstrated that the "principal purpose" of the FY 2020 grant agreement is "to acquire . . . property or services for the direct benefit or use of the United States Government[.]"  31 U.S.C. § 6303(1).  Rather, the principal purpose of the agreement is to transfer money to OTF to support and stimulate the public purpose of promoting Internet freedom, which means that it is a grant agreement, not a procurement contract.  *See* 31 U.S.C. § 6304(1).

The "determination[] of whether a program is principally one of procurement or assistance" is a "basic agency policy decision[]," and "Congress intended the [FGCAA] to allow agencies flexibility to select the instrument that best suits each transaction." *Hymas*, 810 F.3d at 1325-26 (citation omitted).  USAGM determined that its relationship with OTF is principally one of assistance, rather than procurement, and OTF has not demonstrated that USAGM's determination was incorrect.  Indeed, as demonstrated in Section II.A, above, OTF agreed with this determination until about a month ago.

The principal purpose of the relationship between USAGM and OTF is demonstrated by the grant agreement itself and USAGM's FY 2020 Internet Freedom Spend Plan, which explains the breakdown of FY 2020 funding allocated to OTF.  Approximately $10.4 million of the approximately $11 million "grant[ed]" to OTF in FY 2020 was to "be used to *support* Internet freedom projects" or to fund OTF's salaries and operations.  Pl. App. 41, 70 (emphasis added); Def. App. 229, 526 (emphasis added).  And the agreement states that "USAGM seeks to find tools to facilitate the provision and receipt of news and information to countries that have limited or no access to free press and media[.]"  Pl. App. 40.  This indicates that the principal purpose of the agreement is to transfer money to OTF to support USAGM's Internet-freedom objectives, not to acquire services.

This is confirmed by USAGM's FY 2020 Internet Freedom Spend Plan.  The plan explains that USAGM supports "global internet freedom for the expansion of unrestricted access to information," which "enables not only unfettered online access to USAGM products or content, but *also the full spectrum of independent news sources on the internet*."  *Id.* at 21-22 (emphasis added).  And the breakdown of funding allocated to OTF for FY 2020 further

demonstrates that the principal purpose of the relationship between USAGM and OTF is to support Internet freedom, not to acquire services to directly benefit USAGM.  *See id.* at 25-28.

The vast majority of OTF programs and spending identified in the FY 2020 Spend Plan is dedicated to supporting and stimulating Internet freedom, not providing products or services to USAGM.  *See id.*  For example, OTF's Internet Freedom Fund ($7,000,000) "is the primary mechanism through which OTF provides funding for innovative global internet freedom projects," which are "primarily focused on technology development and implementation but can also include applied research and digital security projects."  *Id.* at 25.  As another example, OTF's Labs ($1,775,000) provide "expert services to the internet freedom community at large[.]"  *Id.* at 26.  Indeed, out of the 12 budget categories in OTF's FY 2020 Spend Plan, only two might support an argument that USAGM is "acquiring" products or services for its "direct benefit": 1) OTF's Entity Support Program ($260,000) "will hire expert digital security consultants to provide direct internet freedom assistance to USAGM networks," *id.* at 27; and 2) OTF's Technology at Scale Fund ($7,000,000) "is the means through which OTF supports the circumvention and secure communication technology needs of USAGM networks."  *Id.* at 26.

Putting aside that "USAGM networks" includes RFA, RFE/RL, and MBN, which are not Federal entities, *see* Def. App. 236, and that OTF has stated that it "was unable to launch its Tech at Scale fund," Pl. App. 6, these two projects account for only $7,260,000 of the $19,825,000 allocated to OTF from FY 2020 appropriations, *i.e.*, approximately 36 percent.  Def. App. 528. Assuming that the other $600,000 from OTF's FY 2020 grant agreement is similar in nature, *see* Pl. App. 41, only $7,860,000 of the $20,425,000 allocated to OTF for FY 2020, *i.e.*, approximately 38 percent, could potentially support an argument that USAGM is "acquiring" products or services for its "direct benefit."  Accordingly, where less than 40 percent of the funds

allocated to OTF could arguably be used to acquire products or services for the direct benefit of USAGM, the "principal purpose" of the parties' relationship is properly construed as transferring a thing of value to OTF to carry out the public purpose of supporting and stimulating Internet freedom, and OTF's "Grant Agreement" is not a procurement contract. *See* 31 U.S.C. § 6304(1).

Contrary to OTF's argument, Pl. Mot. 15-17, this case is readily distinguishable from *CMS Contract Management Services v. Massachusetts Housing Finance Agency*, 745 F.3d 1379 (Fed. Cir. 2014). In *CMS*, the Court determined that the agency entered into an "intermediary" relationship with certain entities to fulfill its "legal obligation" to transfer housing assistance payments to landlords. *Id.* at 1386. Because the entities were "*not receiving assistance from the federal agency* but [were] merely used to provide a service to another entity which is eligible for assistance," the Court concluded that the proper instrument to define the relationship was a procurement contract, not a cooperative agreement. *Id.* (quoting S. Rep. No. 97–180, at 5 (1981)) (emphasis added).

In this case, USAGM has no "legal obligation" to provide "assistance" to the people and entities that OTF funds, nor is USAGM using OTF to provide a service to those people and entities. Rather, USAGM has a general obligation to expend funds on "Internet freedom programs," P.L. 116-94, Div. G, Title I, 133 Stat. at 2822, such as "tools and techniques to securely develop and distribute USAGM digital content[.]" *Id.* at § 7050(b)(2)(A), 133 Stat. at 2915. USAGM's mandate is consistent with OTF's stated "purposes" to: 1) "further the internet freedom objectives of [USAGM] so as to expand unrestricted access to information available to the public on the internet"; 2) "support the development and use of circumvention and secure communications technologies on a worldwide basis where the same is restricted in order to advance the internet freedom objectives of" USAGM; and 3) "lessen the burdens of government

28

by furthering the internet freedom objectives of" USAGM.  Def. App. 179.  Accordingly, OTF is not an "intermediary," as that term was used in *CMS*.

Moreover, even if OTF could be considered an "intermediary," that would not make its grant agreement a procurement contract.  The same Senate Report that the Federal Circuit relied upon in *CMS* indicates that "intermediary" relationships can lawfully be reflected in a grant agreement, where the principal purpose of the agreement is to "assist the intermediary" in "producing a product or carrying out a service that is then delivered to an assistance recipient[.]" S. Rep. No. 97-180, at 5 (1981).  To the extent that OTF could be described as an "intermediary," the principal purpose of the grant agreement is to provide funding to OTF to assist OTF in its mission of promoting Internet freedom, consistent with USAGM's objectives, not to acquire OTF's services.  Accordingly, the grant agreement is not a procurement contract.

OTF also erroneously argues that the grant agreement is a procurement contract because OTF "must spend the vast majority of [its] funds on internet-freedom programs that directly benefit USAGM, including through contracts with third parties to develop privacy and firewall-circumvention tools."  Pl. Mot. 15.  First, this argument contradicts OTF's August 31, 2020 statement to the D.C. Circuit that "OTF's support for third-party technologies *indirectly* benefits USAGM[.]"  Def. App. 592 (emphasis added).  Second, the dispositive question is not whether USAGM *benefits* from OTF's activities.  *Electronic Space Sys. Corp.*, 61 Comp. Gen. 428, 429 (1982) ("We do not agree with [the complainant's] apparent assertion that 'benefit' is dispositive of the question of whether a contract, grant or cooperative agreement should be used in any particular instance.").  Rather, the dispositive question is "whether it is the Government's principal purpose to *acquire* the services or goods in question, or whether it is the Government's purpose to *stimulate or support their production*."  *Id.* (emphasis added).  As demonstrated

above, the principal purpose of the grant agreement is to stimulate and support Internet freedom. That USAGM and its networks may benefit from the tools developed through OTF's grant does not make it a procurement contract.

Additionally, contrary to OTF's argument, Pl. Mot. 16, USAGM's larger role in administering its Internet-freedom programs prior to FY 2020 does not demonstrate that OTF's grant agreement is a procurement contract. As demonstrated above, the principal purpose of the grant agreement is to assist OTF in stimulating and supporting Internet freedom. That this assistance might also benefit USAGM by lessening its administrative burdens does not make it a procurement contract. *See Hymas*, 810 F.3d at 1329 n.8. The FGCAA grants USAGM the flexibility to structure transactions as procurements or assistance, and the Court should not interfere with the agency's policy choices in how to effect its mission. *Id.* at 1329.

Because count IV of OTF's complaint is not in connection with a procurement or proposed procurement, the Court should dismiss this count for lack of jurisdiction.

## III.   OTF Lacks Standing Because It Has Not Shown That It Is A Qualified Bidder For The "Procurement Contract" It Seeks

If this Court determines that OTF has brought a procurement protest, then it should still dismiss count IV for lack of jurisdiction because OTF has not demonstrated that it has standing to bring the protest. Standing is a threshold jurisdictional issue. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). "The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

The "irreducible constitutional minimum of standing" requires that the plaintiff prove three elements: 1) an "injury in fact"; 2) "a causal connection between the injury and the conduct complained of"; and 3) a likelihood that the injury will be "redressed by a favorable decision."

*Lujan*, 504 U.S. at 560-61 (citations omitted).[8]  In the bid protest context, an injury in fact

equates to "prejudice," which, at a minimum, requires a plaintiff to demonstrate that it suffered a

"a non-trivial competitive injury which can be redressed by judicial relief," as result of the

alleged errors.  *Weeks Marine*, 575 F.3d at 1361, 1363.  A necessary component of prejudice is

that the plaintiff is "qualified to compete for the contract it seeks."  *CliniComp Int'l, Inc. v.

United States*, 904 F.3d 1353, 1360 (Fed. Cir. 2018).

A plaintiff cannot demonstrate that it is a qualified bidder if it cannot demonstrate that it

is "responsible" to perform the contract at issue.  *Myers*, 275 F.3d at 1371.  Responsibility

generally means "an offeror's apparent ability and capacity to perform all contract

requirements[.]"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009).

More specifically, responsibility includes, among other requirements, that the prospective

contractor have: 1) "adequate financial resources to perform the contract, or the ability to obtain

them"; and 2) "a satisfactory performance record[.]"  FAR 9.104-1.[9]

First, OTF has not demonstrated that it has adequate financial resources to perform a $20

million contract "administering [USAGM's] internet-freedom program and related grants," Am.

Compl. 27, because OTF has not demonstrated that it can perform this task without advance

funding from USAGM.  In procurement contracts, the default rule is that contractors are paid

---

[8]  Although this is an Article I Court, a plaintiff must still meet the minimum Article III
standing requirements.  *See Weeks Marine*, 575 F.3d at 1359.

[9]  USAGM has the authority to exempt itself from the FAR.  *See* 22 U.S.C.
§ 6204(a)(10).  Pursuant to this authority, USAGM has exempted certain procurements from
certain provisions of the FAR.  *See* Def. App. 173-76.  USAGM has not, however, generally
exempted these procurements from the responsibility requirements of FAR subpart 9.1.  *See id.*
at 175.

*after* they have rendered the required services or delivered the required goods, not in advance.
*See* 31 U.S.C. § 3324(a).

In count I of its complaint, OTF alleges that USAGM agreed that it "would distribute
funding under the [FY 2020 grant] agreement in a quarterly disbursement at the start of the fiscal
quarter." *Id.* at 23. In a July 6, 2020 e-mail, OTF asserted that this "quarterly funding is
necessary to both live out congressional intent for internet freedom funds *and to keep our
independent non-profit organization operationally viable.*" Def. App. 393 (emphasis added).
OTF apparently cannot maintain its operations supporting Internet freedom unless it receives
advance payments from USAGM.

Indeed, OTF alleges that when USAGM did not provide OTF with the advance funding
that OTF anticipated for July 2020, OTF was "forced to issue stop-work orders to over 80
percent of its projects, largely bringing to a halt the services it was providing to support
USAGM's important internet-freedom mission." Am. Compl. 3. Even after OTF received an
additional $1.6 million from USAGM on August 19, 2020, OTF stated that "this doesn't
substantially change our financial situation and, unfortunately, will not enable OTF to restart
projects or begin soliciting new applications." Def. App. 587. Accordingly, OTF has not
demonstrated the financial capacity to perform a procurement contract administering USAGM's
$20 million dollar Internet-freedom program.

Second, OTF has not demonstrated that it has "a satisfactory performance record[.]"
FAR 9.104-1(c). "A prospective contractor that is or recently has been seriously deficient in
contract performance shall be presumed to be nonresponsible, unless the contracting officer
determines that the circumstances were properly beyond the contractor's control, or that the
contractor has taken appropriate corrective action." FAR 9.104-3(b). OTF has only one

agreement with the Government worth more than $4,000, and USAGM has determined that OTF failed to comply with a material term of this agreement and subsequently failed to bring itself into compliance by declining to provide USAGM with the information USAGM requested in a timely manner and in the format requested, in violation of Article IV.c.2 of the agreement. *See* Pl. App. 44, 121; Def. App. 707-08.

Although OTF disputes that it has failed to comply with the grant agreement and asserts that USAGM is acting in bad faith, *see* Am. Compl. 26, a "nonresponsibility determination may be based upon the agency's reasonable perception of inadequate prior performance, even where the agency did not terminate the prior contract for default, and the contractor disputes the agency's interpretation of the facts or has appealed a contracting officer's adverse determination." *Daisung Co.*, 2004 CPD ¶ 196, 2004 WL 2199486, at *2 (Comp. Gen. 2004).

USAGM's request for a "copy of every contract, grant agreement, and obligation that OTF has executed" with USAGM funds over the course of OTF's brief existence is a reasonable request for agency oversight of the grant funds, Pl. App. 92, and OTF's offer to allow USAGM to review *redacted* copies of the agreements at OTF's offices, at times set by OTF, without the ability to even photocopy the agreements, Def. App. 586, does not comply with its obligation under the grant agreement to provide USAGM information "in the format and within the timeframe so requested." Pl. App. 44.

Similarly, USAGM reasonably requested factual information from OTF regarding the relationships between OTF's employees and the people/entities OTF funds, as well as outside income for OTF's officers, directors, and others affiliated with OTF, so that USAGM could determine whether there were any conflicts of interest in OTF's use of USAGM funds. *See* Pl. App. 92. This request is particularly reasonable considering that a 2015 OIG report found that

RFA, which was led by Ms. Liu at the time, failed to comply with OMB conflict-of-interest requirements and awarded millions of dollars in Internet-freedom contracts – often without proper competition and possibly above "fair value" – to "organizations that had some affiliation with either RFA officials or members of the OTF Advisory Council."  *See* Def. App. 26-34, 42, 75.  Instead of complying with USAGM's request, OTF objected and made the conclusory statement "that there are no potential conflicts of interest to disclose to USAGM at this time."  *Id.* at 109-10.  This does not comply with Article IV.c.2 of the grant agreement or permit USAGM to conduct adequate oversight, especially in light of OTF's past failures while a part of RFA.  OTF has not demonstrated a satisfactory performance record.

Accordingly, because OTF has not demonstrated that it is a qualified bidder for a $20 million procurement contract, it has failed to demonstrate that it has standing.

## IV.    OTF Has Not Made A Non-Frivolous Allegation That USAGM's Alleged In-sourcing Violated Any Statute Or Regulation

OTF's complaint should be dismissed for lack of jurisdiction or failure to state a claim, because OTF has not identified any statute or regulation applicable to the alleged in-sourcing.

By its nature, OTF's "in-sourcing" protest, alleging that USAGM is illegally performing activities previously performed by OTF, does not object to a solicitation, award, or proposed award of a Federal contract, and OTF does not assert otherwise.  *See* Am. Compl. 27-28; Pl. Mot. 14-18.  Rather, OTF argues that this Court possesses jurisdiction over its in-sourcing challenge based upon an "alleged violation of statute or regulation in connection with a procurement."  Pl. Mot. 14 (quoting 28 U.S.C. § 1491(b)(1)).  For this Court to possess jurisdiction under this prong of 28 U.S.C. § 1491(b)(1), OTF must make a "non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed

procurement[.]"  *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008).  OTF has not met this standard.

In its amended complaint, OTF alleges that USAGM violated the following inapplicable statutes and regulations by in-sourcing OTF's activities:  1) 22 U.S.C. § 6204(a)(16); 2) 31 U.S.C. § 1535 (the Economy Act); and 3) FAR 17.502-2.  Am. Compl. 28.  These allegations are founded upon an argument that "USAGM can only in-source the services provided by OTF" if certain conditions outlined in 31 U.S.C. § 1535(a) are met.  *id.*; *see also* Pl. Mot. 17-18.  OTF's argument is meritless.

The Economy Act does not impose general requirements for "in-sourcing."  Section 1535, entitled "[a]gency agreements," provides that the "head of an agency or major organizational unit within an agency *may* place an order with a major organizational unit within the same agency or another agency for goods or services if" certain conditions are met. 31 U.S.C. § 1535(a) (emphasis added).  Accordingly, the Economy Act provides an *authority* for agencies to transfer appropriated funds by entering into agreements with other agencies or major organizational units within the agency, but it does not require agencies to do so.  *See* FAR 17.502-2(a) ("The Economy Act (31 U.S.C. 1535) *authorizes* agencies to enter into agreements to obtain supplies or services from another agency" and "also provides *authority* for placement of orders between major organizational units within an agency") (emphasis added); GAO, *Principles of Federal Appropriations Law*, Third Ed., p. 12-29 (2008) ("the authority to use the Economy Act is permissive rather than mandatory.").  Because OTF has not alleged that USAGM invoked its authority under the Economy Act to enter into any intra-agency or inter-agency agreements, OTF's allegation that USAGM violated the Economy Act is baseless.

Additionally, an intra-agency agreement pursuant to the Economy Act requires that the two organizations within the agency are funded by different appropriations. *Principles of Federal Appropriations Law*, Third Ed., p. 12-33 ("While the two bureaus or offices may be part of the same department or agency, they must be funded under separate appropriations" in order to enter into an Economy Act agreement). Because all of the funds at issue were appropriated to USAGM as a whole, *see, e.g.*, P.L. 116-94, Div. G, Title I, 133 Stat. at 2822, rather than different appropriations funding different organizations within USAGM, the Economy Act is not applicable.

In order to obligate the funds apportioned to it by OMB, USAGM "allocates" those funds to certain projects. *See Principles of Federal Appropriations Law*, Fourth Ed., p. 2-28 n.32 ("Congress appropriates, OMB apportions, and the receiving agency allots (or allocates) within the apportionment."). Pursuant to 22 U.S.C. § 6204(a)(6), the USAGM CEO has authority to "allocate funds appropriated for international broadcasting activities among the various elements of [USAGM] and grantees[.]" This is distinct from and in addition to his authority to "procure, pursuant to section 1535 of Title 31 . . . goods and services from other departments or agencies[.]" 22 U.S.C. § 6204(a)(16).

OTF's argument that USAGM violated 22 U.S.C. § 6204(a)(16) is derivative of its argument that USAGM violated the Economy Act and, for the same reason, is meritless. Section 6204(a)(16) plainly grants the USAGM CEO *authority* to enter into Economy Act agreements; it does not require him to do so. Furthermore, although the Economy Act permits intra-agency agreements, *see* 31 U.S.C. § 1535(a), the authority in 22 U.S.C. § 6204(a)(16) is limited to *inter-agency* agreements with "*other* departments or agencies" (emphasis added). The Office of Internet Freedom is not a department or agency, *see* 5 U.S.C. §§ 101, 105, which is another

36

reason why OTF's allegation of a violation of 22 U.S.C. § 6204(a)(16) does not bring OTF's complaint within this Court's bid protest jurisdiction.

OTFs allegation that USAGM violated FAR 17.502-2 is also not a non-frivolous allegation because: 1) this regulation implements the Economy Act, and, as demonstrated above, OTF's allegation that USAGM must in-source through the Economy Act is meritless; and 2) like 22 U.S.C. § 6204(a)(16), FAR 17.502-2 does not apply to *intra-agency* Economy Act transactions. FAR 17.502-2(a) provides that the "FAR applies when one agency uses *another* agency's contract to obtain supplies or services . . . The Economy Act also provides authority for placement of orders between major organizational units within an agency; *procedures for such intra-agency transactions are addressed in agency regulations*" (emphasis added). Accordingly, even if USAGM had entered into an Economy Act agreement with its Office of Internet Freedom (which it did not), FAR 17.502-2 would still not apply.

Besides OTF's meritless allegations of statutory and regulatory violations described above, OTF also generally alleges that "USAGM in-sourced OTF's work based on bad faith and bias" and that "USAGM's in-sourcing of OTF's contract is arbitrary, capricious, an abuse of discretion, and contrary to law." Am. Compl. 28; *see also* Pl. Mot. 18-22. But this Court does not possess jurisdiction to entertain allegations of bad faith or irrational procurement activity in a bid protest, unless the allegations are part of: 1) an objection to a solicitation, award, or proposed award of a Federal contract; or 2) a non-frivolous allegation that the procurement activity violated a specific statute or regulation. *See* 28 U.S.C. § 1491(b)(1); *Savantage Fin. Servs., Inc. v. United States*, 123 Fed. Cl. 7, 33-34 (2015), *aff'd*, 668 F. App'x 366 (Fed. Cir. 2016); *Data Monitor Sys., Inc. v. United States*, 74 Fed. Cl. 66, 72-73 (2006).

OTF does not purport to object to a solicitation, contract award, or proposed contract award, *see* Pl. Mot. 14, and, as we demonstrated above, the statutes and regulation that OTF invokes in its complaint are inapplicable to the alleged "in-sourcing."  Accordingly, the alleged bad faith and irrationality in USAGM's alleged in-sourcing decision could not violate the statutes or regulation that OTF relies upon, and, thus, this Court lacks jurisdiction to entertain those allegations.  *See Savantage*, 123 Fed. Cl. at 33-34.

## V.   Count IV Fails To State A Claim Because OTF Has Not Identified Any Statutory Violation, And Budgeting Decisions Regarding How To Allocate Limited Appropriations Are Otherwise Committed To Agency Discretion By Law

As demonstrated in Section IV, above, OTF's allegations that USAGM violated 22 U.S.C. § 6204(a)(16) and 31 U.S.C. § 1535(a) by allegedly in-sourcing services performed by OTF fail to state a claim.  OTF's failure to identify a statutory violation means that the rest of its allegations in count IV also fail to state a claim because, absent a statute circumscribing USAGM's discretion, its decisions regarding how to allocate its appropriations are unreviewable.

Pursuant to 5 U.S.C. § 701(a)(2), a court may not review an agency's decision pursuant to the Administrative Procedure Act standard of review, where the "agency action is committed to agency discretion by law."  The Supreme Court has "read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993).  Such decisions are presumptively unreviewable.  *See id.*  How an agency allocates its appropriated funds is the type of agency decision "traditionally regarded as committed to agency discretion."  *Id.* at 192-93.  Here, USAGM has decided to allocate some of its appropriated funds for Internet-freedom projects administered by its Office of Internet Freedom, rather than allowing OTF to "implement

the internet freedom program in full[.]"  Am. Compl. 27 (quoting Pl. App. 23).  Budgeting

decisions like this are generally committed to agency discretion as a matter of law.

In *Lincoln*, the United States Supreme Court explained that budgeting decisions are only

reviewable to the extent that Congress has, in the text of a statute, expressly circumscribed the

agency's discretion in such a manner that the courts would have a meaningful standard against

which to judge the agency's exercise of discretion.  *See id.* at 191, 193.  If "no judicially

manageable standards are available for judging how and when an agency should exercise its

discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"  *Heckler v.*

*Chaney*, 470 U.S. 821, 830 (1985).

Here, although Congress has placed some restrictions in its appropriations acts on how

USAGM spends its Internet-freedom funds, *see, e.g.*, P.L. 116-94, § 7050(b), 133 Stat. at 2915,

OTF does not allege that USAGM violated any of those restrictions.  Rather, other than its

meritless allegations that USAGM violated inapplicable statutes and regulations involving the

Economy Act, the rest of OTF's allegations question USAGM's exercise of its discretion to

more robustly fund its Office of Internet Freedom.  *See* Am. Compl. 28; Pl. Mot. 18-22.

Accordingly, count IV of OTF's complaint fails to state a claim.[10]

## VI.   Count IV Fails To State A Claim Because OTF Complains About USAGM Performing Inherently Governmental Functions For Which It May Not Contract

Count IV of OTF's complaint also fails to state a claim because its purported "in-

sourcing" protest challenges USAGM's in-house performance of inherently governmental

functions.  OTF alleges that "services provided by OTF under the agreement include

---

[10]  Even if OTF were to allege that USAGM violated restrictions in an appropriations act, that would not state a claim because alleged violations of appropriations acts – as opposed to procurement statutes – are outside this Court's bid protest jurisdiction.  *Cleveland Assets*, 883 F.3d at 1381-82.

administering [USAGM's] internet-freedom program and related grants."  Am. Compl. 27.  And the only example of the alleged "in-sourcing" provided by OTF in its complaint is a reference to an August 18, 2020 announcement that USAGM has "awarded several contracts for the deployment of secure and effective anti-censorship technologies[.]"  Def. App. 531 (cited in Am. Compl. 2, 21).[11]  Putting aside the oddity of OTF alleging that USAGM is "in-sourcing" by awarding contracts, the FAR and USAGM policy prohibit USAGM from allowing contractors to perform inherently governmental functions such as awarding and administering Federal contracts.

FAR 7.503(a) provides that "[c]ontracts shall not be used for the performance of inherently governmental functions."  And FAR 7.503(c)(12) provides that, with respect to Federal prime procurement contracts, inherently governmental functions include "[d]etermining what supplies or services are to be acquired by the Government," "[a]warding contracts" and "[a]dministering contracts[.]"[12]  Likewise, USAGM policy states that USAGM "shall not use contractors to perform Inherently Governmental Functions," which includes "Federal procurement activities" such as "[d]etermining what supplies or services are to be acquired by the Government," "[a]warding contracts," and "[a]dministering contracts on behalf of the Government[.]"  Def. App. 1-2.

Accordingly, count IV of OTF's complaint fails to state a claim because it challenges Government performance of work that OTF may not perform under a procurement contract.

---

[11]  The August 18, 2020 announcement is incorporated by reference into OTF's complaint, and, thus, it is properly considered for purposes of our motion to dismiss under RCFC 12(b)(6).  *See A&D*, 748 F.3d at 1147.

[12]  As we noted in Section III, above, USAGM has the authority to exempt itself from the FAR.  *See* 22 U.S.C. § 6404(a)(10).  USAGM has not, however, generally exempted its procurements from the acquisition planning requirements of FAR Part 7.  *See* Def. App. at 175.

**VII.    OTF Has Not Demonstrated A Likelihood Of Success On The Merits Because USAGM Has A Rational Basis For Reviving Its Office Of Internet Freedom**

For all of the reasons stated above, the Court should not only dismiss count IV, but also deny OTF's motion for a preliminary injunction because OTF has failed to demonstrate a likelihood of success on the merits.  Additionally, OTF has not demonstrated a likelihood that USAGM's decision to revive its Office of Internet Freedom lacked a rational basis or was made in bad faith.

USAGM rationally explained its decision to revive its Office of Internet Freedom in an August 18, 2020 announcement.  Def. App. 531-32.  Specifically, USAGM explained that because "a number of regimes restrict the exchange of information, while others ban it entirely, there is a critical need to support technologies that allow individuals to securely access and share information online."  *Id.* at 531.  USAGM stated that bringing back the Office of Internet Freedom "will further allow our agency to make significant strides in this area."  *Id.*  OTF does not dispute the critical need to fund Internet-freedom technology or the Office of Internet Freedom's ability to do so.  *See* Pl. Mot. 18-22.

Instead, OTF suggests that USAGM does not have a sufficient basis to reverse its previous leadership's decision to implement its Internet-freedom programs almost entirely through OTF.  *See id.*  But USAGM explained in its August 18, 2020 announcement that the Office of Information Freedom "has a track record of ensuring that U.S. taxpayer dollars allocated for internet freedom projects are maximized."  Def. App. 531.  And USAGM explained in an earlier statement that the Office of Internet Freedom "performed the same task but far more efficiently [than OTF], saving millions of taxpayer dollars by avoiding unnecessary overhead expenses."  *Id.* at 523.  These statements are supported.

41

In FY 2019, USAGM's Office of Internet Freedom had only five Federal employees, plus another $20,000 budgeted for non-personnel program support, while RFA had $1.2 million budgeted for OTF salaries and operations, plus another $169,230 budgeted for "OTF Program Support."  *Id.* at 141, 143-44, 147.  In FY 2020, OTF budgeted just under *$3 million* for administrative expenses (including $2.12 million for salaries and operations, $350,000 for programmatic support, and $500,000 for "[o]ne-time startup costs"), *plus* USAGM budgeted for at least one Federal employee in the Office of Internet Freedom and $175,000 to "manage projects that assess particular threats and/or OTF effectiveness in appropriate areas to inform USAGM strategy and oversight."  Pl. App. 23, 28.  This indicates that OTF "implement[ing] the internet freedom program in full," *id.* at 23, results in higher administrative expenses.

In addition to OTF's high administrative costs, a 2015 OIG report found that RFA failed to comply with OMB conflict-of-interest requirements and awarded millions of dollars in OTF Internet-freedom contracts – often without proper competition and possibly above "fair value" – to "organizations that had some affiliation with either RFA officials or members of the OTF Advisory Council."  *See* Def. App. 26-34, 42, 75.  For example, RFA/OTF awarded two Internet-freedom contracts, totaling $1.2 million, to a non-profit founded by Ms. Liu, RFA's President at the time and OTF's initial CEO.  *Id.* at 28.  USAGM's concerns about whether OTF was maximizing the value of USAGM's Internet-freedom appropriations were reasonable.

OTF alleges that USAGM's "in-sourcing" is the product of bad faith, but it has not met its heavy burden of demonstrating a likelihood of bad faith.  Pl. Mot. 20-22.  There is "a strong presumption in the law that administrative actions are correct and taken in good faith.  It takes 'well-nigh irrefragable proof' to overcome the presumption."  *Sanders v. United States Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986) (citations omitted).  The Court of Claims has

equated the "necessary 'irrefragable proof' . . . with evidence of some specific intent to injure the plaintiff." *Kalvar Corp. Inc. v. United States*, 543 F.2d 1298, 1302 (Ct. Cl. 1976); *see also Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 267 (2011).

Although there is certainly evidence of acrimony between USAGM and OTF over the past several months, OTF has not demonstrated an intent by USAGM to do anything other than maximize the effectiveness of its Internet-freedom appropriations. The acrimony between USAGM and OTF stems largely from: 1) a disagreement over whether USAGM has the authority to replace OTF's officers and directors (an issue that also resulted in disagreement between a district court judge and a motions panel for the D.C. Circuit); and 2) OTF's unwillingness to comply with USAGM's requests for information, despite OTF's obligation to "report such information to USAGM as may be reasonably requested by USAGM in the format and within the timeframe so requested." Pl. App. 44.

OTF argues that USAGM's August 13, 2020 statement to a media outlet demonstrates bad faith, asserting that USAGM claimed "without support that OTF's 'leadership' had 'attempt[ed] to line its own pockets with U.S. taxpayer dollars while insisting upon no oversight.'" Pl. Mot. 20 (citation omitted); Def. App. 523. As demonstrated above, however, USAGM had ample basis for its concern that too much of its Internet-freedom appropriations were going to OTF salaries and operations and potentially to entities affiliated with OTF's leadership. Likewise, the August 13, 2020 assertion that OTF was "insisting upon no oversight" was reasonable in the context of a rhetorical statement to the press. In July 2020, OTF initially refused to allow USAGM to exercise its rights under the FY 2020 grant agreement "to visit [OTF's] facilities and to inspect the facilities, activities, and work pertinent to the grant[.]" Pl. Mot. 53, 84-87. And, OTF made little if any effort to comply with USAGM's August 10, 2020

43

requests for information by the initial deadline of August 12, 2020, instead sending a letter expressing "serious questions and concerns" about the requests and stating that OTF will "review [USAGM's] requests in greater depth and respond with questions and requests for clarification as necessary[.]"  *Id.* at 90-99.  Although OTF may not technically have been insisting upon *no* oversight, its willingness to submit to oversight by USAGM has been lacking.  *See* Section III, above.

OTF also questions the initial two-day deadline for responses to the information requests, Pl. Mot. 22, but USAGM subsequently granted OTF a five-day extension until August 17, 2020.  Def. App. 530  And, after informing OTF on August 18, 2020 that OTF had failed to comply with a material term of the agreement, USAGM granted OTF multiple extensions of time until September 11, 2020 to bring itself into compliance.  *See id.* at 700, 708; Pl. App. 120-21.  Moreover, USAGM has not yet exercised its right to suspend or terminate OTF's grant agreement pursuant to Article XIV of the agreement.  *See* Pl. App. 54-55.  USAGM has given OTF ample opportunity to comply with its information requests.  Instead of complying, however, OTF has questioned USAGM's motives and attempted to dictate the terms of when and what information it will provide, *see id.* at 96-118, Def. App. 584-86, 705-06, 709-11, contrary to the plain language of the grant agreement.  Pl. App. 44.

OTF also erroneously states that the "only justification [USAGM] has offered is that USAGM needs the information to address 'security' concerns in response to an [Office of Personnel Management (OPM)] report critical of the agency's security practices."  Pl. Mot. 21.  Beyond security – which is a legitimate area of inquiry, particularly in light the recent OPM report critical of USAGM's security practices, *see* Def. App. 296-392 – USAGM explained on multiple occasions that its requests were also to ensure that OTF was complying with the terms

of the grant agreement and maximizing taxpayer dollars.  *See* Pl. App. 90 ("We expect all grantees, including OTF, to cooperate with USAGM to ensure compliance with our legitimate safety, U.S. national security, *and other* nonlitigation related *compliance concerns*.") (emphasis added);  Def. App. 530 ("We expect OTF to fully cooperate with USAGM's document and other requests to ensure *not only* U.S. national security interests are met . . . but *also* that OTF, which is currently 100% taxpayer funded through a grant from USAGM, is *accountable to the American people who are paying for its work.*") (emphasis added); *id.* at 700-01 ("USAGM's new leadership has a duty to oversee the use of grant funds . . . the requests are meant to pierce OTF's opacity and cure the oversight failure of previous USAGM leadership and not for any other alleged purpose.").[13]

USAGM's new leadership reasonably wants to ensure that the taxpayer dollars that Congress has entrusted to USAGM for Internet-freedom programs are being used to the greatest degree possible to fund and implement Internet circumvention technologies and other Internet-freedom tools.  *See* Def. App. 531-32.  OTF's refusal to comply with USAGM's information requests does not allow USAGM to perform this vital oversight function.  *See Principles of Federal Appropriations Law*, Third Ed., p. 10-16 ("grantor agencies have an affirmative duty to oversee grant performance").

OTF's claims of bad faith are also contradicted by USAGM's expressed willingness to continue to fund OTF, if OTF would fully comply with USAGM's information requests.  On August 13, 2020, CEO Pack approved an amendment to the FY 2020 Grant Agreement granting

---

[13]  USAGM's information requests to OTF also referenced non-public reports by the Office of the Director of National Intelligence (ODNI) that were critical of USAGM's security practices.  *See* Pl. App. 90.  To avoid the need for a protective order and sealed filing at this time, we do not rely upon any ODNI reports in this brief.

OTF more than $1.6 million in additional funds (covering OTF's budgeted July 2020 expenses),

notwithstanding OTF's initial deficient response to USAGM's information requests.  Def. App.

526-29.  And USAGM explained to OTF on September 4, 2020 that USAGM "stands ready to

provide August funding to OTF upon a satisfactory response to our requests."  *Id.* at 700.[14]  OTF

is not satisfied with a piece of the pie, however, and believes it is entitled to control nearly all of

USAGM's Internet-freedom funds without complying with its sole benefactor's reasonable

requests for oversight.  But USAGM has the discretion to allocate the Internet-freedom funds

that Congress has appropriated to it, and the Court should not second guess its decisions.

## VIII.   OTF Has Failed To Demonstrate Irreparable Harm

The "irreparable injury requirement erects a very high bar for a movant." *Air Transport

Ass'n of Am., Inc. v. Export-Import Bank of the United States*, 840 F. Supp. 2d 327, 334 (D.D.C.

2012) (citation omitted).  In order to obtain preliminary injunctive relief, it is not sufficient that a

plaintiff demonstrate the mere "possibility" of irreparable injury.  *Winter*, 555 U.S. at 22.

Rather, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an

injunction."  *Id.* (emphasis in original).

OTF erroneously argues that it will suffer irreparable harm if the Court does not

preliminarily enjoin USAGM from:  1) terminating OTF's FY 2020 grant agreement; and

2) "spending any of the funds allocated to OTF under the grant agreement and USAGM's

Internet Freedom FY 2020 Spend Plan."  Pl. Mot. 22-24, 26.

---

[14]   At the time of this letter, USAGM was apparently unaware that it had no authority to
provide OTF the "August funding" or any other funding that OTF is seeking in its complaint in
this Court, because only the United States Department of Justice (DOJ) has authority to
compromise this litigation.  *See* 28 U.S.C. §§ 516-20; *Sharman Co., Inc. v. United States*, 2 F.3d
1564, 1571-72 (Fed. Cir. 1993), *overruled on other grounds*, *Reflectone, Inc. v. Dalton*, 60 F.3d
1572 (Fed. Cir. 1995) (*en banc*).

Irreparable harm is unlikely in the absence of an injunction against terminating OTF's grant agreement because there is no reason to believe that USAGM will terminate the grant agreement in order to "in-source" any activities.  Unlike procurement contracts, which permit terminations for the convenience of the Government, *see, e.g.,* FAR 52.249-2, USAGM may only unilaterally terminate the grant agreement due to OTF's failure to comply with a material term.  Pl. App. 53-54; 22 C.F.R. § 518.61(a).  The Court must presume that USAGM will act in good faith and not improperly terminate OTF's agreement based solely upon a desire to "in-source."  *See Sanders*, 801 F.2d at 1331.  OTF's improper request to enjoin the Government from terminating the FY 2020 grant agreement highlights OTF's transparent attempt to shoehorn its contract dispute with USAGM into this Court's bid protest jurisdiction.

USAGM spending the funds allocated to OTF under the FY 2020 Internet Freedom Spend Plan is also unlikely to result in any harm to OTF, as this is unlikely to impact the remedies available to OTF in its "bid protest," *see* 28 U.S.C. § 1491(b)(2), or its breach of contract action.  *See* 31 U.S.C. § 1304(a)(1), (a)(3)(A); *Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1331 (2020).  In the meantime, a preliminary injunction will not result in USAGM granting the funds at issue to OTF, because USAGM has no authority to disburse those funds to OTF while this lawsuit remains pending, as DOJ has the sole authority to compromise this litigation.  *See* 28 U.S.C. §§ 516-20; *Sharman*, 2 F.3d at 1571-72.

Accordingly, OTF has failed to demonstrate irreparable harm if the Court denies its motion.

## IX.   OTF Has Not Demonstrated That Its Alleged Harm Outweighs The Harm To The Government And The Public Interest From An Injunction

Granting the preliminary injunctive relief OTF seeks would cause substantial damage to the Government and the public interest.

First, if the Government were preliminarily enjoined from terminating OTF's FY 2020 grant agreement, as OTF requests, Pl. Mot. 26, that would eliminate one of USAGM's substantial and important rights in the grant agreement.  Article XIV of the grant agreement gives USAGM the right to terminate OTF's use of grant funds, and recover any unused grant funds, if OTF fails to comply with a material term of the agreement and fails to cure that deficiency within 10 business days of advance notice of the termination.  Pl. App. 53-54; *see also* 22 C.F.R. § 518.61(a)(1).  If USAGM were prohibited from exercising this right, while this litigation is pending, that would eliminate one of the important tools USAGM has enforce the terms of the agreement and exercise its oversight responsibilities.  In the midst of what has become a contentious relationship, where OTF seems more concerned about protecting its ability to control USAGM's Internet-freedom funds with as little oversight as possible, than about advancing USAGM's Internet-freedom objectives, this would harm the Government and the public interest.[15]

Second, OTF's request to indefinitely impound more than $9.4 million in funds appropriated to USAGM for Internet-freedom programs would cause significant harm to the agency's ability to fund Internet-firewall-circumvention tools and other Internet-freedom tools to allow people in repressive regimes to access news from around the world.  The critical importance of these Internet-freedom programs is undisputed.  *See* Pl. Mot. 24-26.  Accordingly, on September 24, 2020, USAGM issued a solicitation for an open season to award Internet-freedom BOAs to more companies and stated that it "plans to hold competitive procurements for

---

[15]   The harm of OTF's requested injunction is mitigated to some degree because USAGM would retain the right to suspend OTF's use of the grant funds pursuant to Article XIV of the grant agreement.  *See* Pl. Mot. 26; Pl. App. 53-54.  If OTF's requested injunction were read to include a suspension of its grant funds as well, such an injunction would effectively eliminate USAGM's ability to enforce the terms of its grant agreement, short of suing OTF.

the issuance of new task orders after concluding the Open Season selection process."  Def. App.

726.  Likewise, on October 2, 2020, USAGM issued a synopsis for a broad agency

announcement, which may result in "contracts, grants and/or cooperative agreements to firms

proposing new internet freedom techniques, tools or technologies of interest to the agency[.]"  *Id.*

at 741.

      USAGM is moving forward with its important Internet-freedom programs and should not

be prevented from using $9.4 million that Congress has appropriated to *USAGM* for "Internet

freedom programs" (not for OTF).  P.L. 116-94, Div. G, Title I, 133 Stat. at 2822.  As

demonstrated in Section VIII, above, if OTF believes that USAGM will disburse this $9.4

million to OTF if USAGM is preliminarily enjoined from using the funds itself, then OTF is

mistaken, as USAGM has no authority to disburse this money to OTF, while this lawsuit is

pending.  Accordingly, if the Court enjoins USAGM from using this $9.4 million, it will likely

go unused for the duration of the injunction, potentially delaying and hindering USAGM's

efforts to provide information to the people of repressive regimes throughout the world, due to

OTF's mistaken belief that it has a right to control funds appropriated to USAGM.

## **CONCLUSION**

      For these reasons, we respectfully request the Court dismiss count IV of OTF's complaint

and deny OTF's motion for preliminary injunction.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

Karen Mayo
Maryellen Righi
Assistant General Counsels
USAGM

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ William P. Rayel
WILLIAM P. RAYEL
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0302
Fax: (202) 307-0972
E-mail: William.Rayel@usdoj.gov

Dated: October 15, 2020

Attorneys for Defendant