**Broadcasting Board of Governors**
**INTERNATIONAL BROADCASTING BUREAU**

**Title:** IX BAM 750 - Performance of Inherently Governmental Functions
**Policy Tracking #:** IBB-12-05
**Effective Date:** July 10, 2014
**Originating Office:** IBB Office of Administration (202) 203-4595

**(a) PURPOSE:** The purpose of this policy is to protect the Government's interests by preventing contractors from performing Inherently Governmental Functions. In addition, this policy implements Office of Federal Procurement Policy guidance on performance of Inherently Governmental Functions.

**(b) AUTHORITIES AND SCOPE:**

(1) <u>Authorities</u>.

(i) <u>FAR Subpart 7.3 – Contractor Versus Government Performance</u>;

(ii) <u>FAR Subpart 7.5 – Inherently Governmental Functions</u>;

(iii) <u>OMB Circular A-76</u> (revised May 29, 2003);

(iv) <u>OFPP Policy Letter 11-01, Performance of Inherently Governmental and Critical Functions, 09-12-2011</u>;

(v) <u>Technical Correction to OFPP Policy Letter 11-01</u>.

(2) <u>Scope</u>.

(i) This policy applies to all offices and divisions of the Federal Government supervised by the Broadcasting Board of Governors (collectively "the Agency").

(ii) This policy applies to all requirements for procuring services, including contract awards, modifications to awards for services, task orders against Blanket Purchase Agreements, and other contract vehicles.

**(c) POLICY:**

(1) <u>Prohibitions</u>. The Agency shall not use contractors to perform Inherently Governmental Functions, including but not limited to the following examples:

(i) Conducting foreign relations or determining foreign policy;

(ii) Determining Agency policy, such as determining the content and application of regulations;

(iii) Determining Federal program priorities for budget requests;

(iv) Determining budget policy, guidance, and strategy;

1

(v) Supervising Federal employees;

(vi) Selecting individuals for Federal Government employment, including interviewing individuals for employment;

(vii) Approving position descriptions or performance standards for Federal employees;

(viii) Determining what Government property to dispose of and on what terms;

(ix) Federal procurement activities, including but not limited to:

    (A) Determining what supplies or services are to be acquired by the Government;

    (B) Participating as a voting member on any source selection board;

    (C) Approving any contractual documents, such as documents defining requirements, incentive plans, and evaluation criteria;

    (D) Awarding contracts;

    (E) Administering contracts on behalf of the Government, including but not limited to:

        *(1)* Serving as a Contracting Officer's Representative;

        *(2)* Ordering changes in contract performance or contract quantities;

        *(3)* Taking action based on evaluations of contractor performance; and

        *(4)* Accepting or rejecting contractor products or services.

    (F) Terminating contracts;

    (G) Determining whether contract costs are reasonable, allocable, and allowable; and

    (H) Participating as a voting member on contractor performance evaluation boards.

(x) Approving Agency responses to Freedom of Information Act requests or approving Agency responses to administrative appeals of denials of Freedom of Information Act requests;

(xi) Conducting administrative hearings to determine the eligibility of any person for a security clearance, or involving actions that affect matters of personal reputation or eligibility to participate in Government programs;

(xii) Collecting, controlling, or authorizing disbursement of public funds, such as fees, royalties, duties, fines, or taxes, unless specifically authorized by statute;

(xiii) Controlling the Agency's treasury accounts;

(xiv) Administering public trusts; and

(xv) Drafting Congressional testimony, responses to Congressional correspondence, or agency responses to audit reports from the Inspector General, the Government Accountability Office, or other Federal audit entity.

(2) <u>Service Classifications</u>. All requisitions for services and statements of work shall include a Service Classification of Closely Associated with Inherently Governmental Functions, Critical Functions, or Other Functions (see paragraph (e) below for definitions).

(3) <u>Contract Oversight</u>.  When the Agency contracts for services that are Critical Functions or Closely Associated with Inherently Governmental Functions, the Contracting Officer and Contracting Officer Representative will implement appropriate managerial oversight to:

(i) Prevent contractors from performing Inherently Governmental Functions;

(ii) Maintain control over the Agency's mission and operations; and

(iii) Protect the Government's interests.

**(d) PROCEDURES AND PRIMARY RESPONSIBILITIES:**

(1) Program and project managers, the Agency's acquisition workforce, and all employees who prepare or approve requisitions for services shall familiarize themselves with FAR Subpart 7.5 and OFPP Policy Letter 11-01, paying special attention to the lists of examples, tests, and guidelines for classifying functions as Inherently Governmental Functions (IGF), Critical Functions (CF), or Closely Associated with an Inherently Governmental Function (CA/IGF).

(2) For further guidance on how to apply these tests and guidelines, contact the IBB Office of Contracts, Policy and Procedures Branch.

(3) <u>Requisitioning Office Responsibilities</u>.  Whoever develops the statement of work, requisition, or other documents defining the Agency's requirements for a service contract shall:

(i)  Classify the services in accordance with OFPP Policy Letter 11-01, consulting with the IBB Office of Contracts, Policy and Procedures Branch as required;

(ii) Identify services as Closely Associated with Inherently Governmental Functions, Critical Functions, or Other Functions, in all statements of work, requisitions, or other procurement requests; and

(iii) Write a meaningful description of the services in requisitions or other procurement requests.

(4) <u>Administrative Officer Responsibilities</u>.  If an Administrative Officer receives a requisition for services that are classified as Inherently Governmental Functions, he or she shall return the requisition to the requesting official.

(5) <u>Approving Official Responsibilities</u>.

(i) Approving officials must confirm, in writing, that services the Agency plans to procure comply with OFPP Policy Letter 11-01.  Approving officials may satisfy this requirement by signing a requisition, prepared in Momentum, with the following text incorporated into either the description or extended description fields in the requisition's header: "I, the approving official, confirm that, to the best of my knowledge and understanding, the services that will be procured pursuant to this requisition do not include work that must be reserved for performance by Federal employees, and that the Agency will be able to manage contractor performance consistent with its responsibility to perform inherently governmental functions and maintain control over the Agency's mission and operations."

(ii) No approving official shall approve a requisition for IGF services.  If an Approving Official is asked to sign a requisition for IGF services, he or she shall return the requisition to the requesting official.

(6) <u>Contracting Officer Responsibilities</u>.

(i) If a Contracting Officer receives a requisition for services that include IGF, he or she shall return the requisition without action to the appropriate Administrative Officer, or other official from the requisitioning office, for deletion of the IGF services requirement.

(ii) If a requisition for services does not include a Service Classification and a description of work, the Contracting Officer shall:

(A)  Return the requisitions to the Requesting Official and remind that official that he or she is required to provide a Service Classification and a meaningful description of services with each requisition for services; and

(B) Notify the Requesting Official that the Office of Contracts, Policy and Procedures Branch provides guidance on how to categorize services.

(iii) For procurement of services above the simplified acquisition threshold, the Contracting Officer shall include the following in the contract file:

(A) The approving official's confirmation that the procurement complied with OFPP Policy Letter 11-01; and

(B)  Analysis, developed in coordination among the requisitioning office, the Contracting Officer, and the Office of the General Counsel, which establishes that:

*(1)* The contract does not include functions that appear on the list of IGF in the FAR or Appendix A to OFPP Policy Letter  11-01;

4

*(2)* No statutes or other authority identify functions included in the contract as IGF, or otherwise require performance of these functions by Federal employees;

*(3)* The proposed role for the contractor is not so extensive that it would pre-empt or inappropriately restrict Agency management from developing, considering, or taking courses of action;

*(4)* If the contract includes functions that are CA/IGF, that:

> *(i)* The Agency has given special consideration to using Federal employees to perform the function; and

> *(ii)* The Agency has sufficient capacity and capability to give special management attention to contractor performance, limit or guide the contractor's exercise of discretion, ensure reasonable identification of contractors work products, avoid conflicts of interest, and preclude unauthorized personal services.

*(5)* If the function is a CF, that the Agency has sufficient internal capability to control its mission and operations.

(iv)  If, after contract award, a Contracting Officer discovers that a contractor has performed IGF, the Contracting Officer shall take prompt corrective action, as necessary, such as strengthening contract oversight, in-sourcing work, the non-exercise of option periods, issuing a cure notice, terminating the contract, or terminating the portion of the contract being used to fulfill inherently governmental responsibilities.

(v) If a Contracting Officer discovers that any Agency employee directed a contractor to perform IGF, the Contracting Officer shall notify the employee's supervisor for appropriate action.  In addition, if a Contracting Officer discovers that a COR directed a contractor to perform IGF, the Contracting Officer may immediately terminate the COR's designation.

(vi)  Required Training.

(A) The Office of Contracts Policy Branch, the Office of the General Counsel, The IBB Office of Administration, and the Office of Human Resources Training Division shall coordinate to develop training for Agency staff on management of IGF, CA/IGF, and CF.

(B) All Agency Contracting Officers, Contract Specialists, Contracting Officer Representatives, Administrative Officers, and all Agency personnel who have authority to approve requisitions shall take this training no less than every two years.

(vii) Review and Updates to this Policy.  In order to comply with OFPP Policy Letter 11-01, and in accordance with BAM Title II, Section 100, the IBB Office of Administration,

Def. App. 5

in coordination with the Office of Contracts Policy Branch, shall review this policy annually.

**(e) DEFINITIONS:**

(1) <u>Service Classification</u> means the Agency's determination that services fall into one of the following categories: Inherently Governmental Functions, Closely Associated with Inherently Governmental Functions, Critical Functions, or Other Functions.

(2) <u>Inherently Governmental Functions</u> (IGF) are activities so intimately related to the public interest as to require performance by Government employees, including all examples listed in FAR Subpart 7.5 and OFPP Policy Letter 11-01.

(3) <u>Closely Associated with Inherently Governmental Functions</u> (CA/IGF) – While OFPP Policy Letter 11-01 does not provide a precise definition of "Closely Associated with Inherently Governmental Functions," generally tasks that are Closely Associated with Inherently Governmental Functions are those contractor duties that could expand to become IGF.  OFPP Policy Letter 11-01, Appendix B (page 15 of the linked document) lists examples of functions Closely Associated with Inherently Governmental Functions, including but not limited to:

   (i)  Supporting or providing advice or recommendations with regard to inherently governmental activities;

   (ii) Work in a situation that permits or might permit access to confidential business information or other sensitive information;

   (iii) Dissemination of information regarding agency policies or regulations;

   (iv) Participation in a situation where it might be assumed that the participants are agency employees or representatives;

   (v) Provision of legal advice and interpretations of regulations and statues to Government officials; and

   (vi) Provision of non-law-enforcement security activities.

(4) <u>Critical Functions</u> (CF) means functions that are necessary to the Agency being able to effectively perform and maintain control of its mission and operations. Typically, critical functions are recurring and long-term in duration. A critical function is not necessarily so intimately related to the public interest as to mandate performance by Government employees.

(5) <u>Other Functions</u> means all tasks or services that are not IGF, CA/IGF, or CF.  That is, functions which are neither so intimately related to the public interest as to mandate performance by Government employees, nor necessary to an agency's maintaining control of its mission and operations.

**(f) APPROVAL AND EFFECTIVE DATE:**

Approved by:

André Mendes
Director of Global Operations

Effective Date:

7/10/14

Def. App. 7



## UNITED STATES DEPARTMENT OF STATE
## AND THE BROADCASTING BOARD OF GOVERNORS
### *OFFICE OF INSPECTOR GENERAL*

| AUD-FM-IB-15-24 | Office of Audits | June 2015 |
|---|---|---|

# Audit of Radio Free Asia Expenditures

IMPORTANT NOTICE. This report is intended solely for the official use of the Department of State or the Broadcasting Board of Governors, or any agency or organization receiving a copy directly from the Office of Inspector General. No secondary distribution may be made, in whole or in part, outside the Department of State or the Broadcasting Board of Governors, by them or by other agencies or organizations, without prior authorization by the Inspector General. Public availability of the document will be determined by the Inspector General under the U.S. Code, 5 U.S.C. 552. Improper disclosure of this report may result in criminal, civil, or administrative penalties.

**<u>UNCLASSIFIED</u>**

## Acronyms

| | |
|---|---|
| BBG | Broadcasting Board of Governors |
| CFO | Chief Financial Officer |
| CFR | Code of Federal Regulations |
| IBB | International Broadcasting Bureau |
| OIG | Office of Inspector General |
| OMB | Office of Management and Budget |
| OTF | Open Technology Fund |
| RFA | Radio Free Asia |
| U.S.C. | United States Code |

**<u>UNCLASSIFIED</u>**

## Table of Contents

<u>Section</u>                                                                                      <u>Page</u>

Executive Summary ..................................................................................................1

Background…..........................................................................................................3

Objectives……. ......................................................................................................8

Audit Results  ..........................................................................................................8

    Finding A. Broadcasting Board of Governors Did Not Have a Well-Defined Structure To Monitor Grantee Activities ................................................................8

    Finding B. Broadcasting Board of Governors Did Not Provide Sufficient Guidance on the Use of Open Technology Fund Resources......................................................14

    Finding C. Radio Free Asia Did Not Comply With Federal Procurement Requirements or Internal Procurement Processes ........................................................16

    Finding D. Radio Free Asia Did Not Return Unneeded Funds to the Broadcasting Board of Governors. ............................................................................................32

    Finding E. Non-Personnel Expenditures Were Generally Allowable, but Some Personnel Costs May Be Unallowable ..............................................................38

List of Recommendations ......................................................................................47

Appendix
    A. Scope and Methodology.................................................................................50
    B. Broadcasting Board of Governors Response .................................................57
    C. Radio Free Asia Response..............................................................................64
    D. Office of Inspector General Replies to Radio Free Asia General Comments .............74

Major Contributors to This Report ........................................................................79

UNCLASSIFIED

# Executive Summary

The Broadcasting Board of Governors (BBG), an independent Federal agency that received approximately $714 million in appropriated funds during FY 2013, oversees all U.S. Government-supported civilian international broadcasting. BBG provides about one-third of its budget to three grantees that develop news content and provide other key services. One of these grantees is Radio Free Asia (RFA). RFA's mission is to provide accurate and timely information, news, and commentary about events in designated Asian countries. BBG provides funding to finance RFA operations. BBG also provides funding for RFA to expand unrestricted access to information on the Internet. RFA created the Open Technology Fund (OTF) program to focus on Internet initiatives.

The purpose of this audit was to assist BBG in its efforts to monitor funds provided to RFA. Specifically, the objectives of this audit were to determine to what extent BBG monitored RFA's activities, RFA used OTF resources to accomplish program priorities, RFA complied with Federal procurement requirements and internal procurement processes for awarding OTF contracts, RFA returned unused unobligated funds to BBG at the end of the fiscal year, and RFA used grant funds provided by BBG in accordance with Federal regulations and the grant agreement. The scope and methodology for this audit are in Appendix A.

The Office of Inspector General (OIG) found that BBG did not have a well-defined structure to monitor RFA activities.[1] There was no specific office or person assigned primary responsibility for monitoring grantees, and staff performing monitoring activities did not have a clear understanding of their roles. This occurred, in part, because BBG did not have sufficient policies and procedures for grants monitoring. Further, BBG's Board of Governors did not exhibit support for BBG's efforts to increase grantee oversight. Although BBG developed a Corrective Action Plan to implement previous audit recommendations related to grants monitoring, the plan was not fully implemented at the time of this audit. As a result, BBG did not detect the deficiencies in RFA grant activities that OIG identified during this audit.[2]

OIG was unable to determine the extent to which RFA used OTF resources to accomplish program priorities (such as BBG's strategies and policies) because BBG did not provide sufficient guidance to RFA describing BBG's OTF strategies or program priorities. As a result, BBG could not be sure that RFA used OTF funds to achieve BBG's overall goals for the program. OIG also found that RFA did not fully comply with Federal procurement requirements for grantees or its own internal procurement process. Specifically, OIG identified instances of noncompliance with Office of Management and Budget (OMB) conflict-of-interest requirements. In addition, RFA did not sufficiently document its justification for the lack of competition in the OTF procurement process, and none of the contracts tested had independent cost estimates. Further, RFA did not comply with its internal OTF procurement process. For example, for five of six contracts tested, RFA funded the OTF projects even though RFA Advisory Council members

---

[1] As indicated in the United States Code, 22 U.S.C. § 6204(a)(5), BBG is responsible for the oversight and administration of grants.

[2] In May 2015, OIG issued a management alert (*Management Alert: Broadcasting Board of Governors Significant Management Weaknesses,* MA-15-01) that reiterated issues identified in prior OIG reports related to BBG's oversight of grants.

UNCLASSIFIED

did not recommend the awards. These exceptions occurred, in part, because RFA had not developed and implemented a sufficient procurement policy and procedures for awarding OTF contracts. In addition, the process used by RFA for selecting projects was not adequate. As a result, there was no assurance that RFA received fair value for the contracts awarded to support OTF projects.

OIG also found that RFA did not return all unused unobligated funds to BBG at the end of FY 2013 as required by the grant agreement. OIG identified $583,583 in unused funds that RFA should have returned to BBG. RFA's practice was to keep funds received from BBG for 5 years and, at the end of the 5-year period, request permission to use the unused funds for other purposes. Further, RFA did not have a sufficient process to regularly review unused funds to determine whether the funds were still needed. In addition, BBG did not have a process to oversee RFA's unused funds annually and ensure that funds not needed were either returned or were used for another allowable purpose. As a result, OIG is questioning $583,583 in costs because the funds were not returned to BBG as required by the grant agreement.

OIG found that RFA generally used the grant funds provided by BBG in accordance with Federal regulations and the grant agreement. Of 199 non-personnel expenditures tested, amounting to $1,673,537, OIG found that 194 expenditures, totaling $1,656,505, complied with Federal regulations and the grant agreement and 5 expenditures, totaling $17,032, were not in compliance. In addition to testing a sample of non-personnel expenditures, OIG reviewed a list of RFA's general ledger accounts and identified items that were specifically prohibited by Federal regulations totaling $19,854. OIG also identified instances in which RFA's personnel-related costs were not in technical compliance with Federal law and grant requirements. Specifically, maximum salary levels for four of seven RFA positions OIG reviewed were higher than the maximum salary levels of comparable BBG positions. In addition, 4 of 11 benefits reviewed exceeded the benefits provided to Federal employees. The noncompliance occurred primarily because RFA benefits were required for some employees by a collective bargaining agreement. In addition, BBG did not perform a recent comparability study of benefits and salaries, as required, which would have allowed BBG to better determine whether the aggregation of RFA's benefits exceeded benefits provided to Federal employees. If BBG's comparability study found that the salaries and benefits offered to RFA employees exceeded those offered to Federal employees, these funds would have been deemed unallowable and could have been put to better use.

OIG made 21 recommendations to BBG that were intended to improve BBG oversight of RFA and therefore improve RFA's management of Government-provided resources. In its March 25, 2015, response (see Appendix B) to a draft of this report, BBG concurred with all 21 recommendations. Although no recommendations were addressed to RFA, OIG requested and RFA provided comments to a draft of this report, which are presented in Appendix C. Based on the responses from BBG and RFA, OIG considers 18 recommendations resolved (Recommendations 1-16, 19, and 21), 2 recommendations unresolved (Recommendations 17 and 20), and 1 recommendation closed (Recommendation 18). Management's responses and OIG's replies to those responses are presented in the body of this report following each recommendation. In addition, RFA provided general comments that were not directly related to

UNCLASSIFIED

the recommendations. A summary of RFA's general comments and OIG's replies are presented in Appendix D.

# Background

BBG is an independent Federal agency that oversees all U.S. Government-supported civilian international broadcasting. BBG received approximately $714 million in appropriated funds during FY 2013. BBG's mission is to inform, engage, and connect people around the world in support of freedom and democracy via radio, television, and the Internet. A key strategic priority for BBG is to assist people in gaining access to information in countries where governments censor information for political purposes.

A Board of Governors oversees BBG. The Board is a nine-member bipartisan body consisting of the Secretary of State (ex officio) and eight private citizens appointed by the President. Some of the Board's responsibilities include the following:

- supervising broadcasting activities
- reviewing and evaluating the mission and operation of, and assessing the quality, effectiveness, and professional integrity of, broadcasting activities
- ensuring that international broadcasting is conducted in accordance with the law
- making and supervising grants for broadcasting and related activities and
- allocating funds appropriated for international broadcasting activities among the various elements of the International Broadcasting Bureau (IBB) and grantees.

IBB, a significant component of BBG, maintains the global distribution network over which all BBG-funded news and information programming is distributed. IBB also performs administrative functions such as financial management, human resources, and information technology support. For example, IBB elements include BBG's Office of the Chief Financial Officer (CFO), Office of Human Resources, Office of Contracts, and Office of Technology, Services, and Innovation.

BBG provides about one-third of its budget to three grantees—RFA, Radio Free Europe/Radio Liberty, and Middle East Broadcasting Networks—which develop news content and provide other key services. The Corporate Boards of the three grantees are made up entirely of members of BBG's Board of Governors.[3] Figure 1 shows the organizational relationship of BBG's Board of Governors to the grantees as well as to IBB.

---

[3] 22 U.S.C. § 6207(A)(1) expressly requires the Radio Free Europe board to "consist of the members of the [BBG]." BBG has implemented the same structure for the other two grantees.

UNCLASSIFIED

UNCLASSIFIED

### Figure 1. Board of Governors Relationship to Grantees and to IBB



Source: BBG's Fiscal Year 2013 Performance and Accountability Report.

BBG has responsibility for monitoring and overseeing its grantees. At a minimum, BBG should maintain documentation of its monitoring and oversight of each grantee to ensure the grantee's compliance with the terms and conditions of the grant agreement[4] and Federal regulations. According to BBG's Grantee Handbook, information and activities that support grantee monitoring include "reports, as well as interaction with the grantee through meetings, site visits, telephone calls, written correspondence or audits."

**Radio Free Asia**

RFA was created in response to congressional direction.[5] RFA's mission is to provide accurate and timely information, news, and commentary about events in designated Asian countries. RFA broadcasts news in nine languages to the People's Republic of China, Burma, Vietnam, Laos, Cambodia, Tibet, and North Korea. RFA is a private, nonprofit Section 501(c)(3) corporation.[6] RFA has its headquarters in Washington, D.C., and has overseas offices in eight countries throughout Asia.

BBG establishes an annual grant[7] with RFA to provide news and information programming. The amount of the grant is included in BBG's annual appropriation. The grant is established using a formal grant agreement that includes guidance on the types of programming that can be produced using grant funds. The grant includes a number of administrative requirements. For example, the grant requires that BBG be given 5-days advance notice of any new contracts exceeding $350,000 and requires RFA to return to BBG any unused grant funds at the end of the fiscal year. The grant agreement also includes a requirement that BBG should conduct an annual review to measure RFA's performance in achieving the purposes of the

---

[4] BBG Grantee Handbook.
[5] 22 U.S.C. § 6208, "Radio Free Asia."
[6] Sec. 501(c)(3) of the Internal Revenue Code establishes the criteria for qualifying as a tax-exempt organization. To be exempt from taxation on earnings, an organization cannot be organized to operate for the benefit of any private interests, and no part of the organization's net earnings can be for the benefit of a private shareholder or individual.
[7] A grant is an award of financial assistance, the principal purpose of which is to transfer a thing of value from a Federal agency to a recipient to carry out a public purpose. A grant is different from a contract in that a contract is used to acquire property or services for the Federal Government's direct benefit or use.

UNCLASSIFIED
Def. App. 14

agreement and compliance with its terms. Further, the grant agreement requires RFA to comply with OMB Circulars No. A-110,[8] A-122,[9] and A-133;[10] parts of Title 5 of the United States Code (U.S.C.);[11] and Federal travel policy.[12] The grant agreement includes some limiting factors on how RFA may spend grant funds. For example, grant funds cannot be used for first-class travel accommodations.

In FY 2013, BBG provided about $37.5 million in appropriated funds to finance RFA operations (program and support services). RFA did not receive funding from any other sources. According to the grant agreement, RFA "may use the Grant Funds solely for planning and operating expenses related to international broadcasting and administration thereof." In FY 2013, BBG provided $4.3 million in additional funds to RFA for Internet anti-circumvention projects, which, according to the grant agreement, means "expanding unrestricted access to information on the Internet."[13]

Before receiving grant funds, RFA must submit a financial plan to BBG describing how it will use the funds received. The financial plan must be consistent with the strategy and purposes approved by BBG. The financial plan also estimates RFA's monthly expenditures for various items.

RFA annually prepares financial statements that include information on its assets, liabilities, revenue, and expenditures. The financial statements are audited by an independent public accounting firm as required by Federal policy.[14] For the FY 2013 financial statements, RFA received an unmodified opinion (which is the best opinion possible).

**Program and Support Services**

During FY 2013, RFA spent approximately $37.6 million for program and support services. The program services area is separated into two functions—broadcasting and programming. Broadcasting includes the costs, such as costs for broadcasters' salaries, to prepare news reports and commentary about events in the designated Asian countries. Programming includes the costs for overseeing the reporting and editing done by language services, the wire room editors, and the researchers. Support services include expenses for administrative costs, such as corporate insurance and auditing fees, and technical expenses, such as office and

---

[8] OMB A-110, *Uniform Administrative Requirements for Grants and Agreements With Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations* (codified in the Code of Federal Regulations (CFR) at 22 CFR pt. 518.5 for BBG).

[9] OMB A-122, *Cost Principles for Non-Profit Organizations* (codified at 2 CFR pt. 230).

[10] OMB A-133, *Audits of States, Local Governments, and Non-Profit Organizations.*

[11] 5 U.S.C. pt. III.

[12] While not specifically mentioned in the grant agreement, the requirement to comply with 48 CFR pt. 31.205-46, "Travel costs," is incorporated in OMB Circular A-122, which is included as a requirement in the grant agreement.

[13] According to RFA's Open Technology Fund Annual Report for 2012, the Internet is a crucial platform for freedom of expression and the exchange of ideas and information. However, some governments monitor and obstruct the use of the Internet by individuals. RFA (through BBG) is working to empower people to overcome governments that illegitimately block or censor the Internet.

[14] OMB A-133, subpt. B–Audits, §_.200(a) and (b).

computer equipment and Internet connectivity. Figure 2 provides the amount by category of RFA expenditures from program and support services funding in FY 2013.



**Figure 2. FY 2013 Expenditures for Program and Supporting Services**

- Salaries and Benefits - $25,920,162
- Contractors - $4,674,817
- Rental Expenses - $3,558,121
- Travel - $587,244
- Communications - $463,790
- News Wire Costs - $393,932
- Other - $2,041,908

Total - $37,639,974

Source: OIG prepared using RFA's Statement of Functional Expenses for the Year Ended September 30, 2013.

The largest category of expenditures, totaling $25.9 million, related to salaries and benefits. As of September 30, 2013, RFA had 253 employees. Another significant category of expenditures was related to contractors. For instance, RFA used funds (provided by the Government) to pay for editorial consultants' services and for the services of the financial statement auditors. RFA also used approximately $3.6 million for rental costs, which included the rent for its headquarters offices in Washington, D.C., and for its overseas offices in eight countries.

**Open Technology Fund**

In FY 2012, RFA established the OTF, which uses Internet anti-circumvention funding provided by BBG to support Internet freedom efforts.[15] RFA uses the funding for the development and implementation of technologies that can circumvent censorship and surveillance of the Internet to benefit all U.S. international broadcasting. For the year ended September 30, 2013, OTF expenses were approximately $4.9 million. Figure 3 provides the amount of RFA's OTF expenditures by category in FY 2013.

---

[15] This program is coordinated with BBG, the U.S. Department of State, and the U.S. Agency for International Development, all of which receive funding to support Internet freedom.

UNCLASSIFIED



Source: OIG prepared using RFA's Statement of Functional Expenses for the Year Ended September 30, 2013.

The largest category of OTF expenditures, totaling approximately $3.6 million, was for contractors working on OTF projects to support Internet freedom. Another significant category of expenditures, totaling approximately $400,000, was for Internet connectivity projects, which included translating OTF tools into multiple languages. Additionally, expenditures for salaries and benefits totaled approximately $325,000.

**Prior OIG Reports**

In 2011, OIG issued an inspection report[16] that identified concerns with RFA's procurement practices. These concerns included RFA's lack of advertising for procured services, weak justifications for sole-source purchases, and no approval process for sole-source justifications. OIG did not make formal recommendations related to these issues but instead made informal recommendations because the inspectors found no evidence of impropriety on the part of RFA or vendors. RFA officials agreed with OIG's assessment and said that RFA would address the sole-source procurement process and had directed the vice president of Administration and Finance to approve sole-source procurements.

A 2013 OIG inspection report[17] about BBG discussed the role of BBG's Board of Governors with respect to the grantees. Specifically, the report stated that the Governors were expected to supervise broadcasting activities of the various broadcasting entities, including the grantees. However, over time, the Governors' level of supervision and their focus slipped from strategic guidance to involvement in day-to-day administration, which had contributed to

---

[16] *Inspection of Radio Free Asia* (ISP-IB-11-29, Mar. 2011).
[17] *Inspection of the Broadcasting Board of Governors* (ISP-IB-13-07, Jan. 2013).

UNCLASSIFIED

UNCLASSIFIED

inefficiency and confusion over roles and responsibilities, thereby weakening the ability of BBG's staff  to manage effectively.

In FY 2014, OIG reported[18] a material weakness in internal control related to BBG's management of its grantees. Specifically, although BBG was responsible for monitoring how its grantees used BBG funds, the auditors identified numerous instances where BBG did not sufficiently monitor its grantees. The report stated that because of insufficient monitoring, BBG did not have a complete understanding of the grantees' financial management practices and was unaware that the grantees had significant amounts of unused funds.

In FY 2014, OIG reported[19] that BBG did not provide sufficient oversight of another grantee. Specifically, BBG did not sufficiently monitor activities of the grantee, adequately define roles and responsibilities related to grant oversight, and maintain adequate internal communications related to the grantee. Further, the format of financial reports required from the grantee did not include information on unfunded liabilities, and BBG did not perform benefit comparability studies in a complete or timely manner.

In 2015, OIG issued a Management Alert[20] that summarized significant vulnerabilities that OIG had identified in prior OIG projects, including issues related to BBG's management and oversight of its grantee organizations.

## Objectives

The objectives of this audit were to determine to what extent BBG monitored RFA's activities and to determine to what extent RFA:

- used OTF resources to accomplish program priorities;
- complied with Federal procurement requirements and internal procurement processes for awarding OTF contracts;
- returned unused, unobligated funds to BBG at the end of the fiscal year; and
- used grant funds provided by BBG in accordance with Federal regulations and the grant agreement.

## Audit Results

## Finding A. Broadcasting Board of Governors Did Not Have a Well-Defined Structure To Monitor Grantee Activities

Agencies have a responsibility to develop and maintain effective internal control, including ensuring sufficient monitoring of the agencies' operations. OIG found that BBG did

---

[18] *Independent Auditor's Report on the Broadcasting Board of Governors 2013 Financial Statements* (AUD-FM-IB-14-14, Dec. 2013).
[19] *Audit of Radio Free Europe/Radio Liberty After-Employment Benefits* (AUD-FM-IB-14-34, Sept. 2014).
[20] *Management Alert: Broadcasting Board of Governors Significant Management Weaknesses* (MA-15-01, May 2015.)

UNCLASSIFIED

not have a well-defined structure to monitor grantee activities. No single BBG office or person was assigned primary responsibility for monitoring grantees, staff performing monitoring activities did not have a clear understanding of their roles, and BBG had not formally designated a grants officer or analyst to monitor the RFA grant. One reason that BBG did not have a well-defined grantee monitoring structure was that BBG had not developed clear policies and procedures for overseeing grantees. Although BBG had developed a Grantee Handbook, the Handbook lacked specificity in many key areas, and some employees performing grant monitoring activities were unfamiliar with the Handbook. Further, the Board of Governors did not support BBG efforts to increase oversight of grantees. As a result of not having a structure in place to monitor grantee activities, BBG did not detect deficiencies in RFA grant activities that OIG identified during this audit.

**Lack of Well-Defined Grantee Oversight Structure**

BBG is responsible for the oversight and administration of grants[21] in accordance with the United States International Broadcasting Act of 1994, as amended;[22] OMB Circular A-110;[23] and BBG's Grantee Handbook. Further, according to OMB, the proper stewardship of Federal resources is an essential responsibility of agency managers and staff. Federal employees must ensure that Federal resources are used efficiently and effectively to achieve desired objectives. Resources must be used consistent with agency missions, in compliance with laws and regulations, and with minimal potential for waste, fraud, and mismanagement. Management has a fundamental responsibility to develop and maintain effective internal control.[24] According to the Government Accountability Office, internal control should generally be designed to ensure that ongoing monitoring occurs in the course of normal operations. The monitoring should be performed continually and ingrained in the agency's operations. This includes regular management and supervisory activities, comparisons, reconciliations, and other actions people take in performing their duties.[25]

OIG found that BBG did not have a well-defined structure for overseeing RFA or its other grantees. Specifically, no single individual or office had primary responsibility for monitoring grantees. Instead, a number of individuals and offices were involved in grantee oversight. For example, the Board of Governors performed some grantee monitoring while other BBG officials and offices, such as the Director of Global Operations, the Budget Office, and the Office of Strategy and Development, had a role in the oversight process. Even within an office, no single individual had primary responsibility for grantee oversight. For example, in the Budget Office, one employee processed payments to grantees, another employee allocated funds, and a third employee was performing day-to-day financial monitoring of the grantees.

Some of the employees who were performing grant oversight did not have a clear understanding of their roles in the oversight process. For example, one individual responsible for

---

[21] 22 U.S.C. § 6204(a)(5).
[22] 22 U.S.C. § 6201-6216.
[23] OMB Circular A-110 (codified at 22 CFR pt. 518.5 for BBG).
[24] OMB Circular A-123, *Management's Responsibility for Internal Control*.
[25] Government Accountability Office, *Standards for Internal Control in the Federal Government*, GAO/AIMD-00-21.3.1.

UNCLASSIFIED

monitoring the performance of BBG grants stated that she viewed her responsibilities as performance planning and reporting and not as monitoring. This employee indicated that she had never read the RFA grant agreement. Further, the person who was performing some of the financial monitoring duties was unclear about his authority to work directly with RFA and other grantees or to request information from the grantees.

In addition, BBG did not formally designate a grants officer or a grants analyst to oversee the RFA grant. In general, grants officers are responsible for monitoring the performance of the grantee through reviewing performance reports and financial status reports, conducting site visits of the grantees, maintaining official grant files, and signing and issuing amendments to grant awards. According to a BBG official, the Director of Global Operations has grant authority because of his position. However, this would not take the place of formally designating a grants officer with the appropriate training and experience to oversee the grant.

### Insufficient Policies and Procedures

One reason that BBG did not have a well-defined grantee monitoring structure was that BBG did not develop sufficient and clear policies and procedures for overseeing grantees, including information on employees' roles and responsibilities. One BBG official stated that the lack of clear procedures was the root cause of inadequate grantee monitoring. The BBG Grantee Handbook lacked specificity in many sections. For example, the Handbook did not assign certain oversight responsibilities to specific offices. Many of the responsibilities for overseeing grantees were included in a general section labeled "BBG responsibilities." No details were provided on which office within BBG was responsible for the grant agreement, the grant files, general monitoring, or periodic reviews.

In addition to the limitations in the Grantee Handbook, some employees involved in grant monitoring were not aware that the Handbook existed. For example, the BBG employee who monitored RFA's financial performance stated that he was not aware of the Grantee Handbook until the financial statement auditors asked him about it in FY 2013. The BBG employee who oversees the performance portion of the RFA grant also said that she was not familiar with the Handbook.

BBG also did not have a policy on required training for BBG officials who were responsible for overseeing grantees. One employee involved in overseeing RFA's financial performance indicated that he had received only limited formal training related to grantees and no formal training on how to monitor grantees. Further, BBG did not have a policy requiring that a grants analyst or grants officer be assigned to monitor grantee activities.

One BBG official stated that there were many views in BBG about what constituted monitoring grantees. The official indicated that some officials believed that oversight was not needed because funds were basically "passed through" BBG to RFA. Other officials believed that oversight was sufficient because the members of BBG's Board of Governors were also the Board of Directors for the grantees. Alternatively, some BBG officials believed that that BBG should have a robust monitoring process because BBG had not received an OMB waiver indicating that BBG and RFA did not have to comply with Federal requirements.

UNCLASSIFIED

### Board Did Not Support Efforts To Improve Grant Oversight

The lack of a well-defined grants monitoring structure also occurred because BBG's Board of Governors did not support efforts to improve grant oversight. In order for BBG to implement an effective grants monitoring infrastructure, the Board must support that effort. Ensuring an appropriate internal control environment is ultimately the responsibility of the Board of Governors. However, OIG found that the Board was not setting a "tone at the top"[26] to demonstrate its support of efforts to improve grantee oversight, even though BBG is responsible for the oversight and administration of grants.[27] OIG auditors attended two separate meetings attended by Board Members, BBG staff, and grantee representatives. In both meetings, the President of RFA raised concerns with BBG's efforts to improve grants monitoring, and Board Members either supported the President of RFA's position or remained silent, thereby allowing RFA to effectively limit the oversight of the grant.

For example, during one meeting, BBG's CFO and a BBG contractor were discussing an initiative to develop policies and procedures to better oversee the grantees. RFA's President questioned the CFO's authority to improve oversight specifically related to OTF funds and stated that the CFO did not have the authority to increase oversight of the grantees. One Board Member concurred with the RFA President that the CFO did not have authority to improve oversight of grantees, especially related to OTF. The Board Chairman stated that the Board would consider the need for additional oversight at a later time, once more progress was made.

At another meeting, BBG officials discussed the development of a committee that would determine the projects that should be funded using Internet anti-circumvention funding, including projects funded by RFA through the OTF program. RFA's President stated that the Committee should be responsible only for BBG Internet anti-circumvention projects and not for RFA OTF projects. None of the Board Members disagreed with the RFA President's statements. In fact, one Board Member was supportive of RFA's efforts while being critical of BBG's internal efforts.

If improvement in RFA grant oversight is to be realized, it is imperative that the Board of Governors support the efforts of BBG staff to improve internal controls related to the oversight of BBG grantees. If the Board is unable to separate its roles as Board Members for BBG and Board Members for RFA, then it should formally recuse itself from involvement in the development of grant monitoring controls.

### BBG's Efforts To Improve Grants Monitoring

In FY 2014, BBG developed a Corrective Action Plan that outlined certain control improvements for grantee monitoring. The external firm developing the Corrective Action Plan recommended a number of areas that should be improved, including the following:

---

[26] According to the Association of Certified Fraud Examiners, "tone at the top" refers to the atmosphere created in the workplace by the organization's leadership.
[27] 22 U.S.C. § 6204(a)(5).

UNCLASSIFIED

- Update the Grantee Handbook to include specific procedures for the monitoring of grantees by role.
- Define roles and responsibilities within the organization in regards to grant administration and oversight.
- Establish a process to consolidate grantee monitoring procedures and develop a plan to communicate the results.

As of August 2014, this plan was not substantively implemented. According to a BBG official, BBG made progress on the new monitoring procedures but had not yet vetted them with stakeholders—specifically OMB and the grantees.

### Insufficient Monitoring Allowed Grantee Issues To Go Undetected

Because BBG did not have a sufficient oversight structure in place to monitor grantees and administer grant agreements, it did not detect issues that OIG identified during this audit. These issues are presented as Findings B, C, D, and E in this report.

**Recommendation 1.** OIG recommends that the Broadcasting Board of Governors define its grant monitoring structure, formally document the roles and responsibilities of all parties involved in the grant monitoring process, and revise its Grantee Handbook accordingly.

**BBG Response:** BBG concurred with the recommendation, stating that it had "drafted a revised Grantee Handbook, which outlines the roles and responsibilities of various Agency offices in grant oversight and administration." BBG further stated that the Handbook was "pending internal review and approval" and that it anticipated that the Handbook would be approved and in use "by the end of the 1st Quarter of FY 2016."

**OIG Reply:** Based on BBG's concurrence and planned corrective actions, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts a revised Grantee Handbook that defines the grant monitoring structure and documents the roles and responsibilities of all parties involved in the grant monitoring process.

**Recommendation 2.** OIG recommends that the Broadcasting Board of Governors develop and implement a comprehensive grant oversight program and revise its Grantee Handbook to document the specific procedures for the grant oversight program.

**BBG Response:** BBG concurred with the recommendation, stating that it has "drafted a grant monitoring program" that "aligns with its revised Grantee Handbook, as well as OMB 2 CFR 200 requirements." BBG further stated that the draft grant monitoring program is "pending internal review and approval."

**OIG Reply:** Based on BBG's concurrence and planned corrective actions, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has developed and implemented a

comprehensive grant oversight program and revised its Grantee Handbook to document the specific procedures for the grant oversight program.

**Recommendation 3.** OIG recommends that the Broadcasting Board of Governors (BBG) develop and implement a training plan for all employees involved in grant oversight as determined in response to Recommendation 1. This training plan should cover both Government-wide requirements for grant oversight and also BBG's internal grants policies and procedures. BBG should revise its Grantee Handbook to include the training plan.

**BBG Response:** BBG concurred with the recommendation, stating that training slides are being "developed for both the Federal and Non-Federal entities as a part of a grant monitoring program" and that BBG employees who are responsible for grantee activities have "enrolled in grant management training."

**OIG Reply:** Based on BBG's concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has developed and implemented a training plan for all employees involved in grants oversight and revised its Grantee Handbook accordingly.

**Recommendation 4.** OIG recommends that the Broadcasting Board of Governors (BBG) formally designate a grants analyst to monitor Radio Free Asia. As part of the designation, BBG should ensure that the grants analyst's responsibilities are clearly defined and communicated to that employee.

**BBG Response:** BBG concurred with the recommendation, stating that it is "actively recruiting an experienced Grants Manager." BBG provided documentation showing that a vacancy announcement for the position had been issued.  BBG further stated that it anticipated that "a Grants Manager will be onboard by the 3rd Quarter of FY 2015" who "will lead the grant monitoring efforts, in cooperation with a budget analyst."

**OIG Reply:** Based on BBG's concurrence and planned corrective actions, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has designated a Grants Manager and that the Grants Manager's responsibilities are clearly defined.

**Recommendation 5.** OIG recommends that the Board of Governors formally designate a high level Broadcasting Board of Governors (BBG) official, such as the Chief Executive Officer, as the official responsible for approving initiatives to improve BBG's grant oversight process.

**BBG Response:** BBG concurred with the recommendation. BBG stated that based on delegation of authority from the Board, BBG's interim Chief Executive Officer/Director has "authority to approve initiatives to improve BBG's grant oversight process."

UNCLASSIFIED

**OIG Reply:** Based on BBG's concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts the official delegation of authority from the Board to the interim Chief Executive Officer.

**Recommendation 6.** OIG recommends that the Broadcasting Board of Governors (BBG) ensure that the Board of Governors immediately receives training and guidance on its responsibilities as a Board. This training and guidance should include, but not be limited to, information on Federal requirements for overseeing grantees and BBG's internal grant oversight policies and procedures. The training should also address the Board's responsibilities for ensuring that BBG complies with Federal grants regulations. In addition, BBG should develop a plan to provide refresher training to the Board on its responsibilities annually.

**BBG Response:** BBG concurred with the recommendation, stating that it planned to provide training to the Board of Governors "on Federal requirements for overseeing grantees and BBG's internal grant oversight policies and procedures, including, for example, the relevant circulars of the Office of Management and Budget."

**OIG Reply:** Based on BBG's concurrence and planned corrective actions, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that members of BBG's Board of Governors have received training on responsibilities for overseeing grantees and also that BBG has developed a plan to provide refresher training to the Board annually.

## Finding B. Broadcasting Board of Governors Did Not Provide Sufficient Guidance on the Use of Open Technology Fund Resources

The grant agreement between BBG and RFA states that grant funds provided to RFA should be used to "promote and implement" BBG "strategy and policy." OIG was unable to determine the extent to which RFA used OTF resources to accomplish program priorities (such as BBG's strategies and policies) because BBG did not provide sufficient guidance to RFA describing BBG's OTF strategies or program priorities. As a result, BBG could not ensure that RFA prioritized the use of the limited OTF funds to achieve BBG's overall goals for the program.[28]

To determine whether RFA's OTF projects accomplished program priorities, OIG reviewed 30 OTF contracts,[29] totaling $7.8 million. Based on the OTF mission statement, RFA uses OTF funds for "projects that develop open and accessible technologies promoting human rights and open societies" and to "advance inclusive and safe access to global communication networks." An example of the type of projects funded by RFA's OTF funds was for the development of software for operating systems aimed at supporting the practice of journalistic

---

[28] As indicated in 22 U.S.C. § 6204(a)(5), BBG is responsible for the oversight and administration of grants.

[29] RFA funded 47 contracts using OTF funds during FYs 2012 and 2013. However, 17 of the contracts related to security audits or service contracts. Therefore, for the purposes of audit testing, OIG considered only the 30 contracts that related to OTF projects. The section "Detailed Testing Methodology" in Appendix A provides details on the work performed.

UNCLASSIFIED

UNCLASSIFIED

whistleblowing,[30] which gave people the tools necessary to start their own journalistic whistleblowing initiative. Another funded project was intended to build servers to support secure text messaging functionality for a mobile device platform.

However, OIG could not determine whether the projects related to BBG's priorities for the OTF program because BBG had not provided detailed, formal guidance to RFA on its strategies or policies for the program. Although BBG Board Members provided feedback to RFA on OTF projects, the only formal document with instructions to RFA on the use of OTF funds was the grant agreement. The FY 2013 grant agreement stated that RFA was authorized to use OTF funds for "costs associated with expanding unrestricted access to information on the internet." However, the grant agreement did not include details on BBG's program priorities or strategies.

RFA officials stated that they informed BBG officials (including members of BBG's Board of Governors and IBB officials) about OTF projects that RFA planned to fund and that BBG did not notify RFA that any of the proposed projects were improper. However, one IBB official stated that IBB officials did not object to proposed OTF projects because BBG's Board of Governors typically agreed with RFA's projects. While informal feedback from the Board is useful, it does not take the place of a formal, agreed-upon framework on how OTF funds should be spent to achieve BBG's strategies and policies.

BBG did not provide formal guidance to RFA on the use of OTF funds to achieve BBG's strategies. Thus, BBG could not be assured that RFA used OTF funds in a manner that met BBG's priorities for the OTF program. Developing and implementing better guidance on how RFA is to use the funds would assist both BBG and RFA in prioritizing work and ensuring resources are efficiently used to achieve desired outcomes.

**Recommendation 7.** OIG recommends that the Broadcasting Board of Governors (BBG) develop a formal framework describing how Radio Free Asia should use Internet anti-circumvention funds. This framework should describe BBG's priorities for the use of the funds.

**BBG Response:** BBG concurred with the recommendation, stating that it is "currently drafting policy and procedures designed to provide oversight for the use of all Internet Anti-Censorship funds to ensure usage is in line with appropriation language, BBG strategy, and applicable procurement process and approvals."

**OIG Reply:** Based on BBG's concurrence and planned corrective actions, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has developed a formal framework describing how Internet anti-circumvention funds can be used, including BBG priorities.

---

[30] An RFA official defined journalistic whistleblowing as people in closed countries who report on human rights issues, corruption, illegal logging, disappearances, or other issues via the Internet.

UNCLASSIFIED

UNCLASSIFIED

**Recommendation 8.** OIG recommends that the Broadcasting Board of Governors (BBG) revise the grant agreement with Radio Free Asia (RFA) to provide guidance to RFA on the newly developed framework describing BBG's priorities for the use of the Internet anti-circumvention funds, as determined in response to Recommendation 7.

**BBG Response:** BBG concurred with the recommendation. BBG stated that in its FY 2015 Operating Plan that was sent to Congress, the Board "expressed its intent to establish a sound oversight mechanism for any funds granted to RFA." The scope of the Board's direction to BBG's interim Chief Executive Officer/Director "authorizes the inclusion of conditions, including imposition of these recommended requirements, in any subsequent grant amendment."

**OIG Reply:** Based on BBG's concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that the grant agreement with RFA has been updated to include guidance on the priorities for the use of the Internet anti-circumvention funds.

## Finding C. Radio Free Asia Did Not Comply With Federal Procurement Requirements or Internal Procurement Processes

OIG found that RFA did not comply with Federal procurement requirements for grantees. OIG identified instances in which RFA and its agents did not comply with OMB conflict-of-interest procurement requirements for grantees. Specifically, OIG found that RFA entered into 14 contracts, totaling $4.0 million (51 percent of the amount of OTF FYs 2012 and 2013 project-related contracts), with organizations that had some affiliation with either RFA officials or members of the OTF Advisory Council.[31] Further, of six RFA contracts tested, OIG found that none of the contracts fully complied with other Federal procurement requirements for grantees. Specifically, none of the six contracts were competed, and RFA did not have adequate justification for the lack of competition. Further, RFA did not develop formal independent cost estimates or show evidence of cost or price analyses for all six contracts. Although OIG found that RFA performed contract administration tasks related to monitoring the six contracts, OIG identified four contracts where contractual deadlines were missed and no action was taken by RFA to address the condition.

RFA also did not comply with its own internal procurement process[32] for OTF projects. For example, in some cases RFA funded projects that Advisory Council members did not recommend. In addition, RFA did not have evidence that the RFA Legal Counsel and President approved each of the projects that were funded, as required by RFA's internal process.

These exceptions occurred, in part, because RFA's conflict-of-interest policy was ineffective and conflict-of-interest disclosure statements were not always maintained. In

---

[31] RFA used an Advisory Council to evaluate project proposals prior to awarding OTF contracts. According to the OTF website, the 19 Advisory Council members are not RFA employees but are volunteers who are employed by universities, foundations, and private companies.

[32] RFA's process for OTF procurements, specifically contract awards, was included on its website.

UNCLASSIFIED

UNCLASSIFIED

addition, RFA did not have detailed procurement policies and procedures for the OTF program. Additionally, OTF staff was not familiar with the acquisition process, and RFA did not have an approach to monitor procurements to ensure that RFA's internal process, outlined on the OTF website, was followed. Based on these concerns, RFA and BBG should reconsider RFA's process for evaluating and selecting OTF projects. Because RFA did not comply with Federal procurement requirements or its own internal process, there was no assurance that BBG and RFA received fair value for OTF projects.

**Radio Free Asia Did Not Comply With Federal Procurement Requirements for Grantees**

BBG's grant agreement with RFA requires that RFA's procurement processes comply with OMB guidance.[33] OIG found that RFA did not comply with the OMB procurement standards for grantees. Specifically, RFA did not ensure that its employees and agents complied with OMB requirements related to real or apparent conflicts of interest. OIG found that RFA entered into 14 contracts, totaling $4.0 million,[34] with organizations that had some affiliation with either RFA officials or members of the OTF Advisory Council. In addition, RFA did not comply with other procurement requirements related to competition, cost estimates, and contract administration.

### Radio Free Asia Did Not Comply With Conflict-of-Interest Requirements for its Employees

OMB's procurement standards for grantees state, "No employee, officer, or agent shall participate in the selection, award, or administration of a contract supported by Federal funds if a real or apparent conflict of interest would be involved. Such a conflict would arise when the employee, officer, or agent . . . has a financial or other interest in the firm selected for an award."[35] OIG found that RFA did not comply with this requirement. Some RFA officials who determined which OTF proposals to fund were affiliated with organizations that received OTF funding. Specifically, OIG identified four RFA officials who had some affiliation with two organizations that were awarded a total of seven contracts during FYs 2012 and 2013.[36] Table 1 provides details of the organizations and the number of contracts awarded to them.

**Table 1. RFA Officials Affiliated With Organizations That Received OTF Funding**

| Organization | Number of Contracts Awarded | Amount of Contracts Awarded |
|---|---|---|
| New America Foundation | 5 | $1,411,800 |
| Freedom2Connect | 2 | 1,200,000 |
| Totals | 7 | $2,611,800 |

Source: OIG developed based on a review of the Internet and OTF contracts.

---

[33] The grant agreement requires that RFA procedures be in compliance with OMB Circular A-110, which was codified in 22 CFR pt. 518.5.

[34] These 14 contracts reflect approximately 51 percent of the number of OTF project-related contracts entered into during FYs 2012 and 2013.

[35] 22 CFR pt. 518.42, "Codes of Conduct."

[36] One of the organizations was also affiliated with three Advisory Council members.

UNCLASSIFIED

**New America Foundation.** RFA awarded five contracts, amounting to $1.4 million, to New American Foundation. A senior RFA official served as a Senior Technology Fellow with New America Foundation's Open Technology Initiative from 2009 through 2011. Although the official did not work for New America Foundation at the time of the contract awards, his recent employment for this organization gives the appearance of a conflict of interest that should have been considered before the awards were made.

**Freedom2Connect Foundation.** The President of RFA established the Freedom2Connect Foundation (Foundation) in 2011 as a private non-profit 501(c)(3) organization.[37] In addition, RFA employees serve as the Secretary and Treasurer of Freedom2Connect.[38] According to an RFA official, the purpose of the Foundation is to "raise private money and merge it with public money to take on better projects" for OTF. RFA awarded two contracts, totaling $1.2 million, to the Foundation for anti-censorship projects.

The RFA President informed OIG that she disassociated herself from the Foundation after it was established. However, on her conflict-of-interest form for 2012, she lists herself as a Freedom2Connect advisor. Regardless of the RFA President's current role, there is an association between the RFA President and the Foundation that creates the appearance of a conflict of interest. In addition, other RFA employees continue to volunteer their services to the Freedom2Connect Foundation. Additionally, the Foundation's address and suite number are the same as RFA's address and suite number,[39] and RFA is the registered agent for the Foundation.

Following RFA's $1.2 million contract award to Freedom2Connect, the Foundation gifted the entire amount to the University of California-Berkeley (Berkeley) in support of "anti-censorship research." RFA officials stated that the Department of State was partially funding the same project and the RFA President believed the entire project should be funded. However, OIG noted that three of RFA's Advisory Council members questioned the Foundation project because of concerns with the project proposal. For example, one Council member said that the work was praiseworthy but "extraneous to RFA's goals," and another member said that it "feels interesting on a theoretical basis, but might be unlikely to succeed in a real-world environment."

In addition to the factors related to the apparent conflicts of interest prohibited by OMB guidance setting forth the uniform administrative requirements for grants, RFA also did not comply with OMB guidance that prohibits grantees from using Government funds for donations or contributions.[40] According to RFA officials, RFA provided funding to Berkeley as a gift through the Foundation to decrease the 53.5 percent overhead rate charged by Berkeley for

---

[37] An organization that qualifies for tax exemption under Section 501(c)(3) of the Internal Revenue Code is commonly referred to as a "charitable organization" and must not be organized or operated for the benefit of private interests. Although established as a not-for-profit organization, during OIG's audit, the Foundation was delinquent in its filings with the District of Columbia's Department of Consumer and Regulatory Affairs. For example, the Foundation had not filed its Biannual Compliance Reports, which were due on April 1, 2012, and April 1, 2014, and had not paid its fees associated with its required filing of the compliance reports.

[38] These RFA employees work for the Foundation on a voluntary basis.

[39] According to an RFA official, the RFA address was used because the Foundation was registered in Washington, D.C., and none of the Foundation volunteers lived in Washington, D.C.

[40] OMB Circular A-122, att. B (item 12).

UNCLASSIFIED

research grants to 10.5 percent, which is the overhead rate charged by Berkeley for research gifts. RFA officials indicated that since RFA did not gift the funds directly to Berkeley but through the Foundation, RFA complied with the OMB requirement. The RFA General Counsel also stated that she believed that the OMB guidance restricting the use of grant funds did not extend beyond the transfer of funds to the Foundation. Further, because the funds were transferred using a contract rather than a sub-grant award mechanism, she stated that the OMB guidance would not apply.

OIG disagrees with the conclusions reached by RFA officials that the gift of Federal funds was allowable. OMB guidance states that the provisions of the guidance,[41] including a requirement to comply with allowable cost principles contained in OMB Circular A-122,[42] shall be applied to subrecipients performing work under awards if the subrecipient is a non-profit organization. A subrecipient is defined as an entity that receives a subaward.[43] The OMB guidance states that a subaward means an award of financial assistance made by a recipient, which can be provided by any legal agreement, even if the agreement is called a contract.[44] Since the contract between RFA and the Foundation was not for the procurement of goods and services but instead provided financial assistance, OIG considers the amount provided to the Foundation to be a subaward. As noted, OMB Circular A-122 prohibits the use of Federal grant funds for donations or contributions.[45] Therefore, RFA should have ensured that its subrecipient did not use Federal funds as a gift.

Berkeley used the $1.2 million in funds provided by the Foundation for the purposes originally intended. But because the Foundation elected to provide the $1.2 million as an unrestricted gift, the funds could have been reallocated to other purposes with no recourse for RFA.

**Conflict-of-Interest Policy for Radio Free Asia Employees.** RFA's conflict-of-interest policy requires employees to take "scrupulous care to avoid any action or relationship, whether inside or outside the workplace, and whether or not specifically prohibited by an RFA policy or procedure, which results in or is reasonably likely to create the appearance of:

- Losing independence, impartiality, or honesty;
- Using their status with RFA to promote personal interest or gain;
- Giving inappropriately preferential treatment to any person;
- Impeding the Company's efficiency or economy;
- Making a decision on behalf of RFA outside of Company-sanctioned channels; or
- Undermining the confidence of the public in the integrity of the Company."

Violation of the policy, "including the failure to report existing or prospective activities or relationships that constitute or create the appearance of a conflict of interest," could result in disciplinary action, such as termination of employment.

---

[41] 22 CFR pt. 518.5.
[42] 22 CFR pt. 518.27.
[43] 22 CFR pt. 518.2(gg).
[44] 22 CFR pt. 518.2(ff).
[45] OMB Circular A-122, att. B (item 12).

UNCLASSIFIED

UNCLASSIFIED

Two of the four RFA employees who OIG found had some affiliation with organizations that were awarded contracts during FYs 2012 and 2013 did not comply with RFA's conflict-of-interest guidance. Specifically, one employee did not include, in a 2012 conflict-of-interest document, the relationship the employee had with the New America Foundation. The other employee disclosed, in the conflict-of-interest document, that the employee provided "programmatic advice and information to the Freedom2Connect Foundation."

### Radio Free Asia Did Not Comply With Conflict of Interest Requirements for its Agents

OIG also found that RFA did not comply with OMB conflict-of-interest requirements for some RFA agents, specifically, members of RFA's Advisory Council. RFA awarded 30 OTF contracts for projects during FYs 2012 and 2013.[46] Prior to awarding the contracts, RFA used an Advisory Council to evaluate the project proposals for technical viability and to determine whether the projects supported OTF objectives. According to the OTF website, the 19 Advisory Council members were not RFA employees but were experts in privacy and security technology who had "volunteered their service in their respective personal capacity." The members came from different backgrounds, such as working at universities, foundations, and private companies. The Advisory Council's role was to provide formal evaluations of the proposals that it reviewed. The members could either recommend the proposals for contract award or provide feedback on their concerns about the proposals as written.

OIG reviewed the 30 OTF project-related contracts and identified 14 contracts, totaling $4.0 million, with organizations that had some affiliation with 7 of the 19 members of the Advisory Council. For example, one Advisory Council member is a founder of one of the organizations that received OTF funding. Additionally, five other Advisory Council members are employees of organizations that were awarded contracts. These 14 projects represented 51 percent of the total amount (about $7.8 million) of OTF project contracts for FYs 2012 and 2013. Table 2 provides information on the organizations and the number and dollar amount of the contracts awarded.

---

[46] RFA funded 47 contracts using OTF funds during FYs 2012 and 2013. However, 17 of the contracts related to security audits or service contracts, which were not reviewed by the Advisory Council. Therefore, for the purposes of this section, OIG considered only the 30 contracts that related to OTF projects.

UNCLASSIFIED

**Table 2. Organizations Affiliated With Advisory Council Members Who Received OTF Funding**

| Organization | Number of Contracts Awarded | Amount of Contracts Awarded |
|---|---|---|
| University of California-Berkeley* | 2 | $1,200,000 |
| Thinkst | 1 | 130,000 |
| SecondMuse | 1 | 162,410 |
| New America Foundation | 5 | 1,411,800 |
| Whisper Systems | 5 | 1,133,862 |
| Totals | 14 | $4,038,072 |

*These two contracts were not awarded directly to Berkeley by RFA. Instead, they were awarded to another not-for-profit organization, which then gifted the funds to Berkeley. Additional information on this not-for-profit is provided in the section "Freedom2Connect Foundation" of this report.
Source: OIG developed based on a review of the OTF website and OTF contracts.

RFA requires Advisory Council members to sign annually the "RFA Open Technology Fund Advisory Council Conflict of Interests Policy and Non Disclosure Agreement." The purpose of the policy is to protect RFA's interests when RFA is contemplating entering into a transaction being reviewed by the Advisory Council that might benefit the private interests of an Advisory Council member. The policy is also intended to identify "independent" Advisory Council members. In addition to the annual document, each Advisory Council member is required to complete an "Advisory Council Member Conflict of Interests Disclosure Form" prior to evaluating a proposal. This disclosure form requires Advisory Council members to identify any relationship, transactions, or positions held that may create a conflict of interest between RFA and the Advisory Council member's personal or financial interests.

To determine whether the Advisory Council members signed both documents, OIG obtained and reviewed conflict-of-interest documentation for five[47] of 30 project-related contracts. OIG found that none of the five contract files included complete conflict-of-interest documentation. For example, for four of five contracts, only one Advisory Council member signed the annual conflict-of-interest disclosure form. Further, not all Advisory Council members signed the additional project-specific disclosure form required before evaluating a proposal for any of the contracts reviewed. A summary of compliance with RFA's Advisory Council conflict-of-interest policy for the five contracts is shown in Table 3.

---

[47] OIG selected six contracts for procurement review. However, two of those contracts were awarded to the same organization for a project with work that would be performed in FYs 2012 and 2013. The Advisory Council reviewed the proposal only once because the proposal submitted for its review was for both years. Thus, instead of six proposals for Advisory Council review, there were five.

UNCLASSIFIED

**Table 3. Summary of Compliance With RFA's Advisory Council Conflict-of-Interest Policy**

|  | Contract 1 | Contract 2 | Contract 3 | Contract 4 | Contract 5 |
|---|---|---|---|---|---|
| Number of Advisory Council members who reviewed the proposal | 3 | 4 | 3 | 2 | 5 |
| Number of Advisory Council members who signed the annual conflict-of-interest disclosure | 1 | 1 | 1 | 1 | 5 |
| Number of Advisory Council members who signed the project-specific conflict-of-interest disclosure | 1 | 0 | 0 | 1 | 3 |

Source: Prepared by OIG based on the results of testing.

The reason that none of the five contract files we examined had complete conflict-of-interest documentation was, in part, because RFA did not have a process in place to ensure that Advisory Council members completed the two types of conflict-of-interest disclosure forms. We reviewed the list of Advisory Council members who evaluated projects. According to documentation provided by RFA, none of the Advisory Council members evaluated proposals for organizations with which they were affiliated. However, the number and dollar amounts of the contracts that were awarded to organizations affiliated with Advisory Council members created the appearance of potential conflicts of interest.

**Radio Free Asia Did Not Comply With Other Federal Procurement Requirements for Grantees**

In addition to conflict-of-interest requirements, OMB mandates that grantees comply with other procurement requirements, including the following:

- Competing procurement transactions to the maximum extent practical.[48]
- Justifying the lack of competition for contracts that are sole sourced.[49]
- Developing independent cost estimates.[50]
- Performing cost or price analyses.[51]
- Maintaining a system of contract administration.[52]

Further, grantees are required to maintain contract files that contain documentation supporting RFA's compliance with these requirements.

---

[48] 22 CFR pt. 518.43, "Competition."
[49] 22 CFR pt. 518.46, "Procurement records."
[50] 22 CFR pt. 518.44, "Procurement procedures."
[51] 22 CFR pt. 518.45, "Cost and price analysis."
[52] 22 CFR pt. 518.47, "Contract administration."

UNCLASSIFIED

UNCLASSIFIED

OIG tested six RFA contracts,[53] totaling about $4.0 million, related to the OTF program to determine whether RFA complied with certain procurement requirements.[54] OIG found that RFA did not comply with certain procurement requirements for any of the contracts tested. Table 4 provides the results of testing.

**Table 4. Compliance with Federal Procurement Requirements**

|  | Contract 1 | Contract 2 | Contract 3 | Contract 4 | Contract 5 | Contract 6 |
|---|---|---|---|---|---|---|
| Contract Was Competed | No | No | No | No | No | No |
| Sole-Source Justification Provided | Yes | Yes | Yes | No | Yes | No |
| Independent Cost Estimate Developed | No | No | No | No | No | No |
| Cost or Price Analysis Performed | No | No | No | No | No | No |
| Evidence of Contract Administration | Yes | Yes | Yes | Yes | Yes | Yes |

Source: Prepared by OIG based on testing six RFA contracts.

**Insufficient Competition.** None of the six contracts tested were competed, meaning that all were issued using a sole-source[55] award. Further, according to RFA officials, RFA chose to issue all 47 OTF procurements during FYs 2012 and 2013 as sole-source awards. RFA officials stated that RFA did not complete the OTF procurements because of the "unique nature of the work" that OTF requires. RFA officials further explained that OTF projects are concepts or ideas that individuals or organizations develop, and according to RFA officials, these individuals or organizations wanted assurance that their ideas would not be taken by others. However, OIG reviewed the 47 OTF contracts and identified 17 that were awarded for services. OIG concluded that these 17 service contracts were neither "unique" nor would inherently expose concepts or ideas if the procurements were competed. Specifically, these contracts, which again were awarded by RFA using a sole-source award, included five contracts, totaling about $79,000, to develop the OTF website. Another two contracts, totaling $200,000, were awarded for translating software, websites, documentation, and other information into foreign languages. An additional six contracts, totaling $563,000, were awarded for security audits. Three contracts, totaling approximately $34,000, were for event planning and event facilitation. Finally, one contract, for $275,000, was for a research study to map the digital environment in a specific country.

**Insufficient Sole Source Documentation.** RFA did not maintain sufficient documentation to support the decision not to compete the procurements. Although it may have

[53] Two contracts were awarded based on the same proposal. Specifically, the proposal included work to be performed during two separate years.

[54] The section "Detailed Testing Methodology" in Appendix A provides information on how the contracts were selected for this audit.

[55] Sole-source acquisition means a contract for the purchase of supplies or services that is entered into after soliciting and negotiating with only one source. According to the Federal Acquisition Regulation (sbpt. 6.302, "Circumstances permitting other than full and open competition"), some of the circumstances permitting other than full and open competition include the following; only one responsible source is available, unusual or compelling urgency, or national security.

UNCLASSIFIED

UNCLASSIFIED

been appropriate for RFA to award the six contracts tested without competition, it was difficult to determine because of the insufficient sole-source justifications. Two of six contracts did not have sole-source justifications in the file. One contract awarded in FY 2013 was based on a proposal submitted in FY 2012 for a 2-year project.[56] According to RFA officials, the FY 2013 contract did not need a sole-source justification because the justification used for the FY 2012 contract also applied to the FY 2013 contract. The second contract without a sole-source justification was also awarded in FY 2013. The RFA President provided OIG a blanket sole-source justification, prepared in April 2012, as a justification for sole-source contracts. The blanket justification provided several general reasons for using the sole-source procurement method, such as project efficiency, expedited timetables, and "nimble funding structure." OIG concluded that the blanket justification was not sufficient because it did not provide details on why specific projects were awarded without competition.

The remaining four of the six contracts tested had justifications in the contract file. RFA provided hand-written memoranda to justify the lack of competition for the four contracts. The justifications for two contracts stated that the work would "complement the project work funded by the State Department to complete the project life cycle." RFA sole sourced the other two contracts because the individuals hired to work on the projects were the ones who originally developed the projects.

OMB guidance to grantees requires that justification for sole-source contracts be documented; it does not provide details on the type of information that must be included in the justification. Although grantees are not required to comply with the Federal Acquisition Regulation, the regulation provides information on what a justification for less than full and open competition should include.[57] Specifically, justifications should include such things as:

- A demonstration that the proposed contractor's unique qualifications or the nature of the acquisition requires the use of a sole-source contract.
- A description of the market research conducted.
- A determination that the anticipated cost will be fair and reasonable.
- Approval in writing by an appropriate official.

Based on this guidance, OIG concluded that the limited information included in the justifications for the four OTF contracts was insufficient. The justifications did not include details to demonstrate that the sole-source award was appropriate or that the vendor chosen would provide the expected services at a fair and reasonable rate. Further, the justifications were not signed by an approving official, although RFA's President stated that she personally prepared the documents.

**Lack of Independent Cost Estimates.** RFA did not develop independent cost estimates for any of the six contracts tested. According to RFA officials, a formal cost estimate was not

---

[56] RFA awarded two contracts to the same organization, giving the organization $600,000 in FY 2012 and another $600,000 in FY 2013, for a total of $1.2 million.
[57] Federal Acquisition Regulation, sbpt. 6.303-2, "Content."

UNCLASSIFIED

needed because OTF staff has knowledge about the work involved and know what the costs of each project should be.

**Lack of Cost or Price Analysis.** RFA was unable to show evidence that it performed cost or price analyses for any of the six contracts tested. According to an RFA official, a formal cost or price analysis was not needed because OTF officials negotiate and significantly reduce the amount of the proposals before final award. OIG reviewed the original cost proposals for the six contracts and their final awards and did not identify significant reductions. For example, one contract's proposed cost was $1 million, which was the awarded amount. Another contract was awarded for $991,750, which was a reduction of only $5,400 (less than 1 percent) from the original proposal amount.

**Some Contract Administration Performed.** After contracts are awarded, grantees must maintain a system of contract administration to ensure conformance with the terms and conditions of the contract. OIG found evidence in the contract files that OTF staff performed some contract administration tasks to monitor its contractors and ensure that the work performed met the conditions of the contracts. For example, the contract files for the six contracts tested contained emails from vendors communicating the progress of their work, notes of telephone calls, written status updates, and periodic reports.

Although OIG found evidence in the contract files of some contract monitoring, the monitoring process did not always ensure that contractual deadlines were met. OIG identified 4 of 47 OTF contracts where deadlines were not met, and RFA did not take action to either extend the deadlines or require the contractor to comply with the contract. RFA officials were not aware that these deadlines were missed until OIG brought it to their attention. An RFA official stated that contract extensions were not initiated because a project manager position was temporarily vacant.

**Radio Free Asia Did Not Comply With its Internal Procurement Process**

RFA developed written procurement procedures for certain types of procurement activities, such as using consultants and purchasing services and goods. However, the procedures did not address OTF procurements. RFA posted the OTF contract award process on the OTF website. The process begins when an interested party submits a concept note or proposal through the OTF website.[58] OTF staff work with organizations that submit ideas to develop a sufficient proposal for projects that the OTF staff believe are viable and relate to the program.

Once approved by OTF staff, OTF submits the proposals to the Advisory Council for review and evaluation. Advisory Council members[59] review the proposals to determine whether they are technologically viable and financially sound and make recommendations for funding. The website did not indicate how many Advisory Council members must recommend a project

---

[58] Although not specifically mentioned on the website, this process is used only for proposals for projects related to Internet or mobile device programs. Internally determined service-type contracts, such as for the development of the OTF website, are not put through this process.

[59] At the time of the audit, the Advisory Council consisted of 19 members; prior to 2013, the Council consisted of 7 members.

UNCLASSIFIED

before it goes forward in the process. According to one official, for FYs 2012 and 2013, OTF considered two Advisory Council member recommendations sufficient. Another RFA official stated that in FY 2012, three Advisory Council members approved a proposal before the proposal could go forward, while five to six Advisory Council members were needed in FY 2013.

Proposals with recommendations for funding from both OTF staff and the Advisory Council are then reviewed by RFA's executive, legal, and financial departments before contracts are awarded. According to the OTF website, contracts are awarded for final proposals determined to be a "high priority, technically feasible, and legally and fiscally compliant."

OIG reviewed the proposals related to six RFA OTF contracts,[60] totaling about $4.0 million, to determine whether RFA complied with the process described on its website.[61] OIG found that none of the six proposals complied with all of the procurement requirements. Table 5 provides the results of the testing.

**Table 5. Compliance With Radio Free Asia Procurement Process**

|  | Contract 1 | Contract 2 | Contract 3 | Contract 4 | Contract 5 | Contract 6 |
|---|---|---|---|---|---|---|
| Sufficient Number of Advisory Council Members Reviewed the Proposal[*] | Yes | Yes | Yes | Yes | Yes | Yes |
| Sufficient Number of Advisory Council Members Recommended the Proposal | No | No | No | No | No | Yes |
| Evidence the Proposal Was Reviewed by the Legal Department | No | Yes | Yes | Yes | No | Yes |
| Evidence the Proposal Was Reviewed by the Financial Department | Yes | Yes | Yes | Yes | Yes | Yes |
| Evidence the Proposal Was Reviewed by the Executive Department | No | No | No | No | No | No |

[*] OIG considered a review by two members to be acceptable.
Source: Prepared by OIG based on the results of testing

[60] Two of the contracts were for the same project. However, the contracts were awarded for work in two separate years.
[61] The section "Detailed Testing Methodology" in Appendix A provides information on how the contracts were selected for this audit.

UNCLASSIFIED

### Advisory Council Members Review

Because RFA did not have a policy on the number of Advisory Council members who needed to review a proposal before it could go forward, OIG considered a review by two members to be acceptable, which was the fewest number of members allowed, according to one RFA official. All six proposals were reviewed by at least two Advisory Council members before award.

### Advisory Council Members Recommendation

Five of six proposals were not recommended by at least two Advisory Council members. In some cases, the Advisory Council members had questions and concerns about the proposals. For example, three Advisory Council members who reviewed one proposal identified a number of concerns, including the need for additional project details and specific cost information. One Council member stated that the proposal was "vague for the amount of money they were asking for." For another proposal, one Advisory Council member stated that "this is a big, unfocused project. … For a million bucks, I expect more detail." RFA awarded contracts for both proposals despite the concerns raised by the Advisory Council members.

Contrary to the process information on the website, an RFA official stated that Advisory Council members do not have to recommend a project before it moves forward. If members make negative comments about the project, OTF staff will adjust the proposal to address the concerns. When OTF staff believe they have addressed all of the Advisory Council members' concerns, the proposals are forwarded for further processing without asking for further Council member review or feedback.

### Legal and Financial Reviews

Documentation in the form of emails showed that four of the six proposals were reviewed by the General Counsel. RFA officials stated that the General Counsel reviewed all proposals, but RFA lacked the documentation. All six proposals were reviewed by the Budget Director.

### Executive Review

Although the President stated that she approved sole source justifications for these projects, RFA did not provide documentation demonstrating that the RFA President had approved any of the six contracts tested before the contracts were awarded.

## Radio Free Asia Did Not Have Detailed Procurement Policies and Procedures for Open Technology Fund Projects

RFA did not comply with Federal procurement requirements for grantees or with its own internal OTF contract award process because RFA did not have detailed OTF procurement policies and procedures. In addition, RFA staff were not familiar with Federal procurement requirements and were not trained in contract procedures, such as developing cost estimates and

UNCLASSIFIED

price analyses. Additionally, RFA did not have detailed internal control procedures for OTF contracts, such as the number of Advisory Council members needed to approve a proposal or requirements for documenting executive approval of a proposal. Further, RFA did not have procedures in place to monitor the OTF procurement process to ensure that it was followed. RFA officials stated that the procedures currently in place are sufficient and are followed.

**Process Used To Select Projects Needs Improvement**

Based on the concerns that OIG identified with the appearance of conflicts of interest with both RFA officials and the Advisory Council members, as well as instances of noncompliance with other procurement requirements and its own procurement process, OIG concluded that BBG and RFA should reconsider RFA's process for evaluating and selecting OTF projects. At the time of this audit, a BBG Special Committee on Internet Anti-Censorship was developing objectives for the Internet Anti-Censorship Program and processes for using Internet anti-censorship funds. For instance, the Special Committee on Internet Anti-Censorship planned to establish a process to oversee the use of the funds and measure program achievements. The Committee proposed establishing a new BBG Program Office that would be staffed with full-time BBG employees. The office would provide oversight for all Internet anti-circumvention activities funded by BBG, both directly and indirectly.

In addition, the Special Committee on Internet Anti-Censorship proposed a pre-award review, analysis of performance, and an assessment of results. The pre-award review would require BBG, grantees, and sub-recipients to "engage in a robust review of applications in order to reduce the risk of money being wasted or projects not achieving the intended results." During a meeting on the Committee's findings, the President of RFA disagreed with the Committee's proposal, stating that the new program office should be responsible only for projects funded directly by BBG, not projects funded indirectly by BBG through RFA. The BBG Board of Governors did not make a decision on the Committee's proposal at this meeting. However, based on the findings identified by OIG and presented in this report, it is essential for BBG to reassess the methodology used by RFA to select projects for funding.

During a meeting with OIG, RFA's legal counsel stated that BBG would violate the law[62] if BBG asked RFA to participate in a joint process to select projects to fund using Internet anti-circumvention funds. Specifically, the law states that an executive agency should use a grant agreement when substantial involvement is not expected between the executive agency and the recipient when carrying out the activity. OIG does not agree that asking RFA to participate in a joint process to select projects to be funded would violate law or regulation.[63] The law does not prohibit substantial involvement, nor does it define either the specific term "substantial involvement" or detail what might constitute substantial involvement by the agency. Moreover, the mere selection of projects to fund does not entail prescribing how the projects are to be carried out. Additionally, BBG's participation in the selection of projects to fund would not be infringing on RFA's regulatory responsibility to conduct its own source evaluations. Regardless, since OIG is suggesting that RFA (as well as BBG) participate in the selection process, OIG

---

[62] 31 U.S.C. § 6304.
[63] 22 CFR 518.41 and 2 CFR 200.318(k).

UNCLASSIFIED

concluded that RFA's participation would mitigate as a precautionary safeguard against BBG getting substantially involved in carrying out the activity contemplated in the grant agreement and would comply with a reasonable construction of the statutory language and requirements.

**Projects May Have Cost More Than Necessary**

Because RFA did not comply with Federal procurement requirements, there is no assurance that RFA received fair value for OTF contracts. Since RFA did not sufficiently compete the OTF projects, there was no assurance that other parties might not have been able to do the projects more efficiently or at a better price. Without independent cost estimates, RFA could not compare the proposed prices with independent estimates and determine whether the proposed prices were reasonable. Since RFA did not perform formal cost or price analyses, there was no assurance that the individual cost elements charged to RFA were reasonable and allowable. Furthermore, without sufficient oversight, there was no assurance that the work paid for was completed timely and in accordance with the contract. In addition, formal written internal procurement processes would assist RFA in ensuring that its employees procured items in compliance with Federal guidelines.

According to RFA, the Advisory Council review process "greatly expands OTF's project oversight capacity, expertise, perspective, and accountability." It also helps OTF avoid "unintentional duplication of efforts, provide independent verification of programmatic assessments, and identify strategic parallels in complementary fields." The Advisory Council review process was developed so that OTF could take full advantage of the members' expertise in the technical and practical aspects of privacy and security technology. However, OIG found that RFA had not received a significant amount of feedback from Council members on proposals and did not necessarily rely on the Council members' evaluations when they were received. Effectively, the RFA officials responsible for OTF projects made the decisions on which proposals to fund with little oversight or control.

> **Recommendation 9.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to develop and implement supplemental procurement policies and procedures for Open Technology Fund procurements that comply with Federal procurement requirements for grantees.
>
> **BBG Response**: BBG concurred with the recommendation, stating that the Board "will condition any further grant of" Internet anti-censorship "funding to RFA on RFA's development and implementation of such policies and procedures, consistent with BBG guidance."
>
> **RFA Response:** RFA concurred with the recommendation, stating that it had "a Procurement Policy that is followed for all purchases." RFA acknowledged that "there were some departures from its procurement procedures and Office of Management and Budget requirements applicable at the time." However, RFA stated that it believes that those departures were "primarily matters of insufficient documentation rather than substantive ones." In response to the recommendation, RFA stated that it will "immediately initiate a review of its procurement procedures affecting all of its activities,

including OTF, and supplement them particularly in light of the recent issuance by the Office of Management and Budget (OMB) of *Uniform Administrative Requirements, Cost Principles and Audit Requirements*." RFA further stated that it planned to fully assess the "procurement standards contained in that policy guidance" and appropriately incorporate the information in RFA's procurement policy. RFA also stated that it planned to ensure that "competition is conducted to the extent practical." Further, RFA stated, "Appropriate cost or price analysis will be conducted and contract administration procedures to assure contractor compliance and performance will be adopted."

**OIG Reply:** While OIG agrees that RFA has a procurement policy, that procurement policy was not used for OTF procurements. RFA included the OTF contract award process on the OTF website. That contract award process was different than the information included in RFA's general procurement policy. OIG confirmed that the process was different with RFA officials during the audit. OIG also disagrees with RFA's assertion that RFA's departures from OMB guidance and its own policy were not substantial. OIG identified significant noncompliance with Federal requirements related to competition; cost and price analyses; conflict of interest; and, to a lesser degree, contract administration. RFA's significant noncompliance makes it difficult to ensure that RFA used resources it received from the Government in a cost-effective manner.

Based on BBG concurrence, OIG considers the recommendation resolved. OIG will close this recommendation when OIG receives and accepts documentation showing that BBG has required RFA to develop and implement supplemental procurement policies and procedures for OTF procurements that comply with Federal requirements.

**Recommendation 10.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia (RFA) to develop and implement a training plan that ensures that RFA employees involved in the Open Technology Fund procurement process understand the supplemental procurement policies developed in response to Recommendation 9.

**BBG Response:** BBG concurred with the recommendation, stating that the Board "will condition any further grant" of Internet anti-circumvention funding "to RFA on RFA's development and implementation of such a training plan, consistent with BBG guidance."

**RFA Response:** RFA concurred with the recommendation, stating that it will "initiate a training regimen for appropriate employees involved in organizational procurements, including those involved in the Open Technology Fund, to assure that they are aware of RFA's current procurement procedures." RFA also stated that it had already "obtained a web based training module" that "addresses and analyzes the underlying OMB requirements. The training module will be used as the first step in that process."

**OIG Reply:** Based on BBG and RFA concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has required RFA to develop and implement a training plan to ensure RFA procurement officials understand procurement requirements.

**Recommendation 11.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia (RFA) to implement a process to monitor the Open Technology Fund procurement process to ensure compliance with RFA's procurement procedures.

**BBG Response:** BBG concurred with the recommendation, stating that the Board "will condition any further grant" of Internet anti-circumvention funding "to RFA on RFA's development and implementation of such a process, consistent with BBG guidance."

**RFA Response:** RFA concurred with the recommendation, stating that it "will conduct . . monitoring of its procurement process through a self-audit of contracts" as well as through "the internal control review conducted by its external auditors." RFA further stated that any "deficiencies revealed through such monitoring will be addressed as appropriate."

**OIG Reply:** Based on BBG and RFA concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has required RFA to develop and implement a process to monitor OTF procurements to ensure compliance with RFA procurement procedures.

**Recommendation 12.** OIG recommends that the Broadcasting Board of Governors direct Radio Free Asia (RFA) to ensure that employees and Advisory Council members comply with RFA's conflict-of-interest requirements.

**BBG Response:** BBG concurred with the recommendation, stating that the Board "will condition any further grant" of Internet Anti-Censorship "funding to RFA on RFA's development and implementation of compliance with these requirements, subject to BBG oversight."

**RFA Response:** RFA concurred with the recommendation, stating that it "will continue to enforce its Conflict of Interests policy through an awareness memorandum to employees, officers, and agents and will incorporate specific subject training into the broader procurement training."

**OIG Reply:** Based on BBG and RFA concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has directed RFA to ensure that employees and Advisory Council members comply with RFA's conflict-of-interest requirements.

**Recommendation 13**. OIG recommends that the Broadcasting Board of Governors (BBG) develop and implement a process to select Open Technology Fund projects that Radio Free Asia (RFA) will fund. Both BBG and RFA officials should be involved in the selection process.

**BBG Response:** BBG concurred with the recommendation, stating that it is "drafting policies and procedures designed to provide oversight for the use of all Internet Anti-Censorship funds." BBG further stated that the policy "will include language indicating

that both BBG and RFA officials will participate in the project selection process." BBG has already "engaged in discussions with the RFA President to ensure that Agency officials, well versed in all areas of Information Technology . . . represent the Agency as members of the OTF Advisory Panel." According to BBG, several BBG officials will participate as "voting members of the OTF Advisory Panel."

**RFA Response:** RFA did not concur with the recommendation but concurred with BBG's response to the recommendation. RFA disagreed with how the recommendation was written" in that OMB procurement standards provide that "[t]he recipient is the responsible authority, without recourse to the Federal awarding agency, regarding the settlement and satisfaction of all contractual and administrative issues arising out of procurements entered in support of an award or other agreement. This includes disputes, claims, protests, **source evaluation** (emphasis added) or other matters of a contractual nature." RFA believes that "its purpose is to recognize privity of agreement and the fact that the Federal awarding agency is not a party to procurement contracts under grants."

"Second, if substantial federal involvement in the recipient's procurement process is anticipated, the Federal awarding agency is required by the Federal Grant and Cooperative Agreement Act . . .  to issue a cooperative agreement in which that substantial involvement is specified." RFA "suggests that the OIG's recommendation could give rise to the possibility that BBG would be viewed as using an intermediary to carry out activities that it might be precluded from undertaking directly."

"It should be noted that RFA reviews all potential projects with the Director of Global Operations/Acting CFO and presents a list of potential projects to be funded during the annual Operating Plan submission process."

**OIG Reply:** Based on BBG concurrence, OIG considers the recommendation resolved. Because of the concerns identified during the audit with the selection of OTF projects (such as noncompliance with procurement requirements and the appearance of conflicts of interest), OIG concluded that it was important for BBG to assess the process used by RFA to select projects and to ensure that RFA met BBG's expectations. OIG does not agree that asking RFA to participate in a joint process with BBG to select projects to be funded would violate the laws cited by RFA. It is ultimately BBG's decision on how best to accomplish the intent of the recommendation. BBG's planned participation on the Advisory Council is sufficient to resolve this recommendation. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has implemented a process to increase its participation in the selection of projects to be funded by OTF.

## Finding D. Radio Free Asia Did Not Return Unneeded Funds to the Broadcasting Board of Governors

OIG found that RFA did not return all unused unobligated funds to BBG at the end of FY 2013 as required by the grant agreement. Specifically, OIG identified funds of $583,583 that were no longer needed but were not returned to BBG. RFA did not return unused funds because

UNCLASSIFIED

RFA's practice was to keep funds received from BBG for 5 years and at the end of the 5-year period request permission to use the unused funds for other purposes. According to an RFA official, BBG never informed RFA that this practice was not allowed. Further, RFA did not have an effective process to regularly review unused funds to determine whether the funds were still needed. In addition, BBG did not have a process in place to oversee RFA's unused funds annually and ensure that funds not needed in the current fiscal year were either returned or used for another allowable purpose. As a result of the insufficient control over funds, OIG identified questioned costs of $583,583.

**Some Unused Funds Were No Longer Needed by RFA**

RFA's grant agreement with BBG stated that RFA "shall return to BBG at the conclusion of the fiscal year any portion of the grant funds that are not required for a legally binding transaction or designated by RFA for a purpose and in an amount consistent with the approved financial plan (as well as any recoveries or carryover balances from prior years), unless otherwise approved by BBG."

According to its financial statements, as of September 30, 2013, RFA maintained unused funds of $5.1 million from FY 2013 and prior years, all of which were provided by BBG. RFA officials stated that these unused funds consisted of commitments and prior year unexpended funds. Table 6 provides the amount of RFA's unused funds by fiscal year as of September 30, 2013.

**Table 6. Total Unused Funds as of September 30, 2013**

| Fiscal Year | Commitments | Unexpended Funds | Total Amount of Unused Funds |
|---|---|---|---|
| 2007 | $0 | $87,352 | $87,352 |
| 2008 | 0 | 135,471 | 135,471 |
| 2009 | 0 | 82,135 | 82,135 |
| 2010 | 0 | 90,889 | 90,889 |
| 2011 | 0 | 6,237 | 6,237 |
| 2012 | 1,262,847 | 72,296 | 1,335,143 |
| 2013 | 3,375,578 | 0 | 3,375,578 |
| Totals | $4,638,425 | $474,380 | $5,112,805 |

Source: RFA's FY 2013 financial statements.

RFA officials stated that all of the unused funds were needed for valid purposes and that therefore the funds did not need to be returned to BBG. Specifically, of the unused funds of $5.1 million, funds of $4,638,425 represented commitments for contracts, purchase orders, or work orders that were issued but for which goods or services were not received by RFA as of the end of the fiscal year. For example, RFA issued 12 contracts, totaling $1.7 million, on September 30, 2013, and committed funds to make future payments on these contracts. RFA did not receive goods or services from these contracts and did not make payments to the contractors prior to the end of FY 2013. The remaining unexpended funds, which totaled $474,380, were unspent. RFA preferred to keep the unspent funds until it determined that no additional invoices would be submitted by the vendor.

UNCLASSIFIED

OIG assessed the validity[64] of the commitments and identified six commitments, valued at $186,236 (4 percent), that were no longer needed. The amounts of the valid and invalid commitments from FYs 2012 and 2013 are provided in Table 7.

**Table 7. Invalid Commitments Identified by OIG**

| Fiscal Year | Amount Tested | Valid Commitments | Invalid Commitments |
|---|---|---|---|
| 2012 | $1,262,847 | $1,107,106 | $155,741 |
| 2013 | 3,375,578 | 3,345,083 | 30,495 |
| Totals | $4,638,425 | $4,452,189 | $186,236 |

Source: OIG prepared based on testing.

Of the six unneeded commitments identified, the following information is provided:

- One commitment, totaling $30,000, was considered invalid because it was not in compliance with Federal regulations. RFA obligated the funds without a legally binding transaction or for a specific purpose. RFA used the commitment as a "place holder" in case additional unplanned items were needed. Federal regulations prohibit grantees from using grant funds for contingency purposes.[65]

- One commitment, with a remaining balance of $150,000, had expired. Specifically, on April 25, 2012, RFA obligated $300,000 for a project with four deliverables that were to be provided by October 1, 2012. As of the deliverable date, RFA received one deliverable, for which it paid the contractor $75,000. On October 15, 2012, RFA extended the completion date for the other three deliverables to April 30, 2013. RFA received and paid the contractor $75,000 for one additional deliverable. However, the contractor did not provide the remaining two deliverables. RFA officials stated that RFA did not anticipate receiving the remaining two deliverables and that the balance of $150,000 would not be used for that purpose.

- Four commitments, totaling $6,236, were considered invalid because there was no activity for more than 6 months. For example, on September 19, 2012, RFA obligated $5,000 for a consultant to perform information technology security forensics testing. Although the purchase order was marked "urgent," no work was done as of March 31, 2014, more than 17 months later.

In addition to the invalid commitments, RFA officials informed OIG that $397,347 of the $474,380 in unexpended funds was no longer needed. In fact, after OIG began audit fieldwork, RFA sent a memorandum to BBG requesting to use the funds for another purpose; specifically, to equip a new video studio with auxiliary equipment and furnishings.

---

[64] OIG based its validity determination on three criteria: whether the item or service purchased was allowable according to 2 CFR pt. 230, "Cost Principles for Non-profits"; whether the date by which the good or service was to be received had occurred; and whether the account had some type of activity in the 6 months prior to the testing.
[65] OMB Circular A-122, att. B(9).

UNCLASSIFIED

**RFA and BBG Did Not Have Sufficient Controls Over Unused Funds**

RFA maintained a significant amount of unneeded funds that were not in compliance with the grant agreement because, according to RFA officials, RFA's practice was to keep the funds received from BBG for 5 years and, at the end of the 5-year period, RFA would request permission from BBG to use the remaining unused funds for other purposes. For example, in an email sent to BBG in June 2008, RFA requested that BBG allow RFA to use $210,670 in unused funds from FY 2004 and FY 2005 for costs related to news coverage of the Olympics and the Cambodian national elections and for cyber-security consulting. BBG approved this request. According to an RFA official, BBG did not inform RFA that retaining the unused funds did not comply with the grant agreement. BBG's CFO was not familiar with RFA's 5-year rule but was aware that her predecessor approved carrying over unexpended grantee funds.

In addition, RFA did not have a sufficient process in place to regularly review its unexpended funds and open commitments to determine whether they were still needed. Although an RFA official provided documentation showing he ran monthly reports that identified the amount of unused funds, there was no evidence that RFA officials had assessed the amounts to determine whether they were still needed. Sound fund management requires regular reviews of obligations so that unneeded funds can be promptly used for other needs.

Further, BBG did not have a process to ensure that grantees returned unused funds or request that the funds be reprogrammed, as required by the grant agreement. Moreover, some BBG officials were unaware that there was a requirement for RFA to return unused funds annually. BBG's administrative manual[66] states that the Office of the CFO "shall require the recipient to promptly refund any balances of unobligated cash that has been advanced or paid that is not authorized to be retained by the recipient for use in other projects." To address the issue, BBG hired an external contractor to assess the amount of unused funds retained by its grantees and develop policies and procedures to monitor unused funds. Until a sufficient process is in place, BBG officials cannot make well-informed decisions as to whether funds should be reprogrammed by RFA or returned to BBG.

**Funds Used for Questioned Costs Could Have Been Put to Better Use**

As a result of inadequate fund management, OIG questioned $583,583 in costs. These funds could have been put to better use either by RFA or by BBG. Invalid commitments and unexpended funds affect RFA's ability to effectively manage its funds. In addition, because of RFA's practice to request approval to reprogram funds 5 years after the funds are received, RFA has become dependent on these monies to fund projects that were not originally in the financial plan. Because of inadequate oversight of the funding provided to RFA, BBG does not have an accurate understanding of the amount of funds that RFA needs to operate each fiscal year.

**Recommendation 14.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to revise its processes to include an assessment of the continued

---

[66] International Broadcasting Bureau Manual of Operations and Administration, ch. 7-600, "Grants and Other Financial Assistance."

need for funds that are either unexpended or committed and to take action to deobligate funds that are no longer needed.

**BBG Response:** BBG concurred with the recommendation, stating that it will "assess the grantees' process for de-obligation of funds." BBG further stated that it had drafted or revised templates "for use by grantees to identify unexpended or committed funds that are no longer needed and should be de-obligated."

**RFA Response:** RFA concurred with the recommendation, stating that it "maintains a monthly record of unexpended funds by year." RFA also suggested that the "presence of obligated but unexpended funds at the end of a grant award year is a common situation that arises in the context of federal awarding agency and recipient interaction. This is reinforced by the BBG practice of allowing Grantees to reprogram prior-year funds."

**OIG Reply:** Based on BBG and RFA concurrence, OIG considers the recommendation resolved. RFA provided, and OIG reviewed, RFA's monthly record of unexpended funds during the audit. While the document may be a useful tool for RFA to track its various accounts, there is no evidence that RFA officials reviewed the information in the spreadsheet to assess the current need for the unexpended funds. RFA's fund management process is not sufficient considering that OIG identified unexpended funds of $397,347 that were no longer needed dating back to FY 2007. Moreover, when OIG brought this to the attention of RFA, RFA immediately requested permission from BBG to reprogram the funds. While OIG agrees that it is possible to have valid obligations remain open in future fiscal years, it is important for an organization to have a process in place to periodically assess open obligations for continued need and to take appropriate actions when obligations are no longer needed.

The recommendation can be closed when OIG receives and accepts documentation showing that BBG has required RFA to revise its funds management processes to include a consideration of the continued need for funds that are either unexpended or committed and to take action to deobligate funds that are no longer needed.

**Recommendation 15.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to annually report on the amount of unused funds.

**BBG Response:** BBG concurred with the recommendation, stating that it will require RFA "to annually report on the amount of unused funds."

**RFA Response:** RFA concurred with the recommendation, stating that it will "provide a report of prior-year funds at the end of October each year when it submits the final fiscal year financial reports required by the Grant Agreement."

**OIG Reply:** Based on BBG and RFA concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has required RFA to annually report on the amount of unused funds.

**Recommendation 16.** OIG recommends that the Broadcasting Board of Governors develop and implement a process to oversee Radio Free Asia's unused funds.

**BBG Response:** BBG concurred with the recommendation, stating that it will continue to work "to finalize the process for handling grantees' unused funds. These results will be incorporated into the Grant Monitoring Program."

**RFA Response:** RFA concurred with the recommendation.

**OIG Reply:** Based on BBG and RFA concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has developed and implemented a process to oversee RFA unused funds.

**Recommendation 17.** OIG recommends that the Broadcasting Board of Governors make a formal determination on the $583,583 in questioned costs related to unused funds at Radio Free Asia identified by OIG.

**BBG Response:** BBG concurred with the recommendation, stating that the Office of the Chief Financial Officer will "review the questioned cost related to unused funds and make related recommendations to the Interim Director."

**RFA Response:** RFA concurred with the recommendation, stating that of the "$583,583 questioned by the OIG, BBG granted RFA permission to reprogram $397,347 of this amount." RFA also stated that one commitment of $150,000 had not expired as reported by OIG. RFA further stated that this "contract was amended on April 30, 2014" to extend "the time of performance through December 31, 2014, and the remaining two deliverables have been completed." RFA said that it plans to "monitor the remaining obligated amounts and when it is determined that any of those funds are no longer required for the original purpose, RFA will work with BBG to reprogram those funds."

**OIG Reply:** While BBG agreed with OIG's recommendation, BBG's response was not sufficient for OIG to consider the recommendation resolved because management did not provide a decision with respect to the validity of the $583,583 in questioned costs OIG identified related to unused funds.[67]

RFA indicated that some of the questioned costs OIG identified were not invalid because the contractor provided the remaining deliverables for which RFA paid. During multiple meetings on the topic of unused funds, including the audit exit conference, RFA did not provide OIG documentation showing that the status of the identified unused funds had changed. Because OIG did not receive documentation showing that the funds were used appropriately, the amount of questioned costs presented in the recommendation, $583,583, remains unchanged. RFA should provide BBG documentation related to these

---

[67] Inspector General Act, as amended, Pub. L. No. 95-452 § 5(a)(8).

UNCLASSIFIED

funds to facilitate BBG's formal determination of the questioned costs related to unused funds.

This recommendation can be resolved when BBG provides a determination (dollar value agreed to or not agreed to) on the validity of the $583,583 in questioned costs. This recommendation can be closed when OIG receives and accepts documentation showing that BBG took appropriate action related to the unused funds questioned by OIG, including the recovery of any costs determined to be disallowed.

## Finding E. Non-Personnel Expenditures Were Generally Allowable, but Some Personnel Costs May Be Unallowable

OIG found that RFA generally used the grant funds provided by BBG in accordance with Federal regulations and the grant agreement. Specifically, of 199 non-personnel expenditures tested, amounting to $1,673,537, OIG found that 194 expenditures, totaling $1,656,505, complied with Federal regulations and the grant agreement. OIG identified $1,740 in unallowable travel-related expenditures that occurred primarily because RFA's travel policy did not require that travelers obtain approval to exceed Federal per diem amounts. Additional travel-related expenditures of $15,292 that otherwise would have been allowable were paid with funds that were not available for the purpose for which they were used, primarily because changes in funding were not made to reflect the changes in travel purposes. OIG also identified unallowable expenditures of $19,737 for promotional items and unallowable expenditures of $117 for charitable contributions that were specifically prohibited by Federal regulation. BBG approved the expenditures for promotional items without obtaining the required waiver from OMB, and one RFA field office made charitable contributions because the office was not aware that grant funds could not be used for charitable donations. RFA and BBG had taken actions to address the control deficiencies that resulted in these unallowable costs.

OIG also identified instances in which RFA's personnel-related costs were not in technical compliance with Federal law and grant requirements. Specifically, maximum annual salary levels for four of seven RFA positions reviewed were higher than the maximum annual salary levels of comparable BBG positions. In addition, 4 of 11 benefits reviewed exceeded the benefits provided to Federal employees. The noncompliance occurred primarily because the RFA benefits were required under a collective bargaining agreement.[68] In addition, BBG did not perform a recent comparability study of benefits and salaries, as required, which would have allowed BBG to better assess whether the aggregation of RFA's benefits exceeded benefits provided to Federal employees. As a result, some funds may have been spent on unallowable personnel costs that could have been put to better use.

---

[68] According to RFA officials, BBG approved the collective bargaining agreement.

## Most Non-Personnel Expenditures Complied With Federal Regulations and the Grant Agreement

The grant agreement requires that the costs incurred by RFA comply with OMB guidance[69] and authorizes certain types of expenditures insofar as the costs are reasonable and necessary to further the purpose of the grant. For example, the grant agreement authorizes RFA to pay for the costs of foreign travel, but it prohibits RFA from paying for first-class travel for any employee.

### Testing of Non-Personnel Expenditures

To determine whether RFA's non-personnel expenditures complied with OMB guidance and the grant agreement, OIG tested the non-personnel expenditures.[70] Of 9,782 FY 2013 expenditures, totaling $13,088,505, OIG tested 199 expenditures, totaling $1,673,537, or almost 13.0 percent of the dollar value of the universe. OIG determined that 194, or 97.5 percent, of the 199 expenditures, totaling $1,656,505 or 99.0 percent of total dollar value tested were allowable. OIG identified five travel-related expenditures, totaling $17,032, that included unallowable costs. This amount represented 1.0 percent of the amount of all expenditures tested. Table 8 provides the results of OIG's sample of non-personnel expenditures.

**Table 8. Results of Testing of RFA Non-Personnel Expenditures**

| Expenditure Category | Number Sampled and Tested | Number of Allowable Items | Number of Items With Unallowable Costs | Amount Over Per Diem | Amount of Incorrect Funds Used |
|---|---|---|---|---|---|
| Contract Services | 68 | 68 | 0 | $0 | $0 |
| Travel | 44 | 39 | 5 | 1,740 | 15,292 |
| Office Space | 38 | 38 | 0 | 0 | 0 |
| General and Administrative | 34 | 34 | 0 | 0 | 0 |
| Technical* | 10 | 10 | 0 | 0 | 0 |
| Capital Expenditures | 5 | 5 | 0 | 0 | 0 |
| Totals | 199 | 194 | 5 | $1,740 | $15,292 |

* Technical expenditures include technical equipment that cost less than $5,000.
Source: OIG prepared based on the results of its testing.

Of the five unallowable travel-related expenditures, three expenditures included reimbursement for unallowable travel costs amounting to $1,740 and are detailed as follows:

---

[69] The grant agreement requires RFA's costs to be in compliance with OMB A-122.
[70] The section "Detailed Testing Methodology" in Appendix A provides information on how the expenditures were selected for this audit.

UNCLASSIFIED

- Two of the three expenditures included reimbursement for hotel rooms at a rate higher than the maximum daily rate allowed by Federal regulation.[71] Federal regulation authorizes organizations to exceed the maximum allowable rate if it is approved by an officer of the organization "to ensure that the authority is properly administered and controlled to prevent abuse." However, RFA's travel policy did not include a requirement for approval.
- The third travel-related expenditure was unallowable because RFA mistakenly used the wrong per diem rate when calculating the traveler's reimbursement.

After discussing these issues with RFA officials, RFA updated its travel policy to require prior approval when an employee's travel plans included special or unusual circumstances that necessitated exceeding the maximum allowable daily lodging rate. RFA officials also collected the overpayment of per diem from the employee.

OIG also identified instances in which RFA used incorrect funds to pay for charges totaling $15,292 related to three of the five unallowable expenditures.[72] Although the expenditures were allowable under Federal regulations, the expenditures were paid with funds that were not available for the purpose for which they were used. Specifically,

- Two expenditures for one trip were paid using programming/broadcasting funds, but the purpose of the travel was Internet anti-circumvention.
- One expenditure for a separate trip was paid from Internet anti-circumvention funds, but the purpose of the travel was programming/broadcasting.

The grant agreement states that RFA "may use the Grant Funds solely for planning and operating expenses related to international broadcasting and administration thereof" and that Internet anti-circumvention funding "is made available for costs associated with expanding unrestricted access to information on the Internet."

RFA officials stated that the original purpose of one of the two trips was for programming/broadcasting purposes but that the trip evolved into an Internet anti-circumvention technology study. The officials agreed that it would have been more appropriate to prorate the trip between the two funds. For the second trip, only the airfare portion of the trip was paid from Internet anti-circumvention funds, while the remainder of the trip was paid from programming/broadcasting funds. In FY 2014, BBG began requiring that RFA detail all expenditures from the Internet anti-circumvention funding, which will help RFA identify the purpose of the expenditures and ensure that the appropriate funds are used. The new requirement should also help BBG ensure that grant funds are used for their appropriate purpose in the future.

---

[71] 48 CFR pt. 31.205-46, "Travel Costs."
[72] One of these expenditures also included unallowable travel costs. The portion of the expenditure that was unallowable was reported with the other unallowable costs.

UNCLASSIFIED

### Analysis of Non-Personnel Expenditure Accounts

In addition to testing a sample of non-personnel expenditures, OIG reviewed a listing of RFA's general ledger accounts and identified two accounts—"Promotional Items" and "Contributions"—that were specifically prohibited by Federal regulation.[73] Grantee funds may be used for promotional items or contributions but only if a waiver is obtained from OMB.

During FY 2013, RFA spent $19,737 on promotional items. RFA officials stated that the promotional items included caps, t-shirts, coffee mugs, and other similar items that would be given to the general public as a marketing tool to "get RFA's name out there." RFA officials also stated that promotional items were included in the financial plan that was submitted to and approved by BBG. BBG officials stated that RFA faces challenges with name recognition. However, BBG did not obtain the necessary waiver from OMB for RFA to spend grant funds on promotional items. Without the required waiver, the expenditures of $19,737 are unallowable costs.

RFA also spent $117 on contributions. RFA officials stated that one of RFA's field offices made two contributions, totaling $117, to a charitable organization. After OIG brought the expenditures to RFA's attention, RFA officials sent an email to all RFA field offices informing them that they could not use office funds to make donations to charitable organizations.

According to BBG officials, BBG did not have a process to determine whether grantee expenditures were made in compliance with OMB guidance but instead relied on the work performed by RFA's independent financial statement auditor. The independent auditor concluded that there were no reportable findings related to RFA's expenditures. Considering the small number and amount of the deficiencies identified, OIG concluded that it is reasonable for BBG to continue to rely on the testing performed by RFA's independent financial statement auditor.

### Some Salaries and Benefits Did Not Comply With Federal Regulations or the Grant Agreement

The grant agreement required that grant funds not be used to pay any salary or other compensation in excess of the rates established for comparable positions under Part III, Title 5, of the United States Code (Title 5). Title 5 governs the benefits and salaries provided to Federal employees. For example, Title 5 lists the number of annual leave days per year provided to Federal employees as well as the schedules of basic salary rates for Federal employees.

### Comparison of Maximum Annual Salaries

To determine whether RFA salaries were in compliance with Title 5, OIG compared the maximum annual salaries for seven RFA positions with the maximum annual salaries for similar

---

[73] OMB Circular A-122, atts. B (1)(f)(3) and (12)(a).

UNCLASSIFIED

positions at BBG.[74] Of seven positions with comparable duties, only one RFA position was at a higher maximum annual salary level than its BBG counterpart. The maximum annual salary level for this RFA position exceeded the maximum annual salary level for the BBG position by only $29.

However, RFA employees received a paid 1-hour lunch break each day, while Federal employees do not receive a paid lunch break. Therefore, RFA employees work 7 hours each work day, while BBG employees work an 8-hour work day. When the maximum annual salary levels are adjusted for this difference, RFA maximum annual salary levels for four positions exceeded the BBG maximum annual salary levels, as shown in Table 9.

**Table 9. Comparison of Maximum Annual Salaries Offered by RFA and BBG With Comparable Duties**

| Sample Number | RFA Maximum Annual Salary | BBG Maximum Annual Salary | Difference | Adjusted BBG Maximum Annual Salary | Difference |
|---|---|---|---|---|---|
| S1-03 | $85,200 | $97,333 | ($12,133) | $85,166 | $34 |
| S3-02 | 72,500 | 97,333 | (24,833) | 85,166 | (12,666) |
| S4-02 | 87,800 | 115,742 | (27,942) | 101,274 | (13,474) |
| S4-05 | 96,500 | 111,930 | (15,430) | 97,939 | (1,439) |
| S5-01 | 181,500 | 181,500 | 0 | 158,813 | 22,687 |
| S5-02 | 181,500 | 181,500 | 0 | 158,813 | 22,687 |
| S5-04 | $136,800 | $136,771 | $29 | $119,675 | $17,125 |

Source: OIG analysis based on RFA Employee Roster – Pay Bands, Office of Personnel Management – Salary Table 2013, and Department of State 2013 Foreign Service (FS) Salary Table – Overseas.

### Comparison of Benefits

To determine whether RFA benefits were in compliance with Title 5, OIG compared 11 employment benefits—Medical, Dental, Vision, Holiday Leave, Sick Leave, Public Transportation Assistance, Retirement Contributions, Floating Personal Leave, Parental Leave, Annual Leave, and Basic Life Insurance— offered to RFA employees with similar benefits provided to Federal employees.

Of 11 benefits provided to RFA employees, 7 benefits were similar to or less than the benefits provided to Federal employees and were therefore in compliance with the grant agreement. Specifically, RFA's medical, dental, and vision health insurance benefits and sick leave benefits were similar to Federal benefits. In addition, RFA's paid holidays, public transportation assistance, and contributions to employees' retirement plans were less than those provided to Federal employees. Although most of the RFA benefits complied with the requirements of the grant agreement, four benefits—floating personal leave, parental leave,

---

[74] See Appendix A for details of the testing of salaries.

UNCLASSIFIED

annual leave, and basic life insurance—exceeded the benefits provided to Federal employees depending on years of service.

**Floating Personal Leave.** RFA offers two floating personal days to each employee each year in addition to the annual and sick leave provided. Unlike annual or sick leave, the floating personal days may not be carried over to the following calendar year, and there is no payment for unused floating days upon termination. There is no comparable leave provided to Federal employees by Title 5.

**Parental Leave.** RFA offers parental leave to its employees. Employees are allowed 3 days of paid leave within the first 30 days after the birth or adoption of a child. Similar to the floating personal leave, parental leave is in addition to the annual or sick leave RFA employees earn. Federal employees are not offered paid parental leave in Title 5.  For the birth or adoption of a child, Federal employees may use annual or sick leave.

**Annual Leave.** Although the number of annual leave days earned per year increases over time for both RFA and Federal Government employees, the earned leave increases at a different rate for each entity. During the first 3 years of service, RFA employees receive 15 days of annual leave per year while Federal Government employees receive 13 days per year. During years 4 and 5 of employment, RFA employees continue to earn 15 days of annual leave per year while Federal Government employees' annual leave increases to 20 days per year. Both RFA and Federal Government employees earn 20 days of annual leave per year during years 6 to 10. During years 11 to 14 of employment, RFA employees receive 25 days of annual leave per year while Federal Government employees continue to earn 20 days per year. Starting at year 15 of employment, RFA employees earn 25 days of annual leave per year while Federal Government employees earn 26 days per year. OIG's analysis of annual leave earned indicates that RFA employees generally fare better over time than Federal Government employees.

**Basic Life Insurance.** RFA provides basic life insurance equivalent to two times an employee's annual salary, with a cap of $350,000. RFA pays the entire cost of basic life insurance premiums. Title 5 offers Federal employees basic life insurance at two times the employees' annual basic insurance amount[75] when they are younger than 35, with the payment decreasing to the annual basic insurance amount when the Federal employee reaches age 45. The Federal Government pays only one-third of the premiums, and Federal employees pay the remaining two-thirds.

### Collective Bargaining Agreement and Comparability Study

Some RFA maximum annual salaries and benefits exceeded maximum annual salaries and benefits provided to Federal employees because the work schedule and benefits were required under the terms of a collective bargaining agreement with an employee union.[76]

---

[75] Annual basic insurance amount is equal to an employee's annual basic pay rounded to the next $1,000 plus an additional $2,000.

[76] A collective bargaining agreement is a legal contract between an organization's management and a trade union representing employees of the organization. A collective bargaining agreement establishes the conditions of employment for the covered employees (such as wages, working hours, and conditions).

UNCLASSIFIED

UNCLASSIFIED

Although the collective bargaining agreement technically covers only RFA's broadcasters and some administrative staff, RFA offers the provisions of the agreement to all RFA employees to maintain equity among its staff. RFA's Human Resources Director stated that although the collective bargaining agreement directs a 7-hour work day, RFA employees "routinely work in excess of eight hours per day" without compensatory time or overtime pay. Although the collective bargaining agreement is a legally binding agreement, the grant agreement, which was in place before the collective bargaining agreement, is also a legally binding agreement. Federal Government funds should not be used to pay for salaries and benefits in excess of those allowed by Title 5.

Another reason that RFA's maximum annual salaries and benefits exceeded the maximum annual salaries and benefits provided to Federal employees was that BBG had not performed a recent comparability study. Although BBG's Grantee Handbook required BBG to perform a comparability study annually to verify the comparability of compensation plans, a study had not been performed since 2007. The 2007 study indicated that, in aggregate, the salaries and benefits offered by RFA to its employees were comparable to the salaries and benefits offered by BBG to its employees. However, the 2007 study was performed before certain benefits, such as parental leave, were provided to RFA employees.

### Some Funds Identified as Questioned Costs Could Have Been Put to Better Use

As a result of its testing and analysis, OIG is questioning the $19,854 that was spent on unallowable non-personnel-related costs. Further, the amount of the maximum annual salaries and benefits that exceeded similar maximum annual salaries and benefits that were provided to Federal employees was unallowable. These questioned costs could have been put to better use by RFA or returned to BBG.

**Recommendation 18.** OIG recommends that the Broadcasting Board of Governors direct Radio Free Asia (RFA) to make and verify that RFA has made the necessary journal entries to correct the funding used for $15,292 in travel costs OIG identified as allowable but where incorrect funds were used.

**BBG Response:** BBG concurred with the recommendation, stating that it would "make necessary inquiries to retrieve supporting documentation for the posting of travel costs in the general ledger to make the proper evaluation of correct posting logic."

**RFA Response:** RFA concurred with the recommendation and provided documentation showing that it had prepared and posted the journal entries requested by OIG.

**OIG Reply:** Based on OIG's review and acceptance of the documentation provided by RFA on the posting of the adjusting journal entry, OIG considers this recommendation closed.

**Recommendation 19.** OIG recommends that the Broadcasting Board of Governors (BBG) make a determination as to whether promotional items, in general, are an appropriate cost for Radio Free Asia (RFA). If BBG does not believe that promotional

items are an appropriate RFA cost, BBG should inform RFA that promotional items should not be purchased using grant funds.

**BBG Response:** BBG concurred with the recommendation but noted that "if BBG determines that promotional items are a necessary expense of international broadcasting, then we do not need an OMB waiver."

**RFA Response:** RFA concurred with the recommendation, stating that it "believes that BBG can make the determination of allowability of the promotional items cited in this finding without the need to seek an OMB waiver." RFA based this position on the provisions of 22 CFR 518.4, which permits the Federal awarding agency itself to grant case-by-case deviations.

**OIG Reply:** Based on BBG and RFA concurrence, OIG considers the recommendation resolved. Further, based on comments about the recommendation to obtain a waiver from the OMB, OIG reviewed the cited criteria and modified the recommendation to remove the requirement for an OMB waiver. The recommendation can be closed when OIG receives and accepts documentation showing that BBG (a) has made a determination on whether RFA can use funds for the types of promotional activities that it was performing and (b) either formally grants a deviation from the OMB standards or notifies RFA that it cannot use funds for promotional activities.

**Recommendation 20.** OIG recommends that the Broadcasting Board of Governors make a formal determination on the $19,854 in questioned costs related to Radio Free Asia's purchase of promotional items and contributions identified by OIG.

**BBG Response:** BBG concurred with this recommendation.

**RFA Response:** RFA concurred with the recommendation, stating that the "expenditures were reasonable and were needed to advance the purpose of outreach for the award and urges BBG to ratify these expenditures."

**OIG Reply:** While BBG concurred with this recommendation, the response was not satisfactory to resolve the recommendation because management did not provide a decision with respect to the validity of the $19,854 in questioned costs related to Radio Free Asia's purchase of promotional items and contributions.[77] This recommendation can be resolved when BBG provides a determination (dollar value agreed to or not agreed to) on the validity of the $19,854 in questioned costs. This recommendation can be closed when OIG receives and accepts documentation showing the actions BBG has taken related to the $19,854 in questioned costs, including the recovery of any costs determined to be disallowed.

**Recommendation 21.** OIG recommends that the Broadcasting Board of Governors (BBG) work collaboratively with Radio Free Asia (RFA) to perform a comparability

---

[77] Inspector General Act, as amended, Pub. L. No. 95-452 § 5(a)(8).

study of RFA salaries and benefits and determine whether the salaries and benefits offered by RFA violate the requirements of the grant agreement. If they do, BBG should direct RFA to bring salaries and benefits into compliance with the grant agreement.

**BBG Response:** BBG concurred with this recommendation, stating that it is reestablishing "the annual comparability study to verify the comparability of compensation plans across all BBG entities."

**RFA Response:** RFA concurred with the recommendation.

**OIG Reply:** Based on BBG concurrence, OIG considers the recommendation resolved. The recommendation can be closed when OIG receives and accepts documentation showing that BBG has performed a comparability study of RFA salaries and benefits and requested that RFA take action to address any salaries and benefits that do not comply with the grant agreement.

## List of Recommendations

**Recommendation 1.** OIG recommends that the Broadcasting Board of Governors define its grant monitoring structure, formally document the roles and responsibilities of all parties involved in the grant monitoring process, and revise its Grantee Handbook accordingly.

**Recommendation 2.** OIG recommends that the Broadcasting Board of Governors develop and implement a comprehensive grant oversight program and revise its Grantee Handbook to document the specific procedures for the grant oversight program.

**Recommendation 3.** OIG recommends that the Broadcasting Board of Governors (BBG) develop and implement a training plan for all employees involved in grant oversight as determined in response to Recommendation 1. This training plan should cover both Government-wide requirements for grant oversight and also BBG's internal grants policies and procedures. BBG should revise its Grantee Handbook to include the training plan.

**Recommendation 4.** OIG recommends that the Broadcasting Board of Governors (BBG) formally designate a grants analyst to monitor Radio Free Asia. As part of the designation, BBG should ensure that the grants analyst's responsibilities are clearly defined and communicated to that employee.

**Recommendation 5.** OIG recommends that the Board of Governors formally designate a high level Broadcasting Board of Governors (BBG) official, such as the Chief Executive Officer, as the official responsible for approving initiatives to improve BBG's grant oversight process.

**Recommendation 6.** OIG recommends that the Broadcasting Board of Governors (BBG) ensure that the Board of Governors immediately receives training and guidance on its responsibilities as a Board. This training and guidance should include, but not be limited to, information on Federal requirements for overseeing grantees and BBG's internal grant oversight policies and procedures. The training should also address the Board's responsibilities for ensuring that BBG complies with Federal grants regulations. In addition, BBG should develop a plan to provide refresher training to the Board on its responsibilities annually.

**Recommendation 7.** OIG recommends that the Broadcasting Board of Governors (BBG) develop a formal framework describing how Radio Free Asia should use Internet anti-circumvention funds. This framework should describe BBG's priorities for the use of the funds.

**Recommendation 8.** OIG recommends that the Broadcasting Board of Governors (BBG) revise the grant agreement with Radio Free Asia (RFA) to provide guidance to RFA on the newly developed framework describing BBG's priorities for the use of the Internet anti-circumvention funds, as determined in response to Recommendation 7.

**Recommendation 9.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to develop and implement supplemental procurement policies and procedures for Open Technology Fund procurements that comply with Federal procurement requirements for grantees.

47

**Recommendation 10.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia (RFA) to develop and implement a training plan that ensures that RFA employees involved in the Open Technology Fund procurement process understand the supplemental procurement policies developed in response to Recommendation 9.

**Recommendation 11.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia (RFA) to implement a process to monitor the Open Technology Fund procurement process to ensure compliance with RFA's procurement procedures.

**Recommendation 12.** OIG recommends that the Broadcasting Board of Governors direct Radio Free Asia (RFA) to ensure that employees and Advisory Council members comply with RFA's conflict-of-interest requirements.

**Recommendation 13**. OIG recommends that the Broadcasting Board of Governors (BBG) develop and implement a process to select Open Technology Fund projects that Radio Free Asia (RFA) will fund. Both BBG and RFA officials should be involved in the selection process.

**Recommendation 14.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to revise its processes to include an assessment of the continued need for funds that are either unexpended or committed and to take action to deobligate funds that are no longer needed.

**Recommendation 15.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to annually report on the amount of unused funds.

**Recommendation 16.** OIG recommends that the Broadcasting Board of Governors develop and implement a process to oversee Radio Free Asia's unused funds.

**Recommendation 17.** OIG recommends that the Broadcasting Board of Governors make a formal determination on the $583,583 in questioned costs related to unused funds at Radio Free Asia identified by OIG.

**Recommendation 18.** OIG recommends that the Broadcasting Board of Governors direct Radio Free Asia (RFA) to make and verify that RFA has made the necessary journal entries to correct the funding used for $15,292 in travel costs OIG identified as allowable but where incorrect funds were used.

**Recommendation 19.** OIG recommends that the Broadcasting Board of Governors (BBG) make a determination as to whether promotional items, in general, are an appropriate cost for Radio Free Asia (RFA). If BBG does not believe that promotional items are an appropriate RFA cost, BBG should inform RFA that promotional items should not be purchased using grant funds.

**Recommendation 20.** OIG recommends that the Broadcasting Board of Governors make a formal determination on the $19,854 in questioned costs related to Radio Free Asia's purchase of promotional items and contributions identified by OIG.

**Recommendation 21.** OIG recommends that the Broadcasting Board of Governors (BBG) work collaboratively with Radio Free Asia (RFA) to perform a comparability study of RFA salaries and benefits and determine whether the salaries and benefits offered by RFA violate the requirements of the grant agreement. If so, BBG should direct RFA to bring salaries and benefits into compliance with the grant agreement.

# Scope and Methodology

The purpose of this audit was to assist the Broadcasting Board of Governors (BBG) in its efforts to manage funds provided to the grantee. Specifically, the objectives of this audit were to determine to what extent BBG monitored Radio Free Asia's (RFA) activities, RFA used Open Technology Fund (OTF) resources to accomplish program priorities, RFA complied with Federal procurement requirements and internal procurement processes for awarding OTF contracts, RFA returned unused unobligated funds to BBG at the end of the fiscal year, and RFA used grant funds provided by BBG in accordance with Federal regulations and the grant agreement.

The Office of Inspector General (OIG) conducted fieldwork for this audit from February to August 2014 at BBG and RFA. OIG limited its audit work to RFA expenditures for FYs 2012 and 2013 and unused funds from FYs 2007-2013. OIG conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that OIG plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for its findings and conclusions based on its audit objectives. OIG believes that the evidence obtained provides a reasonable basis for its findings and conclusions based on the audit objectives.

To obtain background for the audit, OIG researched and reviewed public laws and United States Code sections related to grants, Government Accountability Office guidance, the International Broadcasting Bureau Manual of Operations & Administration, BBG's Grantee Handbook, budget-related documents, BBG's strategic plan, and Congressional Budget Justifications. OIG also obtained and reviewed RFA's financial statements, policy and guidance, and OTF annual reports.

OIG interviewed officials at BBG to gain an understanding of its monitoring activities toward RFA, as well as the processes for formulating grantee budgets; for prioritizing needs of and communicating the goals of the Internet anti-circumvention program; for determining the amount of and ensuring unused funds are returned by RFA; and for monitoring and overseeing RFA activities, both financial and performance. OIG also interviewed officials at RFA to gain an understanding of the mission, objectives, and priorities of OTF; to discuss OTF's contracting processes and procedures and other uses of Internet anti-circumvention funds; to determine how OTF projects are selected; to ascertain the processes for determining the amount of and for returning unused funds to BBG; and to determine how compliance with Federal regulations and the grant agreement is monitored by RFA officials.

To determine whether RFA's procurement processes for OTF contracts complied with Federal grantee requirements, OIG selected contracts to review, as described in "Detailed Testing Methodology" in this appendix, and compared the procurement processes with Federal requirements. Further, OIG obtained RFA's written procurement procedures to determine whether RFA established written procurement procedures for OTF-funded contracts. In addition, OIG reviewed the affiliations of the officials making decisions on which projects to fund to determine whether there was a potential conflict of interest. This review was performed by

conducting Internet searches on Advisory Council members and comparing the information to the projects that were funded.

OIG also performed work to determine whether RFA expended its funds in accordance with Federal regulations and the grant agreement. This effort included reviewing general ledger account titles for compliance with Federal regulations and testing a sample of RFA's non-personnel expenditures for FY 2013 to determine compliance with Federal regulations and the grant agreement. OIG also compared RFA's maximum annual salaries provided to its employees with maximum annual salaries provided to BBG employees through Title 5 of the United States Code. This work is described further in "Detailed Testing Methodology."

To review additional benefits in addition to salaries, OIG used other means to compare benefits RFA's and BBG's benefits, such as annual leave, basic life insurance, and retirement. For example, to reach conclusions on retirement benefits, OIG used a report prepared by an actuarial specialist who determined the approximate service cost of the Federal Government for contributions to the Federal Employees Retirement System.

**Use of Computer-Processed Data**

The audit team used computer-processed data from RFA's Cost Point System, which is RFA's accounting system. Specifically, OIG obtained a listing of all transactions and a listing of all account balances for FYs 2012 and 2013. OIG used the transactions listing to generate a sample of expenditures for allowability testing. OIG performed substantive testing of the expenditure information obtained during the audit to assess the reliability of the data. In addition, RFA's financial statements, which are produced using data from Cost Point, are audited annually. OIG determined, based on how the data would be used in the report, the assurances provided by the annual financial statement audit, and the procedures performed during this audit, that the data was sufficiently reliable for OIG's needs. Issues identified during fieldwork are detailed in the Audit Results section, Finding E, "Non-Personnel Expenditures Were Generally Allowable, but Some Personnel Costs May Be Unallowable."

**Work Related to Internal Controls**

OIG performed steps to assess the adequacy of internal controls related to the areas audited. For example, OIG gained an understanding of and tested the controls over the contract process used to award contracts for Internet anti-circumvention efforts. OIG also gained an understanding of and tested the controls over the return of any unexpended funds by RFA to BBG. In addition, OIG gained an understanding of and tested the controls over the allowability of RFA's expenditures. Work performed on internal controls during the audit is detailed in the Audit Results section of the report.

**Detailed Testing Methodology**

OIG's sampling objectives were to determine to what extent:

- OTF contracts would fulfill program priorities;

- OTF contracts were in accordance with procurement standards established for grant recipients;[1]
- RFA continued to have a valid need for funds that were committed at the end of FY 2013;
- RFA used its grantee funds in accordance with Federal regulations and the grant agreement; and
- RFA's salaries were in compliance with Title 5 of the United States Code as required by the grant agreement.

**Selection of OTF Contracts for Determining Accomplishment of Priorities**

To determine whether OTF contracts would accomplish program priorities, OIG obtained all the contracts awarded using OTF funding in FYs 2012 and 2013. RFA awarded 47 contracts,[2] totaling about $9 million. OIG reviewed each contract and determined the purpose and separated the contracts into six categories, as shown in Table A.1.

**Table A.1. OTF Contracts From FY 2012-2013 by Category**

| Contract Category | Number of Contracts | Value of Contracts |
|---|---|---|
| Internet Projects | 18 | $4,401,397 |
| Mobile Device Projects | 12 | 3,412,087 |
| OTF Web site | 5 | 78,880 |
| Project Security Audits | 6 | 563,445 |
| Translation/Language | 2 | 200,000 |
| Other | 4 | 309,300 |
| Totals | 47 | $8,965,109 |

Source: OIG prepared based on the purpose of each contract.

Of 47 total contracts, 30 contracts, valued at about $7.8 million, were awarded for Internet and mobile device projects. OIG considered the remaining contracts to be service in nature, for example, website development, audits, translation, and meeting costs. Therefore, OIG focused its analysis on the 30 contracts that were awarded for Internet and mobile device projects, as shown in Table A.2.

**Table A.2. OTF Contracts Included in Analysis**

| Contract Category | Number of Contracts | Value of Contracts |
|---|---|---|
| Internet Projects | 18 | $4,401,397 |
| Mobile Device Projects | 12 | 3,412,087 |
| Totals | 30 | $7,813,484 |

Source: OIG prepared based on the results of its analysis.

---

[1] 22 Code of Federal Regulations, pt. 518.5, "Uniform Administrative Requirements for Grants and Agreements With Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations."

[2] RFA provided OIG a list of 48 contracts awarded with OTF funds for FYs 2012 and 2013. One item included as a contract was actually a contingency fund, which had no contract award associated with it. That item was removed from the universe; so for purposes of this audit, OIG considered only the 47 actual contracts.

The results of the review are included in the Audit Results section, Finding B, "Broadcasting Board of Governors Did Not Provide Sufficient Guidance on the Use of Open Technology Fund Resources."

**Selection of OTF Contracts for Testing Compliance With Procurement Requirements**

To determine whether RFA's OTF contracts were complying with Federal requirements, OIG judgmentally[3] selected 6 of 30 project-related contracts—with 5 different vendors— that were entered into during FY 2012 or FY 2013.[4] OIG's primary consideration for the selection of the contracts was dollar value. Each contract selected was more than $100,000, and the six contracts selected totaled $3,953,022, which was about 51 percent of the total value of the contracts. However, OIG also considered the relationship of the officials who selected projects for funding to the organizations that received funding when selecting its sample. OIG considered these contracts to be at high risk for abuse.

The six contracts selected were reviewed for compliance with procurement standards established for grant recipients.[5] For each of the selected contracts, OIG reviewed the contract files to determine whether RFA maintained sufficient documentation to support the following:

- Maximum competition or a justification when competitive bids or offers were not obtained.
- Cost or price analysis.
- Basis for contractor selection.
- Basis for award cost or price.
- A system of contract administration, such as evidence OTF staff monitored the performance of the contract awardees to ensure their deliverables met the specifications of the contract.

Additionally, RFA established program and funding guidance that it included on its OTF website. OIG reviewed the contract files to determine whether the contracts received the required project proposal reviews and approvals from OTF management or staff and the OTF advisory council prior to contract award. Additionally, OIG reviewed the contract files to determine (1) whether the budget director and general counsel reviewed the proposals to ensure funding was available and there were no conflicts of interest, respectively, and (2) whether the President of RFA approved the proposals prior to contract award. The results of the review are included in the Audit Results section, Finding C, "Radio Free Asia Did Not Comply With Federal Procurement Requirements or Internal Procurement Processes."

---

[3] A judgment sample is a nonstatistical sampling method in which the sample is selected by using discretionary criteria rather than the laws of probability; a judgment sample cannot be projected to the universe.
[4] The judgmental selection included four contracts from FY 2012 and two contracts from FY 2013.
[5] 22 CFR pt. 518.

UNCLASSIFIED

### Selection of Unexpended Funds for Allowability and Validity Testing

OIG also performed work to determine whether RFA's unexpended funds were no longer needed and should have been returned to BBG. RFA's unexpended funds consisted of commitments[6] and prior years' unexpended funds. OIG reviewed all commitments included in RFA's FY 2013 financial statements as well as unexpended funds from FYs 2007-2010 to determine their validity. OIG did not review the unexpended funds from FYs 2011 and 2012. The transactions for those 2 years totaled only about $79,000, and so the value added to the audit work would be minimal. To test unused funds, OIG reviewed supporting documentation to make a determination using the following factors:

- Whether the item or service purchased was allowed by Federal regulation.
- Whether the date that the item or service was to be received had not passed.
- Whether there was activity on the commitment within 6 months of OIG testing.[7]

The results of the review are included in the Audit Results section, Finding D, "Radio Free Asia Did Not Return Unneeded Funds to the Broadcasting Board of Governors."

### Selection of Non-Personnel Expenditures for Allowability Testing

OIG selected a sample of non-personnel expenditures from RFA's listing of FY 2013 transactions to test for compliance with Federal regulations[8] and the grant agreement. OIG obtained a listing of all RFA transactions for FY 2013 and removed those transactions related to salaries and benefits, which were tested separately, as detailed in "Selection of Job Titles for Comparison Testing" in this appendix. In addition, OIG excluded both negative transactions and duplicate transactions, which were also tested separately. Lastly, OIG removed all transactions with balances of less than $10.

OIG selected the non-personnel expenditures for compliance testing using a nonstatistical sampling method known as judgment sampling. Because this method uses discretionary criteria to effect sample selection, OIG was able to use information it obtained during preliminary work to assist in making informed selections. More specifically, judgment sampling was used primarily to ensure that the relatively few high dollar expenditures would be selected and tested.

OIG grouped the expenditures by the financial plan categories, namely Contract Services, Travel and Allowances, Office Space, General and Administrative, Technical,[9] and Capital.[10] Generally, OIG selected all expenditures above certain thresholds or cutoff amounts for the various categories and then randomly selected a determined number of expenditures below the threshold for each category. To the extent practicable, proportionality was used in selecting the

---

[6] Commitments represent purchase orders, work orders, and contracts that were issued but for which goods or services had not been received by RFA. Unexpended funds were the unspent portion of the budgeted amount.
[7] OIG performed testing on RFA's commitments during May 2014, meaning there would have needed to have been activity since December 2013.
[8] OMB Circular A-122, "Cost Principles for Non-Profit Organizations," and 48 CFR 31.205-46, "Travel Costs."
[9] Technical expenditures include technical equipment that costs less than $5,000.
[10] Capital expenditures include property and equipment purchases of $5,000 or more.

UNCLASSIFIED

UNCLASSIFIED

sample for each category. For example, Contract Services, with the greatest number of and highest dollar amount of expenditures of all categories, was the largest sample; conversely, Capital, with the smallest number of and the lowest dollar amount of expenditures, was the smallest sample of all the categories.

The universe of expenditures provided by RFA was not entirely composed of outlays of funds. Some of the universe items were commitments of funds. OIG attempted to purge the universe of all commitments before sample selection, but this effort met with limited success. In some instances, OIG could determine only after sample selection that purported expenditures were actually commitments. Consequently, the original sample size was decreased, and the universe size needed to be concomitantly reduced. There are, however, undoubtedly other universe items recorded as expenditures in the reduced universe that should be changed to commitments. However, that would have involved checking the entire universe, which was outside the scope of this audit. In addition, RFA, because of circumstances beyond its control, was unable to provide supporting documentation for one General and Administrative expenditure, thereby further reducing the sample. As a result of these reductions, the final number of expenditures sampled and tested was 199, totaling $1,673,537, as shown in Table A.3.

**Table A.3. RFA Non-Personnel Expenditure Sample Selection**

| Category | Universe Total* | Universe Amount* | Number Sampled and Tested | Amount Sampled and Tested |
|---|---|---|---|---|
| Contract Services | 4,051 | $5,560,892 | 68 | $443,627 |
| Travel | 1,829 | 795,142 | 44 | 121,418 |
| Office Space | 408 | 4,072,113 | 38 | 575,012 |
| General and Administrative | 3,009 | 2,272,137 | 34 | 458,625 |
| Technical | 477 | 312,306 | 10 | 21,773 |
| Capital | 8 | 75,916 | 5 | 53,082 |
| Totals | 9,782 | $13,088,506 | 199 | $1,673,537 |

\* The universe of total expenditures and the universe amount of these expenditures as shown in the table are undoubtedly overstated because there are very likely some commitments inadvertently included. Consequently, the totals in these two columns represent upper bounds; they cannot be any larger and are probably less.
Source: OIG prepared based on the results of its testing.

For each of the expenditures tested, OIG determined the allowability of the expenditures based on Federal regulations and the grant agreement. OIG reviewed supporting documentation such as contracts, receiving reports, and invoices to determine whether RFA expended its grant funds in accordance with regulations. The results of the review are included in the Audit Results section, Finding E, "Non-Personnel Expenditures Were Generally Allowable, but Some Personnel Costs May Be Unallowable."

UNCLASSIFIED

**Selection of Job Titles for Comparison Testing**

To determine whether RFA salary levels were in compliance with Title 5 of the United States Code,[11] OIG obtained an employee roster from RFA that included the job title and pay band for each employee. Each of the RFA employee positions or job titles was assigned to one of 19 pay bands that listed a minimum and maximum salary amount (there were no individuals assigned to 3 of the pay bands at the time of the audit). According to the roster, RFA maintained 245 U.S. employees and 8 local hire employees, for a total of 253 employees, as of September 30, 2013. OIG included in its target universe only those job titles for the U.S. employees, as only the U.S. employees' salaries would need to comply with Title 5. For the 245 U.S. employees, there were 89 unique job titles to include in the universe. OIG grouped, by pay band, the job titles with a common element, such as having "Director" in the job title, resulting in five groups or categories. To ensure appropriate coverage across the five categories, OIG selected a judgment sample from each of the categories, which totaled 19 job titles, as shown in Table A.4.

**Table A.4. Job Titles Sampled and Tested**

| Pay Band Categories | Number of Job Titles in Universe | Number of Job Titles Sampled | Number of Job Titles Sampled and Tested |
|---|---|---|---|
| L1-L3 | 7 | 3 | 1 |
| 3-5 | 11 | 2 | 0 |
| 6-7 | 20 | 3 | 1 |
| 8-10 | 30 | 6 | 2 |
| 11-SES Equivalent | 21 | 5 | 3 |
| Totals | 89 | 19 | 7 |

Source: OIG prepared based on RFA Employee Roster and sampling methodology.

OIG planned to sample and test 20 job titles to determine whether there was comparability between the maximum annual remuneration of RFA employees versus BBG employees. However, when OIG obtained position descriptions for each of the sampled items from RFA and then made the same request for position descriptions for BBG or Voice of America positions with similar duties, BBG officials said that they did not believe BBG had a position description that was comparable to one of RFA's positions. Consequently, OIG sampled the duties and responsibilities for 19 positions, determining the highest salary attainable for the pay band or grade assigned to each position. Of these 19 positions, OIG determined that only seven were comparable and therefore suitable for testing. The results of this testing are included in the Audit Results section, Finding E, "Non-Personnel Expenditures Were Generally Allowable, but Some Personnel Costs May Be Unallowable."

---

[11] 5 U.S.C. ch.53, "Pay Rates and Systems."

UNCLASSIFIED

Appendix B

## Broadcasting Board of Governors Response



**BROADCASTING BOARD OF GOVERNORS
UNITED STATES OF AMERICA**

March 25, 2015

Mr. Norman P. Brown
Assistant Inspector General for Audits
Office of Inspector General
U.S. Department of State

Dear Mr. Brown:

Thank you for the consideration shown by your audit team and the opportunity to respond to the Office of Inspector General's draft report, "Audit of Radio Free Asia Expenditures," dated March 2015.

The Broadcasting Board of Governors (BBG) has reviewed the OIG's analysis and draft recommendations and provides its concurrence, as well as comments on recent actions to implement these recommendations, in the enclosures to this letter.

The BBG fully supports the mission and the achievements of Radio Free Asia throughout its short history. RFA's accomplishments, and indeed those of all of BBG's grantees, can only be enhanced through implementation of the management efficiencies and appropriate oversight recommended in the OIG report. We look forward to working with RFA to implement these improvements, and pledge to keep OIG informed of our progress.

Sincerely,

André Mendes
Interim Chief Executive Officer and Director

Enclosures

330 INDEPENDENCE AVENUE, SW    ROOM 3360    COHEN BUILDING    WASHINGTON, DC 20237    (202) 203-4545    FAX (202) 203-4568

57
UNCLASSIFIED

UNCLASSIFIED

*Broadcasting Board of Governors*

**BBG's Response to OIG Draft Report**
**Audit of Radio Free Asia Expenditures**
**March 2015**

**Recommendation 1.** OIG recommends that the Broadcasting Board of Governors define its grant monitoring structure, formally document the roles and responsibilities of all parties involved in the grant monitoring process, and revise its Grantee Handbook accordingly.

**BBG Response**: **BBG concurs. BBG has drafted a revised Grantee Handbook, which outlines the roles and responsibilities of various Agency offices in grant oversight and administration. The Grantee Handbook is in draft, pending internal review and approval. BBG anticipates that the Grantee Handbook will be approved and in use by the end of the 1st Quarter of FY 2016.**

**Recommendation 2.** OIG recommends that the Broadcasting Board of Governors develop and implement a comprehensive grant oversight program and revise its Grantee Handbook to document the specific procedures for the grant oversight program.

**BBG Response**: **BBG concurs. BBG drafted a grant monitoring program (GMP) that aligns with its revised Grantee Handbook, as well as OMB 2 CFR 200 requirements. Both the Grantee Handbook and GMP are pending internal review and approval.**

**Recommendation 3.** OIG recommends that the Broadcasting Board of Governors (BBG) develop and implement a training plan for all employees involved in grant oversight as determined in response to Recommendation 1. This training plan should cover both Government-wide requirements for grant oversight and also BBG's internal grants policies and procedures. BBG should revise its Grantee Handbook to include the training plan.

**BBG Response**: **BBG concurs. Training slide decks are being developed for both the Federal and Non-Federal entities as a part of a grant monitoring program. Moreover, BBG budget analysts who support the BBG-sponsored Grantees enrolled in grant management training in the 1st Quarter of FY 2015. In addition to basic grant management principles, the BBG budget analysts studied federal grant administration, federal assistance and appropriation law, and cost principles.**

**Recommendation 4.** OIG recommends that the Broadcasting Board of Governors (BBG) formally designate a grants analyst to monitor Radio Free Asia. As part of the designation, BBG should ensure that the grants analyst's responsibilities are clearly defined and communicated to that employee.

**BBG Response**: **BBG concurs. BBG is actively recruiting an experienced Grants Manager. The Office of Human Resources has indicated that the vacancy announcement**

1

UNCLASSIFIED

UNCLASSIFIED

*Broadcasting Board of Governors*

had closed with over 200 potential candidates. BBG anticipates that a Grants Manager will be onboard by the 3rd Quarter of FY 2015. This person will lead the grant monitoring efforts, in cooperation with a budget analyst from the Office of the CFO. A copy of the USAJobs announcement is set forth in Attachment A.

**Recommendation 5.** OIG recommends that the Board of Governors formally designate a high level Broadcasting Board of Governors (BBG) official, such as the Chief Executive Officer, as the official responsible for approving initiatives to improve BBG's grant oversight process.

**BBG Response:** BBG concurs. Under his delegation of authority from the Board, BBG's Interim CEO/Director Andre Mendes has authority to approve initiatives to improve BBG's grant oversight process.

**Recommendation 6.** OIG recommends that the Broadcasting Board of Governors (BBG) ensure that the Board of Governors immediately receives training and guidance on its responsibilities as a Board. This training and guidance should include, but not be limited to, information on Federal requirements for overseeing grantees and BBG's internal grant oversight policies and procedures. The training should also address the Board's responsibilities for ensuring that BBG complies with Federal grants regulations. In addition, BBG should develop a plan to provide refresher training to the Board on its responsibilities annually.

**BBG Response:** BBG concurs. The Board will receive training on Federal requirements for overseeing grantees and BBG's internal grant oversight policies and procedures, including, for example, the relevant circulars of the Office of Management and Budget. The training may be provided by a combination of internal and external trainers. The timing of the initial training, as well as annual refresher training, will be as determined by the Board.

**Recommendation 7.** OIG recommends that the Broadcasting Board of Governors (BBG) develop a formal framework describing how Radio Free Asia should use Internet anti-censorship funds. This framework should describe BBG's priorities for the use of the funds.

**BBG Response:** BBG concurs. BBG is currently drafting policy and procedures designed to provide oversight for the use of all Internet Anti-Censorship funds to ensure usage is in-line with appropriation language, BBG strategy, and applicable procurement process and approvals.

**Recommendation 8.** OIG recommends that the Broadcasting Board of Governors (BBG) revise the grant agreement with Radio Free Asia (RFA) to provide guidance to RFA on the newly developed framework describing BBG's priorities for the use of the Internet anti-circumvention funds, as determined in response to Recommendation 7.

2

UNCLASSIFIED

*Broadcasting Board of Governors*

**BBG Response**: BBG concurs. In submitting the Agency's FY 2015 Operating Plan to Congress, which includes additional funding for RFA-sponsored OTF projects, the Board expressed (via a notation vote adopted on March 23, 2015) its intent to establish a sound oversight mechanism for any funds granted to RFA. A copy of the notation vote is set forth in Attachment B. In this notation vote, the scope of the Board's direction to the BBG's Interim CEO/Director authorizes the inclusion of conditions, including imposition of these recommended requirements, in any subsequent grant amendment.

**Recommendation 9.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to develop and implement supplemental procurement policies and procedures for Open Technology Fund procurements that comply with Federal procurement requirements for grantees.

**BBG Response**: BBG concurs. The Board will condition any further grant of IAC funding to RFA on RFA's development and implementation of such policies and procedures, consistent with BBG guidance.

**Recommendation 10.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia (RFA) to develop and implement a training plan that ensures that RFA employees involved in the Open Technology Fund procurement process understand the supplemental procurement policies developed in response to Recommendation 9.

**BBG Response**: BBG concurs. The Board will condition any further grant of IAC funding to RFA on RFA's development and implementation of such a training plan, consistent with BBG guidance.

**Recommendation 11.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia (RFA) to implement a process to monitor the Open Technology Fund procurement process to ensure compliance with RFA's procurement procedures.

**BBG Response**: BBG concurs. The Board will condition any further grant of IAC funding to RFA on RFA's development and implementation of such a process, consistent with BBG guidance.

**Recommendation 12.** OIG recommends that the Broadcasting Board of Governors direct Radio Free Asia (RFA) to ensure that employees and Advisory Council members comply with RFA's conflict of interest requirements.

**BBG Response**: BBG concurs. The Board will condition any further grant of IAC funding to RFA on RFA's development and implementation of compliance with these requirements, subject to BBG oversight.

3

UNCLASSIFIED

UNCLASSIFIED

*Broadcasting Board of Governors*

**Recommendation 13.** OIG recommends that the Broadcasting Board of Governors (BBG) develop and implement a process to select Open Technology Fund projects that Radio Free Asia (RFA) will fund. Both BBG and RFA officials should be involved in the selection process.

**BBG Response: BBG concurs. As noted in our response to Recommendation 7, the BBG is drafting policies and procedures designed to provide oversight for the use of all Internet Anti-Censorship funds. These policies and procedures will provide a framework for oversight to ensure that use of the funds is in line with the BBG strategy, relevant appropriations language, and applicable procurement process and approvals. They will also include language indicating that both BBG and RFA officials will participate in the project selection process.**

**The Agency has already engaged in discussions with the RFA President to ensure that Agency officials, well versed in all areas of Information Technology including IAC and Firewall management, represent the Agency as members of the OTF Advisory Panel. The recently appointed Director of the BBG's IAC program and former Agency Deputy CIO, as well as BBG's IT specialist and recognized expert in IAC matters, will participate as voting members of the OTF Advisory Panel. We will update OIG on these developments as the policies and procedures are completed.**

**Recommendation 14.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to revise its processes to include an assessment of the continued need for funds that are either unexpended or committed and to take action to de-obligate funds that are no longer needed.

**BBG Response: BBG concurs. BBG will assess the grantees' process for de-obligation of funds. BBG has drafted/revised templates (funds need statement, annual financial plan/statement of disbursement) for use by grantees to identify unexpended or committed funds that are no longer needed and should be de-obligated. These templates will be finalized in tandem with final approvals for the updated Grantee Handbook.**

**Recommendation 15.** OIG recommends that the Broadcasting Board of Governors require Radio Free Asia to annually report on the amount of unused funds.

**BBG Response: BBG concurs. BBG will require Radio Free Asia to annually report on the amount of unused funds.**

**Recommendation 16.** OIG recommends that the Broadcasting Board of Governors develop and implement a process to oversee Radio Free Asia's unused funds.

**BBG Response: BBG concurs. BBG will continue to work with the Grantees, BBG Management, OGC, and OMB to finalize the process for handling grantees' unused funds.**

4

UNCLASSIFIED

*Broadcasting Board of Governors*

**These results will be incorporated into the Grant Monitoring Program (GMP), Grantee Handbook and associated templates for reporting.**

**Recommendation 17.** OIG recommends that the Broadcasting Board of Governors make a formal determination on the $583,583 in questioned costs related to unused funds at Radio Free Asia identified by OIG.

**BBG Response:  BBG Concurs. The BBG OCFO will review the questioned cost related to unused funds and make related recommendations to the Interim Director.**

**Recommendation 18.** OIG recommends that the Broadcasting Board of Governors direct Radio Free Asia (RFA) to make and verify that RFA has made the necessary journal entries to correct the funding used for $15,292 in travel costs OIG identified as allowable but where incorrect funds were used.

**BBG Response:** BBG concurs. The BBG OCFO will make necessary inquiries to retrieve supporting documentation for the posting of travel costs in the general ledger to make the proper evaluation of correct posting logic. Once the evaluation has been conducted the information will be vetted with BBG's management for presentation to RFA for action.

**Recommendation 19.** OIG recommends that the Broadcasting Board of Governors (BBG) make a determination as to whether promotional items, in general, are an appropriate cost for Radio Free Asia (RFA), and if so, obtain a waiver from the Office of Management and Budget. If BBG does not believe that promotional items are an appropriate RFA cost, BBG should inform RFA that promotional items should not be purchased using grant funds.

**BBG Response:** BBG concurs. We note, however, that if BBG determines that promotional items are a necessary expense of international broadcasting, then we do not need an OMB waiver. (See 2 CFR 200.421 (b)(4), defining allowable promotional costs to include "[p]rogram outreach and other specific purposes necessary to meet the requirements of the Federal award.)

**Recommendation 20.** OIG recommends that the Broadcasting Board of Governors make a formal determination on the $19,854 in questioned costs related to Radio Free Asia's purchase of promotional items and contributions identified by OIG.

**BBG Response:** BBG concurs.

**Recommendation 21.** OIG recommends that the Broadcasting Board of Governors (BBG) work collaboratively with Radio Free Asia (RFA) to perform a comparability study of RFA salaries and benefits and determine whether the salaries and benefits offered by RFA violate the

5

**UNCLASSIFIED**

*Broadcasting Board of Governors*

requirements of the grant agreement. If so, BBG should direct RFA to bring salaries and benefits into compliance with the grant agreement.

**BBG Response**: BBG concurs. Currently, BBG is reviewing the revised grantee handbook and re-establishing the annual comparability study to verify the comparability of compensation plans across all BBG entities. The Grant Agreement states that grantees may not "pay any salary or other compensation, or enter into any contract providing for the payment of salary or compensation in excess of the rates established for comparable positions under Title 5 of the United States Code, or the foreign relations laws of the United States."

6

**UNCLASSIFIED**
Def. App. 73

**Appendix C**

# Radio Free Asia Response

 **Radio Free Asia**

March 25, 2015

Mr. Norman P. Brown
Assistant Inspector General for Audits
U.S. Department of State, Office of the Inspector General
1700 N. Moore St.
Arlington, VA 22209

Dear Mr. Brown,

Thank you for the opportunity to respond to the Office of Inspector General (OIG) draft report *Audit of Radio Free Asia Expenditures*, dated March 4, 2015. Our response includes specific comments about the substance, tone and word choice employed in the report and responds to each recommendation which concerns possible action by RFA.

It should be stated that, during the conduct of the audit, Radio Free Asia (RFA) staff has worked conscientiously to cooperate fully with your audit team responding quickly, completely and transparently to numerous on-site visits, document requests, telephone and e-mail inquiries and conversations. We request that this cooperation and openness be acknowledged in the report since it is addressed to our funding agency, the Broadcasting Board of Governors (BBG), and the report will eventually become a public document. We ask this, in particular, because the audit team itself indicated that it was RFA's recordkeeping and responsiveness which ensured that some data sought directly from BBG was only made available through RFA.

The fact that RFA has fully cooperated does not mean, however, that it agrees with all of the report's statements, conclusions, and recommendations. To the contrary, we believe that the audit team based several of its findings on mistaken or faulty assumptions and drew unwarranted conclusions. As will become clear in your review of what follows, we believe that a number of the cases in which noncompliance was asserted were based on misinterpretation of applicable rules or extension of them to situations to which they do not apply resulting in an overall misimpression of RFA's performance using federal funds.

We draw your attention to this dispositive statement in your report:
**"Considering the small number and amounts of deficiencies identified, OIG concluded that it is reasonable for BBG to continue to rely on the testing performed by RFA's independent financial statement auditor."**

2025 M Street, NW          T 202 530 4900
Suite 300                  F 202 530 7797
Washington, DC 20036       www.rfa.org

UNCLASSIFIED

We have accepted most of the recommendations because we find them to be constructive.  We respectfully request that the OIG review each comment and modify the report language based on its demonstrated validity. We also request that the full text of RFA's Transmittal Letter and Specific Comments provided herein be treated as part of the "Views of Management" as called for under generally accepted government auditing standards. We understand, however, that it may not be possible to include all supporting attachments.

Including RFA's response will result in a more balanced final report.

Sincerely,

Libby Liu
President

**Enclosure:**     Specific Comments to the OIG Audit of Radio Free Asia
                    Expenditures (including Attachments)

2 of 10

65
UNCLASSIFIED

UNCLASSIFIED

**Radio Free Asia**

## SPECIFIC COMMENTS TO THE OIG AUDIT OF RADIO FREE ASIA EXPENDITURES

### RECOMMENDATION 9

**Concur with recommendation and noting the following:**

RFA has a Procurement Policy that is followed for all purchases.  RFA acknowledges that there were some departures from its procurement procedures and Office of Management and Budget requirements applicable at the time the contracts examined by the OIG were awarded for some Open Technology Fund (OTF) contracts. RFA believes that those departures were primarily matters of insufficient documentation rather than substantive ones. They were not departures which resulted in harm to the programs supported by the Broadcasting Board of Governors (BBG). RFA believes that proper value was received in these procurements and that program objectives were achieved. However, RFA will immediately initiate a review of its procurement procedures affecting all of its activities, including OTF, and supplement them particularly in light of the recent issuance by the Office of Management and Budget (OMB) of *Uniform Administrative Requirements, Cost Principles and Audit Requirements* (2 CFR 200, effective 12/26/14). The procurement standards contained in that policy guidance (2 CFR 200.317-326) will be fully assessed and appropriately incorporated going forward. This review will assure that competition is conducted to the extent practical. Appropriate cost or price analysis will be conducted and contract administration procedures to assure contractor compliance and performance will be adopted.

RFA believes that OIG's assertions about noncompliance with a requirement for independent cost estimates are incorrect and that its suggestion to rely on language on the subject from the Federal Acquisition Regulation (FAR) is inappropriate. The policy cited in a footnote on Page 21 of the draft by the OIG (22 CFR 518.44) does not require independent cost estimates. RFA will incorporate a procedure to prepare cost or price analysis in compliance with the newly issued OMB policy (2 CFR 200.323(a)) for contracts that exceed the federal Simplified Acquisition Threshold.

RFA will also use the guidance provided in 2 CFR 200.330 to develop a policy concerning the proper characterization of its lower tier relationships, known as "subrecipient and contractor determinations" in the new regulations.  RFA suggests that the OIG's characterization of the award

3 of 10

UNCLASSIFIED

UNCLASSIFIED

made to Freedom2Connect Foundation as a subaward (i.e. an award of financial assistance as distinct from a purchase transaction) while at the same time contending that it should have been competitively procured represents an inconsistency on its part. Since there is no past or current general federal requirement for competition of subawards (subgrants) and the oversight requirements for subawards and contracts under grants have and will continue to differ, RFA believes that adopting and following policies on this subject will address the concerns voiced by the OIG.

Please note that on page 16, footnote 34, the OIG stated that the required filings related to the Freedom2Connect Foundation were delinquent.   These filings are now up-to-date.

### RECOMMENDATION 10

**Concur with recommendation and noting the following:**

RFA will initiate a training regimen for appropriate employees involved in organizational procurements, including those involved in the Open Technology Fund, to assure that they are aware of RFA's current procurement procedures.  After the review and policy revisions discussed in our response to Recommendation 9 are implemented, those employees will receive the updated information. RFA has already obtained a web based training module entitled "Purchasing with Federal Grant Funds", developed by an experienced training organization, that addresses and analyzes the underlying OMB requirements. The training module will be used as the first step in that process.

### RECOMMENDATION 11

**Concur with recommendation and noting the following:**

Upon completion of the policy review discussed in Recommendation 9, RFA will conduct near term monitoring of its procurement process  through a self-audit of contracts (Attachment I - OTF Project Approval Form) and through reliance on the internal control review conducted by its external auditors under the engagement performed to satisfy requirements of the Single Audit Act of 1984 (as amended). Any deficiencies revealed through such monitoring will be addressed as appropriate.

It should be noted that there was a sole-source justification on file for the two contracts totaling $200,000 for translations.  The six contracts totaling $563,000 for security audits were awarded to the only companies uniquely qualified to do this type of service.

4 of 10

UNCLASSIFIED

UNCLASSIFIED

**RECOMMENDATION 12**

**Concur with recommendation and noting the following:**

The language in RFA's Conflict of Interests policy was drafted by the BBG, and its use is mandated in the Grant Agreement. RFA suggests that BBG review its mandated Conflict of Interests policy to assure that it is in compliance with applicable OMB requirements. RFA will continue to enforce its Conflict of Interests policy through an awareness memorandum to employees, officers, and agents and will incorporate specific subject training into the broader procurement training to be conducted in response to Recommendation 10. However, RFA believes that the OIG has considerably overstated the extent to which conflict of interests may have arisen in the procurements that were reviewed in connection with the audit. RFA suggests that OIG appears to have concentrated on one sentence of the applicable BBG policy without considering the remainder of the applicable provision. The subject provision (22 CFR 518.42) actually states, "No employee, officer, or agent shall participate in the selection, award, or administration of a contract supported by Federal funds if a real or apparent conflict of interest would be involved. **Such a conflict would arise when the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in the firm selected for the award** (emphasis added).

First, RFA asserts that Advisory Committee members are not employees, officers, or agents of the organization. Their recommendations concerning selection of contractors are not binding on responsible RFA officials. It is not uncommon or inappropriate for such advisory committee members to have affiliations with organizations with technical expertise in highly specialized areas such as those which OTF is supporting.

Second, RFA believes that to suggest that an alumnus or alumna of an institution of higher education has a real or apparent conflict of interest simply because he or she graduated from the institution stretches the stated OMB policy far beyond its intent. A past affiliation or relationship does not create a conflict of duty with current employment and, in the particular case cited by the OIG, the institution involved is annually one of the top 25 institutions of higher education in terms of total federal funds received ($482.2 million in FY 2013). To suggest that that institution might divert funds from an intended purpose belies the federal government's longstanding reliance on it as a grantee and a contractor. Further, RFA notes

5 of 10

UNCLASSIFIED

UNCLASSIFIED

that to suggest that past employment creates a conflict of interest goes beyond the OMB policy which addresses only current or future employment. RFA suggests that the language related to individuals cited in the report unfairly impugns their integrity. We request that it be substantially edited.

## RECOMMENDATION 13

**Non-concur with recommendation, noting the following and concur with BBG response to Recommendation 13**

RFA agrees with and supports BBG's recommended action in response to Recommendation 13.

RFA strongly disagrees with the OIG recommendation as formulated. Our position is based on at least two legal and regulatory bases. First, OMB procurement standards (22 CFR 518.41 for past procurements; 2 CFR 200.318(k) for future procurements) provide that "The recipient is the responsible authority, without recourse to the Federal awarding agency, regarding the settlement and satisfaction of all contractual and administrative issues arising out of procurements entered in support of an award or other agreement. This includes disputes, claims, protests, **source evaluation** (emphasis added) or other matters of a contractual nature." This provision has been in place for more than 20 years. RFA believes that its purpose is to recognize privity of agreement and the fact that the Federal awarding agency is not a party to procurement contracts under grants.

Second, if substantial federal involvement in the recipient's procurement process is anticipated, the Federal awarding agency is required by the Federal Grant and Cooperative Agreement Act (FGCAA; PL 95-224, as amended) to issue a cooperative agreement in which that substantial involvement is specified (OMB Directive on implementation of the FGCAA, FR (8/18/78); OMB Federal Assistance Program Announcements, FR 6/23/03; and, more recently, 2 CFR 200, Appendix I). RFA suggests that the OIG's recommendation could give rise to the possibility that BBG would be viewed as using an intermediary to carry out activities that it might be precluded from undertaking directly, a situation that the FGCAA was intended to address. A recent Supreme Court case has ruled that Congressional pronouncements stating that a particular organization is not a

6 of 10

UNCLASSIFIED

UNCLASSIFIED

federal instrumentality are not dispositive when there is substantial governmental control. [1]

It should be noted that RFA reviews all potential projects with the Director of Global Operations/Acting CFO and presents a list of potential projects to be funded during the annual Operating Plan submission process. Again, RFA agrees with and supports BBG's recommended action in response to Recommendation 13.

## RECOMMENDATIONS 14, 15, AND 16

**Concur with recommendation and noting the following:**

RFA suggests that the presence of obligated but unexpended funds at the end of a grant award year is a common situation that arises in the context of federal awarding agency and recipient interaction. This is reinforced by the BBG practice of allowing Grantees to reprogram prior-year funds.

RFA maintains a monthly record of unexpended funds by year, subject to independent audit, and this information was provided to the IG. (Attachment II - RFA Monthly Status of Prior Year Funds).

RFA will provide a report of prior-year funds at the end of October each year when it submits the final fiscal year financial reports required by the Grant Agreement.

## RECOMMENDATION 17

**Concur with recommendation and noting the following:**

---

[1] *DEPARTMENT OF TRANSPORTATION ET AL. v. ASSOCIATION OF AMERICAN RAILROADS* which held that: For purposes of determining the validity of the metrics and standards, Amtrak is a governmental entity. Pp. 6–12. (a) In concluding otherwise, the Court of Appeals relied on the statutory command that Amtrak "is not a department, agency, or instrumentality of the United States Government," 49 U. S. C. §24301(a)(3), and the pronouncement that Amtrak "shall be operated and managed as a for profit corporation," §24301(a)(2). But Congressional pronouncements are not dispositive of Amtrak's status as a governmental entity for purposes of separation of powers analysis under the Constitution, and an independent inquiry reveals the Court of Appeals' premise that Amtrak is a private entity was flawed. As Amtrak's ownership and corporate structure show, the political branches control most of Amtrak's stock and its Board of Directors, most of whom are appointed by the President, §24302(a)(1), confirmed by the Senate, ibid., and understood by the Executive Branch to be removable by the President at will. The political branches also exercise substantial, statutorily mandated supervision over Amtrak's priorities and operations.

UNCLASSIFIED

UNCLASSIFIED

Of the $583,583 questioned by the OIG, BBG granted RFA permission to reprogram $397,347 of this amount.  (Attachment III - Email from BBG approving the use of prior-year funds).

Also, it should be noted that the OIG cited (page 30) that one commitment of $150,000 had expired.  This contract was amended on April 30, 2014 extending the time of performance through December 31, 2014, and the remaining two deliverables have been completed.

RFA will continue to monitor the remaining obligated amounts and when it is determined that any of those funds are no longer required for the original purpose, RFA will work with BBG to reprogram those funds

**RECOMMENDATION 18**

**Concur with recommendation and noting the following:**

RFA prepared and posted the journal entries requested by OIG.  Copies of the journal entries were submitted to the OIG on February 10, 2015. (Attachment IV - Copy of Journal Entries and relevant support documentation).

**RECOMMENDATIONS 19 AND 20**

**Concur with recommendation and noting the following:**

RFA believes that BBG can make the determination of allowability of the promotional items cited in this finding without the need to seek an OMB waiver. This position is based on the fact that the cost principles applicable at the time that the transactions were consummated (OMB Circular A-122, 2 CFR 230) were incorporated by reference in BBG's regulations at 22 CFR 518.27 and that 22 CFR 518.4 permits the federal awarding agency itself to grant case-by-case deviations from the requirements of the entire regulation (22 CFR 518). RFA suggests that the only time that a waiver is needed from OMB is when an awarding agency such as BBG needs a "class deviation" which is permission to treat a class of recipients or grants differently. Thus, OMB decision-making is warranted when multiple recipients or awards are involved as opposed to a single one, as arose in this case. Further, RFA believes that the expenditures were reasonable and were needed to advance the purpose of outreach for the award and urges BBG to ratify these expenditures.

8 of 10

71

**RECOMMENDATION 21**

**Concur with recommendation and noting the following:**

RFA believes that the provision of the grant agreement requiring adherence to compensation rates established under Title 5 of the United States Code represents an overly expanded application of the provisions of Section 309(d) of the International Broadcasting Act of 1994 (as amended). That provision states, "It is the sense of Congress that administrative and managerial costs for the operation of Radio Free Asia should be kept to a minimum and to the maximum extent feasible should not exceed the costs that would have been incurred if Radio Free Asia had been operated as a Federal entity rather than as a grantee." We suggest that language does not mean that rates for salaries and benefits paid to RFA employees must adhere to Title 5 as a cost containment measure. It is instead strongly indicated that **overall** costs of operations should not exceed those that would arise if the Federal government (not exclusively the Broadcasting Board of Governors) operated this function.  Thus, if an individual element of cost exceeds the amount paid by the federal government for that element, it is entirely possible that offsetting savings might be manifested in other object class categories of expense. Further, use of the word "should" as opposed to the word "must" indicates that the policy is not absolute. We also submit that the requirement that RFA adhere to applicable federal cost principles which identify how reasonableness and allowability of cost for compensation of employees  is determined makes no mention of policies used by the Federal government as any specific standard for such determination and that normally compensation policies of grantee organizations are their prerogative.

That stated, RFA recognizes that the grant agreement which was accepted imposes the requirement. However, RFA believes that it has adhered to the requirement and that the analysis presented by the OIG in Table 9 of the draft report is flawed. This is because the analysis fails to take into account what has **actually** been paid to employees (as opposed to the possible maximum salary available for a position in the classification and compensation plan) and it fails to fully accommodate the concepts related to "exempt" salaried employees under the federal Fair Labor Standards Act, a law that RFA is required to follow. First, data provided to the OIG shows that none of the positions/individuals covered in the sample were actually paid at the level of what the OIG identifies as the "RFA Maximum Annual Salary."  Thus, there was no noncompliance. Second, the calculations and

**UNCLASSIFIED**

comparisons introduced by the OIG concerning total hours worked mix the concepts of "exempt" and "non-exempt" employees and the requisite compensation approaches under the FLSA. The latter (i.e. non-exempt employees) are individuals whose compensation is built by multiplying an hourly wage by the number of hours worked in a continuous designated 168 hour work period (24/7). Under FLSA, if such individuals work more than 40 hours during that work period, they are entitled to premium compensation at one and one half times their regular wage. The former (exempt employees) are paid a fixed salary which does not fluctuate from work period to work period. They are exempt from the overtime provision, under Department of Labor regulations (29 CFR 541) because of their status as executive, administrative or professional employees. By definition, exempt employees are not limited in the number of hours they may work to receive their salary. Many RFA employees, including those in the sample, routinely work many more hours than those mandated by the minimum attendance requirements imposed on them by RFA and they receive no compensation or compensatory time off for these hours. Thus, to assert that RFA employees are overpaid because their minimum number of hours to be worked differs from that used by the BBG does not accommodate the reality of work patterns in either RFA or BBG.

Having said all of the above, RFA does support this recommendation and requests that the methodology, data and findings be shared with RFA.

**Enclosures:**

- Attachment I - OTF Project Approval Form
- Attachment II - RFA Monthly Status of Prior Year Funds
- Attachment III - Email from BBG approving the use of prior-year funds
- Attachment IV - Copy of Journal Entries and relevant support documentation

10 of 10

**UNCLASSIFIED**

# Office of Inspector General Replies to Radio Free Asia General Comments

In addition to comments directly relating to Office of Inspector General (OIG) recommendations, Radio Free Asia (RFA) provided general comments related to a draft of this report (RFA's comments in their entirety are in Appendix C). OIG considered and incorporated RFA's comments into this report as appropriate. A summary of RFA's general comments and OIG replies are as presented.

**RFA Comment:** RFA believes that OIG's assertions about noncompliance with a requirement for independent cost estimates are incorrect. The policy cited by OIG (22 CFR [Code of Federal Regulations] 518.44) does not require independent cost estimates. RFA will incorporate a procedure to prepare cost or price analysis in compliance with the newly issued Office of Management and Budget policy, 2 CFR 200.323(a), for contracts that exceed the Federal Simplified Acquisition Threshold. RFA will also use the guidance provided in 2 CFR 200.330 to develop a policy concerning the proper characterization of its lower tier relationships, known as "subrecipient and contractor determinations" in the new regulations.

**OIG Reply:** The Code of Federal Regulations, 22 CFR 518.44(e), states, "Recipients shall, on request, make available for the Federal awarding agency, pre-award review and procurement documents, such as request for proposals or invitations for bids, independent cost estimates, etc.," when certain conditions apply. One of the conditions is "the procurement is expected to exceed the small purchase threshold…and is to be awarded without competition." The CFR states that the small purchase threshold was $25,000.

All six of the RFA procurements tested by OIG exceeded $25,000. In addition, all of the RFA procurements tested by OIG were awarded without competition. Based on the CFR requirements, RFA should have been prepared to provide pre-award review and procurement documents for these procurements including independent cost estimates. OIG did not make any changes to the report based on this comment.

**RFA Comment:** RFA suggested that OIG's characterization of the award made to Freedom2Connect Foundation as a subaward (that is, an award of financial assistance as distinct from a purchase transaction), while contending that it should have been competitively procured, is inconsistent. RFA stated there is no past or current general Federal requirement for competition of subawards (subgrants) and that the oversight requirements for subawards and contracts under grants have and will continue to differ.

**OIG Reply:** OMB guidance states that a subaward means an award of financial assistance made by a recipient, which can be provided by any legal agreement, **even if the agreement is called a contract** (emphasis added).[1] Because the contract between RFA and the Foundation was not for the procurement of goods and services but instead provided financial assistance, the amount provided to the Foundation is a subaward. However, as noted in the OMB guidance, a subaward

---

[1] 22 CFR pt. 518.2(ff).

can be made using a contract. Because RFA entered into a legal agreement with the
Freedom2Connect Foundation using a contract, RFA is obligated to comply with the contract
requirements established by OMB, as well as ensure that the subrecipient complied with the cost
standards established by OMB. OIG did not make any changes to the report based on this
comment.

**RFA Comment:** It should be noted that there was a sole-source justification on file for the two
contracts totaling $200,000 for translations.

**OIG Reply:** OIG did not report that two contracts for translations did not have sole-source
justifications. OIG concluded that the justifications were not sufficient. OIG did not make any
changes to the report based on this comment.

**RFA Comment:** The six contracts totaling $563,000 for security audits were awarded to the
only companies uniquely qualified to do this type of service.

**OIG Reply:** During the audit exit conference, RFA officials made a similar assertion that there
are only limited companies capable of performing security audits. OIG asked Broadcasting
Board of Governors (BBG) officials, who are familiar with the type of activities performed by
these companies, whether there were other companies available to do this type of work. BBG
officials stated that this type of work could be done by many companies and agreed that sole
sourcing for these services was inappropriate. Therefore, OIG did not make any changes to the
report based on this comment.

**RFA Comment:** RFA believes that OIG has considerably overstated the extent to which
conflicts of interest may have arisen in the procurements that were reviewed in connection with
the audit. RFA suggests that OIG appears to have concentrated on one sentence of the applicable
BBG policy without considering the remainder of the applicable provision. The subject provision
(22 CFR 518.42) actually states, "No employee, officer, or agent shall participate in the
selection, award, or administration of a contract supported by Federal funds if a real or apparent
conflict of interest would be involved. **Such a conflict would arise when the employee, officer,
or agent, any member of his or her immediate family, his or her partner, or an
organization which employs or is about to employ any of the parties indicated herein, has a
financial or other interest in the firm selected for the award** (emphasis added)."

**OIG Reply:** OIG reviewed the section in the report related to RFA's noncompliance with
Federal procurement requirements and concluded that the information presented is accurate. OIG
does not believe that it has "overstated" the seriousness of the issue. OIG considered the criteria
cited by RFA when it assessed compliance with conflict-of-interest requirements and found that
RFA employees participated in the award of Federal funds to an organization in which they had
an interest. Further, 51 percent of the amount of Open Technology Fund (OTF) contracts
awarded in FYs 2012 and 2013 were made to companies affiliated with members of the
Advisory Council. OIG did not make any changes to the report based on this comment.

**RFA Comment:** RFA stated that Advisory Committee members are not employees, officers, or
agents of the organization. RFA further stated that the members' recommendations concerning

75

the selection of contractors are not binding on responsible RFA officials and that it is not uncommon or inappropriate for such advisory committee members to have affiliations with organizations with technical expertise in highly specialized areas such as those which OTF is supporting.

**OIG Reply:** Although recommendations made by the Advisory Council members are not binding on RFA, the Council members do have a significant role in the OTF procurement process. Further, RFA has a conflict-of-interest process for its Advisory Council members. However, RFA did not enforce the requirements. For example, as reported in the finding, none of the five awards reviewed by OIG had the required conflict-of-interest documents for the Advisory Council members. Considering that more than 50 percent of the number of OTF contracts during FY 2012 and FY 2013 were awarded to companies affiliated with Committee members and that these awards were not competed, there is clearly an appearance of a conflict of interest that RFA should consider and take appropriate steps to mitigate during the OTF procurement process. OIG did not make any changes to the report based on this comment.

**RFA Comment:** RFA believes that to suggest that an alumnus or alumna of an institution of higher education has a real or apparent conflict of interest simply because he or she graduated from the institution stretches the stated OMB policy far beyond its intent. A past affiliation or relationship does not create a conflict of duty with current employment and, in the particular case cited by the OIG, the institution involved is annually one of the top 25 institutions of higher education in terms of total Federal funds received ($482.2 million in FY 2013). To suggest that the institution might divert funds from an intended purpose belies the Federal Government's longstanding reliance on it as a grantee and a contractor.

**OIG Reply:** OIG found that the President of RFA established the Freedom2Connect Foundation and that the only transactions performed by the Foundation were to transfer $1.2 million provided by RFA to the University of California-Berkeley as a gift. This was done even though three of RFA's Advisory Council members questioned the project.

Because RFA officials stated that the President of RFA's relationship with Berkeley was not a significant consideration for the project's funding, OIG has removed the information from the finding.

**RFA Comment:** RFA noted that OIG's suggestion that past employment creates a conflict of interest goes beyond OMB policy, which addresses only current or future employment.

**OIG Reply:** OIG does not agree that past employment does not create the appearance of a conflict of interest. Moreover, the Office of Government Ethics considers prior employment when assessing for conflicts of interest. For example, in a brochure related to the procurement and acquisition process,[2] the Office of Government Ethics discusses issues that could impact the appearance of a conflict of interest. The guidance states that "even though you may not have a financial interest that can be affected by a procurement activity or contract, circumstances might

---

[2] Office of Government Ethics, "Ethics & Procurement Integrity: What You Need to Know as a Federal Employee Involved in the Procurement and Acquisition Process" (2007).

UNCLASSIFIED

arise that could call your impartiality" into question. Some examples of when your impartiality could be questioned are when "[y]our duties require you to work on a procurement involving your former employer." The Office of Government Ethics advises employees to "stop working on that matter, and contact your supervisor and agency ethics official" in situations where the employee believes his or her impartiality would be reasonably questioned.

Although the guidance provided by the Office of Government Ethics is intended for Government employees and may not directly apply to RFA, it demonstrates that the consideration of past employment is reasonable when assessing potential conflicts of interest. As OIG reported, during FYs 2012 and 2013 five contracts were awarded to an organization that a high-level RFA official (who was involved in making decisions about procurements) worked at through 2011. This official was responsible for day-to-day operations for OTF and had considerable involvement in overseeing the work performed under the contracts. This person began working for RFA in January 2012. RFA entered into contracts with the official's former employer in May 2012 (three awards) and in October and November 2013. Considering that these contracts were not awarded based on competition, OIG remains concerned about the appearance of a conflict of interest related to this RFA official. OIG did not make any changes to the report based on this comment.

**RFA Comment:** RFA believes that it adhered to the requirement to comply with Title 5, United States Code, for salaries and benefits provided to RFA employees and that the analysis presented by OIG in Table 9 of the draft report is flawed because the analysis fails to take into account what has **actually** been paid to employees (as opposed to the possible maximum salary available for a position in the classification and compensation plan). First, data provided to OIG shows that none of the positions/individuals covered in the sample were actually paid at the level of what the OIG identifies as the "RFA Maximum Annual Salary." Thus, there was no noncompliance.

**OIG Response:** OIG elected to compare RFA salaries by randomly selecting RFA positions and analyzing the maximum amount authorized for each position against similar positions in BBG. OIG considers this a reasonable and fair procedure to compare the data. However, based on RFA's comments, OIG performed additional analyses to compare actual RFA salaries for the selected positions with actual BBG salaries (which were adjusted to reflect the differences in the hours required). As shown in Table D.1, OIG found that RFA salaries paid to four of seven employees tested exceeded the salaries paid to BBG employees in a similar position. Based on these results, OIG did not make any changes to the report.

UNCLASSIFIED

**Table D.1. Comparison of Actual Annual Salaries Offered by RFA and BBG With Comparable Duties**

| Sample Number | RFA Actual Annual Salary | Adjusted BBG Actual Annual Salary | Difference |
|---|---|---|---|
| S1-03 | $72,427 | $72,785 | $(358) |
| S3-02 | 64,655 | 66,168 | (1,513) |
| S4-02 | 79,575 | 97,043 | (17,468) |
| S4-05 | 96,500 | 87,888 | 8,612 |
| S5-01 | 170,000 | 155,750 | 14,250 |
| S5-02 | 170,690 | 142,564 | 28,126 |
| S5-04 | $131,950 | $117,771 | $14,179 |

Source: OIG prepared based on RFA-provided position descriptions and employee roster and BBG-provided position descriptions and salary amounts.

**RFA Comment:** The calculations and comparisons introduced by OIG concerning total hours worked mix the concepts of "exempt" and "non-exempt" employees and the requisite compensation approaches under the Fair Labor Standards Act (FLSA). The latter (i.e., non-exempt employees) are individuals whose compensation is built by multiplying an hourly wage by the number of hours worked in a continuous designated 168-hour work period (24/7). Under FLSA, if such individuals work more than 40 hours during that work period, they are entitled to premium compensation at one and one half times their regular wage. The former (exempt employees) are paid a fixed salary that does not fluctuate from work period to work period. They are exempt from the overtime provision under Department of Labor regulations (29 CFR 541) because of their status as executive, administrative, or professional employees. By definition, exempt employees are not limited in the number of hours they may work to receive their salary. Many RFA employees, including those in the sample, routinely work many more hours than those mandated by the minimum attendance requirements imposed on them by RFA and they receive no compensation or compensatory time off for these hours. Thus, to assert that RFA employees are overpaid because their minimum number of hours to be worked differs from that used by the BBG does not accommodate the reality of work patterns in either RFA or BBG.

**OIG Reply:** OIG recognizes that some RFA employees may work more than the required 7 hours per day. Similarly, OIG recognizes that some Government employees may work more than the required 8 hours per day. The difference is that when an RFA employee works a typical day (7 hours), that employee is getting paid more than the Government employee who works 8 hours because the RFA employee works 1 hour less and receives a paid lunch hour. This is a benefit not afforded to Government employees. Therefore, when comparing RFA salaries to Title 5 requirements, the paid lunch hour afforded to RFA employees must be considered. OIG did not make any changes to the report based on this comment.

## Major Contributors to This Report

Gayle Voshell, Director
Division of Financial Management
Office of Audits

Mary S. Charuhas, Auditor
Division of Financial Management
Office of Audits

Angelo Arpaia, Auditor
Division of Financial Management
Office of Audits

Karen Crue, Auditor
Division of Financial Management
Office of Audits

Carol Hare, Auditor
Division of Financial Management
Office of Audits

Def. App. 89

UNCLASSIFIED



HELP FIGHT
FRAUD. WASTE. ABUSE.

1-800-409-9926
OIG.state.gov/HOTLINE

If you fear reprisal, contact the
OIG Whistleblower Ombudsman to learn more about your rights:

OIGWPEAOmbuds@state.gov

## ORDER FOR SUPPLIES OR SERVICES

IMPORTANT: Mark all packages and papers with contract and/or order numbers.

| 1. DATE OF ORDER<br>06/29/2015 | 2. CONTRACT NO. (If any)<br>BBG50-G-15-0006 | 6. SHIP TO: |
|---|---|---|

| 3. ORDER NO.<br>BBG50-G-15-0006 | 4. REQUISITION/REFERENCE NO.<br>T014-15-IQ-00002 |
|---|---|

**a. NAME OF CONSIGNEE**
Kelly DeYoe

5. ISSUING OFFICE (Address correspondence to)
Broadcasting Board of Governors, Office Of Contracts, 330 C Street SW, Room 4360, Washington, DC 20237

**b. STREET ADDRESS**
BBG Office of Engineering and Technical Services, 330 Independence Ave

| c. CITY<br>Washington | d. STATE<br>DC | e. ZIP CODE<br>20237 |
|---|---|---|

**7. TO:**

**a. NAME OF CONTRACTOR**
MISCELLANEOUS

**f. SHIP VIA**

**b. COMPANY NAME**
MISCELLANEOUS

**8. TYPE OF ORDER**

**c. STREET ADDRESS**
MISC/BLANK

☐ a. PURCHASE

REFERENCE YOUR:
Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated.

☐ b. DELIVERY -- Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract.

| d. CITY | e. STATE | f. ZIP CODE |
|---|---|---|

9. ACCOUNTING AND APPROPRIATION DATA

2015-X0206-TSI-T014-3701-2544-250400-2015

10. REQUISITIONING OFFICE

11. BUSINESS CLASSIFICATION (Check appropriate box(es))
☐ a. SMALL   ☐ b. OTHER THAN SMALL   ☐ c. DISADVANTAGED   ☐ d. WOMEN-OWNED   ☐ e. HUBZone
☐ f. SERVICE-DISABLED VETERAN-OWNED   ☐ g. WOMEN-OWNED SMALL BUSINESS (WOSB) ELIGIBLE UNDER THE WOMEN-OWNED SMALL BUSINESS PROGRAM   ☐ h. ECONOMICALLY DISADVANTAGED WOMEN-OWNED SMALL BUSINESS (EDWOSB)

**12. F.O.B. POINT**

| 13. PLACE OF | | 14. GOVERNMENT B/L NO. | 15. DELIVER TO F.O.B. POINT ON OR BEFORE (Date) | 16. DISCOUNT TERMS |
|---|---|---|---|---|
| a. INSPECTION | b. ACCEPTANCE | | | 0 Days: 0.00 %<br>0 Days: 0.00 %<br>0 Days: 0.00 %<br>0 Days: 0.00 % |

### 17. SCHEDULE (See reverse for Rejections)

| Item No.<br>(a) | SUPPLIES OR SERVICES<br>(b) | QUANTITY ORDERED<br>(c) | UNIT<br>(d) | UNIT PRICE<br>(e) | AMOUNT<br>(f) | QUANTITY ACCEPTED<br>(f) |
|---|---|---|---|---|---|---|
| | See Lines | | | | | |

| | 18. SHIPPING POINT | 19. GROSS SHIPPING WEIGHT | 20. INVOICE NO. | | $0.00 | 17(h) TOT.<br>(Cont.<br>pages) |
|---|---|---|---|---|---|---|

SEE BILLING INSTRUCTIONS ON REVERSE

21. MAIL INVOICE TO:

a. NAME
Marcia Jones

b. STREET ADDRESS(or P.O. Box)
BBG Office of Engineering and Technical Services, 330 Independence Ave SW, Room 4072

| c. CITY<br>Washington | d. STATE<br>DC | e. ZIP CODE<br>20237 | $0.00 | 17(i)<br>GRAND<br>TOTAL |
|---|---|---|---|---|

| 22. UNITED STATES OF AMERICA BY (Signature)<br>*Diane Sturgis* | 23. NAME (Typed)<br>Diane Sturgis |
|---|---|
| | TITLE: CONTRACTING/ORDERING OFFICER |

NSN 7540-01-152-8083
PREVIOUS EDITION NOT USABLE

**OPTIONAL FORM 347 (REV. 5/2011)**
Prescribed by GSA/FAR 48 CFR 53.213(f)

Case 1:20-cv-01047-EGB Document 41-1 Filed 10/15/20 Page 92 of 139

## ORDER FOR SUPPLIES OR SERVICES

### SCHEDULE - CONTINUATION

| | SUPPLEMENTAL INVOICING INFORMATION | PAGE NO. |
|---|---|---|

If desired, this order (or a copy thereof) may be used by the Contractor as the Contractor's invoice, instead of a separate invoice, provided the following statement, (signed and dated) is on (or attached to) the order: "Payment is requested in the amount of $_____ . No other invoice will be submitted." However, if the Contractor wishes to submit an invoice, the following information must be provided: contract number (if any), order number, item number(s), description of supplies or service, sizes, quantities, unit prices, and extended totals. Prepaid shipping costs will be indicated as a separate item on the invoice. Where shipping costs exceed $10 (except for parcel post), the billing must be supported by a bill of lading or receipt. When several orders are invoiced to an ordering activity during the same billing period, consolidated periodic billings are encouraged.

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|

BBG50-G-15-0006

### RECEIVING REPORT

Quantity in the "Quantity Accepted" column on the face of this order has been:  ☐ inspected,  ☐ accepted,  ☐ received, by me and conforms to contract. Items listed below have been rejected for the reasons indicated.

| SHIPMENT NUMBER | PARTIAL | | DATE RECEIVED | SIGNATURE OF AUTHORIZED U.S. GOV'T REP. | DATE |
|---|---|---|---|---|---|
| | FINAL | | | | |
| TOTAL CONTAINERS | GROSS WEIGHT | | RECEIVED AT | TITLE | |

### REPORT OF REJECTIONS

| ITEM NO. | SUPPLIES OR SERVICES | UNIT | QUANTITY REJECTED | REASON FOR REJECTION |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | TOTAL CARRIED FORWARD TO 1ST PAGE (ITEM 17h) | | | |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION NOT USABLE

**OPTIONAL FORM 348** (REV. 4/2006)
Prescribed by GSA - FAR (48 CRF) 52.213(f)
**OPTIONAL FORM 347 (REV. 02/2012) BACK**

**Table of Contents**

| Section | Description | Page Number |
|---|---|---|
| CS | Continuation Sheet | 4 |
| | 1000 BASIC ORDERING AGREEMENT TERMS AND CONDITIONS | 4 |
| | 52.217-8 Option to Extend Services (Nov 1999) | 28 |
| | 1003 CONTRACTOR'S SIGNATURE | 29 |
| | 52.217-9 Option to Extend the Term of the Contract (Mar 2000) | 29 |

## Section  CS  -  Continuation Sheet

| Number | Supplies or Services | Quantity | Unit | Unit Price | Total ( Inc. disc., tax, and fees) |
|---|---|---|---|---|---|
| 1 | Services | 0.000000 | LT | $0.0000 | $0.00 |
| | **Period of Performance:** 06/29/2015 - 06/28/2016 | | | | |
| | **Description:** BASIC ORDERING AGREEMENT FOR CIRCUMVENTION CLIENT SOFTWARE IN ACCORDANCE WITH STATEMENT OF WORK. | | | | |
| | **Reference Line:** T014-15-IQ-00002 - 0 | | | | |
| | **Additional Funding:**<br>1. (2015-X0206-TSI-T014-3701-2544-250400-2015): $0.00 | | | | |

| | CLIN Funding: | Cost: |
|---|---|---|
| Period Base Totals: | $0.00 | $0.00 |
| **Period Exercised Options Totals:** | $0.00 | $0.00 |
| **Period Unexercised Options Totals:** | $0.00 | $0.00 |
| **Period Base and Options Totals:** | $0.00 | $0.00 |
| | | |
| **Quantity Base Totals:** | $0.00 | $0.00 |
| **Quantity Exercised Options Totals:** | $0.00 | $0.00 |
| **Quantity Unexercised Options Totals:** | $0.00 | $0.00 |
| **Quantity Base and Options Totals:** | $0.00 | $0.00 |

*IDC Constraints Line Item*

| Line Number | Minimum Quantity | Minimum Amount | Maximum Quantity | Maximum Amount |
|---|---|---|---|---|
| 1 | 0.000000 | $0.00 | 0.000000 | $0.00 |

**Section CS - Continuation Sheet**


1000   BASIC ORDERING AGREEMENT TERMS AND CONDITIONS

ARTICLE I -   SCOPE OF  BASIC ORDERING AGREEMENT

This Basic Ordering Agreement is established to provide for the following:  Censorship Circumvention Client Software and Services. Agreement between Contractor and BBG is to order services in which the Contract has been deemed eligible in accordance with Task Area that will be identified in Request for Quote (RFP) only.

Individual Task Orders will be issued to awardee via Request for Quote (RFQ).  Task Orders will be competed upon the identified contractor's for the specific area of qualification only.  If your company has not been identified to compete in a specific task area a RFQ will not be submitted.

Contractor's Eligible for Task Order under this agreement:

| Contractor | Task  Area 1 | Task Area 2 | Task Area 3 | Task Area 4 | Task Area 5 |
|---|---|---|---|---|---|
| Psiphon | X | X | | | X |
| UltraReach | X | | | | |
| Washington Software | X | X | | X | X |
| Great Fire | | | | | X |

| SecDev |   |   |   |   | X |
|--------|---|---|---|---|---|
| IDP    |   |   |   |   | X |
| DIT    | X | X |   |   |   |

Psiphon Inc.
4576 Youge Street, Suite 603
Toronto
M2n 6n4, Canada

Washington Software, Inc.
20410 Century Blvd, Suite 220
Germantown, MD  20874

IDP
113 Steeplechase Drive
Doylestown, PA  18901

The SecDev Group
45 O'Connor Street, Suite 1150
Ottawa, Ontario K1P 1A4

Ultrareach Internet Corp
1712 Pioneer Ave, Suite 1089
Cheyenne, WY  82001

DIT
1939 High House Road, #160
Cary, NC  27519

Task Area 3 will not be issued a Task Order under this BOA

**Contractor Performance Requirements:**
**STATEMENT OF WORK**

**SECTION I          OBJECTIVE**

**1.1** The objective of this contract is to obtain Internet censorship circumvention tools and services on a Multiple Award for a Basic Ordering Agreement contract using Task Order issued to all qualified Contractors.  The primary supplies and services required under this contract relate to state-of-the art, extremely specialized information technology (IT) software and systems for circumventing Internet censorship by foreign governments, and require active, ongoing maintenance and support throughout the term of the Task Orders by the Contractor to ensure required service levels.

**1.2** The below Statement of Work (SOW) describes the types of task areas that will be referenced within individual Task Orders. Each Task Order will have its own unique SOW that will specify the work to be performed, the target country or countries and language or languages for the work, the period of performance for the work, the deliverables, the acceptance criteria, and any special requirements related to each Task Order.  The Firm-Fixed-Price for each Task Order will be negotiated and agreed to prior to commencement of work.

**SECTION II          SUPPLIES OR SERVICES**

**1.1** The Contractor shall provide the services and supplies defined in one or more of the task areas below that encompass Circumvention Client Software, Clientless Web Proxies, Satellite Applications, Electronic Mail Newsletter Distribution, and Censorship Circumvention Technical Expertise Task Order shall be negotiated on an individual basis.

**1.2** Individual tasks under the Task Areas identified below will be issued formally by executing Task Orders to the Contractor.  The only work authorized under this contract is that which is performed AFTER the receipt of written Task Orders.

**SECTION III          DESCRIPTION/SPECIFICATION/STATEMENT OF WORK**

The BBG's requirements fall into one or more of the Task Areas described below.  Certain Task Orders could require the delivery of

integrated censorship circumvention platforms, which will require the Contractor to provide services encompassing several different task areas; while other Task Orders would require supplies/services related to only a single Task Area. The Contractor shall provide status reporting on each Task Order with the frequency and details delineated in each Task Order's Statement of Work.

**TASK AREA 1:  Circumvention Client Software**

The contractor shall provide a system to circumvent Internet censorship imposed by foreign governments and Internet Service Providers (ISPs) using client software technology, which, at a minimum, transparently proxies HyperText Transfer Protocol (HTTP) traffic, and may, based on individual Task Order requirements, implement transparent proxy services for additional protocol traffic, up to and including full Virtual Private Network (VPN) service.  This system will work on operating systems as specified in each individual Task Order, which may include various desktop and mobile computing devices. This system must allow Internet users in target countries to use this client software package to circumvent the censorship of the Internet within their country.  This shall be done by accessing a network of servers operated by the Contractor which are distributed globally and use a diverse set of Dynamic Internet Protocol (IP) addresses which cannot easily be discovered, enumerated, and blocked.

**TASK AREA 2:  Clientless Web Proxies**

The Contractor shall provide a network of web proxies which may be accessed by any web browser which supports Secure Hypertext Transfer Protocol (HTTPS) and which can be distributed by BBG broadcasters.  This system must allow Internet users in target countries to circumvent the censorship of the Internet within their country by accessing web proxies operated by the Contractor which are distributed globally and use a diverse set of domain names and dynamic IP addresses which cannot easily be discovered, enumerated, and blocked. The proxy sites will need to be changed regularly, based on the specifics of site blockages in the target countries.

**TASK AREA 3:  Satellite Applications**

The contractor shall provide systems designed to circumvent Internet censorship imposed by foreign governments and Internet Service Providers (ISPs) using satellite applications. Included with these systems, the ability to transparently proxy HyperText Transfer Protocol (HTTP) traffic should exist as part of this system or using another recognized and approved system.  These systems must allow Internet users in target countries to use the satellite application to circumvent the censorship of the Internet within their country.  As specified by individual Task Orders, this may include one-way or two-way communication over satellites, and may include specialized software to interface with satellite systems.

**TASK AREA 4: Electronic Mail Newsletter Distribution**

The Contractor shall distribute an electronic mail (email) newsletter provided by BBG broadcasters to a list of electronic mail addresses provided by the broadcasters, and validated by the Contractor, on a schedule as specified in the Task Order.  The Contractor shall evade attempts by foreign governments to censor these newsletters by techniques including, but not limited to:

(a)    Masking of sender email address;
(b)    Distribution via Simple Mail Transfer Protocol (SMTP) servers using a diverse set of dynamic IP addresses which cannot easily be enumerated and blocked;
(c)    Dynamic updating of the email subject line; and
(d)    Substitution of keywords in message headers or body text which are known to cause blocking.

**TASK AREA 5:  Censorship Circumvention Technical Expertise and Support**

The Contractor shall provide technical expertise in Internet censorship circumvention to further the BBG's other Internet anti-censorship initiatives.  This may consist of producing technical documentation and reports on the current state of Internet censorship in target countries; providing computer programming and software engineering for BBG's internal software products, open source software, or other Contractor's software; or setup, maintenance, and operation of computer systems and network devices as described in the Task Order.  The Contractor may be tasked to provide personnel on-site at BBG offices in Washington, DC, and such personnel may be required either on a short term (e.g. Weekly), or full-time basis, and may be needed on a quick reaction basis to meet emergency operation requirements.  The Contractor will be asked to specifically identify a labor category and rate for professional services.

**SECTION IV                        DELIVERABLES**

**1.    Documentation**

The Contractor shall provide documentation as specified by individual Task Orders, which may include detailed written documentation of a technical nature for use by BBG staff, and may also include diagrams and drawings of system and network architecture as appropriate.  Additionally, required computer software documents may include documentation for end users (e.g. user guide) which is written for an audience familiar with basic computer and Internet use, but not overly technical in tone.  Documentation must be provided in English, but individual Task Orders may also require the Contractor to provide translation into languages as specified for the target countries.  The Contractor shall also be required to provide a written report documenting its progress on the task no less than

monthly. All documents shall be submitted electronically, specifically by email, to the agency point of contact.

## 2. Software

Individual Task Orders will specify the nature of the ownership of software (including source code and computer software documentation) and licenses used for each task. In general, any tasks that require the Contractor to operate and maintain the software or services may require the Contractor to maintain ownership or licensing of all software used to complete the task, with only specified rights transferred to the BBG such as usage or code review. However, some tasks may specify that software created or used for this task must be delivered to the BBG, with ownership or licensing transferred to the BBG. If the software is custom developed for a BBG application, and ownership transferred to the BBG, all source code shall be provided and approved by the Contracting Officer Representative (COR), and if it incorporates any open source software, must include the open source licenses as well. Unless otherwise specified by the specific Task Order, all client software must be available free of charge to end users, and shall not contain any advertising or other methods for the Contractor to obtain additional revenue from the end user.

## 3. Hardware

Unless specified otherwise by the individual Task Order, all hardware purchased or leased by the Contractor to perform the task are owned or leased by the Contractor and ownership is not transferred to the BBG. The Contractor shall have sole responsibility for maintenance and functioning of hardware procured to operate systems as specified in the Task Order, and shall be required to repair or replace any malfunctioning hardware at its own expense and shall not be charged to BBG. The Contractor shall provide a detailed list of all hardware purchased or leased for use on a specific task to the COR in MS Excel format, with equipment manufacturer, model, description, and serial number listed.

## 4. Metrics

As required and specified in detail by individual Task Orders, the Contractor shall provide to the COR and other specified BBG personnel on-demand access to performance metrics for the use of systems specified in each task. Depending on the nature of the task, this may include both instantaneous (real-time or near real-time) metrics as well as aggregate metrics over specified time periods (i.e. daily, weekly, monthly) and may include such description elements as the number of users, number of visits, breakdown of users by country or origin, destination web site and pages visited, protocol of traffic used, and network bandwidth used.

## SECTION V        CONTRACT ADMINISTRATION

## 1. Invoicing

The Contractor shall submit one invoice per 30-day period inclusive of work performed on all Task Orders. Invoices shall describe and clearly identify the work and amount due for each individual Task Order, and otherwise be in accordance with the requirements of the Prompt Pay Act and FAR Clause 52.232-25. Invoices are to be sent to the following address:

U.S. Broadcasting Board of Governors
Office of Technology, Services and Innovation
Attn: Kelly DeYoe
Cohen Building, Room 4301
330 Independence Ave SW, Washington, DC 20237

## 2. Method of Payment

All payments will be made upon the BBG's receipt of proper invoices and in accordance with the Prompt Pay Act and FAR Clause 52.232-25.

## 3. Contracting Officer Representative (COR)

The Contracting Officer will appoint by letter a COR who will have the responsibility of ensuring that the work performed by the Contractor conforms to the requirements of the contract and such other responsibilities and authorities as may be specified in the letter of authorization or in this contract. It is understood and agreed in particular that the COR shall NOT have authority to make changes in the scope of terms and conditions of the contract.

The COR, who has the responsibility of ensuring that the work conforms to the requirements of the contract and other such responsibilities and authorities as may be specified, is:

Kelly DeYoe
U.S. Broadcasting Board of Governors
Office of Technology, Services and Innovation
Cohen Building, Room 4301

330 Independence Ave SW
Washington, DC 20237

It is understood and agreed, in particular that the COR does not have the authority to make changes outside the scope of terms and conditions of the contract. THE RESULTANT CONTRACTOR IS HEREBY FOREWARNED THAT, ABSENT THE REQUISITE AUTHORITY OF THE COR TO MAKE ANY SUCH CHANGES, IT MAY BE HELD FULLY RESPONSIBLE FOR ANY CHANGES NOT AUTHORIZED IN ADVANCE, IN WRITING, BY THE CONTRACTING OFFICER, MAY BE DENIED COMPENSATION OR OTHER RELIEF FOR ANY ADDITIONAL WORK PERFORMED THAT IS NOT SO AUTHORIZED, AND MAY ALSO BE REQUIRED, AT NO ADDITIONAL COST TO THE GOVERNMENT TO TAKE ALL CORRECTIVE ACTION NECESSITATED BY REASON OF THE UNAUTHORIZED CHANGES.

**4.      Contract Administration**

The Contractor shall designate below a company official whom the U.S. Government may contact during the period of the contract for prompt contract administration and issues:

Name:
Title:
Address:
Email:
Telephone:


**SECTION VI                    SPECIAL PROVISIONS**

**1.      Issuance of Task Orders**
(a)            .

(a)      The Contractor shall not perform any work or incur any costs for any purpose under this contract or any individual Task Order until its receipt of a finalized written Task Order (OF-347) signed by the Contracting Officer authorizing specific work. If the Contractor does perform any work or incur any costs prior to written authorization by the Contracting Officer, it shall be at the expense of the Contractor and the Agency will not reimburse the Contractor.

(b)      Work to be performed under this contract shall be accomplished via Task Orders issued by the Contracting Officer. All Task Orders shall be subject to the terms and conditions contained herein; with the contract terms and conditions prevailing in the event of a conflict with an individual Task Order. All Task Orders issued pursuant to this contract shall be implemented in the following manner.

(1)      The Contracting Officer will issue a "Task Order Proposal Letter" to all Contractors on the Multiple Award Schedule who were determined eligible to compete for work in that particular SOW Task Area. The letter will request that the Contract provide (a) a brief technical understanding and approach to performing the work described in the proposed Task Order's Statement of Work and (b) a firm-fixed-price Price Proposal to perform the work. The Contractor shall submit its response to the Contracting Officer. This response shall be comprised of 1) the technical approach AND 2) the proposed price based on the Contractor's analysis of the labor required to perform the work specified in the Task Order, materials, computer time, performance schedule, travel, and other related cost factors, along with such additional information as may be called for in the proposed Task Order.
(2)      The Contractor's failure or refusal to submit a bona-fide response on a consisted or repeated basis (i.e. technical and price proposal) or a written "no bid" response may jeopardize the Contractor's opportunity to be considered for future Task Orders.
(3)      After receiving each Contractor Technical and Price Proposal response to the BBG's proposed Task Order, the Contracting Officer may negotiate a final Task Order with the Contractor whose combined proposal for the individual Task Order represents the best value to the BBG.
(4)      Following negotiations, the Contracting Officer will issue, for signed acceptance by the Contractor, the finalized Task Order using Optional Form 347 (Order for Supplies or Services).
(5)      Each Task Order shall be individually numbered (e.g., BBG50-J-15-xxxx) and shall include, in addition to the amount of the Contractor's firm-fixed-price, the Statement of Work (containing a brief description of the work, listing of deliverables, delivery schedule, and place of inspection/acceptance), applicable appropriation and accounting data, and other pertinent or special directions and/or attachments.
(6)      In the event that the Contracting Officer and the Contractor disagree on any element of the Task Order, including the price or delivery schedule, and the Contractor refuses to sign the Task Order, the Contractor shall expeditiously proceed with the work called for the Task Order when directed by the Contracting Officer. The disagreement shall be treated and handled as a dispute as prescribed herein.


**SECTION  VII                  CONTRACT CLAUSES**

**52.252-2      Clauses Incorporated by Reference (FEB 1998)**

**FAR Clauses**

| | |
|---|---|
| 52.204-9 | **Personal Identity Verification of Contractor Personnel (JAN 2011)** |
| 52.209-9 | **Updates to Publicly Available Information Regarding Responsibility Matters (JAN 2011)** |
| 52.216-18 | **Ordering (OCT 1995)** |
| 52.216-19 | **Order Limitation (OCT 1995)** |
| 52.216-20 | **Definite Quantity (OCT 1995)** |
| 52.216-27 | **Single or Multiple Awards (OCT 1995)** |
| 52.217-4 | **Evaluation of Options Exercised at Time of Contract Award (JUNE 1988)** |
| 52.217-5 | **Evaluation of Options (JUL 1990)** |
| 52.227-14 | **Rights in Data - General (OCT 2010)** |
| 52.227-15 | **Representation of Limited Rights Data and Restricted Computer Software (MAY 1999)** |
| 52.227-16 | **Additional Data Requirements (JUNE 1987)** |
| 52.227-17 | **Rights in Data - Special Works (DEC 2007)** |
| 52.227-19 | **Commercial Computer Software License (DEC 2007)** |
| 52.232-2 | **Service of Protest (SEPT 2006)** |
| 52.232-19 | **Availablility of Funds for the Next Fiscal Year (APR 1984)** |
| 52.237-3 | **Continuity of Services (JAN 1991)** |

**52.212-1 Instructions to Offerors—Commercial Items.**
As prescribed in 12.301(b)(1), insert the following provision:

Instructions to Offerors—Commercial Items (Apr 2014)

(a) *North American Industry Classification System (NAICS) code and small business size standard*. The NAICS code and small business size standard for this acquisition appear in Block 10 of the solicitation cover sheet (SF 1449). However, the small business size standard for a concern which submits an offer in its own name, but which proposes to furnish an item which it did not itself manufacture, is 500 employees.

(b) *Submission of offers*. Submit signed and dated offers to the office specified in this solicitation at or before the exact time specified in this solicitation. Offers may be submitted on the SF 1449, letterhead stationery, or as otherwise specified in the solicitation. As a minimum, offers must show—

(1) The solicitation number;

(2) The time specified in the solicitation for receipt of offers;

(3) The name, address, and telephone number of the offeror;

(4) A technical description of the items being offered in sufficient detail to evaluate compliance with the requirements in the solicitation. This may include product literature, or other documents, if necessary;

(5) Terms of any express warranty;

(6) Price and any discount terms;

(7) "Remit to" address, if different than mailing address;

(8) A completed copy of the representations and certifications at FAR 52.212-3 (see FAR 52.212-3(b) for those representations and certifications that the offeror shall complete electronically);

(9) Acknowledgment of Solicitation Amendments;

(10) Past performance information, when included as an evaluation factor, to include recent and relevant contracts for the same or similar items and other references (including contract numbers, points of contact with telephone numbers and other relevant information); and

(11) If the offer is not submitted on the SF 1449, include a statement specifying the extent of agreement with all terms, conditions, and provisions included in the solicitation. Offers that fail to furnish required representations or information, or reject the terms and conditions of the solicitation may be excluded from consideration.

(c) *Period for acceptance of offers*. The offeror agrees to hold the prices in its offer firm for 30 calendar days from the date specified for receipt of offers, unless another time period is specified in an addendum to the solicitation.

(d) *Product samples*. When required by the solicitation, product samples shall be submitted at or prior to the time specified for receipt of offers. Unless otherwise specified in this solicitation, these samples shall be submitted at no expense to the Government, and returned at the sender's request and expense, unless they are destroyed during preaward testing.

(e) *Multiple offers*. Offerors are encouraged to submit multiple offers presenting alternative terms and conditions or commercial items for satisfying the requirements of this solicitation. Each offer submitted will be evaluated separately.

(f) Late submissions, modifications, revisions, and withdrawals of offers.

(1) Offerors are responsible for submitting offers, and any modifications, revisions, or withdrawals, so as to reach the Government office designated in the solicitation by the time specified in the solicitation. If no time is specified in the solicitation, the time for receipt is 4:30 p.m., local time, for the designated Government office on the date that offers or revisions are due.

(2)(i) Any offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and—

(A) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers; or

(B) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

Def. App. 99

(C) If this solicitation is a request for proposals, it was the only proposal received.

(ii) However, a late modification of an otherwise successful offer, that makes its terms more favorable to the Government, will be considered at any time it is received and may be accepted.

(3) Acceptable evidence to establish the time of receipt at the Government installation includes the time/date stamp of that installation on the offer wrapper, other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel.

(4) If an emergency or unanticipated event interrupts normal Government processes so that offers cannot be received at the Government office designated for receipt of offers by the exact time specified in the solicitation, and urgent Government requirements preclude amendment of the solicitation or other notice of an extension of the closing date, the time specified for receipt of offers will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume.

(5) Offers may be withdrawn by written notice received at any time before the exact time set for receipt of offers. Oral offers in response to oral solicitations may be withdrawn orally. If the solicitation authorizes facsimile offers, offers may be withdrawn via facsimile received at any time before the exact time set for receipt of offers, subject to the conditions specified in the solicitation concerning facsimile offers. An offer may be withdrawn in person by an offeror or its authorized representative if, before the exact time set for receipt of offers, the identity of the person requesting withdrawal is established and the person signs a receipt for the offer.

(g) *Contract award (not applicable to Invitation for Bids)*. The Government intends to evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary. The Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received.

(h) *Multiple awards*. The Government may accept any item or group of items of an offer, unless the offeror qualifies the offer by specific limitations. Unless otherwise provided in the Schedule, offers may not be submitted for quantities less than those specified. The Government reserves the right to make an award on any item for a quantity less than the quantity offered, at the unit prices offered, unless the offeror specifies otherwise in the offer.

(i) Availability of requirements documents cited in the solicitation.

(1)(i) The GSA Index of Federal Specifications, Standards and Commercial Item Descriptions, FPMR Part 101-29, and copies of specifications, standards, and commercial item descriptions cited in this solicitation may be obtained for a fee by submitting a request to—

GSA Federal Supply Service Specifications Section
Suite 8100
470 East L'Enfant Plaza, SW
Washington, DC 20407
Telephone (202) 619-8925
Facsimile (202) 619-8978.

(ii) If the General Services Administration, Department of Agriculture, or Department of Veterans Affairs issued this solicitation, a single copy of specifications, standards, and commercial item descriptions cited in this solicitation may be obtained free of charge by submitting a request to the addressee in paragraph (i)(1)(i) of this provision. Additional copies will be issued for a fee.

(2) Most unclassified Defense specifications and standards may be downloaded from the following ASSIST websites:

(i) ASSIST (*https://assist.dla.mil/online/start/*).

(ii) Quick Search (*http://quicksearch.dla.mil/*).

(iii) ASSISTdocs.com (http://assistdocs.com).

(3) Documents not available from ASSIST may be ordered from the Department of Defense Single Stock Point (DoDSSP) by—

(i) Using the ASSIST Shopping Wizard (https://assist.dla.mil/wizard/index.cfm);

(ii) Phoning the DoDSSP Customer Service Desk (215) 697-2179, Mon-Fri, 0730 to 1600 EST; or

(iii) Ordering from DoDSSP, Building 4, Section D, 700 Robbins Avenue, Philadelphia, PA 19111-5094, Telephone (215) 697-2667/2179, Facsimile (215) 697-1462.

(4) Nongovernment (voluntary) standards must be obtained from the organization responsible for their preparation, publication, or maintenance.

(j) *Data Universal Numbering System (DUNS) Number.* (Applies to all offers exceeding $3,000, and offers of $3,000 or less if the solicitation requires the Contractor to be registered in the System for Award Management (SAM) database.) The offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "DUNS" or "DUNS+4" followed by the DUNS or DUNS+4 number that identifies the offeror's name and address. The DUNS+4 is the DUNS number plus a 4-character suffix that may be assigned at the discretion of the offeror to establish additional SAM records for identifying alternative Electronic Funds Transfer (EFT) accounts (see FAR SuBOArt 32.11) for the same concern. If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one. An offeror within the United States may contact Dun and Bradstreet by calling 1-866-705-5711 or via the internet at http://fedgov.dnb.com/webform. An offeror located outside the United States must contact the local Dun and Bradstreet office for a DUNS number. The offeror should indicate that it is an offeror for a Government contract when contacting the local Dun and Bradstreet office.

(k) *System for Award Management*. Unless exempted by an addendum to this solicitation, by submission of an offer, the offeror acknowledges the requirement that a prospective awardee shall be registered in the SAM database prior to award, during performance and through final payment of any contract resulting from this solicitation. If the Offeror does not become registered in the SAM database in the time prescribed by the Contracting Officer, the Contracting Officer will proceed to award to the next otherwise successful registered Offeror. Offerors may obtain information on registration and annual confirmation requirements via the SAM database accessed through https://www.acquisition.gov.

(l) *Debriefing*. If a post-award debriefing is given to requesting offerors, the Government shall disclose the following information, if applicable:

(1) The agency's evaluation of the significant weak or deficient factors in the debriefed offeror's offer.

(2) The overall evaluated cost or price and technical rating of the successful and the debriefed offeror and past performance information on the debriefed offeror.

(3) The overall ranking of all offerors, when any ranking was developed by the agency during source selection.

(4) A summary of the rationale for award;

(5) For acquisitions of commercial items, the make and model of the item to be delivered by the successful offeror.

(6) Reasonable responses to relevant questions posed by the debriefed offeror as to whether source-selection procedures set forth in the solicitation, applicable regulations, and other applicable authorities were followed by the agency.

(End of provision)

**52.212-2 Evaluation**[ 1 ] **—Commercial Items.**

As prescribed in 12.301(c), the Contracting Officer may insert a provision substantially as follows:

Evaluation—Commercial Items (Oct 2014)

(a) The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. The following factors shall be used to evaluate offers:

_(See evaluation Criteria in Section 9)_

_____

_____

Technical and past performance, when combined, are more important when compared to price.

(b) *Options*. The Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement. The Government may determine that an offer is unacceptable if the option prices are significantly unbalanced. Evaluation of options shall not obligate the Government to exercise the option(s).

(c) A written notice of award or acceptance of an offer, mailed or otherwise furnished to the successful offeror within the time for acceptance specified in the offer, shall result in a binding contract without further action by either party. Before the offer's specified expiration time, the Government may accept an offer (or part of an offer), whether or not there are negotiations after its receipt, unless a written notice of withdrawal is received before award.

(End of provision)

**52.212-4 Contract Terms and Conditions—Commercial Items.**

As prescribed in 12.301(b)(3), insert the following clause:

Contract Terms and Conditions—Commercial Items (Dec 2014)

(a) *Inspection/Acceptance*. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. If repair/replacement or reperformance will not correct the defects or is not possible, the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services. The Government must exercise its post-acceptance rights—

(1) Within a reasonable time after the defect was discovered or should have been discovered; and

(2) Before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(b) *Assignment*. The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727). However, when a third party makes payment (*e.g.,* use of the Governmentwide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

(c) *Changes*. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(d) *Disputes*. This contract is subject to 41 U.S.C. chapter 71, Contract Disputes. Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(e) *Definitions*. The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) *Excusable delays*. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

(g) Invoice.

(1) The Contractor shall submit an original invoice and three copies (or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include—

(i) Name and address of the Contractor;

(ii) Invoice date and number;

(iii) Contract number, contract line item number and, if applicable, the order number;

(iv) Description, quantity, unit of measure, unit price and extended price of the items delivered;

Def. App. 101

(v) Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

(vi) Terms of any discount for prompt payment offered;

(vii) Name and address of official to whom payment is to be sent;

(viii) Name, title, and phone number of person to notify in event of defective invoice; and

(ix) Taxpayer Identification Number (TIN). The Contractor shall include its TIN on the invoice only if required elsewhere in this contract.

(x) Electronic funds transfer (EFT) banking information.

(A) The Contractor shall include EFT banking information on the invoice only if required elsewhere in this contract.

(B) If EFT banking information is not required to be on the invoice, in order for the invoice to be a proper invoice, the Contractor shall have submitted correct EFT banking information in accordance with the applicable solicitation provision, contract clause (*e.g.*, 52.232-33, Payment by Electronic Funds Transfer—System for Award Management, or 52.232-34, Payment by Electronic Funds Transfer—Other Than System for Award Management), or applicable agency procedures.

(C) EFT banking information is not required if the Government waived the requirement to pay by EFT.

(2) Invoices will be handled in accordance with the Prompt Payment Act (31 U.S.C. 3903) and Office of Management and Budget (OMB) prompt payment regulations at 5 CFR Part 1315.

(h) *Patent indemnity.* The Contractor shall indemnify the Government and its officers, employees and agents against liability, including costs, for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark or copyright, arising out of the performance of this contract, provided the Contractor is reasonably notified of such claims and proceedings.

(i) Payment.—

(1) *Items accepted.* Payment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract.

(2) *Prompt payment.* The Government will make payment in accordance with the Prompt Payment Act (31 U.S.C. 3903) and prompt payment regulations at 5 CFR Part 1315.

(3) *Electronic Funds Transfer (EFT).* If the Government makes payment by EFT, see 52.212-5(b) for the appropriate EFT clause.

(4) *Discount.* In connection with any discount offered for early payment, time shall be computed from the date of the invoice. For the purpose of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or the specified payment date if an electronic funds transfer payment is made.

(5) *Overpayments.* If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall—

(i) Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the—

(A) Circumstances of the overpayment (*e.g.*, duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);

(B) Affected contract number and delivery order number, if applicable;

(C) Affected contract line item or subline item, if applicable; and

(D) Contractor point of contact.

(ii) Provide a copy of the remittance and supporting documentation to the Contracting Officer.

(6) *Interest.*

(i) All amounts that become payable by the Contractor to the Government under this contract shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in 41 U.S.C. 7109 , which is applicable to the period in which the amount becomes due, as provided in (i)(6)(v) of this clause, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

(ii) The Government may issue a demand for payment to the Contractor upon finding a debt is due under the contract.

(iii) *Final decisions.* The Contracting Officer will issue a final decision as required by 33.211 if—

(A) The Contracting Officer and the Contractor are unable to reach agreement on the existence or amount of a debt within 30 days;

(B) The Contractor fails to liquidate a debt previously demanded by the Contracting Officer within the timeline specified in the demand for payment unless the amounts were not repaid because the Contractor has requested an installment payment agreement; or

(C) The Contractor requests a deferment of collection on a debt previously demanded by the Contracting Officer (see 32.607-2).

(iv) If a demand for payment was previously issued for the debt, the demand for payment included in the final decision shall identify the same due date as the original demand for payment.

(v) Amounts shall be due at the earliest of the following dates:

(A) The date fixed under this contract.

(B) The date of the first written demand for payment, including any demand for payment resulting from a default termination.

(vi) The interest charge shall be computed for the actual number of calendar days involved beginning on the due date and ending on—

(A) The date on which the designated office receives payment from the Contractor;

(B) The date of issuance of a Government check to the Contractor from which an amount otherwise payable has been withheld as a credit against the contract debt; or

(C) The date on which an amount withheld and applied to the contract debt would otherwise have become payable to the Contractor.

(vii) The interest charge made under this clause may be reduced under the procedures prescribed in 32.608-2 of the Federal Acquisition Regulation in effect on the date of this contract.

(j) *Risk of loss.* Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until, and shall pass to the Government upon:

(1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or

(2) Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

(k) *Taxes*. The contract price includes all applicable Federal, State, and local taxes and duties.

(l) *Termination for the Government's convenience*. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) *Termination for cause*. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(n) *Title*. Unless specified elsewhere in this contract, title to items furnished under this contract shall pass to the Government upon acceptance, regardless of when or where the Government takes physical possession.

(o) *Warranty*. The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract.

(p) *Limitation of liability*. Except as otherwise provided by an express warranty, the Contractor will not be liable to the Government for consequential damages resulting from any defect or deficiencies in accepted items.

(q) *Other compliances*. The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract.

(r) *Compliance with laws unique to Government contracts*. The Contractor agrees to comply with 31 U.S.C. 1352 relating to limitations on the use of appropriated funds to influence certain Federal contracts; 18 U.S.C. 431 relating to officials not to benefit; 40 U.S.C. chapter 37, Contract Work Hours and Safety Standards; 41 U.S.C. chapter 87, Kickbacks; 41 U.S.C. 4712 and 10 U.S.C. 2409 relating to whistleblower protections; 49 U.S.C. 40118, Fly American; and 41 U.S.C. chapter 21 relating to procurement integrity.

(s) *Order of precedence*. Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order:

(1) The schedule of supplies/services.

(2) The Assignments, Disputes, Payments, Invoice, Other Compliances, Compliance with Laws Unique to Government Contracts, and Unauthorized Obligations paragraphs of this clause;

(3) The clause at 52.212-5.

(4) Addenda to this solicitation or contract, including any license agreements for computer software.

(5) Solicitation provisions if this is a solicitation.

(6) Other paragraphs of this clause.

(7) The Standard Form 1449.

(8) Other documents, exhibits, and attachments.

(9) The specification.

(t) System for Award Management (SAM).

(1) Unless exempted by an addendum to this contract, the Contractor is responsible during performance and through final payment of any contract for the accuracy and completeness of the data within the SAM database, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the SAM database after the initial registration, the Contractor is required to review and update on an annual basis from the date of initial registration or subsequent updates its information in the SAM database to ensure it is current, accurate and complete. Updating information in the SAM does not alter the terms and conditions of this contract and is not a substitute for a properly executed contractual document.

(2)(i) If a Contractor has legally changed its business name, "doing business as" name, or division name (whichever is shown on the contract), or has transferred the assets used in performing the contract, but has not completed the necessary requirements regarding novation and change-of-name agreements in FAR SuBOArt 42.12, the Contractor shall provide the responsible Contracting Officer a minimum of one business day's written notification of its intention to (A) change the name in the SAM database; (B) comply with the requirements of SuBOArt 42.12; and (C) agree in writing to the timeline and procedures specified by the responsible Contracting Officer. The Contractor must provide with the notification sufficient documentation to support the legally changed name.

(ii) If the Contractor fails to comply with the requirements of paragraph (t)(2)(i) of this clause, or fails to perform the agreement at paragraph (t)(2)(i)(C) of this clause, and, in the absence of a properly executed novation or change-of-name agreement, the SAM information that shows the Contractor to be other than the Contractor indicated in the contract will be considered to be incorrect information within the meaning of the "Suspension of Payment" paragraph of the electronic funds transfer (EFT) clause of this contract.

(3) The Contractor shall not change the name or address for EFT payments or manual payments, as appropriate, in the SAM record to reflect an assignee for the purpose of assignment of claims (see SuBOArt 32.8, Assignment of Claims). Assignees shall be separately registered in the SAM database. Information provided to the Contractor's SAM record that indicates payments, including those made by EFT, to an ultimate recipient other than that Contractor will be considered to be incorrect information within the meaning of the "Suspension of payment" paragraph of the EFT clause of this contract.

(4) Offerors and Contractors may obtain information on registration and annual confirmation requirements via SAM accessed through https://www.acquisition.gov.

(u) Unauthorized Obligations

(1) Except as stated in paragraph (u)(2) of this clause, when any supply or service acquired under this contract is subject to any End

User License Agreement (EULA), Terms of Service (TOS), or similar legal instrument or agreement, that includes any clause requiring the Government to indemnify the Contractor or any person or entity for damages, costs, fees, or any other loss or liability that would create an Anti-Deficiency Act violation (31 U.S.C. 1341), the following shall govern:

(i) Any such clause is unenforceable against the Government.

(ii) Neither the Government nor any Government authorized end user shall be deemed to have agreed to such clause by virtue of it appearing in the EULA, TOS, or similar legal instrument or agreement. If the EULA, TOS, or similar legal instrument or agreement is invoked through an "I agree" click box or other comparable mechanism (*e.g.*, "click-wrap" or "browse-wrap" agreements), execution does not bind the Government or any Government authorized end user to such clause.

(iii) Any such clause is deemed to be stricken from the EULA, TOS, or similar legal instrument or agreement.

(2) Paragraph (u)(1) of this clause does not apply to indemnification by the Government that is expressly authorized by statute and specifically authorized under applicable agency regulations and procedures.

(v) *Incorporation by reference.* The Contractor's representations and certifications, including those completed electronically via the System for Award Management (SAM), are incorporated by reference into the contract.

(End of clause)

*Alternate I* (*May 2014*). When a time-and-materials or labor-hour contract is contemplated, substitute the following paragraphs (a), (e), (i), (l), and (m) for those in the basic clause.

(a) *Inspection/Acceptance.* (1) The Government has the right to inspect and test all materials furnished and services performed under this contract, to the extent practicable at all places and times, including the period of performance, and in any event before acceptance. The Government may also inspect the plant or plants of the Contractor or any subcontractor engaged in contract performance. The Government will perform inspections and tests in a manner that will not unduly delay the work.

(2) If the Government performs inspection or tests on the premises of the Contractor or a subcontractor, the Contractor shall furnish and shall require subcontractors to furnish all reasonable facilities and assistance for the safe and convenient performance of these duties.

(3) Unless otherwise specified in the contract, the Government will accept or reject services and materials at the place of delivery as promptly as practicable after delivery, and they will be presumed accepted 60 days after the date of delivery, unless accepted earlier.

(4) At any time during contract performance, but not later than 6 months (or such other time as may be specified in the contract) after acceptance of the services or materials last delivered under this contract, the Government may require the Contractor to replace or correct services or materials that at time of delivery failed to meet contract requirements. Except as otherwise specified in paragraph (a)(6) of this clause, the cost of replacement or correction shall be determined under paragraph (i) of this clause, but the "hourly rate" for labor hours incurred in the replacement or correction shall be reduced to exclude that portion of the rate attributable to profit. Unless otherwise specified below, the portion of the "hourly rate" attributable to profit shall be 10 percent. The Contractor shall not tender for acceptance materials and services required to be replaced or corrected without disclosing the former requirement for replacement or correction, and, when required, shall disclose the corrective action taken. [*Insert portion of labor rate attributable to profit.*]

(5)(i) If the Contractor fails to proceed with reasonable promptness to perform required replacement or correction, and if the replacement or correction can be performed within the ceiling price (or the ceiling price as increased by the Government), the Government may—

(A) By contract or otherwise, perform the replacement or correction, charge to the Contractor any increased cost, or deduct such increased cost from any amounts paid or due under this contract; or

(B) Terminate this contract for cause.

(ii) Failure to agree to the amount of increased cost to be charged to the Contractor shall be a dispute under the Disputes clause of the contract.

(6) Notwithstanding paragraphs (a)(4) and (5) above, the Government may at any time require the Contractor to remedy by correction or replacement, without cost to the Government, any failure by the Contractor to comply with the requirements of this contract, if the failure is due to—

(i) Fraud, lack of good faith, or willful misconduct on the part of the Contractor's managerial personnel; or

(ii) The conduct of one or more of the Contractor's employees selected or retained by the Contractor after any of the Contractor's managerial personnel has reasonable grounds to believe that the employee is habitually careless or unqualified.

(7) This clause applies in the same manner and to the same extent to corrected or replacement materials or services as to materials and services originally delivered under this contract.

(8) The Contractor has no obligation or liability under this contract to correct or replace materials and services that at time of delivery do not meet contract requirements, except as provided in this clause or as may be otherwise specified in the contract.

(9) Unless otherwise specified in the contract, the Contractor's obligation to correct or replace Government-furnished property shall be governed by the clause pertaining to Government property.

(e) *Definitions.* (1) The clause at FAR 52.202-1, Definitions, is incorporated herein by reference. As used in this clause—

(i) *Direct materials* means those materials that enter directly into the end product, or that are used or consumed directly in connection with the furnishing of the end product or service.

(ii) *Hourly rate* means the rate(s) prescribed in the contract for payment for labor that meets the labor category qualifications of a labor category specified in the contract that are—

(A) Performed by the contractor;

(B) Performed by the subcontractors; or

(C) Transferred between divisions, subsidiaries, or affiliates of the contractor under a common control.

(iii) *Materials* means—

(A) Direct materials, including supplies transferred between divisions, subsidiaries, or affiliates of the contractor under a common control;

(B) Subcontracts for supplies and incidental services for which there is not a labor category specified in the contract;

(C) Other direct costs (*e.g.*, incidental services for which there is not a labor category specified in the contract, travel, computer usage charges, etc.);

(D) The following subcontracts for services which are specifically excluded from the hourly rate: [*Insert any subcontracts for services to be excluded from the hourly rates prescribed in the schedule.*]; and

(E) Indirect costs specifically provided for in this clause.

(iv) *Subcontract* means any contract, as defined in FAR SuBOArt 2.1, entered into with a subcontractor to furnish supplies or services for performance of the prime contract or a subcontract including transfers between divisions, subsidiaries, or affiliates of a contractor or subcontractor. It includes, but is not limited to, purchase orders, and changes and modifications to purchase orders.

(i) *Payments.* (1) *Work performed.* The Government will pay the Contractor as follows upon the submission of commercial invoices approved by the Contracting Officer:

(i) *Hourly rate.*

(A) The amounts shall be computed by multiplying the appropriate hourly rates prescribed in the contract by the number of direct labor hours performed. Fractional parts of an hour shall be payable on a prorated basis.

(B) The rates shall be paid for all labor performed on the contract that meets the labor qualifications specified in the contract. Labor hours incurred to perform tasks for which labor qualifications were specified in the contract will not be paid to the extent the work is performed by individuals that do not meet the qualifications specified in the contract, unless specifically authorized by the Contracting Officer.

(C) Invoices may be submitted once each month (or at more frequent intervals, if approved by the Contracting Officer) to the Contracting Officer or the authorized representative.

(D) When requested by the Contracting Officer or the authorized representative, the Contractor shall substantiate invoices (including any subcontractor hours reimbursed at the hourly rate in the schedule) by evidence of actual payment, individual daily job timecards, records that verify the employees meet the qualifications for the labor categories specified in the contract, or other substantiation specified in the contract.

(E) Unless the Schedule prescribes otherwise, the hourly rates in the Schedule shall not be varied by virtue of the Contractor having performed work on an overtime basis.

(*1*) If no overtime rates are provided in the Schedule and the Contracting Officer approves overtime work in advance, overtime rates shall be negotiated.

(*2*) Failure to agree upon these overtime rates shall be treated as a dispute under the Disputes clause of this contract.

(*3*) If the Schedule provides rates for overtime, the premium portion of those rates will be reimbursable only to the extent the overtime is approved by the Contracting Officer.

(ii) *Materials.*

(A) If the Contractor furnishes materials that meet the definition of a commercial item at 2.101, the price to be paid for such materials shall not exceed the Contractor's established catalog or market price, adjusted to reflect the—

(*1*) Quantities being acquired; and

(*2*) Any modifications necessary because of contract requirements.

(B) Except as provided for in paragraph (i)(1)(ii)(A) and (D)(2) of this clause, the Government will reimburse the Contractor the actual cost of materials (less any rebates, refunds, or discounts received by the contractor that are identifiable to the contract) provided the Contractor—

(*1*) Has made payments for materials in accordance with the terms and conditions of the agreement or invoice; or

(*2*) Makes these payments within 30 days of the submission of the Contractor's payment request to the Government and such payment is in accordance with the terms and conditions of the agreement or invoice.

(C) To the extent able, the Contractor shall—

(*1*) Obtain materials at the most advantageous prices available with due regard to securing prompt delivery of satisfactory materials; and

(*2*) Give credit to the Government for cash and trade discounts, rebates, scrap, commissions, and other amounts that are identifiable to the contract.

(D) *Other Costs.* Unless listed below, other direct and indirect costs will not be reimbursed.

(*1*) *Other Direct Costs.* The Government will reimburse the Contractor on the basis of actual cost for the following, provided such costs comply with the requirements in paragraph (i)(1)(ii)(B) of this clause: [*Insert each element of other direct costs (e.g., travel, computer usage charges, etc. Insert "None" if no reimbursement for other direct costs will be provided. If this is an indefinite delivery contract, the Contracting Officer may insert "Each order must list separately the elements of other direct charge(s) for that order or, if no reimbursement for other direct costs will be provided, insert 'None'."*]

(*2*) *Indirect Costs (Material Handling, Subcontract Administration, etc.).* The Government will reimburse the Contractor for indirect costs on a pro-rata basis over the period of contract performance at the following fixed price: [*Insert a fixed amount for the indirect costs and payment schedule. Insert "$0" if no fixed price reimbursement for indirect costs will be provided. (If this is an indefinite delivery contract, the Contracting Officer may insert "Each order must list separately the fixed amount for the indirect costs and payment schedule or, if no reimbursement for indirect costs, insert 'None'."*]

(2) *Total cost.* It is estimated that the total cost to the Government for the performance of this contract shall not exceed the ceiling price set forth in the Schedule and the Contractor agrees to use its best efforts to perform the work specified in the Schedule and all obligations under this contract within such ceiling price. If at any time the Contractor has reason to believe that the hourly rate payments and material costs that will accrue in performing this contract in the next succeeding 30 days, if added to all other payments and costs previously accrued, will exceed 85 percent of the ceiling price in the Schedule, the Contractor shall notify the Contracting Officer giving a revised estimate of the total price to the Government for performing this contract with supporting reasons and documentation. If at any time during the performance of this contract, the Contractor has reason to believe that the total price to the Government

for performing this contract will be substantially greater or less than the then stated ceiling price, the Contractor shall so notify the Contracting Officer, giving a revised estimate of the total price for performing this contract, with supporting reasons and documentation. If at any time during performance of this contract, the Government has reason to believe that the work to be required in performing this contract will be substantially greater or less than the stated ceiling price, the Contracting Officer will so advise the Contractor, giving the then revised estimate of the total amount of effort to be required under the contract.

(3) *Ceiling price*. The Government will not be obligated to pay the Contractor any amount in excess of the ceiling price in the Schedule, and the Contractor shall not be obligated to continue performance if to do so would exceed the ceiling price set forth in the Schedule, unless and until the Contracting Officer notifies the Contractor in writing that the ceiling price has been increased and specifies in the notice a revised ceiling that shall constitute the ceiling price for performance under this contract. When and to the extent that the ceiling price set forth in the Schedule has been increased, any hours expended and material costs incurred by the Contractor in excess of the ceiling price before the increase shall be allowable to the same extent as if the hours expended and material costs had been incurred after the increase in the ceiling price.

(4) *Access to records*. At any time before final payment under this contract, the Contracting Officer (or authorized representative) will have access to the following (access shall be limited to the listing below unless otherwise agreed to by the Contractor and the Contracting Officer):

(i) Records that verify that the employees whose time has been included in any invoice meet the qualifications for the labor categories specified in the contract;

(ii) For labor hours (including any subcontractor hours reimbursed at the hourly rate in the schedule), when timecards are required as substantiation for payment—

(A) The original timecards (paper-based or electronic);

(B) The Contractor's timekeeping procedures;

(C) Contractor records that show the distribution of labor between jobs or contracts; and

(D) Employees whose time has been included in any invoice for the purpose of verifying that these employees have worked the hours shown on the invoices.

(iii) For material and subcontract costs that are reimbursed on the basis of actual cost—

(A) Any invoices or subcontract agreements substantiating material costs; and

(B) Any documents supporting payment of those invoices.

(5) *Overpayments/Underpayments*. Each payment previously made shall be subject to reduction to the extent of amounts, on preceding invoices, that are found by the Contracting Officer not to have been properly payable and shall also be subject to reduction for overpayments or to increase for underpayments. The Contractor shall promptly pay any such reduction within 30 days unless the parties agree otherwise. The Government within 30 days will pay any such increases, unless the parties agree otherwise. The Contractor's payment will be made by check. If the Contractor becomes aware of a duplicate invoice payment or that the Government has otherwise overpaid on an invoice payment, the Contractor shall—

(i) Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the—

(A) Circumstances of the overpayment (*e.g.*, duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);

(B) Affected contract number and delivery order number, if applicable;

(C) Affected contract line item or subline item, if applicable; and

(D) Contractor point of contact.

(ii) Provide a copy of the remittance and supporting documentation to the Contracting Officer.

(6)(i) All amounts that become payable by the Contractor to the Government under this contract shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury, as provided in 41 U.S.C. 7109, which is applicable to the period in which the amount becomes due, and then at the rate applicable for each six month period as established by the Secretary until the amount is paid.

(ii) The Government may issue a demand for payment to the Contractor upon finding a debt is due under the contract.

(iii) *Final Decisions*. The Contracting Officer will issue a final decision as required by 33.211 if—

(A) The Contracting Officer and the Contractor are unable to reach agreement on the existence or amount of a debt in a timely manner;

(B) The Contractor fails to liquidate a debt previously demanded by the Contracting Officer within the timeline specified in the demand for payment unless the amounts were not repaid because the Contractor has requested an installment payment agreement; or

(C) The Contractor requests a deferment of collection on a debt previously demanded by the Contracting Officer (see FAR 32.607-2).

(iv) If a demand for payment was previously issued for the debt, the demand for payment included in the final decision shall identify the same due date as the original demand for payment.

(v) Amounts shall be due at the earliest of the following dates:

(A) The date fixed under this contract.

(B) The date of the first written demand for payment, including any demand for payment resulting from a default termination.

(vi) The interest charge shall be computed for the actual number of calendar days involved beginning on the due date and ending on—

(A) The date on which the designated office receives payment from the Contractor;

(B) The date of issuance of a Government check to the Contractor from which an amount otherwise payable has been withheld as a credit against the contract debt; or

(C) The date on which an amount withheld and applied to the contract debt would otherwise have become payable to the Contractor.

(vii) The interest charge made under this clause may be reduced under the procedures prescribed in 32.608-2 of the Federal Acquisition Regulation in effect on the date of this contract.

(viii) Upon receipt and approval of the invoice designated by the Contractor as the "completion invoice" and supporting documentation, and upon compliance by the Contractor with all terms of this contract, any outstanding balances will be paid within 30 days un-

less the parties agree otherwise. The completion invoice, and supporting documentation, shall be submitted by the Contractor as promptly as practicable following completion of the work under this contract, but in no event later than 1 year (or such longer period as the Contracting Officer may approve in writing) from the date of completion.

(7) *Release of claims*. The Contractor, and each assignee under an assignment entered into under this contract and in effect at the time of final payment under this contract, shall execute and deliver, at the time of and as a condition precedent to final payment under this contract, a release discharging the Government, its officers, agents, and employees of and from all liabilities, obligations, and claims arising out of or under this contract, subject only to the following exceptions.

(i) Specified claims in stated amounts, or in estimated amounts if the amounts are not susceptible to exact statement by the Contractor.

(ii) Claims, together with reasonable incidental expenses, based upon the liabilities of the Contractor to third parties arising out of performing this contract, that are not known to the Contractor on the date of the execution of the release, and of which the Contractor gives notice in writing to the Contracting Officer not more than 6 years after the date of the release or the date of any notice to the Contractor that the Government is prepared to make final payment, whichever is earlier.

(iii) Claims for reimbursement of costs (other than expenses of the Contractor by reason of its indemnification of the Government against patent liability), including reasonable incidental expenses, incurred by the Contractor under the terms of this contract relating to patents.

(8) *Prompt payment*. The Government will make payment in accordance with the Prompt Payment Act (31 U.S.C. 3903) and prompt payment regulations at 5 CFR part 1315.

(9) *Electronic Funds Transfer (EFT)*. If the Government makes payment by EFT, see 52.212-5(b) for the appropriate EFT clause.

(10) *Discount*. In connection with any discount offered for early payment, time shall be computed from the date of the invoice. For the purpose of computing the discount earned, payment shall be considered to have been made on the date that appears on the payment check or the specified payment date if an electronic funds transfer payment is made.

(l) *Termination for the Government's convenience*. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid an amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the contract, less any hourly rate payments already made to the Contractor plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred that reasonably could have been avoided.

(m) *Termination for cause*. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

**52.212-5 Contract Terms and Conditions Required to Implement Statutes or Executive Orders—Commercial Items.**
As prescribed in 12.301(b)(4), insert the following clause:

Contract Terms and Conditions Required to Implement Statutes or Executive Orders—Commercial Items (Dec 2014)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (Dec 2014)

(2) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

___Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).

(3) 52.233-3, Protest After Award (Aug 1996) (31 U.S.C. 3553).

(4) 52.233-4, Applicable Law for Breach of Contract Claim (Oct 2004)"(Public Laws 108-77 and 108-78 (19 U.S.C. 3805 note)).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[*Contracting Officer check as appropriate.*]

__ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Sept 2006), with Alternate I (Oct 1995) (41 U.S.C. 4704 and 10 U.S.C. 2402).

_X_ (2) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (41 U.S.C. 3509)).

_X_ (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (June 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)

__ (4) 52.204-10, Reporting Executive Compensation and First-Tier Subcontract Awards (Jul 2013) (Pub. L. 109-282) (31 U.S.C. 6101 note).

__ (5) [Reserved].

_X_ (6) 52.204-14, Service Contract Reporting Requirements (Jan 2014) (Pub. L. 111-117, section 743 of Div. C).

_X_ (7) 52.204-15, Service Contract Reporting Requirements for Indefinite-Delivery Contracts (Jan 2014) (Pub. L. 111-117, section 743 of Div. C).

_X_ (8) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment. (Aug 2013) (31 U.S.C. 6101 note).

__ (9) 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters (Jul 2013) (41 U.S.C. 2313).

__ (10) [Reserved].

__ (11)(i) 52.219-3, Notice of HUBZone Set-Aside or Sole-Source Award (Nov 2011) (15 U.S.C. 657a).

__ (ii) Alternate I (Nov 2011) of 52.219-3.

__ (12)(i) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (Oct 2014) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

__ (ii) Alternate I (Jan 2011) of 52.219-4.

__ (13) [Reserved]

__ (14)(i)  52.219-6, Notice of Total Small Business Set-Aside (Nov 2011) (15 U.S.C. 644).

__ (ii) Alternate I (Nov 2011).

__ (iii) Alternate II (Nov 2011).

__ (15)(i)  52.219-7, Notice of Partial Small Business Set-Aside (June 2003) (15 U.S.C. 644).

__ (ii) Alternate I (Oct 1995) of 52.219-7.

__ (iii) Alternate II (Mar 2004) of 52.219-7.

__ (16) 52.219-8, Utilization of Small Business Concerns (Oct 2014) (15 U.S.C. 637(d)(2) and (3)).

__ (17)(i)  52.219-9, Small Business Subcontracting Plan (Oct 2014) (15 U.S.C. 637(d)(4)).

__ (ii) Alternate I (Oct 2001) of 52.219-9.

__ (iii) Alternate II (Oct 2001) of 52.219-9.

__ (iv) Alternate III (Oct 2014) of 52.219-9.

__ (18) 52.219-13, Notice of Set-Aside of Orders (Nov 2011)(15 U.S.C. 644(r)).

__ (19) 52.219-14, Limitations on Subcontracting (Nov 2011) (15 U.S.C. 637(a)(14)).

__ (20) 52.219-16, Liquidated Damages—Subcon-tracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).

__ (21) 52.219-27, Notice of Service-Disabled Veteran-Owned Small Business Set-Aside (Nov 2011) (15 U.S.C. 657 f).

__ (22)  52.219-28, Post Award Small Business Program Rerepresentation (Jul 2013) (15 U.S.C. 632(a)(2)).

__ (23) 52.219-29, Notice of Set-Aside for Economically Disadvantaged Women-Owned Small Business (EDWOSB) Concerns (Jul 2013) (15 U.S.C. 637(m)).

__ (24) 52.219-30, Notice of Set-Aside for Women-Owned Small Business (WOSB) Concerns Eligible Under the WOSB Program (Jul 2013) (15 U.S.C. 637(m)).

X__ (25) 52.222-3, Convict Labor (June 2003) (E.O. 11755).

_X_ (26) 52.222-19, Child Labor—Cooperation with Authorities and Remedies (Jan 2014) (E.O. 13126).

X__ (27) 52.222-21, Prohibition of Segregated Facilities (Feb 1999).

_X_ (28) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

_X_ (29) 52.222-35, Equal Opportunity for Veterans (Jul 2014)(38 U.S.C. 4212).

_X_ (30) 52.222-36, Equal Opportunity for Workers with Disabilities (Jul 2014) (29 U.S.C. 793).

__ (31) 52.222-37, Employment Reports on Veterans (Jul 2014) (38 U.S.C. 4212).

_X_ (32) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496).

X__ (33) 52.222-54, Employment Eligibility Verification (Aug 2013). (Executive Order 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

__ (34)(i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA–Designated Items (May 2008) (42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (ii) Alternate I (May 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (35)(i) 52.223-13, Acquisition of EPEAT®-Registered Imaging Equipment (Jun 2014) (E.O. 13423 and 13514).

__ (ii) Alternate I (Jun 2014) of 52.223-13.

__ (36)(i) 52.223-14, Acquisition of EPEAT®-Registered Televisions (E.O. 13423 and 13514).

__ (ii) Alternate I (Jun 2014) of 52.223-14.

__ (37) 52.223-15, Energy Efficiency in Energy-Consuming Products (Dec 2007) (42 U.S.C. 8259b).

__ (38)(i) 52.223-16, Acquisition of EPEAT®-Registered Personal Computer Products (Jun 2014) (E.O. 13423 and 13514).

__ (ii) Alternate I (Jun 2014) of 52.223-16.

_X_ (39) 52.223-18, Encouraging Contractor Policies to Ban Text Messaging While Driving (Aug 2011) (E.O. 13513).

_X_ (40) 52.225-1, Buy American—Supplies (May 2014) (41 U.S.C. chapter 83).

_X_ (41)(i)  52.225-3, Buy American—Free Trade Agreements—Israeli Trade Act (May 2014) (41 U.S.C. chapter 83, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, 19 U.S.C. 4001 note, Pub. L. 103-182, 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, 110-138, 112-41, 112-42, and 112-43.

__ (ii) Alternate I (May 2014) of 52.225-3.

__ (iii) Alternate II (May 2014) of 52.225-3.

__ (iv) Alternate III (May 2014) of 52.225-3.

__ (42) 52.225-5, Trade Agreements (Nov 2013) (19 U.S.C. 2501, *et seq*., 19 U.S.C. 3301 note).

_X_ (43) 52.225-13, Restrictions on Certain Foreign Purchases (June 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

__ (44) 52.225-26, Contractors Performing Private Security Functions Outside the United States (Jul 2013) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

__ (45) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

__ (46) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

X__ (47) 52.232-29, Terms for Financing of Purchases of Commercial Items (Feb 2002) (41 U.S.C. 4505, 10 U.S.C. 2307(f)).

__ (48) 52.232-30, Installment Payments for Commercial Items (Oct 1995) (41 U.S.C. 4505, 10 U.S.C. 2307(f)).

Def. App. 108

_X_ (49) 52.232-33, Payment by Electronic Funds Transfer—System for Award Management (Jul 2013) (31 U.S.C. 3332).

__ (50) 52.232-34, Payment by Electronic Funds Transfer—Other than System for Award Management (Jul 2013) (31 U.S.C. 3332).

_X_ (51) 52.232-36, Payment by Third Party (May 2014) (31 U.S.C. 3332).

__ (52) 52.239-1, Privacy or Security Safeguards (Aug 1996) (5 U.S.C. 552a).

__ (53)(i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).

__ (ii) Alternate I (Apr 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[*Contracting Officer check as appropriate.*]

_X_ (1) 52.222-41, Service Contract Labor Standards (May 2014) (41 U.S.C. chapter 67).

__ (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (May 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

X__ (3) 52.222-43, Fair Labor Standards Act and Service Contract Labor Standards-Price Adjustment (Multiple Year and Option Contracts) (May 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

_X_ (4) 52.222-44, Fair Labor Standards Act and Service Contract Labor Standards—Price Adjustment (May 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

__ (5) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (May 2014) (41 U.S.C. chapter 67).

__ (6) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services—Requirements (May 2014) (41 U.S.C. chapter 67).

_X_ (7) 52.222-17, Nondisplacement of Qualified Workers (May 2014) (E.O.13495).

__ (8) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (May 2014) (42 U.S.C. 1792).

__ (9) 52.237-11, Accepting and Dispensing of $1 Coin (Sept 2008) (31 U.S.C. 5112(p)(1)).

_X_ (10) 52.222-55, Minimum Wages Under Executive Order 13658 (Dec 2014) (Executive Order 13658).

(d) *Comptroller General Examination of Record.* The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records—Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR SuBOArt 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause—

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (41 U.S.C. 3509).

(ii) 52.219-8, Utilization of Small Business Concerns (Oct 2014) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $650,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(iii) 52.222-17, Nondisplacement of Qualified Workers (May 2014) (E.O. 13495). Flow down required in accordance with paragraph (l) of FAR clause 52.222-17.

(iv) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

(v) 52.222-35, Equal Opportunity for Veterans (Jul 2014) (38 U.S.C. 4212).

(vi) 52.222-36, Equal Opportunity for Workers with Disabilities (Jul 2014) (29 U.S.C. 793).

(vii) 52.222-37, Employment Reports on Veterans (Jul 2014) (38 U.S.C. 4212)

(viii) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(ix) 52.222-41, Service Contract Labor Standards (May 2014) (41 U.S.C. chapter 67).

(x) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

___Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).

(xi) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment-Requirements (May 2014) (41 U.S.C. chapter 67).

(xii) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services-Requirements (May 2014) (41 U.S.C. chapter 67).

(xiii) 52.222-54, Employment Eligibility Verification (Aug 2013).

(xiv) 52.225-26, Contractors Performing Private Security Functions Outside the United States (Jul 2013) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008;10 U.S.C. 2302 Note).

(xv) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (May 2014) (42 U.S.C. 1792). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.
(xvi) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.
(xvii) 52.222-55, Minimum Wages Under Executive Order 13658 (Dec 2014) (Executive Order 13658).
(2) While not required, the contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of Clause)

## ADDENDUM TO FAR 52.212-4

### 1.0    ISSUANCE OF TASK ORDERS

(a)    The Contractor shall not perform any work or incur any costs for any purpose under this contract or any individual Task Order until its receipt of a finalized written Task Order (OF-347) signed by the Contracting Officer authorizing specific work. If the Contractor does perform any work or incur any costs prior to written authorization by the Contracting Officer, it shall be at the expense of the Contractor and the Agency will not reimburse the Contractor.

(1) The Contracting Officer will issue a "Task Order Proposal Letter" to all Contractors on the Multiple Award Schedule who were determined eligible to compete for work in that particular SOW Task Area. The letter will request that the Contractor provide: (a) a brief technical understanding and approach to performing the work described in the proposed Task Order's Statement of Work and (b) a firm-fixed-price Price Proposal to perform the work.
Order, the Contractor shall submit its response to the Contracting Officer. This response shall be comprised of: (1) the technical approach to perform the work AND

2) the proposed price based on the Contractor's analysis of the labor required to perform the work specified in the Task Order, materials, computer time, performance schedule, travel, and other related cost factors, along with such additional information as may be called for in the proposed Task Order.

3)    After receiving each Contractor Technical and Price Proposal responses to the Agency's proposed Task Order, the Contracting Officer will negotiate a finalized Task Order with the Contractor whose combined proposal for the individual Task Order represents the best value to the Agency.

4)    Following negotiations, the Contracting Officer will issue, for signed acceptance by the Contractor, the finalized Task Order using Optional Form 347 (Order For Supplies or Services).

5)    Each Task Order shall be individually numbered (e.g., BEG50-J--15-xxxx) and shall include, in addition to the amount of the Contractor's firm-fixed-price, the Statement of Work (containing a brief description of the work, listing of deliverables, delivery schedule, and place of inspection/acceptance), applicable appropriation and accounting data, and other pertinent or special directions and/or attachments.

6) In the event that the Contracting Officer and the Contractor disagree on any element of the Task Order, including the price or delivery schedule, and the Contractor refuses to sign the Task Order, the Contractor shall expeditiously proceed with the work called for by the Task Order when directed by the Contracting Officer. The disagreement shall be treated and handled as a dispute as prescribed herein.

### 2.0    TERM OF CONTRACT

The Base Year period of performance of the subject contract shall be (12) months.  The Government will have the unilateral right to extend the term of the contract for a period of one year at a time for four (4) additional years in accordance with FAR Clause 52.217-9 hereof.

### Period of Performance

### 3.0    52.217-8    OPTION TO EXTEND SERVICES (NOV 1999)

The Government may require continue performance of any services within the limits of Statement of Work.  The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months.  The Contracting Officer may exercise option by written notice to the Contractor within 30 days.

(End of Clause)

### 4.0    52.217-9    OPTION TO EXTEND THE TERM OF AGREEMENT (MAR 2000)

(a)  The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 45 days *(60 days unless a different number of days is inserted)* before the contract expires.  The preliminary notice does not commit the Government to an extension.

(b)  If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c)  The total duration of this contract, include the exercise of any options under this clause, shall not exceed five (5) years.

### 5.0    INTERPRETATION OF MODIFICATION(S)

No verbal statement by any person, and no written statement by anyone other than the Contracting Officer, or his authorized representative acting within the scope of his/her authority, shall be interpreted as modifying or otherwise affecting the terms of this contract. All requests for interpretation or modification shall be made in writing to the Contracting Officer.  All changes to this contract shall be made by way of written modification.

## OFFEROR REPRESENTATIONS AND CERTIFICATIONS - COMMERCIAL ITEMS

The offeror makes the following Representations and Certifications as part of its proposal **(check/complete all appropriate boxes or blanks on the following pages).**

(Name of Offeror)

(Signature of Authorized Individual)                                          (Date)
(Typed Name of Authorized Individual)
**Note: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.**
**FAR Clause 52.212-3 OFFEROR REPRESENTATIONS AND CERTIFICATIONS - COMMERCIAL ITEMS (APRIL 2011)**
An offeror shall complete only paragraph (b) of this provision if the offeror has completed the annual representations and certifications electronically at *http://orcabian.crov* If an offeror has not completed the annual representations and certifications electronically at the ORCA website, the offeror shall complete only paragraphs (c) through (o) of this provisions.
(a) *Definitions.* As used in this provision--
*Economically disadvantaged women-owned small business (EDWOSB) concern* means a small business concern that is at least 51 percent directly and unconditionally owned by, and the management and daily business operations of which are controlled by, one or more women who are citizens of the United States and who are economically disadvantaged in accordance with 13 CFR part 127. It automatically qualifies as a women-owned small business eligible under the WOSB Program.
*Forced or indentured child labor* means all work or service—
(1)    Exacted from any person under the age of 18 under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily; or
(2)    Performed by any person under the age of 18 pursuant to a contract the enforcement of which can be accomplished by process or penalties.
*Inverted domestic corporation* means a foreign incorporated entity which is treated as an inverted domestic corporation under 6 U.S.C. 395(b), i.e., a corporation that used to be incorporated in the United States, or used to be a partnership in the United States, but now is incorporated in a foreign country, or is a subsidiary whose parent corporation is incorporated in a foreign country, that meets the criteria specified in 6 U.S.C. 395(b), applied in accordance with the rules and definitions of 6 U.S.C. 395(c).
        *Manufactured end product* means any end product in Federal Supply Classes (FSC) 1000-9999, except—
(1)    FSC 5510, Lumber and Related Basic Wood Materials;
(2)    Federal Supply Group (FSG) 87, Agricultural Supplies;
(3)    FSG 88, Live Animals;
(4)    FSG 89, Food and Related Consumables;
(5)    FSC 9410, Crude Grades of Plant Materials;
(6)    FSC 9430, Miscellaneous Crude Animal Products, Inedible;
(7)    FSC 9440, Miscellaneous Crude Agricultural and Forestry Products;
(8)    FSC 9610, Ores;
(9)     FSC 9620, Minerals, Natural and Synthetic; and
(10)FSC 9630, Additive Metal Materials
*Place of manufacture* means the place where an end product is assembled out of components, or otherwise made or processed from raw materials into the finished product that is to be provided to the Government. If a product is disassembled and reassembled, the place of reassembly is not the place of manufacture.
*Restricted business operations* means business operations in Sudan that include power production activities, mineral extraction activities, oil-related activities, or the production of military equipment, as those terms are defined in the Sudan Accountability and Divestment Act of 2007 (Pub. L. 110-174). Restricted business operations do not include business operations that the person (as that term is defined in Section 2 of the Sudan Accountability and Divestment Act of 2007) conducting the business can demonstrate—
(1)    Are conducted under contract directly and exclusively with the regional government of southern Sudan;
(2)    Are conducted pursuant to specific authorization from the Office of Foreign Assets Control in the Department of the Treasury, or are expressly exempted under Federal law from the requirement to be conducted under such authorization;
(3)    Consist of providing goods or services to marginalized populations of Sudan;
(4)    Consist of providing goods or services to an internationally recognized peacekeeping force or humanitarian organization;
(5)    Consist of providing goods or services that are used only to promote health or education; or
(6)    Have been voluntarily suspended.
*Service-disabled veteran-owned small business concern*--
(1) Means a small business concern—
(i)       Not less than 51 percent of which is owned by one or more service--disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and
(ii)       The management and daily business operations of which are controlled by one or more service- disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran.
(2) *Service-disabled veteran* means a veteran, as defined in 38 U.S.C. 101(2), with a disability that is service-connected, as defined in 38 U.S.C. 101(16).

*Small business concern* means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR Part 121 and size standards in this solicitation.
*Veteran-owned small business concern* means a small business concern--
(1)    Not less than 51 percent of which is owned by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

(2)     The management and daily business operations of which are controlled by one or more veterans.

*Women-owned business concern* means a concern which is at least 51 percent owned by one or more women; or in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and whose management and daily business operations are controlled by one or more women.

*Women-owned small business concern* means a small business concern--

(1)     That is at least 51 percent owned by one or more women; or, in the case of any publicly owned business, at least 51 percent of its stock is owned by one or more women; and

Whose management and daily business operations are controlled by one or more women *Women-owned small business (WOSB) concern eligible under the WOSB Program (in accordance with 13 CFR part 127),* means a small business concern that is at least 51 percent directly and unconditionally owned by, and the management and daily business operations of which are controlled by, one or more women who are citizens of the United States.

(b) (1) *Annual Representations and Certifications.* Any changes provided by the offeror in paragraph (b)(2) of this provision do not automatically change the representations and certifications posted on the Online Representations and Certifications Application (ORCA) website.

(2) The offeror has completed the annual representations and certifications electronically via the ORCA website at httoliorca.npn.gov. After reviewing the ORCA database information, the offeror verifies by submission of this offer that the representations and certifications currently posted electronically at FAR 52.212-3, Offeror Representations and Certifications--Commercial Items, have been entered or updated in the last 12 months, are current, accurate, complete, and applicable to this solicitation (including the business size standard applicable to the NAICS code referenced for this solicitation), as of the date of this offer and are incorporated in this offer by reference (see FAR 4.1201), except for paragraphs

_ *[Offeror to identify the applicable paragraphs at (c) through (o) of this provision that the offeror has completed for the purposes of this solicitation only, if any.*

*These amended representation(s) and/or certification(s) are also incorporated in this offer and are current, accurate, and complete as of the date of this offer.*

*Any changes provided by the offeror are applicable to this solicitation only, and do not result in an update to the representations and certifications posted on ORCA.J*

(c) Offerors must complete the following representations when the resulting contract is to be performed in the United States or its outlying areas. Check all that apply.

*(1)  Small Business concern.* The offeror represents as part of its offer that it [ ] is, [ ] is not a small business concern.

*(2)  Veteran-owned small business concern.* [Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.] The offeror represents as part of its offer that it [ ] is, [ ] is not a veteran-owned small business concern.

*(3)  Service-disabled veteran-owned small business concern.* [Complete only if the offeror represented itself as a veteran-owned small business concern in paragraph (c)(2) of this provision.] The offeror represents as part of its offer that it [ ] is, [ ] is not a service-disabled veteran-owned small business concern.

*(4)  Small disadvantaged business concern.* [Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.]

The offeror represents, for general statistical purposes, that it [ ] is, [ ] is not a small disadvantaged business concern as defined in 13 CFR 124.1002.

*(5)      Women-owned small business concern.* [Complete only if the offeror represented itself as a small' business concern in paragraph (c)(1) of this provision.]

The offeror represents that it [ is, [ ] is not a women-owned small business concern.

**NOTE:** Complete paragraphs (c)(8) and (c)(9) only if this solicitation is expected to exceed the simplified acquisition threshold.

(6) WOSB concern eligible under the WOSB Program. [Complete only if the offeror represented itself as a women-owned small business concern in paragraph (c)(5) of this provision.] The offeror represents that-

(i)     It [ ] is, [ ] is not a WOSB concern eligible under the WOSB Program, has provided all the required documents to the WOSB Repository, and no change in circumstances or adverse decisions have been issued that affects its eligibility; and

(ii)    It [ ] is, [ ] is not a joint venture that complies with the requirements of 13 CFR part 127, and the representation in paragraph (c)(6)(i) of this provision is accurate in reference to the WOSB concern or concerns that are participating in the joint venture. [The offeror shall enter the name or names of the WOSB concern or concerns that are participating in the joint venture: _____ .]

Each WOSB concern participating in the joint venture shall submit a separate signed copy of the WOSB representation.

(7) Economically disadvantaged women-owned small business (EDWOSB) concern. [Complete only if the offeror represented itself as a WOSB concern eligible under the WOSB Program in (c)(6) of this provision.] The offeror represents that--

(i) It [ ] is, [ ] is not an EDWOSB concern eligible under the WOSB Program, has provided all the required documents to the WOSB Repository, and no change in circumstances or adverse decisions have been issued that affects its eligibility; and

(iii) It [ ] is, [ ] is not a joint venture that complies with the requirements of 13 CFR part 127, and the representation in paragraph (c)(7)(ii) of this provision is accurate in reference to the EDWOSB concern or concerns that are participating in the joint venture. The offeror shall enter the name or names of the EDWOSB concern or concerns that are participating in the joint venture: Each EDWOSB concern participating in the joint venture shall submit a separate signed copy of the EDWOSB representation.

*(8)    Women-owned business concern (other than small business concern).* [Complete only if the offeror is a women-owned business concern and did not represent itself as a small business concern in paragraph (c)(1) of this provision.]
The offeror represents that it [ ] is a women-owned business concern.

*(9)    Tie bid priority for labor surplus area concerns.* If this is an invitation for bid, small business offerors may identify the labor surplus areas in which costs to be incurred on account of manufacturing or production *(by* offeror or first-tier subcontractors) amount to more than 50 percent of the contract price:

*(10) (Complete only if the solicitation contains the clause at FAR 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns, or FAR 52.219-25, Small Disadvantaged Business Participation Program—Disadvantaged Status and Reporting, and the offeror desires a benefit based on its disadvantaged status.)*
*(i) General.* The offeror represents that either--
(A) It [ ] is, [ ] is not certified by the Small Business Administration as a small disadvantaged business concern and identified, on the date of this representation, as a certified small disadvantaged business concern in the CCR Dynamic Small Business Search database maintained by the Small Business Administration, and that no material change in disadvantaged ownership and control has occurred since its certification, and, where the concern is owned by one or more individuals claiming disadvantaged status, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); or
(B) It [ ] has, [ ] has not submitted a completed application to the Small Business Administration or a Private Certifier to be certified as a small disadvantaged business concern in accordance with 13 CFR 124, SuBOArt B, and a decision on that application is pending, and that no material change in disadvantaged ownership and control has occurred since its application was submitted.


*Joint Ventures under the Price Evaluation Adjustment for Small Disadvantaged Business Concerns.* The offeror represents, as part of its offer, that it is a joint venture that complies with the requirements in 13 CFR 124.1002(f) and that the representation in paragraph (c)(10)(i) of this provision is accurate for the small disadvantaged business concern that is participating in the joint venture. *[The offeror shall enter the name of the small disadvantaged business concern that is participating in the joint venture:_____.]*
(11) *HUBZone small business concern. [Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision]* The offeror represents, as part of its offer, that--
(i)      It [ ] is, [ ] is not a HUBZone small business concern listed, on the date of this representation, on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration, and no material change in ownership and control, principal office, or HUBZone employee percentage have occurred since it was certified in accordance with 13 CFR part 126; and
(ii)     It [ ] is, [ ] is not a joint venture that complies with the requirements of 13 CFR part 126, and the representation in paragraph (c)(11)(i) of this provision is accurate for each HUBZone small business concern participating in the HUBZone joint venture. *[The offeror shall enter the names of each of the HUBZone small business concerns participating in the HUBZone joint venture:*
_____ .1 Each
HUBZone small business concern participating in the HUBZone joint venture shall submit a separate signed copy of the HUBZone representation.
(d) *Representations required to implement provisions of Executive Order 11246--*
(1) *Previous Contracts and Compliance.* The offeror represents that--
(i)      It [ has, [ ] has not participated in a previous contract or subcontract subject to the Equal Opportunity clause of this solicitation; and
(ii)     It [ ] has, [ has not filed all required compliance reports.
(i)      (2) *Affirmative Action Compliance.* The offeror represents that-- It [ ] has developed and has on file, [ ] has not developed and does not have on file, at each estab-lishment, affirmative action programs required by rules and regulations of the Secretary of Labor (41 CFR Parts 60-1 and 60-2), or
(ii)     It [ ] has not previously had contracts subject to the written affirmative action programs requirement of the rules and regulations of the Secretary of Labor.
(e) *Certification Regarding Payments to Influence Federal Transactions (31 U.S.C. 1352).* (Applies only if the contract is expected to exceed $150,000.) By submission of its offer, the offeror certifies to the best of its knowledge and belief that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress or an employee of a Member of Congress on his or her behalf in connection with the award of any resultant contract. If any registrants under the Lobbying Disclosure Act of 1995 have made a lobbying contact on behalf of the offeror with respect to this contract, the offeror shall complete and submit, with its offer, OMB Standard Form LLL, Disclosure of Lobbying Activities, to provide the name of the registrants. The offeror need not report regularly employed officers or employees of the offeror to whom payments of reasonable compensation were made.
(f) *Buy American Act Certificate. (Applies only if the clause at Federal Acquisition Regulation (FAR) 52.225-1, Buy American Act-*
*-Supplies, is included in this solicitation.)*


(1)  The offeror certifies that each end product, except those listed in paragraph (0(2) of this provision, is a domestic end product and that for other than COTS items, the offeror has considered components of unknown origin to have been mined, produced, or manufac-tured outside the United States. The offeror shall list as foreign end products those end products manufactured in the United States that do not qualify as domestic end products, i.e., an end product that is not a COTS item and does not meet the component test in para-graph (2) of the definition of "domestic end product." The terms "commercially available off-the-shelf (COTS) item," "component," "domestic end product," "end product," "foreign end product," and "United States" are defined in the clause of this solicitation entitled "Buy American Act--Supplies."

(2) Foreign End Products:
Line Item No.:_____ Country of Origin:
(List as necessary)
(3) The Government will evaluate offers in accordance with the policies and procedures of FAR Part 25.
(g) (1) *Buy American Act--Free Trade Agreements--Israeli Trade Act Certificate. (Applies only if the clause at FAR 52.225-3, Buy American Act--Free Trade Agreements--Israeli Trade Act, is included in this solicitation.)*
(i)   The offeror certifies that each end product, except those listed in paragraph (g)(1)(ii) or (g)(1)(iii) of this provision, is a domestic end product and that for other than COTS items, the offeror has considered components of unknown origin to have been mined, produced, or manufactured outside the United States. The terms "Bahrainian, Moroccan, Omani, or Peruvian end product," "commercially available off-the-shelf (COTS) item," "component," "domestic end product," "end product," "foreign end product," "Free Trade Agreement country," "Free Trade Agreement country end product," "Israeli end product," and "United States" are defined in the clause of this solicitation entitled "Buy American Act-Free Trade Agreements-Israeli Trade Act."
(ii)   The offeror certifies that the following supplies are Free Trade Agreement country end products (other than Bahrainian, Moroccan, Omani, or Peruvian end products) or Israeli end products as defined in the clause of this solicitation entitled "Buy American Act--Free Trade Agreements--Israeli Trade Act":
Free Trade Agreement Country End Products (Other than Bahrainian, Moroccan, Omani, or Peruvian End Products) or Israeli End Products:
Line Item No.:_____
(List as necessary)
(iii)   The offeror shall list those supplies that are foreign end products (other than those listed in paragraph (g)(1)(ii) of this provision) as defined in the clause of this solicitation entitled, "Buy

American Act--Free Trade Agreements--Israeli Trade Act." The offeror shall list as other foreign end products those end products manufactured in the United States that do not qualify as domestic end products, i.e., an end product that is not a COTS item and does not meet the component test in paragraph (2) of the definition of "domestic end product."
Other Foreign End Products
Line Item No.:_____
Country of Origin:_____
(List as necessary)
(iv)   The Government will evaluate offers in accordance with the policies and procedures of FAR Part 25.
*(2)     Buy American Act--Free Trade Agreements--Israeli Trade Act Certificate, Alternate I.* If Alternate I to the clause at FAR 52.225-3 is included in this solicitation, substitute the following paragraph (g)(1)(ii) for paragraph (g)(1)(ii) of the basic provision:
(g) (1) (ii) The offeror certifies that the following supplies are Canadian end products as defined in the clause of this solicitation, entitled "Buy American Act--Free Trade Agreements--Israeli Trade Act:"
Canadian End Products
Line Item No.:_____
(List as necessary)
*(3)     Buy American Act--Free Trade Agreements--Israeli Trade Act Certificate, Alternate II.* If Alternate II to the clause at FAR 52.225-3 is included in this solicitation, substitute the following paragraph (g)(1)(ii) for paragraph (g)(1)(ii) of the basic provision:
(g) (1) (ii) The offeror certifies that the following supplies are Canadian end products or Israeli end products as defined in the clause of this solicitation entitled, "Buy American Act--Free Trade Agreements--Israeli Trade Act:"
Canadian or Israeli End Products
Line Item No.:_____
Country of Origin:_____
(List as necessary)
(4) *Trade Agreements Certificate.* (Applies only if the clause at FAR 52.225-5, Trade Agreements, is included in this solicitation.)
(i)     The offeror certifies that each end product, except those listed in paragraph (g)(4)(ii) of this provision, is a U.S.-made or designated country end product, as defined in the clause of this solicitation entitled, "Trade Agreements."
(ii)     The offeror shall list as other end products those end products that are not U.S.-made or designated country end products.

Other End Products
Line Item No.:_____
Country of Origin:_____
(List as necessary)
            (iii) The Government will evaluate offers in accordance with the policies and procedures of FAR Part 25.
            For line items covered by the INTO GPA, the Government will evaluate offers of U.S.-made or designated country end products without regard to the restrictions of the Buy American Act. The Government will consider for award only offers of U.S.-made or designated country end products unless the Contracting Officer determines that there are no offers for such products or that the offers for such products are insufficient to fulfill the requirements of the solicitation.
(h) *Certification Regarding Responsibility Matters (Executive Order 12689).* (Applies only if the contract value is expected to exceed the simplified acquisition threshold.) The offeror certifies, to the best of its knowledge and belief, that the offeror and/or any of its principals—    •
(1)     [ ] Are, [ ] are not presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by

any Federal agency;

(2)    [ Have, [ ] have not, within a three-year period preceding this offer, been convicted of or had a civil judgment rendered against them for: Commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a Federal, state or local government contract or subcontract; violation of Federal or state antitrust statutes relating to the submission of offers; or Commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, violating Federal criminal tax laws, or receiving stolen property; [ ] Are [ ] are not presently indicted for, or otherwise criminally or civilly charged by a Government entity with, commission of any of these offenses enumerated in paragraph (h)(2) of this clause; and

(3)    [ ] Have, [ ] have not, within a three-year period preceding this offer, been notified of any delinquent Federal taxes in an amount that exceeds $3,000 for which the liability remains unsatisfied.

(i) Taxes are considered delinquent if both of the following criteria apply:

(A) The tax liability is finally determined. The liability is finally determined if it has been assessed. A liability is not finally determined if there is a pending administrative or judicial challenge. In the case of a judicial challenge to the liability, the liability is not finally determined until all judicial appeal rights have been exhausted.

(B)    The taxpayer is delinquent in making payment. A taxpayer is delinquent if the taxpayer has failed to pay the tax liability when full payment was due and required. A taxpayer is not delinquent in cases where enforced collection action is precluded.

(ii) Examples. (A) The taxpayer has received a statutory notice of deficiency, under I.R.C. Sec. 6212, which entitles the taxpayer to seek Tax Court review of a proposed tax deficiency. This is not a delinquent tax because it is not a final tax liability. Should the taxpayer seek Tax Court review, this will not be a final tax liability until the taxpayer has exercised all judicial appeal rights.

(B)    The IRS has filed a notice of Federal tax lien with respect to an assessed tax liability, and the

taxpayer has been issued a notice under I.R.C. Sec. 6320 entitling the taxpayer to request a hearing with the IRS Office of Appeals contesting the lien filing, and to further appeal to the Tax Court if the IRS determines to sustain the lien filing. In the course of the hearing, the taxpayer is entitled to contest the underlying tax liability because the taxpayer has had no prior opportunity to contest the liability. This is not a delinquent tax because it is not a final tax liability. Should the taxpayer seek tax court review, this will not be a final tax liability until the taxpayer has exercised all judicial appeal rights.

(C)    The taxpayer has entered into an installment agreement pursuant to I.R.C. Sec. 6159 The taxpayer is making timely payments and is in full compliance with the agreement terms. The taxpayer is not delinquent because the taxpayer is not currently required to make full payment.

(D)    The taxpayer has filed for bankruptcy protection. The taxpayer is not delinquent because

enforced collection action is stayed under 11 U.S.C. 362 (the Bankruptcy Code).

*(i) Certification Regarding Knowledge of Child Labor for Listed End Products (Executive Order 13126).* [The Contracting Officer must list in paragraph (i)(1) any end products being acquired under this solicitation that are included in the List of Products Requiring Contractor Certification as to Forced or Indentured Child Labor, unless excluded at 22.1503(b).]

(1)

Listed end products. Listed End Product Listed Countries of Origin

(2)    *Certification.* [If the Contracting Officer has identified end products and countries of origin in paragraph (i)(1) of this provision, then the offeror must certify to either (i)(2)(i) or (i)(2)(ii) by checking the appropriate block.]

The offeror will not supply any end product listed in paragraph (i)(1) of this provision that was mined, produced, or manufactured in the corresponding country as listed for that product.

The offeror may supply an end product listed in paragraph (i)(1) of this provision that was mined, produced, or manufactured in the corresponding country as listed for that product. The offeror certifies that it has made a good faith effort to determine whether forced or indentured child labor was used to mine, produce, or manufacture any such end product furnished under this contract. On the basis of those efforts, the offeror certifies that it is not aware of any such use of child labor.

(j) *Place of manufacture.* (Does not apply unless the solicitation is predominantly for the acquisition of manufactured end products.) For statistical purposes only, the offeror shall indicate whether the place of manufacture of the end products it expects to provide in response to this solicitation is predominately -

(1)    [ ] In the United States (Check this box if the total anticipated price of offered end products manufactured in the United States exceeds the total anticipated price of offered end products manufactured outside the United States); or

(2)    [ ] Outside the United States.

(k) *Certificates regarding exemptions from the application of the Service Contract Act.*

(Certification by the offeror as to its compliance with respect to the contract also constitutes its certification as to compliance by its subcontractor if it subcontracts out the exempt services.)

*(The contracting officer is to check a box to indicate if paragraph (k)(1) or (k)(2) applies.]*

*[* (1) Maintenance, calibration, or repair of certain equipment as described in FAR 22.1003-4(c)(1).

The offeror [ ] does [ ] does not certify that--

(i)    The items of equipment to be serviced under this contract are used regularly for other than Governmental purposes and are sold or traded by the offeror (or subcontractor in the case of an exempt subcontract) in substantial quantities to the general public in the course of normal business operations;

(ii)    The services will be furnished at prices which are, or are based on, established catalog or market prices (see FAR 22.1003-4(c)(2)(ii)) for the maintenance, calibration, or repair of such equipment; and

Def. App. 115

(iii) The compensation (wage and fringe benefits) plan for all service employees performing work under the contract will be the same as that used for these employees and equivalent employees servicing the same equipment of commercial customers.

[ ] (2) Certain services as described in FAR 22.1003-4(d)(1). The offeror [ballot] does [ballot] does not certify that--

(i)    The services under the contract are offered and sold regularly to non-Governmental customers, and are provided by the offeror (or subcontractor in the case of an exempt subcontract) to the general public in substantial quantities in the course of normal business operations;

(ii)    The contract services will be furnished at prices that are, or are based on, established catalog or market prices (see FAR 22.1003-4(d)(2)(iii));

(iii) Each service employee who will perform the services under the contract will spend only a small portion of his or her time (a monthly average of less than 20 percent of the available hours on an

annualized basis, or less than 20 percent of available hours during the contract period if the contract period is less than a month) servicing the Government contract; and

[Title](iv) The compensation (wage and fringe benefits) plan for all service employees performing work under the contract is the same as that used for these employees and equivalent employees servicing commercial customers.

($^3$) If paragraph (k)(1) or (k)(2) of this clause applies--

(i)    If the offeror does not certify to the conditions in paragraph (k)(1) or (k)(2) an the Contracting officer did not attach a Service Contract Act wage determination to the solicitation, the offeror shall notify the Contracting Officer as soon as possible; and

(ii)    The Contracting Officer may not make an award to the offeror if the offeror fails to execute the certification in paragraph (k)(1) or (k)(2) of this clause or to contact the Contracting Officer as required in paragraph (k)(3)(i) of this clause.

(I) *Taxpayer Identification Number (TIN) (26 U.S.C. 6109, 31 U.S.C. 7701).* (Not applicable if the offeror is required to provide this information to a central contractor registration database to be eligible for award.)

(1)    All offerors must submit the information required in paragraphs (I)(3) through (1)(5) of this provision to comply with debt collection requirements of 31 U.S.C. 7701(c) and 3325(d), reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M, and implementing regulations issued by the Internal Revenue Service (IRS).

(2)    The TIN may be used by the Government to collect and report on any delinquent amounts arising out of the offeror's relationship with the Government (31 U.S.C. 7701(c)(3)). If the resulting contract is subject to the payment reporting requirements described in FAR 4.904, the TIN provided hereunder may be matched with IRS records to verify the accuracy of the offeror's TIN.

(3)    *Taxpayer Identification Number (TIN).*

*[*    TIN: _____

[ ] TIN has been applied for.

[ ] TIN is not required because:

[ ] Offeror is a nonresident alien, foreign corporation, or foreign partnership that does not have income effectively connected with the conduct of a trade or business in the United States and does not have an office or place of business or a fiscal paying agent in the United States;

[ ] Offeror is an agency or instrumentality of a foreign government;

[ ] Offeror is an agency or instrumentality of the Federal Government.

(4)    Type *of organization.*

*[*    Sole proprietorship;

[ ] Partnership;

[ ] Corporate entity (not tax-exempt);

[ ] Corporate entity (tax-exempt);

[ ] Government entity (Federal, State, or local); [ ] Foreign government;

[ ] International organization per 26 CFR 1.6049-4; [ ] Other

(5) *Common parent* Offeror is not owned or controlled by a common parent; [ ] Name and TIN of common parent:

Name_____

TIN

*(m)    Restricted business operations in Sudan.* By submission of its offer, the offeror certifies that the offeror does not conduct any restricted business operations in Sudan.

*(n)* Prohibition on Contracting with Inverted Domestic Corporations. (1) *Relation to Internal Revenue Code.* A foreign entity that is treated as an inverted domestic corporation for purposes of the Internal Revenue Code at 26 U.S.C. 7874 (or would be except that the inversion transactions were completed on or before March 4, 2003), is also an inverted domestic corporation for purposes of 6 U.S.C. 395 and for this solicitation provision (see FAR 9.108).

(2) *Representation.* By submission of its offer, the offeror represents that it is not an inverted domestic corporation and is not a subsidiary of one.

(o) Sanctioned activities relating to Iran. (1) Unless a waiver is granted or an exception applies as provided in paragraph (o)(2) of this provision, by submission of its offer, the offeror certifies that the offeror, or any person owned or controlled by the offeror, does not engage in any activities for which sanctions may be imposed under section 5 of the Iran Sanctions Act of 1996.

(2) The certification requirement of paragraph (o)(1) of this provision does not apply if-

(i)    This solicitation includes a trade agreements certification (e.g., 52.212-3(g) or a comparable agency provision); and

(ii)    The offeror has certified that all the offered products to be supplied are designated country end products.

(End of provision)

**Alternate II** (April 2011). As prescribed in 12.301(b)(2), add the following paragraph (c)(10)(iii) to the basic provision:

*Note: Applicable when small disadvantaged business procurement mechanisms are authorized on a regional basis. Applicable regions*

*by SIC Major Category are located at: http://www.amet.qov/References/sdbadiustments.htm.)*
*(iii) Address. The offeror represents that its address_____ is, _____ is not in a region for which a*
*small disadvantaged business procurement mechanism is authorized and its address has not changed since its certification as a small disadvantaged business concern or submission of its application for certification. The list of authorized small disadvantaged business procurement mechanisms and regions is posted at http://www.amet.gov/ReferencesIsdbadjustments,htm.*
*The offeror shall use the list in effect on the date of this solicitation. "Address," as used in this provision, means the address of the of- feror as listed on the Small Business Administration's register of small disadvantaged business concerns or the address on the com- pleted application that the concern has submitted to the Small Business Administration or a Private Certifier in accordance with 13 CFR part 124, suBOArt B. For joint ventures, "address" refers to the address of the small disadvantaged business concern that is par- ticipating in the joint venture.*

**Addendum to FAR Clause 52.212-3**

**FAR Clause 52.204-6 Data Universal Numbering System (DUNS) Number (April 2008)**

(a)    The offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "DUNS" or "DUNS+4" followed by the DUNS number or "DUNS+4" that identifies the offeror's name and address exactly as stated in the offer. The DUNS number is a nine-digit number assigned by Dun and Bradstreet, Inc. The DUNS+4 is the DUNS number plus a 4-character suffix that may be assigned at the discretion of the offeror to establish additional CCR records for identifying alternative Electronic Funds Transfer (EFT) accounts (see SuBOArt 32.11) for the same concern.

(b)    If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one.

(1) An offeror may obtain a DUNS number--

(i)       Via the Internet at hftp://fedqov.dnb.com/webform or if the offeror does not have Internet access, it may call Dun and Brad- street at 1-866-705-5711 if located within the United States; or

(ii)      If located outside the United States, by contacting the local Dun and Bradstreet office. The offeror should indicate that it is an offeror for a U.S. Government contract when contacting the local Dun and Bradstreet office.

(2) The offeror should be prepared to provide the following information:

(i)  Company legal business name.

(ii) Tradestyle, doing business, or other name by which your entity is commonly recognized. (iii) Company physical street address, city, state and Zip Code.

(iv) Company mailing address, city, state and Zip Code (if separate from physical).

(v)  Company telephone number.

(vi) Date the company was started.

(vii)      Number of employees at your location.

(viii)  Chief executive officer/key manager.

(ix) Line of business (industry).

(x) Company Headquarters name and address (reporting relationship within your entity).

(End of provision)

**6.0       52.216-1 TYPE OF CONTRACT (APR 1984)**

The Government contemplates issuing a Multiple Awards/Basic Ordering Agreement, implemented through Firm-Fixed-Price (FFP) Task Orders, resulting from this solicitation

(End of Provision)

ARTICLE II -  TERM OF AGREEMENT

The term of this agreement shall be from 29 June 2015 through 28 June 2016 to include four (4) twelve (12) Options.

ARTICLE III - EXTENT OF OBLIGATION/ORDERING OFFICIAL.

1 . The Agency shall be obligated only to the extent of authorized call orders actually placed under this agreement and by the Authorized Representatives listed in Article V.

1 . No additional changes can be made in this scope and terms of this agreement unless there is advance written ap- proval by the BBG/IBB, M/CON Contracting Officer.  No other person connected with the BBG/IBB can authorize ad- ditional work or additional cost which may affect the agreement price.  Such terms must be negotiated and agreed upon, in advance and written modification to the agreement issued.

## ARTICLE IV - METHOD OF ORDERING

1 . Services to the furnished under this agreement shall be ordered by task orders.  Requests will be made in writing via Request for Quote (RFQ), on an as needed basis, and will be confirmed in writing by the BBG/IBB, Office of Contract.

## ARTICLE V -  AUTHORIZED REPRESENTATIVES

Orders place under this agreement shall be requested and accepted by the following individuals who have been designated as Authorized Representatives.

Diane Sturgis or Contracting Administrative Officer – 202-382-7849

## PERFORMANCE OF WORK WITHOUT A TASK ORDER

The Contractor shall not perform any work or incur any costs for any purposes under this Basic Ordering Agreement or any individual Task Order until authorized by Authorized Representative via written order and will be confirm in writing by Office of Contracts.

## ARTICLE VI - PAYMENTS/INVOICES

An itemized invoice shall be submitted at least monthly for all services furnished during a billing period and for which payment has not been received.  Invoices shall be submitted electronically to kdeyoe@bbg.gov and shall contain the following information:

1 . This BOA number and delivery order number.
2 . Name, address and telephone number of Contractor.
3 . Description of services furnished to include quantity, unit price, and total cost.
4 . Unique invoice number and date.

## ARTICLE VII -          PRICING

The prices offered the Government shall be as low as or lower than those charged to the contractor's most favored customer for comparable services under similar terms and conditions, in addition to any discounts for prompt payment.

## ARTICLE VIII - SUBCONTRACTING

None of the work to be performed under this BOA shall be subcontracted, and no obligation or duty arising out of the BOA may be transferred, or assigned, without terms acceptable to the Contracting Officer.

---

[ 1]This clause needs to be completed.

**PERIOD OF PERFORMANCE**

| ITEM | START | END |
|------|-------|-----|
| 1 | 06/29/2015 | 06/28/2016 |

**Section CS - Continuation Sheet**

52.217-8   Option to Extend Services (Nov 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These

rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within [insert the period of time with which the Contracting Officer may exercise the option].

(End of clause)


## 1003   CONTRACTOR'S SIGNATURE


_____

**Signature**                                    **Date**


**CONTRACTOR'S SIGNATURE FOR BASIC ORDERING AGREEMENT (BOA)**

*(Contractor is required to sign to knowledge the terms of this BASIC ORDERING AGREEMENT) Return sign copy to issuing office).*


52.217-9   Option to Extend the Term of the Contract (Mar 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within [insert the period of time within which the Contracting Officer may exercise the option]; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least days *[60 days unless a different number of days is inserted]* before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed (months)(years).

(End of clause)


## Section CS - Continuation Sheet

| Identifier | Title | Date | Number of Pages |
|---|---|---|---|
| 1 | IDIQ multiple awards | 11/03/2014 | |
| 2 | mod per M/CON | 11/21/2014 | |



**Broadcasting Board of Governors**

United States of America

July 25, 2018

The Honorable Lindsey Graham
Chairman
Subcommittee on State, Foreign Operations
   and Related Programs
Committee on Appropriations
United States Senate

Dear Mr. Chairman:

The Broadcasting Board of Governors (BBG) hereby submits this report, pursuant to Section 7078(c) of the Consolidated Appropriations Act, 2018 (Div. K, P.L. 115-141). It is the agency's plan for programs to promote Internet freedom globally, including a description of safeguards to help ensure that such programs are not used for illicit purposes

Should you have any questions please contact Adam Tracy, Congressional Liaison, at 202-203-4669.

Sincerely,

John Lansing
Chief Executive Officer and Director

Enclosure

   

330 Independence Avenue, SW | Room 3300 | Cohen Building | Washington, DC 20237 | (202)203-4545 | Fax (202)203-4568

# Internet Freedom (IF) Spend Plan
# FY 2018

## I. Introduction

This spend plan is being submitted pursuant to section 7078 of the Consolidated Appropriation Act, 2018 (P.L. 115-141), and as may be applicable, section 7015 of that Act.

Consistent with Congressional requirements, this Spend Plan details the BBG's Office of Internet Freedom (OIF) priorities and operations for FY 2018 that the OIF seeks to carry out directly or fund via grant. This Spend Plan is submitted in compliance with the BBG's Internet Freedom program framework and governance – produced collaboratively by Internet freedom program leaders following the guidance of the BBG CEO and with the approval of the Board of Governors.

The BBG's Internet Freedom program supports "global Internet freedom for the expansion of unrestricted access to information on the Internet." This work is performed through the BBG's Office of Internet Freedom and the private, non-profit Open Technology Fund (OTF) housed within the BBG's non-profit grantee network, Radio Free Asia (RFA). Together, these programs support the tools and techniques to both generate the content necessary for U.S. international media and the dissemination of its content in information-restrictive markets.

The BBG's target audiences across the world increasingly access media content primarily – if not solely – via digital and social media platforms. Authoritarian governments that repress the majority of markets the BBG serves utilize increasingly sophisticated methods to monitor, surveil and track citizens. This makes it difficult and dangerous for BBG journalists, sources, and audiences to participate in the global free flow of information online. Technologies which provide access to blocked content and safe and secure methods to share content are critically important to getting information that would otherwise be censored to target audiences.

The BBG's Internet Freedom program enables not only unfettered online access to BBG products or content, but also the full spectrum of independent news sources on the Internet. This is increasingly important as the BBG seeks to remain a relevant media organization by harnessing digital platforms and undertaking new methods of engaging with audiences. Accordingly, from OIF's perspective, projects focused on safe and secure communications are critical components for ensuring BBG news and information is delivered to these audiences without further endangering them. Addressing the online threats endured by BBG's audiences and protecting journalists, sources and information seekers against offline punishment for online activity is essential to fostering free speech and free press – and necessitates deploying tools that both circumvent censorship and protect user access to information.

## II. Spend Plan Overview

| Managing Network | Actual FY2016 | Actual FY2017 | Projected FY2018 |
|---|---|---|---|
| BBG/OIF | 7,500,000 | 6,565,000 | 4,300,000 |
| RFA/OTF – Programmatic | 7,500,000 | 7,235,000 | 9,500,000 |
| RFA/OTF – Operations | (Integrated above) | 1,200,000 | 1,200,000 |
| **Total** | **15,000,000** | **15,000,000** | **15,000,000** |

In 2018, as in 2017, the BBG's Internet Freedom program will be, in part, implemented by OIF and OTF. OIF will expand its services to both journalists and audiences while reducing the program's overall cost. With the continued rapid growth in public awareness and funding requests, OTF's unique position in the Internet freedom ecosystem will be leveraged to maximize the effective use of OIF recovered funds and savings.

With a new Director who has unique expertise in operationalizing Internet freedom tools and technologies for U.S. international media, OIF will expand its support of BBG networks' Internet Freedom needs. OIF will continue to facilitate a continued increase in audience through Circumvention-as-a-Service, in addition to the operational implementation and deployment of Internet freedom tools and techniques needed by language services working in closed societies.

Further, OIF will expand its awareness and digital safety training, including launching an Internet freedom fellowship program to embed outside Internet freedom technology experts in the language services under threat for one year. The training, in tandem with direct technology implementation, will help BBG journalists working in some of the world's most closed societies to conduct their reporting and connect with their online audiences more effectively than ever before. Finally, the unique vantage point of having both BBG journalists and their audiences around the world will be harnessed to field test and promote a feedback loop with developers in order to iteratively improve the tools being utilized.

OTF will continue to take a field-driven approach to creating technology solutions that circumvent censorship technology with the use of real-time research and analysis of emerging threats. This year, OTF will expand efforts to fund innovative technologies that can provide additional resiliency to field-deployed circumvention tools, as well as efforts to strengthen the backbone of the encryption infrastructure and libraries utilized for overcoming censorship. OTF will continue to support the services needed to refine these tools and techniques, including the Localization Lab, Usability Lab, Red Team Lab and Core Infrastructure Lab.

Beginning with FY 2018, OIF and OTF programs will be more fully realized of their inherent complementarity, with OIF playing an oversight role while also providing hands-on support to

the networks' language services. This is among the most critical services OIF can provide, and it also represents a more efficient use of resources than housing all circumvention technology development at OIF. Circumvention technology will be split between OIF and OTF in accordance with their programs' comparative advantages. OIF will provide circumvention-as-a-service to the networks and works with them directly on any associated issues. OTF will focus on the further development and integration of improved circumvention technologies.

## OIF Program

The primary objective of OIF is to direct, oversee, and ensure compliance with the BBG's Internet Freedom program. OIF also endeavors to provide appropriate anti-censorship technologies and services, including education and training, to citizens and journalists across BBG's broadcasting regions which allow them to safely create, access and share digital news and other information without fear of repressive censorship or surveillance.

OIF will focus on its oversight role as well as support for the BBG networks, journalists, and sources, including deployments, implementations and digital safety and circumvention tools training and awareness. OIF will work closely with OTF to create better communications flow and a cohesive dynamic to leverage both the federal and private grantee IF initiatives. When BBG networks/services raise issues they are experiencing as part of their work, OIF will notify OTF to assist with exploration of solutions. This will increase OTF's on-the-ground awareness of new developments and threats. To this end, regular check-ins will be created to allow issues from BBG networks to be informed of OTF funding considerations.

Besides working with BBG networks to get leadership buy-in and finding Internet freedom champions in each, OIF will build upon OTF's engagement with other federal agencies such as the Department of State, Defense Advanced Research Projects Agency (DARPA) and the National Science Foundation (NSF) to assist with the overall landscape of Internet freedom type initiatives and foster collaboration where appropriate. A top priority for OIF is to ensure there is no gap in circumvention technology. To do so, it will expand the current base of circumvention technology providers so that there is always one tool working should others be temporarily blocked.

### OIF Staff

For FY 2018, OIF employs five (5) full-time people to provide management and oversight of the OIF objectives below.

### OIF Objectives

OIF focuses on the following objectives:

- **Ingest -** OIF will perform oversight to ensure OTF and OIF comply with relevant rules and regulations in the execution of Congressionally-mandated use of Internet freedom funds for technology projects as well as perform implementation, support, awareness and training of BBG networks**.** The Director of the OIF will participate in the OTF proposal review process as a member of the OTF Advisory Council and have full access to the proposal vetting lifecycle. OTF is demonstrably successful and an industry leader in identifying, soliciting, vetting and fostering projects from Proof of Concept to a Minimal Viable Product (MVP) and beyond.  OTF has the expertise necessary for such initiatives including technical development, field research, and rapid response intervention and supporting at-risk communities.

4

- **Deployment –** Partnering with service providers, OIF will ensure that circumvention technologies are ready and available to users in Internet repressive environments. OIF will also partner with service providers such as 1984.is and Greenhost for Internet freedom technologies ready for deployment now. Services such as Tor.onion ensure maximum privacy and secure tip platforms Globaleaks or SecureDrop assist whistleblowers in repressive environments. Other secure, ready-now technologies include Signal and Telegram channels. OIF will be responsible for enabling BBG networks to utilize these services in a secure and user-friendly manner.  OIF will assist the BBG networks with active monitoring of their websites for censorship activities and proactively provide technical support to bypass any identified content blocking or filtering using proven technologies. This includes conducting field testing of BBG-funded Internet freedom tools and providing developer feedback. Another area within this is working with BBG broadcasting network networks to increase the effectiveness of IF technologies, including but not limited to identifying necessary updates and enhancements based on emerging censorship trends.

- **Training –** OIF is well placed to train BBG journalists, affiliates and networks on digital safety practices and techniques as well as tools and projects that are in a mature state and ready to deploy. Trainings will utilize known competent professional trainers with expertise in these tools and techniques, as well as appropriate cultural and regional sensitivity. Tools that are currently primed for implementation by BBG networks include: Signal, PGP/Mailvelope, Tor & Tor Browser that assist in secure and anonymous communications by journalists in repressive Internet environments. In addition, OIF will foster relationships with groups like Hermes Center and Freedom of the Press Foundation that offer user-training programs ready for deployment at BBG networks. The training will focus on how to start a secure/anonymous digital "tip" platform and secure dissemination platforms. OIF will coordinate efforts amongst these and other expert training teams.

- **Deconflicting Efforts across US Government and Private Sector** – OIF will expand upon OTF's current activities and dramatically increase interagency engagement with the National Security Council, Department of State, Department of Defense, National Counterterrorism Center, the Department of Treasury and others parts of USG.  As such, OIF will raise awareness of BBG Internet freedom activities writ large and coordinate with other efforts to ensure funds are allocated appropriately and without duplication. OIF will also expand upon OTF's numerous private sector relationships by building its own connections with private sector leaders and look for potential partnerships in circumvention tools and training. This includes advising the CEO, the Board, and the leadership of all BBG's five networks on Internet freedom initiatives and technologies, as well as informing Congress of BBG's Internet freedom activities as appropriate and responding to Congressional inquiries.

- **Production –** OIF will provide the ongoing maintenance of network-implemented services as long as these services meet network needs and OIF technical standards.

- **Feedback –** OIF will collect feedback from BBG networks working with these technologies and provide that feedback to OTF and their projects for tool improvement as appropriate. OIF will review and evaluate all BBG-funded Internet freedom projects and budget proposals.

**OIF FY 2018 Spend Plan**

| | 2018 Proposed | |
|---|---|---|
| **Circumvention Technology Services, Expansion and Awareness** | **3,350,000** | **77.91%** |
| | | |
| **Deployment and Implementation Initiative for BBG Networks** | **150,000** | **3.49%** |
| | | |
| **Research, Evaluation and Monitoring Initiative** | **250,000** | **5.81%** |
| | | |
| **BBG Needs Finding, Training and Fellows** | **500,000** | **11.63%** |
| | | |
| **OIF Program Support** (non-personnel) | **50,000** | **1.16%** |
| **TOTALS** | **4,300,000** | **100.00%** |

**OIF Projects**

- **Circumvention Technology Services & Awareness:** This initiative will seek the best, most viable technology services to provide online access in censored environments and may include, but not limited to the following projects: **(Projected FY18 Spend: $3,350,000)**

  o **Circumvention-as-a-Service:** This project will provide landing pages to various BBG networks allowing the user to access the wider Internet.

  o **Expansion:** OIF will seek to expand the field of circumvention technologies it deploys to better serve users in repressive environments.

- **Deployment and Implementation Initiative for BBG Networks:** This initiative will include but not limited to the following projects: **(Projected FY18 Spend: $150,000)**

  o **Tor Hidden Services:** Build, deploy and manage Tor Hidden Service to BBG network websites ensuring maximum privacy to at-risk populations.

  o **Whistleblowing Platforms:** Build, deploy and manage platforms to allow anonymous users to provide documents and communicate with journalists with a high-level of security.

6

- **Alternate Dissemination Platforms:** Provide alternate content dissemination platforms such as Telegram channels.

- **Digital Security Tools:** Provide tools to BBG networks that have been funded by OTF and/or the Department of State's Bureau for Democracy, Human Rights, and Labor such as Signal Messenger for secure digital messaging, Briar for decentralized encrypted messaging when the Internet is blocked and OnionShare to provide quick and secure document sharing.

- **Research, Evaluation and Monitoring Initiative:** This initiative will include but not limited to the following project: **(Projected FY18 Spend: $250,000)**

  - **Website Analytics:** Collect statistics on circumvention methods used to reach BBG network websites.

  - **App Analytics:** Collect statistics on popular mobile circumvention tools used based on downloads and usage for regions important to the BBG.

- **BBG Needs Finding, Training and Fellows:** This initiative will include but is not limited to the following projects: **(Projected FY18 Spend: $500,000)**

  - **Needs Finding:** Identify five (5) BBG network language services most in need of digital security training and do a needs assessment based on their current workflow.

  - **Training:** Provide initial digital security trainings to the five services, including, but not limited to, incorporating whistleblowing platforms in newsrooms.

  - **Fellowships:** Identify fellows and place them within the five services for longer-term support and to ingrain digital security practices into their everyday workflow.

- **In addition, a small amount of funding is set aside for OIF Program Support such as the following, but not limited to,** staff training, travel, limited industry conferences and other costs for making the programs run effectively and efficiently. **(Projected FY18 Spend: $50,000)**

Def. App. 127

## OTF Program

OTF's primary objective is to promote Internet freedom worldwide. It does this by identifying new ways to leverage the free world's technological advantage, supporting research of key threats to Internet freedom, developing emerging and next-generation technology that addresses these threats and deploying tools and techniques that circumvent repressive Internet censorship globally. As part of the overall BBG Internet freedom effort, OTF also aims to provide technologies and tools that keep in step with a quickly evolving field of journalism today. This support is focused on the key activity areas discussed in detail below.

As an entry point for new solutions to receive support, the OTF website maintains a public call to submit concept notes to fund new approaches promoting Internet freedom. Through this open call, OTF has, since its inception, funded more than 250 distinct projects resulting in the creation or evolution of tools that more than two billion people use regularly. These projects were subject to highly competitive process with over 2,000 applications having been received in the same time frame. The program received over 750 requests for support in 2017 totaling more than 100 million dollars. OTF ultimately provided funding to less than 1% of all applications received.

OTF posts the program priority areas and explanation of the problem sets and solution sets sought and takes concept note submissions six times a year – bimonthly.  OTF leverages an Advisory Council consisting of nearly 40 technical and subject matter experts who provide input and guidance on the selection and formulation of OTF-supported projects and strategy.  This enables the program to focus on emerging threats and stay on the cutting edge of this dynamic field of technology – both on the censorship and anti-censorship sides. As part of a multi-pronged USG approach, OTF focuses on forward-looking technology. Given the substantial use of resources and aggressive tactics and techniques constantly deployed by censoring governments, no single solution can achieve a sustainable impact without rigorous development and a deep well of creative and innovative thinkers.

## OTF Objectives

Consistent with section 7078 of the Consolidated Appropriation Act, 2018 (P.L. 115-141), to carry out "research and development of new tools or techniques" and utilize "tools and techniques to securely develop and distribute BBG digital content," the OTF program advances global Internet freedom by addressing emerging censorship tactics and solutions focusing on four major areas: Access, Awareness, Security and Privacy. Within each focus, OTF supports projects with primary activities working to:

- Advance **research into repressive Internet interference** on modern communication networks and the methodologies and technologies to best circumvent it;

- Foster **development of technologies** that circumvent repressive censorship and surveillance or increase communication access and safety; and

- Enable widespread **implementation of solutions** in an effort to free people from repressive Internet interference.

8

**OTF Focus Areas**

OTF makes annual strategic allocations in focus areas that constitute interlocking pieces of a holistic initiative. The focus areas are as follows:

- **Access** to the Internet: The focus of this track includes tools to circumvent website blocks, connection blackouts and widespread censorship;

- **Awareness** of access, privacy, or security threats and protective measures: The focus of this track includes how-to guides, instructional apps, data collection platforms, and other efforts that increase the efficacy of Internet freedom tools;

- **Privacy** enhancement: The focus of this track includes the ability to be free from repressive observation and the option to be anonymous when accessing the Internet; and

- **Security** from danger or threat when accessing the Internet: The focus of this track includes encryption tools.

Because Internet censorship technology and tactics are constantly updating and adapting and other USG IF funders are logistically hampered from working dynamically with changing needs and demands, OTF receives, reviews and contracts projects on a continual rolling basis. As in prior years, OTF is unable to predict how censorship will evolve, how Internet freedom tools will need to develop and adapt and how evolving policies and laws will be propagated in repressive countries.

### OTF 2018 Spending Plan

| 2018 Proposed | | |
|---|---|---|
| Access | $4,450,000 | 46.8% |
| | | |
| Awareness | $1,650,000 | 17.3% |
| | | |
| Privacy and Security | $2,000,000 | 21.1% |
| | | |
| Research | $1,000,000 | 10.5% |
| | | |
| Program Support | $400,000 | 4.2% |
| | | |
| OTF Programmatic Subtotal | $9,500,000 | 100% |
| | | |
| OTF Salaries and Operations | $1,200,000 | |
| | | |
| TOTAL | 10,700,000 | |

Def. App. 129

**OTF Projects**

- **Access:** This initiative will include but is not limited to the following projects: **(Projected FY18 Spend: $4,450,000).**  By nature of BBG's mission and the Internet freedom congressional mandate, access is the largest part of both portfolios. OTF access projects focus on strengthening existing tools and techniques, expanding resiliency in the face of increasingly sophisticated censorship strategies and ensuring the core elements underlying these tools and techniques remain effective.

  o **Boosting Research and Implementations of Emerging Circumvention Techniques:** Supporting projects creating new forms of circumvention in response to ever more sophisticated censorship tactics. **($700,000)**

  o **Evolving Established Circumvention Tools with New Features:** A complement to OIF's provision of Circumvention-as-a-Service, OTF will help ensure that the tools audiences already rely on can keep up with the rapid evolution of censorship techniques. They will do this by supporting the continued development of those mature and established, modern circumvention tools. **($1,300,000)**

  o **Enhancing Censorship Detection, Analysis and Visualization:** Supporting projects, developing detection tools and analyzing censorship events including website blocking, app specific blocking, shutdowns, the underlying techniques being employed and exposing censorship on country specific content platforms that informs the development of evermore sophisticated circumvention methods for access tools. **($800,000)**

  o **Expanding the Robustness of Core Infrastructure:** This program ensures the resiliency of digital security and circumvention projects by providing core infrastructure, or building blocks, of everyday Internet freedom technology. This infrastructure is used by people throughout the world to increase their access, privacy and security online, such as sustaining or improving PGP, SSL, SSH, Tor, OTR, pluggable transports and code libraries.  Without support for these efforts, the efficacy and security of circumvention tools would be far more difficult to ensure. **($400,000)**

  o **Prioritizing Mobile Apps and Browser Extensions that Increase Access and Security:** Mobile apps and browser extensions have become an important vehicle for overcoming Internet interference. These projects focus on fostering circumvention for third parties such as media outlets, thwarting malicious attacks, overcoming Internet shutdowns and increasing communication security. **($750,000)**

  o **Speeding-Up the Transition from Idea to Implementation:** Support engineering services making it easier for good ideas to quickly prototype and/or deploy. The primary OTF services supporting this effort are the secure cloud, geographically dispersed micro clouds within beachhead countries, Virtual Private Servers (VPS) to OTF projects and other related circumvention, security and human rights tools used by journalists and democracy supporters. Due to the threat of take-down and seizure, this approach to shared infrastructure provides more data security protection than traditional cloud services. **($500,000)**

10

- **Awareness:** This initiative will include but is not limited to the following projects: **(Projected FY18 Spend:  $1,650,000)**

  o **Conferences convened by OTF:** OTF partners with the State Department DRL IF Program to support the Internet Freedom Festival, a unique annual global community-led convening of the Internet freedom field. In 2018, the festival attracted technologists, journalists, human rights defenders and policy experts from over 130 countries, and has grown to be the agenda-defining event for the Internet freedom community.  Since its inception, the OTF Summit has been an annual retreat for invited projects, fellows, advisory council members and other experts in the field (including public and private funders) to focus on program review/assessment, landscaping the state of play on Internet freedom, setting priorities for the coming year, strengthening collaboration and growing the impact of the Internet freedom community. This ensures that OTF remains close to the latest developments in the field and that the OTF program is well placed to respond to them. **($400,000)**

  o **Improving Usability, Accessibility, and Localization:** If they are to be effective, tools and information on Internet Freedom need to be accessible by users who live in restrictive information environments around the world. These projects and labs will focus on improving the usability of IF tools and expanding the audiences of relevant research to those directly impacted. This focus area also manages and grows OTF's Localization Lab (nearly 70 Internet freedom projects and over 6,000 volunteer translators in more than 200 languages) **($1,000,000)**

  o **Strengthening and Broadening the Internet Freedom Talent Pipeline:** These efforts provide support and services that maintain and grow the Internet freedom community's technological advantage by growing capacity. Efforts will continue to make it easier for new and better talent to augment the existing core community's capabilities. We will improve knowledge share, collaboration, diversity, and ultimately resiliency and effectiveness within the next generation of Internet freedom leaders. **($250,000)**

- **Privacy and Security:** This initiative will include but not limited to the following projects: **(Projected FY18 Spend:  $2,000,000)**

  o **Advancing the Security and Usage of Privacy-Enhancing Technologies:** Privacy-enhancing technologies serve a critical role both as underlying components of circumvention tools and as a means to protect the idnetwork of the most vulnerable communities when using the Internet. These projects will focus on mitigating known vulnerabilities, increasing the accessibility of anonymity tools and improving third party integrations. **($800,000)**

  o **Analyzing the Security of Widely Used Internet Freedom Technology:** This includes projects and services that reverse engineering widely used communication tools and performing security audits of IF tools and foundational Internet security protocols. It is essential that any vulnerabilities that can be utilized to persecute people for participating in the global online community be identified and rectified *before* they are discovered by totalitarian governments. [a.k.a. Red Team Lab] **($400,000)**

- o **Increasing Digital Security Capacity, Assistance, Needs-finding:** Supporting efforts to strengthen the digital security of at-risk journalists and human rights defenders and their organizations, including through a focus on better understanding usability and localization barriers that limit the adoption of tools designed to counter various digital threats. This occurs through trainings, internal support and help desks. By aggregating these lessons and communicating them to technology developers, we can reduce the need for assistance in order to achieve robust adoptions. This support also provides OTF with a critical on-the-ground perspective of how Internet freedom technology is needed and being used in the field. **($400,000)**

- o **Rapidly Responding to Urgent Digital Emergencies:** Provide timely as-needed support and services for at risk actors such as independent media and human rights defenders facing threats such as website defacements, DDoS attacks, malware found on websites, Internet blocking and hacked email accounts. This support allows OTF to provide real-time intervention when and where Internet freedom is threatened and provides OTF an on-the-ground view of how Internet freedom technology is doing in the field. **($400,000)**

- **Research/Fellowships:** This initiative will include but not limited to the following projects: **(Projected FY18 Spend: $1,000,000)**

- o **Fellowships:** Supporting fellows through the information controls (ICFP) and digital integrity fellowship (DIFP) programs. ICFP supports individuals performing research and development to monitor or mitigate information controls in repressive environments and disseminate findings to relevant actors. DIFP supports individuals to enhance the digital safety of organizations subject to repressive government surveillance and attacks. **($1,000,000)**

- **OTF Program Support:** In addition, funding is set aside for OTF Program Support such as to the following: training, participating in industry conferences as necessary to address emerging threats, proposal system maintenance and other costs for making the programs run effectively, efficiently and collaboratively. **($400,000)**

- **Staff salaries:** (FY2018 **Congressional allocation:$1.2M**)

**OTF Staff**

Open Technology Fund has nine[1] full time staff positions: one Principal Director, one Deputy Director, one Director of Research, one Director of Digital Security Awareness, two program managers, one communications/social media outreach coordinator. OTF is currently recruiting for and Information Security Technologist and an additional program manager.

In addition to their specialty focus areas, each member of the team performs a variety of duties to generate impact in this dynamic environment. These duties include:

- Reviews, ensures compliance of and manages the proposal selection process for each project

---

[1] OTF Staff increased funded by replacing departing highly paid staff with lower paid staff positions.

submission (In 2017, this done was for over 700 submissions.);

- Lead coordination and collaboration continually with USG IF funders, international IF funders, private foundations, corporate foundations and NGOs in the field;
- Share information and coordinate activities with USG networks in related fields including the NSF, Department of Homeland Security Science and Technology Directorate, National Institute of Standards and Technology and U.S. Naval Research Lab;
- Raise millions in private funds to leverage USG funds for OTF approved projects;
- Advise and direct millions of dollars of support for OTF-approved projects from outside sources;
- Work with members of the DG7 international broadcasters to address their respective Internet freedom needs; and
- Actively and interactively manage each project in the OTF portfolio of 80+ active technology projects and fellows and more than 300 projects relying on OTF's labs including Localization Lab, Red Team Lab, Community Lab, Usability Lab, Engineering Lab and Global Cloud Infrastructure.

Def. App. 133

## Appendix A

**Safeguards; Lack of Commercial Analogues; Collaboration
and De-Confliction**

### Lack of Commercial Analogue

Why does the BBG fund the development and provisions of technologies? Why does the private sector not do this themselves? In part, there is simply a market failure here. This work has no commercial analogue for several reasons: 1) The notion of purchasing licenses on commercial products for users in closed countries is both financially prohibitive and logistically impossible – even if we are willing to risk lives by paying for licenses for users in closed societies; 2) The needs of at-risk citizens in closed societies worldwide are not a value proposition for profit-based corporations; 3) Corporations build products based on the security needs of citizens in more affluent or democratic countries, not in restricted or closed countries; 4) Corporations may and have foregone security and privacy features in order to conform to their (superficial) design choices. Fortunately, the US Government is not alone in recognizing this. Since Congress expressly stated that public Internet freedom funds be leveraged with private funds to the extent possible, more than $50 million has been matched to OTF supported efforts by private donors to date.

### Collaboration and De-conflicting

OIF and OTF continue to expand communication, collaboration, and coordination efforts amongst themselves and with a range of other funders. Both maintain recurring and open discussions to identify opportunities for complementary work and avoid duplicating efforts. Further, the OIF office and OTF staff work closely with the U.S. Department of State's Bureaus for Democracy, Human Rights, and Labor (State/DRL) and Near Eastern Affairs (State/NEA), and USAID's Bureau for Democracy, Conflict and Humanitarian Assistance, Center of Excellence on Democracy, Human Rights, and Governance (USAID/DCHA/DRG). Each of these publicly funded Internet freedom efforts participate in regular meetings and is active on online discussion groups to expand beyond the regular in person meetings. Risk of funding duplication is low because each funder pursues a complementary approach and coordinates closely at both the program review level and throughout the project implementation period.  In cases where potential overlap could occur, these funders have and will continue to avoid duplication by de-conflicting budgets at line item level detail, if necessary. Moreover, staff at OIF, OTF and the State Department Internet Freedom program actively participate in each other's project review panels. As such, the impact and success of each program must be considered within the overall context of complementary strategies and portfolios reflecting the shared legislative goals and objectives. OTF staff also actively collaborates with relevant programs within the Federal Government increasing the ability to leverage existing funding streams. These programs include the Secure and Trustworthy Cyberspace at the National Science Foundation, the Science & Technology Cyber Security Division at the Department of Homeland Security, the U.S. Naval Research Laboratory and the Computer Security Division at the National Institute of Standards and Technology.

14

**Illicit Purpose**

As with any technology, including a laptop computer or a cellular telephone, there is no absolute way to ensure that the products developed through our Internet freedom programs are not used for illicit ends. However, similar – and significantly more powerful – technologies are already widely available to individuals who seek to engage in surreptitious illegal activities. One recent study from Harvard identified "865 hardware or software products incorporating encryption from 55 different countries. This includes 546 encryption products from outside the US, representing two-thirds of the total."[2]

Furthermore, the only way to meet the statutory requirement regarding such tools is to make them effective for end users; and the only way to make them effective is to best ensure that users are safe from the authorities of those authoritarian governments who would jail them or worse if discovered.   By providing funds for this purpose, Congress has recognized that, as the experience to date suggests strongly suggests, the benefits of Internet freedom tools justify the development and distribution of these technologies to citizens wishing access to censored information and to journalists, and human rights and political activists seeking a means to avoid repressive intrusions into their activities.

In addition, with OTF's support, OIF convened a panel of experts to discuss and provide recommendations on appropriate measures that can be taken to mitigate the potential risk of using BBG-funded tools for illicit purposes. OIF intends to implement the recommendations from this panel in FY 2018.

---

[2] https://cyber.law.harvard.edu/publications/2016/encryption_survey

**Supplement on FY2018 OTF Fellowships and Labs**

## OTF Fellowships

**Digital Integrity Fellowship**
Total Allocation: Up to $500,000
Total Fellows: Variable by year
Cost Breakdown: Digital security subject matter experts conducting at-risk organization implementation support at $5,000/month for 12 months
Public Call: https://www.opentechfund.org/fellowships/difp
Also announced through OTF website's news section and OTF's social media. This fellowship is currently in its review process for 2018 application round.

**Information Controls Fellowship**
Total Allocation: Up to $500,000
Total Fellows: Variable by year
Cost Breakdown: Fellows at $4,200 for 3, 6, 9 or 12 month research projects
Public Call: https://www.opentechfund.org/fellowships/icfp
Also announced through OTF website's news sections, OTF's social media accounts. This fellowship is currently in its review process for 2018 application round.

## OTF Labs

OTF Labs differ from General Internet Freedom Fund Projects. While Projects are discrete efforts to address specific access, security and privacy issues that put users in closed societies at risk, OTF Labs build capacity and address challenges that face Internet freedom developers writ large. By addressing these common issues holistically, Labs generate solutions in a cost-effective and timely manner. For example, the Engineering Lab provides a free and secure cloud alternative to Internet freedom tools, eliminating the need for commercial cloud providers who may be subject to subpoena powers of repressive regimes. On the other hand, OTF's Localization Lab has completed crowd-sourced and quality-controlled translations of 70 tools into over 200 languages and dialects.

Detailed below is a comprehensive list of OTF Labs that provide essential, in-kind support to the all OTF Projects.

**Red Team Lab**
OTF contracts with a range of professional information security auditors who assess the privacy and security limitations of each project, with the goal of suggesting remedial strategies or specific changes. These audits mitigate the risk inherent in funding cutting-edge technologies, strengthen the technical capacity of the project, and benefit the broader human rights and Internet freedom technology community.

**Engineering Lab**

The Engineering Lab strengthen the core infrastructure and engineering stability of OTF projects. It offers OTF's Secure Cloud Infrastructure, Amazon Cloud credits, Google Apps credits, and other resources new engineering projects need.

**Community Lab**

The Community Lab generates research and insights to inform investments; designs and hosts targeted research and development convenings intended to strengthen subject matter relationships; designs and facilitates the annual OTF Summit; provides OTF projects and community stakeholders with on-demand project consulting; promotes inclusiveness and diversity in the Internet freedom Community; and strengthens community ties and increase collaboration between OTF and non-OTF communities.

**Localization Lab**

OTF's localization work makes Internet freedom tools relevant and usable to local conditions and local users. Prohibitive costs and limited availability of professional translators can prevent global deployment of Internet freedom tools. To address these challenges, OTF has partnered with SecondMuse and Transifex to create an Internet freedom localization hub built on Transifex' online crowd-sourced translation platform. We work with a number of partners, including Transifex and SecondMuse. Currently this lab currently has more than 6,400 volunteer translators working on over 70 Internet freedom tools in over 200 languages and dialects.



330 Independence Avenue SW | Washington, DC 20237 | usagm.gov

June 5, 2019

The Honorable Eliot Engel
Chairman
Committee on Foreign Affairs
U.S. House of Representatives

Dear Mr. Chairman:

The U.S. Agency for Global Media (USAGM) hereby submits this report, pursuant to Section 7065(c) of the Consolidated Appropriations Act, 2019 (Div. F, P.L. 116-6). It is the agency's plan for programs to promote Internet freedom globally, including a description of safeguards to help ensure that such programs are not used for illicit purposes.

Should you have any questions please contact Adam Tracy, Congressional Liaison, at 202-203-4669.

Sincerely,

John F. Lansing
Chief Executive Officer and Director

Enclosure

Voice of America | Radio Free Europe/Radio Liberty | Office of Cuba Broadcasting | Radio Free Asia | Middle East Broadcasting Networks

# USAGM
## Internet Freedom (IF) Spend Plan
## FY 2019

**INTRODUCTION**

| Managing Network | FY2017 IF Spend Plan | FY2018 IF Spend Plan | FY2019 IF Spend Plan |
|---|---|---|---|
| USAGM/OIF | 6,565,000 | 4,300,000 | 5,298,770 |
| RFA/OTF – Programmatic | 7,235,000 | 9,500,000 | 8,501,230 |
| RFA/OTF – Operations - Salaries | 1,200,000 | 1,200,000 | 1,200,000 |
| **Total** | **15,000,000** | **15,000,000** | **15,000,000**[*] |

*Does not include $2.5m in funds reprogrammed from prior year balances.  See description of OIF Spend Plan below.

Pursuant to the Consolidated Appropriations Act, 2019, P.L. 116-6 (FY 2019 Appropriations Act) the U.S. Agency for Global Media (USAGM) was provided a baseline of $13,800,000 in no-year funds specifically for Internet Freedom (IF) programs and $1,200,000 within funds provided for Radio Free Asia for personnel costs associated with IF activities.  This spend plan details USAGM's Office of Internet Freedom (OIF) priorities and operations for these FY 2019 funds and other prior year IF balances.  The plan is submitted in compliance with section 7065(c) of the Consolidated Appropriations Act, 2019, P.L. 116-6, and as may be applicable, sections 7015 and 7070(a) of that Act.

USAGM's IF program supports, per appropriations guidance, global IF for the expansion of unrestricted access to information on the Internet. This work is performed through OIF and the Open Technology Fund (OTF) program housed within Radio Free Asia (RFA), one of USAGM's private, non-profit grantee networks. Together, these programs have supported the tools and techniques to generate the content necessary for U.S. international media and the dissemination of its content in information-restrictive markets.

USAGM's target audiences across the world increasingly access media content via digital and social media platforms. In 2018, USAGM's digital audience grew by 131% to 104 million unduplicated users. Authoritarian governments utilize increasingly sophisticated methods to

monitor, surveil and track citizens online. This makes it difficult and dangerous for USAGM journalists, sources, and audiences to participate in the global free flow of information online. Technologies that provide access to blocked content and safe and secure methods to share content are critically important to getting information to target audiences that would otherwise be censored.

USAGM's IF program enables not only unfettered online access to USAGM products or content, but also the full spectrum of independent news sources on the Internet. This is increasingly important as USAGM continues to harness digital platforms and undertakes new methods of engaging with audiences. Accordingly, projects focused on safe and secure communications are critical components for ensuring that USAGM content creation process does not expose our stringers, sources, and interviewees to threats, and that USAGM news and information are delivered to these audiences without further endangering them. Addressing the online threats faced by USAGM's audiences and protecting journalists, sources, and information seekers against punishment for online activity is essential to fostering free speech and a free press – and necessitates deploying tools that both circumvent censorship and protect user access to information.

**Preparing for the Future of USAGM Internet Freedom Activities:**

This Spend Plan invests in USAGM entities to build internal IF expertise, allowing for better, timelier and customized support of USAGM entities and increased overall effectiveness of USAGM's IF program.  In 2019, as in previous years, USAGM's IF program will be implemented jointly by OIF and OTF. OIF's focus on entity support will be on engaging with and building the IF capacity of USAGM networks and continuing to support Circumvention-as-a-Service.

**SPEND PLAN OVERVIEW**

# OIF Program

The primary objective of OIF is to direct, oversee, and ensure compliance with the USAGM's IF program. OIF will ensure appropriate anti-censorship technologies are funded in compliance with USAGM priorities and that IF services are utilized by the networks. This also includes education and training to citizens and journalists across USAGM's broadcasting regions, allowing them to safely create, access and share digital news and other information without fear of censorship or surveillance.

OIF will focus on its oversight role as well as support for USAGM networks, journalists, and sources, including deployments, implementations and digital safety and circumvention tools training and awareness. OIF will work closely with OTF to create an integrated communications flow and feedback loop to enable a cohesive dynamic to maximize the impact of USAGM IF activities. For example, if USAGM networks/services raise issues they are experiencing as part of their work, OIF will notify OTF to assist with exploration of solutions via OTF's various Labs. This will increase OTF's on-the-ground awareness of new developments and threats as well as form a timely feedback loop on the needs of USAGM journalists, sources and audiences in the field.

In 2019, OIF will invest in network capacity building, establishing needs-finding baselines, enabling implementation of IF tools and techniques in each of the USAGM networks. Perhaps most importantly, OIF will launch a regular Reporters Internet Freedom Dialogues ("RIFD") where USAGM journalists and IF practitioners can work together on solutions to online censorship, surveillance and interference in order to support more integrated processes in the future. Looking forward, OIF will continue entity support and cross-entity efforts of tools such as Psiphon to enable uninterrupted fulfillment of the USAGM mission while focusing on its oversight role. (For additional detail on the programmatic need for OIF, see Appendix A.)

**OIF Staff**

For FY 2019, OIF employs five (5) full-time people to provide management and oversight of the OIF objectives below.

**OIF Objectives**

OIF focuses on the following objectives:

- **Ingest –** The Director of the OIF will continue to participate in the OTF proposal review process as a member of the OTF Advisory Council and have full access to the proposal vetting lifecycle.

- **Direct Support –** OIF will identify and hire two contractors with IF and journalism expertise who can provide support to the broadcast entities as needed with the continual

evolution of online threats and censorship technology in USAGM target markets. Particular beneficiaries are those that are performing investigative journalism. In addition, OIF will engage digital security auditors with regional expertise for a landscaping / baseline study of all entities and a SafeTag expert to consolidate all the reports into a SafeTag security framework for the benefit of all USAGM networks. SafeTag is professional audit framework that has become defacto in the IF community.

- **Collaboration and Knowledge Sharing –** OIF will convene representatives from all the network entities for the inaugural USAGM Reporters' Internet Freedom Dialog (RIFD) with an estimated 30 attendees to be designed and planned with a qualified IF facilitator experienced in identifying challenges and matching solutions with users. Should this be successful OIF will make this an annual event. Each RIFD will conclude with a final report of challenges, action plans, and priorities for entity support. The RIFD mechanism will provide valuable opportunities for discussion, knowledge sharing, expert consultations and tool demonstrations with an eye to establishing this as an annual working meeting for USAGM.  OIF will coordinate efforts amongst these and other expert training teams.

- **De-conflicting Efforts across U.S. Government and Private Sector** – OIF will continue to raise awareness of USAGM IF activities writ large and coordinate with other efforts to ensure funds are allocated appropriately and without duplication. OIF will continue to look for potential partnerships in circumvention tools and training and advise the CEO, the Board, and the leadership of all USAGM's five networks on IF initiatives and technologies.  OIF will continue to inform Congress and other stakeholders of USAGM's IF activities as appropriate and respond to Congressional inquiries.

- **Establishing an Internet Freedom Committee (IFC)** - In order to ensure adequate due diligence and technical review for the one-time allocation of funds for entity-initiated IF capacity building efforts, an IFC will be convened to vet projects important to their individual missions as well as discuss and share knowledge with each other will work together in exploring IF tools and technologies most needed by the respective entities. The IFC will be composed of one representative from each broadcast entity as well as a representative from the USAGM OIF and subject matter experts from the OTF and the U.S. Department of State's Bureaus for Democracy, Human Rights, and Labor (State/DRL) Internet Freedom program to assist with context, provide technical analysis expertise and assistance, and  de-conflict any potential overlaps in the funding of legislatively authorized IF activities.

- **Feedback –** OIF will continue to collect feedback from USAGM networks working with IF technologies and provide that feedback to OTF and their projects for tool improvements as appropriate.  OIF will review and evaluate all USAGM-funded IF projects and budget proposals and provide recommendations for the allocation of future USAGM IF appropriations.

The following is the anticipated breakdown for the FY19 OIF allocation:

**OIF FY 2019 Spend Plan**

| 2019 Proposed – Internet Freedom Funds | | |
|---|---|---|
| Circumvention Technology Services and Awareness | 4,788,770 | 90.38% |
| OIF Contractors with IF / Journalism expertise | 140,000 | 2.64% |
| Landscaping and Baseline study of News Entities | 100,000 | 1.89% |
| Reporters' Internet Freedom Dialog (RIFD) | 150,000 | 2.83% |
| Censorship Monitoring Dashboard | 100,000 | 1.89% |
| OIF Program Support (non-personnel) | 20,000 | 0.38% |
| SUBTOTAL – FY19 Funds | 5,298,770 | 100% |

| Reprogramming of Prior Year (FY18) OIF Funds Entity Specific IF Projects | | |
|---|---|---|
| Voice of America | 500,000 | 20% |
| Office of Cuba Broadcasting | 500,000 | 20% |
| Radio Free Europe/ Radio Liberty | 500,000 | 20% |
| Radio Free Asia | 500,000 | 20% |
| Middle East Broadcasting Network | 500,000 | 20% |
| SUBTOTAL – FY18 Funds | 2,500,000 | 100% |
| TOTAL | 7,798,770 | |

**OIF PROJECTS (FY 2019 ALLOCATION)**

Following is the anticipated breakdown for the FY19 OTF expenditures:

- **Circumvention Technology Services & Awareness:** This initiative will seek the best, most viable technology services to provide online access in censored environments and may include, but not limited to the following project: **(Projected FY19 Spend: $4,788,770)**

  o **Circumvention-as-a-Service:** This project will continue to provide landing pages using IF technology to USAGM networks allowing the user to access the wider Internet. This year, OIF has identified two new circumvention projects for funding.

- **OIF Digital Security & Journalism expert contractors:** This initiative will seek to hire the best individuals who will bridge the gap between the best practices in digital security and the needs of journalists: **(Projected FY19 Spend: $140,000)**

  o **Support for Journalists:** This project will provide important entity digital security support, on an as-needed basis, to journalists who are performing investigative work and journalists working in regions hostile to their efforts.

- **Digital Security Landscaping / Baseline Study:** This study will landscape the digital security practices of USAGM entities and provide a baseline report including vulnerability gaps for journalists, sources and audiences online. **(Projected FY19 Spend: $100,000)**

- **Reporters' Internet Freedom Dialog:** OIF will bring together digital journalists from across USAGM broadcast entities to share new challenges, successes, new technologies and best practices in digital journalism in an IF context. **(Projected FY19 Spend: $150,000)**

- **Censorship Monitoring Dashboard: USAGM will build a censorship monitoring dashboard** in cooperation with fellow international publicly-supported media organizations whose missions also include the promotion of media freedom and the safety of journalists. These partners include Deutsche Welle and the British Broadcasting Corporation (BBC). This project will incubate a real-time censorship dashboard to track active censorship of USAGM and partnered websites. **(Projected FY19 Spend: $100,000)**

- **As additional support to the news entities in FY19, OIF will invest in a one-time allocation of $500,000 directly to each broadcast entity to use on IF Projects that are a priority to their respective needs by reprogramming unobligated prior year (FY18) Internet Freedom funds.** The Internet Freedom Committee (IFC) will review proposals, support the selections and make a determination that the work falls within the legislative remit. **(Projected FY19 Spend: $2,500,000)**

**In addition, a small amount of funds will be set aside for OIF program support, such as the following but not limited to** staff training, travel including travel support for entity employees participating in IF events, limited industry conferences and other costs for making the programs run effectively and efficiently. **(Projected FY19 Spend: $20,000)**

# OTF Program

OTF's primary objective is to promote IF worldwide by supporting research into key threats, developing and incubating emerging technologies that address these threats, and deploying tools and techniques that circumvent repressive Internet censorship and surveillance globally. Given the substantial resources and aggressive tactics and techniques constantly deployed by censoring governments and actors, no single solution can achieve a sustainable impact without rigorous development and a deep well of creative and innovative thinkers. OTF's funding mechanisms are designed to make IF funding more accessible to such thinkers through an open and competitive application process, which simultaneously attracts new solutions from the frontlines of global censorship and surveillance, and achieves substantial cost savings.

In order to ensure a high degree of due diligence, OTF puts applications through multiple rounds of review and leverages an Advisory Council consisting of nearly 40 technical and subject matter experts who provide input and guidance on the selection of OTF-supported projects and funding strategy.  As part of a multi-pronged U.S. Government (USG) approach, OTF's program is by design highly complementary and well-coordinated with OIF and State/DRL Internet Freedom activities by focusing on forward-looking technologies. OTF helps to develop and incubate technologies, establish usability, ensure quality assurance. Additionally, OTF manages effective deployment and ease of field implementation, identification of and the solutions for vulnerabilities, and scale tools for USAGM entity use with appropriate funding partners that may eventually take on maintenance and large-scale deployments pursuant to their mission mandates.[1]

## OTF Objectives

Consistent with section 7065 of the Consolidated Appropriations Act, 2019 (P.L. 116-6), to carry out research and development of new tools or techniques and utilize tools and techniques to securely develop and distribute USAGM digital content, the OTF program advances global IF by addressing emerging censorship tactics and solutions focusing on four major areas: Access, Awareness, Security, and Privacy. OTF makes annual strategic allocations in these focus areas that constitute interlocking pieces of a holistic initiative.

- **Access** to the Internet: The focus of this track includes tools to circumvent website blocks, connection blackouts, and widespread censorship.  Given USAGM's mission and the IF congressional mandate, overcoming repressive censorship and facilitating unrestricted access to the Internet is the largest component of investments.  OTF Access projects focus on strengthening existing circumvention tools and techniques, expanding resiliency in the face of increasingly sophisticated censorship strategies, and ensuring the core elements underlying these tools and techniques remain effective.

- **Awareness** of access, privacy, or security threats and protective measures: The focus of

---

[1] An excellent example of this project lifecycle approach is the Lantern circumvention tool.  In 2015 OTF funded the original development of Lantern from proof-of-concept through implementation. After the implementation phase, State/DRL supported scaling and maturation of the tool.  Lantern is now one of the most used circumvention tools used in China with up to 1 million users.

this track includes how-to guides, instructional apps, data collection platforms, and other efforts that increase the efficacy of IF tools – especially amongst USAGM networks. For news seekers to find content, journalists to develop digital best practices, and human rights defenders to conduct their work safely, awareness of the IF landscape in a given context as well as the state of technologies designed to provide access and safety online, are vital.

- **Privacy** enhancement: The focus of this track includes technologies and resources that protect users from repressive observation and the option to be anonymous when accessing the Internet. Privacy-enhancing technologies serve a critical role both as underlying components of circumvention tools and as a means to protect networks of journalists, human rights defenders and vulnerable communities online. Development of strong privacy-enhancing technologies is vital to defeating repressive surveillance and protecting the practice of USAGM journalism on the frontlines.

- **Security** from danger or threat when accessing the Internet: The focus of this track includes secure communication tools, such as encryption technologies. In many of the world's most repressive online environments where the threat of reprisal for online activities is high, access without security is meaningless. This track also seeks to identify and remediate technology and usability vulnerabilities to make the Internet safer by default and remove attack vectors for governments attempting to surveil or censor USAGM journalists, independent journalists, sources and activists.

Within each focus, OTF supports projects with primary activities working to:

- Advance **research into repressive Internet interference** on modern communication networks and the methodologies and technologies to best circumvent it;

- Foster **development of technologies** that circumvent repressive censorship and surveillance or increase communication access and safety; and

- Enable widespread **implementation of solutions** in an effort to free people from repressive Internet interference.

Because Internet censorship technology and tactics are constantly evolving and adapting, OTF receives, reviews, and contracts projects on a rolling basis. As in prior years, OTF is unable to predict how censorship will evolve, how IF tools will need to develop and adapt, and how evolving policies and laws will be propagated in repressive countries. Thus, OTF requests funding for areas of work rather than specific projects.

| 2019 Proposed | | |
|---|---|---|
| Internet Freedom Fund: Access | $2,650,000 | 31% |
| | | |
| Internet Freedom Fund: Awareness | $900,000 | 11% |
| | | |
| Internet Freedom Fund: Privacy and Security | $1,000,000 | 12% |
| | | |
| Core Infrastructure Fund | $600,000 | 7% |
| | | |
| Rapid Response Fund | $382,000 | 4% |
| | | |
| Prototype Fund | $70,000 | 1% |
| | | |
| OTF Labs | $1,550,000 | 18% |
| | | |
| OTF Fellowships | $1,000,000 | 12% |
| | | |
| OTF Summit | $180,000 | 2% |
| | | |
| OTF Travel and Program Support | $169,230 | 2% |
| | | |
| OTF Programmatic Subtotal | $8,501,230 | 100% |
| *OTF Salaries and Operations* | *$1,200,000* | |
| | | |
| TOTAL | $9,701,230 | |

## OTF FUNDS (FY 2019 ALLOCATION)

OTF provides funding through a variety of mechanisms to ensure that we can support innovative and critical tools at every stage of the development cycle from proof-of-concepts, to on-the-ground rapid deployments, to multi-year efforts. This approach ensures that users have the tools they need right now to safely access the uncensored Internet, while investing in innovative solutions to stay one step ahead of next generation censorship techniques.

- **Internet Freedom Fund (IFF)** is the primary mechanism through which OTF supports global IF. Through an open and transparent process OTF solicits project proposals to the IFF every two months.  IFF projects are primarily focused on technology development but can also include applied research and technology-centric digital security projects. IFF funds are structured around OTF's four funding themes - Access, Awareness, Privacy, and Security. **(Projected FY19 Spend: $4,550,000)**
    - **Access -** Comprising the greatest share of Internet Freedom Fund expenditures,

examples of IFF's access activities include: Boosting Research and Implementations of Emerging Circumvention Techniques; Evolving Established Circumvention Tools with New Features; Enhancing Censorship Detection, Analysis and Visualization; Prioritizing Mobile Apps and Browser Extensions that Increase Access and Security. **(Projected FY19 Spend: $2,650,000)**

○ **Awareness -** Supporting greater IF technology adoption and more collaborative community solutions to censorship and surveillance challenges, examples of for IFF's awareness activities include IF convenings such as the Internet Freedom Festival and Strengthening and Broadening the IF Talent Pipeline. **(Projected FY19 Spend: $900,000)**

○ **Privacy & Security -** Ensuring the journalists and activists on the frontline stay safe and effective, examples of IFF's privacy and security activities include: Advancing the Security and Usage of Privacy-Enhancing Technologies, Analyzing the Security of Widely Used Internet Freedom Technology and Increasing Digital Security Capacity, Assistance and Needs-finding **(Projected FY19 Spend: $1,000,000)**

- **Core Infrastructure Fund** helps ensure the resiliency of digital security and circumvention projects by providing core infrastructure, or building blocks, of everyday IF technology. This infrastructure is used by people throughout the world to increase their access, privacy and security online, such as sustaining or improving PGP, SSL, SSH, Tor, OTR, pluggable transports and code libraries. Without support for these efforts, the efficacy and security of circumvention tools would be far more difficult to ensure. **(Projected FY19 Spend: $600,000)**

- **Rapid Response Fund** provides timely as-needed support and services for at-risk factors such as independent media and human rights defenders facing threats such as website defacements, DDoS attacks, malware found on websites, Internet blocking and hacked email accounts. This support allows OTF to provide real-time intervention when and where IF is threatened and provides OTF an on-the-ground view of how IF technology is doing in the field. This year OTF will engage USAGM services who are targets of Internet censorship in times of increased danger, such as around contested elections. **(Projected FY19 Spend: $382,000)**

- **Community Prototype Fund** supports the rapid development of innovative, viable, and open IF technology prototypes that serve the immediate needs of the human rights and IF communities (such as problems encountered by USAGM journalists). It supports technologists and activists to bring to life ideas that help advance inclusive and safe access to global communications networks and mitigate digital threats to IF, specifically in repressive and transitional environments. **(Projected FY19 Spend: $70,000)**

**OTF LABS**

Despite the diverse nature of challenges being tackled by those in the IF community, a common set of needs exists when it comes to tools and technologies. These needs include secure hosting, code audits, localization into multiple languages, and help with usability design or event support. Accordingly, in addition to directly funding projects through regular open calls, OTF offers a range of services designed to address these core needs through cost-effective service interventions. These services fall under five labs: the Engineering Lab, the Community Lab, the Usability Lab, the Learning Lab and the Localization Lab. By coordinating the provision of these services through the four labs, OTF is able to achieve large economies of scale and bring down the overall cost for the IF community. These services are generally available to both OTF-funded projects, as well as other important IF efforts, through applications associated with each lab. **(Projected FY19 Spend: $1,550,000)**

## OTF FELLOWSHIPS

OTF fellowships support individuals through the information controls (ICFP) and digital integrity (DIFP) fellowship programs. ICFP supports IF experts performing applied research and development to monitor or mitigate information controls in repressive environments and disseminate findings to relevant actors. DIFP supports Frontline digital security trainers to enhance the digital safety of organizations subject to repressive government surveillance and attacks. **(Projected FY19 Spend: $1,000,000)**

## PROGRAM SUPPORT

**OTF Summit:** Since its inception, the OTF Summit has been an annual retreat for invited OTF projects, fellows, Advisory Council members, and other experts in the field (including public and private funders) to focus on program review/assessment, landscaping the state of play on IF, setting priorities for the coming year, strengthening collaboration, and growing the impact of the IF community. This ensures that OTF remains close to the latest developments in the field and that the OTF program is well-placed to respond to them. **(Projected FY19 Spend: $180,000)**

**OTF Program Support:** In addition, funding is set aside for OTF Program Support, such as but not limited to the following: training, travel for project monitoring, participating in industry conferences as necessary to address emerging threats, infrastructure, proposal system maintenance and other costs for making the programs run effectively, efficiently and collaboratively. **(Projected FY19 Spend: $169,230)**

## OTF STAFF

OTF employs nine full-time staff positions: one Principal Director, one Deputy Director, one Director of Research, one Director of Digital Security, three program managers, one program specialist, and one communications/social media outreach coordinator.

In addition to their specialty focus areas, each member of the team performs a variety of duties to generate impact in this dynamic environment. These duties include:
- Reviews, ensures compliance of, and manages the proposal selection process for each project

submission (in 2018, this was done for over 1,000 submissions);

- Leads coordination and collaboration continually with USG IF funders, international IF funders, private foundations, corporate foundations and NGOs in the field;
- Shares information and coordinates activities with USG networks in related fields including the National Science Foundation (NSF), Department of Homeland Security's Science and Technology Directorate, National Institute of Standards and Technology, and U.S. Naval Research Lab;
- Identify and work with private sector partners to jointly fund OTF projects, maximizing the returns on taxpayer dollars;
- Works with members of the DG7 international broadcasters to address their respective IF needs; and
- Actively and interactively manages each project in the OTF portfolio of 80+ active technology projects and fellows and more than 300 projects relying on OTF's labs including Localization Lab, Red Team Lab, Community Lab, Usability Lab, Engineering Lab and Global Cloud Infrastructure.

**Staff salaries:** (FY 2019 **Congressional allocation included in the RFA funding: $1.2M**)

**CONCLUSION**

Building on years of success and impact in promoting and enabling the unrestricted use of the Internet in places where IF is under attack, USAGM's IF program is poised to greatly expand effectiveness through a transition to more streamlined, mature and dynamic operations. Working closely together, USAGM/OIF and RFA/OTF are developing a strategic vision to make the IF program more integrated and resilient against increasingly sophisticated and widespread online censorship, surveillance and blockages as we move into FY 2020 and beyond. This vision will make USAGM-funded content as well as global media and social networks more available to those in oppressive environments.

**APPENDIX A: Why the Need for OIF?**

**Safeguards; Lack of Commercial Analogues; Collaboration and De-Confliction**

**Lack of Commercial Analogue**

Why does USAGM fund the development and provisions of technologies? Why does the private sector not do this themselves? In part, there is simply a market failure here. This work has no commercial analogue for several reasons: 1) The notion of purchasing licenses on commercial products for users in closed countries is both financially prohibitive and logistically impossible – even if we are willing to risk lives by paying for licenses for users in closed societies; 2) The needs of at-risk citizens in closed societies worldwide are not a value proposition for profit-based corporations; 3) Corporations build products based on the security needs of citizens in more affluent or democratic countries, not in restricted or closed countries; 4) Corporations may and have foregone security and privacy features in order to conform to their (superficial) design choices. Fortunately, the U.S. Government is not alone in recognizing this. Since Congress expressly stated that public IF funds be leveraged with private funds to the extent possible, more than $50 million has been matched to OTF-supported efforts by private donors to date.

**Collaboration and De-conflicting**

OIF and OTF continue to expand communication, collaboration, and coordination efforts amongst themselves and with a range of other IF funders. Both maintain recurring and open discussions to identify opportunities for complementary work, avoid duplicating efforts and, as outlined above, this spend plan represents a significant step toward further integration and efficiencies. Further, the OIF office and OTF staff work closely with the U.S. Department of State's Bureaus for Democracy, Human Rights, and Labor (State/DRL) and Near Eastern Affairs (State/NEA), and USAID's Bureau for Democracy, Conflict and Humanitarian Assistance, Center of Excellence on Democracy, Human Rights, and Governance (USAID/DCHA/DRG). Each of these funders participate in regular meetings and are active on online discussion groups to expand beyond the regular in-person meetings. Risk of funding duplication is low because each funder pursues a complementary approach and coordinates closely at both the program review level and throughout the project implementation period.  In cases where potential overlap could occur, these funders have avoided and will continue to avoid duplication by de-conflicting budgets at line item level detail, if necessary. Moreover, staff at OIF and OTF actively participate in State Department IF program review panels.  As such, the impact and success of each program must be considered within the overall context of complementary strategies and portfolios reflecting the shared legislative goals and objectives. OTF staff also actively collaborate with relevant programs within the Federal Government increasing the ability to leverage existing funding streams. These programs include the Secure and Trustworthy Cyberspace at the National Science Foundation, the Science & Technology Cyber Security Division at the Department of Homeland Security, the U.S. Naval Research Laboratory, and the Computer Security Division at the National Institute of Standards and Technology.

**Assessing Illicit Purpose**

USAGM engages in IF activities with the goal of expanding the ability of individuals to exercise their fundamental freedoms – including rights to freedom of expression, association, and peaceful assembly – for peaceful and democratic ends.  IF programming, by its nature, presents new challenges and opportunities for mitigating restrictions on the exercise of fundamental freedoms online.  As with any technology, including a laptop computer or a cellular telephone, there is no absolute way to ensure that the products developed through our IF programs are not used for illicit ends, but USAGM carefully considers risk factors in its programming efforts, and performs due diligence and risk assessments on grantees prior to the issuance of awards.  The design and deployment of USAGM-supported IF technologies are geared towards repressive environments; they are designed specifically to meet the needs of human rights defenders in societies where speech is severely restricted, and distribution methods and networks for IF technologies focus on helping individuals in such environments.



# Grantee Proposal

July 2019

## TABLE OF CONTENTS

I.     Overview

II.    OTF Grantee

III.   Building on Success – OTF's Comparative Advantage

IV.    Office of Internet Freedom

V.     Timeline

VI.    Organizational Structure

VII.   Budget Scenarios

2

# OVERVIEW

## Background

The U.S. government believes that people everywhere in the world should have access to free, objective information as enshrined in Article 19 of the Universal Declaration of Human Rights. As part of the U.S. government's efforts to promote freedom of expression and access to information, Congress has directed USAGM to provide funding to "support Internet freedom and circumvention programs". These funds must be implemented consistent with USAGM's overall mission to "inform, engage, and connect people around the world in support of freedom and democracy," and USAGM Internet Freedom Framework, which "seeks to overcome attempts to interfere with, monitor, censor, or prevent overseas persons from using the Internet as an open platform on which to communicate, innovate, learn, organize, and express themselves."

In accordance with Congressional appropriations, USAGM has been supporting Internet freedom projects since 2012 through the Office of Internet Freedom (formerly the Internet Anti-Censorship Division) and the Open Technology Fund. Over the past seven years, USAGM has invested over $100 million in projects to promote Internet freedom in the world's most restricted environments. These efforts have been highly successful and have enabled billions of Internet users worldwide to safely access the Internet and communicate online, free from censorship or repressive surveillance.

However, in response to these efforts, repressive regimes have begun doubling down on their commitment to curtailing what their citizens see, read, share, and watch online. Today, over two thirds of the world's population live in a country where the Internet access is restricted, and repressive regimes are investing more than ever before in censorship and surveillance technology. This daily suppression of freedom of expression limits all citizens' ability to take full advantage of the powerful communication platform that the Internet has become, thereby encouraging self-censorship, stifling their fundamental human rights, and preventing the development of open societies.

In order to keep with these escalating threats, USAGM must continually assess and refine its approach to protecting Internet freedom to ensure that its programs remain effective and responsive to its entity's and audience members' evolving needs.

## Lessons Learned

USAGM investments in Internet freedom technologies over the last seven years have fostered many innovative solutions and have continued to have an outsized impact given increasing threats. However, ongoing structural challenges have prevented the creation of a comprehensive Internet freedom strategy, technology development pipeline, and feedback loop. We have conducted an assessment of current USG Internet freedom funding strategies and implementation approaches and have identified several critical issues that have undermined coordination, efficiency, and impact.

3

- **Parallel implementation efforts reduce effectiveness**: Historically, USAGM IF efforts have been bifurcated between OTF and a federal program administered by OIF or IAC. The division of labor between OIF and OTF is a bureaucratic artifact rather than the result of strategic vision purposefully designed for maximizing the impact of the legislative mission mandate.  As a result the federal program took on the role of supporting mature technologies for the benefit of the networks. This artificial division of labor has caused the USAGM IF program to fall short of its potential.  A single dedicated home for IF applied research, consistent standards for due diligence, and streamlined timely pipelines will allow for effective coordination, implementation and response to internet Freedom threats.

- **Operating at the speed of government, not innovation**: Current USG Internet freedom funders are designed to support traditional media and development programs, not technology. These models are inconsistent with one another and create inefficiencies that prevent us from operating at the speed of technical innovation. As a result, we miss opportunities to leverage new ideas and are not able to keep pace with our adversaries. These structural limitations also create unnecessary barriers to entry for promising developers/applicants.

- **Limited feedback loop**: USAGM and their partner services have a wealth of information about the needs of their journalists and audiences. However, we have not developed a sufficient feedback loop with which to collect and leverage this information to inform our IF efforts. As a result, opportunities are missed to learn from and address the IF needs of our partners and key audiences.

- **Lack of Coordination**: Coordination between USAGM's Internet freedom programs and news agencies have been limited to date. This undermines our ability to share information, promote our tools, and protect users. For example, when the Iranian government released several spoofed circumvention tools in 2018, OTF and USAGM's Persian services should have worked together in real time to identify the spoofed tools and inform their audience members to ensure the tools they were access were genuine and secure. Instead, communication gaps limited coordination and information-sharing, putting users at risk.

- **Insufficient back-end support**: Current USAGM Internet freedom funders are designed to support traditional media and development programs and are reliant on legacy policies and processes, rather than those developed to support technology in today's operating environment. These models are inconsistent with one another and create inefficiencies and vulnerabilities.

- **Barriers to entry**: Limitations in current funding structures also frustrate promising developers/applicants. For example, several leading anti-censorship tools have decided not to apply for OIF funding due its lengthy and complicated application process. As a result, even when OIF successfully present a

4

solicitation, the applicant pool is far below what is required to succeed in this dynamic operating environment.

- **Inconsistent technical standards**: OTF has worked to develop and implement the highest level of technical standards. However, these standards are not implemented consistently across USAGM, which results in less secure technologies that can put users at risk.

- **Inability to fundraise**: Our inability to directly raise private funds to leverage our public funding means we miss opportunities to amplify the impact of our investments.

## A Way Forward

In order to address these lessons learned and improve the effectiveness of USAGM's Internet freedom efforts, this document proposes the creation of a stand-alone 501(c)3 grantee – the Open Technology Fund Grantee – to implement the U.S. Agency for Global Media's (USAGM) Internet freedom programs while retaining the proper oversight function of the OIF. The creation of this standalone entity and the approach outlined below will maximize the impact of USAGM's Internet freedom investments by creating a whole-of-government approach in order to provide comprehensive, coordinated support for USAGM's Internet freedom needs.

5

# THE OTF GRANTEE

## Background

The Open Technology Fund works to advance Internet freedom in the world's most closed, repressive environments. We support the research, development, and implementation of novel technologies that facilitate the free flow of information, increase at-risk users' digital security, and enable free expression - helping to shape the Internet as a platform that respects fundamental human rights and reinforces core democratic values. In order to achieve this mission, OTF pursues the following objectives:

- **Provide Uncensored Access** to the internet, such as tools to circumvent website blocking, connection blackouts, and widespread censorship

- **Enhance Security** from danger or threat when accessing the internet, including encryption tools.

- **Protect Privacy** including the ability to be free from repressive observation and the option to be anonymous when accessing the internet

- **Increase Awareness** of access, privacy, or security threats and protective measures, including how-to guides, instructional apps, data collection platforms, and other efforts that increase the efficacy of internet freedom tools

> Over 2 billion people use OTF-supported technology every day. More than two-thirds of all mobile users globally have technology incubated by OTF on their device.

OTF supports cutting-edge **research**, the **development** of advanced anti-censorship technology, and the **implementation** of these tools to help human rights defenders, journalists, political dissidents, and regular users alike circumvent censorship and stay safe online. This multi-layered approach ensures that tools are made available to users who need them to safely access the uncensored Internet, while also investing in innovative, next-generation solutions to counter emerging censorship and surveillance threats.

OTF provides funding through a variety of mechanisms to ensure that we can support innovative and critical tools at every stage of the development process, including funds, fellowships, and labs that achieve economies of scale and fill critical gaps in the internet freedom pipeline. To date, the **OTF has distributed more than $50 million, primarily in increments of less than $150,000**. At any given moment, OTF is **actively managing 80+ different projects** in this field with a focus on usability, resilience, transparency and timeliness. Examples of current OTF support mechanisms are included below:

6

**Funds:**

- *Internet Freedom Fund*: OTF's primary support mechanism, funding projects working on open and accessible, tech-centric ant-censorship efforts targeting users living in repressive environments.

- *Core Infrastructure Fund*: Supporting 'building block' technologies relied upon by digital security and circumvention tools strengthening Internet freedom, digital security, and the overall health of the Internet.

- *Rapid Response Fund*: Resolving digital emergencies in a timely and comprehensive manner for individuals, communities, and organizations whose freedom of expression is being suppressed.

**Fellowships:**

- *Information Controls Fellowship:* Cultivating research, outputs, and creative collaboration on topics related to repressive internet censorship and surveillance.

- *Digital Integrity Fellowship:* Embedding digital security experts within at-risk organizations to bolster their digital security practices from the inside out. Currently supported fellows are working with networks and organizations in Ukraine, Malaysia, the MENA region, Ethiopia, the Koreas, and Central America.

**Labs:**

- *Localization Lab:* Making Internet freedom tools available in 200+ languages and dialects through an online, volunteer-driven translation hub

- *Red Team Lab*: Supporting code audits that strengthen the security of Internet freedom tools and also investigating technologies used to suppress online freedoms

- *Usability Lab:* Improving the user experience of Internet freedom tools and thereby increasing user satisfaction, adoption, safety and understanding

- *Engineering Lab*: Supporting the implementation and integration of technologies to ensure that the foundation upon which modern Internet freedom tools are built continues to be resilient, interoperable, and promote the highest level of performance.

- *Community Lab*: Convening support to allow Internet freedom projects to enable information-sharing, effective cross-fertilization, and the adoption of best practices.

7

## OTF Impact

The known impact of OTF's programs to date speak to the strength and effectiveness of the OTF model. Over the last seven years, OTF has funded over **120 programs** to support Internet freedom around the world. As a result, more than **2 billion devices** worldwide have OTF supported technology on them. More than **150 million websites** rely on OTF-supported technology for their security and **tens of millions of people rely on OTF-support tools** to safely access the uncensored Internet each day. In addition, OTF has supported the translation of **over 70 tools into over 200+ languages and dialects** to ensure that around the world can use these critical tools. OTF has also provided rapid response funding to assist with digital security and censorship emergencies in Iran, Azerbaijan, Vietnam, Venezuela, Thailand, Pakistan, Mexico, Uganda, and Tibet, among others.

---

**OTF Case Study: Comprehensive Support for Internet Freedom in Venezuela**

After Venezuela's contested 2018 presidential election, the Maduro regime drastically ramped up its Internet censorship and online attacks against activists and journalists. This has only further escalated into 2019, as the situation has evolved to become a political crisis with opposition leader and National Assembly head Juan Guaido declaring himself interim president. Authorities have regularly implemented "just-in-time" censorship tactics to block speeches by Guaido and critical media content on popular social platforms. In response to this worsening censorship environment, OTF quickly activated its networks to provide rapid response digital security assistance and deploy critical tools to in-country activists and journalists. These efforts ensured that activists and journalists have been able to safely communicate and report on the situation.

- **Deploying Tools**: OTF coordinated with local partners to rapidly deploy anti-censorship tools in response to increased Internet blocking. While several anti-censorship tools have been blocked in the country, OTF-supported tools continue to be available and highly-used. For example, after promoting Tor among key civil society organizations, usage spiked to tens of thousands of users per day.

- **Tracking Censorship:** OTF partners deployed several censorship measurement tools in-country to track when and where Internet censorship is happening, helping to then push that information to activists and journalists.

- **Emergency Response:** OTF provided emergency response assistance both to a vital human rights organization receiving targeted phishing attacks and to a network of Venezuelan journalists in order to keep their content accessible and the communications secure.

- **Digital Security Training**: OTF supported a network of digital security trainers in-country to enable them to work with journalists, activists, and other human rights defenders in to evaluate their digital security protection measures and provide improvements to keep them safe against the escalating threats they faced.

---

8

- **Responding to New Challenges**: During the protest in Venezuela, OTF learned that one of the most pernicious potential threats to protestors is that authorities could easily intercept communications by using IMSI catchers, which spoof cell towers. In response, OTF is supporting groundbreaking research to detect and mitigate this threat.

## The OTF Grantee

Under this proposal, OTF would become an independent USAGM grantee, designed specifically to implement USAGM's Internet freedom programs. Under this new structure, OTF would be responsible for funding all of USAGM's Internet freedom projects from research to development to deployment to maintenance, building on the current OTF model. The OTF Grantee will manage all of USAGM's Internet freedom funds and invest in technology and digital security projects that support USAGM's overall Internet freedom mission "to overcome attempts to interfere with, monitor, censor, or prevent overseas person from using the Internet as an open platform on which to communicate, innovate, learn, organize, and express themselves." The OTF Grantee will also solicit, procure and manage circumvention-as-service and other Internet Freedom technologies utilized by USAGM networks and language services.

The creation of a stand-alone OTF grantee would consolidate and streamline USAGM's Internet freedom efforts and enable USAGM to strategically support each stage of the technology development pipeline. This streamlined process will enable USAGM to provide tailored support for technology development at speed and scale. Further, the OTF Grantee structure will create a formal feedback loop between USAGM entities and the OTF Grantee to ensure that OTF's investments are responsive and tailored to the needs to USAGM's journalists and audience members. Consolidating all these functions into one standalone nonprofit grantee will enable USAGM to lead a whole of government approach to internet freedom.



9

| Research | Prototype | Incubation | Deployment/ Dissemination | Maintenance |
|----------|-----------|------------|---------------------------|-------------|
| OTF will invest in research to analyze new and emerging IF challenges and opportunities to feed fast solutions. | OTF will invest in cutting-edge prototypes to support innovative, next-generation anti-censorship solutions. | OTF will select the most promising IF technologies to fully incubate. OTF will support the initial deployment and piloting of technologies to collect user feedback and tailor tools to meet the needs of USAGM users. | OTF will support the deployment and dissemination of mature technologies to promote scalability and long-term sustainability of essential tools. | OTF will provide long-term, ongoing support to maintain proven, highly effective tools for use by USAGM entities solicited through a designated fund. OTF will also continue to provide rapid response services for organizations and individuals under attack. |

## Improved Support for USAGM Entities

The OTF grantee would not only expand the work of OTF but also expand the support of USAGM networks and help audiences use the Internet freedom resources that are created. To date, OTF has worked with the OIF to identify and respond to USAGM entity needs. This coordination has been useful but largely ad hoc. For example, when VOA's websites were blocked in Pakistan, OTF quickly worked with VOA to create mirror sites for their Urdu services so that users could still access VOA content.

In order to improve coordination and information-sharing with USAGM entities, the OTF Grantee will coordinate closely with the USAGM Office of Internet freedom and the Internet Freedom Committee. (More details about the role of OIF are included in Section 4 below.) In addition, the OTF Grantee will hire two Entity Support Coordinators to work directly with each USAGM entity to assess their Internet freedom needs and deploy/integrate effective technical solutions. This will help further close the feedback loop between USAGM journalists and audience members and OTF technical solutions. Most importantly, this approach will streamline USAGM's Internet freedom work flows and allow USAGM to form a seamless full-service Internet freedom program - free to focus on the most pressing and emerging threats to internet freedom globally and for the USAGM specifically. As a result, USAGM networks will be able leverage internet freedom technology more quickly, connect with even more difficult to reach audience members, and provide OTF with even more front-line based experiences to identify gaps and inform OTF's investments in future Internet freedom technologies.

10

## BUILDING ON SUCCESS – OTF'S COMPARATIVE ADVANTAGE

As a leading Internet freedom funder, OTF has been a pioneer in developing funding strategies and implementation mechanisms to efficiently and effectively support the development and dissemination and critical Internet freedom technologies. OTF has set the highest standards with regard to responsiveness, transparency, cost efficiency, expert review, coordination, and technical standards -- many of which have been adopted and replicated by other USG technology development programs. By creating a standalone grantee based on the OTF model, USAGM would be able to leverage OTF's unique structure, expertise, and partnerships in order to improve the efficiency and effectiveness of its Internet freedom efforts and create a cohesive whole-of-government strategy for supporting Internet freedom.

- **Support for cutting-edge technology:** OTF is highly unique in its ability to support projects that other funders cannot - providing seed funding to incubate projects early on in the development phase which offer promising ways to counter emerging threats to global internet freedom. No other USG Internet freedom donor is able to fund with similar speed, flexibility, and due dilligence. For example, OTF supported the initial development of Signal, Lantern, GlobalLeaks, Tails, and Briar.

- **Highly responsive:** OTF is also highly unique its ability to respond rapidly to new censorship and surveillance threats based on its nimble approach. For example, when it was discovered that a highly popular Chinese anti-censorship tool may have been compromised, OTF was also able to initiate a security audit in a matter of days. Similarly, when protests broke out in Hong Kong in June 2019, OTF was able to fund the development and dissemination of a digital security guide for demonstrators in a matter of days.

- **Streamlined support:** The creation of an OTF grantee would consolidate and streamline USAGM's support for IF by creating a clear development pipeline. This pipeline would ensure that USAGM is investing in a steady stream of cutting-edge solutions to keep pace with evolving technical threats, while maintaining the critical tools that USAGM entities and audiences rely on.

- **Open and Nimble:** OTF's open approach to supporting Internet freedom keeps costs to taxpayers low and ingenuity high in the global fight against censorship. OTF accepts applications on a rolling basis, reviewing submissions and awarding contracts on a bimonthly basis which keeps the pipeline of efforts current with the state of censorship and surveillance technologies.

- **Transparency:** OTF has prioritized transparency throughout its funding to ensure that OTF partners and other donors are able to learn from OTF's work.

11

- **Cost-Effective**: Rather than replicating expertise and technical management capabilities across multiple entities, the creation of an OTF grantee will consolidate those functions into a streamlined team capable of serving all of USAGM. OTF has achieved more than $10 million in savings on supported projects through our hands-on review process and knowledge of technical requirements and costs.

- **Institutional efficiency**: To date, OTF has reviewed and responded to over 3,300 requests for supporting, totaling more than $415 million.

- **Improved back-office support**: OTF has set the standard for supporting Internet freedom technology development. However, a stand-alone grantee would give us the ability to further improve our processes by creating a back office designed to securely support technology development at speed. This would allow for expert financial and legal reviews, tailored award mechanism, more efficient implementation timelines, and improved support for global projects.

- **Expert technical review**: Every proposal submitted to OTF is subjected to a rigorous multi-disciplinary review process. In addition to OTF's internal review process, each project is reviewed by multiple members of OTF's 40-person Advisory Council - composed of experts from the fields of human rights, information security, technology development, and digital safety. A standalone OTF grantee would ensure that *all* USAGM IF projects are reviewed and managed by technical experts at these established high standards.

- **Experience management**: Since starting in 2012, OTF has managed over $50 million in public funds to support more than 400 organizations and individuals advancing Internet freedom worldwide. Ensuring a lean operation, nearly **90%** of received funds are directly disbursed by OTF to support internet freedom efforts.

- **Highest security standards**: OTF has been a leader among IF donor in setting rigorous technical and security standards. The creation of a standalone OTF grantee would ensure that these standards are applied consistently across USAGM, while allowing for transparency and accountability. It would also give USAGM a platform to share and promote best practices among related funders.

- **Donor Coordination**: OTF recognized as a trusted leader among the Internet freedom donor community and coordinates closely with many other donors, including the State Department, USAID, DARPA, NSF, the Ford Foundation, the MacArthur Foundation, the Media Democracy Fund, Mozilla, Hewlett, Omidiyar, and the Open Society Foundations. By forging strategic partnerships, OTF has unlocked more than $100 million USD in complementary funding from non-USG sources. A standalone entity would enhance fundraising opportunities and private sector collaboration.

12

Def. App. 164

- **Private sector collaboration**: OTF also has strong partnerships with the private sector, including Google, Facebook, AWS, Cloudflare, and a wide variety of security first. As a result of these partnerships, OTF has been able to ensure the integration and long-term sustainability of several key Internet freedom technologies.

13

## OFFICE OF INTERNET FREEDOM

Under this proposal, the USAGM Office of Internet Freedom would continue to be responsible for the oversight of all USAGM Internet freedom funding and for facilitating coordination between OTF and other USAGM entities.

- **Oversight:** This proposed structure would separate USAGM's IF implementation (OTF Grantee) and oversight responsibilities (OIF) to ensure effective, independent oversight of all IF projects. OIF will be responsible for all Congressional reporting and oversight responsibilities.

- **Entity Support Plan**: OIF will also create a comprehensive IF entity support plan to solicit feedback from USAGM entities, evaluate users needs, enable customized implementation of technical solutions, and assess outcomes.

  - *Internet Freedom Committee (IFC)*: OIF will organize and convene the USAGM IFC. The IFC will include expert representatives from each USAGM entity, including OTF, and will convene regularly to discuss IF challenges and opportunities. The goal of the IFC is to identify Internet freedom challenges/opportunities most relevant for USAGM, improve information-sharing across entities, and enable OTF to tailor their investments to respond to identified needs and entity feedback.

  - *Internet Freedom Coordinators*: The coordinators will be embedded at OTF and will work directly with each USAGM entity to assess their IF needs and deploy/integrate effective technical solutions

14

# TIMELINE

## 2019

**July**
- Initial briefing for Congressional appropriators

**August**
- Congressional briefings
- USAGM Internet Freedom Committee (IFC) created

**September**
- FY2020 Budget
- OTF Grantee Incorporated
- First draft of OTF Grantee SOPs
- OTF team retreat
- IFC USAGM Entity Consultations

**October**
- Technology Demo Day on the Hill
- IFC USAGM Entity Consultations

**November**
- Second draft of OTF Grantee SOPs
- OTF Summit
- First IFC Panel Convening

**December**
- OTF Grantee SOPs finalized
- New OTF fund for previous OIF contracts created

## 2020

**January**
- Public launch of OTF Grantee
- Hire new staff
- Submit CN to reapportion all FY2020 funds to OTF

**February**
- Transition current OIF contracts to OTF

**September**
- OTF grantee included in FY2021 appropriations

15

## ORGANIZATIONAL STRUCTURE



## BUDGET SCENARIOS

### Current USAGM Internet Freedom Budget

|  | Amount |
|---|---|
| OIF | |
|   Staff/Administration | 5 OIF Staff (paid by USAGM) + $310,00 |
|   Program costs | $5,000,000 |
| OTF | |
|   Staff/Benefits | $1,200,000 |
|   Program costs | 8,800,000 |

### Scenario 1: Merge and maintain current OTF and OIF operations

Under this scenario, the OTF Grantee would be responsible for maintaining OTF and OIF current operations. Included below are budget projections for the first year of operations, which includes **$294,000 in start-up costs**, and ongoing maintenance costs. This budget would enable the OTF Grantee to continue to incubate about **70 programs annually** (OTF's current portfolio of programs) and provide long-term support to at least **3 proven technologies each year** (OIF's current contracts).

#### Year 1 (with start-up costs)

|  | Amount |
|---|---|
| **Operation Costs** | |
|   Direct Labor | $1,400,000 |
|   Fringe benefits (34 percent) | $476,000 |
|   Contractors (team and other) | $295,000 |
|   Travel and Program Support | $90,000 |
|   New office space | $260,000 |
|   Transition period for RFA backend personnel and office space (6 months) | $74,000 |
|   Financial Management Buildout for Application System | $200,000 |
|   Other direct costs | $65,000 |
|   Other direct costs (one-time) | $30,000 |
| ***Admin Subtotal*** | ***$2,890,000*** |
| **Program Costs** | |
|   OTF contracts (70) | $8,100,000 |
|   Former OIF contracts (3) | $4,010,000 |
| ***Program Subtotal*** | ***$12,507,500*** |
| **TOTAL** | **$15,000,000** |

17

Out-years

|  | Amount |
|---|---|
| **Operation Costs** |  |
| Direct Labor | $1,400,000 |
| Fringe benefits (34 percent) | $476,000 |
| Contractors (team and other) | $295,000 |
| Travel and Program Support | $90,000 |
| New office space | $260,000 |
| Other direct costs | $75,000 |
| *Admin Subtotal* | *$2,596,000* |
| **Program Costs** |  |
| OTF contracts (70) | $8,394,000 |
| Former OIF contracts (3) | $4,010,000 |
| *Program Subtotal* | *$12,404,000* |
| TOTAL | **$15,000,000** |

## Scenario 2: Merge and grow OTF and OIF operations

Repressive regimes around the world on doubling down on their efforts to restrict Internet freedom. According to the Freedom House *Freedom on the Net* report, repressive regimes are investing more than ever before in censorship and surveillance technologies to control the Internet. The Chinese government, for example, spends billions of dollars each year on its online censorship and surveillance apparatus, and it is aggressively exporting these technologies to other like-minded regimes. These increasing investments in censorship and surveillance now far outstrip our available resources. As a result, we are no longer able to keep pace with the requests we receive for support. For example, out of the 406 proposal that OTF received through is Internet Freedom Fund in 2017, we were only able to fund 29. In FY 2018 to date OTF has funded 74 projects[1] despite having received over 1000 applications over the calendar year 2018.

In addition, the proliferation of next generation technologies, such as machine learning, artificial intelligence, and 5G, presents new opportunities and challenges for Internet freedom. USAGM's historic Internet freedom budget does not account for these new technological developments and does not include the resources necessary to address them. In order to bring our investments in line with these rising threats and needs, OTF would need at least an **additional $10 million annually**.

---

[1] This number includes fellows, community lab projects and lab service contracts but not individual lab engagements.



**Requested Projects vs Funded Projects**

Under this scenario, the OTF Grantee would be responsible for merging OTF and OIF current operations and growing the OTF grantee budget. Included below are budget projects for the first year of operations, which includes **$294,000 in start-up costs**, as well as growth projections. Our research indicates that we will need to increase the OTF Grantee budget by at least $10 million annually in order to bring our support in line with current threats and USAGM needs. This additional $10 million would allow the OTF Grantee to incubate **30-40 additional programs** per year and provide long-term support to an **additional 3-5 proven technologies**.

### Year 1 (with start-up costs)

| | Amount |
|---|---|
| **Operation Costs** | |
| Direct Labor | $1,400,000 |
| Fringe benefits (34 percent) | $476,000 |
| Contractors (team and other) | $295,000 |
| Travel and Program Support | $90,000 |
| New office space | $260,000 |
| Transition period for RFA backend personnel and office space (6 months) | $74,000 |
| Financial Management Buildout for Application System | $200,000 |
| Other direct costs | $65,000 |
| Other direct costs (one-time) | $30,000 |
| *Admin Subtotal* | *$2,890,000* |
| **Program Costs** | |
| OTF contracts (70) | $8,100,000 |
| Former OIF contracts (3) | $4,010,000 |
| *Program Subtotal* | *$12,507,500* |
| TOTAL | $15,000,000 |

19

Out-years (with increased budget)

|  | Amount |
|---|---|
| **Operation Costs** |  |
| Direct Labor | $1,700,000 |
| Fringe benefits (34 percent) | $578,000 |
| Contractors (team and other) | $295,000 |
| Travel and Program Support | $120,000 |
| New office space | $260,000 |
| Other direct costs | $75,000 |
| *Admin Subtotal* | *$3,028,000* |
| **Program Costs** |  |
| OTF contracts (100) | $13,472,000 |
| Former OIF contracts (7) | $8,500,000 |
| *Program Subtotal* | *$21,972,000* |
| TOTAL | $25,000,000 |

20

U.S. Agency for Global Media (USAGM)
Broadcasting Board of Governors (BBG)                                    *DIRECTIVE MEMO*
Office of Management Services, Contracts Division (OMS/C)

**August 6, 2019**

| | |
|---|---|
| **MEMORANDUM FOR:** | USAGM's Contracting Officers, Contract Specialists and Contracting Officer's Representatives |
| **FROM:** | OMS/C – Fermaint Rios, Senior Procurement Executive |
| **SUBJECT:** | Awarding Federal Acquisition Regulation (FAR) Exempt Special Agreements |

## 1. PURPOSE

The purpose of this Directive is to prescribe guidance for agency Contracting Officers and Contract Specialists when entering into FAR-Exempt Special Agreements (FESAs) pursuant to the statutory authority granted by 22 U.S.C. § 6204(a)(10).

## 2. AUTHORITY

The National Defense Authorization Act (NDAA) for Fiscal Year 2017, codified at 22 U.S.C. § 6204(a)(10).

## 3. APPLICABILITY

This Directive applies to all FAR-Exempt Special Agreements (FESAs), as defined herein. All Contracting Officers (COs), Contracts Specialists (CSs), Contracting Officer's Representatives (CORs) and Program Offices shall comply with this Directive and ensure its requirements are carried out properly. This Directive is effective immediately.

## 4. DEFINITIONS

*Broadcaster* – For purposes of this Directive, a broadcaster is defined as follows: an individual working as a journalist; a reporter, writer, translator, editor, producer, or announcer for broadcasts; hosts for broadcasts, news analysis, editorial and other broadcast features; or a news analysis specialist or commentator; and individuals performing other artistic, technical and support functions that directly support broadcasters and journalistic work, such as directors, camera operators, editors, art directors, set designers, stringers and fixers. The term Broadcaster does not include individuals performing purely administrative support services.

*Competition in Contract Act* (CICA) - The Competition in Contracting Act (CICA) of 1984 (41 U.S.C. § 253, as implemented by FAR Subpart 6.1), is a public law enacted for the purpose of encouraging competition when awarding government contracts.

*FAR-Exempt Special Agreement* (FESA) – A type of contract or agreement that the Senior Procurement Executive has determined to be exempt from certain requirements of the FAR.

*System for Award Management* (SAM) - The primary Government repository for prospective Federal awardee information and the centralized Government system for certain contracting, grants, and other assistance-related processes.

5. **BACKGROUND**

The 2017 NDAA provided the Chief Executive Officer (CEO) of the Broadcasting Board of Governors (BBG) with expanded authorities in the area of agency procurements. One such authority, codified at 22 U.S.C. § 6204(a)(10), provides the CEO with authority, to the extent considered necessary to carry out the functions of the BBG, to procure, rent, or lease supplies, services, and other property for journalism, media, production, and broadcasting, and related support services, "*notwithstanding any other provision of law*" related to such acquisition, rental, or lease.

Where Congress has authorized a government agency to procure, rent or lease supplies, services, and other property "notwithstanding any other provision of law relating to such acquisition, rental or lease", those transactions, by their nature, are not subject to the FAR, or to other procurement-related laws, such as the requirement for contractors to register in the SAM, or CICA [See MFM Lamey Group LLC, B-402377, March 25, 2010].

6. **POLICY**

Pursuant to 22 U.S.C. §6204(a)(10) and the authority delegated by the CEO to the Senior Procurement Executive (SPE), the SPE has designated the following transactions to be FAR-Exempt Special Agreements that shall be exempt from certain provisions or requirements of the FAR:

6.1 Frequency license agreements/contracts (also known as frequency leases, broadcast licenses, broadcast leases, FM leases, FM licenses), including the related hosting of transmitting facilities and their operation and maintenance, without regard to whether the services are provided by one or multiple instrumentalities of a foreign government, or by a commercial entity designated by the foreign government as the only entity authorized to provide the agency with such services.

6.2 Operation and Maintenance contracts with foreign commercial entities for the operation and maintenance of broadcasting and transmitting facilities, when a foreign government, as a condition of obtaining a frequency license, requires their use. This Directive does not apply to contracts/agreements with foreign commercial entities for services for which the foreign government/instrumentality does not require the use of a specific foreign commercial entity. Those contracts/agreements are subject to all FAR requirements, with the exception that the CO, with the concurrence of the SPE, may waive synopsis/publicizing requirements and or System for Award Management requirements (SAM) on a case-by-case basis by making a written determination using the *Determination and Findings for SAM Exception* template maintained by OMS/C Policy (OMS/CP).

6.3 Affiliate agreements with foreign media platforms (e.g., television, radio) to carry the USAGM's content, without regard to whether the agreement/contract is paid or non-paid.

6.4 Broadcaster contracts and agreements with individual broadcasters, both domestic and abroad.

6.5 Acquired content agreement/contracts for the acquisition of pre-existing programming content from another party, both domestic and abroad. Unless covered by another section of this Directive, contracts for the development of content at the expense of the USAGM are not covered by this Directive, thus are subject to all FAR requirements.

6.6 Real property leases for property leased abroad; i.e., foreign real property leases, unless the property owner or landlord is a U.S. based business, subsidiary, or holding of a U.S. based business. COs and

2

CSs entering into foreign property leases shall comply with all other USAGM leasing requirements and clearances. For example, although this Directive exempts foreign real property leases from FAR Part 6 competition requirements, individuals conducting market research shall consider at least three comparable properties. When leasing foreign real property, COs and CSs should verify whether the agency has signed an ICASS agreement with the State Department that includes "Lease Services." When practicable in those situations, COs and CSs should seek the assistance of the State Department to lease the property.

6.7 Other contracts, leases or agreements with foreign states or parastatal entities not covered by paragraph 6.1.

6.8 Any contract dealing with sensitive or security concerns relating to individual safety, protection of sources, or broadcast operability.

6.9 Any other contract determined by the SPE to be a FESA.

## 7. **REQUIREMENTS**

7.1 When processing FESAs pursuant to this Directive, COs and CSs shall disregard the policies, procedures and guidance provided by the FAR with respect to the SAM requirements contained in FAR subpart 4.11 the Publicizing Contract Action requirements in FAR part 5, the Competition Requirements contained in FAR part 6, and any other FAR provisions that require SAM registration, competition, synopsizing and publicizing, or other methods of public notice. Other provisions of the FAR, such as requirements for acquisition planning, market research, contract clauses, and complete contract file documentation, shall continue to apply according to the facts and circumstances of each contract/agreement as determined applicable by the CO.

7.2 COs and CSs shall not require foreign governments or their designated vendors, foreign affiliates, foreign vendors, foreign landlords or individual broadcasters to be registered in SAM if the agency plans to enter into a FESA with one of these parties in accordance with the provisions of this Directive.

7.3 COs and CSs shall ensure that for FESAs with countries where the official language is not English, the requesting office submits the draft agreement to OMS/C translated into the English language. If the agreement includes dual languages, the CO shall ensure that the agreement includes language similar to that found in FAR 52.225-14, *Inconsistency between English Version and Translation of Contracts*, which states, "*In the event of inconsistency between any terms of this contract and any translation into another language, the English language meaning shall control*."

7.4 Before entering into FESAs with instrumentalities of foreign governments, the CO or CS shall obtain legal review from one of the Operation Attorneys in the Office of General Counsel (OGC). Generally, the OGC will submit the contract/agreement to the Department of State (DOS) for review. Such review is required by statute. The DOS must make a determination that the agreement/contract is not an international treaty.

7.5 COs and CSs shall obtain all required clearances and approvals prior to awarding the FESA. For audit purposes, COs and CSs shall make prominent reference to this Directive in the contract file to support the basis for exempting the transaction from the requirements of the FAR.

7.6 Although compliance with the FAR is not required, for DATA Act transparency purposes, COs and CSs shall report the FESAs addressed by this Directive to the Federal Procurement Data System-Next

3

Generation using the generic Unique Entity Identifier (formerly known as the Data Universal Numbering System (DUNS) number), "123456787" in accordance with the agency's FPDS reporting requirements found in IX BAM 460 – *Reporting of Contract Actions to the Federal Procurement Data System Next Generation (FPDS-NG) and Coding of Service Contracts* and CON Directive *Improving the Quality, Accuracy and Completeness of the Data Reported to Federal Procurement Data System-Next Generation (FPDS-NG).* This requirement shall not apply when identification of a foreign contractor by name in FPDS has the potential of placing the contractor at risk of harm.

7.7 The Office of Technology, Services, and Innovation (TSI) shall be responsible for establishing guidelines for the selection of broadcasting and transmitting sites and locations that best meet its strategic and technical needs and that best advance the USAGM's mission. COs and CSs shall give deference to the TSI's selection of sites and locations and shall not subject these to the competitive process.

7.8 TSI and its Regional Marketing Officers (RMOs) shall be responsible for establishing guidelines for the selection of foreign affiliate partners in a manner that advances the USAGM's mission while protecting the interests of the United States in its contractual relationships. COs and CSs shall give deference to TSI's selection of affiliates and shall not subject these to the competitive process.

7.9 The Voice of America (VOA) shall be responsible for establishing guidelines for the selection of broadcasters and acquired content in a manner that advances the USAGM's mission. COs and CSs shall give deference to the VOA's selection of broadcasters and acquired content and shall not subject these to the competitive process.

## 8. **MAINTENANCE**

This Directive shall be maintained by the SPE and updated as needed. Should you have any questions pertaining to this Directive memo, please contact OMS/CP at via e-mail at **CONPolicy@usagm.gov**.

4

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
### DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
### CORPORATIONS DIVISION



# C E R T I F I C A T E

**THIS IS TO CERTIFY** that the attached is a true and correct copy of the documents for this entity as shown by the records of this office.

Open Technology Fund

**IN TESTIMONY WHEREOF I** have hereunto set my hand and caused the seal of this office to be affixed as of 9/20/2019 12:07 PM

Business and Professional Licensing Administration

PATRICIA E. GRAYS
Superintendent of Corporations
Corporations Division

Muriel Bowser
Mayor

Tracking #: lTIUn28e

Initial File #: N00006393100

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
### CORPORATIONS DIVISION



# CERTIFICATE

**THIS IS TO CERTIFY** that all applicable provisions of the District of Columbia Business Organizations Code have been complied with and accordingly, this ***CERTIFICATE OF INCORPORATION*** is hereby issued to:

Open Technology Fund

**Effective Date:** 9/20/2019

**IN WITNESS WHEREOF I** have hereunto set my hand and caused the seal of this office to be affixed as of 9/20/2019 12:06 PM

Business and Professional Licensing Administration

PATRICIA E. GRAYS
Superintendent of Corporations
Corporations Division

Muriel Bowser
Mayor

Tracking #: bOXhACqK

**ARTICLES OF INCORPORATION**
**OF**
**OPEN TECHNOLOGY FUND**

DCRA Corp. Div.

SEP 2 0 2019

File Copy

To:       D.C. Department of Consumer and Regulatory Affairs
          Corporations Division
          Washington, D.C.

We, the undersigned natural persons of the age of eighteen years or more, acting as incorporators of a non-profit corporation, adopt the following Articles of Incorporation for such corporation pursuant to the District of Columbia Non-Profit Act of 2010, as amended.

### ARTICLE I

The name of the Corporation is Open Technology Fund (hereinafter called the "Corporation").

### ARTICLE II

The period of duration of the Corporation is perpetual.

### ARTICLE III

The purpose for which the Corporation is organized is to operate exclusively for charitable, educational, scientific and literary purposes, within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or corresponding provisions of any subsequent federal tax laws); and within such limits to have as it purposes, to (1) further the internet freedom objectives of the United States Agency for Global Media ("USAGM") so as to expand unrestricted access to information available to the public on the internet, and (2) support the development and use of circumvention and secure communications technologies on a worldwide basis where the same is restricted in order to advance the internet freedom objectives of USGAM, and (3) lessen the burdens of government by furthering the internet freedom objectives of USGAM; and consistent with the above, to exercise all powers available to corporations organized pursuant to the District of Columbia Non-Profit Act of 2010, as amended.

### ARTICLE IV

The Corporation shall have no members.

### ARTICLE V

The affairs of the Corporation shall be managed by its Board of Directors. The number of directors (not less than three) and the manner of electing directors shall be fixed in the Bylaws of the Corporation.

1

## ARTICLE VI

Except as provided in these Articles, the internal affairs of the Corporation shall be regulated and determined as provided in the Bylaws.

## ARTICLE VII

In all events and under all circumstances, and notwithstanding merger, consolidation, reorganization, termination, dissolution, or winding up of this Corporation, voluntary or involuntary, or by the operation of law, or upon amendment of the Articles of Incorporation of the Corporation:

(a) The Corporation shall not have or exercise any power or authority either expressly, by interpretation, or by operation of law, nor shall it directly or indirectly engage in any activity that would prevent it from qualifying (and continuing to qualify) as a corporation described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or corresponding provisions of any subsequent federal tax laws).

(b) No part of the assets or net earnings of the Corporation shall inure to the benefit of or be distributable to its incorporators, directors, officers or other private persons having a personal or private interest in the Corporation, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services actually rendered and to make reimbursement in reasonable amounts for expenses actually incurred in carrying out the purposes set forth in ARTICLE III hereof.

(c) No substantial part of the activities of the Corporation shall consist of the carrying out of propaganda, or of otherwise attempting to influence legislation unless Section 510(h) of the internal Revenue Code of 1986, as amended (or corresponding provisions of any subsequent federal tax laws), shall apply to the Corporation, in which case the Corporation shall not normally make lobbying or grass roots expenditures in excess of the amounts therein specified. The Corporation shall not in any manner or to any extent participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office; nor shall it engage in any "prohibited transaction" as defined in Section 503(b) of the Internal Revenue Code of 1986 (or corresponding provisions of any subsequent federal tax laws).

(d)  Neither the whole, or any part of or portion, of the assets or net earnings of the Corporation shall be used, nor shall the Corporation ever be operated, for objects or purposes other than those set forth in ARTICLE III hereof.

(e) In the event that the Corporation is a private foundation within the meaning of Section 509 of the Internal Revenue Code of 1986, as amended (or corresponding provisions of any subsequent federal tax laws):

2

(1)  The Corporation shall distribute its income for each taxable year at such time and in such manner as not to subject it to the tax on undistributed income imposed by Section 4942 of the Internal Revenue Code of 1986, as amended (or any corresponding provisions of any subsequent federal tax laws).

(2) The Corporation shall not engage in any act of self-dealing as defined in Section 4941(d) of the Internal Revenue Code of 1986, as amended (or any corresponding provisions of any subsequent federal tax laws).

(3) The Corporation shall not retain any excess business holdings as defined in Section 4943(c) of the Internal Revenue Code of 1986, as amended (or any corresponding provisions of any subsequent federal tax laws).

(4) The Corporation shall not make any investments in such a manner as to subject it to tax under Section 4944 of the Internal Revenue Code of 1986, as amended (or any corresponding provisions of any subsequent federal tax laws).

(5) The Corporation shall not make any taxable expenditure that would subject it to tax under Section 4945(d) of the Internal Revenue Code of 1986, as amended (or any corresponding provisions of any subsequent federal tax laws).

(f) Upon dissolution of the Corporation, all of its assets and property of every nature and description remaining after payment of all liabilities and obligations of the Corporation (but not including assets held by the Corporation upon condition requiring return, transfer, or conveyance, which condition occurs by reason of the dissolution) shall be paid over and transferred to one or more organizations which engages in activities substantially similar to those of the Corporation and which are then qualified for exemption from federal income taxes as organizations described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or any corresponding provisions of any subsequent federal tax laws).

## ARTICLE VIII

To the fullest extent permitted by law, no director shall be liable to the Corporation for monetary damages for any action taken, or any failure to take any action, as a director, provided that this provision shall not eliminate or limit the liability of a director (a) to the extent of a financial benefit received by the director to which the director was not entitled, (b) for an intentional infliction of harm, (c) for an intentional violation of criminal law, or (d) for voting for or assenting to an unlawful distribution made by the Corporation.   To the fullest extent permitted by law, any repeal or modification of this ARTICLE VIII shall be prospective only and shall not adversely affect any right or protection of, or any limitation of the liability of, a director of the Corporation existing at, or arising out of facts or incidents occurring prior to, the effective date of such repeal or modification.

3

## ARTICLE IX

The address, including street and number of the Corporation's initial registered office in the District of Columbia is 2025 M Street N.W., Washington, D.C. 20036. The name of the Corporation's initial registered agent at such address is Libby Liu.

## ARTICLE X

The number of Directors constituting the initial Board of Directors is [three (3)] and the names and addresses, including street and number, of the persons who are to serve as the initial directors until the first annual meeting or until their successors be elected and qualified are:

| NAME | ADDRESS |
|------|---------|
| Dr. Leon Aron. | 2025 M Street N.W., Washington, D.C. 20036 |
| Ambassador Ryan Crocker | 2025 M Street N.W., Washington, D.C. 20036 |
| Mr. Michael Kempner | 2025 M Street N.W., Washington, D.C. 20036 |
| Ambassador Karen Kornbluh | 2025 M Street N.W., Washington, D.C. 20036 |
| Mr. Ben Scott | 2025 M Street N.W., Washington, D.C. 20036 |
| Mr. Kenneth Weinstein | 2025 M Street N.W., Washington, D.C. 20036 |

## ARTICLE XI

The names and addresses, including street number, of the incorporators of the Corporation are:

| NAME | ADDRESS |
|------|---------|
| Libby Liu | 2025 M Street, N.W. Washington, D.C. 20036 |

4

IN WITNESS WHEREOF, the undersigned has set her hand and seal this 20th day of September 2019.

_____

Libby Liu, Incorporator

**BYLAWS OF**

**OPEN TECHNOLOGY FUND**

**(A District of Columbia Nonprofit Corporation)**

**1.0  NAME**

The name of this corporation shall be the OPEN TECHNOLOGY FUND, hereinafter referred to as the "Corporation."

**2.0  CORPORATE PURPOSE**

**2.1  Nonprofit Purpose**

The Corporation is organized and shall operate exclusively for charitable, scientific, literary, or educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or corresponding provision of any future United States Internal Revenue law).

**2.2  Character of Affairs**

The character of affairs that the Corporation intends to conduct is consistent with the internet freedom objectives of the United States Agency for Global Media (USAGM), to support the worldwide expansion of unrestricted access by the public to information on the internet through the development and use of circumvention and secure communications technologies where such access is otherwise restricted, and to carry out such other activities as deemed necessary to effectuate such affairs.

**2.2.1  Mission and Objectives**

The Corporation shall promote the rights of freedom of opinion and expression, including the freedom to "seek, receive, and impart information and ideas through any media and regardless of frontiers" online in accordance with Article 19 of the Universal Declaration of Human Rights, according to the conviction that open communication of information and ideas among peoples of the world contributes to international peace and stability.  The Corporation shall accordingly support the efforts of USAGM journalists to disseminate, and its audiences to receive, international broadcasting consistent with the standards, principles, and goals of the International Broadcasting Act of 1994, as amended, 22 U.S.C. 6201 et seq. ("Act").

1

To achieve these objectives, the Corporation shall provide funding, services, and support in furtherance of efforts by and through USAGM to advance internet freedom globally through the research, development and implementation of technologies that expand unrestricted access to information on the internet; to timely respond to requests from USAGM and its networks and grantees concerning same; and to carry out such other activities as deemed necessary to raise funds for the purposes described above, including solicitation and acceptance of gifts, grants, devises, bequests, and funds as may be donated or otherwise provided to the Corporation by any person, commensurate with the limitations set forth herein.

### 2.3   Compliance

The Corporation, in selecting Directors and Officers under these Bylaws, shall at all times select and provide for the election, resignation or removal of the members of its Board of Directors, and appoint and provide for the resignation or removal of its Officers, pursuant to and in compliance with the provisions of the Act, as it may be amended from time to time.  The Corporation shall timely revise these Bylaws to reflect amendments to those provisions of the Act applicable to the Corporation's affairs.

## 3.0   CORPORATE OFFICES

The principal office of the corporation shall be located in Washington, D.C.  The Corporation may have offices at such other places, both within and outside the District of Columbia, as the Board of Directors may from time to time determine or the business of the Corporation may require.

## 4.0   MEMBERSHIP

As a non-membership corporation, the Corporation shall have no members; and, to the extent necessary or desirable, the Board of Directors shall exercise the rights and powers of members as provided in applicable law.

## 5.0   GOVERNANCE STRUCTURE

The business and affairs of the Corporation shall be managed under the general direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not prohibited by statute or by the Articles of Incorporation or these Bylaws.  The Directors shall act only as a Board of Directors, or as a committee thereof.

2

### 5.1   Number of Directors

The number of Directors shall be no fewer than three (3), but may be increased or decreased within the aforesaid limit from time to time, provided that no decrease shall have the effect of shortening the term of any incumbent Director.

The initial Board of Directors shall consist of the persons who are named in the Articles of Incorporation of the Corporation, and said Directors, or their replacements in the event of a vacancy on the Board of Directors, shall hold office until the installation of the Directors elected in accordance with the provisions herein.

### 5.2   Election of Directors

Individuals shall be elected by the Board of Directors for three-year terms upon majority vote of the Board of Directors, or as may be authorized by 22 U.S.C. 6203 et seq. , with notice to and in consultation with the USAGM Advisory Board,  the latter of which shall assess the individual's potential promotion of and impact upon the mission and objectives set forth in Section 2.2.1, as they relate to USAGM and its networks and grantees.  He or she shall hold office until the expiration of his or her term and until his or her successor is elected and qualified, or his or her earlier resignation or removal or or as may be authorized by 22 U.S.C. 6203 et seq.

Any vacancy occurring on the Board of Directors due to removal or resignation may be filled by a majority vote of the remaining Directors.  The Director so elected shall hold office for the remainder of his or her predecessor's term or until his or her successor is elected and qualified or until his or her earlier resignation or removal.

### 5.3   Resignation of Directors

Any Director may resign at any time by delivering written notice to the Board of Directors, the Chair of the Board of Directors, or the Chief Executive Officer.  A resignation is effective when the notice is delivered unless the notice specifies a later date.

### 5.4   Committees of the Board of Directors

The Board of Directors may from time to time designate two (2) or more Directors to serve on such committee or committees, both standing and ad hoc, as deemed necessary and proper.  Such committees shall have the authorities provided in such

3

resolution but shall not exercise the authority of the Board of Directors in the management of the corporation. No committee shall have the power to amend the Articles of Incorporation or the Bylaws of the Corporation.

The Board of Directors shall have the power at any time to (a) designate a member of any committee as the committee's chairperson; (b) fill vacancies on any committee; (c) change the membership of any committee; or (d) discharge a committee.  The resolution creating a committee shall specify whether it is a standing committee, and if not a standing committee, shall specify the time period during which the committee shall exist.  The resolution creating a committee shall also establish the term of office of members of the committee, requirements for meetings of the committee, and shall establish the quorum necessary for it to take action.

### 5.4.1   Audit Committee

The Audit Committee shall be a standing committee of the Board of Directors. It shall be responsible for making recommendations to the Board of Directors regarding the Corporation's integrity, financial credibility, and long-term viability, including the results of audits of the accounts of the Corporation performed in accordance with generally accepted auditing standards by independent certified or licensed public accountants.  In consultation with the Vice President/Treasurer, the chair of the Audit Committee shall convene appropriate meetings.  The Audit Committee shall have the power to adopt rules for the conduct of its business with respect to all matters not provided for in the Bylaws.

## 6.0   MEETINGS OF THE BOARD OF DIRECTORS

### 6.1   Annual Meeting

An annual meeting of the Board of Directors shall be held at the principal office of the Corporation, and at such time or other place as shall be determined by the Board of Directors and designated in the notice of the meeting.  Meetings may be held within or without the District of Columbia.

### 6.2   Regular Meetings

Regular meetings of the Board of Directors shall be conducted on a quarterly basis or on such other basis as determined by the Directors.  Meetings may be held within or

without the District of Columbia.

### 6.3   Agendas

Wherever practicable, agendas for regular meetings shall be prepared and distributed electronically to each Director at least seven (7) days prior to each meeting. The Chief Executive Officer and President shall propose agenda items to the Chair.  Individual Directors may designate agenda items and resolutions.

### 6.4   Notice of Annual and Regular Meetings

Notice of each annual and regular meeting of the Board of Directors stating its date, time, and place shall be provided to each Director personally, or by post, by overnight courier, by telephone, or by electronic mail at the street address, telephone number, or electronic mail address of corporate record.  Such notice shall be provided not less than ten (10) days prior to the date of the meeting and need not specify the business to be transacted at or the purpose of the periodic meeting.  Before or at any meeting of the Directors, any Director may, in writing, waive notice of such meeting and such waiver shall be deemed equivalent to a giving of notice.  Attendance by a Director at an annual or regular meeting of the Board of Directors without objection shall be deemed as a waiver of notice by such Director.

### 6.5   Special Meetings

Special meetings of the Board of Directors may be called by the Chair or by one less than a majority of Directors then serving on the Board of Directors.  With the exception of a special meeting conducted telephonically, as specified herein, such special meetings shall only be called upon no less than forty-eight (48) hours' notice to each Director, which shall specify the date, time, and place of the meeting.  Meetings may be held within or without the District of Columbia.

### 6.6   Emergency Meetings

Upon the occurrence of urgent circumstances and request of the Chair or one less than a majority of  Directors, an emergency meeting may be convened upon twenty-four (24) hours' notice by telephonic or electronic means to each Director, which shall specify the date, time, and place of the meeting. The emergency meeting may be conducted in person, by telephone, or other appropriate means, and may be held within or without the District of Columbia.

5

### 6.7  Telephonic Meetings

The Board of Directors, or any committee thereof, may conduct meetings telephonically, by means of conferencing equipment or similar systems by which all participants may be heard.  Participation in such a meeting is equivalent to personal presence at such meeting.

### 6.8  Action Without Meeting

Directors may take action without a meeting if all Directors consent thereto in writing, and such consent shall constitute a unanimous vote.  Record of such consent shall be filed by the Secretary with the minutes of proceedings of the Board of Directors in the books and records of the Corporation.

### 6.9  Quorum

At all meetings of the Directors, a majority of the Directors shall constitute a quorum for the transaction of any business, and the acts of a majority of the Directors present at a meeting at which a quorum is present shall be the acts of the Directors except as otherwise specified herein. If at any meeting of the Directors there be less than a quorum present, the majority of those Directors present may adjourn the meeting until a quorum can be present.

### 6.10 Minutes

The minutes and a record of any decisions made at a meeting of the Board of Directors shall be maintained by the Secretary and made available by same to all Directors before the next scheduled meeting of the Board of Directors.

### 6.11 Compensation and Reimbursement of Directors

No compensation shall be provided to Directors for services rendered to or as members of the Board of Directors or its committees, save reimbursement for reasonable costs and expenses incurred on behalf of the Corporation, as authorized by the Board of Directors and pursuant to the limitations set forth herein, except as otherwise may be set forth in these Bylaws.

### 6.12 Removal of Directors

Any Director may be removed from office for cause by the vote of two-thirds (2/3) of those Directors present at a meeting of the Board of Directors at which a quorum is present, provided that all Directors, including the Director to be removed are provided

no less than ten (10) days' notice of such meeting.

6.13. **Standard of Conduct for Directors**

Directors when discharging the duties of a Director shall act in good faith, in a manner reasonably believed to be in the best interests of the Corporation.  Directors, when becoming informed in connection with their decision-making function or devoting attention to their oversight function, shall discharge their duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances.  In discharging Board or committee duties, Directors shall disclose information to the Board or a committee that is material to the discharge of the Directors' decision-making or oversight functions; provided, however, that disclosure is not required to the extent that the Director reasonably believes that disclosing would violate a duty imposed by law, a legally enforceable obligation of confidentiality, or a professional ethics rule. Unless a Director has knowledge that makes reliance unwarranted, a Director when discharging the duties of a Director may rely on information, opinions, reports, or statements prepared or presented by officers, employees or volunteers of the Corporation whom the Director reasonably believes to be reliable and competent in the functions performed or the information or opinions provided, legal counsel, public accountants or other persons retained by the Corporation as to matters that the Director reasonably believes to be within the person's professional or expert competence or as to which the person merits confidence, or a committee of the Board of Directors of which the Director is not a member if the Director reasonably believes the committee merits confidence.

## 7.0  OFFICERS

The Officers of the Corporation shall be the Chair of the Board of Directors, Chief Executive Officer ("CEO"), President, Vice President/Treasurer, and General Counsel/Secretary (collectively, the "Officers"), and such other officers as the Board of Directors, or the USAGM Chief Executive Officer in accordance with the Act, may appoint.

In no event shall the positions of President and Treasurer be occupied simultaneously by the same individual.

### 7.1  Election and Term of Office

The Chair shall be elected by majority vote of the Board of Directors at a duly called meeting at which a quorum is present.  The Chair shall serve a term of two (2) years on a calendar year basis, and he or she shall hold office until his or her successor is elected

7

and qualified or his or her earlier resignation or removal.  In no event shall the position of Chair be filled by the same individual for more than two (2) consecutive terms.

All other Officers shall be elected by majority vote of the Board of Directors at a duly called meeting at which a quorum is present or as may be authorized by 22 U.S. C. 6203 et seq.  Each Officer shall serve a term of three (3) years on a calendar year basis, and he or she shall hold office until his or her successor is elected and qualified or his or her earlier resignation or removal or as may be authorized by 22 U.S.C. 6203 et seq.  There shall be no limitations on consecutive or total terms of office for such Officers.

### 7.2   Powers and Duties

The respective Officers shall have the powers and duties usually vested in such officers, including without limitation the following, and those that may be vested in them by the Board of Directors from time to time.

### 7.2.1   Chair of the Board of Directors

The Chair shall preside over all meetings of the Board of Directors; shall serve as a members of all standing committees of the Board of Directors; shall annually evaluate, in consultation with the Board, the performance of the CEO and shall exercise any other powers and discharge any other duties as vested in the Chair by the Board of Directors.

### 7.2.2   Chief Executive Officer

The CEO shall be responsible for implementing and sustaining medium- and long-term initiatives related to fundraising, grantmaking, external relations, partnerships, Corporate development, recruitment for the Board of Directors, and retention of subject matter experts to augment the work of such standing and ad hoc committees of the Board of Directors as may be established; shall serve as the primary liaison between the Board of Directors and the President, pursuant to the translation of qualitative plans and projects into actionable and quantitative executables; shall serve as the Corporation's resource for maintaining cross-organizational cohesion and inclusiveness; shall provide suggestions for consideration of the Board of Directors nominees for the positions of Officers of the Corporation as well as succession planning; shall be responsible for Corporate strategy in conjunction with the President; and, subject to the limitations in this article, have exclusive authority over all hiring

8

and employment decisions by the Corporation after taking into consideration any recommendations by the President ; and shall serve as a member of the USAGM International Coordinating Committee (or such successor coordinating committee that consists of representatives of Radio Free Asia, RFE/ RL, Incorporated, the Office of Cuba Broadcasting, the Voice of America, and USAGM).

### 7.2.3   President

The President shall exercise active and general management of the day-to-day affairs of the Corporation and ensuring the implementation of all resolutions and orders of the Board of Directors; shall be responsible for the recruitment, training and retention of staff and make recommendations for employment actions to the CEO; shall be responsible for developing corporate strategy and executing action plans in collaboration with the CEO; shall timely inform, either directly or through the CEO, as appropriate, the Board of Directors of such matters of significance to the Corporation that occur during the general management of its day-to-day affairs; shall seasonably inform the Board of Directors of the state and operations of the Corporation.

### 7.2.4   Vice President/Treasurer

The Vice President/Treasurer shall, in the absence or disability or pursuant to the removal or resignation of the President, exercise the powers and discharge the duties of the President as set forth herein, subject to the same limitations incumbent thereupon; shall serve as the Treasurer of the Corporation, overseeing and administering all financial affairs of the Corporation, including the administration and maintenance of all financial records and books of account and the means by which such books and records are kept and reported; shall prepare and recommend an annual budget of the Corporation for the consideration of and adoption by the Board of Directors; shall seasonably submit to the Board of Directors, or upon request of same, reports on the financial affairs and state of the Corporation; shall provide for the timely completion of all such audits as may be required by law or generally accepted accounting practices; and shall timely inform, either directly or through the Chair, as appropriate, the Board of Directors of such matters of significance to the Corporation that arise with respect to the discharge of the foregoing duties.

9

### 7.2.5   General Counsel/Secretary

The General Counsel/Secretary shall serve as chief legal officer for the Corporation; shall provide advice and counsel on such matters concerning the Corporation as may be referred to the General Counsel/Secretary by Directors, Officers, or the collective Board of Directors or its committees; shall attend each meeting of the Board of Directors and take the minutes thereof, maintaining the official record of same; shall issue the official notice of meetings of the Board of Directors as set forth herein; and shall timely inform, either directly or through the Chair, as appropriate, the Board of Directors of such matters of significance to the Corporation that arise with respect to the discharge of the foregoing duties, including matters of legal risk and regulatory compliance.

### 7.3   Compensation of Officers

The Board of Directors shall establish the annual rate of compensation for the CEO, which shall be paid from the Corporation's operating funds.  No other Officer shall be compensated for their service as an Officer of the Corporation, save reimbursement for reasonable costs and expenses incurred on behalf of the Corporation pursuant to the limitations set forth herein, provided, however, that such other Officers may be compensated for services rendered to the Corporation in their capacities as employees of the Corporation.

### 7.4   Resignation of Officers

Any Officer may resign at any time by delivering written notice to the Board of Directors, the Chair of the Board of Directors, or the Chief Executive Officer.  A resignation is effective when the notice is delivered unless the notice specifies a later date.  Acceptance by the Board of Directors of such resignation shall not be necessary to make it effective.

### 7.5.   Standard of Conduct for Officers

Each officer of the Corporation shall discharge his or her duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the officer reasonably believes to be in the best interests of the Corporation.  Each officer shall inform his or her superior officer to whom the officer reports or the Board of Directors or a committee thereof of any information about the affairs of the Corporation known to the officer and within the scope of the officer's functions, and known to the officer to be material to the superior

10

officer, Board or committee thereof.  Each officer shall inform his or her superior officer, or another appropriate person within the Corporation, or the Board or a committee thereof, of any actual or probable material violation of law involving the Corporation, and any material breach of duty to the Corporation by an officer, employee, or agent of the Corporation that the officer believes has occurred or is likely to occur.  When discharging his or her duties an officer who does not have knowledge that makes reliance unwarranted may rely on information, opinions, reports, or statements prepared or presented by officers or employees of the Corporation whom the officer reasonably believes to be reliable and competent in the functions performed or the information or opinions provided, or legal counsel, public accountants or other persons retained by the Corporation as to matters that the officer reasonably believes to be within the person's professional or expert competence or as to which the person merits confidence.

## 8.0  FINANCIAL ADMINISTRATION AND FUNDRAISING

### 8.1  Purpose of the Financial Assistance

The Corporation shall have the power to make grants, contracts, cooperative agreements, contributions and to render other financial assistance for the purposes expressed in Section 2.0 of the Bylaws and in accordance with available financial resources as determined by the Vice President/Treasurer.

### 8.2  Accounting Required

The Board of Directors shall require that all grantees furnish a periodic accounting of sufficient detail and particularity to show that such funds were expended for the purposes that were approved by the Corporation.  Pursuant to the Corporation's receipt of grants or funds under the Act, the Corporation shall at all times comply with the following requirements set forth by USAGM:

1. The activities of the Corporation as set forth in Section 2.2.1, and any Grant Agreement with USAGM, will be in compliance with USAGM grant administration and under the oversight of the USAGM Director of Internet Freedom.
2. The Corporation shall furnish USAGM a quarterly accounting of all grant funds to ensure that such funds were expended appropriately and in support of the Agency's mission to "inform, engage, and connect people around the world in support of freedom and democracy."

11

3. The Corporation shall, upon request and at any time, furnish USAGM with an audit of any Corporate program expenditure.
4. The Corporation shall at all times administer its funds in full compliance with and adherence to the terms of any grant agreement between the Corporation and USAGM, pursuant to full cooperation between same.
5. The Corporation shall designate a liaison between the Corporation and USAGM, by and through the USAGM Director of Internet Freedom, who shall make regular recommendations to the Board of Directors regarding the ways in which the Corporation can support the efforts of USAGM journalists to disseminate, and its audiences to receive, international broadcasting consistent with the standards, principles, and goals of the Act.

### 8.3   Restrictions on Contributions

The Corporation retains complete control and discretion over the use of all contributions it receives. Contributions received by the Corporation from the solicitations for specific grants shall be regarded as for the use of Corporation and not for the organizations from which the funds were solicited. The Corporation refuses to accept contributions earmarked exclusively for allocation to one or more foreign organizations.

### 8.4   Restrictions on Fundraising

The Corporation shall not engage in any fundraising activities whatsoever unless such activities have been expressly approved in writing in advance by the Board of Directors.

### 8.5   Records of Fundraising

The Corporation shall, upon request, make available such records, documentation, and books of account concerning its fundraising activities to the USAGM Director of Internet Freedom for his or her inspection.  The Corporation shall furnish an accounting of its fundraising activities to the USAGM Director of Internet Freedom on a quarterly basis.

## 9.0   CONFLICTS OF INTEREST TRANSACTIONS

In addition to any other policies as to conflict of interest transactions that the Corporation may, from time to time, adopt, the Corporation shall, at a minimum, adhere to the following procedures with respect to conflict of interest transactions:  A contract or transaction between the Corporation and one or more of its Directors, or officers or between the

12

Corporation and any other entity in which one or more of its Directors, or officers are Directors or officers, hold a similar position, or have a financial interest, shall not be void or voidable solely for that reason, or solely because the Director, member of a designated body, or officer is present at or participates in the meeting of the Board of Directors that authorizes the contract or transaction, or solely because his or their votes are counted for that purpose, if (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors and the Board in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors even though the disinterested directors are less than a quorum; or (2) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved, or ratified by the Board of Directors.  For purpose of this Article 9.0, common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board that authorizes a contract or transaction specified in this Article.

Notwithstanding the foregoing, the appointment of a Federal official as Director or Officer by the USAGM Chief Executive Officer shall not be deemed a conflict of interest, provided that such appointment and service to the Corporation are authorized under the Act and related provisions of law.

**10.0 MAINTENANCE OF TAX-EXEMPT STATUS**

The Corporation has been formed as a nonprofit corporation under District of Columbia law for charitable, scientific, literary, or educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or corresponding provision of any future United States Internal Revenue law).

It shall be the duty of each Director and Officer to maintain the tax-exempt status of the Corporation pursuant to the provisions of Section 501(c)(3) of the Internal Revenue Code of 1986 (or corresponding provision of any future United States Internal Revenue law) and its regulations (as they now exist or as they may hereafter be amended).  A willful violation of this duty shall constitute a wrongful act or conduct subjecting the participating Director or Officer to removal procedures as set forth in these Bylaws.

**11.0 AMENDMENTS**

An amendment to the Articles of Incorporation or these Bylaws may be adopted only after Directors have been given ten (10) days' notice of the content of the proposed amendment by post, overnight courier, or electronic mail at the street address or electronic mail address of

13

corporate record.  The proposed amendment shall be adopted and implemented upon a two-thirds (2/3) affirmative vote of the Board of Directors [then in office/ at duly called meeting at which a quorum is present] or by unanimous consent.

## 12.0 INDEMNIFICATION, LIABILITY LIMITATION AND INSURANCE

### 12.1 Indemnification

Unless expressly prohibited by law, to the fullest extent permitted by law the Corporation shall fully indemnify any person made, or threatened to be made, a party to an action, suit or proceeding (whether civil, criminal, administrative or investigative) by reason of the fact that such person, or such person's testator or intestate, is or was a director, officer, employee or agent of the Corporation or serves or served any other enterprise at the request of the Corporation, against all expenses (including attorneys' fees), judgments, fines and amounts paid or to be paid in settlement incurred in connection with such action, suit or proceeding.

### 12.2 Limitation of Liability for Volunteers and Employees

Provided the corporation maintains liability insurance with a limit of coverage of not less than $200,000 per individual claim and $500,000 per total claims that arise from the same occurrence, officers, directors and other persons who perform services for the Corporation and who do not receive compensation other than reimbursement of expenses for those services ("volunteers") shall be immune from civil liability; except that the foregoing insurance requirements shall not be required if the Corporation is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, and the Corporation has annual total functional expenses (exclusive of grants and allocations) of less than $100,000. Additionally, persons regularly employed to perform a service for a salary or wage ("employees") shall not be held personally liable in damages for any action or omission in providing services or performing duties on behalf of the corporation in an amount greater than the amount of total compensation (other than reimbursement of expenses) received during the twelve (12) months immediately preceding the act or omission for which liability was imposed.  Regardless of the amount of liability insurance maintained, this limitation of liability for officers, directors, volunteers and employees shall not apply when the injury or damage was a result of such person's willful misconduct, crime (unless the officer, director, volunteer or employee had reasonable cause to believe that the act was lawful), transaction that resulted in an improper personal benefit of money,

14

Def. App. 197

property or service to the officer, director, volunteer or employee, or act or omission that was not in good faith and was beyond the scope of authority of the Corporation pursuant to this applicable law or the corporate charter.  This limitation of liability shall not apply to any licensed professional employee operating in his or her professional capacity.  The Corporation is liable only to the extent of the applicable limits of insurance coverage it maintains.

**12.3 Insurance**

Notwithstanding any other provision in these Bylaws, including this Article 12.0, the Corporation shall purchase insurance on behalf of any individual who is or was a director or officer of the Corporation, or who, while a director or officer of the Corporation, serves or served at the Corporation's request as director, officer, partner, employee, or agent of another entity (including, but not limited to an employee benefit plan), against liability asserted against or incurred by the individual in that capacity or arising from the individual's status as a director or officer, whether or not the Corporation would otherwise have power to indemnify or advance expenses to the individual against the same liability under the District of Columbia Nonprofit Corporation Act of 2010 Act, as amended**.**

## 13.0 MISCELLANEOUS PROVISIONS

**13.1 Fiscal Year**

The fiscal year of the Corporation shall begin on the first day of October of every year, except that the first fiscal year of the Corporation shall begin as of the date of incorporation.  The fiscal year provided for herein shall be subject to change by act of the Directors, should corporate practice subsequently dictate.

**13.2 Execution of Instruments**

All checks or demands for money and notes of the Corporation shall be signed by such Officer or Officers or such other person or persons as the Board of Directors may from time to time designate.

**13.3 Corporate Seal**

The Corporation may have a corporate seal of such design as the Board of Directors may prescribe.  The General Counsel/Secretary shall have custody of the corporate seal and the authority to affix it to all instruments so requiring.

15

**13.4.  Director, Officer and Employee Representations.**

No Director, officer or employee of the Corporation (or any entity in which such person is in a position of authority such as an owner, officer or chief executive) is authorized to speak or take action on behalf of the Corporation without the prior specific authorization of the Chair of the Board of Directors (or his/her designee) or the CEO or President (or his/her/their designee).  In addition, no such person(s) or entities are authorized to use the name or logo of the Corporation in conducting any non-Corporation business in any manner that suggests or reasonably may be interpreted to imply the approval by the Corporation without the prior specific authorization of the Chair of the Board of Directors (or his/her designee).

**13.5.  Loans.**

The Corporation shall not lend money to or guarantee the obligations of a Director or officer.

**14.0 CONTEST OF VALIDITY OF CORPORATE ACTIONS [OPTIONAL]**

In the event that any of the members of the Board of Directors, officers, or any other party or parties that are permitted by applicable law to be subject to this provision, seeks to contest or otherwise challenge the validity of any action taken by the Corporation or the Board of Directors, then to the fullest extent permitted by applicable law, such challenge shall be resolved as permitted by and in accordance with Section 20-401.22(c) of the District of Columbia  Nonprofit Corporation Act of 2010, as amended, as follows:  Such contest or other challenge of the validity of an action taken by the Corporation or the Board of Directors shall be submitted for final disposition to the Board of Directors who shall resolve such challenge by a majority vote of all of the then-existing members of the Board of Directors; and such disposition by the Board of Directors shall be final to the fullest extent permitted by applicable law.

16

# GRANT AGREEMENT
# BETWEEN THE
# U.S. AGENCY FOR GLOBAL MEDIA AND
# OPEN TECHNOLOGY FUND

## FAIN: OT01-19-GO-00001

## GRANT FUNDS TABLE

|  | Initial Award | New Award Total | Currency gain/(loss) (Informational) |
|---|---|---|---|
| **Operations** | $4,000 | $4,000 | None Reported |
| **Internet Freedom** | -0- | -0- | None Reported |
| **FUNDING** | $4,000 | $4,000 | None Reported |

Preamble

This Grant Agreement ("Agreement") is between the **U.S. AGENCY FOR GLOBAL MEDIA**[1] (hereinafter "USAGM") and **OPEN TECHNOLOGY FUND** (hereinafter "Non-Federal Entity"), a nonprofit organization incorporated in the District of Columbia. USAGM enters into this Agreement under the authority provided by the U.S. International Broadcasting Act of 1994, as amended, 22 U.S.C. §§ 6201 et seq. (the "International Broadcasting Act") and other authorization or appropriation acts that provide authority for such activities. **The Catalog of Federal Domestic Assistance (CFDA) Number for USAGM is 90.500. The DUNS Number for the Non-Federal Entity is 117206256.  The Federal Award Identification Number (FAIN) for this Award for Financial Assistance is OT01-19-GO-00001.**

WHEREAS, USAGM is the United States Government agency responsible for non-military U.S. Government-funded international broadcasting pursuant to the authorities set forth in the International Broadcasting Act;

WHEREAS, the purpose of the activities supported by the International Broadcasting Act is to "promote the right of opinion and expression, including the freedom 'to seek, receive, and impart information and ideas through any media and regardless of frontiers,' in accordance with Article 19 of the Universal Declaration of Human Rights;" Id. § 6201 (1)

WHEREAS, USAGM's mission is to "inform, engage, and connect people around the world in support of freedom and democracy;"




---

[1] On August 22, 2018, The Broadcasting Board of Governors (BBG) officially changed its name to the U.S. Agency for Global Media (USAGM).

1

WHEREAS, USAGM seeks to find tools to facilitate the provision and receipt of news and information to countries that have limited or no access to free press and media, and, in furtherance thereof;

WHEREAS, in furtherance of this mission and as authorized by the International Broadcasting Act, USAGM makes and supervises a grant to the Non-Federal Entity to advance Internet freedom overseas through the research, development, and implementation of technologies that enable secure and unrestricted access to news and information on the Internet, consistent with the scope and limitations of the authorization for such activities in our annual appropriation act and other provisions of law;

NOW, THEREFORE, USAGM agrees to make, and the Non-Federal Entity agrees to accept, the grant of funds in accordance with the following provisions:

Article I - THE GRANT

a.   Amount of the Grant. USAGM hereby grants the amount of **$4,000.00** (the "Grant Funds"), provided by the Continuing Appropriations Act, 2019, Division C of P.L. 115- 245 (September 28, 2018), to Non-Federal Entity for the purposes and subject to the terms and conditions stated herein. -

b.   Use of the Grant Funds. The Non-Federal Entity may use the Grant Funds solely for planning and operating expenses related to advancing Internet freedom overseas, within the meaning of paragraph c of Article I, and administration thereof.  The Grant Funds are provided solely for the purposes and in the amounts approved by USAGM and as set forth in the Approved Financial Plan (as such term is defined in Article VI hereof and subject to the review procedures and adjustments described therein).

c.   The funds made available under this grant are subject to the purposes set forth in law for the Agency's internet freedom funding, including the annual appropriation Act.  For funds appropriated under the Consolidated Appropriations Act, 2019, section 7065 of that act defines the scope of USAGM Internet Freedom funding.

d.   Funds provided under a partial year, Continuing Resolution (CR) are subject to the terms and conditions set forth in Article VI(a)(5) and those otherwise required under a partial year CR.

Article II - WORK/ PROJECTS SUPPORTED WITH GRANT FUNDS

a.   Non-Federal Entity shall use the Grant Funds to support authorized Internet Freedom activities consistent with the relevant principles and standards set forth in the International Broadcasting Act and the strategy for USIB as determined and implemented by the USAGM.[2]

---

[2] Under authority delegated by the Board of the USAGM, the Chief Executive Officer (CEO) exercises all of the Board's delegable authorities for day-to-day operation of the Agency, including with respect to the Non-Federal Entities,

2

b.  The Non-Federal Entity shall carry out projects described in the Approved Financial Plan, as defined in Article VI of this Agreement. Upon USAGM's request, the Non-Federal Entity shall provide to USAGM with a detailed written schedule of all of the efforts and the projects funded with the Grant Funds.

c.  All efforts shall be carried out in a manner consistent with the Agency Internet Freedom Framework and Governance Documents.

Article III - RIGHTS

a.  Subject to the limitations of Article III(c), the Non-Federal Entity acknowledges and agrees that USAGM is authorized to provide for distribution of the programming that is paid for with the Grant Funds over the global network of broadcasting and transmission facilities owned and/or operated by USAGM or, as the case may be, through affiliated networks arranged by USAGM ("USAGM's Global Distribution Network"). Subject to the limitations of Article ITI(c), the Non-Federal Entity shall provide the programming that it produces with the Grant Funds to USAGM for distribution over USAGM Global Distribution Network.

b.  The Non-Federal Entity may not use Grant Funds for the purpose of concluding agreements with affiliates, except as approved in writing by USAGM. Unpaid affiliate agreements must be consistent with the USAGM's strategy for USIB, as described in Article II (a).

c.  The Non-Federal Entity grants to USAGM a worldwide, non-exclusive, royalty-free and perpetual license to broadcast, use, distribute and create derivative works from those of the Non-Federal Entity's original programs that contain no materials provided by or licensed from any third parties. The Non-Federal Entity grants to USAGM a worldwide, non- exclusive, royalty-free license to broadcast and otherwise use those of the Non-Federal Entity's programs that are legally available for such licensing and use. When obtaining materials from third parties for inclusion in its original programming, the Non-Federal Entity agrees to use reasonable best efforts to secure sufficient rights to permit the Non- Federal Entity to license to USAGM (on a non-exclusive, worldwide and royalty-free basis) the right to broadcast the resulting original programming; provided, however, that the Non-Federal Entity shall not be required to do so where the acquisition of such rights would materially and detrimentally affect the Non-Federal Entity's ability to secure its own license from said third parties. The Non-Federal Entity shall provide, without charge, information concerning, and DVD or other electronic copies of any of its programs to USAGM upon USAGM's request.

d.  The Non-Federal Entity hereby grants to USAGM, and USAGM hereby accepts, an irrevocable, royalty-free, fully paid-up, non-exclusive, perpetual license during the Grant Term to use registered and unregistered trademarks owned by the Non-Federal Entity. USAGM's use of the Non-Federal Entity's trademarks shall be limited to use in

BBG    2019 SEP 26  PM 5: 44

3

conjunction with disseminating the Non-Federal Entity's materials to USAGM's audiences for the purpose of furthering the USAGM mission.

e. As used here and elsewhere in this grant agreement, "programming" may refer to any hardware, software, or other end-products of the grant.

## Article IV - COOPERATION WITH USAGM GOVERNANCE OF UNITED STATES INTERNATIONAL BROADCASTING

As a condition of its receipt and use of the Grant Funds provided hereunder, the Non-Federal Entity shall cooperate with USAGM's governance of USIB under the International Broadcasting Act as follows:

a. The Non-Federal Entity acknowledges that certain authorities of USAGM under the International Broadcasting Act are non-delegable, including those listed in Attachment A, meaning that USAGM has sole and exclusive authority to determine USIB strategy and policy and that the Grant Funds are intended to promote and implement such USAGM-sponsored strategy and policy.

b. The Non-Federal Entity's articles of incorporation, by-laws or other constitutional documents shall provide that the Board of Directors of the Non-Federal Entity may consist of some or all of the current members of the USAGM established under the International Broadcasting Act and other technical experts, as appropriate. The Board of Directors shall make all major policy determinations governing the operations of the Non-Federal Entity and shall appoint and fix the compensation of such managerial officers and employees of the Non-Federal Entity as it considers necessary to carry out the purposes of the Grant.

The Non-Federal Entity shall cooperate in the processes and protocols of USAGM as follows:

1. The Non-Federal Entity acknowledges that USAGM has adopted certain rules of conduct to govern the participation and cooperation of the elements of USAGM-sponsored USIB. Such rules of conduct are set forth in Attachment B hereto.

2. The Non-Federal Entity shall report such information to USAGM as may be reasonably requested by USAGM in the format and within the timeframe so requested. Consistent with the USAGM's desire to foster transparency as described in the "rules of the road'" in Attachment B, and in order to better enable the Non-Federal Entity to provide accurate and relevant information, where possible, USAGM's request will include information regarding the purpose of the request.

3. The Non-Federal Entity acknowledges that USAGM has delegated to the Chief Executive Officer (CEO) the authority to oversee the day-to-day management of the Federal agency and to identify, evaluate, and resolve strategic trade-offs and conflicts among the entities, including the Non-Federal Entity, consistent with the Board's strategic guidelines and subject to the Board's continued oversight. The Non-Federal Entity shall use Grant Funds in a manner consistent with any such delegation.

4

2019 SEP 26  PM 5:47  BBG

4. In order to facilitate coordinated communications among the elements of USIB, the Non-Federal Entity will seek advance approval of USAGM of any Congressional and Executive Branch communications and outreach activities undertaken with the use of the Grant Funds, provided that nothing in this paragraph, shall prevent the Non-Federal Entity (i) from responding to specific requests for information, documents or materials from Congress or the Executive Branch, or (ii) from engaging in routine correspondence or communications with Congress and/or the Executive Branch (including United States embassies). Upon USAGM's request, the Non-Federal Entity shall inform USAGM about such responses to requests and/or correspondence in a timely manner. The Non-Federal Entity acknowledges that 31 U.S.C. §1352 prohibits Non-Federal Entities from using appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making, extension, continuation, renewal, amendment, or modification of any Federal grant. This provision shall not apply to any communications or outreach activities of any Director of the Board of Directors of the Non-Federal Entity who is a Governor of the USAGM at the time such communication or outreach activity is undertaken.

5. The Non-Federal Entity shall not disclose any information expressly designated in writing as confidential by USAGM to any third party not authorized by USAGM to receive it. USAGM shall provide to the Non-Federal Entity a copy of the written standards and procedures used by USAGM in designating information as confidential. The Non-Federal Entity shall require each Non-Federal Entity employee and contractor with access to USAGM-designated confidential information to enter into a written undertaking of confidentiality consistent with this paragraph. The Non-Federal Entity further agrees to take all steps reasonably necessary to protect the confidentiality of the confidential information and to prevent the confidential information from falling into the public domain or into the possession of unauthorized persons. The Non-Federal Entity shall have no obligation of confidentiality with respect to information that (A) was known to the Non-Federal Entity prior to receiving any of the confidential information from USAGM, (B) has become publicly known through no wrongful act of the Non-Federal Entity, or (C) was received by the Non-Federal Entity from a third party without restriction as to the use and disclosure of the information.

6. The Non-Federal Entity shall participate in activities of the International Broadcasting Bureau (IBB) Coordinating Committee in accordance with the International Broadcasting Act.

7. As indicated in Article II(c), all efforts shall be carried out in a manner consistent with the Agency Internet Freedom Framework and Governance Documents.

5

Article V- MUTUAL ASSISTANCE TO PROMOTE UNITED STATES INTERNATIONAL BROADCASTING

a. In the spirit of cooperation among USAGM-sponsored entities and in order to promote the efficient use of Grant Funds and Agency resources, USAGM and the Non-Federal Entity will use their reasonable best efforts to render assistance to each other to promote the interests of USIB and the implementation of USAGM's strategy.

b. Upon USAGM's request, the Non-Federal Entity shall make reasonable efforts to provide or facilitate provision of administrative or other services or resources to USAGM or other USAGM-sponsored broadcasting entities in order to promote implementation of USAGM's strategy. Grant Funds shall be available for in-kind services to the USAGM or other USAGM-sponsored entities where cost effective and consistent with the USAGM strategic plan as determined by USAGM. USAGM shall not be required to reimburse the Non-Federal Entity for Grant Funds used to provide such in-kind services nor otherwise to supplement the Grant Funds provided hereunder. USAGM will endeavor to make such requests in a manner that does not interfere with the Non-Federal Entity's ability to discharge its responsibilities under this Agreement and, where necessary to achieve the request, to provide resources to assist the Non-Federal Entity in fulfilling such requests. The Non-Federal Entity shall notify USAGM of any expenditures it makes on provision of in-kind services to USAGM and other USAGM-sponsored entities.

c. All assistance contemplated under this Article V shall be rendered in a manner consistent with applicable law and regulations.

Article VI— ADMINISTRATION OF THE GRANT

a. Development and Review of the Approved Financial Plan

1. Definition. As used in this Agreement, the term **"Approved Financial Plan"** shall mean (i) the financial plan for use of the Grant Funds that is approved by USAGM in accordance with the procedures set forth in this Article VI; (ii) any modification to such plan that is approved by USAGM during the term of this Agreement; and (iii) any proposal or modification of such proposal during a Continuing Resolution as referenced in Article VI (a) (5) below.

2. Financial Plan Required. Unless otherwise determined by USAGM, within 30 calendar days (or, if the same is on a U.S. federal holiday, the first business day occurring thereafter) of entering into this Agreement (or, as the case may be, any amendment to this Agreement which alters the amount or purpose of Grant Funds available), the Non- Federal Entity shall submit to USAGM a proposed detailed financial plan consistent with the strategy, purposes, and language services approved by USAGM and covering the full amount of the Grant.

3. Financial Plan Detail. The Non-Federal Entity's proposed financial plan shall delineate the Non-Federal Entity's anticipated monthly expenditures for each budget line item, anticipated monthly expenditures for each office and language service, and any additional detail required by USAGM. Budget line items will be

6

defined by the USAGM in order to ensure uniformity.

4.  Approval of the Proposed Financial Plan. USAGM shall transmit any disapproval of the proposed financial plan within 30 days of its receipt from the Non-Federal Entity. If USAGM has not notified the Non-Federal Entity of its disapproval within 30 days of receiving the plan, the plan shall be deemed approved.

5.  Financial Plan during a Partial Year Continuing Resolution (CR). If appropriations for the full year amount of the Grant Funds are not available to USAGM at the time that the Non-Federal Entity enters into this Agreement, the Non-Federal Entity shall provide, with each request for funding, an explanation of funding requirements for the period covered by the funding request and two subsequent months. Unless otherwise determined by law or approved by USAGM, such requirements shall include only the minimum amounts of Grant Funds reasonably necessary to sustain current operations under the partial-year Continuing Resolution. No later than 30 days after enactment of an appropriation covering the fiscal year, the Non-Federal Entity shall submit a proposed detailed financial plan for approval in accordance with paragraphs one (1) through four (4) of this subsection. The Non-Federal Entity shall operate at a rate of obligation under its CR financial plan until] USAGM approval in accordance with this paragraph.

b.  USAGM will provide the Grant Funds to Non-Federal Entity by the U.S. Treasury electronic funds transfers through the Automated Clearing House System.  USAGM will make disbursements in monthly increments or on such other basis as may be consistent with the Approved Financial Plan.

c.  Reporting and Review of Use of Grant Funds

1.  Monthly Reports. Unless otherwise approved by USAGM, twenty (20) days after the end of each month, except following the final month of the fiscal year, when this period shall be 30 days, the Non-Federal Entity shall provide to USAGM a report (Monthly Reports shall include a Federal Financial Report (SF-425) and Statement of Obligations and Disbursements (SOD)), for such month, of obligations and cash disbursements in U.S. dollars with the level of detail described in Article VI(a)(3), together with such additional information as USAGM may request from time to time. As requested by USAGM, the Non-Federal Entity shall justify in detail its use of Grant Funds against items defined in the Approved Financial Plan.

2.  Reporting on Mitigation of Illicit Use. In accordance with Continuing Appropriations Act, 2019, Division C of P.L. 115- 245 (September 28, 2018), the Non-Federal Entity shall establish safeguards to minimize the use of Work supported with these grant funds for illicit purposes to the greatest extent possible ("the Safeguards"). The Non-Federal Entity shall provide USAGM an annual update of the Safeguards and shall review the risks and benefits of all supported



7

Work in relationship to the Safeguards and report findings to USAGM upon request.

3. Other Reviews. The Non-Federal Entity shall prepare and submit to USAGM such other reviews and reports on expenditures and obligations as USAGM may request on a schedule to be provided periodically by USAGM.

4. Report on Vacancies. Not later than the 21 days after the end of each fiscal quarter, the Non-Federal Entity shall submit a report to USAGM listing personnel vacancies as of the end of the quarter. This report should be organized by division and include the Position Title, Grade Level, Annual Salary, Date Vacant and Expected Hire Date. The provision of such report to USAGM is solely to facilitate USAGM's budget planning and reporting to Congress and does not imply that the Non-Federal Entity is required to seek USAGM approval to fill personnel vacancies.

5. Report on Equipment and Equipment Disposition. In accordance with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for federal Award, 2 CFR §200, the Non-Federal Entity shall submit annually to USAGM an inventory of all equipment. Requests for disposition instructions concerning property purchased with Grant Funds with an estimated fair market value (at the time of such disposition) of U.S. $5,000 or more must be submitted to USAGM 120 days in advance of the proposed disposition. If USAGM has not notified the Non-Federal Entity that the disposition is disapproved, the disposition will be deemed approved.

d. The Non-Federal Entity shall maintain at its principal offices full and complete records and books of account, in accordance with generally accepted accounting principles, covering the financial details applicable to the Grant. The Non-Federal Entity shall maintain separate accountability for funds provided under this Agreement. The Non-Federal Entity shall expend these funds only on the operating costs authorized by this Agreement unless it receives prior written approval of USAGM to do otherwise.

e. In accordance with 2 CFR §200.308, the Non-Federal Entity is required to report deviations from the Approved Financial Plan to USAGM. The Non-Federal Entity shall make reasonable efforts to provide prior notice of anticipated deviations. The Non-Federal Entity may not transfer Grant Funds among direct costs if the cumulative amount of such transfers exceeds, or is expected to exceed 10 percent of the total budget in the Approved Financial Plan unless otherwise approved by USAGM .

f. Unless otherwise approved by USAGM, the Non-Federal Entity shall provide five (5) days advance notification of any new grants or contracts exceeding U.S. $350,000 and any new leases exceeding U.S. $200,000.

g. Return of Funds

8

1. The Non-Federal Entity shall return to USAGM at the conclusion of the fiscal year or other period agreed upon by the parties any portion of the Grant Funds that are not required for a legally binding transaction or designated by the Non-Federal Entity for a purpose and in an amount consistent with the Approved Financial Plan.

2. Any and all interest earned on Grant Funds provided to the Non-Federal Entity pursuant to this Agreement shall be returned to USAGM on an annual basis in accordance with the requirements of 2 CFR §200.305.

3. Expenditures by the Non-Federal Entity that are not consistent with the Approved Financial Plan or otherwise permitted by this Agreement shall be recovered by the Non- Federal Entity and promptly refunded to USAGM.

Article VII—REGULATORY COMPLIANCE

a. The Parties acknowledge and agree that the Parties are subject to all Federal rules and regulations pertaining to federal grants, including the following: 22 U.S.C. §§ 6201 et seq., 31 U.S.C. §§ 7502 and 1352, 41 U.S.C. § 702, the Federal Grant and Cooperative Agreement Act and implementing regulations, and 2 CFR §200.

b. Allowability of costs incurred under this Agreement will be determined in accordance with 2 CFR §200, pursuant to certain clarifications specified in Attachment C and subject to any exceptions granted by authorization or appropriation laws.

c. The Non-Federal Entity shall comply with the covenants and other contracting provisions set forth in Attachment D.

d. The Non-Federal Entity shall comply with grant limitations in the International Broadcasting Act and/or any applicable appropriations statute that are expressly applicable to the Non-Federal Entity, including without limitation, those set forth in Attachment E.

e. The Non-Federal Entity shall deliver all required certifications identified in Attachment F upon execution of this Grant Agreement.

f. No Grant Funds may be used for the following purposes:

1. to pay any salary or other compensation, or enter into any contract providing for the payment of salary or compensation in excess of the rates established for comparable positions under Title 5 of the United States Code, or the foreign relations laws of the United States.

2. to pay first-class travel for any employee of the Non-Federal Entity, or the relative of any employee.

g. The Non-Federal Entity shall comply with all applicable U.S. laws and regulations, including, without limitation, the copyright laws of the United States.

9

h.  In accordance with Continuing Appropriations Act, 2019, Division C of P.L. 115-245 (September 28, 2018), the Non-Federal Entity shall only support technologies that undergo comprehensive security audits to ensure that such technology is as secure as possible and has not been compromised in a manner detrimental to the interest of the United States or to individuals and organizations benefiting from program supported by such funds.

i.  When engaging outside the United States in activities that require the use of Grant Funds, the Non-Federal Entity shall exercise due diligence to ascertain the local laws and regulations, and other relevant local circumstances, applicable to the Non-Federal Entity's activities in the relevant country(ies) where such activities shall be undertaken. In the event that the Non-Federal Entity or any of its employees or contractors becomes subject to any fine, imprisonment, judgment, tax, or other penalty (whether civil, administrative, criminal, or otherwise) in any country as a result of the activities undertaken with the use of the Grant Funds, the Non-Federal Entity shall notify USAGM in writing of the same as soon as practicable (but, in no case later than 30 days following any such event) and shall provide such information as USAGM may request regarding the circumstances of any such penalty.

j.  Consistent with 2 CFR §200.113, applicants and recipients must disclose, in a timely manner, in writing to the Office of Inspector General (OIG) for the Department of State and the U.S. Agency for Global Media, with a copy to the cognizant Grants Officer, all violations of Federal criminal law involving fraud, bribery, or illegal gratuities potentially affecting the Federal award. Sub-recipients must disclose, in a timely manner, in writing to the OIG and to the prime recipient (pass-through entity) all violations of Federal criminal law involving fraud, bribery, or illegal gratuities potentially affecting the Federal award. Failure to make required disclosures can result in any of the remedies described in §200.338. Remedies for noncompliance, including suspension or debarment. Disclosures must be sent to: U.S. Department of State Office of Inspector General, P.O. Box 9778, Arlington, VA 22219, Website: https://oig.state.gov/hotline Phone: 1-800- 409-9926 or 202-647-3320

## Article VIII — LIMITATIONS OF USAGM OVERSIGHT

a.  The Non-Federal Entity is a private, nonprofit corporation, and nothing in this Agreement may be construed to make the Non-Federal Entity a Federal agency or instrumentality,

b.  USAGM's oversight and supervision of the Grant Funds are subject to limitations in applicable law.

c.  USAGM acknowledges and affirms the safeguards contained in the United States International Broadcasting Act of 1994 (as amended) meant to preserve the journalistic independence and integrity of USAGM programming. USAGM acknowledges and affirms that those safeguards extend to the Non-Federal Entity. To that end, no U.S. Government official—including individual Governors, the CEO, the Secretary of State, and the Inspector General—may attempt to influence the content or editorial choices of one of the broadcasting entities in a manner that is not consistent with the highest

10

standards of professional broadcast journalism. Nor may any U.S. Government official take any other action that may tend to undermine the journalistic integrity, credibility, or independence of USAGM, the Non-Federal Entity, or Work funded by the Non-Federal Entity or its broadcasters. In the event that the Non-Federal Entity reasonably believes that a breach of this Article VIII (c) has occurred, then the Non-Federal Entity shall report the breach to the Chairperson of the USAGM.

d. USAGM acknowledges and affirms the safeguards contained in the United States International Broadcasting Act of 1994 (as amended) meant to preserve the journalistic independence and integrity of USAGM programming.  To that end, no U.S. Government official—including individual Governors, the CEO, the Secretary of State, and the Inspector General—may attempt to influence the content or editorial choices of one of the broadcasting entities in a manner that is not consistent with the highest standards of professional broadcast journalism or take any other action that may tend to undermine the journalistic credibility or independence of USAGM or its broadcasters.  In the event that the Non-Federal Entity reasonably believes that a breach of this Article VIII (b) has occurred, then the Non-Federal Entity shall report the breach to the Chairperson of the USAGM.

## Article IX - FUNDRAISING

The Non-Federal Entity may not engage in fundraising from other sources except in accordance with the principles of fundraising to be agreed by USAGM and the Non-Federal Entity.  The Non-Federal Entity is prohibited from using any Federal funds to finance its fundraising efforts, except as may be agreed upon.

## Article X - PERSONNEL SECURITY POLICY

a. To the extent authorized and that USAGM determines that they are able, USAGM will perform security background investigations and provide appropriate clearance for the persons holding the positions listed in the letter to be provided by USAGM to the Non-Federal Entity following the signing of this Agreement. These security background investigations and clearances shall be performed at no cost to the Non-Federal Entity.

With regard to those of the Non-Federal Entity's employees and contractors who are not identified in the letter to be provided pursuant to Article X (a), but who are determined by the Non-Federal Entity and USAGM to require background investigations and/or clearances, the Non-Federal Entity and USAGM shall establish an agreed upon protocol ("Protocol"), which shall be reduced to writing and confirmed in a letter agreement following the signing of this Agreement. The Protocol shall cover (i) the categories of persons for whom such investigations and/or clearances are required, (ii) the identity of the entity or entities that will perform the investigations and/or clearances and, where necessary, (iii) who shall cover the costs associated with such investigations and/or clearances,

## Article XI — IT NETWORK SECURITY POLICY

11

Any material breach of the Non-Federal Entity's IT network security policies, or any incident that materially affects the integrity or operations of the Non-Federal Entity's IT network system, shall be reported to USAGM within twenty-four (24) hours of detection. These violations shall include, but are not limited to, the following:

1. Unauthorized access to any of the social media or web site content management systems used by the Non-Federal Entity.

2. Disruption or denial of service for production or distribution systems.

3. Unauthorized modification or removal of the Non-Federal Entity data.

Article XII - AUDITS AND INSPECTIONS

a. Records required to be kept in order to comply with the terms and conditions of this Agreement, including bid solicitations, evidence of shipment for commodities and procurement and service contracts, shall be maintained by the Non-Federal Entity for a period of three (3) years from the date of the submission of the final expenditure report, in a manner that will permit verification of the Non-Federal Entity's compliance with its representations, warranties, and obligations contained in this Agreement. If any litigation, claim or audit is started before the expiration of the 3-year period, the records shall be retained until such litigation, claim or audit has been resolved.

b. The Non-Federal Entity acknowledges the audit requirements set forth in accordance with 2 CFR §200 Subpart F.

c. Operations of the Non-Federal Entity, as related to use of the Grant Funds, may be audited by the Government Accountability Office in accordance with such principles and procedures and under such rules and regulations as may be prescribed by the Comptroller General of the United States. Any such audit shall be conducted at the place or business where accounts of the Non-Federal Entity are normally kept.

d. Representatives of the Government Accountability Office shall have access to all books, accounts, records, reports, files, papers, and property belonging to or in use by the Non-Federal Entity, pertaining to such financial transactions and necessary to facilitate an audit. Such representatives shall be afforded full facilities for verifying transactions with any assets held by depositories, fiscal agents, and custodians, All such books, accounts, records, reports files, papers, and property of the Non-Federal Entity, shall remain in the possession and custody of the Non-Federal Entity.

e. The Inspector General of the United States Department of State is authorized to exercise the authorities of the Inspector General Act of 1978 with respect to the Non-Federal Entity.

f. USAGM shall conduct an annual review to measure the Non-Federal Entity's performance in achieving the purposes of this Agreement and compliance with its terms. Such reviews shall be conducted at reasonable times and upon reasonable notice to the Non-Federal Entity.

12

g. To ensure continuous and cooperative planning and operations hereunder, the Non-Federal Entity shall permit USAGM or its authorized representatives, including the Inspector General, to visit the Non-Federal Entity's facilities and to inspect the facilities, activities, and work pertinent to the grant, both in the United States and abroad, and to interview personnel engaged in the performance of the grant to the extent deemed necessary by USAGM. USAGM, however, shall not exercise any prepublication review of the substance of any broadcast or print publication of the Non-Federal Entity.

## Article XIII - FAILURE TO COMPLY WITH THE TERMS OF THE GRANT

In the event that the Non-Federal Entity fails to comply with any material term of this Grant, then, upon the decision of the USAGM Board of Governors, USAGM shall have the right to suspend or terminate the Non-Federal Entity's use of the Grant Funds by providing written notice to the Non- Federal Entity. USAGM shall provide advance notice of suspension or termination, except in urgent or compelling circumstances, as determined by USAGM in its sole discretion, after which the Non-Federal Entity will have ten (10) business days to bring itself in compliance with this Agreement.

In the event USAGM suspends or terminates the Non-Federal Entity's use of Grant Funds, the Non-Federal Entity shall forthwith return any portion of the Grant Funds in its possession or control to USAGM. Any such termination or suspension shall be without further obligation by USAGM or the United States.

## Article XIV - POINTS OF CONTACT

For USAGM, the following person, or anyone otherwise designated by the Chief Executive Officer, shall be deemed to be the points of contact for the Non-Federal Entity with respect to the provisions of this Agreement:

> Grant Turner
> Chief Financial Officer
> Tel: (202) 203-4845
> Email: gturner@USAGM.gov

For the Non-Federal Entity, the following persons, or anyone otherwise designated by either of them, shall be deemed to be the points of contact for the Non-Federal Entity with respect to the provisions of this Agreement:

> Nathaniel Kretchun
> Secretary/Treasurer
> Tel: (214) 394-5920
> Email: nat@opentech.fund

BBG

2019 SEP 26 PM 5:

13

Article XV - AMENDMENTS

The terms of this Agreement may be amended by mutual written consent between USAGM and the Non-Federal Entity.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year specified below:

**OPEN TECHNOLOGY FUND**

BY _____

Libby Liu
CEO

DATE ____9/26/19____

**U.S. AGENCY FOR GLOBAL MEDIA**
**International Broadcasting Bureau**

BY _____

John F. Lansing
CEO & Director

DATE ____9/26/19____

14

**ATTACHMENT A**

| NON-DELEGABLE USAGM AUTHORITIES |
|---|
| 1. To supervise all broadcasting activities conducted pursuant to International Broadcasting Act, the Radio Broadcasting to Cuba Act and the Television Broadcasting to Cuba Act. |
| 2. To review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such activities within the context of the broad foreign policy objectives of the United States. |
| 3. To ensure that United States International Broadcasting (USIB) is conducted in accordance with the broadcasting standards and principles set forth in the Act: |

| Broadcasting Standards<br>USIB shall – | Broadcasting Principles<br>USIB shall include – |
|---|---|
| be consistent with the broad foreign policy objectives and the international telecommunications policies and treaties of the United States; | news which is consistently reliable and authoritative, accurate; |
| not duplicate the activities of private US broadcasters or government supported broadcasting entities of other democratic nations; | a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society; |
| be conducted in accordance with the highest standards of broadcast journalism; | clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States Government; |
| be based on reliable information about its potential audience; | |
| be designed to effectively reach a significant audience; | the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad; |
| promote respect for human rights, including freedom of religion. | programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations; |
| | information about developments in each significant region of the world; |
| | a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen; |
| | reliable research capacity to meet the criteria under this section; |
| | adequate transmitter and relay capacity to support USIB activities; and training and |

BBG

2019 SEP 26   PM 5:45

15

|  |  | technical support for independent indigenous media through government agencies or private United States entities. |
| --- | --- | --- |
| 4. | To review, evaluate, and determine, at least annually, after consultation with the Secretary of State, the addition or deletion of language services. | |
| 5. | To make and supervise grants for broadcasting and related activities. | |
| 6. | To allocate funds appropriated for international broadcasting activities among the various elements of the International Broadcasting Bureau and Non-Federal Entities. | |
| 7. | To submit an annual report to the President and the Congress. | |
| 8. | To appoint such staff personnel for the Board as the Board may determine necessary to carry out its functions. | |

16

## ATTACHMENT B

The USAGM Board of Governors (Board) on June 3, 2011, adopted the following "rules of the road" governing Board operations and procedures and the interactions among the elements of United States International Broadcasting (USIB), namely (i) the Board; (ii) the International Broadcasting Bureau (IBB), Voice of America (VOA), and Office of Cuba Broadcasting (OCB); and (iii) USAGM's private Non-Federal Entities Radio Free Europe/Radio Liberty (RFE/RL), Radio Free Asia (RFA), Open Technology Fund (OTF), and Middle East Broadcasting Networks (MBN) (collectively, "Non-Federal Entities").

The Board affirmed the following general principles of USAGM governance:

- To fulfill its statutory mission, the Board requires the elements of USIB to cooperate in working toward goals established by the Board, and implemented by the IBB, in a spirit of collegiality, transparency, mutual respect, and good communication with peers and colleagues.

- The Board will endeavor to focus its attention on issues of strategic importance as required for the Board to exercise the non-delegable authorities of the Board in the United States International Broadcasting Act of 1994 (as amended).

- The Board will rely on the IBB to assist the Board in carrying out the Board's responsibilities for decisions and oversight of U.S. international broadcasting. The Board will delegate authority to the CEO to oversee the day-to-day management of the federal agency and to identify, evaluate, and resolve strategic trade-offs and conflicts among the broadcasting entities, consistent with the Board's strategic guidelines and subject to the Board's continued oversight. The Board will require the federal and non-federal elements of USIB to cooperate with and assist the CEO in fulfilling these duties.

- In recognition of the collective decision-making authority of the Governors and their desire to leverage their collective talents to promote and enhance USIB, the Governors will work to avoid the creation of "fiefdoms" in respect of the individual elements of USIB or particular functions or authorities of the Board.

- The Board will require the management of the respective, federal and non-federal elements of USIB to faithfully implement and operationalize the Board's decisions, including revised management structures intended to improve the overall efficiency of USIB, and to cooperate fully with the Committees, the CEO, and other senior USAGM officials or reporting mechanisms on which the Board relies to inform its deliberations and decision-making.

BBG

2019 SEP 26 PM 5:45

Def. App. 216

## ATTACHMENT C

Allowability of costs incurred under this Agreement will be determined in accordance with 2 CFR §200 Subpart E with the following clarifications:

a.    All operating costs are determined to be direct costs.  (See 2 CFR §200.413)

b.    The following expenses, insofar as they are reasonable and necessary to further the purpose of the grant, are authorized. (Relevant paragraphs of 2 CFR §200, are noted in parentheses.)

    1.  Official representation expenses necessary to further the mission of Non-Federal Entity, are not to exceed the amount in the Approved Financial Plan unless otherwise authorized by USAGM.  (See Department of State Standardized Regulations (DSSR), Section 300 Representation Allowances - - 330 Prohibitions)

    2.  Capital expenditures for general purpose equipment. (See 2 CFR §200.439)

    3.  Overtime, extra-pay shift, and multi-shift premiums. (See 2 CFR §200.430)

    4.  Participant support costs (See 2 CFR §200.456)

    5.  Costs of legal, accounting, and consulting services, and related costs, incurred in connection with organization and reorganization. (See 2 CFR §200.435; §200.455 & §200.462)

    6.  Public information service costs. (See 2 CFR §200.421)

    7.  Publication and printing costs. (See 2 CFR §200.461)

    8.  Foreign travel costs as specified in the Approved Financial Plan.  (See 2 CFR §200.474)

    9.  The cost of advertising the availability of publications, recordings, or services of the Non-Federal Entity, subject to limitations in applicable law or regulation.


BBG
2019 SEP 26  PM 5:45
OCFO

18

## ATTACHMENT D

1.    COVENANT AGAINST CONTINGENT FEES

The Non-Federal Entity warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees, bona fide established commercial or selling agencies maintained by Non-Federal Entity for the purpose of securing business. For breach or violation of this warranty, USAGM shall have the right to annul this Agreement without liability or in its discretion to deduct from the Agreement price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

2.    EQUAL OPPORTUNITY

During the performance of this Agreement, the Non-Federal Entity agrees that it will not discriminate against an employee or applicant for employment because of race, creed, color, sex, national origin, age, or handicap in accordance with all pertinent Federal laws and regulations prohibiting discrimination in employment including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. 2000e, et seq.; section 504 of the Rehabilitation Act of 1973, as amended; 29 U.S.C. 794; the Age Discrimination Employment Act of 1975, as amended; and 42 U.S.C. 6101, et seq. The provisions of this paragraph shall apply to employment actions including, but not limited to, employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship. The Non-Federal Entity shall continue to include in all solicitations or advertisements for employees placed by or on behalf of the Non-Federal Entity language stating that "Non-Federal Entity is an equal opportunity employer committed to work force diversity."

3.    AIR TRAVEL

The Non-Federal Entity agrees that all travel paid for with the Grant Funds will comply with the "Fly America Act" (49 U.S.C. § 40118).

4.    CONVICT LABOR

In connection with the performance of work under this grant, the Non-Federal Entity agrees not to employ any person undergoing sentence of imprisonment except as provided by 18 U.S.C. 3622 and Executive Order No. 11755, December 29, 1973, as amended.

5.    THE NON-FEDERAL ENTITY SHALL COMPLY WITH:

a.    Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000d et seq.,

19

which prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving Federal financial assistance.

b.   Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, which prohibits discrimination on the basis of handicap in programs and activities receiving Federal financial assistance.

c.   The Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits discrimination on the basis of age in programs or activities receiving Federal financial assistance.

BBG

2019 SEP 26   PM 5: 45

OCFO

20

## ATTACHMENT E

### GRANT LIMITATIONS – OPEN TECHNOLOGY FUND

A. The headquarters of OPEN TECHNOLOGY FUND (OTF) and its senior administrative and managerial staff must be in a location which ensures economy, operational effectiveness, and accountability to the Board.

B. Any contract entered into by OTF shall specify that all obligations are assumed by OTF and not by the United States government.

C. Any lease agreement entered into by OTF shall be, to the maximum extent possible, assignable to the United States Government.

D. OTF shall make every reasonable effort to ensure that administrative and managerial costs for operation of OTF should be kept to a minimum and, to the maximum extent feasible, should not exceed the costs that would have been incurred if OTF had been operated as a Federal entity rather than as a Non-Federal Entity.

BBG   2019 SEP 26   PM 5:45   OCFO

21

## ATTACHMENT F

1.   CERTIFICATION REGARDING LOBBYING

The Non-Federal Entity shall sign the Certification (Attachment G) Concerning Lobbying Activities that it will comply with 31 U.S.C. § 1352 concerning the use of appropriated funds for lobbying activities. If no appropriated funds have been paid or will be paid for lobby activities, the Non-Federal Entity shall submit Standard Form LLL, "Disclosure of Lobbying Activities."

2.   CERTIFICATION REGARDING DRUG-FREE WORKPLACE REQUIREMENTS

The Non-Federal Entity shall sign the Certification (Attachment H) Regarding Drug Free Workplace Requirements: Drug-Free Workplace Act of 1988 that it will provide a drug-free workplace in accordance with the Drug-Free Workplace Act of 1988, 22 CFR 513, Subpart F.

3.   FEDERAL DEBT STATUS

Under OMB Circular No. A-129, the Non-Federal Entity must certify that it is not delinquent on payment of any Federal debt.  The Non-Federal Entity shall sign the Certification (Attachment I) Regarding Federal Debt Status.

4.   DEBARMENT AND SUSPENSION

Executive Order 12549 of February 18, 1986, as clarified by Executive Order 12689 of August 15, 1989, requires uniform Federal rules on non-procurement debarment and suspension from certain transactions with the Government.  The May 26, 1988 Federal Register (53 Fed. Reg. 19161) contains these rules, which, among other things, require signature by Non-Federal Entities of the Certification (Attachment J) Regarding Debarment and Suspension.

5.   STANDARDS OF ETHICAL CONDUCT

The Non-Federal Entity will publish written policy guidelines, as approved by USAGM, on conflict of interest and avoidance thereof.  These guidelines will reflect federal laws and must cover financial interest, gifts, gratuities and favors, nepotism, political activity and foreign affiliations, outside employment, and use of company assets. These rules must also indicate how outside activities, relationships, and financial interests are reviewed by the responsible Non-Federal Entity official(s). The Non-Federal Entity will ensure that each employee is given a copy of the policy and notified that, as a condition of employment under the grant, the employee must abide by the terms of the policy.

22

## ATTACHMENT G

### Certification Concerning Lobbying Activities

The undersigned certifies, to the best of his or her knowledge and belief that:

(1) No federal funds have been paid or will be paid, by or on behalf of the undersigned, to any person influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment or modification of any Federal contract, grant, loan or cooperative agreement.

(2) No registrant under the Lobbying Disclosure Act of 1995 has made lobbying contacts on behalf of the undersigned with respect to this grant.

(3) The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was made when this contract was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each failure.

OPEN TECHNOLOGY FUND

Libby Liu

9/26/19
Date

23

Def. App. 222

## ATTACHMENT H

### Certification Regarding Drug Free Workplace Requirements
### Drug-Free Workplace Act of 1988

The Non-Federal Entity certifies that it will provide a drug-free workplace by (a) publishing a statement notifying employees that the unlawful manufacture, distribution dispensation, possession or use of a controlled substance is prohibited in the Non-Federal Entity's workplace and specifying that action that will be taken against employees for violation of such prohibitions; (b) establishing a drug-free awareness program to inform employees about (1) the dangers of drug abuse in the workplace, (2) the Non-Federal Entity's policy of maintaining a drug-free workplace, (3) any available drug counseling, rehabilitation, and employee assistance programs, and (4) the penalties that may be imposed on employees for drug abuse violations (c) making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (c), (d) notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will (1) abide by the terms of the statement and (2) notify the employer of any criminal drug statute conviction for a violation occurring in the workplace not later than five days after such conviction ; (e) notifying the agency within ten days after receiving notice under subparagraph (d) (2) from an employee or otherwise receiving actual notice of such conviction; (f) taking one of the following actions with respect to any employee who is so convicted: (1) taking appropriate personnel action against such an employee, up to and including termination, or (2) requiring such an employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency; and (g) making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

OPEN TECHNOLOGY FUND

Libby Liu

9/26/19
Date

BBG

2019 SEP 26 PM 5: 46

24

**ATTACHMENT I**

**Certification Regarding Federal Debt Status**
**(OMB Circular A-129)**

The Non-Federal Entity certifies to the best of its knowledge and belief that it is not delinquent in the repayment of any federal debt.

OPEN TECHNOLOGY FUND

_____
Libby Liu

_____
Date   9/26/19

BBG

2019 SEP 26  PH 5: 46

OCFO

25

## ATTACHMENT J

### Certification Regarding Debarment and Suspension

The Non-Federal Entity certifies to the best of its knowledge and belief that its principals : (a) are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excided form covered transactions by any Federal department or agency; (b) have not, within a three year period preceding this grant, been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state or local) transaction or contract under a public transaction; violation of Federal or state anti-trust statutes; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property; (c) are not presently indicted or otherwise criminally or civilly charged by a governmental entity (Federal, state or local) with any of the offenses enumerated in paragraph (b) of this certification; and (d) have not within a three-year period preceding this grant had one or more public transactions (Federal, state or local) terminated for cause of default.

OPEN TECHNOLOGY FUND

_____
Libby Liu

_9/26/09_
Date

BBG
2009 SEP 26  PM 5: 46
OCRO

26

Def. App. 225

**Radio Free Asia**
**FY 2019 FINANCIAL PLAN  - Open Technology Fund (OTF)**
**October 1, 2018 Through September 30, 2019**

9/24/2019

| OTF - NEW DIGITAL MANDARIN | October | November | December | January | February | March | April | May | June | July | August | September | FY2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries | | | | | | | | | | | | | |
| Benefits | | | | | | | | | | | | | |
| Sal/Ben -Operations | - | - | - | - | - | - | - | - | - | - | - | | |
| Contract Services | | | | | | | | | | | | | - |
| Travel & Allowances | | | | | | | | | | | | | - |
| Office Space | | | | | | | | | | | | | - |
| General & Administrative Expenses | | | | | | | | | | | | | - |
| Technical & Capital Expenses | | | | | | | | | | | | 4,000 | 4,000 |
| SUBTOTAL | - | - | - | - | - | - | - | - | - | - | - | 4,000 | 4,000 |
| | | | | | | | | | | | | | - |
| TOTAL OTF - NEW DIGITAL MANDARIN | - | - | - | - | - | - | - | - | - | - | - | 4,000 | 4,000 |

USAGM APPROVAL STATEMENT:  USAGM Financial Plan Approval applies to Open Technology Fund (OTF) which was for established as an independent non-profit grantee to implement the agency's Internet freedom programs. The agency believes that this additional independence will be beneficial to the overall mission.  As envisioned, this grantee would combine the expertise and funding of the USAGM Office of Internet Freedom (OIF) and OTF to implement the agency's Internet freedom program.  The establishment of OTF is authorized by Congressional Notification (CN) received on September 19, 2019. The agency estimates that the maximum costs for incorporating the proposed Internet freedom grantee in FY 2019 would not exceed $4,000, with residual start-up costs, recurring staffing expenses, and programmatic costs funded out of Internet freedom resources appropriated in FY 2020 and subsequent years.

U.S. AGENCY FOR GLOBAL MEDIA

FINANCIAL PLAN APPROVAL

John F. Lansing | CEO                                              9/26/19
                                                                    Date

Def. App. 226

BBG

2019 SEP 27 PM 5: 1☐

OCFO

## GRANT AGREEMENT
## BETWEEN THE
## U.S. AGENCY FOR GLOBAL MEDIA AND
## OPEN TECHNOLOGY FUND

### FAIN: OT01-19-GO-00001

GRANT FUNDS TABLE

| | Previous Award | Current | New Award Total | Currency gain/(loss) (Informational) |
|---|---|---|---|---|
| **Operations** | $4,000 | No Cost | $4,000 | None Reported |
| **Internet Freedom** | -0- | No Cost | -0- | None Reported |
| **FUNDING** | $4,000 | No Cost | $4,000 | None Reported |

This Agreement constitutes Amendment number one (001) (the "Amendment") to the Fiscal Year ("FY") 2019 Grant Agreement between the U.S. AGENCY FOR GLOBAL MEDIA ("USAGM") and OPEN TECHNOLOGY FUND ("Non-Federal Entity") signed in September 2019 (the "Grant Agreement").

The Parties hereby agree to the following:

Paragraph (a) of Article I of the Grant Agreement is hereby amended by striking the authority and inserting "Full Year Appropriations Act, 2019, Division C of P.L. 115-245 (September 28, 2018), and any other subsequent relevant Acts."

Paragraph (a) of Article I of the Grant Agreement is hereby amended by inserting the following sentence at the end, "The "Grant Funds" are available for a period ending no later than "September 26, 2020."

Funds may only be used for projects for purposes and in a manner consistent with the Approved Financial Plan (as defined in Article VI of the Grant Agreement), and the corresponding, Board-approved, Budget/Operating Plan. If at any time before the September 26, 2020, the Board decides that any project or activity under the Approved Financial Plan should no longer be carried out, that project or activity shall be considered removed from the scope of this extension.

Except as otherwise expressly provided herein, the other provisions of the FY 2019 Grant Agreement shall remain in full force and effect.

BBG

2019 SEP 27  PM 5: 12

OCFO

| OPEN TECHNOLOGY FUND | U.S. AGENCY FOR GLOBAL MEDIA |
| | International Broadcasting Bureau |

BY _____

Libby Liu
CEO

Date __9/27/19__

BY _____

John F. Lansing
CEO & Director

Date __9/27/2019__

**GRANT AGREEMENT**
**BETWEEN THE**
**U.S. AGENCY FOR GLOBAL MEDIA AND**
**OPEN TECHNOLOGY FUND**
**FOR ADDITIONAL AMOUNTS IN FY 2020**

**FAIN: OT01-20-GO-00001**

## GRANT FUNDS TABLE

| | FY 2020 PROGRAM PLAN | Previous Award Total | Initial Award | New Award Total | Currency gain/(loss) (Informational) |
|---|---|---|---|---|---|
| **FUNDING** | Continuing Resolution | N/A | $40,000 | $40,000 | N/A |

In addition to the Grant Funds allocated pursuant to Article VI of the FY 2019 Grant Agreement in September 2019, the **U.S. AGENCY FOR GLOBAL MEDIA** ("USAGM") hereby grants an additional amount of **$40,000** to **OPEN TECHNOLOGY FUND** for salaries and benefits during FY 2020, as made available pursuant to the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2019 of the Continuing Appropriations Act, 2020, Division A of P.L. 116-59 (September 27, 2019).

With the additional amount granted under this agreement, the total amount available is $40,000. It is anticipated that additional amounts will be made available to RFA for operations during FY 2020 as soon as such funds become legally available.

Except as otherwise expressly provided herein, the other provisions of the FY 2019 Grant Agreement shall remain in full force and effect.

**OPEN TECHNOLOGY FUND**

BY _____
Libby Liu
CEO

DATE 11/14/19

**U.S. AGENCY FOR GLOBAL MEDIA**
**International Broadcasting Bureau**

BY _____
Grant K. Turner
CEO & Director

DATE 11/20/2019 .



330 Independence Avenue SW | Washington, DC 20237 | usagm.gov

August 29, 2019

The Honorable Lindsey Graham
Chairman
Subcommittee on State, Foreign Operations and Related Programs
Committee on Appropriations
United States Senate

Dear Mr. Chairman:

On behalf of the U.S. Agency for Global Media (USAGM), I am pleased to notify the
Committee consistent with Division F of the Consolidated Appropriations Act 2019,
Public Law 116-6 of its intent to (1) adjust Voice of America (VOA) Uzbek- and Azeri-
language programming to focus on TV and digital, and away from radio; (2) include
Sudan to the previously approved realignment of the Middle East Broadcasting Networks'
(MBN) Radio Sawa transmissions; (3) begin Radio Free Europe/Radio Liberty (RFE/RL)
Hungarian-language broadcasting; (4) establish an independent Internet freedom grantee;
and (5) execute funding transfers to RFE/RL and Radio Free Asia (RFA).



### VOA Uzbek Service Content Realignment

VOA proposes to realign Uzbek-language programming to eliminate radio broadcasts, a
total of 3.5 weekly hours (with an additional 3.5 hours of radio repeats weekly). Funds
used to support radio broadcasts would instead fund an increase in production of content
for all digital platforms. This realignment responds to changes in how Uzbek audiences
consume content. VOA will continue to produce its weekly TV content (4.5 hours total,
including repeats).

USAGM's most recent audience research in Uzbekistan, conducted in 2017, found that
audiences were not engaging with traditional radio broadcasts. Instead, they were
consuming VOA Uzbek-language content on television and digital platforms. There is
no evidence to suggest that this general trend away from radio to TV and digital has
reversed since 2017 in Uzbekistan, similar to elsewhere in the region.

VOA Uzbek currently has no radio affiliates in Uzbekistan, although it has two radio
affiliates elsewhere in the region—Radio Almaz FM (Bishkek, Kyrgyzstan) and Radio
Shahrwand FM (Samangan, Northern Afghanistan) that would be impacted; however,
they can use audio from VOA's existing TV and digital output. Online media outlets are
also now regularly posting VOA content with attribution and requesting reports from

Washington.  Increased production of digital content across Facebook, YouTube, Twitter, and Uzbekistan's Odnoklassniki will lead to further growth in VOA's Uzbek audience. VOA's Uzbek Service has four full-time employees (FTEs) and three contractors.  This realignment would result in no changes to staffing levels, although some position descriptions might need to be amended.  The realignment of content would also result in no change to the existing FY19 funding level of $698,000.

### VOA Azerbaijani Service to Focus on TV and Digital

VOA proposes eliminating radio broadcasts in Azerbaijani-language, and refocusing the Service's radio staff and programming resources on enhancing online and social media products.  Funds used to support radio broadcasts would instead fund an increase in production of Azerbaijani-language content for all digital platforms.  VOA Azerbaijani would continue to produce its weekly TV broadcasts (3.75 hours total, including repeats).

Currently, VOA broadcasts 1.75 weekly original hours of Azerbaijani-language radio content (with an additional 22.75 hours of radio repeats weekly) that are carried on satellite (Turksat, Hotbird and Yamal) to Azerbaijan.  VOA has not been allowed to broadcast on FM affiliates in Azerbaijan since 2009, and shortwave broadcasts were discontinued because of a lack of shortwave penetration to the region in 2013.  The most recent audience research in Azerbaijan was conducted by USAGM in 2015, and at that time, only 0.4 percent of the population listened to VOA radio via satellite.

Azerbaijan authorities have begun banning Western-based news outlets, including RFE/RL's Azeri website, although VOA's site is still accessible.  Using radio resources to beef up VOA Azeri Service's online and social media content offers a valuable opportunity to reach an audience with increasingly scarce news alternatives.

### Transmission in Sudan to Include MBN's Radio Sawa and VOA

As outlined in the FY 2019 program plan, USAGM will shift and consolidate MBN radio transmissions in the Middle East and North African region.  As part of this realignment, USAGM will transition AM and FM capabilities in Djibouti, Libya, Mauritania, and Morocco to VOA, which will utilize a variety of relevant languages to reach audiences in those markets.  No additional costs would be required to produce and supply VOA content, and no staffing positions at VOA would be affected.



With the government coup in April 2019, Sudan is now in turmoil, and different programming is required to serve that country.  This notification also serves to inform that MBN is planning to launch a new Radio Sawa Sudan service in Arabic-language, targeting the specific needs of that audience.  During the development of this service, MBN and VOA will share the FM transmissions to Sudan.

Changing the format of the Khartoum FM from mostly music to news and information via MBN's Radio Sawa, supplemented by VOA-produced programming, will fill a need for independent, objective radio news programming in an FM-oriented media market that is government-influenced.  While the new MBN format is being developed, VOA will broadcast on the Khartoum FM 12 hours per day with content from its English-to-Africa

Service with Radio Sawa streaming 12 hours per day.  Upon launch of the new Sawa Sudan service, MBN will broadcast targeted news and information 18-20 hours per day to the people of Sudan, and VOA will retain 4-6 hours of English-language programming.

MBN's new Arabic service for Sudan is planned for launch by the end of the year.  MBN will target Arabic-speakers, the majority population of the country.  VOA programming will target elites, government officials, and emerging leaders in English, an official language of the country.

No additional costs would be required to produce and supply the VOA content, and no staffing positions at VOA would be affected.  The MBN Sawa Sudan service would be funded through reallocation of available resources.  Through the new format and language mix, USAGM will reach Sudan more effectively and with more impact.

### RFE/RL Hungarian Service

USAGM seeks to have RFE/RL re-launch a Hungarian Service to create and distribute Hungarian-language content.  The Service would launch with a focus on digital distribution.

While Hungary remains a member of the EU and NATO, press and political freedom have sharply declined.  In a first for an EU member, Freedom House downgraded Hungary's rating to "partly free" on its Freedom in the World index, and the country dropped 14 places on Reporters Without Borders' 2019 press freedom ranking to number 87.  The long-term deterioration of Hungary's media environment has accelerated in the past several years.  The Orbán Government has increasingly utilized official levers of power to undermine a free press, while oligarchs close to the Orbán government have steadily purchased critical and independent outlets and turned their editorial lines to favor the government.  In November 2018, 476 private media outlets—including TV channels, radio stations, newspapers, and websites—representing as much as 90 percent of the media market in the country, were "donated" by their owners to a media foundation friendly to the government and protected from antitrust laws.  Given Hungary's current state of affairs, Hungary may also be susceptible to increased Russian and Chinese influence.



The proposed RFE/RL Hungarian Service would be focused on digital platforms, on the model of its recently re-launched Bulgarian and Romanian services.  Around 80 percent of Hungarians have regular internet access, and the Internet is nearly as important a news source as television.  The Hungarian government does not block or censor websites.  The digital landscape is dominated by Western social media and a few large news sites and aggregators, several of which are potential partners for the new RFE/RL service.

The agency estimates minimal costs for re-launching RFE/RL's Hungarian Service in FY 2019, with a projection of approximately $500,000 for the service in FY 2020 in non-recurring startup costs, as well as a prorated portion of the annual costs with a goal of building out the service to its full capacity by the middle of next fiscal year.  In FY 2021, the agency estimates operating and staffing costs at approximately $1 million to be funded out of existing resources.

3

### Establish Independent Internet Freedom Grantee

The USAGM Internet freedom program supports the development and deployment of technologies to allow our journalists and audiences to safely and securely create, access, and share digital content without blockage, interference, or fear of reprisal from foreign censors. *See* section 7065(b)(2) of the FY'19 Consolidated Appropriation Act, PL 116-6. Currently, significant portions of the USAGM Internet freedom program are implemented by Radio Free Asia's Open Technology Fund (OTF). USAGM proposes to provide funds to establish an independent non-profit grantee to implement the agency's Internet freedom programs. Rather than create a new grantee from whole cloth, OTF would be spun off as an independent grantee. The agency believes that this additional independence will be beneficial to the overall mission.

This OTF Internet Freedom Grantee would be incorporated as a 501(c)(3) organization. Pursuant to 22 USC §6209(a)(1), the agency is authorized to incorporate a grantee; and per 22 USC §6204(a)(21), the agency may require that the grantee be governed in accordance with the other USAGM grantees – RFE/RL, RFA, and MBN – each of which is currently led by a bipartisan board, comprised of the agency's federal board.

As envisioned, this proposed grantee would combine the expertise and funding of the USAGM Office of Internet Freedom (OIF) and OTF to implement the agency's Internet freedom program. The creation of an independent Internet freedom grantee would maximize USAGM's Internet freedom investments by consolidating and streamlining the agency's Internet freedom efforts into a single entity that would enjoy the flexibility of the grantee form. This streamlined process would enable USAGM to strategically support each stage of the development pipeline in order to support technology at speed and scale, while also ensuring security. Further, the proposed grantee would enhance coordination with USAGM entities by creating a direct feedback loop between users and developers to ensure that the agency's Internet freedom investments are responsive and tailored to the needs to USAGM's journalists and audience members. Consolidating all these functions into an independent grantee would enable USAGM to lead a whole of government approach to Internet freedom, and ensure that citizens and journalists around the world can safely access and share digital news and information without fear of repressive censorship or surveillance.

Financial and programmatic oversight of the proposed Internet freedom grantee would continue to be performed by the USAGM Director of OIF or the equivalent.
The agency estimates that the maximum costs for incorporating the proposed Internet freedom grantee in FY 2019 would not exceed $5,000, with residual start-up costs, recurring staffing expenses, and programmatic costs funded out of Internet freedom resources appropriated in FY 2020 and subsequent years.

### Funding Transfers for RFE/RL Infrastructure Improvements and RFA Mandarin

USAGM is planning to leverage $1.2 million in transmission savings from the Office of Technology, Services, and Innovation (TSI) to support important investments in RFE/RL's studio infrastructure ($800,000) and in RFA Mandarin-language programming ($400,000), as described below.



4

| FY 2019 Post-Transfer Funding Levels (thousands of $) | | | |
|---|---|---|---|
| Entity | FY 2019 Program Plan | Transfers | Post-CN Levels |
| Radio Free Europe/Radio Liberty | 123,632 | +800 | 124,432 |
| Radio Free Asia | 44,217 | +400 | 44,617 |
| Technology, Services, and Innovation | 180,591 | -1,200 | 179,391 |

- *RFE/RL Studio Infrastructure Improvements* – RFE/RL is planning critical studio infrastructure upgrades that will enhance and expand its capacity for producing television and digital programming for the Russian-language *Current Time* network, the Persian-language *VOA365* network, and other important target audiences. Specifically, the $800,000 identified in this notification would go toward building out the HVAC and electricity in under-utilized basement space in the RFE/RL headquarters building in the Czech Republic. Once the space's utilities are upgraded, RFE/RL can begin the next phase of infrastructure improvement, constructing a control room and studio with modern, industry-standard television news sets that can more effectively compete with RFE/RL's well-funded competitors in Russian, Eastern European, and Central Asian markets. The additional costs of constructing the control room, studio, and sets would be funded out of existing RFE/RL resources in FY 2020.

- *RFA Programming for USAGM's New Digital Mandarin 24/7 Network* – USAGM is in the process of launching a new digital brand in Mandarin Chinese to counter China's disinformation efforts, reaching out to Mandarin-speakers inside the country and its extensive diaspora abroad. The network will offer digital, multimedia, and social media content appealing to a young, mainstream audience, in a voice that will be engaging, contemporary, and lively, posing questions that young Mandarin-speakers might not have previously confronted or heard from China's government-controlled media. According to USAGM's 2017 national survey of China, more than 70 percent of Chinese adults now have at least one smartphone and almost all reported surfing the web on their phones. When asked to name their top source for news, those under age 45 are now more likely to name a digital source for news, rather than the government's news channel CCTV. Previously, CCTV was always cited as the top source for Chinese adults. Both VOA and RFA will contribute content from existing resources, but the $400,000 identified here will be reallocated from TSI transmission savings in FY 2019 to accelerate RFA's capacity to quickly contribute to the network. The network will require staff with demonstrated expertise in Mandarin social media and with this younger demographic. USAGM will also commission specialty digital programming for the project, using existing funds.

We appreciate your continued support for USAGM. Should you have any questions, please contact Marta McLellan Ross, Acting Director of Congressional Affairs, at 202-203-4517.

Sincerely,

John F. Lansing
Chief Executive Officer and Director

# Open Technology Fund
## FY 2020 FINANCIAL PLAN
### October 1, 2019 Through September 30, 2020

11/14/2019

| OPEN TECHNOLOGY FUND | October | November* | December | January | February | March | April | May | June | July | August | September | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PERSONNEL COSTS** | | | | | | | | | | | | | |
| Salaries | | 29,850 | | | | | | | | | | | 29,850 |
| Benefits | | 10,150 | | | | | | | | | | | 10,150 |
| Total Salaries & Benefits | - | 40,000 | - | - | - | - | - | - | - | - | - | - | 40,000 |
| | | | | | | | | | | | | | |
| **NON-PERSONNEL COSTS** | | | | | | | | | | | | | |
| Contract Services | | | | | | | | | | | | | - |
| Travel & Allowances | | | | | | | | | | | | | - |
| Office Space | | | | | | | | | | | | | - |
| General & Administrative Expenses | | | | | | | | | | | | | - |
| Technical & Capital Expenses | | | | | | | | | | | | | - |
| **GENERAL OPERATING EXPENSES** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **SUB-TOTAL OTF** | | 40,000 | - | - | - | - | - | - | - | - | - | - | 40,000 |
| | | | | | | | | | | | | | - |
| **TOTAL OPEN TECHNOLOGY FUND** | - | 40,000 | - | - | - | - | - | - | - | - | - | - | 40,000 |

*Executive Pay for CEO

**USAGM APPROVAL STATEMENT:** USAGM Financial Plan Approval applies to Open Technology Fund for Executive Salary and Benefits as of November 2019, in the amount of **$40,000.00**. Pursuant to the Congressional Notification ("CN") dated August 29, 2019 and approved by Congress on September 19, 2019, recurring staffing expenses are to be funded out of Internet freedom resources appropriated in FY 2020 and subsequent years. Approval of the amounts reflected on this financial plan are not to be misconstrued as a pro-rated amount of an annual budget for FY20. FY20 annual budgets will be distributed when a full-year appropriation is enacted and the FY20 USAGM Program Plan is finalized. Initiation of new programs (aka "New Starts") is prohibited under the continuing resolution (CR). Please spend prudently during the CR period.

U.S. AGENCY FOR GLOBAL MEDIA | UNITED STATES BROADCASTING BOARD OF GOVERNORS

FINANCIAL PLAN APPROVAL

Grant K. Turner | CEO & Director          Date   11/20/2019

Def. App. 235



330 Independence Avenue SW | Washington, DC 20237 | usagm.gov

February 14, 2020

The Honorable Lindsey Graham
Chairman
Subcommittee on State, Foreign Operations and Related Programs
Committee on Appropriations
United States Senate

Dear Mr. Chairman:

The U.S. Agency for Global Media ("USAGM" or "the Agency") is pleased to submit its Fiscal Year 2020 Operating Plan (i.e., "the Plan" or "the Program Plan") and Congressional Notification, pursuant to sections 7015(b) and 7061(a), as well as the "International Broadcasting Operations" heading, of the FY 2020 Further Consolidated Appropriations Act, Public Law 116-94.

The mission of USAGM is to inform, engage, and connect people around the world in support of freedom and democracy. USAGM accomplishes this mission through two federal entities: the Voice of America (VOA) and the Office of Cuba Broadcasting (OCB); and four USAGM-funded grantees: Radio Free Europe/Radio Liberty (RFE/RL), Radio Free Asia (RFA), the Middle East Broadcasting Networks (MBN), and the Open Technology Fund (OTF), which was established as an independent grantee at the end of FY 2019.

The USAGM's five public service media organizations provide global audiences with accurate, objective, and professional news and information programming on television, radio, internet, and digital platforms. Meanwhile, OTF is dedicated to advancing internet freedom and ensuring that USAGM journalists and audiences can safely create, access, and share digital news and other information without fear of repressive online censorship or surveillance.

As required under section 7061(a), the Program Plan addresses the entirety of the $810.4 million appropriated for USAGM under the Act: $798.7 million for International Broadcasting Operations; and $11.7 million for Broadcasting Capital Improvements. Within this Plan, USAGM is proposing $29.2 million in transfers across its entities (i.e., its Programs, Projects, and Activities or "PPAs") of which $20.0 million is reflected on the new OTF line. As noted, this Plan also serves as notification as may be required by law, pursuant to section 7015(b) and the "International Broadcasting Operations" heading.

This Program Plan includes the information listed below. In addition to formally required

Def. App. 236

notifications related to PPA transfers and other issues, planned funding levels for major USAGM-targeted languages, languages identified in the FY 2020 Conference Report, and language service and operational level funding tables for each entity have been included as background for the Committees. The sections are as follows:

1. FY 2020 Program Plan Table (includes the net transfers among USAGM's entities)
2. Table of Transfers between the Entities by Line Item
3. Funding for Languages Identified in the FY 2020 Conference Report
4. Internet Freedom Funding
5. Funding Estimates for Major Target Languages
6. Broadcasting Capital Improvements (BCI) Account
7. Office of Cuba Broadcasting (OCB) Shortwave Transmissions Reduction
8. Appendix A: Detailed Entity Funding Tables
9. Appendix B: Weekly Broadcast Hours

## 1. FY 2020 Program Plan Table

| U.S. Agency for Global Media FY 2020 Program Plan | | | | | | |
|---|---|---|---|---|---|---|
| *($ in thousands)* | | | | | | |
| International Broadcasting Operations (Programs, Projects, and Activities) | | FY 2020 Enacted | | +/- Adjustments | | FY 2020 Program Plan |
| **Federal Entities** | | | | | | |
| Voice of America | $ | 252,000 | $ | 1,761 | $ | 253,761 |
| Office Cuba Broadcasting | $ | 20,973 | $ | (75) | $ | 20,898 |
| International Broadcasting Bureau | $ | 65,291 | $ | (17,556) | $ | 47,735 |
| *Internet Freedom and Circumvention Activities (non-add)* | *$* | *20,000* | *$* | *(19,825)* | *$* | *175* |
| Technology, Services and Innovation | $ | 180,591 | $ | (3,076) | $ | 177,515 |
| **Subtotal, Federal Entities** | **$** | **518,855** | **$** | **(18,946)** | **$** | **499,909** |
| **Non-Federal Entities** | | | | | | |
| Radio Free Europe/Radio Liberty | $ | 125,306 | $ | (846) | $ | 124,460 |
| Radio Free Asia | $ | 44,223 | $ | 1,414 | $ | 45,637 |
| Middle East Broadcasting Networks | $ | 110,312 | $ | (1,446) | $ | 108,866 |
| Open Technology Fund | $ | - | $ | 19,825 | $ | 19,825 |
| **Subtotal, Non-Federal Entities** | **$** | **279,841** | **$** | **18,947** | **$** | **298,788** |
| **Subtotal, International Broadcasting Operations (IBO)** | **$** | **798,696** | **$** | **1** | **$** | **798,697** |
| **Broadcasting Capital Improvements (BCI)** | **$** | **11,700** | **$** | **-** | **$** | **11,700** |
| **Total, U.S. Agency for Global Media** | **$** | **810,396** | **$** | **1** | **$** | **810,397** |

## 2. Table of Transfers between the Entities by Line Item

As the Agency pursues coordination and cooperation across all entities and support operations, a given entity may provide service(s) to another entity or entities. The adjustments column below reflect these service-related transfers that enable the Agency to better carry out its mission. The total transfers by PPA in the tables below correspond to the adjustments column in the table in section 1.

| Voice of America (VOA) Transfers | Ins | Outs | VOA TOTAL |
|---|---|---|---|
| TSI - Mobile Phone Expenses | $    18,607 | | |
| TSI - Facilities Expenses | $    31,700 | | |
| TSI - Abuja Training | $    25,000 | | |
| TSI - Persian IT | $   137,000 | | |
| RFE/RL - Current Time Graphics | $    26,500 | | |
| IBB - Avue HR System | $   610,747 | | |
| IBB - DCSA Background Investigations | | $     (598,697) | |
| IBB - Phase 1 HR system enhancement | | $     (315,487) | |
| TSI - Mobile Phone Expenses | | $      (29,490) | |
| TSI - Global Mandarin | $ 1,900,000 | | |
| RFE/RL - News Wire service | $    56,948 | | |
| MBN - News Wire service | $    50,757 | | |
| OCB - News Wire service | $    13,912 | | |
| RFA - News Wire service | $     9,434 | | |
| TSI - One position/.58 FTE | | $     (110,662) | |
| IBB - Half Year salary | | $      (65,633) | |
| **Total, VOA Transfers** | **$ 2,880,605** | **$    (1,119,969)** | **$    1,760,636** |

| Office of Cuba Broadcasting (OCB) Transfers | Ins | Outs | OCB TOTAL |
|---|---|---|---|
| IBB - Avue FR System | $    38,111 | | |
| IBB- DCSA Background Investigations | | $      (66,035) | |
| IBB - Phase 1 HR system enhancement | | $      (33,093) | |
| VOA - News Wire service | | $      (13,912) | |
| **Total, OCB Transfers** | **$    38,111** | **$     (113,040)** | **$      (74,929)** |

| International Broadcasting Bureau (IBB) | Ins | Outs | IBB TOTAL |
|---|---|---|---|
| TSI - Reverse FY 2019 Transfer for OPR Research | | $ (40,000) | |
| RFA - Research | $ 89,840 | | |
| TSI - Contract Support (OPR) | $ 70,000 | | |
| RFE/RL - CEEMC Repayment | $ 370,135 | | |
| VOA - DCSA Background Investigations | $ 598,697 | | |
| VOA - Phase 1 HR system enhancement | $ 315,487 | | |
| TSI- DCSA Background Investigations | $ 80,578 | | |
| TSI - Phase 1 HR system enhancement | $ 55,786 | | |
| OCB- DCSA Background Investigations | $ 66,035 | | |
| OCB - Phase 1 HR system enhancement | $ 33,093 | | |
| MBN- DCSA Background Investigations | $ 700,000 | | |
| RFA- DCSA Background Investigations | $ 200,000 | | |
| RFE/RL- DCSA Background Investigations | $ 600,000 | | |
| TSI - Representation Funds | | $ (1,900) | |
| RFE/RL -Travel | | $ (5,688) | |
| RFA - Sensitive population survey | | $ (213,000) | |
| OTF - Internet Freedom Funding | | $ (20,000,000) | |
| OTF Oversight | $ 175,000 | | |
| RFE/RL - OPR - Research project for Countering Disinformation | | $ (3,000) | |
| VOA - Half Year salary | $ 65,633 | | |
| VOA - Avue HR System | $ - | $ (610,747) | |
| TSI - Avue HR System | | $ (64,312) | |
| OCB - Avue FR System | | $ (38,111) | |
| **Total, IBB Transfers** | **$ 3,420,284** | **$ (20,976,758)** | **$ (17,556,474)** |

| Technology, Services, and Innovation (TSI) Transfers | Ins | Outs | TSI TOTAL |
|---|---|---|---|
| IBB - Reverse FY 2019 Transfer for OPR Research | $ 40,000 | | |
| RFE/RL - Travel/Training for Current Time Affiliate in Kyrgyzstan, Next TV | $ 1,000 | | |
| VOA - Mobile Phone Expenses | | $ (18,607) | |
| VOA - Facilities Expenses | | $ (31,700) | |
| VOA - Abuja Training | | $ (25,000) | |
| VOA - Persian Internet Costs (Azure) | | $ (137,000) | |
| IBB - Contract Support (OPR) | | $ (70,000) | |
| IBB - Avue HR System | $ 64,312 | | |
| IBB- DCSA Background Investigations | | $ (80,578) | |
| IBB - Phase 1 HR system enhancement | | $ (55,786) | |
| RFA - Global Mandarin | | $ (1,500,000) | |
| VOA - Mobile Phone Expenses | $ 29,490 | | |
| VOA - Global Mandarin | | $ (1,900,000) | |
| IBB - Representation Funds | $ 1,900 | | |
| VOA- One position/.58 FTE | $ 110,662 | | |
| RFE/RL - Studio upgrade | | $ (200,000) | |
| MBN - Satellite Broadcast service | $ 695,859 | | |
| **Total, TSI  Transfers** | **$ 943,223** | **$ (4,018,671)** | **$ (3,075,448)** |

Def. App. 239

| Radio Free Europe/Radio Liberty (RFE/RL) Transfers | Ins | Outs | RFE/RL TOTAL |
|---|---|---|---|
| VOA - CT Graphics | | $    (26,500) | |
| TSI - Travel/Training for Current Time Affiliate in Kyrgyzstan, Next TV | | $      (1,000) | |
| IBB - Travel | $      5,688 | | |
| IBB - OPR - Research project for Countering Disinformation | $      3,000 | | |
| IBB - CEEMC Repayment | | $  (370,135) | |
| IBB- DCSA Background Investigations | | $  (600,000) | |
| TSI - Studio upgrade | $   200,000 | | |
| VOA - News Wire service | | $    (56,948) | |
| **Total, RFE/RL  Transfers** | **$   208,688** | **$ (1,054,583)** | **$      (845,895)** |

| Radio Free Asia (RFA) Transfers | Ins | Outs | RFA TOTAL |
|---|---|---|---|
| IBB - Research Conducted by RFA | | $    (89,840) | |
| IBB- DCSA Background Investigations | | $  (200,000) | |
| TSI- Global Mandarin | $ 1,500,000 | | |
| IBB - Sensitive population survey | $   213,000 | | |
| VOA - News Wire service | | $      (9,434) | |
| **Total, RFA  Transfers** | **$ 1,713,000** | **$  (299,274)** | **$   1,413,726** |

| Middle East Broadcasting Networks (MBN) Transfers | Ins | Outs | MBN TOTAL |
|---|---|---|---|
| IBB- DCSA Background Investigations | | $  (700,000) | |
| TSI - Satellite Broadcast service | | $  (695,859) | |
| VOA - News Wire service | | $    (50,757) | |
| **Total, MBN  Transfers** | **$        -** | **$ (1,446,616)** | **$  (1,446,616)** |

| Open Technology Fund (OTF) | Ins | Outs | OTF TOTAL |
|---|---|---|---|
| IBB - Internet Freedom funding | $20,000,000 | | |
| IBB - OTF Oversight | | $  (175,000) | |
| **Total, OTF  Transfers** | **$20,000,000** | **$  (175,000)** | **$  19,825,000** |

| | | | |
|---|---|---|---|
| **Grand Total USAGM Transfers** | **$ 29,203,911** | **$ (29,203,911)** | **$         -** |

## Shared Wire Service Contract

The USAGM's five public service media organizations have successfully centralized and streamlined procurement of content, including graphics, photographs, text, and video, from news wire services such as the Associated Press, Agence France-Presse, and Reuters. This streamlining is part of the Agency's effort to improve news production sharing across the networks that, in turn, will yield a better product and control costs. The FY 2020 funding transfers to VOA from the four networks, which are necessary to facilitate this joint procurement effort, amount to $131,051 in the chart above.

## Background Investigations

USAGM is transferring $2.246 million to the International Broadcasting Bureau (IBB) for projected background investigation costs. Based on a recommendation from the Office of the Director of National Intelligence (ODNI), USAGM began having the U.S. Department of Defense's (DoD) Defense Counterintelligence and Security Agency (DCSA) perform background investigations on USAGM employees and those employed by USAGM's non-federal entities.

## USAGM Human Resources Information System (HRIS) Migration Phase 1

For processing personnel actions, record-keeping and other human resources activities, USAGM currently

relies on the Defense Civilian Personnel Data System (DCPDS), which is operated by the DoD. DoD is making significant upgrades to its system. During Phase 1 of this effort, USAGM will leverage the core Defense Civilian HR Management System (DCHRMS) Human Resources Information System (HRIS) configurations developed through a series of workshops with private sector implementation partners. USAGM will incorporate the DCHRMS baseline configurations and modify the product to incorporate Agency unique requirements.

The technology upgrade afforded from this migration will transition USAGM from DCPDS HRIS, which is based on the Oracle E-Business Suite Federal human resources application, to a SaaS solution with long-term benefits. The new HRIS will alleviate the burden of repeated software license agreements for a SaaS maintenance structure, thus providing the opportunity for operational cost benefits to the Agency.

USAGM's HRIS migration will be funded through cost allocations from the federal entities.

**VOA/RFA Global Mandarin Strategy**
The largest programming-driven transfers in the table above are $1.9 million to VOA and $1.5 million to RFA to support the expansion of digital Mandarin-language content to audiences around the world. This audience includes the extensive Chinese diaspora overseas and the growing population of Chinese citizens travelling globally for business, leisure, and education. The Mandarin Services at VOA and RFA supplement established programming from traditional radio and satellite broadcasts while enabling a pivot of USAGM efforts toward new digital and social media content for Mandarin-speakers worldwide. USAGM research suggests digital and social media to be effective channels for information-seeking people to evade government firewalls. Despite China's aggressive and widespread actions to control media and the information space inside China and regionally, both VOA and RFA have seen impressive audience reach on digital platforms. In total, USAGM content reaches 67 million people weekly in China – primarily on digital platforms. Research also indicates that VOA and RFA content is regarded as highly trustworthy among well-educated Chinese adults. Given this combined $3.5 million investment in digital Mandarin programming across VOA and RFA, USAGM will evaluate new programming and use impact metrics to make data-driven decisions on program and content development, with the aim of successfully reaching target audiences. In addition to Mandarin, USAGM is also building on successful programming in Cantonese, Tibetan, and Uyghur, which is regularly cited by major news organizations around the world.

## 3. Funding for Languages Identified in the FY 2020 Conference Report

For the Committees' background, this section summarizes the funding contained in the Program Plan for the languages identified in the Conference Report for the FY 2020 enacted appropriations.

**VOA and RFE/RL Countering Russian Disinformation**
The FY 2020 Enacted Budget supports the work of Current Time – the 24/7 Russian-language TV and digital network led by RFE/RL in cooperation with VOA – in countering Kremlin-controlled disinformation campaigns.

VOA and RFE/RL collaborate to deliver the Current Time network, offering audiences objective

news and information about and from America that would otherwise be non-existent in the Russian-language media market. The FY 2020 Enacted Budget supports Current Time's strategic efforts to expand and enhance cross-platform programming for Russian-speakers across Russia, Ukraine, Central Asia, the Caucasus, the Baltics, Eastern Europe, and as far away as Israel. Access to the network's factual, accurate, topical and trustworthy content serves as a reality check on disinformation that is driving conflict and seeding anti-Americanism in the region. For examples, through the Current Time TV network and digital properties, VOA will play a critical role in the coverage of the United States elections. VOA will expand and enhance its multimedia reporting to explain the United States democratic process and share America's democratic experience, primarily focusing on issues targeted by Russian disinformation campaigns.

Current Time seeks to further build on its already strong engagement with Russian-speaking audiences. Its cross-platform content will maximize on-the-ground reporting, live news, human storytelling, media literacy, and fact-checking aimed at building trust among audiences who are fed a steady diet of state-run media. In FY 2020, Current Time will continue to grow its digital reach. Beyond its 12 affiliates inside Russia, the network will expand its presence on Over-The-Top (OTT) platforms and push for licensing agreements that would allow greater access to its content via satellite and cable distribution.

FY 2020 is a politically packed year across Eurasia, with critical elections in Belarus, Tajikistan, Kyrgyzstan, and Georgia – all countries that are vulnerable to pro-Kremlin influence and manipulation of the local media environment. Current Time, which provided live, on-the-ground, and multi-city coverage of recent key elections in Russia and Ukraine, in addition to live breaking-news coverage from locations throughout Eurasia, seeks to build on its achievements in live coverage. This will ensure that the network provides audiences with a steady around-the-clock flow of information that sets the news agenda, rather than simply responds to the one set by the Kremlin.

Current Time will also build on the strength of its main counter-disinformation brand, *Footage vs. Footage*, which juxtaposes different examples of television news coverage to demonstrate how different countries cover the same issue according to their political interests. The program has become one of RFE/RL and Current Time's strongest weapons in highlighting the pervasive disinformation campaigns waged by Russian state-run media. It covers issues as varied as pension reform and medical costs to the Russia-led war in Donbas and Iran's recent admission of involvement in the missile strike that brought down a Ukrainian passenger jet. In FY 2020, Current Time seeks to expand the regional distribution of *Footage vs. Footage*, currently available on seven affiliates, by actively promoting it to potential partners throughout the Russian periphery. *Footage vs. Footage* is also working more extensively with Current Time regional correspondents and all of RFE/RL's language services to highlight the growing spread of disinformation across Eurasia.

**VOA Latin American Division**

In FY 2020, the VOA Spanish Service will add a daily radio program as well as additional content for video and social media. VOA's content is also featured prominently on media partners in the region including leading websites and digital video outlets. The audio program will be distributed via satellite, to media partners in Venezuela as well as through alternative

distribution channels that include social media as well as Telegram, WhatsApp channels and groups. USAGM Marketing Office is seeking additional media partners in the interior of Venezuela to add distribution venues. The additional coverage has made Venezuela the top country in digital traffic for VOA's Spanish-language digital channels. VOA has leveraged WhatsApp's group chats to connect directly to Venezuelans for coverage ideas and feedback. VOA provides live coverage of events in the United States and Venezuela that are of interest to the audience and its on-the-ground reporters in Caracas appear on major networks throughout Latin America, including in Nicaragua, Honduras, Guatemala, Argentina, El Salvador, Mexico, Colombia, Ecuador, Chile, and Argentina.

VOA's Spanish Service also expanded coverage of Central America – including in Nicaragua, Guatemala, Honduras, and El Salvador. With additional funding in FY 2020, the Service continues to provide unique content targeted to Central American media partners. At the request of those partners, the Service also produces special programming focused on policy and social solutions, which feature local organizations and individuals that fight gang violence and support opportunities for youth.

In FY 2020, the Service will increase its programming to Central America with a weekly multimedia news and analysis program and additional co-productions with radio and television media partners in the region.

**VOA and RFA Tibetan Programming**
The VOA Tibetan Service continues to reach its target audience in Tibet and beyond with uncensored, engaging news and information on television, shortwave and satellite radio, web, and social media platforms. This objective content is otherwise unavailable to Tibetans who are restricted to Chinese state-controlled media given their highly censored environment. VOA Tibetan provides a forum for critical discussions among Tibetans worldwide on political, cultural, and social issues, discussions that further the audience's understanding of their own circumstances and ideas of freedom and democracy.

In FY 2019, VOA's Tibetan Service launched two talk shows, *BhoMe* (Women Transforming), which discusses global changes in the role of women in society, and *Pelok* (Book Review), which features books and authors from all over the world. Many Tibetans have restrictive access to books, and *Pelok* has become a popular program. So popular that, in fact, Tibetan media created a show modeled after it.

In FY 2020, RFA's Tibetan Service will break day-to-day local stories and produce investigative reports on Tibetans' efforts to preserve their identity, culture, language, natural environment, and history. The Service will look at how Tibetans push back against the ruling Chinese government's influence in these areas and on the suppression of their fundamental human rights. China's monitoring of Tibetans increasingly relies on the same digital technologies deployed in areas where ethnic Uyghurs reside. RFA is paying particular attention to the increase in forced resettlement of nomadic Tibetans into urban areas and the evidence of more invasive control of Tibetans both inside and outside the Tibetan Autonomous Region. This includes expanded coverage of the Dalai Lama, a topic of great importance to Tibetans living under Communist Chinese Party (CCP) rule.

RFA Tibetan prioritizes hiring stringers with strong in-country networks. The Service is also exploring opportunities to use satellite imagery to track detention centers, prisons, and large Chinese infrastructure projects such as railroads, tunnels, dams, and mining operations, all of which are dislocating Tibetan nomads. RFA will use original content from its Tibetan, Uyghur, Mandarin, and Cantonese Services to promote inter-ethnic understanding and harmony. These original materials can be translated across the Services and used for cross-cultural education.

**RFA Uyghur Programming**

In FY 2020, the RFA Uyghur Service is focusing on maintaining its strong radio and video programming, increasing translation abilities, and expanding social media efforts to provide its unique reporting to a broader international audience. The Uyghur Service's coverage of China's brutal incarceration of millions of ethnic Uyghur Muslims in camps and its deployment of modern technologies to control all aspects of life within the Xinjiang Uyghur Autonomous Region (XUAR) has alerted the outside world to this dire human rights crisis. Despite the detention of RFA Uyghur reporters' families since 2017 and ongoing direct threats in response to their reporting, the Service continues to serve as the most credible news source on the Chinese government's crackdown.

The Service will expand its social media in FY 2020 to reach Uyghurs in the global diaspora – from central Asia to Turkey to Western Europe and beyond. Its video, audio, and infographic content for social media platforms are already very popular among the Uyghur exile community, who then share the content with family and friends in XUAR through a variety of means. In addition, the Uyghur Service's FY 2020 initiatives include increasing the volume of original online and video content. This effort is prompted by a recent survey of refugees and travelers, which made a strong recommendation for an increase of RFA's Uyghur Service content.

To help engage diaspora audiences through online and social media content, and increase coverage of those who have escaped XUAR, RFA Uyghur will establish a three-person video team. The team will take on the challenge of timely production of video clips and programs and customize video content for social media and messaging platforms most widely used inside and outside of China. The Service will provide social media content in Cyrillic as well as Arabic and Roman fonts to reach a wider audience.

**4. Internet Freedom Funding**

The Program Plan provides $20 million to the Open Technology Fund for internet freedom programs and $1.2 million to RFA for associated staffing costs.

**Open Technology Fund**

OTF works to advance internet freedom in repressive environments by supporting the research, development, implementation, and maintenance of technologies that provide secure and uncensored access to USAGM's content and the broader internet in order to rapidly respond to evolving censorship threats around the world.

In September 2019, OTF was incorporated as an independent non-profit 501(c)(3) organization

and became the fourth USAGM-funded grantee. OTF was first established as a pilot program at RFA in 2012. Over the last seven years, OTF supported pioneering internet freedom technologies that counter attempts by authoritarian governments to restrict freedom online. Today, over two billion people globally use OTF-supported technology daily, and more than two-thirds of all mobile phone users have OTF-incubated technology on their devices. As non-federal entity, OTF is fully enabled to support and expand USAGM's internet freedom efforts with the flexibility, speed, and due diligence needed to empower innovation and compete against well-resourced and aggressive adversaries to a free and open internet.

OTF provides direct internet freedom assistance to USAGM's five networks. This includes improving the digital security of USAGM's entities and journalists, making USAGM's websites and applications more secure and resistant to censorship, providing customized and secure tip lines for sources, and deploying leading internet freedom technologies to ensure that audiences can access USAGM content despite increasing censorship. This expanded support via OTF ensures that USAGM's journalists and audiences have the tools they need to safely access the internet and circumvent censorship.

**OTF Staffing**
The OTF team currently consists of twelve full-time team members: one CEO, one Principal Director, one Deputy Director, one Director of Technology, one General Counsel, one Director of Research, one Director of Digital Security, three program managers, one program specialist, and one communications and outreach coordinator.

As a whole, the team is rich with experience in the field of internet freedom. OTF's program managers include technical and implementation experts with deep knowledge of the regions where OTF's efforts are most needed. OTF's technical experts are developers, computer science experts, and digital security trainers/auditors. OTF's implementation experts have led technology and digital security initiatives for independent media outlets and human rights organizations around the world. OTF will hire up to six additional staff members over the next year to fully support OTF's operations, particularly in the areas of finance and accounting, external relations, and program management.

**Office of Internet Freedom**
As detailed below, of the $20 million allocated for internet freedom programs, USAGM intends to transfer $175,000 for the Office of Internet Freedom (OIF) in IBB to support OIF's oversight activities, including monitoring and evaluation efforts.

USAGM senior leadership, vis-à-vis OIF, will continue to provide oversight of all OTF activities. OTF's day-to-day work will be monitored by the OIF Director, and its finance and accounting will be monitored by USAGM's Chief Financial Officer.

As required by Public Law 116-94, 7050(c), a detailed Internet Freedom Spend Plan, describing the activities funded by the $20 million identified here, will be submitted separately within 90 days of enactment.

**5. Funding Estimates for Major Target Languages**

For the Committees' background, this section summarizes the funding contained in the Program Plan for certain major languages targeted by USAGM.

| FY 2020 RUSSIAN-LANGUAGE SERVICE | | | |
|---|---|---|---|
| ($ in thousands) | Language Service | Current Time TV and Digital | Total |
| Voice of America | $   3,429 | $   6,656 | $   10,085 |
| Radio Free Europe/Radio Liberty | $   7,876 | $   11,820 | $   19,696 |
| Total | $   11,305 | $   18,476 | $   29,781 |

| FY 2020 PERSIAN-LANGUAGE SERVICE | |
|---|---|
| Entity ($ in thousands) | FY 2020 Program Plan |
| Voice of America | $   16,789 |
| Radio Free Europe/Radio Liberty | $   10,507 |
| Total | $   27,296 |

| FY 2020 MANDARIN-LANGUAGE SERVICE | |
|---|---|
| Entity ($ in thousands) | FY 2020 Program Plan |
| Voice of America | $   12,342 |
| Radio Free Asia | $   6,087 |
| Total | $   18,429 |

NOTE: Non-federal entity (RFE/RL and RFA) amounts are net of any prior year carryover balances, focusing on the use of FY 2020 appropriated resources. The detailed entity funding tables in Appendix A identify prior year carryover balances, in addition to FY 2020 appropriated resources.

## 6. Broadcasting Capital Improvements (BCI) Account

The proposed allocation of the $29.817 million provided for the BCI account is set forth in the table below; the Agency expects to continue to use BCI funds for these or other such authorized purposes:

| U.S. Agency for Global Media<br>Broadcasting Capital Improvements (BCI)<br>Program Plan Changes | | | |
|---|---|---|---|
| *($ in Thousands)* | | | |
| Broadcasting Capital Improvements | FY 2020 Enacted Level | Carryover | FY 2020 Operating Plan |
| **Maintenance, Improvements, Replace and Repair (MIR** | **6,116** | **2,289** | **8,405** |
| Continuing M&R | 4,222 | 276 | 4,498 |
| VOA TV M&R | 615 | 1,551 | 2,166 |
| Security M&R | 582 | 81 | 663 |
| HVAC System M&R | 554 | 118 | 672 |
| Office of Cuba Broadcasting | 143 | 263 | 406 |
| **Upgrade of Existing Facilities Projects** | **4,550** | **15,508** | **20,058** |
| Network Realignment | | 229 | 229 |
| Kuwait Radio Farda SW Improvements/Realigning SW Transmission Assets | | 14,786 | 14,786 |
| Kuwait Continued Expansion | 4,550 | | 4,550 |
| TV Studio Project | | 140 | 140 |
| Radio Master Control Project | | 303 | 303 |
| Digital Media Systems | | 50 | 50 |
| **Satellites** | **1,034** | **320** | **1,354** |
| **Grand Total BCI** | **11,700** | **18,117** | **29,817** |

## 7. Office of Cuba Broadcasting (OCB) Shortwave Transmissions Reduction

OCB broadcasts 24-hours a day to Cuba from the Marathon, FL, medium wave transmitting station; Greenville, NC, shortwave transmitting station; and 24-hour streaming internet services. While OCB currently maintains a schedule of 24-hour daily transmissions of Radio Martí programming to Cuba via these means, the decrease in appropriations for OCB in FY 2020 will potentially necessitate a reduction in shortwave broadcasting hours. However, given the rise in cell phone and internet usage on parts of the island, OCB will look to target digitally-connected Cubans where circumvention of the regime's censorship proves possible. As it does with all of its entities, USAGM will make strategic and data-driven decisions around OCB broadcasting hours, operations, and programming to best serve the organization's vital mission of providing quality, effective, and unbiased information and news to the Cuban people. More important than maintaining historically established radio transmissions during those hours with little audience, is to dynamically adjust to the needs of Cuban audiences, including younger Cubans, to provide them with quality information as a counterbalance to regime disinformation and propaganda.

We appreciate your continued support for U.S. international media. Should you have any questions, please contact Adam Tracy in USAGM's Office of Congressional Affairs at 202-203-4669.

Sincerely,

Kenneth Weinstein
Chairman of the Board

Grant K. Turner
Chief Executive Officer and Director

12

## 8. Appendix A: Detailed Entity Funding Tables

**U.S. Agency for Global Media**
**Voice of America (VOA)**
**Program Plan Changes**

*($ in thousands)*

| Voice of America | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| VOA Director Office/Resource Management/Research/PR | $ 7,047 | $ 8,837 | $ 1,790 |
| Digital Office, Strategy and Audience Engagement | $ 1,000 | $ 1,000 | $ - |
| VOA Chief Digital Officer | $ 5,331 | $ 5,311 | $ (20) |
| Contract Journalists and Other Support | $ - | $ 3,439 | $ 3,439 |
| **Subtotal, VOA Director** | **$ 13,378** | **$ 18,587** | **$ 5,209** |
| **Programming Directorate[1]** | **$ 9,814** | **$ 8,507** | **$ (1,307)** |
| **Studio and Production Operations** | | | |
| Director of Operations | $ 3,118 | $ 3,118 | $ - |
| Central Production Services Division | $ 9,531 | $ 9,531 | $ - |
| Operations Support Division | $ 25,498 | $ 26,361 | $ 863 |
| Technical Support Division | $ 7,772 | $ 7,772 | $ - |
| **Subtotal, Associate Director, Operations** | **$ 45,919** | **$ 46,782** | **$ 863** |
| ***Africa Division*** | | | |
| Division Chief | $ 4,017 | $ 4,844 | $ 827 |
| Bambara Service | $ 307 | $ 307 | $ - |
| Central Africa  (Kinyarwanda, Kirundi) | $ 1,365 | $ 1,365 | $ - |
| English to Africa | $ 5,594 | $ 5,594 | $ - |
| French To Africa Service | $ 4,415 | $ 4,415 | $ - |
| Hausa Service | $ 3,424 | $ 3,424 | $ - |
| Horn Of Africa  (Amharic, Tigrigna, Afaan Oromoo) | $ 2,785 | $ 2,785 | $ - |
| Portuguese Service | $ 1,434 | $ 1,434 | $ - |
| Somali Service | $ 2,382 | $ 2,382 | $ - |
| Swahili Service | $ 1,694 | $ 1,694 | $ - |
| Zimbabwe/Shona/Ndebele/English | $ 1,186 | $ 1,186 | $ - |
| **Subtotal, Africa Division** | **$ 28,603** | **$ 29,430** | **$ 827** |
| ***East Asia & Pacific Division*** | | | |
| Division Chief | $ 2,150 | $ 3,622 | $ 1,472 |
| Burmese Service | $ 3,168 | $ 3,168 | $ - |
| Cantonese Service | $ 1,187 | $ 1,187 | $ - |
| English to Asia | $ 228 | $ 228 | $ - |
| Indonesian Service | $ 6,173 | $ 6,173 | $ - |
| Khmer Service | $ 2,431 | $ 2,431 | $ - |
| Korean Service | $ 6,327 | $ 6,327 | $ - |
| Lao Service | $ 754 | $ 754 | $ - |
| Mandarin Service | $ 12,342 | $ 12,342 | $ - |
| Thai Service | $ 922 | $ 922 | $ - |
| Tibetan Service | $ 3,344 | $ 3,344 | $ - |
| Vietnamese Service | $ 2,241 | $ 2,241 | $ - |
| **Subtotal, East Asia & Pacific Division** | **$ 41,267** | **$ 42,739** | **$ 1,472** |

| Voice of America | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| *Eurasia Division* | | | |
| Division Chief | $ 2,791 | $ 2,306 | $ (485) |
| Albanian Service | $ 1,355 | $ 1,355 | $ - |
| Armenian Service | $ 545 | $ 545 | $ - |
| Bosnian Service | $ 835 | $ 835 | $ - |
| Georgian Service | $ 600 | $ 600 | $ - |
| Macedonian Service | $ 352 | $ 352 | $ - |
| Russian Service | $ 10,085 | $ 10,085 | $ - |
| Serbian Service | $ 1,248 | $ 1,248 | $ - |
| Ukrainian Service | $ 2,601 | $ 2,601 | $ - |
| **Subtotal, Eurasia Division** | **$ 20,412** | **$ 19,927** | **$ (485)** |
| *Latin America Division* | | | $ - |
| Division Chief | $ 606 | $ 607 | $ 1 |
| Creole Service | $ 2,169 | $ 2,169 | $ - |
| Spanish Service | $ 5,369 | $ 6,620 | $ 1,251 |
| Production Unit | $ - | $ - | $ - |
| **Subtotal,  Latin America Division** | **$ 8,144** | **$ 9,396** | **$ 1,252** |
| *South Asia Division* | | | |
| Division Chief (South Asia + NECA) | $ 3,034 | $ 3,034 | $ - |
| Afghanistan Service | $ 8,015 | $ 7,980 | $ (35) |
| VOA Radio Deewa (Pashto) | $ 5,083 | $ 5,083 | $ - |
| Azerbaijani Service | $ 669 | $ 669 | $ - |
| Bangla Service | $ 1,538 | $ 1,538 | $ - |
| Kurdish Service | $ 4,571 | $ 4,071 | $ (500) |
| Turkish Service | $ 3,420 | $ 2,920 | $ (500) |
| Urdu Service | $ 5,661 | $ 4,861 | $ (800) |
| Uzbek Service | $ 698 | $ 698 | $ - |
| **Subtotal, South Asia Division** | **$ 32,689** | **$ 30,854** | **$ (1,835)** |
| ***VOA Persian*** | **$ 17,714** | **$ 16,789** | **$ (925)** |
| | | | |
| **Central News** | | | |
| VOA Central News | $ 25,805 | $ 24,160 | $ (1,645) |
| Home Leave & Transfer (HLT) | $ 207 | $ 207 | $ - |
| **Subtotal, Central News** | **$ 26,012** | **$ 24,367** | **$ (1,645)** |
| | | | $ - |
| Los Angeles | $ 317 | $ 532 | $ 215 |
| New York | $ 840 | $ 345 | $ (495) |
| Silicon Valley | $ 295 | $ 126 | $ (169) |
| **Subtotal, Domestic Bureaus** | **$ 1,452** | **$ 1,003** | **$ (449)** |

14

| Voice of America | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| **Overseas Bureaus and News Centers** | | | |
| Bangkok | $ 958 | $ 754 | $ (204) |
| Beijing | $ 724 | $ 675 | $ (49) |
| Dakar | $ 299 | $ 26 | $ (273) |
| Hong Kong | $ 220 | $ 232 | $ 12 |
| Islamabad | $ 373 | $ 478 | $ 105 |
| Istanbul | $ 318 | $ 419 | $ 101 |
| Jakarta | $ 450 | $ 450 | $ - |
| Johannesburg | $ 238 | $ 240 | $ 2 |
| London | $ 1,674 | $ 1,099 | $ (575) |
| Moscow | $ 340 | $ 163 | $ (177) |
| Nairobi | $ 411 | $ 631 | $ 220 |
| Seoul | $ 591 | $ 213 | $ (378) |
| **Suntotal, Overseas Bureaus** | **$ 6,596** | **$ 5,380** | **$ (1,216)** |
| **GRAND TOTAL, VOA** | **$ 252,000** | **$ 253,761** | **$ 1,761** |

[1]Funding for Global Mandarin Network is included

| U.S. Agency for Global Media Office of Cuba Broadcasting (OCB) Program Plan Changes | | | |
|---|---|---|---|
| ($ in thousands) | | | |
| **Office of Cuba Broadcasting** | FY 2020 Enacted | FY 2020 Program Plan | Changes |
| OCB Directorate and Advisory Board | $ 670 | $ 670 | $ - |
| Administration* | $ 3,325 | $ 3,250 | $ (75) |
| Radio Marti | $ 3,905 | $ 3,905 | $ - |
| New Media | $ 2,027 | $ 2,027 | $ - |
| Central News | $ 3,057 | $ 3,057 | $ - |
| TV Marti | $ 2,695 | $ 2,695 | $ - |
| Technical Operations | $ 1,525 | $ 1,525 | $ - |
| Computer Services | $ 1,010 | $ 1,010 | $ - |
| Greenville Transmitting Station | $ 2,759 | $ 2,759 | $ - |
| **GRAND TOTAL, OCB** | **$ 20,973** | **$ 20,898** | **$ (75)** |

*Administration includes office space and guard service.

| U.S. Agency for Global Media<br>International Broadcasting Bureau (IBB)<br>Program Plan Changes | | | | | | |
|---|---|---|---|---|---|---|
| *($ in thousands)* | | | | | | |
| **International Broadcasting Bureau** | **FY 2020 Enacted** | | **FY 2020 Program Plan** | | **Changes** | |
| Total, CEO Office | $ | 2,651 | $ | 2,651 | $ | - |
| Total, Office of Management Services | $ | 3,237 | $ | 5,312 | $ | 2,075 |
| Total, Office of Chief Financial Officer | $ | 13,279 | $ | 11,824 | $ | (1,455) |
| Office of Policy and Research | $ | 7,053 | $ | 8,725 | $ | 1,672 |
| Office of Communications and External Affairs | $ | 1,471 | $ | 2,322 | $ | 851 |
| Office of General Counsel | $ | 2,234 | $ | 2,234 | $ | - |
| Office of Contracting and Procurement | $ | 3,915 | $ | 2,642 | $ | (1,273) |
| Office of Human Resources | $ | 6,050 | $ | 5,408 | $ | (642) |
| Office of Workforce Support and Development | $ | 1,102 | $ | 1,459 | $ | 357 |
| Office of Civil Rights | $ | 1,067 | $ | 1,057 | $ | (10) |
| Office of Policy | $ | 939 | $ | 939 | $ | - |
| Office of Security | $ | 2,127 | $ | 2,269 | $ | 142 |
| Office of Internet Freedom | $ | 166 | $ | 896 | $ | 730 |
| **GRAND TOTAL, IBB** | **$** | **45,291** | **$** | **47,738** | **$** | **2,448** |
| * 20M was transferred out of OIF to OTF | | | | | | |

## U.S. Agency for Global Media
## Office of Technology, Services, and Innovation (TSI)
## Program Plan Changes

($ in thousands)

| Office of Technology, Services, and Innovation | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| **Technology, Services, and Innovation Director** | | | |
| Director | 215 | $ 215 | $ - |
| Home Leave & Transfer (HLT) | 411 | $ 411 | $ - |
| **Subtotal, TSI Director** | $ 626 | $ 626 | $ - |
| **Office of the CIO** | 10,385 | $ 10,686 | $ 301 |
| Global Networks Division | 9,407 | $ 9,164 | $ (243) |
| Satellites | 16,982 | $ 17,678 | $ 696 |
| Satellite Carryover | 3,726 | $ 3,726 | $ - |
| **Subtotal, Office of the CIO** | $ 40,500 | $ 41,254 | $ 754 |
| **Information Technology Directorate** | **15,573** | $ **15,537** | $ (36) |
| **Technology Support Directorate** | **8,004** | $ **7,979** | $ (25) |
| **Office of Business Development** | 3,088 | $ 3,088 | $ - |
| Regional Marketing Offices | 10,965 | $ 10,965 | $ - |
| **Subtotal, Office of Business Development** | $ 14,053 | $ 14,053 | $ - |
| **Resource and Project Management Directorate** | 2,768 | $ 2,768 | $ - |
| Project Management | 862 | $ 842 | $ (20) |
| Facilities Management | 34,907 | $ 34,877 | $ (30) |
| **Subtotal, Resource and Project Management Directorate** | $ 38,537 | $ 38,487 | $ (50) |
| **Broadcast Technologies Division** | 1,961 | $ 1,961 | $ - |
| Leased Transmissions | 5,347 | $ 3,653 | $ (1,694) |
| FM Transmissions | 2,848 | $ 2,548 | $ (300) |
| **Subtotal, Broadcast Technologies Division** | $ 10,156 | $ 8,162 | $ (1,994) |
| **Operations Division** | 1,987 | $ 1,952 | $ (35) |
| Worldwide Procurement (WWP) | 3,109 | $ 3,474 | $ 365 |
| **Subtotal, Operations Division** | **5,096** | **5,426** | **330** |
| | | | |
| **Stations Division** | | | |
| **Domestic Transmitting Stations** | | | |
| Tinian | 5,988 | 5,988 | $ - |
| **Subtotal, Domestic Stations** | **5,988** | **5,988** | **-** |
| | | | |
| **Overseas Transmitting Stations** | | | |
| Afghanistan | 3,581 | 3,581 | $ - |
| Botswana | 2,624 | 2,624 | $ - |
| Germany | 12,856 | 10,195 | $ (2,661) |
| Kuwait | 12,828 | 12,828 | $ - |
| Philippines | 5,494 | 5,744 | $ 250 |
| Sao Tome | 3,570 | 3,607 | $ 37 |
| Thailand | 4,077 | 4,396 | $ 319 |
| **Subtotal, Overseas Stations** | **45,030** | **42,975** | **(2,055)** |
| **Monitoring Offices** | **754** | **754** | $ - |
| | | | |
| **Reconciliation to Appropriation** | | | |
| Satellite Carryover | (3,726) | **(3,726)** | $ - |
| **GRAND TOTAL, TSI** | **180,591** | **177,515** | **(3,076)** |

Def. App. 252

| **U.S. Agency For Global Media**<br>**Radio Free Europe/Radio Liberty (RFE/RL)**<br>**Program Plan Changes** | | | |
| --- | --- | --- | --- |
| *($ in thousands)* | | | |
| **Radio Free Europe/Radio Liberty** | **FY 2020 Enacted** | **FY 2020 Program Plan** | **Changes** |
| **News Division** | | | |
| Director | 2,633 | 2,623 | (10) |
| Marketing and Affiliates | 1,104 | 1,104 | - |
| **Language Services** | | | |
| Armenian | 1,911 | 1,911 | - |
| Azerbaijani | 1,910 | 1,910 | - |
| Balkans (Bosnian, Serbian, Albanian) | 4,820 | 4,760 | (60) |
| Belarusian | 2,307 | 2,307 | - |
| Bulgarian | 514 | 514 | - |
| Current Time TV and Digital | 11,843 | 11,820 | (24) |
| Georgian | 2,356 | 2,356 | - |
| Hungarian | - | - | |
| Kazakh | 1,633 | 1,633 | - |
| Kyrgyz | 2,206 | 2,205 | (1) |
| Radio Farda (Persian) | 10,507 | 10,507 | - |
| Radio Free Afghanistan (Dari and Pashto) | 5,203 | 5,203 | - |
| Radio Mashaal (Pashto) | 3,254 | 3,254 | - |
| Romanian to Moldova and Romania | 2,450 | 2,450 | - |
| Russian | 8,176 | 7,876 | (300) |
| North Caucasus (Chechen) | 1,227 | 1,227 | - |
| Tajik | 1,976 | 1,976 | - |
| Tatar-Bashkir | 1,503 | 1,503 | - |
| Turkmen | 809 | 809 | - |
| Ukrainian | 4,710 | 4,690 | (20) |
| Uzbek | 1,552 | 1,552 | - |
| News and Current Affairs | 4,821 | 4,821 | - |
| Multimedia Strategy, Development, and Training | 2,060 | 2,050 | (10) |
| **Subtotal, News Division** | **81,485** | **81,061** | **(425)** |
| **Office of the President** | 6,762 | 6,568 | (194) |
| **Technology Division** | 29,273 | 29,416 | 143 |
| **Finance Division** | 5,443 | 5,073 | (370) |
| **Human Resources Division** | 2,343 | 2,343 | - |
| **Subtotal** | **43,821** | **43,400** | **(421)** |
| **GRAND TOTAL, RFE/RL** | **125,306** | **124,460** | **(846)** |

In addition to the FY 2020 Enacted level there is $10,494 available in prior year carryover balances

Def. App. 253

**U.S. Agency for Global Media**
**Radio Free Asia (RFA)**
**Program Plan Changes**

*($ in thousands)*

| Radio Free Asia | FY 2020 Enacted | | FY 2020 Program Plan | | Changes | |
|---|---|---|---|---|---|---|
| **Programming Division** | | | | | | |
| Executive Editor | $ | 2,379 | $ | 2,379 | $ | - |
| | | | | | | |
| **Program Services** | | | | | | |
| Burmese Service | $ | 1,831 | $ | 1,831 | $ | - |
| Cambodian Service | $ | 1,795 | $ | 1,795 | $ | - |
| Cantonese Service | $ | 1,115 | $ | 1,115 | $ | - |
| Korean Service | $ | 2,912 | $ | 2,912 | $ | - |
| Korea DPRK TV | $ | - | $ | - | $ | - |
| Laotian Service | $ | 1,487 | $ | 1,487 | $ | - |
| Mandarin Service | $ | 4,212 | $ | 4,212 | $ | - |
| Global Mandarin | $ | | $ | 1,500 | $ | 1,500 |
| Tibetan Service | $ | 4,473 | $ | 4,473 | $ | - |
| Uyghur Service | $ | 1,519 | $ | 1,719 | $ | 200 |
| Vietnamese Service | $ | 1,233 | $ | 1,233 | $ | - |
| **Program Offices** | | | | | $ | - |
| Bangkok Office | $ | 123 | $ | 123 | $ | - |
| Dharamsala Office | $ | 104 | $ | 104 | $ | - |
| Hong Kong Office | $ | 1,189 | $ | 1,189 | $ | - |
| Phnom Penh Office | $ | - | $ | - | $ | - |
| Seoul Office | $ | 1,108 | $ | 1,108 | $ | - |
| Taipei Office | $ | 566 | $ | 566 | $ | - |
| Yangon Office | $ | 525 | $ | 525 | $ | - |
| **Subtotal, Programming Division** | **$** | **26,571** | **$** | **28,271** | **$** | **1,700** |
| | | | | | | |
| Office of the President | $ | 811 | $ | 811 | $ | - |
| Internet Freedom Salaries (Open Technology Fund) | $ | 1,200 | $ | 1,200 | $ | - |
| Internet Freedom | $ | - | $ | - | $ | - |
| Research, Training, and Evaluation | $ | 757 | $ | 881 | $ | 124 |
| Technical Operations | $ | 7,969 | $ | 7,769 | $ | (200) |
| HQ Facilities | $ | 4,227 | $ | 4,017 | $ | (210) |
| Communications | $ | 293 | $ | 293 | $ | - |
| Finance | $ | 1,990 | $ | 1,990 | $ | - |
| Human Resources | $ | 405 | $ | 405 | $ | - |
| **Subtotal, Administration, Management, and Finance** | **$** | **17,652** | **$** | **17,366** | **$** | **(286)** |
| **GRAND TOTAL, RFA** | **$** | **44,223** | **$** | **45,637** | **$** | **1,414** |
| In addition to FY2020 Enacted level, there is $1,779 available in prior year carryover balances | | | | | | |

**U.S. Agency for Global Media**
**Middle East Broadcasting Networks, Inc. (MBN)**
**Program Plan Changes**

*($ in thousands)*

| Middle East Broadcasting Networks | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| **Programming** | | | |
| Alhurra Television | $ 29,674 | $ 29,674 | $ - |
| Radio Sawa | $ 5,469 | $ 5,469 | $ - |
| MBN Digital | $ 10,143 | $ 10,143 | $ - |
| **Subtotal, Programming** | **$ 45,286** | **$ 45,286** | **$ -** |
| **Overseas Offices** | | | |
| **Iraq** | **$ 5,937** | **$ 5,937** | **$ -** |
| **Pan Arab** | **$ 16,356** | **$ 16,356** | **$ -** |
| Beirut | $ 3,291 | $ 3,291 | $ - |
| Cairo | $ 998 | $ 998 | $ - |
| Dubai | $ 11,027 | $ 11,027 | $ - |
| Jerusalem | $ 1,040 | $ 1,040 | $ - |
| **Maghreb** | **$ 1,092** | **$ 1,092** | **$ -** |
| Rabat | $ 827 | $ 827 | $ - |
| Tunis | $ 265 | $ 265 | $ - |
| **Subtotal, Overseas Offices** | **$ 23,385** | **$ 23,385** | **$ -** |
| Technical Operations | $ 22,633 | $ 21,886 | $ (747) |
| Administration | $ 12,180 | $ 11,480 | $ (700) |
| Creative Services | $ 4,328 | $ 4,328 | $ - |
| **Subtotal, MBN** | **$ 107,812** | **$ 106,365** | **$ (1,447)** |
| Balances Out - Carryover | $ 2,500 | $ 2,500 | $ - |
| **GRAND TOTAL, MBN** | **$ 110,312** | **$ 108,865** | **$ (1,447)** |

In addition to the FY 2020 Enacted level, there is $17,733 available in prior year carryover balances

**U.S. Agency for Global Media**
**Open Technology Fund (OTF)**
**FY 2020 Program Plan Changes**

*($ in thousands)*

| Open Technology Fund | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| Open Technology Fund Programs | $ 20,000 | $ 19,825 | (175) |
| **GRAND TOTAL, OTF** | **$ 20,000** | **$ 19,825** | **$ (175)** |

| U.S. Agency for Global Media Funding from Outside Sources (estimated) FY 2019 – FY 2020 | | | | | | |
|---|---|---|---|---|---|---|
| ($ In Whole Dollars) | | | | | | |
| **Funds Source** | **FY 2018/19 Funds** | **FY 2019 Funds** | **FY 2015/20 Funds** | **FY 2019/20 Funds** | **FY 2020 Funds** | **Totals** |
| United States Agency for International Development (USAID) | $   66,525 | $1,500,000 | | | | $   1,566,525 |
| Department of State (DoS) | $ 2,431,762 | $   103,051 | $2,546,000 | | | $   5,080,813 |
| Centers for Disease Control (CDC) | $   200,000 | $   155,000 | | $   240,000 | | $   595,000 |
| United Stated Pacific Command (PACOM) | | $2,225,000 | | | $2,030,000 | $   4,255,000 |
| **GRAND TOTAL** | **$ 2,698,287** | **$3,983,051** | **$2,546,000** | **$ 240,000** | **$2,030,000** | **$ 11,497,338** |

## 9. Appendix B: Weekly Broadcast Hours

| U.S. Agency for Global Media Weekly Broadcast Hours Program Plan Changes | | | |
|---|---|---|---|
| **Language Service** | **FY 2020 Enacted** | **FY 2020 Program Plan** | **Changes** |
| **Voice of America (VOA)** | | | |
| *Africa Division* | | | |
| Bambara Service | 8.00 | 8.00 | 0.0 |
| Central Africa  (Kinyarwanda, Kirundi) | 40.14 | 40.14 | 0.0 |
| English to Africa Service | 260.25 | 260.25 | 0.0 |
| French to Africa and the Trans Sahel | 176.50 | 176.50 | 0.0 |
| Hausa Service | 16.50 | 16.50 | 0.0 |
| Horn Of Africa  (Amharic, Tigrigna, Afaan Oromoo) | 34.50 | 34.50 | 0.0 |
| Portuguese Service | 10.25 | 10.25 | 0.0 |
| Somali Service | 31.41 | 31.41 | 0.0 |
| Swahili Service | 16.78 | 16.78 | 0.0 |
| Zimbabwe/Shona/Ndebele/English | 17.00 | 17.00 | 0.0 |
| *Total, Africa Division* | **611.33** | **611.33** | **0.0** |
| *East Asia and Pacific Division* | | | |
| Burmese Service | 59.75 | 59.75 | 0.0 |
| Cantonese Service | 54.67 | 54.67 | 0.0 |
| English to Asia Programs | 6.23 | 6.23 | 0.0 |
| Indonesian Service | 58.87 | 58.87 | 0.0 |
| Khmer Service | 11.24 | 11.24 | 0.0 |
| Korean Service | 52.50 | 51.88 | -0.6 |
| Lao Service | 4.67 | 4.67 | 0.0 |
| Mandarin Service | 185.50 | 185.50 | 0.0 |
| Thai Service | 6.62 | 6.62 | 0.0 |
| Tibetan Service | 204.00 | 204.00 | 0.0 |
| Vietnamese Service | 7.00 | 3.50 | -3.5 |
| *Total, East Asia and Pacific Division* | **651.05** | **646.93** | **-4.1** |

Def. App. 256

| Weekly Broadcast Hours Continued | | | |
|---|---|---|---|
| **Language Service** | **FY 2020 Enacted** | **FY 2020 Program Plan** | **Changes** |
| | | | |
| ***Eurasia Division*** | | | |
| Albanian Service | 3.67 | 3.67 | 0.00 |
| Armenian Service | 1.58 | 1.58 | 0.00 |
| Bosnian Service | 2.58 | 2.58 | 0.00 |
| Georgian Service | 1.42 | 1.42 | 0.00 |
| Macedonian Service | 1.05 | 1.05 | 0.00 |
| Russian Service | 11.17 | 12.50 | 1.33 |
| Serbian Service | 2.75 | 2.75 | 0.00 |
| Ukrainian Service | 2.83 | 2.83 | 0.00 |
| *Total, Eurasia Division* | **27.05** | **28.38** | **1.33** |
| ***Latin America Division*** | | | |
| Creole Service | 17.83 | 17.83 | 0.00 |
| Spanish Service | 187.49 | 191.49 | 4.00 |
| *Total, Latin America Division* | **205.32** | **209.32** | **4.00** |
| ***South Asia Division*** | | | |
| Dari | 31.67 | 31.67 | 0.00 |
| Pashto | 31.67 | 31.67 | 0.00 |
| VOA Radio Deewa (Pashto) | 63.33 | 63.33 | 0.00 |
| Azerbaijani Service | 3.75 | 3.75 | 0.00 |
| Bangla Service | 11.02 | 11.02 | 0.00 |
| Kurdish Service | 65.10 | 65.10 | 0.00 |
| Turkish Service | 13.16 | 13.16 | 0.00 |
| Urdu Service | 78.04 | 78.04 | 0.00 |
| Uzbek Service | 4.50 | 4.50 | 0.00 |
| *Total, South Asia Division* | **302.24** | **302.24** | **0.00** |
| ***Persian News Network*** | **168.00** | **168.00** | **0.00** |
| | | | |
| ***English*** | | | |
| Music (FM Team/Programming) | 178 | 178 | 0.00 |
| Learning English (VOA Programming) | 91.53 | 91.53 | 0.00 |
| English News (News Center) | 132.92 | 132.92 | 0.00 |
| *Total, English* | **402.45** | **402.45** | **0.00** |
| **TOTAL, VOA** | **2,367.44** | **2,368.65** | **1.21** |

| **Language Service** | **FY 2020 Enacted** | **FY 2020 Program Plan** | **Changes** |
|---|---|---|---|
| **Office of Cuba Broadcasting (OCB)** | | | |
| Radio Marti | 168.00 | 168.00 | 0.00 |
| TV Marti | 168.00 | 168.00 | 0.00 |
| **TOTAL, OCB** | **336.00** | **336.00** | **0.00** |

Def. App. 257

OCB will maintain the current schedule of 24-hour daily transmissions of Radio Marti to Cuba from the Marathon (Florida) medium wave transmitter and 24-hour streaming Internet services. OCB will reduce some Radio Marti shortwave transmissions to Cuba in order to maintain economical and effective service among all available radio delivery platforms using available resources.

| Language Service | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| **Radio Free Europe/Radio Liberty (RFE/RL)** | | | |
| Armenian | 107.60 | 107.60 | - |
| Azerbaijani | 74.60 | 74.60 | - |
| Balkans (Bosnian, Serbian, Albanian, Macedonian, Montenegrin, Croatian) | 73.88 | 73.88 | - |
| Belarusian | 168.00 | 168.00 | - |
| Bulgarian | - | - | - |
| Current Time TV and Digital | 158.50 | 158.50 | - |
| Georgian | 32.60 | 32.60 | - |
| Hungarian | - | - | - |
| Kazakh | 0.50 | 0.50 | - |
| Kyrgyz | 68.60 | 68.60 | - |
| Radio Farda (Persian) | 168.00 | 168.00 | - |
| Radio Free Afghanistan (Dari and Pashto) | 84.00 | 84.00 | - |
| Radio Mashaal (Pashto) | 63.00 | 63.00 | - |
| Romania (Romanian to Moldova) | 17.20 | 17.20 | - |
| Russian | 168.00 | 168.00 | - |
| North Caucasus (Chechen) | - | - | - |
| Tajik | 42.00 | 42.00 | - |
| Tatar-Bashkir | - | - | - |
| Turkmen | 56.00 | 56.00 | - |
| Ukrainian | 60.60 | 60.60 | - |
| Uzbek | 168.00 | 168.00 | - |
| News and Current Affairs | | - | - |
| **TOTAL, RFE/RL** | **1,511.08** | **1,511.08** | **-** |

| Language Service | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| **Radio Free Asia (RFA)** | | | |
| Burmese Service | 63.00 | 63.00 | - |
| Cambodian Service | - | - | - |
| Cantonese Service | 49.00 | 49.00 | - |
| Korean Service | 63.00 | 63.00 | - |
| Laotian Service | 42.00 | 42.00 | - |
| Mandarin Service | - | - | - |
| Tibetan Service | 154.00 | 154.00 | - |
| Uyghur Service | 42.00 | 42.00 | - |
| Vietnamese Service | - | - | - |
| **TOTAL, RFA** | **413.00** | **413.00** | **-** |

Def. App. 258

| Language Service | FY 2020 Enacted | FY 2020 Program Plan | Changes |
|---|---|---|---|
| **Middle East Broadcating Network (MBN)** | | | |
| Alhurra | 336.00 | 336.00 | - |
| Alhurra Pan-Arab | 168.00 | 168.00 | - |
| Alhurra Iraq | 168.00 | 168.00 | - |
| Radio Sawa | 504.00 | 504.00 | - |
| Sawa Iraq | 168.00 | 168.00 | - |
| Sawa Levant | 168.00 | 168.00 | - |
| Sawa Sudan | 168.00 | 168.00 | - |
| MBN Digital | 672.00 | 672.00 | - |
| Alhurra | 168.00 | 168.00 | - |
| Elsaha | 168.00 | 168.00 | - |
| Aswat Magharibyya | 168.00 | 168.00 | - |
| Irfaa Sawtak | 168.00 | 168.00 | - |
| **TOTAL, MBN** | **3,024.00** | **3,024.00** | **-** |

**From:**  Thomas Layou <TLayou@usagm.gov>
**Sent:**  Wednesday, February 26, 2020 1:53 PM
**To:**  Libby Liu; John Barkhamer
**Cc:**  laura@opentech.fund; Lauren Turner; Nat Kretchun; Grant Turner; David Kligerman;
Patrick Taylor; Marcus Murchison; Virginia Boateng
**Subject:**  RE: OTF FY2019 unobligated funds transfer

Libby,

The process is a bit laborious, but compared to everything else that you had to do to set up a new organization from scratch, this is fairly simple. To answer your question about Congressional notification; This transition plan should be addressed in the Internet Freedom Spend Plan due to the Hill on No Later Than March 19, 2020 (which is 90 days after Enactment).

This transfer should be a part of a full plan to transition Prior Year (PY) funding from RFA's OTF Program (An Account) to the Newly established OTF Non-Federal Entity (Organization).  Currently, the RFA OTF Program has 12.9 million dollars cash-on-hand, of which 5.9 million is unobligated in PY funds as of January 31, 2020.  The following steps need to occur in order to transfer funding from RFA to OTF:

1. The RFA's CFO needs to confirm and validate unobligated balances of the remaining funds based of reporting submitted as of January 31, 2020, making any transaction auditable;
2. The accounting for PY funding needs to be reported by fiscal year for the sole purpose of amending the PY Grant Agreements for each fiscal year.  Currently RFA is reporting funding across three fiscal years: FY17 through FY19;
3. RFA's CFO needs to review the currently reported 7.5 million in Unliquated Obligations (ULOs) to determine if these obligations are still valid and whether or not these funds should be deobligated and added to the current unobligated balance of funds for transfer to OTF;
4. No-Year funds will need to be recaptured to the agency and be reapportioned and rewarded to the newly established OTF Organization to fulfill the same purpose.   Because the funding is No-Year, there is no issue with a recapture by the Agency and a reward to the OTF;
5. RFA's CFO will need to revise the SF-425s and Financial Plans for each fiscal year to reflect the deduction to each Grant Award.

As always, the budget staff stands by ready to support both OTF & RFA through this process.

All the best,

Thom Layou
Director of Budget
Office: (202)203-4422
Cell: (202) 590-6957
TLayou@usagm.gov



**From:** Libby Liu <libby@opentech.fund>
**Sent:** Wednesday, February 26, 2020 1:24 PM
**To:** John Barkhamer <JBarkhamer@usagm.gov>
**Cc:** Laura Cunningham <laura@opentech.fund>; Lauren Turner <lauren@opentech.fund>; Nat Kretchun <nat@opentech.fund>; Grant Turner <GTurner@usagm.gov>; David Kligerman <dkligerman@usagm.gov>; Thomas Layou <TLayou@usagm.gov>; Patrick Taylor <taylorp@rfa.org>
**Subject:** Re: OTF FY2019 unobligated funds transfer

Terrific!

Thank you!

*Libby Liu*
*CEO*
*Open Technology Fund*


On Feb 26, 2020, at 12:29 PM, John Barkhamer <JBarkhamer@usagm.gov> wrote:


Libby, I completely understand.  This spinoff/startup has so many administrative quirks to deal with even as you push ahead on so many critical investments.  Thom will circle back on the steps to move the money.  And I defer to Dave on CNs, but am inclined to agree with you.  This funding has already been CNed for OTF purposes.

Regards,

John

**From:** Libby Liu <libby@opentech.fund>
**Sent:** Wednesday, February 26, 2020 11:34 AM
**To:** John Barkhamer
**Cc:** Laura Cunningham; Lauren Turner; Nat Kretchun; Grant Turner; David Kligerman; Thomas Layou
**Subject:** Re: OTF FY2019 unobligated funds transfer

Hi John

Thanks for this!!  You're right - I think there were just too many moving parts.

The OTF at RFA transfer funds got superseded by all the effort to start the FY2020 Grant Agreement

Can we initiate a transfer of $2m from RFA to USAGM to be in an amendment to the FY2020 OTF grant agreement while you all seek re-apportionment approvals?  (This is a little more than half the remaining unobligated OTF funds at RFA).  The final transfer won't happen until later this year after outside auditors certify all the various balances.

David - I'm assuming that the Hill does not need a notification since this is IF funds for OTF going to OTF to be spent on IF.  Eg., although it is another entity, it is for the same use by the same program.

Question: John, is this what you'd recommend for the MBN transfer as well?

Many thanks!

Libby

**Libby Liu**
**CEO**
**Open Technology Fund**


On Feb 26, 2020, at 11:01 AM, John Barkhamer <JBarkhamer@usagm.gov> wrote:


Please see USAGM's response to this issue from two months ago.  I encourage OTF and RFA not to wait another two months to start this process that could have been completed by now.

---

**From:** Grant Turner
**Sent:** Tuesday, February 25, 2020 9:40 AM
**To:** Libby Liu <libby@opentech.fund>; David Kligerman <dkligerman@usagm.gov>; John Barkhamer <JBarkhamer@usagm.gov>; Thomas Layou <TLayou@usagm.gov>
**Cc:** Laura Cunningham <laura@opentech.fund>; Lauren Turner <lauren@opentech.fund>; Nat Kretchun <nat@opentech.fund>
**Subject:** Re: OTF FY2019 unobligated funds transfer

I'm adding John and Thom as well.

Grant
Get Outlook for iOS

---

**From:** Libby Liu <libby@opentech.fund>
**Sent:** Monday, February 24, 2020 2:41:43 PM
**To:** Grant Turner <GTurner@usagm.gov>; David Kligerman <dkligerman@usagm.gov>
**Cc:** Laura Cunningham <laura@opentech.fund>; Lauren Turner <lauren@opentech.fund>; Nat Kretchun <nat@opentech.fund>
**Subject:** OTF FY2019 unobligated funds transfer

Hi all

We are looking to find the easiest and quickest way to transfer unobligated OTF funds from RFA to OTF so we can spend down the FY2019 money.

As you know, at OTF we have $3.6m-ish of FY2020 IF funds to use for new contracts but would like to use up the FY2019 funds before exhausting the FY2020 funds.

Can this be done through a grantee to grantee transfer if both boards pass resolutions allowing for it?  My hunch is that this would be far quicker than going back through USAGM & OMB & reprogramming...

Please let us know if you agree,

Thanks!

Libby

***Libby Liu***
***CEO***
***Open Technology Fund***

<mime-attachment>

| From: | Virginia Boateng <vboateng@usagm.gov> |
|-------|----------------------------------------|
| Sent: | Tuesday, June 16, 2020 4:18 PM |
| To: | Libby Liu; laura@opentech.fund; Nat Kretchun |
| Cc: | Heidi Pilloud; Patrick Taylor; John Barkhamer; Thomas Layou; Lillian Cheng; David Kligerman; Marcus Murchison |
| Subject: | FW: OTF FY-20  Grant Amendment #002 - FAIN:OT01-20-GO-00001 - Funding for July - September, 2020 |
| Attachments: | OTF FY20 Grant Agreement Amdt.  002 - FAIN OT01-20-GO-00001.pdf; FY20 USAGM Internet Freedom Spend Plan -  Graham.pdf |

Good afternoon Libby,

Please find attached, **Amendment #002 to the OTF FY20 Grant Agreement** between the USAGM and OTF, which provides operational funds for **July 1, 2020 through September 30, 2020**, as approved in the FY2020 Internet Freedom Spend Plan Submission to Congress pursuant to the FY-2020 Appropriations Bill – P.L. 116-94.  The Financial Assistance Identification Number (**FAIN**) for this Grant Award is **OT01-20-GO-00001.**  At this time, USAGM intends to approve the submitted financial plan for the period of July1 through September 30, 2020  in the amount of **$11,047,128.**

This amendment also includes the following attachments:
- Attachment K - Internet Freedom Spend Plan Potluck, which reflects FY 2020 Appropriated Funds Only
- Internet Freedom Spend Plan approved April 23, 2020

Please provide a signed version of this Grant Amendment and your entity's July – September 2020 funding request in the amount of **$11,047,128** in order to expedite the payment process**.**  We will provide a copy of the bilaterally signed version of this agreement and the approved financial plan once all necessary signatures have been obtained.

If you have any questions, please let me know.

Thanks,
Virginia

*Virginia C. Boateng*
Budget Analyst
U.S. Agency for Global Media (USAGM)
Office of the Chief Financial Officer
Budget Division

Def. App. 264

(202) 203-4644
vboateng@usagm.gov

**GRANT AGREEMENT
BETWEEN THE
U.S. AGENCY FOR GLOBAL MEDIA AND
OPEN TECHNOLOGY FUND**

**FAIN: OT01-20-GO-00001**

**GRANT FUNDS TABLE**

| | FY 2020 PROGRAM PLAN | Previous Award Total | Current Award | New Award Total | Currency gain/(loss) (Informational) |
|---|---|---|---|---|---|
| **Open Technology Fund[1]** | $19,825,000 | $8,777,872 | $11,047,128 | $19,825,000 | Non-Reported |
| **Internet Freedom** | N/A | $600,000 | $0 | $600,000[2] | Non-Reported |
| **TOTAL FUNDING** | $19,825,000 | $9,377,872 | $11,047,128 | $20,425,000 | Non-Reported |

This Agreement constitutes Amendment number two (002) (the "Amendment") to the Fiscal Year ("FY") 2020 Grant Agreement between the U.S. AGENCY FOR GLOBAL MEDIA ("USAGM") and OPEN TECHNOLOGY FUND ("Non-Federal Entity") signed in January 2020 (the "Grant Agreement"). USAGM hereby grants an additional amount of **$11,047,128** of no-year funds to OPEN TECHNOLOGY FUND, up to $9,460,171 shall be used to support Internet freedom projects. The remainder shall be used to fund OTF salaries and operations.

WHEREAS, funding has been made available pursuant to the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2020 of the Consolidated Appropriations Act of 2020, H.R. 1865 / H. Res.765, (Div. G, P.L. 116-94, December 20, 2019) and the corresponding Explanatory Statement (165 Cong. Rec. H11061 at H11428, December 17, 2019) and Report(s) (H. Rept. 116-78, S. Rept. 116–126), the USAGM has submitted the Internet Freedom Spend Plan and the necessary consultations have occurred, including with the Congress, and such plans are finalized (See Attachment K);

With the additional amounts granted under this agreement, the total amount USAGM has granted to the NFE for FY 2020 is **$20,425,000**, of which, **$600,000** of the no-year funds are provided by the Consolidated Appropriations Act of 2019 (Div. F, P.L. 116-6); and, **$19,825,000** (up to

---

[1] FY 2020 Internet Freedom Spend Plan Submission to Congress dated April 3, 2020 was approved April 23, 2020.

[2] $600,000 of the no-year funds were provided by the Consolidated Appropriations Act of 2019 (Div. F, P.L. 116-6).

**$17,552,955** shall be used to support Internet freedom projects. The remainder shall be used to fund OTF salaries and operations.) of the no-year funds are provided by the Further Consolidated Appropriations Act, 2020, P.L. 116-94.

Except as otherwise expressly provided herein, the other provisions of the FY 2020 Grant Agreement shall remain in full force and effect.

**OPEN TECHNOLOGY FUND**                    **U.S. AGENCY FOR GLOBAL MEDIA**

BY _____              BY_____
Libby Liu                                Michael Pack
CEO                                      Chief Executive Officer

DATE _____                    DATE _____

Attachment K[3]

| Open Technology Fund Spend Plan FY2020 | | |
|---|---|---|
| Internet Freedom Fund | $ 7,000,000 | 35% |
| Technology at Scale Fund | $ 7,000,000 | 35% |
| Core Infrastructure Fund | $ 750,000 | 4% |
| Prototype Fund | $ 70,000 | 0% |
| Rapid Response Fund | $ 450,000 | 2% |
| OTF Labs | $ 1,725,000 | 9% |
| Research Fellowships | $ 370,000 | 2% |
| USAGM Entity Support | $ 260,000 | 1% |
| OTF Summit | $ 200,000 | 1% |
| Programmatic Support | $ 150,000 | 1% |
| One-time Startup Costs | $ 500,000 | 3% |
| **OTF Programmatic and Operations - Subtotal** | **$ 18,475,000** | 93% |
| OTF Staff | $ 1,350,000 | 7% |
| **OTF Staff - Subtotal** | **$ 1,350,000** | 7% |
| **Grand Total, OTF** | **$ 19,825,000** | **100%** |

---

[3] Amounts in Internet Freedom Spend Plan Potluck reflect FY 2020 Appropriated Funds Only. The chart included in the Internet Freedom Spend Plan on pg. 8 had a total amount of $21,025,000, which inadvertently included the $1.2 million in annual funds for OTF salaries paid by RFA. Subsequently, the table above was adjusted to reflect the current FY2020 Financial Plan.



330 Independence Avenue SW | Washington, DC 20237 | usagm.gov

April 3, 2020

The Honorable Lindsay Graham
Chairman
Subcommittee on State, Foreign Operations and Related Programs
Committee on Appropriations
United States Senate

Dear Mr. Chairman:

The U.S. Agency for Global Media (USAGM) hereby submits this report, pursuant to Section 7050(b) of the Further Consolidated Appropriations Act, 2020 (Div. G, P.L. 116-94). It is the agency's plan for programs to promote Internet freedom globally, including a description of safeguards to help ensure that such programs are not used for illicit purposes.

Should you have any questions please contact Adam Tracy, Congressional Liaison, at 202-203-4669.

Sincerely,

Grant K. Turner
Chief Executive Officer and Director

Enclosure

     

PUBLIC SERVICE MEDIA

Def. App. 269

# U.S. Agency for Global Media
# Internet Freedom FY 2020 Spend Plan

| Managing Network | FY 2018 IF Actual | FY 2019 IF Actual | FY 2020 IF Projected |
|---|---|---|---|
| USAGM/OIF | 4,300,000 | 5,298,770 | 175,000 |
| RFA/OTF | 10,700,000 | 9,701,230 | 1,200,000 |
| OTF, Inc. | 0 | 0 | 19,825,000 |
| **Total** | **15,000,000** | **15,000,000** | **21,200,000** |

Pursuant to the Further Consolidated Appropriation Act, 2020, P.L. 116-94 (FY20 Appropriation Act) the Agency was provided $20,000,000 in no-year funds which shall be for internet freedom (IF) programs.  This spend plan details the USAGM's Office of Internet Freedom (OIF) and the Open Technology Fund's (OTF) priorities and operations for these FY 2020 funds.  The plan is submitted in compliance with section 7050(b) of the FY20 Appropriation Act, and as may be applicable, section 7015 and 7061 of that Act.

The mission of the United States Agency for Global Media is to "inform, engage, and connect people around the world in support of freedom and democracy."  In furtherance of this mission, USAGM has been supporting internet freedom projects since 2012 through the Office of Internet Freedom (formerly the Internet Anti-Censorship Division) and the Open Technology Fund (OTF), USAGM's newest non-profit grantee.  The USAGM's internet freedom program supports, per congressional appropriations guidance, global internet freedom for the expansion of unrestricted access to information on the internet.  Over the past seven years, USAGM has invested over $100 million in projects to promote internet freedom in the world's most restricted environments.  Together, these programs have supported the tools and techniques necessary for USAGM networks to report and disseminate content in information-restrictive markets, and for USAGM audiences to receive and share content safely online.

USAGM's target audiences across the world increasingly access media content via digital and social media platforms.  In 2019, USAGM's unduplicated digital audience reached 127 million people, representing a 22% growth from the previous year.  In parallel, threats to internet freedom have escalated dramatically.  Repressive regimes are deploying a new generation of advanced censorship and surveillance technology that is designed to stifle dissent, track minorities, and manipulate content online.  China alone spends billions of dollars each year to

maintain its complex censorship and surveillance apparatus, while Russia and Iran are each investing hundreds of millions of dollars to build what are fundamentally "national intranets." These and other efforts by repressive regimes are fundamentally re-shaping the internet from a shared, global platform to isolated networks of censorship and control. Today, over two thirds of the world's population live in countries where the internet access is restricted, and that number is growing. This makes it difficult and dangerous for USAGM journalists, sources, and audiences to engage in and share fact-based news online.

Technologies that provide access to blocked content, and safe and secure methods to share content, are critically important to getting information to target audiences that would otherwise be siloed by government censorship. USAGM's IF program enables not only unfettered online access to USAGM products or content, but also the full spectrum of independent news sources on the internet. This is increasingly important as the USAGM continues to harness digital platforms and undertakes new methods of engaging with audiences. Accordingly, projects focused on safe and secure communications are critical components for ensuring that the USAGM content creation process does not expose our stringers, sources, and interviewees to threats, and that USAGM news and information is delivered to these audiences without further endangering them. Addressing the online threats faced by USAGM's audiences and protecting journalists, sources, and information seekers against punishment for online activity are essential to fostering free media, and necessitate deploying tools that both circumvent censorship and protect user access to information.

In response to escalating attacks on freedom of expression, USAGM, with congressional support, established the Open Technology Fund as USAGM-sponsored independent organization. This allows for the consolidation of previous streams of effort into a synchronized and expanded capacity to protect internet freedom around the globe.

USAGM's FY 2020 budget provides $20 million to the International Broadcasting Bureau for internet freedom programs, and $1.2 million to RFA for associated staffing costs to continue support services as OTF builds out an administrative team. As detailed above, of the $21,200,000 allocated for internet freedom programs, USAGM will provide $19,875,000 to the newly established Open Technology Fund corporation through a grant agreement and will hold back $175,000 for the Office of Internet Freedom to support OIF's oversight activities, including monitoring and evaluation efforts.

Radio Free Asia (RFA) has engaged the services of its auditors, Calibre CPA Group to review the open contracts on RFA's financial records as of May 31, 2020. Upon completion of this review, any unobligated and obligated funding, along with any unused portion of the $1.2 million for associated staffing costs during the transition will be transferred to OTF. The estimated completion of this review is mid-June.

2

# OFFICE OF INTERNET FREEDOM

Since 2002, USAGM has been involved in activities to circumvent internet censorship by foreign governments in order to distribute news content and better provide a forum for free expression in closed countries.  In 2016, USAGM established the Office of Internet Freedom (OIF) to conduct governance and oversight of USAGM internet freedom activities.

OIF no longer directly implements or manages internet freedom projects or contracts but rather will manage projects that assess particular threats and/or OTF effectiveness in appropriate areas to inform USAGM strategy and oversight.  The Open Technology Fund, a non-federal entity, will implement the internet freedom program in full, including support for all USAGM news networks.  More details about this transition are included later in the OTF section below.

OIF will continue to perform critical oversight to ensure OTF compliance with relevant rules and regulations in the execution of congressionally mandated use of internet freedom funds for technology projects, ensuring uninterrupted circumvention services for USAGM entities and their training needs.  The Director of the OIF, currently the sole employee assigned to OIF, will participate in the OTF proposal review process as a member of the OTF Advisory Council and have full access to the proposal vetting lifecycle.

| OFFICE OF INTERNET FREEDOM SPEND PLAN FY 2020 | | |
|---|---|---|
| Third party evaluation of circumvention tools at scale | $100,000 | 57.5% |
| Research reports on the reach of OTF-incubated projects | $50,000 | 28.5% |
| Programmatic support | $25,000 | 14% |
| **GRAND TOTAL, OIF** | **$175,000** | **100%** |

# OPEN TECHNOLOGY FUND

Since its creation in 2012, the Open Technology Fund has been incubated by Radio Free Asia, a non-profit USAGM-sponsored grantee.  During this time, OTF has supported pioneering research, development, and implementation of cutting-edge internet freedom technologies to respond to rapidly evolving censorship threats around the world.  Today, over two billion people globally use OTF-supported technology daily, and more than two-thirds of all mobile users have OTF-incubated technology on their device.

3

In September 2019, OTF was incorporated as an independent non-profit organization.  The creation of an independent Open Technology Fund enables USAGM to further build on its success, expanding its internet freedom efforts and maximizing the impact of its investments.  With a growing percentage of USAGM's audiences relying on the internet to access news and information, it is essential that they have the tools necessary to do so safely, and free from censorship and surveillance.  The same is true of USAGM journalists, stringers, and sources who are constantly exposed to threats throughout the reporting process.

As an independent organization, OTF is uniquely situated to responsibly and accountably support the U.S. government's internet freedom efforts at the pace and with the flexibility needed to empower innovation and compete against adversaries to a free and open internet.  These additional resources will enable OTF to increase long-term support for core internet freedom tools, expand funding for next generation solutions, and provide direct technical and digital security support to USAGM networks.

## MISSION

The Open Technology Fund works to advance internet freedom in repressive environments by supporting the applied research, development, implementation, and maintenance of technologies that provide secure and uncensored access to USAGM's content and the broader internet to counter attempts by authoritarian governments to control the internet and restrict freedom online, including secure communications between journalists and sources.

Historically, OTF has supported the research, development, and implementation of cutting-edge internet freedom technologies.  As an independent organization, OTF's mission has expanded to support a broader range of technologies to respond to increasingly aggressive and sophisticated censorship and surveillance threats and to provide more comprehensive and tailored support to USAGM networks.  OTF will continue to work to advance internet freedom globally but, in addition to supporting the research, development, and implementation of innovative internet freedom technologies, OTF will also support the long-term maintenance and advancement of core internet freedom tools.  This will enable OTF to provide tailored support throughout the entire technology development cycle from proof-of-concept, to on-the-ground deployments, to multi-year efforts to better support technology development at speed and scale.  Additionally, OTF will provide direct internet freedom assistance to USAGM's news networks to improve the digital security of USAGM entities and journalists, including making USAGM websites and applications more secure and resistant to censorship, providing customized and secure tip lines for sources, and deploying leading internet freedom technologies to ensure that audiences can access USAGM content despite increasing censorship.  This expanded support will ensure that USAGM journalists and audiences have the tools they need to safely access the uncensored internet today as well as respond to future censorship threats.

## OBJECTIVES

Consistent with section 7050(b) of the Further Consolidated Appropriations Act, 2020 (P.L. 116-94), to "carry out research and development of new tools or techniques" and "utilize tools and

techniques to securely develop and distribute USAGM digital content", OTF supports programs to:

- **Provide uncensored access to the internet** to individuals living in information-restrictive countries to ensure that they can safely access USAGM content. This entails the development and deployment of circumvention technology as well as research and awareness-raising that help circumvention technology stay a step ahead of the censors.

- **Protect journalists, sources, and audiences** from repressive surveillance and digital attacks to ensure that they can safely create and consume USAGM content. This includes support for secure communication tools, targeted digital security interventions and other forms of privacy and security technology.

## OTF PROGRAMS

OTF solicits project ideas through a fully open and competitive application process. The OTF application process has been designed to reduce barriers to entry to make funding more accessible to a wide scope of qualified individuals and organizations around the world. This process has helped to attract innovative applications from groups that are not typically able to access federal funds, including expert technologists, frontline journalists and human rights defenders, cutting-edge researchers, and digital security specialists. In order to ensure a high degree of due diligence during the application review process, OTF implements a multi-stage process through which successful applications are improved and refined to maximize impact. Through this process all proposals are reviewed by OTF experts as well as OTF's all-volunteer Advisory Council, a group of nearly 40 technical, regional, and subject-matter experts from a wide range of relevant disciplines, who provide feedback, guidance, and rankings for all proposals. In addition to ensuring that the most competitive and impactful projects are funded, this multistage review process also achieves substantial cost savings.

In order to fully support the technology development cycle, OTF provides resources through a variety of implementation mechanisms to enable tailored and comprehensive support to internet freedom projects. Because internet censorship technology and tactics are constantly evolving and adapting, OTF receives, reviews, and contracts projects on a continual rolling basis.

- **Funds:** OTF provides direct funding to support the applied research, development, implementation, and maintenance of technologies that enable censorship circumvention and enhance user security and privacy online.

  - **Internet Freedom Fund (IFF)** is the primary mechanism through which OTF provides funding for innovative global internet freedom projects. IFF projects are primarily focused on technology development and implementation but can also include applied research and digital security projects. Through an open and competitive process, OTF solicits project proposals to the IFF every two months. Projects funded through the IFF typically range from $10,000 - $500,000. OTF anticipates supporting 75-90 projects with these FY 2020 resources. **(Projected FY20 budget: $7,000,000)**

5

- ○ **Technology at Scale Fund** is the means through which OTF supports the circumvention and secure communication technology needs of USAGM networks. The fund will solicit technology solutions to deliver USAGM content to audiences in information-restricted environments and protect USAGM journalists and sources.  It will also ensure that technologies already used at scale by millions remain secure and effective.  Projects funded through the Technology at Scale Fund will range from $500,000 - $2,500,000.  OTF anticipates supporting 6-8 large-scale technologies that have a proven track record of successfully and safely circumventing online censorship in highly internet restricted environments and/or providing secure content sharing and communications in repressive contexts with these FY 2020 resources. **(Projected FY20 budget: $7,000,000)**

- ○ **Core Infrastructure Fund** supports the core infrastructure of everyday internet freedom technology to ensure the resiliency of digital security and circumvention tools.  This infrastructure, such as PGP, SSL, SSH, OTR, SNI, TLS, pluggable transports and code libraries, is utilized by people throughout the world to increase their access, privacy and security online.  Supporting these efforts is essential to ensuring the efficacy and security of critical circumvention and security tools. OTF anticipates supporting 6-8 projects with these FY 2020 resources. **(Projected FY20 Spend: $750,000)**

- ○ **Prototype Fund** supports the rapid development of cutting-edge internet freedom technology prototypes that serve the immediate needs of independent journalists and human rights defenders.  Through this fund, technologists and activists receive support to bring to life next-generation solutions that address emerging censorship and surveillance threats.  Projects funded through the Prototype Fund range from $3,000 - $6,000. OTF anticipates supporting 10-20 projects with these FY 2020 resources. **(Projected FY20 budget: $70,000)**

- ○ **Rapid Response Fund** provides emergency support to independent media outlets, journalists, and human rights defenders who face digital attacks to help them stay safe, get back online and mitigate future attacks or to combat sudden censorship events.  OTF will have the capacity to support at least 20 rapid response engagements with these FY 2020 resources. **(Projected FY20 budget: $500,000)**

- ● **Labs:** In addition to direct funding, OTF provides expert services to the internet freedom community at large through its Labs, including security code audits, usability assessments, engineering support, the translation and localization of internet freedom tools into over 200 languages, legal information and referrals for pro-bono legal support, and secure cloud storage.  These services fall under six labs: the Engineering Lab, the Red Team Lab, the Usability Lab, the Community Lab, the Localization Lab, the Learning Lab and the Legal Lab.

    These services also ensure that the technologies incubated and supported by OTF are as effective, secure, and usable for USAGM audiences as possible.  By coordinating the provision of these services through the labs, OTF is able to achieve large economies of scale and bring down the overall cost of providing expert support to internet freedom

6

projects.  These services are available to both OTF-funded projects, as well as other important internet freedom efforts, through applications associated with each lab.  These FY 2020 resources will allow OTF to scale up its Lab services to fully support the programs described above. **(Projected FY20 budget: $1,775,000)**

- **Research Fellowships:** OTF supports individuals to carry out cutting-edge applied research projects examining how authoritarian states are restricting the free flow of information and ways for citizens to overcome those tactics.  OTF fellowships help to cultivate the next generation of internet freedom experts by creating a viable career track for those who have the skills and passion for internet freedom.  Over the course of the last six rounds of fellows, the program has both (a) produced extremely timely and impactful breakthroughs that immediately feedback into the development of internet freedom technologies, and (b) received applications from some of the most highly-regarded researchers and technologists who take leave from high profile and highly paid positions in order to focus on a particularly important area of research.  The cost per fellowship averages $60,000 and OTF anticipates supporting 10-12 fellows with these FY 2020 resources. **(Projected FY20 budget: $500,000)**

- **Entity Support Program:** Evolving an effort launched by OIF in FY 2019, OTF will hire expert digital security consultants to provide direct internet freedom assistance to USAGM networks, such as technical audits and digital security trainings, to improve the digital security of its entities and journalists. Based on findings of these digital security interventions, OTF will leverage resources available through its other funding mechanisms to support the entities ongoing internet freedom needs, such as making USAGM websites and applications more secure and resistant to censorship, providing customized and secure tip lines for sources, and deploying leading internet freedom technologies to ensure that our audiences can access USAGM content despite increasing censorship.  These FY 2020 resources will enable OTF to begin piloting the Entity Support Program with Radio Free Europe/Radio Liberty and Voice of America. **(Projected FY20 budget: $260,000)**

- **OTF Summit:** Since its inception, the OTF Summit has been an annual retreat for invited OTF projects, fellows, advisory council members and other experts in the field (including public and private funders) to focus on OTF program review/assessment, landscaping the state of play on internet freedom in hot spots around the world, setting priorities for the coming year, strengthening collaboration, and growing the impact of the IF community.  This ensures that OTF remains deeply integrated with the latest developments in censorship and surveillance technology and tactics in the field as well as emerging breakthroughs to counter threats to internet freedom. **(Projected FY20 budget: $200,000)**

- **OTF Program Support:** In addition, funding is set aside for OTF Program Support including, but not limited to: training, travel for project monitoring, participating in industry conferences as necessary to address emerging threats, collaborations with complementary programs, infrastructure, proposal system maintenance and other costs for making the programs run effectively, efficiently and collaboratively. **(Projected**

7

**FY20 budget: $350,000)**

- **One-time Start-up Costs:** OTF anticipates the following one-time start-up expenses to establish a fully independent organization: office space, supplies, expansion of OTF's proposal system in incorporate back-end functions such as invoicing and contract management, start-up service fees for accounting, payroll, human resources. **(Projected FY20 budget: $500,000)**

- **Salaries and Operations:** This covers the cost of OTF staff, fringe, office space, and other general direct costs.  More details about OTF staffing and leadership are provided below. **(Projected FY20 budget: $2,120,000)**

| OPEN TECHNOLOGY FUND SPEND PLAN FY 2020 | | |
|---|---|---|
| Internet Freedom Fund | $7,000,000 | 33% |
| Technology at Scale Fund | $7,000,000 | 33% |
| Core Infrastructure Fund | $750,000 | 3.5% |
| Prototype Fund | $70,000 | 0.5% |
| Rapid Response Fund | $500,000 | 2.5% |
| OTF Labs | $1,775,000 | 9% |
| Research Fellowships | $500,000 | 2.5% |
| USAGM Entity Support | $260,000 | 1% |
| OTF Summit | $200,000 | 1% |
| Programmatic Support | $350,000 | 1.5% |
| One-time start-up costs | $500,000 | 2.5% |
| **OTF Programmatic and Operations Subtotal** | **$18,905,000** | **90%** |
| OTF Staff | $2,120,000 | 10% |
| **OTF Staff Subtotal** | **$2,120,000** | **10%** |
| **GRAND TOTAL, OTF** | **$21,025,000** | **100%** |

8

**OTF OPERATIONS**

**Leadership**

OTF will have both a CEO and President to fully and efficiently support the creation of the organization.

Libby Liu is the inaugural CEO of the OTF grantee corporation. Prior to joining OTF, Ms. Liu was the President of RFA for nearly 20 years, where she provided the private non-profit grantee with leadership, vision, and mission-based strategic and operational direction. Under Ms. Liu's leadership, RFA transformed from a radio broadcaster to a wholly digital multi-media interactive news organization. Ms. Liu also created OTF as a program within RFA in 2012 and has overseen OTF as a program at RFA for the past seven years.[1]

The CEO is responsible for leading the start-up of the OTF grantee and establishing the organization including financial, legal and HR infrastructure. The CEO will also lead OTF's development strategy, including external relations, partnerships, fundraising, and serve as the primary liaison to the OTF Board. The CEO will also serve as a member of USAGM Internal Coordinating Committee. The CEO position is expected to be a short-term role to lead the initial start-up and establishment of the OTF corporation. At the conclusion of the CEO's term, the CEO and President roles will be collapsed into a single position, consistent with other USAGM entity leadership structures.

Laura Cunningham is the inaugural President of the OTF grantee corporation. As President, Ms. Cunningham is responsible for OTF's strategic development, long-term planning, and day-to-day operations to enable OTF to fulfill its mission to support internet freedom worldwide. Ms. Cunningham has over a decade of experience working on internet freedom across a variety of donor, non-profit, and government organizations. Prior to joining OTF, Ms. Cunningham was the Senior Advisor for Internet Freedom in the U.S. State Department's Bureau of Democracy, Human Rights and Labor, where she led the Department's internet freedom programs focused on technology development, digital security, internet policy advocacy, and research.[2]

---

[1] Prior to joining RFA, Ms. Liu served as the Director of Administration and Strategic Planning at the Baltimore headquarters of the National Association for the Advancement of Colored People (NAACP).  There she played a pivotal role in the Board's establishment of the NAACP's Five-Year Strategic Plan Goals and Objectives and in the implementation of the Plan. Ms. Liu holds a bachelor's degree from the University of California-Berkeley, an MBA from the Wharton School at the University of Pennsylvania and a JD from the University of Pennsylvania Law School.

[2] Prior to joining the State Department, Laura was Program Manager of ICT Policy and Programs at Internews. Previously, Laura worked as a Digital Coordinator at the Center for International Media Assistance at the National Endowment for Democracy, and helped to launch the Liberation Technology Program at Stanford University's Center for Democracy, Development and the Rule of Law. Laura holds an M.A. in comparative politics and a B.A. in political science, with a minor in computer science, from Stanford University.

9

**OTF Board**

Per USAGM policy, all USAGM Board members were offered the opportunity to participate on the OTF Board and all six Board members opted in, including Mr. Kenneth Weinstein, as Board Chairman, Dr. Leon Aron, Ambassador Ryan Crocker, Mr. Michael Kempner, Ambassador Karen Kornbluh, and the Secretary of State, ex officio, or his designee.

Given the highly technical nature of OTF's work, the OTF Board has the ability to add additional experts to the Board. To date, the Board has added Ben Scott to the Board. Mr. Scott is Director of Policy & Advocacy at Luminate. Prior to joining Luminate, he co-led the Stiftung Neue Verantwortung (SNV) in Berlin, where he helped to develop it into a leading tech policy voice in German politics. He also was a senior adviser to a think tank in Washington DC, where he helped design the Public Interest Technology Initiative. Previously, Ben was Policy Adviser for Innovation at the U.S. Department of State, where he helped steward the 21st Century Statecraft agenda, with a focus on technology policy, social media, and development. Before this, Ben led the Washington office of Free Press, a public interest organization expanding affordable access to an open internet and fostering more public service journalism.

**Staffing**

The OTF team currently consists of twelve full-time team members: one CEO, one President, one Deputy Director, one Director of Technology, one General Counsel, one Director of Research, one Director of Digital Security, three program managers, one program specialist, and one communications/social media outreach coordinator. As a whole, the team is rich with experience in the field of internet freedom. OTF's program managers include technical and implementation experts with deep knowledge of the regions where OTF's efforts are most needed.  OTF's technical experts are developers, computer science experts, and digital security trainers/auditors. OTF's implementation experts have led technology and digital security initiatives for independent media outlets and human rights organizations around the world. OTF is in the process of hiring several additional staff members over the next year to fully support OTF operations, including human resources, external relations, finance and accounting experts, administrative and program staff.

**Monitoring and Evaluation**

Monitoring and evaluating the success of OTF projects is key to OTF's ability to make informed, impactful and cost-effective funding decisions. Evaluation of OTF project success is conducted in accordance with the USAGM's Internet Freedom Framework. While projects vary in their individual metrics, all OTF-funded projects must clearly define an intended impact and present metrics for measuring success as part of the OTF application process. Moreover, the vast majority of OTF contracts are constructed as pay-for-performance, which is only possible with the hands-on program management central to the OTF approach. Metrics for each project are approved by the OTF team and reported to the Director of the Office of Internet Freedom in the Office of the Chief Strategy Officer.

**Mitigating Illicit Use**

10

OTF engages in internet freedom activities with the goal of expanding the ability of individuals to exercise their fundamental freedoms – including rights to freedom of expression, association, and peaceful assembly – for peaceful and democratic ends. Internet freedom programming, by its nature, presents new challenges and opportunities for mitigating restrictions on the exercise of fundamental freedoms online. As with any technology, including a laptop computer or a cellular telephone, there is no absolute way to ensure that the products developed through USAGM internet freedom programs are not used for illicit ends; however, OTF implements a comprehensive illicit use mitigation strategy to minimize the potential for illicit use of supported technologies to the greatest extent possible. OTF carefully considers risk factors in its review process and programming efforts and performs due diligence and risk assessments on grantees prior to the issuance of awards. Additionally, the design and deployment of OTF-supported internet freedom technologies are geared towards repressive environments; they are designed specifically to meet the needs of independent journalists, information seekers, human rights defenders and other at-risk user groups in societies where speech is severely restricted; and distribution methods and networks for internet freedom technologies focus on helping individuals in internet-repressive environments. OTF re-evaluates its illicit use review process and mitigation strategy on an ongoing basis to ensure it remains relevant and effective. OTF is currently coordinating with the internet freedom program at the State Department's Bureau of Democracy, Human Rights and Labor to commission such a re-evaluation.

## OVERSIGHT

USAGM will continue to provide oversight of all OTF activities. Overall oversight responsibility will be led by the USAGM's CEO while OTF's programmatic work will be overseen directly by USAGM's Director for the Office of Internet Freedom in the Office of the Chief Strategy Officer, and OTF's budget and finances will be overseen by USAGM's Budget Office. In order to ensure USAGM has full transparency over OTF's operations and is able to provide appropriate oversight, OTF will provide USAGM with an annual spend plan, monthly programmatic and financial reports, and an annual report on OTF's annual illicit use mitigation strategy as well as other reviews and reports upon request.

In addition to USAGM oversight, OTF is committed to meeting all Congressional oversight requirements and requests, including the timely preparation of the annual USAGM Internet Freedom Spend Plan.

## COORDINATION WITH USG FUNDERS

OTF is committed to maintaining and expanding strong partnership and close collaboration with all other USG internet freedom funders to share information, identify opportunities for complementary work, avoid duplicating efforts and leverage efficiencies. OTF works closely with the U.S. Department of State's Bureaus for Democracy, Human Rights, and Labor (State/DRL) and Near Eastern Affairs (State/NEA), USAID's Bureau for Democracy, Conflict and Humanitarian Assistance, Center of Excellence on Democracy, Human Rights, and Governance (USAID/DCHA/DRG), and the Defense Advanced Research Projects Agency (DARPA). Each of these publicly funded internet freedom efforts participate in regular meetings

11

and is active on online discussion groups to expand beyond the regular in-person meetings. Risk of funding duplication is low because each funder pursues a complementary approach and coordinates closely at both the program review level and throughout the project implementation period. In cases where potential overlap could occur, these funders have and will continue to avoid duplication by de-conflicting budgets at line item level detail, if necessary. Moreover, OTF and the State Department internet freedom program actively participate in each other's project review panels. As such, the impact and success of each program must be considered within the overall context of complementary strategies and portfolios reflecting the shared legislative goals and objectives. OTF staff also actively collaborates with relevant programs within the Federal Government increasing the ability to leverage existing funding streams. These programs include the Secure and Trustworthy Cyberspace at the National Science Foundation, the Science & Technology Cyber Security Division at the Department of Homeland Security, the U.S. Naval Research Laboratory and the Computer Security Division at the National Institute of Standards and Technology.

## LEVERAGING PRIVATE FUNDING

The annual Global Internet Freedom appropriations states that, "funds made available pursuant to this section shall be matched, to the maximum extent practicable, by sources other than the United States Government, including from the private sector." In pursuit of this goal, OTF has worked to educate private donors about internet freedom and encouraged them to increase funding for internet freedom initiatives. As a result of these efforts, leading private donors, including the Ford Foundation, the Hewlett Foundation, and the Media Democracy Fund, have made internet freedom a core component of their funding strategy and have invested millions of dollars to support internet freedom globally - many times in joint funding with OTF. In addition, OTF has actively engaged with the private sector and advocated for companies to adopt, integrate, and support internet freedom technologies. For example, due to OTF engagement, WhatsApp integrated the OTF-funded Signal protocol into the WhatsApp application, which now secures the communication of over 1.5 billion users worldwide.

As an independent organization, OTF will continue to engage private donors and encourage the private sector to increase funding and support for internet freedom tools and technologies. OTF will also continue to educate donors about the current Internet freedom landscape to help them best direct new resources. In addition, to these awareness-raising efforts, OTF will also work to leverage private funding through direct fundraising efforts. OTF's fundraising efforts will aim to unlock resources from private donors and the private sector that complement ongoing Congressional appropriations and fill critical internet freedom funding gaps. Per the nature of grant law and regulation and the required USAGM oversight over OTF operations, OTF will not engage in fundraising from other sources except in accordance with established USAGM policy. In addition, OTF will not use any Federal funds to finance its fundraising efforts, unless authorized by USAGM and in accordance with relevant laws and regulations.

## RECENT ACCOMPLISHMENTS

Threats to internet freedom have escalated dramatically in recent years.  Repressive regimes are deploying a new generation of advanced censorship and surveillance technology that is designed

12

to stifle dissent, track minorities, and manipulate content online. China alone spends billions of dollars each year to maintain its complex censorship and surveillance apparatus, while Russia and Iran are each investing hundreds of millions of dollars to build what are fundamentally "national intranets." These and other efforts by repressive regimes are fundamentally re-shaping the internet from a shared, global platform to isolated networks of censorship and control. As a result, today, over two thirds of the world's population live in a country where the internet access is restricted, and that number is growing. This daily suppression of freedom of expression stifles the fundamental human rights of all citizens and prevents the development of open societies.

In response to these growing threats, over the last year, OTF funded over **60 innovative technology projects** to combat censorship and repressive surveillance, **22 fellowships** to support cutting-edge research and digital security interventions, **7 labs** to improve the security, usability, resiliency and interoperability of key internet freedom technologies, and over **50 rapid response interventions** to address digital emergencies.

**Technology to Fight Censorship and Repressive Surveillance**

Over the last year, OTF supported the development and implementation of cutting-edge technologies to fight increasingly sophisticated censorship and surveillance threats, including:

- **Advanced VPN Technology:** Virtual Private Networks (VPNs) have become one of the most popular methods for circumventing government-imposed censorship and, as a result, have become the target of repressive governments. Unfortunately, many popular, propriety VPNs rely on underlying protocols that have numerous, widely known vulnerabilities, massive codebases, and significant performance issues. In order to meet the demand for more secure, resilient, easy-to-use VPNs, OTF has invested in better documenting the vulnerabilities in widely used VPN protocols and the privacy practices of commercial VPNs and several emerging VPN solutions, such as Wireguard. Wireguard features a lightweight codebase, extensive security review, and integration of many important security features lacking in previous VPN protocols such as a "fail-closed" feature, which forces a more secure connection by default.

- **Emerging Circumvention Techniques:** The Chinese government constantly updates the Great Firewall (GFW) to prevent Chinese citizens from using new circumvention techniques to access blocked content. This process of updates creates a perpetual cat-and-mouse game between Chinese censors and new circumvention techniques. In response, OTF has supported the creation of an entirely new subfield of circumvention research that relies on machine learning techniques to constantly analyze the GFW. Through this analysis, researchers have discovered four new "species" of circumvention techniques and more than 25 distinct ways to overcome the GFW. These newly discovered techniques can rapidly evolve based on any changes made to the GFW and attempting to plug these holes in the GFW will in some cases open up new ones. The most promising mobile-friendly techniques are being pursued and developed into software kits for integration by circumvention tools. The researchers are also investigating techniques that will allow a content publisher to transmit information in ways that overcome the GFW and will allow users to access blocked content by simply pulling up the website on a browser.

13

- **Encrypted SNI:** Blocking websites through the unencrypted SNI field is an increasingly pervasive censorship tactic. This method of censorship is being used extensively in China as well as in Venezuela, which OTF-supported researchers discovered last year. Simply encrypting the SNI field would prevent censors from using this form of blocking. However, in order to encrypt SNI, browsers and website hosting providers must adopt this approach, which many have not because of a lack of standardization and difficulties related to implementation. Over the last year, OTF has supported a central actor in the IETF working group to finalize the encrypted SNI standard and create the template code to minimize any challenges associated with implementation. This will dramatically increase adoption of encrypted SNI and remove a primary blocking strategy employed by censorship regimes.

- **Secure Document Sharing and Storage:** As part of their daily operations, journalists, media networks, and human rights organizations frequently collect, store, and share sensitive information. This information often contains multiple layers of sensitivity and requires varying forms of protection from governments that seek to surveil and censor their citizens. In order to address this threat and to protect information at rest and shared within an organization, OTF has supported the development of several open source, secure file storage and file-sharing systems designed for journalists and human rights organizations, including Globaleaks, Tahoe-LAFS, OpenArchive, and OpenAppStack.

- **Mobile Surveillance Detection:** An international mobile subscriber identity-catcher (IMSI-catcher) is a surveillance device used to intercept mobile phone traffic and track mobile phone users. Over the last several years, repressive regimes have increasingly deployed IMSI-catchers during political protests to identify, track, and intercept the communications of protestors, journalists, and opposition groups in order to target, censor, and/or arrest them. In order to protect citizens from this repressive surveillance, OTF has supported the development of tools to detect the use of IMSI-catchers based on research conducted by the University of Washington and has piloted this technology in three Latin American cities.

**Combating Internet Shutdowns**

Over the last year, governments around the world have shut down the internet over 188 times. In order to ensure that citizens can continue to access and share digital content in the face of internet shutdowns, OTF has invested in unique peer-to-peer technologies that enable content-sharing and communication without an internet or cellular connection. For example, OTF has supported the development of **Briar**, an open- source, decentralized, encrypted messaging system that is designed for journalists, human rights defenders, and anyone who needs a safe and easy way to communicate when internet connectivity is uncertain. OTF has incubated **F-Droid**, an alternative app store for Android that allows users to easily share apps with others in their vicinity without an internet connection. In addition, OTF has supported the development of Ouinet. **Ouinet** is a free, open source technology, which allows web content to be served with the help of an entire network of cooperating nodes using peer-to-peer routing and distributed caching of responses.

14

**Timely, Accurate Censorship Detection**

Growing levels of internet censorship has heightened the need for robust censorship detection and analysis tools. Without knowledge of what is being blocked where and the underlying technical means for doing so, it is very difficult for circumvention tool developers to understand their adversaries' capabilities and to create effective tools to respond. Recognizing this, OTF has invested in the development and implementation of leading censorship detection tools, including the Open Observatory of Network Interference (OONI) and the Internet Outage Detection and Analysis (IODA) project. OONI is an open-source networking testing framework and testing network for detecting network interference including outright censorship. IODA is a system that monitors the internet in near-real time to identify macroscopic internet outages affecting the edge of the network. Collectively, these projects measure and document internet censorship nearly every minute in more than 210 countries.

**Exposing Repressive PRC Surveillance**

OTF has also played a key role in investigating and exposing PRC-affiliated apps used for repressive surveillance, including tools used by the government to target religious minority Uyghur Muslims in Xinjiang province as well as the widely used PRC-affiliated app, Study the Great Nation. In addition to exposing the increasingly sophisticated tactics that the Chinese government is using to surveil and control their own citizens, this research has also helped to shine a light on the types of technologies and tactics that the Chinese government is exporting to like-minded regimes around the world.

OTF conducted an audit of the **"BXAQ" app** that is used by Chinese police in the Xinjiang province to scan tourists' mobile phones. The audit found that the app not only scans phones but also captures users' data and sends that information insecurely to a local file server for analysis. In conjunction with Human Rights Watch, OTF also supported technical researchers to analyze a data collection and analysis system, called the **Integrated Joint Operations Platform (IJOP)**, that is used by police in the Xinjiang region to track residents. Researchers found that the system tracks the location data of phones, ID cards, and vehicles as well as the use of electricity and gas stations by all residents in the region. When the IJOP system detects irregularities or deviations from the norm, the system flags these abnormalities to authorities as suspicious, which prompts an investigation. In addition, OTF supported research on the mobile application, known as **Jingwang**, that all residents of Xinjiang have been forced to install on their mobile phones. Researchers found that the app collects personally identifiable information, scans the device for "dangerous" files, and sends a list of all files to an unknown entity for monitoring. Research supported by OTF also tracked the export of Chinese censorship and surveillance technologies and tactics to **102 countries** around the world.

**Responding to Digital Emergencies around the World**

Over the last year, OTF supported rapid response interventions across the globe to help journalists and human rights defenders respond to digital attacks and other forms of online censorship, including in places such as Venezuela, Hong Kong, Iran, Egypt, Gambia, DRC, Tibet, Thailand, Bahrain, Sudan, Ethiopia, Pakistan, Vietnam and Azerbaijan.

- **Venezuela:** After Venezuela's contested 2018 presidential election, the Maduro regime drastically ramped up its internet censorship and online attacks against journalists and activists. These attacks escalated further in 2019 with authorities regularly implementing

15

Def. App. 284

"just-in-time" censorship tactics to block media content and popular social platforms. In response to this worsening censorship environment, OTF quickly activated its networks to detect and monitor new censorship events, provide rapid response digital security assistance to journalists and activists on the ground, and deploy anti-censorship and secure communication tools for tens of thousands of citizens. OTF also provided rapid response assistance to a leading Venezuelan human rights organization and a network of Venezuelan journalists that were the targets of government-sponsored hacking attempts. These combined efforts ensured that activists and journalists were able to continue safely communicating and reporting on the situation.

- **Hong Kong:** In late 2019, protests erupted in Hong Kong in opposition to a proposed extradition law that would essentially subject its citizens to the Chinese legal system. Shortly after the protests began, Hong Kong-based journalists and human rights organizations reached out to OTF for digital security support and assistance. In response, OTF supported the creation of a tailored Chinese/English digital security guide for journalists and protesters, quickly deployed anti-censorship and secure communications tools to over 100,000 citizens, and supported the integration of OTF-incubated New Node into the popular Telegram app to improve the security and resiliency of communications.

- **Iran:** OTF responded quickly to the internet shutdown in Iran in November 2019. OTF-supported network measurement tools, including OONI and IODA, immediately reported the shutdown and closely monitored the situation in Iran. OTF collected this information in real-time and shared it with circumvention tool developers in order to help them update their tools accordingly and integrate new, effective circumvention techniques. OTF also shared this information with USAGM news networks to improve reporting and raise awareness about the technical aspects of the shutdown. In addition, OTF worked with the USAGM networks, the State Department, and Iranian human rights organizations to distribute the OTF-incubated Briar and F-Droid app to journalists, protestors, and civil society in Iran to enable peer-to-peer messaging during the shutdown so that users could continue to communicate and share information.

## <u>CONCLUSION</u>

The technologies funded by OTF over the last year have played a critical role in advancing the state of the art of anti-censorship and secure communication technologies globally. However, threats to internet freedom continue to grow exponentially as repressive regimes deploy increasingly bold and sophisticated censorship and surveillance tactics and technology. Over the last year, regimes have started to deploy artificial intelligence (AI) and machine learning to enable faster, more targeted, and more aggressive online censorship and surveillance. These new technologies have significantly decreased the cost of mass censorship and surveillance, making these tactics and techniques easily accessible to repressive regimes around the world. In many countries, repressive regimes have also begun to deploy new and nefarious technologies to create and propagate disinformation. By combining advanced censorship and surveillance technology with disinformation tactics, repressive regimes are now able to control and manipulate the online information landscape in a way they never have before. In addition to advanced and nefarious technical approaches, repressive regimes have become bolder and more aggressive in their online

16

censorship tactics, going so far as to cut their citizens off from the internet entirely. Over the last year, governments around the world shut down the internet over 188 times, including in Iraq and Iran. On average, internet shutdown cost countries over $20 million per day in GDP, demonstrating just how far repressive regimes will go to stop the free flow of information.
As threats to internet freedom continue to increase globally, so too have the need and demand for internet freedom projects. As a leading internet freedom funder and trusted partner among the global technical and human rights communities, requests for support from OTF have also grown exponentially. Over the last seven years, OTF has reviewed and responded to nearly 5,000 requests for support seeking over $500 million in total. In just the last year, OTF reviewed and responded to over 1,400 requests for support.

Building on years of success and impact in promoting and enabling the unrestricted use of the internet in places where internet freedom is attacked, OTF is poised to greatly expand effectiveness through a transition to a more streamlined, mature and dynamic organization. This new structure will enable OTF to support more strategic, coordinated, and resilient internet freedom programs to combat increasingly sophisticated and widespread online censorship and repressive surveillance as we move into FY 2020 and beyond.

17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OPEN TECHNOLOGY FUND,
2101 L Street, NW, Suite 300
Washington, DC 20036

AMBASSADOR RYAN CROCKER,
13022 East Apache Pass Lane
Spokane, Washington 99206

AMBASSADOR KAREN KORNBLUH,
3209 Cleveland Avenue, NW
Washington, DC 20008

BEN SCOTT,
52 Lucknow Drive
Nottingham NG3 5EU, United Kingdom

MICHAEL W. KEMPNER,
2150 Broadway, Apt. 14A
New York, New York 10023,
                    *Plaintiffs*,
        v.

MICHAEL PACK, in his official capacity
as Chief Executive Officer and Director of the
U.S. AGENCY FOR GLOBAL MEDIA,
330 Independence Avenue, SW,
Washington, DC 20237,
                    *Defendant*.

Case No. 20-cv-1710

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**EMERGENCY TEMPORARY
RESTRAINING ORDER SOUGHT**

## INTRODUCTION

On June 17, 2020—within days of taking the reins as head of the U.S. Agency for Global Media—Michael Pack attempted the wholesale purge of the officers and directors of the Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. Mr. Pack's actions, quickly dubbed the "Wednesday night massacre," came just two days after the resignations of Voice of America's director and deputy director, and have already prompted widespread, bipartisan concerns about their lawfulness.

Republican Senate" for confirming Mr. Pack after "a big battle in Congress for 25 years." @realDonaldTrump, Twitter (June 4, 2020).[4]

37.     Mr. Pack was sworn in as CEO of the Agency on June 8, 2020 and immediately began to redirect the efforts of Agency grantees.

38.     At approximately 12:15 p.m. on the afternoon of June 9, 2020, officers of Open Technology Fund, along with the other grantees, received an email stating that, "[e]ffective immediately" there was a "freeze" on: "(1) obligations for new contracts or extensions of any contract, (2) all personnel actions relating to hiring or promotion, and excluding retirements, and (3) all technical migrations."

39.     Immediately, and in the days that followed, the Fund sought clarification of the "freeze," including details about the reason for the freeze and its intended duration. Open Technology Fund's CEO and CFO emailed multiple senior staff members of the agency, as well as the agency's finance office, to explain the immediate negative impact that the freeze had on Open Technology Fund's operations as well as the long-term detrimental effects that the freeze would have if it continued beyond one week. The only responses they received to these inquiries were from the finance office, which stated that it also lacked information.

40.     On June 10, Open Technology Fund was invited by the Agency's finance office to provide specific financial information about finance priorities and the potential impact of the freeze. Open Technology Fund was informed that this information would be compiled with that of other grantees but was given no guidance on whether any exceptions to the freeze would be granted or when the freeze would be lifted.

41.     In the days that followed, Open Technology Fund learned of Mr. Pack's intention

---

[4] https://twitter.com/realDonaldTrump/status/1268676374501502977.

to rely on 22 U.S.C. § 6203 *et seq.* to fire and replace the Fund's Board of Directors and high-level officers.

42.     On June 13, the Fund's CEO Libby Liu submitted her resignation letter to the Board, effective July 13, 2020, in an attempt to preempt her firing and take the heat off of Open Technology Fund.

43.     On June 17, in what the press soon dubbed a "Wednesday night massacre," CEO Pack attempted to terminate the leadership of Open Technology Fund, Radio Free Asia, Radio Free Europe, the Middle East Broadcasting Networks, and the Office of Cuba Broadcasting. Mr. Pack also replaced the formerly bipartisan board members of these entities with political allies of the President.

a.     Mr. Pack sent a letter to Ms. Liu, notifying her that, "[e]ffective immediately," he was "removing [her] from [her] position as Chief Executive Officer (CEO) of OTF . . . . pursuant to [his] authorities as CEO of [the Agency], including under 22 USC 6209(d) and [OTF] bylaws."

b.     Mr. Pack additionally dismissed the heads of Radio Free Asia (Bay Fang); Radio Free Europe (Jamie Fly), Middle East Broadcasting Networks (Alberto M. Fernandez), and Office of Cuba Broadcasting (Emilio Vazquez).

c.     Mr. Pack notified Ms. Liu that "[e]ffective immediately," and "pursuant to [his] authorities" as CEO, including "under 22 USC 6209(d)" and [Open Technology Fund] bylaws": a) all "currently serving board members are hereby removed"; and b) "the following individuals are added to the Board of the OTF": Jonathan Alexandre (Senior Counsel, Liberty Counsel Action), Robert Bowes (Senior Advisor to the Secretary, HUD), Bethany Kozma (Deputy Chief of Staff, USAID), Rachel Semmel (Communications Director, OMB), Emily Newman (Chief of Staff, USAGM), and Michael Pack (CEO, USAGM) as Chairman.

d.     Mr. Pack has filled the "bipartisan" boards of all five organizations with these same

six Directors—five of whom are political appointees of the Trump administration. The remaining Director works for a conservative advocacy organization, Liberty Counsel Action.

44. The next day, June 18, Mr. Pack sent a letter to Laura Cunningham, notifying her that "[e]ffective immediately," he was "removing [her] from [her] position as President of [Open Technology Fund] . . . . pursuant to [his] authorities as CEO of [the Agency], including under 22 USC 6209(d) and [Open Technology Fund's] bylaws."

45. Members of Congress from both major political parties have expressed concern about Mr. Pack's actions.

a. On June 19, Congressman Michael McCaul, Republican Leader on the Foreign Affairs Committee, and Republican Senator Marsha Blackburn issued a statement on the termination of Laura Cunningham, President of Open Technology Fund, and the Fund's Board of Directors. In the statement, they said that they were "troubled by the recent termination[s]" and were "concerned about the future of the organization." They also noted that they had been "impressed with the efforts of President Laura Cunningham and her team."

b. On June 23, Robert Menendez, Democratic Senator from New Jersey and Ranking Member of the Senate Committee on Foreign Relations sent a letter to Acting Inspector General Stephen Akard about the attempted firings. Menendez asked Akard to "review whether Mr. Pack's wholesale firing of the leadership of [the Agency] networks violated a rule" promulgated by the Agency. *See Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150, 36,151 (June 11, 2020) (to be codified at 22 C.F.R. 531). Mr. Menendez noted that, "[o]n its face, the firing of the leadership of each network and dissolution of the boards appear to constitute an attempt to 'interfere with' and 'impermissibly influence'" the networks, in violation of the Rule. He further noted that Mr. Pack's actions "appear to be entirely inconsistent with the highest standards of professional journalism."

46. As of the filing of this complaint, all funds continue to be "frozen," preventing Agency-funded organizations, including plaintiffs, from performing normal business operations and executing the mission that congressional appropriators intended.

### CLAIMS FOR RELIEF

### COUNT ONE
### (LACK OF ANY LEGAL AUTHORITY TO TERMINATE THE OFFICERS AND DIRECTORS OF THE OPEN TECHNOLOGY FUND; DECLARATORY JUDGMENT ACT)

47. Mr. Pack lacks any legal authority to remove or appoint officers or directors of the Open Technology Fund. Under the International Broadcasting Act, officers and directors of "RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks, or any organization that is established through the consolidation of such entities . . . shall serve at the pleasure of and may be named by the" CEO. 22 U.S.C. § 6209(d). Additionally, the CEO may appoint and remove officers and directors of "any organization . . . authorized under this chapter." *Id.* Open Technology Fund was not one of the entities specifically "authorized" by the Act. Nor was it "established through the consolidation" of Radio Free Europe, Radio Free Asia, or the Middle East Broadcasting Networks. Section 6209(d) thus does not grant the CEO any authority to appoint or remove officers or directors of Open Technology Fund.

48. This plain reading is supported by the surrounding text. Section 6209(c) provides that "[n]othing in this chapter or any other Act . . . shall be construed to make such a consolidated grantee described in subsection (a) or Radio Free Europe, Radio Free Asia, or the Middle East Broadcasting Networks or any other grantee or entity provided funding by the agency a Federal agency or instrumentality." This language—notably broader than that in § 6209(d)—covers Open Technology Fund. The different statutory language used in §§ 6209(c) and (d) are indicative of congressional intent to cover different sets of entities between the provisions. The Open Technology Fund is included in the broader coverage of § 6209(c), but not § 6209(d).

18

49. Nor did Mr. Pack have legal authority to remove or appoint officers or directors under Open Technology Fund's corporate bylaws. Under the Fund's bylaws, officers and directors are appointed to three-year terms via majority vote of the board of directors. Directors can be removed through a vote of two-thirds of a quorum of directors, and any vacancy resulting from such removal may be filled by a majority vote of the remaining directors.

50. The Open Technology Fund's bylaws also provide that officers and directors may be appointed or removed "as may be authorized by" the International Broadcasting Act, 22 U.S.C. 6203 *et seq.* But since the Act does not grant Mr. Pack independent authority to appoint Open Technology Fund officers or directors, this provision does not authorize Mr. Pack's actions.

51. Because Mr. Pack did not have authority under the International Broadcasting Act or Open Technology Fund's corporate bylaws, his actions removing the Fund's officers and replacing its directors were unlawful.

52. There is a substantial and continuing controversy between Open Technology Fund, its officers and directors, and Mr. Pack, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that Mr. Pack does not have the ability to remove or appoint officers or directors of Open Technology Fund.

53. Open Technology Fund and its officers and directors will be and are irreparably harmed by Mr. Pack's actions and are without any adequate remedy at law.

**COUNT TWO**
**(UNLAWFUL ACTION TO UNDERMINE THE INDEPENDENCE OF RADIO FREE EUROPE, RADIO FREE ASIA, AND THE MIDDLE EAST BROADCASTING NETWORKS, AND OPEN TECHNOLOGY FUND; DECLARATORY JUDGMENT ACT)**

54. The International Broadcasting Act establishes a "statutory firewall" between the Executive Branch and the agency-funded networks. Section 6204(b) provides that the CEO, "in carrying out [his] functions, shall respect the professional independence and integrity of the Board,

19

its broadcasting services, and the grantees of the Board." § 6204(b). This firewall ensures that agency-funded networks enjoy full editorial independence under the Act; because of the firewall, grantees, and their employees, are "fully insulated from any political . . . pressures or processes" that would "be inconsistent with the highest standards of professional journalism." *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36, 150, 36,151 (June 11, 2020) (to be codified at 22 C.F.R. 531).

55.   This "firewall" is violated when "any person within the Executive Branch . . . attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks, including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities." *Id.* at 36,152.

56.   The grant agreements between the agency and the networks it funds reaffirm this statutory firewall. First, the grant agreements between the agency and Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks recognize that each grantee is a "private, nonprofit corporation" and that the agency's "oversight and supervision" of the grantee is "subject to limitations in the applicable law." Second, the grant agreements "acknowledge[] and affirm[] the safeguards contained in the United States International Broadcasting Act . . . meant to preserve the journalistic independence and integrity of USAGM programming." Under the grant, "no U.S. Government official"—including the CEO—may "attempt to influence the content or editorial choices" of the broadcasting entity "in a manner that is not consistent with the highest standards of professional broadcast journalism or take any other action that may tend to undermine the journalistic credibility or independence of USAGM or its broadcasters."

57.   By terminating the heads of Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks; replacing all members of the organizations'

respective boards in one fell swoop; and imposing a freeze on contracts, personnel actions, and technical migrations, Mr. Pack violated the statutory firewall and breached the grant contracts, violated applicable grant rules and guidance, and violated the statutory, regulatory, and contractual firewall.

## COUNT THREE
### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

58. The Administrative Procedure Act (APA) provides that a reviewing court may set aside final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

59. Mr. Pack's attempted appointment and removal of officers and directors of the Open Technology Fund, Radio Free Europe, Radio Free Asia, and Middle East Broadcasting Networks; his violation of the statutory firewall; and his freeze on contracts, personnel actions, and technical migrations are all agency actions that are arbitrary and capricious, abuses of discretion, and violations of law.

60. The plaintiffs will be and are irreparably harmed by Mr. Pack's actions and are without any adequate remedy at law.

## PRAYER FOR RELIEF

The plaintiffs request that the Court:

a. Declare that Mr. Pack lacks any legal authority to remove or appoint officers or directors of Open Technology Fund;

b. Declare that any actions taken by Mr. Pack in excess of his legal authority with respect to Open Technology Fund are null and void;

c. Declare that Mr. Pack's attempted wholesale terminations of the officers and directors of Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks, and his actions to freeze grant funds, were unlawful and therefore null and void;

d. Enjoin Mr. Pack, or any of his agents or subordinates, from taking any unlawful action to terminate officers or directors of Open Technology Fund, Radio Free

21

Europe, Radio Free Asia, or the Middle East Broadcasting Networks, or freeze their grant funds;

e. Award all other appropriate relief, including attorneys' fees and costs.

Respectfully submitted,

Dated: June 23, 2020

*/s/ Deepak Gupta*
DEEPAK GUPTA
GREGORY A. BECK
JONATHAN E. TAYLOR
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com*
*greg@guptawessler.com*
*jon@guptawessler.com*

*Counsel for Plaintiffs*

22

**U.S. Office of Personnel Management**
**Suitability Executive Agent Programs**

**Follow-Up Review of the**
**U.S. Agency for Global Media**
**Suitability Program**

July 2020



*CAUTION-- This report has been distributed to Federal officials who are responsible for the administration of the reviewed program. This report is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized OPM or agency official.*

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

## Contents

Executive Summary ............................................................................................................ 2
   Summary of Recommendations .................................................................................... 5
      Areas for Improvement ........................................................................................... 5
Background ....................................................................................................................... 11
Findings ........................................................................................................................... 13
   Delegation of Investigative Authority ....................................................................... 13
   Designation of Position Risk and Sensitivity ............................................................ 15
   Investigation Processing ............................................................................................ 25
      Electronic Questionnaires for Investigations Processing ....................................... 25
      Use of Appropriate Security Forms ...................................................................... 27
      Pre-Appointment Screening and Referral ............................................................ 29
      Reciprocity ............................................................................................................ 33
      Investigation Request Timeliness and Quality ..................................................... 36
   HSPD-12 Credentialing .............................................................................................. 39
   Suitability Investigation Quality ................................................................................ 48
   Adjudication ............................................................................................................... 52
      Suitability Review and Determination .................................................................. 52
      Reporting Suitability Adjudicative Determinations ............................................. 55
   Internal Control Activities .......................................................................................... 57
      Records of Investigation ....................................................................................... 57
      Record Retention .................................................................................................. 59
      Physical Safeguards .............................................................................................. 60
      Adjudicator Training and Qualifications .............................................................. 62
      Policies and Procedures ........................................................................................ 64
Conclusion and Agency Comments ................................................................................. 69
   Consolidated List of Open Recommendations: .......................................................... 69
Appendix I ....................................................................................................................... 72
   Objectives, Scope and Methodology ......................................................................... 72
Appendix II ...................................................................................................................... 74
   Contributors to this Report ......................................................................................... 74
   Report Distribution .................................................................................................... 74
Attachment A – USAGM Personal Financial Statements .............................................. 75
Attachment B – USAGM Response to Draft Report ...................................................... 79
Attachment C – USAGM Waiver Request to 5 CFR 1400 ............................................ 94
Attachment D – USAGM's Response to OPM Information Request ............................... 96

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

## Executive Summary

The heads of agencies that make suitability determinations must conduct their suitability
programs in accordance with applicable statutes, executive orders, and regulations.

Per 5 USC 1104, the director of the U.S. Office of Personnel Management may delegate
personnel management functions to the heads of agencies in the executive branch and other
agencies employing persons in the competitive service. OPM has established standards that
apply to the delegated functions, and OPM has established and maintains an oversight program
to ensure that delegated activities are conducted in accordance with those standards.  Per the
statute, when OPM makes a written finding, on the basis of information obtained as part of its
oversight program or otherwise, that any action taken by an agency pursuant to delegated
authority is contrary to any law, rule, or regulation, or is contrary to the standards established by
OPM, the agency involved shall take any corrective action OPM may require.

OPM's oversight program conducted by OPM's Suitability Executive Agent Programs (SuitEA)
conducts program reviews of Executive Branch agencies' personnel suitability and vetting
programs.  These reviews are conducted on, among others, agencies to which OPM has granted
delegated investigative authority to conduct their own investigations and/or adjudications and
agencies with a documented history of performance concerns.  The Office of the Director of
National Intelligence (ODNI), which has similar oversight responsibility for national security
programs, has established the Security Executive Agent National Assessment Program (SNAP).
OPM and ODNI may jointly conduct their assessments to provide for onsite validation of
metrics, policy, practices, and agency compliance with regulatory requirements regarding the
personnel security and suitability programs. The reviews identify any deficiencies which may
negatively impact the efficiency or integrity of the Federal service or are inconsistent with or
may weaken the interests of National Security.

In 2012, OPM's Agency Oversight program notified USAGM, then known as the U.S.
Broadcasting Board of Governors (BBG), that OPM's 2010 assessment of BBG's personnel
security and suitability program reflected the program needed improvement.  OPM provided a
listing of fourteen recommendations to improve the program.

In 2014, OPM's Agency Oversight program and ODNI's Security Executive Agent National
Assessment Program (SNAP) conducted a review of the U.S. Agency for Global Media
(USAGM) security and suitability program. OPM issued its draft report in September of 2015
and detailed a series of critical recommendations that required USAGM's immediate corrective
action.  Many of these were recommendations to which OPM had alerted USAGM in 2012, for
which USAGM had not taken corrective action.  In USAGM's response, it indicated it would
comply with the OPM's recommendations. In OPM's final report, issued in 2017, OPM

Def. App. 298

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

informed USAGM that failure to address the recommendations could serve as grounds to revoke
USAGM's delegated authority.

In 2018, OPM's Suitability Executive Agent Programs (SuitEA) team initiated another review,
again conducted jointly with ODNI's SNAP, to assess USAGM's corrective efforts on
deficiencies identified in past program reviews (2010 and 2014), to assess compliance with
current suitability regulations and supplemental guidance, and to determine if USAGM has
effectively implemented and maintained the performance goals and measures identified by the
Performance Accountability Council (PAC).  The review found USAGM staff had not made
required corrective efforts based on the prior reviews and further identified multiple new
deficiencies.  Corrective action was required due to deficiencies in USAGM's program relating
to position designation, background investigations processing, Homeland Security Presidential
Directive 12 credentialing, background investigations quality, adjudications, and internal
controls.  The review also noted potential concerns with USAGM's safeguarding of classified
national security information.

USAGM responded to OPM's draft report on November 20, 2018 and agreed with all
recommendations. In OPM's final report, issued to USAGM Chief Operating Officer and
Director John Lansing by then OPM Acting Director Margaret Weichert in August of 2019,
OPM identified 37 recommendations requiring corrective action and provided USAGM 90 days
to bring all program areas into compliance.  OPM informed USAGM that failure to do so could
result in OPM and ODNI taking additional steps, to include revoking USAGM's delegated
adjudicative authority.

In February 2020, OPM's SuitEA and ODNI's SNAP conducted follow-up activity regarding the
status of corrective actions required as a result of the 2019 report.  The objective of the follow-up
was to determine if USAGM had made all required corrections and had successfully brought
their security and suitability program into compliance.

To answer our objective, we reviewed applicable program operation manuals, policies,
documentation, and OPM data.  We also interviewed USAGM managers and employees.

This report includes the findings and recommendations from our 2018 inspection, which were
based on data covering a specific measurement period of investigative and adjudicative activities
that occurred January 1, 2016 through December 31, 2017.  All results from our current 2020
follow-up review activities are included under the "Current Status" heading in each section of
this report and cover a specific measurement period of investigative and adjudicative activities
that occurred November 1, 2018 through January 3, 2020, unless otherwise noted.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

OPM found USAGM has taken corrective action on 18 of OPM's 37 recommendations and has
failed to take corrective action on 19 of OPM's 37 recommendations made in OPM's 2019 final
report.  Additionally, OPM identified 6 new recommendations based on data collected covering
our follow-up measurement period.

OPM will take steps to revoke USAGM's adjudicative and other delegated authorities until such
a time as USAGM can demonstrate to OPM's satisfaction that USAGM has taken all corrective
actions.  OPM does not intend to grant delegated investigative authority to USAGM.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

## Summary of Recommendations

**Areas for Improvement**

Delegation of Investigative Authority

- Previous Recommendation 1:  USAGM must immediately cease all investigative activities and must immediately transfer all investigative work to the National Background Investigations Bureau (NBIB).[1]
    - Previous Recommendation 1 is CLOSED.

Designation of Position Risk and Sensitivity

- Previous Recommendation 2:  USAGM must ensure that all covered positions are designated for both risk and sensitivity using OPM's Position Designation System (PDS).
    - Previous Recommendation 2 is OPEN and UNRESOLVED.
- Previous Recommendation 3:  USAGM must maintain a Position Designation Record (PDR) (or equivalent) for each covered agency position, per OPM's Suitability Processing Handbook.
    - Previous Recommendation 3 is CLOSED.
- Previous Recommendation 4:  USAGM must ensure all USAGM employees tasked with position designation responsibilities are operating in a fair, consistent, and reliable manner.
    - Previous Recommendation 4 is CLOSED.
- Previous Recommendation 5:  USAGM must re-designate all positions in accordance with 5 CFR part 1400.
    - Previous Recommendation 5 is CLOSED.
- Previous Recommendation 6:  USAGM must request the correct level of investigation based on the accurate position designation, per 5 CFR part 1400, OPM's PDS, OPM issuances and Federal Investigation Notices, and the Federal Investigative Standards.
    - Previous Recommendation 6 is OPEN and UNRESOLVED.

Investigation Processing – Electronic Questionnaire for Investigations Processing (e-QIP)

- Previous Recommendation 7:  USAGM must immediately begin using e-QIP for all investigation requests.
    - Previous Recommendation 7 is CLOSED.

---

[1] NBIB's investigative function has been transferred to the Defense Counterintelligence and Security Agency (DCSA).  Per statute, Executive Order, and delegation, DCSA is the primary investigations provider for federal agencies.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

- <u>Previous Recommendation 8</u>:  USAGM must immediately begin using the current SF86 and must not allow applicants or employees to complete outdated versions of the form.
  - Previous Recommendation 8 is CLOSED.
- <u>Previous Recommendation 9</u>:  USAGM must immediately begin using the correct security forms (to include the SF85) for any position which does not require the use of the SF86.
  - Previous Recommendation 9 is CLOSED.

<u>Investigation Processing – Pre-Appointment Screening</u>

- <u>Previous Recommendation 10</u>:  USAGM staff tasked with pre-screening responsibilities must use 5 CFR part 731 criteria when making pre-screening determinations, as required by the CFR and OPM's Suitability Processing Handbook.
  - Previous Recommendation 10 is OPEN and UNRESOLVED.
- <u>Previous Recommendation 11</u>:  USAGM must ensure all staff tasked with pre-screening responsibilities receive training and are familiar with the criteria found in 5 CFR part 731.
  - Previous Recommendation 11 is OPEN and UNRESOLVED.
- <u>Previous Recommendation 12</u>:  USAGM must immediately discontinue use of the SF 86 (or any other security form) prior to making an offer of employment, in accordance with 5 CFR §330.1300, unless and until USAGM is granted an exception.
  - Previous Recommendation 12 is CLOSED.

<u>Investigation Processing – Referral</u>

- <u>Previous Recommendation 13</u>:  USAGM must refer all cases with potential material, intentional false statement, or deception or fraud in the examination or appointment process to OPM, as required by 5 CFR part 731 and the Suitability Processing Handbook.
  - Previous Recommendation 13 is CLOSED.

<u>Investigation Processing – Reciprocity</u>

- <u>Previous Recommendation 14</u>:  USAGM must update internal processes to eliminate the practice of initiating all applicants and employees into e-QIP prior to checking for reciprocity, in accordance with E.O.s 13467 and 13488.
  - Previous Recommendation 14 is CLOSED.
- <u>Previous Recommendation 15</u>:  USAGM must work with their NBIB liaison to obtain access to all appropriate investigation databases.
  - Previous Recommendation 15 is OPEN and UNRESOLVED.
- <u>New Recommendation A</u>:  USAGM must eliminate all duplicate investigation requests.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

<u>Investigation Processing – Investigation Request Timeliness</u>

- <u>Previous Recommendation 16</u>:  USAGM must ensure the e-QIP "Approver" user role is held by a Federal employee.  The e-QIP Agency Administrator must immediately remove the Approver access for the Contractors currently holding that role.
    - Previous Recommendation 16 is CLOSED.
- <u>Previous Recommendation 17</u>:  USAGM must immediately cease having applicants and employees re-sign security form releases upon Entry On Duty (EOD), in support of accurate timeliness metrics.
    - Previous Recommendation 17 is CLOSED.
- <u>Previous Recommendation 18</u>:  USAGM must ensure background investigations are initiated no more than 14 days after the applicant's initial certification of the investigative forms.
    - Previous Recommendation 18 is OPEN and UNRESOLVED.
- <u>Previous Recommendation 19</u>:  USAGM must update its policies, manuals, and employee training practices to ensure all USAGM staff with a role in the initiation process are aware of the 14 day initiation timeliness standard.
    - Previous Recommendation 19 is CLOSED.

<u>Investigation Processing – Investigation Request Quality</u>

- <u>New Recommendation B</u>:  USAGM must establish and implement processes to reduce the unacceptable submission rate for investigation requests to 5% or less.

<u>Homeland Security Presidential Directive 12 (HSPD-12) Credentialing</u>

- <u>Previous Recommendation 20</u>:  USAGM must ensure every individual has a favorably adjudicated fingerprint before being issued a Personal Identity Verification (PIV) credential, as required by HSPD-12 and FIPS 201-2.
    - Previous Recommendation 20 is OPEN and UNRESOLVED.
- <u>Previous Recommendation 21</u>:  USAGM must cease revoking and destroying PIV credentials when employees undergo re-investigation.
    - Previous Recommendation 21 is CLOSED.
- <u>Previous Recommendation 22</u>:  USAGM must update its processes and implement the use of PIV cards for logical access.
    - Previous Recommendation 22 is CLOSED.
- <u>Previous Recommendation 23</u>:  USAGM must update processes, procedures, and employee training requirements to reciprocally accept PIV credentials for physical access, in accordance with HSPD-12.
    - Previous Recommendation 23 is CLOSED.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

- New Recommendation C:  USAGM must develop a mechanism to track PIV expiration dates.
- New Recommendation D:  USAGM must update their PIV issuance process to identify staff responsible for uploading credentialing determinations into CVS.

Suitability Investigation Quality

- Previous Recommendation 24:  USAGM must work with NBIB to immediately initiate new investigations for all individuals investigated by USAGM since the expiration of USAGM's delegated investigative authority in 2012.
  - Previous Recommendation 24 is OPEN and UNRESOLVED.
- New Recommendation E:  USAGM must add a "Please Call" notice in CVS for each investigation USAGM conducted after the expiration of USAGM's delegation of investigative authority.

Adjudication – Reporting Adjudicative Determinations

- Previous Recommendation 25:  USAGM must perform and document a distinct suitability adjudication on every closed investigation, in accordance with 5 CFR part 731.
  - Previous Recommendation 25 is OPEN and UNRESOLVED.
- Previous Recommendation 26:  USAGM should consider making arrangements to ensure OS staff are not responsible for adjudicating their direct-report employees' investigations.
  - Previous Recommendation 26 is OPEN and UNRESOLVED.
- Previous Recommendation 27:  USAGM must report all suitability determinations to OPM as soon as possible, and in no event later than 90 days after receipt of the final report of investigation.
  - Previous Recommendation 27 is OPEN and UNRESOLVED.
- New Recommendation F:  In lieu of reporting pending adjudications for any investigations USAGM conducted after the expiration of their delegated investigative authority, USAGM must discontinue these investigations and initiate new investigations through DCSA.

Internal Control Activities – Records of Investigation

- Previous Recommendation 28:  USAGM must request the required background investigation on any USAGM appointee or employee where a record of investigation cannot be verified.
  - Previous Recommendation 28 is OPEN and UNRESOLVED.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

Internal Control Activities – Record Retention

- Previous Recommendation 29:  USAGM must ensure the Certification of Investigation or similar agency form is included in the eOPF, as required by OPM's Guide to Personnel Recordkeeping.
  - Previous Recommendation 29 is CLOSED.

Internal Control Activities – Physical Safeguards

- Previous Recommendation 30:  Ensure all physical space containing sensitive information, including investigative and adjudicative information and PII, is properly secured and not accessible to those without a need to know.
  - Previous Recommendation 30 is OPEN and UNRESOLVED.
- Previous Recommendation 31:  Update policies and procedures to implement immediate measures to ensure PII and sensitive and/or classified information will not be compromised.
  - Previous Recommendation 31 is OPEN and UNRESOLVED.

Internal Control Activities – Adjudicator Training

- Previous Recommendation 32:  USAGM must ensure the personnel who perform adjudicative work receive suitability adjudications training in accordance with the National Training Standards.
  - Previous Recommendation 32 is CLOSED.
- Previous Recommendation 33:  USAGM must ensure adjudicative staff is able to demonstrate a sufficient knowledge and understanding of suitability adjudications requirements and criteria.
  - Previous Recommendation 33 is OPEN and UNRESOLVED.

Internal Control Activities – Adjudicator Qualifications

- Previous Recommendation 34:  USAGM must ensure personnel who perform adjudicative work maintain a favorable determination based on the results of the appropriate level of investigation.
  - Previous Recommendation 34 is OPEN and UNRESOLVED.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

Internal Control Activities – Policies and Procedures

- <u>Previous Recommendation 35</u>:  USAGM must ensure the manuals, forms, directives, and policies that govern its personnel suitability operations are in compliance with all applicable E.O.s, OPM requirements, and current investigative products.
  - o  Previous Recommendation 35 is OPEN and UNRESOLVED.
- <u>Previous Recommendation 36</u>:  USAGM must ensure security and suitability staff operates in accordance with all SOPs and written guidelines.
  - o  Previous Recommendation 36 is OPEN and UNRESOLVED.
- <u>Previous Recommendation 37</u>:  USAGM must immediately stop requesting information for background investigations which goes beyond the scope of the Federal Investigative Standards.
  - o  Previous Recommendation 37 is OPEN and UNRESOLVED.

U.S. Agency for Global Media

Def. App. 306

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

## Background

The USAGM was created when the U.S. Information Agency was consolidated in accordance with the International Broadcasting Act on April 30, 1994.  The Act established the International Broadcasting Bureau (IBB) within the U.S. Information Agency and created a Broadcasting Board of Governors.  On October 1, 1999, the USAGM became an independent government entity responsible for oversight of the IBB, and is responsible for all U.S. government and government-sponsored non-military international broadcasting.[2]  Ultimately, the mission of the USAGM is to inform, engage, and connect people around the world in support of freedom and democracy.[3]

USAGM's personnel security and suitability functions are divided between the Office of Security (OS) and the Office of Human Resources (OHR), both located within IBB's Office of Management Services (OMS).

OS consists of two divisions: Personnel Security and Physical Security.  The Personnel Security Division (PSD) is responsible for all personnel security functions and includes one Chief, three Personnel Security Specialists, three Security Specialists, and four Security Assistants.

Physical Security is responsible for issuing PIV credentials.[4]

In addition to their standard OHR responsibilities, one Senior Human Resources (HR) Program Specialist, four federal HR Specialists, and two contractor HR Specialists are directly involved in OS activities.  These staff members are responsible for position designation.[5]

Chart 1 reflects a condensed version of USAGM's organizational chart, highlighting the offices with a role in the suitability program (shown in bold).

---

[2] https://www.usagm.gov/who-we-are/history/

[3] https://www.usagm.gov/who-we-are/

[4] In addition to other physical security-related duties, which we will not cover during this report.

[5] Agency structure current as of the time of our 2020 onsite activities.

Def. App. 307

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Chart 1**
**USAGM Organizational Chart**



*Source:  USAGM*

USAGM consists of approximately 1,412 employees, with approximately 1,067 in the competitive service.[6]

---

[6] Fedscope, June 2019

U.S. Agency for Global Media

Def. App. 308

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

## Findings

### Delegation of Investigative Authority

At the time of our original review, under Civil Service Rule V, 5 CFR § 5.2(a), the President delegated to OPM the authority for "[i]nvestigating the qualifications, suitability, and fitness of applicants for positions in the competitive service, positions in the excepted service where the incumbent can be noncompetitively converted to the competitive service, career appointments to positions in the Senior Executive Service, and any other positions in the excepted service of the executive branch for which the Director has standard-setting responsibility under Civil Service Rule II." Further, except as otherwise provided by statute or executive order, personnel investigations for working for or on behalf of the United States were the responsibility of OPM's NBIB under E.O. 13764, Amending the Civil Service Rules, E.O. 13488, and E.O. 13467, To Modernize the Executive Branch-Wide Governance Structure and Processes for Security Clearances, Suitability and Fitness for Employment, and Credentialing, and Related Matters.

Per this order, NBIB was to "serve as the primary executive branch service provider for background investigations for eligibility for access to classified information; eligibility to hold a sensitive position; suitability or, for employees in positions not subject to suitability, fitness for Government employment; fitness to perform work for or on behalf of the Government as a contractor; fitness to work as a non-appropriated fund employee, as defined in E.O. 13488 of January 16, 2009,[7] as amended; and authorization to be issued a Federal credential for logical and physical access to federally controlled facilities or information systems."

With the issuance of Executive Order 13869, "Transferring Responsibility for Background Investigations to the Department of Defense,"[8] NBIB's investigative functions were transferred to the Department of Defense's Defense Counterintelligence and Security Agency (DCSA).

Under 5 U.S.C. §1104(a)(2), OPM may delegate its investigative authority to other agencies. Agencies seeking such delegation must request[9] and receive approval from OPM prior to beginning investigative activities, and must stay in compliance with all performance and investigative standards established by OPM. OPM "shall, pursuant to section 1104 of title 5, United States Code, prescribe performance standards and a system of oversight for any suitability or fitness function delegated by the Director to the head of another agency, including

---

[7] Executive Order 13488, *Granting Reciprocity on Excepted Service and Federal Contractor Employee Fitness and Reinvestigating Individuals in Positions of Public Trust*, January 16, 2009
[8] Executive Order 13869, *Transferring Responsibility for Background Investigations to the Department of Defense*, April 24, 2019
[9] OPM has prescribed basic requirements for requesting delegated investigative authority for competitive service positions in 5 CFR, part 736.

Def. App. 309

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

uniform and consistent policies and procedures to ensure the effective, efficient, timely, and secure completion of delegated functions" and "shall make a continuing review of agency programs for suitability and fitness vetting to determine whether they are being implemented according to this order."[10]

**Previous Finding:**  During the course of our 2014 review, we determined USAGM was operating without the proper delegated authority.  The last valid MOU between USAGM and OPM was signed in 2010 and expired in December 2012.  When we asked the then-Chief of Security about the existence of any current MOUs, he stated OPM staff did not provide an updated version for signature, and told him the 2010 MOU was automatically renewed and remained in effect.

However, we found that OPM sent a proposed MOU to USAGM in January 2013.  USAGM asked for modifications to the signature block and requested the omission of the requirement to use e-QIP.  OPM updated the signature block and provided an explanation to USAGM regarding the e-QIP requirement.  The updated, proposed MOU was emailed directly to the then-Chief of Security in April 2013, and again in June 2013.  USAGM did not execute the MOU.  Therefore, USAGM had been operating without the proper delegated authority since December 2012.

We included this information in our prior draft report, issued September 2015, which was sent to the then-Chief of Staff of USAGM, Director of Security, and Director of Human Resources.  This information was also included in the final report for our 2014 review, issued July 20, 2017, which was sent to the then-Director of Management Services, International Broadcasting Bureau, USAGM; Director of Security; Chief of the Investigations Branch; and -Chief of the Adjudications Branch.

The Director of Management Services, the Chief of the Investigations Branch (now the Director of Security), and the Chief of the Adjudications Branch still occupied these positions at the time of our 2018 review.  Despite receiving our prior reports and our discussion of USAGM's lack of authority to act as its own ISP, the Director of Security and the Chief of the Adjudications Branch (Adjudications Chief) claimed "nobody knew" of the expired MOU during our 2018 onsite activities.

The Director of Security stated he discovered the expired MOU in July of 2017 and tried to contact OPM to resolve the issue, with no results.

OPM, as the Suitability Executive Agent, found USAGM to be out of compliance and operating without any proper delegation of investigative authority, despite repeated notification from the

---

[10] E.O. 13467, as amended, §§ 2.5(b)(v), (vii)

U.S. Agency for Global Media

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

Suitability Executive Agent.  Given the severity and quantity of the errors we identified in USAGM's security and suitability program during our 2014 review, and the ongoing nature of those errors (as identified during our April 2018 onsite activities), OPM was unwilling to consider signing a new Delegation of Investigative Authority until such a time as USAGM corrected all errors identified later in this report.  In the absence of a delegation agreement, USAGM lacked the authority to conduct background investigations.

We informed USAGM that failure to comply with this recommendation would result in further action, to include referral to the Office of Inspector General of the Department of State and revocation of adjudicative authority.

**Previous Recommendation 1:  USAGM must immediately cease all investigative activities, and must immediately transfer all investigative work to NBIB.**

**Current Status:  Corrective action IMPLEMENTED.**

In February 2019 the Director stated USAGM discontinued all cases in progress and transferred all investigations to the Defense Counterintelligence and Security Agency (DCSA), and were fully compliant with this recommendation by January 2019.  We also spoke to both USAGM Inspectors, who stated they have been assigned new duties and no longer perform investigatory work.

OPM data covering the follow-up measurement period of November 1, 2018 through January 3, 2020 reflected USAGM did not report initiating any background investigations under its own investigations program.  While this information is strictly self-reported, during our onsite we found no indications that USAGM has continued to operate an investigations program without the proper delegation.

**Previous Recommendation 1 is CLOSED.**

## Designation of Position Risk and Sensitivity[11]

Proper position designation is the foundation of an effective and consistent suitability program. It determines what type of investigation is required and how closely an individual is screened for a position.

---

[11] Position designation is outlined in Civil Service Rule V, E.O.s 13467 and 13488, as amended, and 5 CFR §731.106 and part 1400.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

By executive order, the President has directed that "[t]he Director [of OPM] may cause positions to be designated based on risk to determine the appropriate level of investigation, and may prescribe investigative standards, policies, and procedures."[12]  The President has separately directed that "[w]ith respect to the Suitability Executive Agent functions, the Director…shall, pursuant to sections 1103 and 1104 of title 5, United States Code, and the Civil Service Rules, be responsible for suitability and fitness by…prescribing position designation requirements with regard to the risk to the efficiency and integrity of the service;" and that "Contractor employee fitness or non-appropriated fund employee fitness is subject to the same position designation requirements…as prescribed by the Office of Personnel Management under the Civil Service Rules."[13]

The suitability regulation[14] requires all covered[15] positions to be designated at the high, moderate, or low risk level.  In addition, proper position designation is required to support many of the Joint Security and Suitability reform initiatives.  The Position Designation System (PDS) is required for all positions in the competitive service, positions in the excepted service where the incumbent can be non-competitively converted to competitive service, and career appointments in the Senior Executive Service.

To clarify the requirements and procedures agencies should observe when designating positions, OPM and ODNI issued 5 CFR 1400 on June 5, 2015 and implementation guidance to executive agencies, including, specifically, to USAGM, in May 2016 explaining the regulatory requirements regarding the designation of National Security positions in the competitive service, and describing the requirements to use the PDT, to review the designation of covered positions.

The joint OPM and ODNI regulation provides guidance to assist agency heads in evaluating and designating sensitive positions.  Agencies had 24 months from July 6, 2015, to review positions and determine whether or not certain positions impact National Security under the new definition and make the appropriate designation change.

Finally, in addition to using the PDS, the agency must complete and maintain the Position Designation Record (PDR) or its equivalent for each agency position, as described in the Suitability Processing Handbook.[16]

---

[12] Civil Service Rule V, 5 CFR § 5.2(a)(ii)
[13] E.O. 13467, as amended, § 2.5(b)(i); E.O. 13488, as amended, § 3(b)
[14] 5 CFR 731.106 (a)
[15] Pursuant to 5 CFR 731.101(b), a "covered position" means a position in the competitive service, a position in the excepted service that can non-competitively convert to the competitive service, and a career appointment to a position in the Senior Executive Service.
[16] OPM Suitability Processing Handbook, Appendix B

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

The Position Designation Tool (PDT) is recommended for all positions.  The PDT will help to ensure a systematic, dependable, and uniform way of making position designations and maintaining the PDR or its equivalent.

**Previous Finding:**  USAGM failed to take corrective action on a finding related to position designation following our 2014 review and as of 2018 still did not use the PDS to designate all covered positions, as required.

According to the Adjudications Chief, OHR was responsible for position designation.  The Adjudications Chief stated OS was aware of the requirement to use OPM's PDS to accurately designate positions, but that OHR had been unwilling to use the system as required.

The OHR Operations Branch Chief stated they did not use the PDS, and would not use it, due to the uniqueness of USAGM's mission and the fact they employed non-citizens.  The Operations Branch Chief stated OHR staff designated positions based on the duties performed, who the employee would have contact with, and whether the employee would have access to sensitive or classified information.  The Operations Branch Chief stated each classifier made their own decisions and relied "more or less" on their personal judgment rather than any sort of standardized designation system.  He added classifiers usually designated positions based on what the hiring manager wanted, and may have upgraded the position upon request.

The Operations Branch Chief stated USAGM recorded designations on the Optional Form (OF) 8[17] and did not maintain any sort of PDR.  USAGM had no policy to re-designate positions when vacant.

The Director stated position designation and meeting the requirements of 5 CFR part 1400 had been a "shaky situation."  He stated USAGM's Office of General Counsel (OGC) believed USAGM was exempt from re-designation requirements because of the agency's mission and staffing patterns.  The Director stated he had been aware of the requirement to use OPM's PDS since we issued the report of our 2014 review, but added that senior leadership were unwilling to comply.[18]

At the time of our 2018 onsite USAGM had not properly requested an extension from the Suitability and Security Executive Agents to extend the position designation review period, which ended in July 2017.

---

[17] OF-8 Position Description
[18] ODNI's report will provide further information about USAGM's compliance with 5 CFR part 1400.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

In 2018 we obtained position descriptions (PDs) for 10 of the positions in our file sample and used the PDT to designate the positions, to determine if USAGM's designations were roughly in line with OPM's analysis of the PD.[19]  Table 1 reflects any discrepancies between the two designations.

**Table 1**
**USAGM Position Designation Discrepancies, 2018**

| PD # | Position Title | USAGM Designation and Required Investigation | OPM Designation and Required Investigation |
|------|----------------|----------------------------------------------|--------------------------------------------|
| PD 2 | Senior Advisor | Critical Sensitive/ ANACI | High Risk Public Trust/ T4[20] |
| PD 3 | Director for Broadcast Operations | Unknown[21] | High Risk Public Trust / T4 |
| PD 6 | International Broadcaster (Radio) (Creole) | Non-Critical Sensitive/ NACLC | High Risk Public Trust / T4 |
| PD 7 | Investigative Writer | Non-Critical Sensitive/ T3 | High Risk Public Trust / T4 |
| PD 8 | International Broadcaster (English) | Unknown/ T3 | High Risk Public Trust / T4 |
| PD 13 | International Broadcaster (Urdu) | Non-Critical Sensitive/ T3 | High Risk Public Trust (minimum)[22]/ T4 |
| PD 15 | Deputy for Technology Support Services | Non-Critical Sensitive/ ANACI | High Risk Public Trust (minimum)/ T4 |
| PD 17 | General Manager, Persian News Network | Critical-Sensitive/ T3 | High Risk Public Trust (minimum)/ T4 |

---

[19] We consulted with a representative from OPM's Adjudications and Clearance Processing group to obtain accurate designations for these positions.  Staff in this group is responsible for designating OPM positions for risk and sensitivity, and therefore have extensive experience in accurately using the OPM PDS and the PDT.

[20] Refer to OPM *Federal Investigation Notices* (*FIN*s) 15-03, 16-02, and 16-07 for information regarding how OPM's new tiered investigations relate to prior investigative types.

[21] USAGM provided an incomplete OF-8 for this position, so we were unable to determine how USAGM's designation compared to OPM's designation.

[22] USAGM's PDs were not sufficiently detailed to allow OPM staff to properly designate these positions.  Based on any National Security impacts, these positions could be designated at higher levels.

Def. App. 314

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

| PD 19 | Coverage Editor (Africa) | Non-Sensitive/ T3 | High Risk Public Trust (minimum)/ T4 |
|---|---|---|---|
| PD 20 | Supervisory International Broadcaster (Russian) | Non-Critical Sensitive/ ANACI | High Risk Public Trust (minimum)/ T4 |

*Source: USAGM and OPM*

OPM designated PDs 2, 6, 7, and 8 at the High Risk Public Trust level, and individuals should
have been subject to a T4 investigation (based on a completed SF85P).  USAGM's designations
for these positions necessitated applicants filling out a more intrusive national security
questionnaire, the SF86.  PDs 13, 15, 17, 19, and 20 did not provide sufficient detail for OPM
classifiers to make more than a minimum designation of a High Risk Public Trust.

In addition, while reviewing the USAGM -provided designations, we noted several instances
where USAGM did not conduct the correct investigation required by their own designation.  PDs
2 and 17 were designated as Critical Sensitive and should have undergone a T5 investigation,
and PD 19 was designated as Non-Sensitive and should have undergone a T1 or T2 investigation,
based on the position's risk level.[23]  These are the investigation levels required by the
government-wide Federal Investigative Standards jointly promulgated by OPM and ODNI
pursuant to executive order.[24]

Proper position designation allows agencies to achieve accuracy and consistency in all positions,
to include aligning with the correct investigative levels.  Maintaining the PDR provides proof of
compliance and eliminates a duplication of efforts for the agency.

Failure to consistently designate agency positions at the proper level using established standards
may result in investigating employees at a higher level than required, subjecting them to
unnecessary scrutiny and placing undue financial burden on the agency.  It may also allow
individuals access to information they are not properly vetted for, placing the agency and the
federal government at risk.

Failure to designate all agency positions using current criteria, in accordance with 5 CFR 1400,
may allow individuals access to information they are not properly vetted for, placing the agency
and the Federal government at risk.

---

[23] PDs 2 and 17 were subject to a lower investigation than required, PD 19 was subject to a higher investigation than
required.
[24] See Civil Service Rule V, 5 CFR § 5.2(a)(ii); E.O. 13488, as amended, § 3(b); E.O. 13467, as amended, §§ 1.1(d),
2.5(b)(i), 2.5(c)(i), 3(c); E.O. 12968, as amended, §§ 3.2(b), 3.4(c).

U.S. Agency for Global Media

Def. App. 315

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

Requesting and/or conducting a higher-level investigation than required wastes agency funds and subjects applicants or employees to an undue level of scrutiny.  Requesting and/or conducting a lower level investigation than required may place the agency and the Federal Government at risk by allowing individuals access to information they are not properly vetted for.

**Previous Recommendation 2**:  **USAGM must ensure that all covered positions are designated for both risk and sensitivity using OPM's PDS.**

**Current Status**:  **Corrective action PARTIALLY IMPLEMENTED.**

According to USAGM's Senior HR Program Specialist six HR Specialists are tasked with position designation responsibilities.[25]  After an HR Specialist receives a PD from a classifier, they run the PD against the PDS, attach the newly created PDR to the PD, and then provide both documents to PSD.  PDRs are also saved in a SharePoint library accessible by the HR Specialists and PSD.

As part of our follow-up activities we asked for a PDR for the positions in our original sample roster (Table 1) as well as for 21 positions in a new follow-up sample roster.  USAGM provided an updated PDR for each position in our original roster.  All positions were designated at or higher than the OPM-suggested designation made in 2018.

To further verify the accuracy of USAGM's designation process, we had personnel from OPM's Personnel Security division designate 10 randomly-selected PDs from the follow-up sample roster.  Table 2 shows the discrepancies between USAGM's designation and OPM's designation.

**Table 2**
**USAGM Position Designation Discrepancies, 2020**

| PD # | Position Title | USAGM Designation and Required Investigation | OPM Designation and Required Investigation |
|---|---|---|---|
| NPD 2[26] | Editor (Bridge) | Non-Critical Sensitive, Moderate Risk/T3 | Non-Sensitive, High Risk/T4 |
| NPD3 | Electronics Engineer | Non-Critical Sensitive, Moderate Risk/T3 | Non-Sensitive, Moderate Risk/T2 |

---

[25] In addition to their normal HR duties
[26] New PD 2, etc.

U.S. Agency for Global Media

Def. App. 316

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

| NPD9 | IT Program Manager (APPSW) | Non-Critical Sensitive, Moderate Risk/T3 | Non-Sensitive, High Risk/T4 |
|------|---------------------------|------------------------------------------|------------------------------|
| NPD10 | IT Specialist (CUSTSPT) | Non-Critical Sensitive, Moderate Risk/T3 | Non-Sensitive, Moderate Risk/T2 |
| NPD15 | Multimedia Production Spec | Non-Critical Sensitive, Moderate Risk/T3 | Non-Sensitive, Moderate Risk/T2 |
| NPD17 | Project Manager | Non-Critical Sensitive, High Risk/T5 | Non-Sensitive, Moderate Risk/T2 |
| NPD18 | Purchasing Agent | Non-Sensitive, Low Risk/T1 | Non-Sensitive, Moderate Risk/T2 |

*Source: OPM and USAGM*

USAGM's designations for NPDs 2, 9, and 18 were lower than OPM's suggested designation, meaning the individuals in the position may have been investigated insufficiently for the position. USAGM's designations for NPDs 3, 10, 15, and 17 were higher than OPM's suggested designation, meaning the individuals in those positions may have been subject to a more strenuous investigation than necessary.

In addition, the Senior HR Program Specialist stated USAGM does not have a schedule in place to re-designate positions on a regular basis, and that any future re-designations would depend on hiring managers updating the PD. The Senior HR Program Specialist stated if the PD was more than five years old, or was "outdated" or reflected language or terms that were no longer in use at the agency, an HR Specialist would "probably" prompt the hiring manager to make an update.

While we are not issuing a new recommendation in this area, USAGM should ensure there is an established re-designation schedule in place to ensure PDs accurately reflect the duties of the position, and that applicants or employees are investigated appropriately for the duties they perform.

**Previous Recommendation 2 is OPEN and UNRESOLVED.**

**Previous Recommendation 3:  USAGM must maintain a PDR (or equivalent) for each covered agency position, per OPM's Suitability Processing Handbook.**

**Current Status:  Corrective action IMPLEMENTED.**

Def. App. 317

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

USAGM provided an updated PDR for every position in our original file sample, as well as for the 21 positions in our follow-up file sample.

**Previous Recommendation 3 is CLOSED.**

**Previous Recommendation 4:  USAGM must ensure all USAGM employees tasked with position designation responsibilities are operating in a fair, consistent, and reliable manner.**

**Current Status:  Corrective action IMPLEMENTED.**

The Senior HR Program Specialist stated six[27] HR Specialists are responsible for designating positions in the PDT.  Of the six HR Specialists, three have successfully completed OPM's Automated Position Designation Tool (ADPT) training.[28]  We verified their attendance through USAGM-provided training certificates.

**Previous Recommendation 4 is CLOSED.**

**Previous Recommendation 5:  USAGM must re-designate all positions in accordance with 5 CFR part 1400.**

According to the Senior HR Program Specialist, USAGM re-designated all positions by January 2020.  We verified this by reviewing PDRs (discussed above), which were all updated as required.

**Previous Recommendation 5 is CLOSED.**

**Previous Recommendation 6:  USAGM must request the correct level of investigation based on the accurate position designation, per 5 CFR part 1400, OPM's PDS, OPM issuances and Federal Investigation Notices, and the Federal Investigative Standards.**

**Current Status:  Corrective Action NOT IMPLEMENTED.**

USAGM has not initiated the correct level of investigation required by the position designation for 15 of the cases from our original sample list, as shown in Table 3.

---

[27] Four FTEs and 2 Contractors
[28] Formal training is not required to use OPM's PDT, as the system is designed to be self-explanatory.

Def. App. 318

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

**Table 3**
**Incorrect Investigations, 2018 Sample Roster**

| OPM File Number | Position Title | Investigation Required by Updated Designation | Current Investigation of Record |
|---|---|---|---|
| 1 | International Broadcaster | T3 | T3* |
| 2 | Senior Advisor | T5 | ANACI* (no adjudication reported) |
| 3 | Supv TV Production Specialist | T5 | T3* |
| 4 | International Broadcaster | T3 | NACLC* (no adjudication reported) |
| 6 | INT Broadcaster (Radio) (Creole) | T3 | NACLC (no adjudication reported) |
| 8 | International Broadcaster | T3 | NACLC |
| 9 | International Broadcaster | T3 | NAC* |
| 10 | Human Resources Specialist (Information Systems) | T2 | ANACI (no adjudication reported) |
| 11 | International Broadcaster | T3 | ANACI* |
| 12 | Payroll Specialist | T3 | NACLC* (no adjudication reported) |
| 13 | INT Broadcaster (Urdu) | T3 | T3* |
| 14 | International Broadcaster | T3 | NACLC (no adjudication reported) |
| 17 | General Manager Persian News Network | T5 | T3* (no data regarding case close date, no adjudication reported) |
| 18 | TV Production Specialist (Graphics) | T3 | ANACI |
| 20 | Supv Int Broadcaster (Russian) | T3 | ANACI* |

*Source: OPM file review*

Files 2, 3, 9, and 17 have not been subject to the correct (higher) level of investigation, based on the updated designation. Files 2, 4, 6, 10, 12, 14, and 17[29] do not show any adjudicative data, so we were unable to verify if these individuals are eligible to occupy their positions. Further, investigations 1, 2, 3, 4, 9, 11, 12, 13, 17, and 20 were completed by USAGM after the expiration of USAGM's delegated investigative authority, and therefore are not valid.

USAGM has also not initiated the correct level of investigation required by the position designation for any of the cases from our follow-up sample list, as shown in Table 4.

---

[29] File 17 also does not show that the investigation was completed.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

**Table 4**
**Incorrect Investigations, 2020 Sample Roster**

| OPM File Number | Position Title | Investigation Required by Updated Designation | Current Investigation of Record |
|---|---|---|---|
| NPD1 | Director of Research | T5 | T3* (no adjudication reported) |
| NPD2 | Editor (Bridge) | T3 | T3* |
| NPD3 | Electronics Engineer | T3 | T3* (no adjudication reported) |
| NPD4 | Electronics Technician | T3 | ANACI (no adjudication reported) |
| NPD5 | Equal Employment Specialist | T2 | NACLC (no adjudication reported) |
| NPD6 | Executive Officer | T2 | T3R* (no adjudication reported) |
| NPD7 | Executive Producer | T3 | PRI (no adjudication reported) |
| NPD8 | General Assignments Reporter (English) | T3 | T3* (no adjudication reported) |
| NPD9 | IT Program Manager (APPSW) | T3 | BI (no adjudication reported) |
| NPD10 | IT Specialist (CUSTSPT) | T3 | T3* (no adjudication reported) |
| NPD11 | Library Technician | TI | T3* |
| NPD12 | Logistics and Operations Specialist | T1 | No Investigation on Record |
| NPD13 | Logistics and Operations Technician Team Leader | T1 | No Investigation on Record |
| NPD14 | Mail Operations Assistant | T5 | T1 |
| NPD15 | Multimedia Production Spec | T3 | T3* (no adjudication reported) |
| NPD16 | Procurement Assistant | T1 | T3* |
| NPD17 | Project Manager | T5 | SBI (no adjudication on record) |
| NPD18 | Purchasing Agent | T1 | SSBIPR* (no adjudication on record) |
| NPD19 | Supervisory Staff Accountant | T4 | T3* |
| NPD20 | Telecommunications Manager | T5 | T3* |
| NPD21 | Telecommunications Specialist | T5 | T2S |

*Source: OPM*

U.S. Agency for Global Media
Def. App. 320

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

Files NPD12 and NPD13 do not have an investigation on record.  Files NPD1, NPD14, NPD19, NPD20, and NPD21 have not been subject to the appropriate level of investigation, as required by the current position designation.  NPD3 through NPD10, NPD15, NPD17, and NPD18 do not have an adjudication on record, so we were unable to verify if these individuals are eligible to occupy their positions.

Further, files NPD1, NPD2, NPD3, NPD6, NPD8, NPD11, NPD15, NPD16, NPD18, NPD19, and NPD20 were investigated by USAGM after the expiration of USAGM's delegated investigative authority, and therefore are not valid.

**Previous Recommendation 6 is OPEN and UNRESOLVED.**


## Investigation Processing

**Electronic Questionnaires for Investigations Processing**

The Electronic Questionnaires for Investigations Processing (e-QIP) goals established for agencies and reportable under the PAC for suitability and security programs support the expectation that agencies will use e-QIP to request investigations. The use of e-QIP automation encourages accuracy and timeliness in the investigations request process.  Federal Investigative Notice (FIN) 11-07[30] mandated use of e-QIP and FIN 17-07[31] mandates use of the 2016 SF86. Under the Paperwork Reduction Act, agencies are required to use only current, OMB-approved information collections.

**Previous Finding:**  At the time of our 2014 review, USAGM was not using e-QIP and required applicants to complete the 2008 paper version of the SF 86.[32]  This form expired with the issuance of the 2010 SF 86.

USAGM failed to take corrective action on the 2014 finding and as of our 2018 review still was not using e-QIP and the current security forms as required.

According to the Adjudications Chief, USAGM's e-QIP system was not connected to OPM's systems until the week before our onsite, so USAGM had not received updates to the security

---

[30] Discontinuing the 2008 Standard Form (SF) 86; Implementing the Fully Electronic 2010 SF 86, August 29, 2011
[31] Revised Standard Form 86 Implementation, August 18, 2017
[32] While USAGM and OPM signed a Memorandum of Understanding (MOU) regarding the use of e-QIP in 2013, at the time of our 2014 review OHR and SEC staff stated funding was not approved until October 2014.  At the time, staff was unable to provide a timeline for implementation.

Def. App. 321

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

forms.  The Adjudications Chief also stated interns and "grantees"[33] at USAGM were not required to use e-QIP, and often completed outdated paper versions of the security forms because the 2010 and 2016 SF 86 forms were too long to fill out manually.[34]

During our 2018 onsite activities we reviewed a file sample of 13[35] individuals.  Eight of these individuals had completed security forms which were outdated at the time of signature, as shown in Table 5.

**Table 5**
**USAGM Investigations Completed on Incorrect Case Papers, 2018**

| OPM File # | Case Paper Certification Date[36] | Correct Case Papers[37] | Case Papers Completed |
|:---:|:---:|:---:|:---:|
| 4 | January 40, 2012 | 2010 SF 86 | 2008 SF 86 |
| 5 | August 29, 2012 | 2010 SF 86 | 2008 SF 86 |
| 8 | March 9, 2015 | 2010 SF 86 | 2008 SF 86 |
| 9 | September 23, 2013 | 2010 SF 86 | 2008 SF 86 |
| 11 | May 2, 2014 | 2010 SF 86 | 2008 SF 86 |
| 14 | September 23, 2013 | 2010 SF 86 | 2008 SF 86 |
| 15 | October, 2014 | 2010 SF 86 | 2008 SF 86 |
| 20 | August 12, 2015 | 2010 SF 86 | 2008 SF 86 |

*Source: OPM review of USAGM security files*

By not complying with *FINs 11-07 and 17-07*, USAGM was not operating effectively or efficiently.  Further, older versions of the SF86 did not utilize branching questions for issue resolution.  Reciprocity could not be properly applied to a USAGM -conducted investigation as they were not being conducted based on current investigative standards.  Further, the use of expired and unauthorized information collections risked noncompliance with the Paperwork Reduction Act and the Privacy Act.

---

[33] Individuals in media organizations who receive grants from USAGM to promote freedom and democracy and enhance understanding through multimedia communication of accurate, objective, and balanced news, information, and other programming about America and the world to audiences overseas.

[34] When printed, the current SF 86 is approximately 120 pages long.  However, this is because the form uses a branching questions methodology, in which certain threshold responses require the completion of branching responses.  As properly completed in e-QIP, the degree of burden of the information collection depends on whether the respondent's threshold responses require the completion of branching responses, and if so, how many.  A print-out of the full content of the information collection includes all possible branching questions, and thus does not accurately represent what a respondent will actually be required to fill out.

[35] Due to the egregious quality of errors we found in these 13 files, we did not feel it necessary to review all 20 of our sample files.

[36] Certification date is the date Subject signed the case papers

[37] Based on the case papers which were current at the time of certification

Def. App. 322

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Previous Recommendation 7:  USAGM must immediately begin using e-QIP for all investigation requests.**

**Current Status:  Corrective action IMPLEMENTED.**

USAGM provided a Memorandum of Understanding between USAGM and OPM for the use of e-QIP, signed November 19, 2018.  This MOU verifies USAGM's efforts to cease having applicants complete hardcopy versions of security forms.  OPM data covering the follow-up measurement period also confirms USAGM submitted 100% of their investigation requests to DCSA via e-QIP.

**Previous Recommendation 7 is CLOSED.**

**Previous Recommendation 8:  USAGM must immediately begin using the current SF86 and must not allow applicants or employees to complete outdated versions of the form.**

**Current Status:  Corrective action IMPLEMENTED.**

e-QIP is continually updated to reflect the current version of all security forms.  Further, DCSA does not accept investigation requests submitted on out-of-date forms.  As part of our follow-up activities we also selected a sample of 20 investigations which were submitted to DCSA by USAGM during our follow-up measurement period.  All 20 investigation requests were submitted on up-to-date forms.

Please note, however, that USAGM has not requested new investigations for the 8 individuals identified in Table 2.  These investigations remain invalid, as they were conducted under an expired Delegation for Investigative Authority and on expired security forms.  We will address this further later in this report.

**Previous Recommendation 8 is CLOSED.**

**Use of Appropriate Security Forms**

E.O. 13467 (as amended) states "[t]he appointment or retention of each covered individual shall be subject to an investigation," the scope of which be determined "according to the degree of

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

material adverse effect the occupant of the position sought to be filled could bring about, by virtue of the nature of the position, on the national security."[38]

Under the Federal Investigative Standards, agencies must ensure applicants and employees complete the security form which corresponds with the required level of investigation.

**Previous Finding:**  As stated earlier in this report, most positions at USAGM were classified as non-critical sensitive, requiring employees to complete the SF 86 and undergo a Tier 3 background investigation.  Interns at USAGM were classified as low risk, non-sensitive, and underwent a Tier 1 investigation, which required completion of the SF 85.[39]

However, the Director stated all employees at USAGM completed the SF 86, regardless of their position classification or the level of investigation.  He stated this policy was because USAGM employed individuals from "criteria countries"[40] and the SF 85 and 85P[41] did not collect information regarding foreign influence or connections.

The SF 86 is to be used in conducting investigations for "persons under consideration for, or retention of, national security positions…and for individuals requiring eligibility for access to classified information under E.O. 12968."[42]  Using this form for low risk, non-sensitive positions ran counter to the purpose of the form itself and violated OPM guidance and the Federal Investigative Standards.

Instructing employees to complete the SF 86 when not required subjected employees to investigative questioning that went beyond the current investigative standards for their position.  This also imposed an unnecessary paperwork burden on employees and risked noncompliance with the Paperwork Reduction Act and the Privacy Act.

We notified USAGM that if their agency wished to go beyond questioning allowed by the Federal Investigative Standards they must first request and receive approval from the Suitability and Security Executive Agents, as specified in section 2.2 of E.O. 13467, as amended.

**<u>Previous Recommendation 9</u>:  USAGM must immediately begin using the correct security forms (to include the SF85) for any position which does not require the use of the SF86.**

---

[38] Executive Order 13764, "Amending the Civil Service Rules, Executive Order 13488, and Executive Order 13467 to Modernize Executive Branch-Wide Governance Structure and Processes for Security Clearances, Suitability and Fitness for Employment, and Credentialing, and Related Matters," Part 3, Section 1.1 (d)
[39] Standard Form 85, Questionnaire for Non-Sensitive Positions
[40] Countries that pose a National Security risk
[41] Standard Form 85P, Questionnaire for Public Trust Positions
[42] SF 86, "Purpose of this Form"

Def. App. 324

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Current Status:  Corrective action IMPLEMENTED.**

As of January 2019, USAGM has transferred all investigative work to DCSA, which requires the use of e-QIP and will not accept investigation requests which have been submitted on outdated or incorrect investigative forms.

As part of our follow-up activities we selected a sample of 20 USAGM investigation requests from our current measurement period.  We verified these investigations were submitted on the correct forms, to include the SF85 and SF85P.

**Previous Recommendation 9 is CLOSED.**

**Pre-Appointment Screening and Referral**

Upon collection of the Optional Form 306 (OF 306),[43] agencies should screen for and address any adverse suitability issues prior to appointment and initiation of the investigation required for the position.[44]  This is an essential part of the suitability process as it saves the costs of investigation if there are actionable issues, and ensures an unsuitable person does not start work before resolution of known issues.

According to the OPM *Suitability Processing Handbook (SPH)*, the screening and referral process involves:

- Reviewing applications, OF-306, and any other application related materials received or developed to identify any potentially disqualifying suitability issues,[45] and
- Referral of applications in cases involving potentially disqualifying issues to qualified Adjudicators for a determination of whether the known information is disqualifying, or for referral to OPM's Suitability Adjudication Branch (SAB) for a determination.[46]

OPM must be informed in all cases where there is evidence of material, intentional false statement, or deception or fraud in examination or appointment (MIF).  OPM reserves the right to undertake a determination of suitability based upon evidence of falsification or fraud relating

---

[43] Declaration for Federal Employment
[44] In accordance with 5 CFR § 731.106(c)(3), if appointed, the minimum level of background investigation must be conducted.
[45] OPM's Suitability Processing Handbook, Chapter III describes that conduct which may constitute a suitability issue.
[46] OPM's Suitability Processing Handbook, Chapter VI, reflects suitability issues should fall under the purview of 5 CFR 731.202 while Chapter V describes the methodology for assessing issue seriousness.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

to an examination or appointment at any point when information giving rise to such a charge is discovered.[47]  Such information is relevant to a government-wide debarment, which only OPM is permitted to undertake.

### Pre-Appointment Screening

**Previous Finding:**  During our 2018 onsite, USAGM did not appropriately conduct pre-screening.

OHR was responsible for initiating and pre-screening investigation requests for all non-OS new USAGM employees.  According to the HR Operations Branch Chief, after a hiring official selected an applicant, an OHR HR Specialist initiated the applicant into e-QIP[48] and allowed two weeks for completion.  When the applicant released the completed SF 86 to USAGM, OHR HR Specialists reviewed the e-QIP forms, OF-306, credit release, and USAGM-specific credit release using suitability referral criteria found in OPM's SPH.

If staff identified a potential suitability issue, they notified OS, at which point a Personnel Security Specialist attempted to mitigate the information and made the ultimate decision about an applicant's suitability for employment.  Once the Personnel Security Specialist made a determination, they notified OHR via email, at which point an OHR HR Specialist either notified the hiring manager to select another applicant or issued an offer of employment and established an EOD, as appropriate.

The Adjudications Chief stated OS was responsible for initiating investigations for new OS staff.[49]  When OHR notified OS of a new OS employee, OS staff initiated the applicant[50] in e-QIP and allowed 45 days for completion.[51]  When the applicant returned the completed SF 86 to OS, a Personnel Security Specialist reviewed the forms for completeness and accuracy.

If OS staff identified issues on the SF 86, they attempted to obtain additional information from the applicant.  If the individual did not provide this information, staff instructed OHR to perform a non-select action and to notify the hiring manager to select a new candidate.  However, the Adjudications Chief stated if the issue was not "glaring"[52] staff let the investigation proceed and

---

[47] OPM's Suitability Processing Handbook, Chapter IV, B and 5 CFR 731.103(d)(2) & (g).
[48] In the event USAGM staff had individuals complete paper copies of the SF 85 or 86, USAGM staff would later input that information into e-QIP on the individual's behalf.
[49] As well as re-investigations for current USAGM employees
[50] Or employee, in the case of re-investigations
[51] Please note this is not consistent with the two weeks HR allows individuals they are processing.
[52] The Adjudications Chief did not provide information about what would constitute a "glaring" issue.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

made a final determination based on the completed investigation.  If the SF 86 did not contain derogatory information, or OS staff deemed the issues not serious enough to non-select the applicant, staff notified OHR to issue an offer of employment and establish an EOD.

While OS staff did review submitted forms for potentially derogatory information, the Adjudications Chief[53] stated they used the "13 areas of personnel conduct guidelines," but could not specify what those guidelines were, and made no mention of 5 CFR part 731.  USAGM was required to use the suitability factors in 5 CFR part 731 as a condition of its exercise of delegated adjudicative authority.[54]

Without consistently using the standards found in 5 CFR part 731 during pre-screening process, staff could have overlooked potentially derogatory information.  This posed a potential risk as well as an undue financial burden to the agency by requesting investigations on individuals who could possibly be found unsuitable or unfit in the pre-screening process.

According to the HR Operations Branch Chief, USAGM did not issue tentative offers of employment.  OS and OHR issued one final offer following a favorable pre-screening of the completed SF 86.  This was not permitted per 5 CFR §330.1300, which stated that unless an exception was granted by OPM:

> *"A hiring agency may not make specific inquiries concerning an applicant's criminal or credit background of the sort asked on the OF-306 or other forms used to conduct suitability investigations for Federal employment (i.e., inquiries into an applicant's criminal or adverse credit history) unless the hiring agency has made a conditional offer of employment to the applicant."[55]*

Requiring applicants to complete the SF 86 (or any other security form) prior to an offer of employment violated 5 CFR §330.1300 and threatened the integrity of the competitive hiring process.

**Previous Recommendation 10:  USAGM staff tasked with pre-screening responsibilities must use 5 CFR part 731 criteria when making pre-screening determinations, as required by the CFR and OPM's Suitability Processing Handbook.**

**Current Status:  Corrective action NOT implemented.**

---

[53] The then Adjudications Chief had become the Chief, Personnel Security Division by our 2020 review.
[54] See 5 CFR § 731.103(c)
[55] 5 CFR §330.1300 "Timing of suitability inquiries in competitive hiring"

Def. App. 327

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

According to a Personnel Security Assistant, after an individual returns their completed e-QIP to
USAGM, a Personnel Security Assistant reviews the forms for accuracy and completeness, and
look for potentially derogatory information (to include foreign citizenship or contact, drug use,
or other derogatory information). If the Assistant identifies derogatory information, they forward
the file to the PSD Chief, who makes the pre-screening determination and decides whether to
continue the hiring process, or to perform a non-select action.

However, we spoke to the PSD Chief, who stated she does not perform pre-screening duties,
which she claimed were the responsibility of the USAGM adjudicators.

We were unable to verify which USAGM staff currently conduct pre-screening duties, or what
criteria they use to do so. Furthermore, staff's inability to identify who is responsible for specific
duties may indicate a lack of general program knowledge.

**Previous Recommendation 10 is OPEN and UNRESOLVED.**


**Recommendation 11:  USAGM must ensure all staff tasked with pre-screening
responsibilities receive training and are familiar with the criteria found in 5 CFR part 731.**

**Current Status:  Corrective Action NOT EVALUATED.**

As we were unable to identify which USAGM staff are currently responsible for pre-screening,
we were unable to validate their training or knowledge of pre-screening requirements.

**Previous Recommendation 11 is OPEN and UNRESOLVED.**


**Previous Recommendation 12:  USAGM must immediately discontinue use of the SF 86 (or
any other security form) prior to making an offer of employment, in accordance with 5
CFR §330.1300, unless and until USAGM is granted an exception.**

**Current Status:  Corrective Action IMPLEMENTED**

According to a Personnel Security Assistant, PSD staff only provide applicants and employees
with a link to e-QIP after OHR has issued a tentative offer of employment and PSD staff have
determined reciprocity does not apply. During the course of our follow-up activities we did not
find any indication that USAGM continued use security forms prior to making an offer of
employment.

Def. App. 328

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Previous Recommendation 12 is CLOSED.**

*Referral*

**Previous Finding:**  The OS Personnel Security Specialist we interviewed stated she had seen instances of potential MIF but had not yet referred any cases to OPM.

While we contacted OPM's SAB and found that USAGM made one referral to OPM within the three years prior to our onsite, USAGM's adjudicative staff required education regarding referral requirements.

When an individual obtains a position after making material, intentional false statements, the competitive examining process is compromised and the individual gains, or potentially gains, an unfair advantage.  Therefore, OPM retains jurisdiction in these types of cases under 5 CFR § 731.103(g).  This permits OPM to determine whether the case warrants a government-wide debarment, which only OPM is permitted to undertake.

**Previous Recommendation 13**:  **USAGM must refer all cases with potential material, intentional false statement, or deception or fraud in the examination or appointment process to OPM, as required by 5 CFR part 731 and the Suitability Processing Handbook.**

**Current Status:**  **Corrective action IMPLEMENTED**

According to OPM data USAGM staff have not made any referrals since our last onsite, but staff we interviewed were aware of the requirement to report cases involving potential material, intentional falsification to OPM's SAB.

**Previous Recommendation 13 is CLOSED.**

**Reciprocity**

E.O.s 13467, as amended,[56] and 13488, as amended,[57] requires reciprocal recognition of suitability and fitness investigations and adjudications so long as specified conditions are met.[58]

---

[56] E.O. 13467, "Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information"

[57] E.O. 13488, "Granting Reciprocity on Excepted Service and Federal Contractor Employee Fitness and Reinvestigating Individuals in Positions of Public Trust"

[58] To include the existing favorably adjudicated investigation meeting or exceeding the requirements of the position being sought.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

OPM's regulations at 5 CFR 731 provide additional supplemental guidance for agencies' use in exercising suitability requirements for investigative and adjudicative reciprocity in 5 CFR §§ 731.104 and 731.202.  Agencies must check the Central Verification System (CVS), the government-wide reciprocity database for the suitability program, to properly support reciprocity.

**Previous Finding:**  USAGM did not appropriately apply reciprocity.

OS staff checked CVS for reciprocity for USAGM employees receiving an upgrade or re-investigation, and for newly hired OS employees.  The OS Head Special Agent stated after the employee completed the SF 86, OS staff checked CVS for an existing favorably adjudicated investigation that met or exceeded the requirements of the position being sought.  If one existed, USAGM staff applied reciprocity and continued the onboarding process.  She stated staff only requested copies of the investigation when there was a "Please Call" notice or when the previous investigation was completed but not adjudicated.

If staff could not apply reciprocity, they scheduled an investigation.

OHR staff checked CVS for reciprocity for interns and all other new USAGM employees.  According to the Operations Branch Chief, after the employee completed the SF 86 the Branch Chief checked CVS for an existing favorably adjudicated investigation that met or exceeded the requirements of the position being sought.  The Branch Chief stated he consulted with OS for advice as to whether reciprocity applied.  He then initiated the background investigation as needed and continued the onboarding process.

Both OS and OHR improperly required all applicants and employees to complete the SF 86 prior to determining if an investigation was required.  Individuals should only be initiated into e-QIP when reciprocity cannot be applied.

USAGM also did not have access to the Joint Personnel Adjudication System (JPAS)[59] or Scattered Castles,[60] and therefore could not check all applicable databases for existing favorably-adjudicated national security investigations.  This could have hindered USAGM's ability to apply security reciprocity requirements prescribed by ODNI.

By requiring all applicants and employees to complete the SF 86 prior to determining if reciprocity applies, USAGM placed an unnecessary burden on the applicant and contributed to an extra and unnecessary workload, which affected the efficiency of USAGM's overall hiring

---

[59] Joint Personnel Adjudication System; a DoD system to record clearance eligibility determinations
[60] A database used by the Intelligence Community to record eligibility and access to Sensitive Compartmented Information

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

process. Failing to check all appropriate investigations databases may have also lead to duplicate investigation requests, wasting agency funds and negatively impacting the efficiency of USAGM's suitability program.

**Previous Recommendation 14:  USAGM must update internal processes to eliminate the practice of initiating all applicants and employees into e-QIP prior to checking for reciprocity, in accordance with E.O.s 13467 and 13488.**

**Current Status:  Corrective action IMPLEMENTED.**

A PSD Personnel Security Specialist stated after PSD front office staff receive an applicant's paperwork from OHR, a Personnel Security Assistant checks CVS for an investigation which meets or exceeds the requirements of the position being sought. They then forward the case to the Personnel Security Specialist, who performs a second check and then writes a memo indicating if reciprocity applies. This memo stays in the individual's file.

If reciprocity applies, the Personnel Security Specialist annotates this in a memo and then sends the file to a Security Specialist who proceeds with PIV processing.

If reciprocity does not apply, the Personnel Security Specialist writes a memo explaining why, and then returns the file to the PSD front office staff to initiate the individual into e-QIP.

**Previous Recommendation 14 is CLOSED.**

While USAGM has updated their reciprocity processes and now check CVS for all applicants/employees, USAGM is not appropriately applying reciprocity. OPM data covering our follow-up measurement period reflects USAGM had 7 (2.65%) duplicate requests of their 264 total investigation requests.

By not following the established standards, USAGM runs the risk of re-investigating applicants more frequently than required, thereby wasting agency funds and negatively impacting the efficiency of USAGM's suitability and security program.

**New Recommendation A:  USAGM must eliminate all duplicate investigation requests.**

**Previous Recommendation 15:  USAGM must work with their NBIB liaison to obtain access to all appropriate investigation databases.**

**Current Status:  Corrective action PARTIALLY IMPLEMENTED.**

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

The Security Specialist told us they access JPAS through CVS.  They are still waiting on Scattered Castles access, however, as they are waiting for their user accounts to be created.

**Previous Recommendation 15 is OPEN and UNRESOLVED.**

### Investigation Request Timeliness and Quality

The 2010 Security and Suitability Process Reform Strategic Framework established an initiation timeliness metric of 14 days for the fastest 90% of all investigation requests from the date of the applicant's signature on the investigative forms to the date the investigative service provider receives the forms. The metrics also require investigations to be requested using e-QIP with 5% or less returned by the NBIB due to missing information or forms.

### *Investigation Request Timeliness*

**Previous Finding:**  USAGM did not initiate investigations within 14 days as required.[61]

According to the Adjudications Chief, individuals in the appropriate hiring office were responsible for initiating applicants/employees in e-QIP following an offer of employment.[62] USAGM allowed individuals 45 days to complete e-QIP; the Security Assistant monitored each applicant or employee's status and provided email reminders as necessary.  Once the applicant or employee certified the security forms and returned them to USAGM, USAGM staff established an EOD and conducted pre-screening and reciprocity checks.

On EOD OS staff directed the employee to re-certify (and re-sign) their security forms, at which point a contractor Security Assistant released e-QIP, scheduled any required investigation, and assigned fieldwork to a USAGM contract Investigator.

The Adjudications Chief stated the time between initial certification (applicant/employee signature on the completed SF 86) and EOD averaged two weeks.  If this estimation was correct, USAGM routinely exceeded the 14-day timeliness metric before staff began processing and scheduling the required investigation.  The Adjudications Chief was not aware of the 14 day initiation timeliness metric.

---

[61] As USAGM acted as its own ISP and did not maintain initiation timeliness data, we were unable to obtain metrics to support our findings in this area.  All recommendations in this section were based on testimony we received from USAGM staff.

[62] OS initiated re-investigations for employees and investigations for new OS employees, the Office of Contracts initiated investigations for contractors, and OHR initiated investigations for all other new USAGM employees.

Def. App. 332

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

According to OPM guidance, the Approver releases the e-QIP request to the ISP and commits
the government funds needed to schedule an investigation.  According to the Office of
Management and Budget Circular A-76, Attachment A, Section B, the obligation of government
funds is inherently a governmental function, to be conducted by a Federal employee.  Per OPM
and OMB guidance, the e-QIP Approver must be a Federal employee.

Instructing applicants and employees to re-sign investigative forms upon EOD prevents the
collection of accurate timeliness metrics.

Delayed completion of e-QIP forms can adversely affect the efficiency of the hiring processes
and overall investigative timeliness.

**Previous Recommendation 16:  USAGM must ensure the e-QIP "Approver" user role is
held by a Federal employee.  The e-QIP Agency Administrator must immediately remove
the Approver access for the Contractors currently holding that role.**

**Current Status:  Corrective action IMPLEMENTED**

During our follow-up activities we requested a list of all SEC staff with roles in e-QIP, and
instructed USAGM to identify if those individuals were contractors or federal employees, as well
as which specific e-QIP roles each held.  We verified that only federal employees hold the
Approver role in e-QIP.

**Previous Recommendation 16 is CLOSED.**

**Previous Recommendation 17:  USAGM must immediately cease having applicants and
employees re-sign security form releases upon EOD, in support of accurate timeliness
metrics.**

**Current Status:  Corrective action IMPLEMENTED.**

According to the Personnel Security Specialist, USAGM staff no longer have applicants re-
certify their e-QIP forms on EOD.

**Previous Recommendation 17 is CLOSED.**

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Previous Recommendation 18: USAGM must ensure background investigations are initiated no more than 14 days after the applicant's initial certification of the investigative forms.**

**Current Status: Corrective action NOT IMPLEMENTED.**

USAGM is not meeting the investigation request timeliness goal. OPM data covering our follow-up measurement period reflects USAGM requested the fastest 90% (418) of their 464 total investigation requests in an average of 18 days.

A Personnel Security Assistant (Assistant) stated after a Personnel Security Specialist confirms reciprocity does not apply, a Personnel Security Assistant initiates the applicant or employee in e-QIP, and allow the individual 72 hours to complete the forms. Assistants check e-QIP daily to monitor individuals' progress, and will send reminder emails as necessary.

Once the individual completes the e-QIP forms, an Assistant reviews them for completeness, accuracy, and potentially derogatory information, before releasing the investigation request to DCSA.

The Assistant was not aware that USAGM was not meeting the timeliness goal, and could not explain why they were over the 14 day limit.

**Previous Recommendation 18 is OPEN and UNRESOLVED.**

**Previous Recommendation 19: USAGM must update its policies, manuals, and employee training practices to ensure all USAGM staff with a role in the initiation process are aware of the 14 day initiation timeliness standard.**

**Current Status: Corrective action IMPLEMENTED.**

Page 4 of USAGM's Personnel Security Management Directive states "[a]ll investigations must be initiated within fourteen (14) days of applicant certifying and releasing security questionnaire to SEC."

While USAGM's timeliness does not currently meet standards, staff were aware of the 14 day timeliness metric.

**Previous Recommendation 19 is CLOSED.**

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

*Investigation Request Quality*

**Previous Finding:**  We were not able to evaluate this area during our 2018 review, as USAGM
conducted its own investigations and did not maintain data regarding investigation request
quality.

**Current Status:**  USAGM is not meeting the investigation request quality goal.  OPM data
covering our follow-up measurement period reflects DCSA returned 167 (38.75%) of USAGM's
431 total investigation requests for correction.

According to a Personnel Security Assistant, Security Specialists receive unacceptable
notifications from DCSA, and then tell the Assistant what errors need to be corrected.  The
Assistant contacts the subject if necessary, and allows three days for the subject to provide the
required information.  The Assistant believes USAGM's unacceptable investigation request rate
is due to the fact nobody in PSD was assigned to resolve these unacceptable requests, prior to the
Assistant's arrival in July 2019.

Inaccurate information on the e-QIP forms can adversely impact the efficiency of the hiring
process and overall investigative timeliness.

**New Recommendation B:  USAGM must establish and implement processes to reduce the
unacceptable submission rate for investigation requests to 5% or less.**

## HSPD-12 Credentialing

HSPD-12[63] requires all Federal Executive departments and agencies to issue Personal Identity
Verification (PIV) credentials based on a common Federal standard for secure and reliable forms
of identification; and to require the use of the PIV to the extent practicable for physical access to
federally controlled facilities and for logical access to federally controlled information systems.
The PIV is for "other than occasional or intermittent access to federally controlled facilities or
intermittent systems."[64]

FIPS 201-2, "*Personal Identity Verification (PIV) of Federal Employees and Contractors*,"[65]
outlines the standard used to issue and manage PIV cards.  This guidance outlines the minimum

---

[63] https://www.dhs.gov/homeland-security-presidential-directive-12
[64] E.O. 13467, as amended, § 1.3(m)
[65] NIST, *Personal Identity Verification (PIV) of Federal Employees and Contractors*, August 2013

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

standards for PIV card issuance, specifically the requirement that a minimum of a NACI (now Tier 1) investigation be initiated[66] and FBI fingerprint check completed before a PIV card may be issued.

OPM, as Credentialing Executive Agent, develops standards for investigations, reinvestigations, and continuous vetting, adjudicative guidelines, guidelines for reporting and recording eligibility, and standards for suspending, denying and revoking eligibility for PIV cards. OPM also "may develop guidelines and instructions to the heads of agencies" related to PIV eligibility processes and "shall monitor and make a continuing review of agency programs for determining eligibility for a PIV credential to determine whether they are being implemented according to this order."[67]

Agencies, in turn must "promptly furnish, or cause to be promptly furnished" to OPM "the information deemed by the Executive Agents to be necessary for purposes of record keeping and reciprocity."[68] For this purpose OPM's 2008 Final Credentialing Standards, as amended in 2016, require HSPD-12 credentialing determinations be reported into CVS in order to reciprocate acceptance of PIV credential determinations among agencies.

### HSPD-12 – Issuing PIV Credentials

**Previous Finding:** USAGM did not issue PIV credentials appropriately.

On EOD the OS Senior Physical Security Specialist collected employees' fingerprints manually and then scanned them to NBIB[69] to conduct a fingerprint check through the FBI. Physical Security staff then issued a temporary, USAGM -specific badge. This badge was valid for a year, though staff could renew it as needed if the employee's background investigation was not completed in that time. Employees were also issued a ProxCard for facility access and were required to go through security screening to access the building.

Once the employee's background investigation was completed and favorably adjudicated by OS, the Physical Security Specialist issued the PIV credential and reported the determination into CVS. USAGM used PIV credentials for physical access only.

According to the Senior Physical Security Specialist, when an employee was due for a re-investigation the employee returned their PIV credential to the badging office, where Physical Security staff electronically revoked and sometimes physically destroyed the PIV credential.

---

[66] Page 5 of FIPS 201-2 defines "initiated" as "submission of the investigative request to the Office of Personnel Management (OPM), or other Federal background investigation service provider (if authorized)."
[67] E.O. 13467, as amended, § 2.5(c)
[68] *Id*. § 2.7(b)(vi)
[69] At the time of our 2018 review, NBIB performed this function. Such duties are now the responsibility of DCSA.

Def. App. 336

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

When the employee's re-investigation was favorably adjudicated, the employee received a new PIV credential.  While the re-investigation was ongoing the employee used a USAGM -specific badge and ProxCard and was required to go through security screening to access the building.

The Senior Physical Security Specialist stated USAGM revoked and destroyed the employee's existing PIV credential to ensure the employee completed their security forms in a timely manner.

Once an employee separated[70] from USAGM, they returned their PIV credential to the badging office as part of out-processing.  Physical Security staff revoked the credential electronically and then destroyed the physical card.

We obtained a list of USAGM employees who were recently issued a PIV credential.  We compared this list of employees against investigations information contained in OPM's Personnel Investigation Processing System (PIPS), and identified 1 of the 20 employees were approved for PIV issuance without an appropriate investigation initiated.  Details of these files are listed in Table 6.

**Table 6**
**USAGM Improperly-Issued PIV Credentials, 2018**

| OPM File # | Investigation Conducted[71] | Investigation Start Date | PIV Issuance Date |
|---|---|---|---|
| P4 | T3 | 12/22/2017 | 12/01/2017 |

*Source:  USAGM*

Neither the Senior Physical Security Specialist nor the Director were able to provide information about why this credential was issued inappropriately.

While the majority of the files we reviewed were issued PIV credentials correctly, USAGM had not corrected their PIV issuance process since our 2014 review and still did not adjudicate fingerprint results prior to issuance.  The Senior Physical Security Specialist stated she thought the Director or Adjudications Chief adjudicated the fingerprint results, but the Adjudications Chief stated the Senior Physical Security Specialist was responsible for all such adjudications.

USAGM also did not use PIV credentials for logical access.  As noted above, under HSPD-12 and E.O. 13467, as amended, the PIV is to be used for other than occasional or intermittent

---

[70] Or if access is revoked or suspended
[71] All individuals were subject to a Special Agreement Check (SAC), which does not meet the minimum requirements for PIV issuance.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

logical access, the maximum extent practicable.  Additionally, in 2015, the government initiated a 30-day Cybersecurity Sprint,[72] designed to strengthen the Federal Government's overall cybersecurity infrastructure.  Agencies were required to "dramatically" accelerate implementation of multi-factor authentication for access to Federal networks, systems, and data. According to USAGM staff, only OHR personnel used PIV credentials for logical access, meaning the majority of USAGM staff were not in compliance with multi-factor authentication requirements.  The Director was not able to provide information about why USAGM was not in compliance.

Granting a PIV without the minimum standards being met (specifically, a favorably adjudicated fingerprint check) poses a risk to the agency and to the Federal Government as a whole, by granting access to facilities and information systems to individuals who have not been appropriately vetted.

Revoking, destroying, and re-issuing PIV credentials to individuals undergoing re-investigation places an unnecessary financial and logistical burden on the agency, and may weaken the efficiency of USAGM's security and suitability program.

Failing to comply with federal multi-factor authentication requirements weakens the security of USAGM's logical systems, and may allow intruders to access Federal networks, systems, and data.

**Previous Recommendation 20:  USAGM must ensure every individual has a favorably adjudicated fingerprint before being issued a PIV credential, as required by HSPD-12 and FIPS 201-2.**

**Current Status:  Corrective action NOT IMPLEMENTED.**

The Physical Security Specialist stated when a new hire requires a PIV credential, onboarding staff in SEC add an appointment to the Physical Security Specialist's schedule.  When the applicant arrives, she inspects their identification, takes their fingerprints, and submits them via C-CURE 9000.[73]

The Physical Security Specialist stated she later receives a PIV request sheet from SEC when the applicant or employee is approved for a PIV credential.  This request sheet does not contain any information about if or when fingerprint results were favorably adjudicated, and does not indicate the level of investigation conducted (or when said investigation was initiated).

---

[72] https://obamawhitehouse.archives.gov/sites/default/files/omb/budget/fy2016/assets/fact_sheets/enhancing-strengthening-federal-government-cybersecurity.pdf
[73] A security management software program

Def. App. 338

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

We requested a list of personnel who were issued a PIV credential since October 2018, and
selected a random sample of 20. 18 of those 20 credentials were issued a PIV credential
inappropriately, as reflected in Table 7, below.

**Table 7**
**Improperly Issued PIV Credentials, 2020**

| OPM File # | Investigation Conducted | Investigation Start Date | PIV Issuance Date | Notes |
|---|---|---|---|---|
| PIV1 | T3 | 6/27/19 | 8/28/17 | • USAGM-conducted investigation<br>• Investigation discontinued 3/4/19; no new investigation initiated<br>• No indication fingerprint SAC was favorably adjudicated |
| PIV2 | T3 | 3/18/19 | 6/27/17 | • USAGM-conducted investigation<br>• No indication fingerprint SAC was favorably adjudicated |
| PIV3 | MBI | (closed) 2/5/98 | 3/18/19 | • No adjudication reported<br>• 1998 investigation was an MBI; now out of scope |
| PIV4 | T3 | 2/1/16 | 12/20/19 | • USAGM-conducted investigation<br>• No indication fingerprint SAC was favorably adjudicated |
| PIV5 | NA | NA | 11/5/19 | • No investigation initiated |

Def. App. 339

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

| | | | | |
|---|---|---|---|---|
| **PIV6** | ANACI | 8/5/15 | 12/4/18 | • USAGM-conducted investigation<br>• No indication fingerprint SAC was favorably adjudicated |
| **PIV8** | T1 | 7/17/19 | 6/27/19 | • PIV issued before investigation initiated |
| **PIV9** | T3 | 11/8/17 | 9/23/19 | • USAGM-conducted investigation<br>• Investigation discontinued 3/13/19 (no new investigation initiated)<br>• No indication fingerprint SAC was favorably adjudicated |
| **PIV10** | PRI | (closed) 2/21/06 | 8/12/19 | • No reported adjudication<br>• Investigation out of scope |
| **PIV11** | T3R | 11/15/19 | 8/30/19 | • PIV issued before investigation initiated |
| **PIV12** | ANACI | (closed) 6/17/15 | 3/11/19 | • No reported adjudication<br>• USAGM-conducted investigation |
| **PIV13** | ANACI | (closed) 10/19/11 | 9/10/19 | • No indication fingerprint SAC was adjudicated |
| **PIV14** | T3 | 10/26/17 | 5/20/19 | • USAGM-conducted investigation |
| **PIV16** | NACLC | 7/21/15 | 10/2/18 | • USAGM-conducted investigation |

U.S. Agency for Global Media

Def. App. 340

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  | • No indication fingerprint SAC was adjudicated |
| **PIV17** | SSBIPR | 1/28/13 | 6/3/19 | • USAGM-conducted investigation<br>• Investigation expired in 2018<br>• Fingerprint SAC scheduled after PIV issued (11/19/19)<br>• No indication fingerprint SAC was adjudicated |
| **PIV18** | ANACI | 8/17/15 | 6/3/19 | • USAGM-conducted investigation<br>• No indication fingerprint SAC was adjudicated |
| **PIV19** | NACLC | (closed) 9/9/15 | 10/7/19 | • USAGM-conducted investigation<br>• No indication fingerprint SAC was adjudicated |
| **PIV20** | ANACI | (closed) 3/2/15 | 2/7/19 | • USAGM-conducted investigation<br>• No indication fingerprint SAC was adjudicated |

*MBI: Minimum Background Investigation; ANACI: Access National Agency Check with Inquiries; T1: Tier 1; PRI: Periodic Reinvestigation; T3R: Tier 3; NACLC: National Agency Check with Law and Credit; SSBIPR: Single Scope Background Investigation Periodic Reinvestigation*
*Source: OPM file review*

As noted in the chart, we could not find evidence that many of the required fingerprint SACs were adjudicated, and all cases with the notation "USAGM-conducted investigation" were investigations conducted by USAGM after the expiration of USAGM's delegated investigative authority.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

USAGM staff did not provide who adjudicates fingerprint results, and did not have any information about why the PIV credentials in Table 7 were issued inappropriately.

**Previous Recommendation 20 is OPEN and UNRESOLVED.**

**Previous Recommendation 21:  USAGM must cease revoking and destroying PIV credentials when employees undergo re-investigation.**

**Current Status:  Corrective Action IMPLEMENTED.**

According to the Physical Security Specialist, USAGM no longer destroys PIV credentials when employees undergo re-investigations.  During the course of our inspection we found no evidence to indicate otherwise.

**Previous Recommendation 21 is CLOSED.**

**Previous Recommendation 22:  USAGM must update its processes and implement the use of PIV cards for logical access, to improve the security of USAGM's network, system, and data security.**

**Current Status:  Corrective Action IMPLEMENTED.**

According to the Physical Security Specialist, PIV cards are now used for physical and logical access.

**Previous Recommendation 22 is CLOSED.**

While USAGM has made some progress in correcting the deficiencies in their credentialing program, during our latest review we developed that USAGM does not track PIV credentials which are expiring and require re-issuance.  The Physical Security Specialist told us employees are responsible for tracking their own PIV expiration dates, and must reach out to Physical Security staff to have a new credential issued.

Failing to identify expiring PIV credentials could negatively impact the agency's efficiency, as employees could lose access to facilities or systems.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**New Recommendation C:  USAGM must develop a mechanism to track PIV expiration dates.**

### *HSPD-12 – Reporting PIV Credentials*

**Previous Finding:**  OPM data reflected USAGM reported 815 PIV credentials into CVS during our initial measurement period.

**Current Status:**  OPM data reflects USAGM reported 476 PIV credential actions[74] into CVS during our follow-up measurement period.

However, the Physical Security Specialist stated she does not update PIV credentials into CVS and we were unable to identify which USAGM staff perform these updates.

**New Recommendation D:  USAGM must update their PIV issuance process to identify staff responsible for uploading credentialing determinations into CVS.**

### *Additional Physical Security Concerns*

**Previous Finding:** While we do not normally report on physical security issues beyond PIV issuance, we identified several additional areas of concern during the course of our 2018 review.

Physical Security staff did not operate under consistent procedures.  At various points during our onsite activities, our review team (1) was required to go through security screening, (2) was allowed to access the building through turnstiles that read our PIV credentials, (3) was required to be escorted at all times, and (4) was allowed to access all areas of the building without an escort.  Physical Security staff were not aware of who their supervisor was, and were unable to locate them to ask for guidance on granting us access to the building.

The Senior Physical Security Specialist told us USAGM did not yet reciprocally accept PIV credentials from other agencies, and at several points during our onsite guard staff told us we would not be allowed to access the facility without going through a full security screening (though on different occasions, different guards allowed us to access the building without screening).

---

[74] "actions" include active credentials, revocations, denials, administrative withdrawals, and suspensions

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

NIST and OMB issuances recognize that agencies must make risk-based access control and level of authorization decisions, to determine what resources PIV card holders may access.[75]  But failing to reciprocally accept PIV credentials issued by other federal agencies for any purpose is counter to the policy of having a common, interoperable platform for identity authentication based on standard investigative and adjudicative criteria.  Lack of reciprocity contributes to an extra and unnecessary workload, which affects the efficiency of USAGM's overall process.

We did not issue a recommendation regarding the other areas of concern, but USAGM was required to ensure physical security staff was operating consistently and in accordance with standard procedures.

**Previous Recommendation 23**:  **USAGM must update processes, procedures, and employee training requirements to reciprocally accept PIV credentials for physical access, in accordance with HSPD-12.**

**Current Status:  Corrective action IMPLEMENTED.**

During our 2020 onsite, USAGM physical security staff demonstrated far fewer inconsistencies, to include reciprocally accepting our PIV credentials and maintaining escort procedures.

**Previous Recommendation 23 is CLOSED.**

## Suitability Investigation Quality[76]

5 USC §1104(a)(2) states OPM may delegate its investigative authority to other agencies. However, OPM is required to establish performance standards for agencies exercising delegated investigative authority, and to conduct oversight to ensure that the activities performed under the delegation are in accordance with its standards.[77]

Agencies operating under Delegated Investigative Authority must implement and maintain a personnel suitability and security investigations program which complies with federal laws, regulations, standards, and policies, including, but not limited to:

---

[75] See generally FIPS 201-2, chapter 6
[76] ODNI will discuss USAGM's investigative program and any findings related to National Security investigation quality in their report.
[77] See 5 USC §1104(b), 2301

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

- Compliance with Federal Investigative Standards and OPM coverage requirements,
  including the 2012 Federal Investigative Standards as they are implemented according to
  the Federal Investigative Standards Implementation Plan;
- Compliance with 5 CFR part 736, which prescribes requirements for the timely initiation
  of investigations, compliance with the Privacy Act, notices to investigative sources, and
  the protection of source confidentiality;
- Compliance with E.O. 13488 which requires public trust re-investigations under
  standards to be prescribed by OPM.

**Previous Finding:**  In addition to conducting investigations without a current MOU for
delegated investigative authority, USAGM did not conduct its investigations in accordance with
federal standards.

During our 2018 onsite activities, we reviewed the investigative files for the individuals in our
file sample.  Every file we reviewed was missing crucial investigative information, to include
discussions of admitted derogatory information, required records and/or personal sources, and
law coverage.  Other files contained records or Secret-marked information about individuals who
were not the subject and were not under investigation, and several cases had all leads closed as a
backlog-mitigation effort due to "passage of time," despite the fact that in most of these
instances, less than a month had elapsed.

Specific details of the errors we identified are included in Table 8.

**Table 8**
**USAGM Suitability Investigation Deficiencies, 2018[78]**

| OPM File # | Identified Coverage Deficiencies |
|---|---|
| 3 | • Not reviewed; USAGM could not locate security file |
| 4 | • Missing employment record<br>• SSN missing from case papers<br>• File contained Secret-marked information that did not relate to Subject or any individual listed in Subject's investigation<br>• Submitted on out of date case papers |
| 5 | • Missing six employment records<br>• All social reference leads closed as a risk management effort, citing "length of time since request"<br>• Submitted on out of date case papers |

[78] Due to the egregious quality and quantity of errors we found in these files, we did not feel it necessary to review
files 1, 2, 10, 12, and 13.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

| 6 | • ROI referred to Subject by incorrect pronoun |
| | • Did not address possible foreign relatives |
| | • Did not address foreign bank account |
| | • Did not address foreign travel |
| **7** | • Not reviewed; USAGM could not locate security file |
| 8 | • Copy of Subject's passport maintained in security file |
| | • Copy of Subject's relatives' passports maintained in security file |
| | • Security file contains no records of investigation or testimony |
| | • Submitted on out of date case papers |
| **9** | • Security file contains no records of investigation or testimony |
| | • Employment and residence reference leads closed as a risk management effort, citing "length of time since request" |
| | • Submitted on out of date case papers |
| 11 | • Copy of Subject's passport and driver's license maintained in security file |
| | • Employment record and reference leads closed as a risk management effort, citing "length of time since request" |
| | • Submitted on out of date case papers |
| **14** | • Missing law check |
| | • Copy of Subject's passport maintained in security file |
| | • Missing employment record |
| | • Missing personal sources for employment and residence |
| | • Submitted on out of date case papers |
| 15 | • Submitted on out of date case papers |
| **16** | • Missing residence record |
| | • Missing Selective Service check |
| | • Missing all social references |
| 17 | • Missing employment record |
| | • Copy of Subject's mother's Social Security card maintained in security file |
| | • Copy of Subject's sister's passport maintained in security file |
| **18** | • Employment and residence leads closed as a risk management effort, citing "length of time since request" |
| 19 | • Referred to Subject by incorrect pronoun |
| | • Missing employment record |
| | • Did not include Subject's alias on a law check |
| | • Copy of Subject's passport maintained in security file |
| | • Missing Spouse National Agency Checks |
| **20** | • Missing employment record |
| | • Missing FBI fingerprint and name checks |

Def. App. 346

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

- Missing all law checks
- Submitted on out of date case papers

*Source: OPM File Review*

The quality of USAGM's background investigations posed a serious risk to both the agency and the Federal Government as a whole, as USAGM employees had not been appropriately or thoroughly vetted before being granted access to Federal systems, facilities, and, in many instances, sensitive or classified information.

Given the severity and quantity of the errors we identified in USAGM's investigations during our 2014 review, and the ongoing nature of those errors (as identified during our April 2018 onsite activities), we did not believe USAGM was running an acceptable investigations program.

We referred back to Recommendation 1 of this report and reiterated that USAGM must immediately cease all investigative activities and must work with their DCSA liaison to transfer all ongoing and future investigations to DCSA.

Additionally, as USAGM was not operating under a current MOU for delegated investigative authority and therefore was not authorized to conduct background investigations, and because the quality of their investigations was not up to standards and compromised reciprocity, USAGM must initiate new investigations for all employees investigated since the delegation of investigative authority expired in 2012.

**Previous Recommendation 24:  USAGM must work with NBIB to immediately initiate new investigations for all individuals investigated by USAGM since the expiration of USAGM's delegated investigative authority in 2012.**

**Current Status:  Corrective action NOT IMPLEMENTED.**

USAGM has failed to complete the required corrective action for this recommendation.

On January 17, 2020, the Director of the Office of Security provided a letter addressing USAGM's progress in this area.[79]  This letter stated USAGM is "still in the process of identifying, prioritizing, and reinitiating investigations working backwards to 2012."  During our 2020 onsite the PSD Chief stated it was a priority to initiate new investigations, but that OS was waiting for HR to re-designate all agency positions.  Neither the Director of the Office of Security nor the PSD Chief could provide a timeframe for when all investigations would be initiated as required by our 2019 final report.

---

[79] Refer to Attachment D

Def. App. 347

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

We provided USAGM with a list of 1,527 investigations USAGM conducted under expired delegated authority, to assist them in identifying the individuals who require a new investigation. As of our February 2020 onsite, USAGM has only scheduled investigations for 314 individuals.

USAGM's failure to schedule new investigations as required poses a series risk to the agency and the federal government as a whole.  USAGM employees have not been properly vetted, yet currently have access to government systems, facilities, and, in some cases, sensitive or classified information.  More importantly, USAGM employees wishing to change jobs could have their investigations reciprocally accepted by a new agency, which would not know the investigations (and subsequent favorable adjudication) were invalid.

Until USAGM re-investigates all applicable individuals, USAGM must add a "Please Call" notice in CVS for each investigation that was conducted after the expiration of USAGM's delegation of authority.

We will notify the U.S. Department of State's Office of the Inspector General regarding USAGM's status in this area.

**Previous Recommendation 24 is OPEN and UNRESOLVED.**

**<u>New Recommendation E</u>:  USAGM must add a "Please Call" notice in CVS for each investigation USAGM conducted after the expiration of USAGM's delegation of investigative authority.**

## <u>Adjudication</u>

**Suitability Review and Determination**

Agencies are responsible for establishing and maintaining an effective suitability program to ensure the employment of each person in a covered position will promote the efficiency and protect the integrity of the service.[80]

A suitability determination must be made for all appointments that are subject to investigation under the Suitability regulation.[81]

---

[80] OPM's *Suitability Processing Handbook*, Chapter I D
[81] 5 CFR 731.104(b)(3)

U.S. Agency for Global Media

Def. App. 348

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

**Previous Finding:**  We were unable to verify that USAGM appropriately adjudicated for
suitability.

According to a Personnel Security Specialist, the Adjudications Chief hand carried completed
investigations to USAGM's two Personnel Security Specialists and tracked assignments through
each adjudicator's Case Tracking queue.

If the completed investigation contained no derogatory information, the Personnel Security
Specialist updated Case Tracking, signed USAGM's favorable adjudication memo, and reported
the adjudication to OPM via CVS.

When completed investigations contained potentially derogatory information, the Personnel
Security Specialist tracked the issues on an adjudicative worksheet and contacted the subject of
investigation for additional information.  The assigned adjudicator allowed the subject two
weeks to provide potentially mitigating information and discussed issues with the Adjudications
Chief as needed.

If the Personnel Security Specialist was able to mitigate the issues with the provided information,
they updated Case Tracking, signed the favorable adjudication memo, and reported the
determination to OPM.  If they could not mitigate the issues, the Adjudications Chief was
required to approve the unfavorable determination.  If the Adjudications Chief agreed with the
unfavorable determination, OSM/S staff worked with USAGM's OGC to issue a letter of
removal and proceeded through due process procedures.

The Personnel Security Specialist estimated USAGM had approximately 6-8 unfavorable
determinations in the previous three years.

While USAGM staff described an acceptable suitability adjudication process, during the course
of our file review we found no documentation to support the fact a suitability determination was
made on USAGM's closed investigations.  The Personnel Security Specialist told us adjudicators
did not maintain any adjudicative worksheets and USAGM's favorable adjudication memo did
not make any reference to 5 CFR 731.[82]  Staff we interviewed also were not familiar with the
suitability adjudication criteria; the Adjudications Chief could not name the standards and the
Personnel Security Specialist could only name them after looking at notes they brought into our
interview.[83]

The Adjudications Chief also stated she was responsible for adjudicating her direct employees'
investigations.  If not carefully managed, this posed a potential conflict of interest for the agency,

---

[82] We discuss this memo in depth later in this report.
[83] We discuss staff training in depth later in this report.

Def. App. 349

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

as the Adjudications Chief could be a witness in subsequent due process proceedings involving
her subordinates.

Failure to use established standards and to make a distinct suitability determination on every
investigation increases the odds of an unsuitable person being granted Federal employment,
placing the government at risk.  Failure to document such an adjudication may hinder reciprocity
across government, as other agencies will be unable to verify such an adjudication was made.

Given the ongoing nature of USAGM's weaknesses in this area and the agency's failure to take
corrective action despite multiple warnings from the Suitability Executive Agent, OPM declared
we will take action to revoke USAGM's adjudicative authority if these errors were not corrected
immediately.

**Previous Recommendation 25:  USAGM must perform and document a distinct suitability
adjudication on every closed investigation, in accordance with 5 CFR part 731.**

**Current Status:  Corrective action NOT VERIFIED.**

A Personnel Security Specialist stated USAGM receives closed investigations via mail from
DCSA.  The PSD Chief assigns cases to adjudicators, who review the investigation for
completeness before making an adjudicative determination and documenting their decision in a
narrative write-up.

If a case has no derogatory information, the adjudicating Personnel Security Specialist completes
the narrative write-up, closes the case in CaseTracking, and notifies HR.

If a case has potentially derogatory information, the adjudicating Personnel Security Specialist
contacts the Subject via email and allows a week for them to provide mitigating information.
The Personnel Security Specialist will discuss any provided information with the Subject in
person.  If the derogatory information can be mitigated, the Personnel Security Specialist then
closes the investigation and continues the onboarding process as described above.

If the mitigating information cannot be mitigated, the Personnel Security Specialist writes a
denial letter stating the agency's intention to make an unfavorable determination.  The applicant
has 30-45 days to respond to this letter with any mitigating information.

If the derogatory information still cannot be mitigated, the adjudicating Personnel Security
Specialist reports the adjudication into CVS and notifies HR that the applicant cannot be brought
on board.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

While this process is appropriate as described, USAGM staff expressed confusion about when determinations should be made using 5 CFR 731 criteria. The Personnel Security Specialist we interviewed stated 5 CFR 731 would be used "if needed," but could not specify when that would be the case. After further questioning the Personnel Security Specialist explained that 5 CFR 731 criteria would be used "for all cases which require suitability," on those individuals in National Security positions, "may" be used on contractors, but would not be used on Tier 1 investigations.

As part of our inspection activities we reviewed the adjudicative write-ups for 34 cases adjudicated within our follow-up measurement period. Only one investigation was for a federal employee, and while this write-up did reflect the adjudicator used 5 CFR 731 criteria to make a suitability determination, the available sample is not sufficient for us to determine that USAGM is uniformly making suitability determinations as required.

**Previous Recommendation 25 is OPEN and UNRESOLVED.**

**Previous Recommendation 26: USAGM should consider making arrangements to ensure OS staff are not responsible for adjudicating their direct-report employees' investigations.**

**Current Status: Corrective action NOT IMPLEMENTED**

The Personnel Security Specialist we interviewed stated USAGM was still attempting to find another office to adjudicate SEC investigations, but that there had not been a need to adjudicate any SEC employees since our prior onsite.

Our record review, however, revealed two SEC employees were adjudicated by SEC staff since our 2018 review.

**Previous Recommendation 26 is OPEN and UNRESOLVED.**

**Reporting Suitability Adjudicative Determinations**

Agencies are required to report their suitability decisions to OPM by sending the INV Form 79A[84] or by uploading their determinations electronically through PIPS.[85] According to

---

[84] INV Form 79a, "Report of Agency Adjudicative Action on OPM Personnel Investigations."
[85] Personnel Investigations Processing System

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

regulation[86] all unfavorable suitability actions must be reported to OPM within 30 days after the action was taken.  All other actions based on an OPM investigation must be reported as soon as possible, and in no event later than 90 days after receipt of the final report of investigation.[87]

USAGM is not meeting the suitability adjudicative timeliness goal.  OPM data reflects USAGM reported 94 suitability determinations in an average of 51 days.  However, OPM data also reflects that as of March 15, 2018, USAGM has 66 unreported adjudications more than 90 days old.

According to the Personnel Security Specialist, each adjudicator reports adjudicative determinations through PIPS upon adjudication.  The Personnel Security Specialist was not able to provide any information about the 66 unreported adjudications.

The Adjudications Chief stated she was aware USAGM was not meeting the standard, as they have a "huge" backlog and do not have sufficient staff to adjudicate all cases within the required timeframe.

It is critical to report all suitability adjudications to OPM to ensure the most accurate information exists and to promote reciprocity when warranted.  Adjudicating cases in a timely manner ensures employees in covered positions are suitable to begin work right away while protecting the integrity and promoting the efficiency of the service.

**Previous Recommendation 27:  USAGM must report all suitability determinations to OPM as soon as possible, and in no event later than 90 days after receipt of the final report of investigation.**

**Current Status:  Corrective Action NOT IMPLEMENTED.**

OPM data reflects during the follow-up measurement period USAGM adjudicated 49 cases in an average of 34.5 days.  However, OPM data also reflects that USGAM still has 349 unreported adjudications more than 90 days old.

**Previous Recommendation 27 is OPEN and UNRESOLVED.**

---

[86] 5 CFR 731.203(g)
[87] 5 CFR 731.203(g) and 5 CFR 732.302

Def. App. 352

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**New Recommendation F:  In lieu of reporting pending adjudications for any investigations USAGM conducted after the expiration of their delegated investigative authority, USAGM must discontinue these investigations and initiate new investigations through DCSA.**

*"D" Level Suitability Adjudications*

OPM's Suitability Adjudications Branch (SAB) conducts a review of some agency decisions on "D" issue suitability cases.  When SAB disagrees with an agency's adjudication decision on a "D" issue case, SAB issues a letter requesting details regarding the adjudicative determination.

**Previous Finding:** We were unable to review USAGM's status in this area; during the measurement period, SAB did not review any of USAGM's suitability adjudications.

**Current Status:**  We contacted OPM's SAB, who stated they did not review any of USAGM's adjudications during the follow-up measurement period.

## Internal Control Activities

Internal control is an integral component of an entity's management that provides reasonable assurance that the objectives of an entity are being achieved.[88]  Internal control activities are the policies, procedures, techniques, and mechanisms that help ensure management's directives are carried out.[89]

We reviewed the agency's internal control activities related to records of investigation, record retention, physical safeguards, adjudicator training and qualifications, and policies and procedures to ensure operational effectiveness and efficiency.

**Records of Investigation**

E.O. 13764 states "[t]he appointment or retention of each covered individual shall be subject to an investigation," the scope of which be determined "according to the degree of material adverse

---

[88] GAO "Standards for Internal Control in the Federal Government," 2013 Exposure Draft, dated September 2013
[89] GAO-01-1008G "Internal Control Management and Evaluation Tool," dated August, 2001

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

effect the occupant of the position sought to be filled could bring about, by virtue of the nature of the position, on the national security."[90]

The employing agency is responsible for requesting the appropriate level of investigation to be conducted based on the position designation. According to the regulation,[91] background investigations must be initiated within 14 days of an individual's placement into the position.

**Previous Finding:** In 2018 we conducted an electronic comparison of USAGM's employee roster against OPM's Security and Suitability Investigations Index (SII), which retains investigative records information in the SII for a minimum of 16 years. We found 6 employees with no record of a prior investigation.

We provided a list of employees with no record of investigation to the Adjudications Chief, who stated she would look into these no-record results.

Failure to investigate an employee as required can place the agency at risk by granting access to a person who has not been appropriately vetted.

**Previous Recommendation 28:  USAGM must request the required background investigation on any USAGM appointee or employee where a record of investigation cannot be verified.**

**Current Status:  Corrective action NOT IMPLEMENTED.**

As of our February 3rd 2020 onsite activities, USAGM had not initiated investigations for the 6 individuals identified as having no record during our prior review.

While we provided a list of these no records to USAGM in 2018, it was only after our 2020 onsite that they took action; On February 18, 2020 a Security Assistant stated USAGM initiated investigations for 4 of those individuals. However, as of February 25, 2020, OPM's PIPS still shows no record of these individuals, to include any investigations in-progress.

---

[90] Executive Order 13764, "Amending the Civil Service Rules, Executive Order 13488, and Executive Order 13467 to Modernize Executive Branch-Wide Governance Structure and Processes for Security Clearances, Suitability and Fitness for Employment, and Credentialing, and Related Matters," Part 3, Section 1.1 (d)
[91] 5 CFR 736.201(c); 5 CFR §731.106(c)(1) ("Persons receiving an appointment made subject to investigation under this part must undergo a background investigation.  OPM is authorized to establish minimum investigative requirements correlating to risk levels.  Investigations should be initiated before appointment but no later than 14 calendar days after placement in the position").

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

The remaining two individuals do now have investigations on record, but both were completed by USAGM following the expiration of their delegation of investigative authority, and are therefore invalid.

**Previous Recommendation 28 is OPEN and UNRESOLVED**

**Record Retention**

OPM's Guide to Personnel Recordkeeping (GPR) provides instructions for filing documents related to the investigative process.  The GPR requires that the OPF includes a notice showing the case was investigated, the level of the investigation, confirmation the case was adjudicated, and the date a determination was made.  These notices include the Certification of Investigation (COI) or similar agency form.  According to the GPR, investigative reports, memos, or other materials are not to be retained in the OPF.

**Previous Finding:**  USAGM did not maintain COIs as required.

We reviewed 20 eOPFs associated with the individuals in our file sample.  Of the 20 eOPFs reviewed, 19 (95%) did not contain an investigative notice as required.[92]

The Adjudications Chief stated USAGM began creating and maintaining a USAGM -specific COI approximately three to four months prior to our 2018 onsite.[93]  The Personnel Security Specialist we interviewed stated upon adjudication, adjudicators sent a physical copy of the COI to OHR for inclusion in the eOPF.

The HR Operations Branch Chief stated his staff received the COI from OS and scanned it into the employee's eOPF within a week.  USAGM staff was not able to provide any additional information.

Missing COIs hinder interagency transfers and overall hiring efficiency, as other agencies may not be able to accurately verify that appropriate investigations have been conducted.

**Previous Recommendation 29:  USAGM must ensure the Certification of Investigation or similar agency form is included in the eOPF, as required by OPM's Guide to Personnel Recordkeeping.**

---

[92] The other 19 files did contain a memo of adjudication, but this document did not include any of the information required to qualify as a COI.

[93] Please note USAGM was notified of the requirement to maintain such documentation in the draft and final reports of our prior review, issued in 2015 and 2017, respectively.

Def. App. 355

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

**Current Status:  Corrective action NOT EVALUATED.**

We no longer evaluate this area during our reviews.

**Previous Recommendation 29 is CLOSED.**


**Physical Safeguards**

Reports, records, and files pertaining to background investigations contain privacy protected information and must be properly safeguarded to allow access only to those requiring access to perform assigned duties.  For classified information, "each agency head or senior agency official …shall establish controls to ensure that classified information is used, processed, stored, reproduced, transmitted, and destroyed under conditions that provide adequate protection and prevent access by unauthorized persons."[94]  An agency maintaining its own investigative records must adhere to the safeguards described in section 1.1(e) of E.O. 13467, as amended. Additionally, an agency maintaining OPM reports of investigation in its security files must adhere to the safeguards prescribed for those reports under the Privacy Act.[95]

**Previous Findings:**  Our review raised concerns over whether USAGM appropriately safeguarded its security files.

USAGM adhered to record retention schedules set by the National Archives and Records Administration.  OS maintained hardcopy security files in file cabinets within OS, which was badge-locked and accessible only by OS staff.

OS staff stored background investigations, employee security files, and Secret information in "open" storage within the OS file room (during our onsite activities, we identified files marked Secret left on top of cabinets within the file room).  While all OS staff had the appropriate level of investigation to access this information, not all staff had a favorably adjudicated investigation and therefore may not be eligible to access these files.

During our 2018 onsite activities OS staff provided the review team files containing Secret information without verifying all inspection staff was appropriately cleared to view such information.

---

[94] E.O. 15526, § 4.1(g); see also 32 C.F.R. pt. 2001, subpart E
[95] 81 Fed. Reg. 70191, 70196 (Oct. 11, 2016)

Def. App. 356

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

Failure to properly secure sensitive and/or classified information and personally identifiable information (PII) places the agency at risk of a security breach.[96]

**Previous Recommendation 30:  Ensure all physical space containing sensitive information, including investigative and adjudicative information and PII, is properly secured and not accessible to those without a need to know.**

**Current Status:  Corrective action NOT IMPLEMENTED.**

According to an OS Investigator, USAGM stores all sensitive or adjudicative material in Lektrievers within a locked file room, inside the secure OS suite.

In their response to our previous final report, USAGM stated the OS Director "implemented enhanced security protocols to ensure…only those with a need to know are permitted access to sensitive information."  However, during our latest follow-up activities a PSD Security Specialist told us all while not all PSD employees have a need to access the file room, all PSD employees have access.

**Previous Recommendation 30 is OPEN and UNRESOLVED.**

**Previous Recommendation 31:  Update policies and procedures to implement immediate measures to ensure PII and sensitive and/or classified information will not be compromised.**

**Current Status:  Corrective action NOT IMPLEMENTED.**

According to the PSD Inspector, adjudicative material is stored in a GSA-approved safe or in the locked file room within the PSD suite.  All Top Secret information is stored within a GSA-approved safe within USAGM's new SCIF.[97]

However, OPM data reflects 9 of PSD's staff members were investigated by USAGM after the expiration of USAGM's delegated authority and have not had new investigations initiated with DCSA.  These employees have not been properly investigated or adjudicated and may not be eligible to access the files within PSD's file room.

---

[96] Because the Information Security Oversight Office (ISOO) of the National Archives and Records Administration, not OPM, is the entity responsible for oversight of classified information safeguards, OPM will make an informational copy of our draft and final reports available to ISOO.
[97] Sensitive Compartmented Information Facility

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Previous Recommendation 31 is OPEN and UNRESOLVED.**

**Adjudicator Training and Qualifications**

OPM's Suitability Processing Handbook[98] states that adjudications shall be performed by "appropriately trained personnel," and that agencies are responsible for providing appropriate training for designating position risk and adjudicating suitability."

*Adjudicator Training*

As of August 2015, agencies are required to document that adjudicators have been trained according to National Training Standards.[99]

**Previous Findings:**  USAGM adjudicators were not appropriately trained in suitability adjudications.

Only one USAGM adjudicator provided training certificates from OPM's Essentials of Suitability Training Program (ESAP).  The other two adjudicators received on the job training, but could not provide if their trainers had been trained in accordance with the National Training Standards.[100]

Additionally, neither of the adjudicators we spoke to could name the suitability adjudicative criteria without referring to written notes they brought in to the interview.

A lack of proper training can lead to inefficient or incorrect personnel security and suitability activities.

**Previous Recommendation 32:  USAGM must ensure the personnel who perform adjudicative work receive suitability adjudications training in accordance with the National Training Standards.**

**Current Status:  Corrective action IMPLEMENTED.**

---

[98] OPM's *Suitability Processing Handbook*, pg. I-3
[99] July 2014 Implementation Plan for Background Investigator and Adjudicator National Training Standards
[100] Please note that this goes against USAGM's *PSP Directive*, which states "all personnel responsible for determining individuals' eligibility for access to classified information shall have completed a minimum of 2 weeks of formal suitability training." (*[USAGM] PSP Directive FINAL*, page 4)

Def. App. 358

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

USAGM has two adjudicators responsible for suitability adjudications.  We verified both USAGM adjudicators attended OPM's Essentials of Suitability Adjudication Program training through USAGM-provided training certificates.

**Previous Recommendation 32 is CLOSED.**

**Previous Recommendation 33:  USAGM must ensure adjudicative staff is able to demonstrate a sufficient knowledge and understanding of suitability adjudications requirements and criteria.**

**Current Status:  Corrective action NOT IMPLEMENTED.**

According the PSD Personnel Security Specialist, USAGM adjudicators apply 5 CFR 731 to suitability cases "as needed", and stated it was not applied to T1 cases.  The Personnel Security Specialist could not tell us why suitability criteria are not used for T1 cases and could not explain what "as needed" meant.  We were not able to positively verify that USAGM adjudicative staff have a comprehensive understanding of suitability adjudications requirements and criteria.

**Previous Recommendation 33 is OPEN and UNRESOLVED.**

*Adjudicator Qualifications*

In accordance with OPM's *Suitability Processing Handbook,* each adjudicator must maintain a favorable determination based on the results of at least a Background Investigation (BI).[101]

Additionally, at least one adjudicator must maintain a favorably adjudicated SSBI[102] in the event classified material at the Top Secret level is included in a file.

**Previous Finding:**  We confirmed through PIPS that all USAGM adjudicators had the appropriate level of investigation for the position, but one adjudicator did not have a favorably adjudicated investigation on record.  The Adjudications Chief stated she would look into this issue and ensure the investigation is adjudicated as required.

---

[101] As of October 1, 2016, the BI product has been replaced by the Tier 4 investigative product.  Please refer to OPM FIN 16-07.

[102] As of October 1, 2016, the Tier 5 investigative product has replaced the SSBI product. Please refer to OPM FIN 16-07.

U.S. Agency for Global Media
Def. App. 359

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

Failure to investigate and adjudicate an employee as required can place the agency at risk by allowing a person who has not been appropriately vetted access to sensitive investigative information.

**Previous Recommendation 34:  USAGM must ensure personnel who perform adjudicative work maintain a favorable determination based on the results of the appropriate level of investigation.**

**Current Status:  Corrective action PARTIALLY IMPLEMENTED.**

We confirmed through PIPS that both of USAGM's current adjudicators maintain a favorable determination based on the results of the appropriate level of investigation.  However, the investigations themselves are not valid, as they were conducted by USAGM after the expiration of USAGM's delegated investigative authority in 2012.  USAGM must initiate new investigations for these individuals.

**Previous Recommendation 34 is OPEN and UNRESOLVED.**

**Policies and Procedures**

Agencies are responsible for establishing structure for the suitability program.  They must "implement policies and maintain records demonstrating that they employ reasonable methods to ensure adherence to…OPM issuances" related to the suitability program.[103]

**Previous Findings:**  We evaluated the following USAGM-provided documents:

- *3-550 Approved Records Disposition Schedules*
- *3-570 Disposition Schedule for Management Records*
- *Adjudication Standard Operating Procedures October 28, 2014*
- *[USAGM] PSP Directive FINAL, undated*
- *Broadcasting Board of Governors Personal Identity Verification (PIV) Request for [USAGM] Credential, November 2005*
- *[USAGM] Request for Security Information*
- *Notification Regarding [USAGM] Drug Policy*
- *[USAGM] Notification of Coercible Hostage Statement*
- *Scope Information worksheet*
- *T5 Scoping Information worksheet*

---

[103] 5 CFR § 731.103(c)

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

- *T5R Scoping Information worksheet*
- *[USAGM] Personal Financial Statements*
- *[USAGM] Foreign Travel Briefing and Acknowledgment*
- *Anomaly Detection and Reporting*
- *Foreign Travel Debriefing*

We identified multiple discrepancies between USAGM's written policies and USAGM's daily processes, as summarized in Table 9.

**Table 9**
**USAGM SOP Discrepancies, 2018**

| USAGM PSP Directive Quote and Page # | Discrepancy |
|---|---|
| "The [USAGM] has been delegated the authority to administer its own [personnel security program] by [OPM] and [ODNI]." (introduction pg. 8) | USAGM does not have a current delegation of investigative authority, as stated in our September 2015 final report. |
| Documents to verify U.S. citizenship or legal status are: U.S. Citizenship and Immigration Services (USCIS) Form N-560 or N-561; USCIS Form 550, 551, or 571; valid or expired U.S. passport; USCIS form 1-551, Form 1-94 Departure Record with visa; USCIS Form 1-766; valid U.S. Travel Document; Form 1-327 (page 22) | USAGM policy does not call for requesting or maintaining copies of relatives' social security cards (as documented earlier in this report) |
| "[Security] will initiate all background investigations using OPM's e-QIP." (page 27) | USAGM staff does not initiate all investigations through OPM's e-QIP (as documented earlier in this report) |
| "The OHR must provide, in addition to the previously submitted PIV and identifications, the following to [security] as soon as the organization has selected an individual for a position as a Federal employee and the individual has accepted a tentative offer…" (page 45) | According to staff, USAGM does not issue tentative offers of employment, and OHR provides all forms to [security] prior to issuing the sole and final offer of employment to the applicant. |
| "[Security] will receive all investigative returns/reports from OPM and in some cases will receive reports of investigation completed by other agencies." (page 54) | USAGM does not utilize OPM (or NBIB) as an investigative service provider. |

Def. App. 361

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

| | |
|---|---|
| **"Upon request of OPM, [USAGM] is required to report the final adjudicative action based on an OPM report of investigation or a file OPM furnishes in response to a check of its CVS." (page 55)** | Reporting adjudicative determinations to OPM is a requirement, and not dependent on any request from OPM. |
| **"All foreign positions shall be designated at least noncritical sensitive." (page 78)** | USAGM must not make blanket designations; all position descriptions must support the applicable designation.  Further, this contradicts page 5 of USAGM's PSP Directive, which states "[Position sensitivity designation] is determined utilizing the OPM, Position Designation Tool." |
| **"Minimum Background Investigation (MBI): An investigation consisting of a National Agency Check and Inquiries (NACI), a credit search, a face-to-face personal interview between the investigation and the subject and telephone inquiries to follow up on written inquiries not returned." (page 83-84)** | The MBI investigative product no longer exists. |

*Source:  OPM review of USAGM-provided documents*

USAGM also utilized Personal Financial Statements[104] that asked for detailed financial information to include salary, Subject's spouse's net income, monthly expenses, investment earnings, educational and charitable expenses, insurance and medical expenses, child/elder care costs, and personal care expenses (to include makeup and toiletries).  These questions went well beyond the scope of what is allowed by the current Federal Investigative Standards.

Failure to maintain updated policies and procedures—and to operate in accordance with these written manuals—may contribute to inefficient or incorrect personnel security and suitability activities.

Requiring applicants or employees to provide detailed financial information goes beyond the scope of the Federal Investigative Standards, which are binding on the Executive branch.

**Previous Recommendation 35**:  **USAGM must ensure the manuals, forms, directives, and policies that govern its personnel suitability operations are in compliance with all applicable E.O.s, OPM requirements, and current investigative products.**

---

[104] Refer to Attachment A.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Current Status:  Corrective action NOT IMPLEMENTED.**

The Director of the Office of Security told us USAGM has a new SOP, which will be assessed and updated annually.  We reviewed this document and note that it is largely unchanged from the SOP we reviewed during our 2018 inspection.  We have included examples of unchanged sections which conflict with current USAGM processes (as described to us by USAGM staff) in Table 10, below.

**Table 10**
**USAGM SOP Discrepancies, 2020**

| USAGM PSP Directive Quote & Page # | Discrepancy |
|---|---|
| **"When requested, advise and assist OHR when they are adjudicating suitability of applicants or employees" (pg. 5)** | Per SEC staff, OHR has no role in the adjudication process. |
| **"The OHR shall…Notify SEC of the need to initiate an investigative request through the e-QIP system…" (pg. 6)** | This function is performed by SEC front office staff. |
| **"The OHR shall…assist applicant or employee with accessing personnel security questionnaires in e-QIP, fingerprints, and other forms as required for personnel security processing.  Ensure required documents are properly completed and submitted in time to initiate investigations as required…" (pg. 6)** | These functions are performed by SEC front office staff. |
| **"The [Position Designation Tool] is available on the OPM Web site at www.opm.gov/investigate." (pg. 18)** | The PDT is no longer at this address. |
| **"Team Leads, Personnel Security Division…conducts periodic "check rides" (oversight) with individuals…to ensure that interviews and other components of casework are conducted per OPM and ODNI standards." (pg. 7)** | USAGM does not have delegated investigative authority, and therefore does not have authority to conduct (or oversee) investigative work. |
| **"The USAGM has been delegated the authority to administer it's own PSP by the Office of Personnel Management (OPM) and the Office of the Director of National Intelligence (ODNI)." (pg. 8)** | USAGM has not been granted such authority by either OPM or ODNI. |
| **"Chapter V: Personnel Security Investigation Requirements" (pg. 20)** | Section 4 of this chapter covers Investigative Methodology, to include standards for conducting interviews and record checks. USAGM does not have delegated |

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

| | investigative authority and is therefore not authorized to perform any of these activities. |
|---|---|

*Source: OPM review of USAGM-provided SOP*

In addition to the issues identified in Table 10, we compared this SOP to the manual[105] USAGM provided during our 2018 inspection, and found that aside from minor wording changes, the two manuals are the same.  Contrary to what the Director of Security told us, the SEC SOP has not been substantively updated.

**Previous Recommendation 35 is OPEN and UNRESOLVED.**

**Previous Recommendation 36**:  **USAGM must ensure security and suitability staff operates in accordance with all SOPs and written guidelines.**

**Current Status**:  **Corrective action NOT IMPLEMENTED**

As reflected in Table 10, above, USAGM's policies (as stated to us during interviews) do not align with USAGM's written policies and guidance.

**Previous Recommendation 36 is OPEN and UNRESOLVED.**

**Previous Recommendation 37**:  **USAGM must immediately stop requesting information for background investigations which goes beyond the scope of the Federal Investigative Standards.**

**Current Status**:  **Corrective action PARTIALLY IMPLEMENTED**

While USAGM has transferred all investigative work to DCSA and therefore no longer requests investigative information, USAGM must identify and properly dispose of all improperly-requested information contained in their existing security files.

**Previous Recommendation 37 is OPEN and UNRESOLVED.**

---

[105] BBG PSP Directive

Def. App. 364

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

## Conclusion and Agency Comments

This follow-up report contains 19 outstanding corrective actions to be undertaken and an additional six recommendations.  OPM will take steps to revoke USAGM's adjudicative and other delegated authority until such time as USAGM can demonstrate to OPM's satisfaction that USAGM has taken all corrective actions. OPM does not intend to grant delegated investigative authority to USAGM.

### Consolidated List of Open Recommendations:

**Previous Recommendation 2**:  **USAGM must ensure that all covered positions are designated for both risk and sensitivity using OPM's PDS.**

**Previous Recommendation 6**:  **USAGM must request the correct level of investigation based on the accurate position designation, per 5 CFR part 1400, OPM's PDS, OPM issuances and Federal Investigation Notices, and the Federal Investigative Standards.**

**Previous Recommendation 10**:  **USAGM staff tasked with pre-screening responsibilities must use 5 CFR part 731 criteria when making pre-screening determinations, as required by the CFR and OPM's Suitability Processing Handbook.**

**Recommendation 11**:  **USAGM must ensure all staff tasked with pre-screening responsibilities receive training and are familiar with the criteria found in 5 CFR part 731.**

**Previous Recommendation 15**:  **USAGM must work with their NBIB liaison to obtain access to all appropriate investigation databases.**

**Previous Recommendation 18**:  **USAGM must ensure background investigations are initiated no more than 14 days after the applicant's initial certification of the investigative forms.**

**Previous Recommendation 20**:  **USAGM must ensure every individual has a favorably adjudicated fingerprint before being issued a PIV credential, as required by HSPD-12 and FIPS 201-2.**

**Previous Recommendation 24**:  **USAGM must work with NBIB to immediately initiate new investigations for all individuals investigated by USAGM since the expiration of USAGM's delegated investigative authority in 2012.**

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

**Previous Recommendation 25**:  USAGM must perform and document a distinct suitability adjudication on every closed investigation, in accordance with 5 CFR part 731.

**Previous Recommendation 26**:  USAGM should consider making arrangements to ensure OS staff are not responsible for adjudicating their direct-report employees' investigations.

**Previous Recommendation 27**:  USAGM must report all suitability determinations to OPM as soon as possible, and in no event later than 90 days after receipt of the final report of investigation.

**Previous Recommendation 28**:  USAGM must request the required background investigation on any USAGM appointee or employee where a record of investigation cannot be verified.

**Previous Recommendation 30**:  Ensure all physical space containing sensitive information, including investigative and adjudicative information and PII, is properly secured and not accessible to those without a need to know.

**Previous Recommendation 31**:  Update policies and procedures to implement immediate measures to ensure PII and sensitive and/or classified information will not be compromised.

**Previous Recommendation 33**:  USAGM must ensure adjudicative staff is able to demonstrate a sufficient knowledge and understanding of suitability adjudications requirements and criteria.

**Previous Recommendation 34**:  USAGM must ensure personnel who perform adjudicative work maintain a favorable determination based on the results of the appropriate level of investigation.

**Previous Recommendation 35**:  USAGM must ensure the manuals, forms, directives, and policies that govern its personnel suitability operations are in compliance with all applicable E.O.s, OPM requirements, and current investigative products.

**Previous Recommendation 36**:  USAGM must ensure security and suitability staff operates in accordance with all SOPs and written guidelines.

**Previous Recommendation 37**:  USAGM must immediately stop requesting information for background investigations which goes beyond the scope of the Federal Investigative Standards.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

**New Recommendation A**:  USAGM must eliminate all duplicate investigation requests.

**New Recommendation B**:  USAGM must establish and implement processes to reduce the unacceptable submission rate for investigation requests to 5% or less.

**New Recommendation C**:  USAGM must develop a mechanism to track PIV expiration dates.

**New Recommendation D**:  USAGM must update their PIV issuance process to identify staff responsible for uploading credentialing determinations into CVS.

**New Recommendation E**:  USAGM must add a "Please Call" notice in CVS for each investigation USAGM conducted after the expiration of USAGM's delegation of investigative authority.

**New Recommendation F**:  In lieu of reporting pending adjudications for any investigations USAGM conducted after the expiration of their delegated investigative authority, USAGM must discontinue these investigations and initiate new investigations through DCSA.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

## Appendix I

### __Objectives, Scope and Methodology__

This report documents the OPM performance review of the U.S. Agency for Global Media
(USAGM) personnel vetting program.  The objective of this review was to inspect USAGM's
policies and processes, identify any corrective efforts as a result of our 2018 review, and to
measure performance towards reform goals and Performance Accountability Council (PAC)
metrics.

The authority and parameters for this review can be found in Executive Orders (E.O.s) 10577,
13467, 13488, and 13764;  U.S. Code (USC), Title 5, Chapter 33, Subchapter I: Sections 3301-
3302; and Code of Federal Regulations (CFR), Title 5, Parts 731, 732, and 1400.

We conducted the onsite review in Washington, DC on February 3, 2020.

We analyzed relevant USAGM -provided data, as well as data extracted from OPM's Personnel
Investigations Processing System (PIPS) and Case Information Request System (CIRS),
including the following reports:

- HSPD-12 Reporting
- Duplicate Case Submissions Summary
- Adjudication Timeliness Report
- Report of Unacceptable Case Submissions
- Investigations Summary
- Report of Unreported Adjudications
- Security and Suitability Investigations Index

We also interviewed the following USAGM managers and employees:

- Director, Office of Security
- Chief, Personnel Security Division
- Security Specialists
- Personnel Security Specialist
- Security Assistant
- Deputy Director, OHR

Def. App. 368

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

OPM case study activities focused on a specific measurement period of investigative and
adjudicative activities that occurred November 1, 2018 through January 3, 2020, unless
otherwise noted.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

## Appendix II

### **Contributors to this Report**

Mary F. Miltner, Chief, Suitability Oversight, Suitability Executive Agent Programs
Jenna Wold, Inspector, Suitability Executive Agent Programs
Tiffany Barnes, Inspector, Suitability Executive Agent Programs


### **Report Distribution**

Michael Pack, Chief Executive Officer and Director, USAGM
Emily Newman, Chief of Staff, USAGM
Marie Lennon, Director, Office of Management Services, USAGM
Andrew Jansen, Chief, Office of Security, USAGM
Carl Johns, Operations Branch Chief, HR, USAGM
Security Executive Agent National Assessment Program (SNAP), ODNI

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

## Attachment A – USAGM Personal Financial Statements

**Personal Financial Statement**

Name: _____

**Monthly Income:**

| | | | | |
|---|---|---|---|---|
| Net Salary | $_____ | Real Estate | $_____ |
| Spouse's Net Income | $_____ | Vehicles | $_____ |
| Other Income (specify) | $_____ | Savings/Checking | $_____ |
| | | Retirement Accounts | $_____ |
| | | Stocks/Bonds | $_____ |
| TOTAL NET MONTHLY INCOME:$_____ | | TOTAL ASSETS: | $_____ |

**Monthly Expenses:**

HOUSING:
Mortgage/Rent            $_____
2nd Mortgage/Home Equity $_____
Insurance                $_____
HOA Fees                 $_____
Property Maintenance     $_____
Storage Fees             $_____

UTILITIES:
Electric                 $_____
Water/Sewer              $_____
Gas/Oil Heat             $_____
Trash Service            $_____
Cable TV/Internet        $_____

PERSONAL COMMS:
Telephone (land)         $_____
Cell Phone(s)            $_____
Pager/PDA                $_____
Internet Fee             $_____
Other (specify)          $_____

EDUCATION:
Tuition                  $_____
Room/Board               $_____
Books/Supplies           $_____
Other                    $_____

INSURANCE:
Life                     $_____
Disability               $_____
Health                   $_____
Other:                   $_____

MEDICAL:
Doctor/Dentist:          $_____
Medications              $_____
Vet & Pet Supplies       $_____
Other:                   $_____

GIFTS:
Charitable/Tithes        $_____
Birthday/Holiday         $_____
Other:                   $_____

CLOTHING:
Monthly Purchase         $_____
Dry Cleaning             $_____
Other                    $_____

FOOD:
Groceries                $_____
Lunches out              $_____
School lunches           $_____
Pet Food                 $_____

AUTOMOBILE:
Car Note                 $_____
Insurance                $_____
Fuel & Oil               $_____
Repairs, Etc.            $_____
Commuting/Parking        $_____
Property Taxes           $_____

ENTERTAINMENT:
Movies/Concerts/Theater  $_____
Dining Out               $_____
Sports/Hobbies/Clubs     $_____
Beverages/Tobacco        $_____
Baby Sitting             $_____
Vacation Payments        $_____
Other                    $_____

PERSONAL:
Barber/Salon             $_____
Allowances               $_____
Make-up/Toiletries       $_____
Other                    $_____

OTHER EXPENSES:
Alimony                  $_____
Child Support            $_____
Child Care               $_____
Elder Care               $_____
Family Support           $_____
Other                    $_____

TOTAL MONTHLY EXPENSES: $_____

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Additional Debts:**

List all expenses and debts to include, but not limited to: loans against 401k plans or other similar retirement accounts, auto loans/leases, recreational vehicles (boats, motorcycles), timeshares, student loans, family and personal loans, credit union accounts, finance companies, home improvement or furniture loans, bank loans, and credit cards. List each account separately by name of person/company. Include al debts for which you are obligated as a co-signer. Continue on a separate sheet if necessary.

| Name: | Amount Owed: | Monthly Payment: |
|---|---|---|
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |

**TOTALS.**  $_____   $_____

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

## PERSONAL FINANCIAL STATEMENT

Name: _____   SSN: ____-__-____   Date: _____

### MONTHLY INCOME:

| | |
|---|---|
| Gross Salary | $_____ |
| -Total Deductions | $_____ |
| Net Salary (Take Home Pay) | $_____ |
| Spouse's Net Income | $_____ |
| Other Income (please specify) | $_____ |

TOTAL NET MONTHLY INCOME  $_____

### ASSETS:

| | |
|---|---|
| Real Estate | $_____ |
| Vehicles | |
| (Car/Boat/Motorcycle/Trailers, etc.) $_____ |
| Savings/Checking | $_____ |
| Stocks/Bonds | $_____ |
| Retirement Accounts | $_____ |
| Miscellaneous | $_____ |

TOTAL ASSETS  $_____

### MONTHLY EXPENSES:

HOUSING: (Primary and Investment)

| | |
|---|---|
| Mortgage/Rent | $_____ |
| Mobile Home(s) | $_____ |
| 2nd Mortgage/Home Equity | $_____ |
| Insurance (also Renters) | $_____ |
| Real Estate Taxes | $_____ |
| Home Owner Assoc Fees | $_____ |
| Property Maintenance Costs | $_____ |
| Storage Fees | $_____ |

UTILITIES:

| | |
|---|---|
| Electric | $_____ |
| Water/Sewer | $_____ |
| LP Gas/Fuel Oil/Natural Gas | $_____ |
| Trash Service | $_____ |

PERSONAL COMMO:

| | |
|---|---|
| Telephone | $_____ |
| Auto Telephone | $_____ |
| Pager | $_____ |
| Personal Data Assistant | $_____ |
| Internet Connection Fees | $_____ |
| Other (specify) | $_____ |

CHARITY/DONATIONS  $_____

EDUCATION

| | |
|---|---|
| Tuition/Fees | $_____ |
| Books/Supplies Etc. | $_____ |
| Other (Specify) | $_____ |

INSURANCE:

| | |
|---|---|
| Life | $_____ |
| Disability | $_____ |
| Medical/Health | $_____ |
| Other Insurance | $_____ |

MEDICAL:

| | |
|---|---|
| Doctor | $_____ |
| Dentist | $_____ |
| Vet & Pet Supplies | $_____ |
| Medication | $_____ |
| Other (specify) | $_____ |

GIFTS:

| | |
|---|---|
| Birthdays | $_____ |
| Holidays | $_____ |
| Cards/Stamps | $_____ |
| Other (Specify) | $_____ |

CLOTHING:

| | |
|---|---|
| Personal | $_____ |
| Family (incl Uniforms) | $_____ |
| Dry Cleaning/Laundry | $_____ |
| Other (Specify) | $_____ |

FOOD:

| | |
|---|---|
| Groceries | $_____ |
| School Lunches | $_____ |
| Other Lunches | $_____ |
| Pet Food | $_____ |

Page 1 of 2

U.S. Agency for Global Media

Def. App. 373

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

AUTOMOBILE:

| | | |
|---|---|---|
| Insurance | $ | |
| Fuel & Oil | $ | |
| Repairs/Tires Etc | $ | |
| Licensing/Personal | | |
| Property Taxes | $ | |
| Taxi/Van Pool/Parking | $ | |
| Other (Specify) | $ | |

PERSONAL:

| | | |
|---|---|---|
| Allowances | $ | |
| Barber/Salon | $ | |
| Cigarettes/Tobacco | $ | |
| Toiletries | $ | |
| Other (Specify) | $ | |

ENTERTAINMENT:

| | | |
|---|---|---|
| Movies/Plays/Dinner Theaters | $ | |
| Dining Out/Parties | $ | |
| Clubs/Sports/Hobbies | $ | |
| Beverages, Alcoholic or Not | $ | |
| Baby Sitting | $ | |
| Vacations | $ | |
| Cable Television/Satellite TV | $ | |
| Other (specify) | $ | |

OTHER EXPENSES:

| | | |
|---|---|---|
| Alimony | $ | |
| Child Support | $ | |
| Child Care | $ | |
| Elder Care | $ | |
| Family Member Support | $ | |
| Other (specify) | $ | |

OTHER MONTHLY
EXPENSES (specify):   $

TOTAL MONTHLY EXPENSES:
$

## DEBTS:

List all expenses/debts to include but not limited to: loans against 401k plans or other similar retirement accounts, auto loans/leases, recreational vehicles, boats, motorcycles, timeshares, student loans, family loans, credit union(s), finance company(ies), home improvement loans, bank loans, and credit cards. List each account separately by name of person/company/firm.  Include all debts for which you are obligated as a co-signer.  Continue on a separate sheet if necessary.

| NAME: | AMOUNT OWED | MONTHLY PAYMENT |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| TOTALS: | $ | $ |

(bring forward any line items from a separate page)

Subjects Signature: _____ Date: _____

Page 2 of 2

U.S. Agency for Global Media
Def. App. 374

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

## Attachment B – USAGM Response to Draft Report



330 Independence Avenue SW | Washington, DC 20237 | usagm.gov

November 20, 2018

Ms. Margaret M. Weichert
Acting Director
Office of Personnel Management

Dear Ms. Weichert:

Thank you for the opportunity to respond to the Office of Personnel Management's (OPM) draft report, addressing findings from OPM's review in April 2018 of U.S. Agency for Global Media's (USAGM) suitability program. (*Review of the U.S. Agency for Global Media Suitability Program,* dated October 22, 2018).

We have reviewed the draft report carefully, including the identified deficiencies and proposed recommendations. I assure you that my staff and I understand the critical importance of proper background investigations of employees, contractors, and applicants, particularly given our unique mission in the foreign affairs/national security space. I take this matter seriously and have directed my staff to begin taking corrective actions immediately. We are committed to bringing the agency's suitability program into full compliance with applicable laws, rules, and regulations, and we look forward to re-establishing a Memorandum of Understanding (MOU) with OPM for delegated investigative authority.

Enclosed is the agency's response to the draft report, describing the corrective actions we are taking to address each of OPM's recommendations. For all 37 recommendations, actions have been initiated or completed. These are actions that will either immediately bring the agency into compliance with applicable legal authorities, or provide a strong start for achieving full compliance in the near future.

In particular, I would like to address the two significant recommendations highlighted in your letter of October 22, 2018. Reflecting our commitment to address OPM's concerns, USAGM has ceased all investigative activities related to personnel security investigative actions and begun the transition of USAGM investigative functions to the National Background Investigations Bureau (NBIB). It is our intent that this transition will be temporary, and that USAGM will utilize NBIB's investigative services until USAGM corrects the deficiencies identified by your program review and is able to enter into a new MOU with OPM for delegated investigative authority.

Voice of America | Radio Free Europe/Radio Liberty | Office of Cuba Broadcasting | Radio Free Asia | Middle East Broadcasting Networks

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

Again, thank you for the opportunity to comment on the draft report. Should you or your staff have any questions, please feel free to contact Marie Lennon, Director of the Office of Management Services (202) 203-4515 or Andrew Jansen, Director of the Office of Security at (202) 382-7789.

Sincerely,

John F. Lansing
Chief Executive Officer and Director

Enclosure

2

Def. App. 376

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Recommendation-by-Recommendation Response to OPM Draft Report**
*Review of the U.S. Agency for Global Media Suitability Program*

**November 16, 2018**

*Throughout this response there are numerous references to documents such as Standard Operating Procedures (SOP) and other guidance materials. Copies can be provided if requested. The two primary management directives noted throughout are attached.*

The U.S. Agency for Global Media (USAGM) generally concurs with the 37 recommendations in the draft report, and describes below the corrective actions taken to date:

**Recommendation 1:** USAGM must immediately cease all investigative activities, and must immediately transfer all investigative work to NBIB.

**USAGM Response:** After receiving OPM's letter, dated October 22, 2018, USAGM has ceased initiating investigations and has coordinated with National Background Investigations Bureau (NBIB) to assume USAGM investigative actions. NBIB will continue to provide investigative coverage until USAGM receives authorization from OPM to reengage investigative efforts through the issuance of an updated Memorandum of Understanding (MOU), granting USAGM delegated investigative authority.

**Recommendation 2:** USAGM must ensure that all covered positions are designated for both risk and sensitivity using OPM's PDS.

**USAGM Response:** The USAGM Office of Security (SEC) and the Office of Human Resources (OHR) have identified and scheduled training in November 2018, December 2018, and January 2019 related to the use of the Position Designation System (PDS). In the meantime, using OPM guidance, Office of Management Services (OMS) staff have begun using OPM's Position Designation Tool (PDT) to designate both risk and sensitivity and to produce a Position Designation Records (PDR) for each USAGM covered position, as defined in Executive Order (EO) 13467. USAGM expects to complete a PDR for all Federal and contractor positions by February 1, 2019.

While moving forward to comply fully with this recommendation and given the agency's unique mission in the foreign affairs / national security space, USAGM respectfully reiterates the concerns it expressed regarding position sensitivity designations under 5 C.F.R. 1400 in its letter dated May 8, 2018 to OPM and the Office of the Director of Intelligence. To date, USAGM has not received a response to this letter.

**Recommendation 3:** USAGM must maintain a PDR (or equivalent) for each covered agency position, per OPM's Suitability Processing Handbook.

**USAGM Response:** As stated above in our response to Recommendation 2, efforts are currently underway to run all agency positions through the PDT to ensure that a PDR, or equivalent, will be maintained for each covered agency position. USAGM expects to

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

complete this effort by February 1, 2019. The PDR will then be utilized when determining
the level of Investigation conducted.

While moving forward to comply fully with this recommendation and given the agency's
unique mission in the foreign affairs / national security space, USAGM respectfully
reiterates the concerns it expressed regarding position sensitivity designations under 5
C.F.R. 1400 in its letter dated May 8, 2018, to OPM and the Office of the Director of
Intelligence. To date, USAGM has not received a response to this letter.

**Recommendation 4:** USAGM must ensure all USAGM employees tasked with position
designation responsibilities are operating in a fair, consistent, and reliable manner.

**USAGM Response:** Trained SEC and OHR personnel are currently performing PDS
operations in a fair, consistent, and reliable manner. To ensure accountability in following
this instruction, the OMS Director, in conjunction with the Directors of OHR and SEC, is
developing a plan for ongoing review of this work. In addition, once an employee has
received training, his/her performance plan will include tasks related to the use of the PDT
for position sensitivity.

**Recommendation 5:** USAGM must re-designate all positions for all employees whose position
does not accurately reflect the requirements of the position, in accordance with 5 CFR part 1400.

**USAGM Response:** As discussed in our response to Recommendation 2, all USAGM
employee and contractor positions will be re-designated by no later than February 1, 2019.
While re-designating positions, OHR personnel will evaluate whether employee position
descriptions accurately reflect the requirements of the position, as required under 5 CFR
1400.101 (b). If the evaluation leads to an updated position description, the updated
position description will be utilized for PDS evaluation. Where a sensitivity designation
has changed, requiring a higher investigation, USAGM will initiate an investigation within
14 days of the PDS assessment, as required under 5 CFR 1400.204(b)(1).

While moving forward to comply fully with this recommendation and given the agency's
unique mission in the foreign affairs / national security space, USAGM respectfully
reiterates the concerns it expressed regarding position sensitivity designations under 5
C.F.R. 1400 in its letter dated May 8, 2018, to OPM and the Office of the Director of
Intelligence. To date, USAGM has not received a response to this letter.

**Recommendation 6:** USAGM must request the correct level of investigation based on the
accurate position designation, per 5 CFR part 1400, OPM's PDS, OPM issuances and Federal
Investigation Notices, and the Federal Investigative Standards.

**USAGM Response:** OHR personnel and their delegates will receive training on accurate
position designation and the correct level of investigation to request. We anticipate that all
eligible staff will complete this training no later than the end of the second quarter of FY
2019. SEC will initiate the correct level of personnel investigation based on an accurate
PDR, per 5 CFR Part 1400. Close coordination between SEC and OHR will assist in the

2

process to initiate investigative action on all agency personnel holding covered positions. SEC will ensure OHR is aware of any newly released Federal Investigative Standards or other authorities.

While moving forward to comply fully with this recommendation and given the agency's unique mission in the foreign affairs / national security space, USAGM respectfully reiterates the concerns it expressed regarding position sensitivity designations under 5 C.F.R. 1400 in its letter dated May 8, 2018, to OPM and the Office of the Director of Intelligence.  To date, USAGM has not received a response to this letter.

**Recommendation 7:**  USAGM must immediately begin using e-QIP for all investigation requests.

**USAGM Response:**  The OMS Director, in coordination with the SEC Director, issued a management directive to Security staff on November 15, 2018 mandating that e-QIP shall be used for all investigation requests.  Beginning November 30, 2018, SEC will initiate all e-QIP requests, relieving OHR and the Office of Contracts (CON) of their e-QIP case initiation responsibilities.  This step will ensure proper procedures are followed prior to initiation of e-QIP for new employees and contractors.

**Recommendation 8:**  USAGM must immediately begin using the current SF86 and must not allow applicants or employees to complete outdated versions of the form.

**USAGM Response:**  The OMS Director, in coordination with the SEC Director, issued a management directive on November 15, 2018 mandating the use of current forms for investigative purposes.  Beginning November 30, 2018, SEC will initiate all requests for investigations utilizing the e-QIP system; therefore, eliminating the possible use of outdated forms.

**Recommendation 9:**  USAGM must immediately begin using the correct security forms (to include the SF85) for any position which does not require the use of the SF86.

**USAGM Response:**  The OMS Director, in coordination with the SEC Director, issued a management directive on November 15, 2018 mandating that e-QIP shall be used for all investigation requests and prohibiting use of incorrect or outdated forms.  As previously stated in our response to Recommendation 8, SEC will use e-QIP to initiate all investigation requests, based on a valid PDR that documents the appropriate position sensitivity designation, and it will eliminate the possibility of utilizing the wrong questionnaire.

**Recommendation 10:**  USAGM staff tasked with pre-screening responsibilities must use 5 CFR Part 731 criteria when making pre-screening determinations, as required by the CFR and OPM's Suitability Processing Handbook.

**USAGM Response:**  The OMS Director, in coordination with the SEC Director, issued a management directive on November 15, 2018 to OHR personnel that only criteria found in OPM Suitability Processing Handbook (Chapter IV(B) and 5 CFR 731.101(a) /

3

U.S. Agency for Global Media
Def. App. 379

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

731.103(d)(1) shall be used in pre-screening determinations. More specifically, standards delineated in 5 CFR 731.202(b) will be utilized to determine suitability issues and/or the identification of mitigating circumstance. Additionally, all personnel responsible for pre-screening will be trained and certified in this activity. We have two employees scheduled for classes in December 2018 and January 2019 and anticipate that training for remaining employees will be completed by no later than the end of the second quarter of FY 19.

**Recommendation 11:** USAGM must ensure all staff tasked with pre-screening responsibilities receive training and are familiar with the criteria found in 5 CFR part 731.

**USAGM Response:** Through periodic reviews of employee training records, the OMS Director will ensure any USAGM employee performing pre-screening responsibilities has received OPM-recognized training to perform these duties. A Standard Operating Procedures (SOP) has been developed to guide personnel engaged in pre-screening activities and to ensure compliance with 5 CFR Part 731.

**Recommendation 12:** USAGM must immediately discontinue use of the SF 86 (or any other security form) prior to making an offer of employment, in accordance with 5 CFR §330.1300, unless and until USAGM is granted an exception.

**USAGM Response:** The OMS Director issued a management directive on November 15, 2018 to all USAGM employees performing pre-screening responsibilities regarding compliance with 5 CFR §§ 330.1300 and 731.103(d)(1). Going forward, candidates for employment shall not be given a link to e-QIP, nor any current security form(s) to complete, until the candidate has first been pre-screened and a conditional offer of employment has been issued. Additionally, the OHR Director will produce and distribute on-boarding/screening guidance for OHR specialists to assist in this process.

**Recommendation 13:** USAGM must refer all cases with potential material, intentional false statement, or deception or fraud in the examination or appointment process to OPM, as required by 5 CFR part 731 and the Suitability Processing Handbook.

**USAGM Response:** On November 15, 2018, the OMS Director issued a management directive to all SEC and OHR personnel mandating the proper reporting to OPM of any instance of material-intentional false statement, or deception or fraud in examination or appointment, or refusal to furnish testimony as required, as delineated under 5 CFR 731.103(g).

**Recommendation 14:** USAGM must update internal processes to eliminate the practice of initiating all applicants and employees into e-QIP prior to checking for reciprocity, in accordance with E.O.s 13467 and 13488.

**USAGM Response:** On November 30, 2018, USAGM will introduce updated on-boarding procedures requiring that SEC personnel handle all in-processing of new personnel. The process relieves OHR and CON personnel of on-boarding responsibilities while centralizing

4

U.S. Agency for Global Media
Def. App. 380

all on-boarding procedures within SEC. This process also requires SEC personnel to conduct checks related to reciprocity prior to authorizing an e-QIP application.

**Recommendation 15:** USAGM must work with their NBIB liaison to obtain access to all appropriate investigation databases.

**USAGM Response:** The NBIB liaison was contacted on November 1, 2018, and advised that NBIB cannot coordinate USAGM access to the Joint Personnel Adjudication System (JPAS). USAGM will reach out to DOD to determine accessibility. Until full JPAS access is attained, USAGM will continue to utilize the partial JPAS access offered through Central Verification System (CVS). Moreover, USAGM has recently built a Sensitive Compartmented Information Facility (SCIF), which will allow for access to Scattered Castles. The SCIF should be functional within 60 days of this response. The 60-day estimate is the timeframe provided by Verizon for installation of the network connection.

**Recommendation 16:** USAGM must ensure the e-QIP "Approver" user role is held by a Federal employee. The e-QIP Agency Administrator must immediately remove the Approver access for the Contractors currently holding that role.

**USAGM Response:** Under current practice and going forward, SEC will not authorize non-FTE personnel to assume the role as Approver within the e-QIP domain. SEC understands the issues associated with the approval of monetary transactions by unauthorized personnel and will not allow such activities. At this time, no contracted personnel have Approver access.

**Recommendation 17:** USAGM must immediately cease having applicants and employees re-sign security form releases upon EOD, in support of accurate timeliness metrics.

**USAGM Response:** On November 15, 2018, the OMS Director, in coordination with the SEC Director, issued a management directive to staff to cease requiring employees to re-sign security forms that have already been submitted via e-QIP. Moreover, effective immediately, SEC will maintain a proper Investigative timeline with OPM/NBIB via the proper e-QIP and CVS channels.

**Recommendation 18:** USAGM must ensure background investigations are initiated no more than 14 days after the applicant's initial certification of the investigative forms.

**USAGM Response:** On November 15, 2018, SEC issued a directive mandating new on-boarding procedures, which includes a provision requiring the initiation of investigations within 14 days of receiving certified investigative forms through e-QIP. Moreover, at the end of FY 18, SEC acquired a new Case Tracking System that will not only modernize the handling of cases within SEC but will assist with the expeditious handling of all assigned cases during Administrative, Investigative, and Adjudication processes. We are working with the vendor towards an implementation date by the end of January 2019.

5

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

**Recommendation 19:**  USAGM must update its policies, manuals, and employee training practices to ensure all USAGM staff with a role in the initiation process are aware of and adhere to the 14-day initiation timeliness standard.

**USAGM Response:  The OMS Director, in coordination with the SEC Director, is drafting new policies and SOP that outline who initiates e-QIP requests, which Federal employee will release the certified e-QIP forms, and that it is the responsibility of every SEC staff member involved in managing and releasing e-QIP forms that an investigation must begin within 14 days of certification.  It is anticipated that these policies and SOP will be completed January 30, 2019.**

**Recommendation 20:**  USAGM must ensure every individual has a favorably adjudicated fingerprint before being issued a PIV credential, as required by HSPD-12 and FIPS 201-2.

**USAGM Response:  On November 15, the OMS Director, in coordination with the SEC Director, issued a management directive requiring that credentialing only occur after an employee's fingerprints have been favorably adjudicated.  SEC produced SOP that provides instruction related to all aspects of the investigative service, consistent with HSPD-12 and FIPS 201-2.  Included in the SOP are provisions related to the issuance of PIV Identification cards, subsequent to the adjudication of the fingerprint return from FBI and a case review.  Additionally, the SOP contains a systematic process for on-boarding.**

**Recommendation 21:**  USAGM must cease revoking and destroying PIV credentials when employees undergo re-investigation.

**USAGM Response:  On November 15, 2018, the OMS Director, in coordination with the SEC Director, issued a management directive to prohibit the revocation or destruction of PIV credentials when employees undergo re-investigation.  USAGM acknowledges that ensuring employees complete re-investigation applications in a timely manner does not constitute cause for revocation or destruction of a PIV credential.**

**Recommendation 22:**  USAGM must update its processes and implement the use of PIV cards for logical access, to improve the security of USAGM's network, system, and data security.

**USAGM Response:  The SEC Director has addressed the issue of logical access with USAGM's technical services personnel.  Efforts are underway to implement the use of PIV cards for logical access and to improve the security of the agency's network.  Preliminary conversations with CIO staff indicate that USAGM will begin the rollout of this product in February 2019.  The agency is committed to agency-wide implementation of two-factor authentication to the agency's network, though it is difficult at this time to estimate when this effort will be completed.**

**Recommendation 23:**  USAGM must update processes, procedures, and employee training requirements to reciprocally accept PIV credentials for physical access, in accordance with HSPD-12.

6

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**USAGM Response:  The Federal Protective Services (FPS) controls the activities of locally assigned guard services; however, some oversight is granted to SEC personnel serving as Agency Technical Representatives (ATR).  An ATR acts as a direct link to FPS, but cannot drive conformity or issue Post Orders.  Post Orders are provided to the guard service by FPS.**

**To address OPM's recommendation, the ATR has reviewed post orders and found them sufficient to properly control entry and exit to/from the building.  SEC also contacted the FPS guard captain to review the proper application and use of FPS policy concerning PIV credentials and requested training on this topic for guard force personnel.  SEC will continually spot check the entry process for non-conformity.**

**In addition, on November 16, 2018, a physical security policy memorandum was issued within SEC addressing issues related to HSPD-12 and FIPS 201.  SEC personnel will receive training related to the proper escort processes as well as conformity to risk-based access control policies.**

**Recommendation 24:**  USAGM must work with NBIB to immediately initiate new investigations for all individuals investigated by USAGM since 2012.

**USAGM Response:  The OMS Director, in coordination with the SEC Director, will work with NBIB and OPM regarding the initiation of new background investigations for all personnel investigated since the last MOU for delegated investigative authority expired. SEC has already initiated a process with NBIB to transfer USAGM investigative responsibility to NBIB.  NBIB will conduct all USAGM investigations until further notice.**

**Recommendation 25:**  USAGM must perform and document a distinct suitability adjudication on every closed investigation, in accordance with 5 CFR part 731.

**USAGM Response:  On November 15, 2018, the OMS Director, in coordination with the SEC Director, issued a management directive that all USAGM adjudicators must keep a record of any adjudication in both electronic and paper files.  It is an established agency protocol that a distinct suitability adjudication is performed and incorporated in each Subject's electronic file (Case Tracking), but the agency acknowledges that up until now, the suitability adjudication was not made a part of the paper file.  Effective immediately, the electronic adjudication will be printed and a copy will be retained in each Subject's security file.**

**Recommendation 26:**  USAGM should consider making arrangements to ensure SEC staff are not responsible for adjudicating their direct-report employees' investigations.

**USAGM Response:  The OMS Director, in coordination with the SEC Director, is in the process of implementing an alternative process to having the Adjudications Chief adjudicate his/her direct reports.  USAGM anticipates entering into an MOU with another USG Agency with adjudicative authority by January 30, 2019.**

7

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

**Recommendation 27:** USAGM must report all suitability determinations to OPM as soon as possible, and in no event later than 90 days after receipt of the final report of investigation.

**USAGM Response: On November 15, 2018, the OMS Director, in coordination with the SEC Director, issued a management directive that, effective immediately, all USAGM adjudicators must follow OPM timeliness goals and must report all suitability decisions to OPM.**

**Recommendation 28:** USAGM must request the required background investigation on any USAGM appointee or employee where a record of investigation cannot be verified.

**USAGM Response:  Currently, it is SEC policy that all personnel will be investigated as prescribed by Federal regulations and Executive Orders.  SEC will work with NBIB and determine any deficiencies in this process and make corrections as required.  Regarding the six employees identified in OPM's Draft Report as having no investigation listed in the Suitability Investigations Index (SII), the SEC Director will initiate the required background investigation.  At this time, USAGM is aware of only these employees whose records of investigation cannot be verified.**

**Recommendation 29:** USAGM must ensure the Certification of Investigation or similar agency form is included in the eOPF, as required by OPM's Guide to Personnel Recordkeeping.

**USAGM Response:  On November 15, 2018, the OMS Director, in coordination with the Directors of SEC and OHR, issued a management directive requiring, effective immediately, that a Certification of Investigation (COI) must be added to every USAGM employee's eOPF file subsequent to investigation.**

**Recommendation 30:** Ensure all physical space containing sensitive information, including investigative and adjudicative information and PII, is properly secured and not accessible to those without a need to know.

**USAGM Response:  On November 19, 2018, the SEC Director implemented enhanced security protocols to ensure sensitive information is properly stored when housed on-site, and that only those with a need to know are permitted access to sensitive information.  A copy of the agency's policy on safeguarding PII will also be distributed to all SEC personnel and USAGM-wide to remind all employees of the importance of protecting this sensitive data.**

**Recommendation 31:** Update policies and procedures to implement immediate measures to ensure PII and sensitive and/or classified information will not be compromised.

**USAGM Response:  The SEC Director has reviewed existing agency policy and SOPs for the safeguarding and handling of PII and/or classified information.  As a result of this review, SEC has initiated changes concerning the storage of sensitive or classified material to include the removal of all classified material from open sight within our secured and manned file repository.  SEC will institute better verification practices to include all**

8

Def. App. 384

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

personnel with access to secure areas located within the restricted area that SEC occupies. Lastly, please note that SEC personnel are all cleared for access to Secret material, at a minimum. SEC is not currently authorized to store top-secret information and has no top secret information stored on site.

**Recommendation 32:** USAGM must ensure the personnel who perform adjudicative work receive suitability adjudications training in accordance with the National Training Standards.

**USAGM Response:** All permanent adjudicative staff have been trained and certified in both suitability and national security adjudicative process. Training certificates for adjudicators are available for review. We are awaiting a new training schedule to initiate Advanced Suitability Adjudication Program (ASAP) training.

Concerning the two trainee adjudicators, they are registered for Fundamentals of Suitability for Suitability and Fitness Adjudicators training in 11/2018 and 2/2019.

**Recommendation 33:** USAGM must ensure adjudicative staff is able to demonstrate a sufficient knowledge and understanding of suitability adjudications requirements and criteria.

**USAGM Response:** The SEC Director will ensure all adjudicators are knowledgeable about applicable regulations, OPM and ODNI guidance, and FIS standards. Adjudicators will now receive regular distributions of current OPM guidance and annual training in adjudicative functions. Further, when possible, adjudicators will attend OPM sanctioned meetings, like Background Investigators Stakeholders Group (BISG), to expose them to changes in the security community. Lastly, adjudicative performance will be closely monitored by supervisory personnel utilizing performance management plans.

**Recommendation 34:** USAGM must ensure personnel who perform adjudicative work maintain a favorable determination based on the results of the appropriate level of investigation.

**USAGM Response:** The SEC Director has verified that all adjudicative staff have investigative and adjudicative actions properly annotated within CVS. The failure to report the adjudication of one of the adjudicative staff members, which was identified in the draft report, appears to have been an oversight. All associated personnel were counseled concerning the proper reporting of adjudicative actions.

**Recommendation 35:** USAGM must ensure the manuals, forms, directives, and policies that govern its personnel suitability operations are in compliance with all applicable E.O.s, OPM requirements, and current investigative products.

**USAGM Response:** The SEC Director of Security will begin a systematic review of all manuals, forms, directives, and policies in use within the USAGM SEC to ensure they are in compliance with all applicable E.O.s, OPM requirements, and current investigative products. The current expected timeframe for completion is January 2019.

9

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions
7E, 7F

**Recommendation 36:** USAGM must ensure security and suitability staff operates in accordance with all SOPs and written guidelines.

**USAGM Response:  Within 45 days of this response, the SEC Director will issue a management directive requiring all security and suitability staff to operate according to documented SOPs and written policy/guidance.  The SEC Director, or delegate, will perform random spot checks of practices and procedures throughout the year to ensure compliance and will produce written reports of findings for review by the OMS Director.**

**Recommendation 37:** USAGM must immediately stop requesting information for background investigations which goes beyond the scope of the Federal Investigative Standards.

**USAGM Response:  On November 15, 2018, the OMS Director, in coordination with the SEC Director, issued a management directive to immediately cease collecting or requesting information for background investigations that go beyond the scope of the Federal Investigative Standards (FIS).  Current NBIB/OPM procedures concerning the collection of information will be reviewed with SEC staff within 45 days of this response.  All investigations taking place within USAGM, or on behalf of USAGM at NBIB, will be based on the FIS and the position's sensitivity level.**

10

U.S. Agency for Global Media
Def. App. 386

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F



**U.S. AGENCY FOR GLOBAL MEDIA** | UNITED STATES BROADCASTING BOARD OF GOVERNORS

# Management Directive on USAGM's Suitability Program: Activities to Cease Immediately

| Date: | November 15, 2018 |
|-------|-------------------|
| From: | Marie Lennon, Director of Management Services |
| To: | OMS/S Staff |
| Re: | Practices to Cease Immediately |

As many of you are aware, the Office of Personnel Management recently released its draft inspection report, dated October 22, 2018, of the Agency's Suitability program. The Office of Management Services is committed to bringing the program into full compliance with applicable laws and regulations and is utilizing the recommendations in OPM's draft report as the first step in this process. To that effect, I am instructing that the following activities cease immediately, as of the date of this directive, in the manner and method directed by Andrew Jansen, Director of Security:

1. Requiring applicants and employees to re-sign security form releases upon EOD (See OPM recommendation number 17).
2. Revoking and destroying PIV credentials when employees undergo re-investigation (See OPM recommendation number 21).
3. Requesting information for background investigations which goes beyond the scope of the Federal Investigative Standards (See OPM recommendation number 37).
4. Use of the SF 86 (or any other security form) prior to making an offer of employment, in accordance with 5 CFR §330.1300, unless and until USAGM is granted an exception (See OPM recommendation number 12).

The Director of Security has issued Standard Operating Procedures and interim policies that outline new workflows addressing the above changes. There will be additional efforts aimed at outlining SEC's practices and policies, as well as those of HR. All newly authored interim policies and guidance can be found on the Office of Security's intranet page here: https://bbg.sharepoint.com/sites/offices/security/.

Office of Management Services staff will conduct ongoing management reviews to ensure Office of Security staff cease the four prohibited activities enumerated in this management directive.

Marie Lennon
Director of Management Services

Andrew Jansen
Director of Office of Security

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F



# Management Directive on USAGM's Suitability Program: Activities to Begin Immediately

| | |
|---|---|
| Date: | November 15, 2018 |
| From: | Marie Lennon, Director of Management Services |
| To: | OMS/S Staff |
| Re: | Practices to Begin Immediately |

As many of you are aware, the Office of Personnel Management (OPM) recently released its draft inspection report, dated October 22, 2018, of the Agency's Suitability program. The Office of Management Services is committed to bringing the program into full compliance with applicable laws and regulations and are utilizing the recommendations in OPM's draft report as the first step in this process. To that effect, I am instructing Security staff (and OHR as appropriate), under the direction of Andrew Jansen, the Director of Security, to ensure that, as of the date of this directive, the following activities are either being performed, or to begin immediately:

1. Conduct PDS operations in a fair, consistent, and reliable manner (See OPM Recommendation number 4).
2. Ensure use of e-QIP for all investigation requests (See OPM recommendation number 7).
3. Ensure use of the current SF86, and advise applicants or employees that outdated versions of the form are not valid (See OPM recommendation number 8).
4. Ensure use of the correct security forms (to include the SF85) for any position which does not require the use of the SF86 (See OPM recommendation number 9)
5. Report all suitability determinations to OPM as soon as possible, and in no event later than 90 days after receipt of the final report of investigation (See OPM recommendation number 27).
6. Update internal processes to eliminate the practice of initiating all applicants and employees into e-QIP prior to checking for reciprocity, in accordance with E.O.s 13467 (as amended) and 13488 (See OPM recommendation number 14).
7. Refer all cases with potential material, intentional false statement, or deception or fraud in the examination or appointment process to OPM, as required by 5 CFR part 731 and the Suitability Processing Handbook (See OPM recommendation number 13).
8. Perform and document a distinct suitability adjudication on every closed investigation, in accordance with 5 CFR part 731 (See OPM recommendation number 25).
9. Ensure the e-QIP "Approver" user role is held by a Federal employee. The e-QIP Agency Administrator must immediately remove the Approver access for the contractors currently holding that role (See OPM recommendation number 16).

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

10. Ensure background investigations are initiated no more than 14 days after the applicant's initial certification of the investigative forms (See OPM recommendation number 18).

11. Ensure every individual has a favorably adjudicated fingerprint before being issued a PIV credential, as required by HSPD-12 and FIPS 201-2 (See OPM recommendation number 20).

12. Ensure the Certification of Investigation or similar agency form is included in the eOPF, as required by OPM's Guide to Personnel Recordkeeping (See OPM recommendation number 29).

13. Ensure personnel who perform adjudicative work maintain a favorable determination based on the results of the appropriate level of investigation (See OPM recommendation number 34).

14. Ensure the manuals, forms, directives, and policies that govern its personnel suitability operations are in compliance with all applicable E.O.s, OPM requirements, and current investigative products (See OPM recommendation number 35).

15. Strictly adhere to all SOPs and written guidelines (See OPM recommendation number 36).

16. Use 5 CFR part 731 criteria when making pre-screening determinations, as required by the CFR and OPM's Suitability Processing Handbook (See OPM recommendation number 10).

The Director of Security has updated and issued Standard Operating Procedures and interim policies that outline new workflows addressing the above changes. There will be additional efforts aimed at outlining SEC's practices and policies, as well as those of HR. All newly authored interim policies and guidance can be found on the Office of Security's intranet page here: https://bbg.sharepoint.com/sites/offices/security/.

Office of Management Services staff will conduct ongoing management reviews to ensure Office of Security staff continuously implement the sixteen corrective activities enumerated in this management directive. As appropriate, some items enumerated above will be addressed in employee performance plans and evaluated through that annual process.

Marie Lennon
Director of Management Services

Andrew Jansen
Director of Office of Security

U.S. Agency for Global Media

Def. App. 389

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

## Attachment C – USAGM Waiver Request to 5 CFR 1400



**BROADCASTING BOARD OF GOVERNORS**
**UNITED STATES OF AMERICA**

May 8, 2018

Office of the Director of National Intelligence
National Counterintelligence and Security Center
Security Executive Agent

Office of Personnel Management
Suitability and Credentialing Executive Agent

To Whom It May Concern:

The Broadcasting Board of Governors (BBG) has assessed the matter of *position sensitivity designation,* pursuant to a review of 5 CFR Part 1400; Executive Order 13467, as amended by EO 13764; and other relevant guidance and authorities.[1]

A "sensitive position" is a position "in which the occupant could bring about by virtue of the nature of the position, a material adverse effect on the national security";[2] this corresponds by definition to a "national security position", which "includes any position in a department or agency, the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security."[3]  The head of Agency is called upon to "designate, or cause to be designated" any position which the head of Agency determines should be designated as a "national security position"; and "to determine whether changes in position sensitivity designations are necessary."[4,5]

---

[1] As elaborated below, this includes 5 CFR 1400.201(a); 5 CFR 1400.204(a) and (d); section 2.7(b) of EO 13467, as amended by EO 13764; and 22 USC 1464b.  The latter is a BBG specific provision of law which posits the requirement that the BBG to investigate/assess whether BBG staff are subject to foreign influence/loyalty, and which by definition would appear to categorize all positions at least, the non-critical, sensitive level (i.e. as at a minimum requiring the type of investigation required for a national security position under 5 CFR 731.106 at the moderate level, unless the agency determines that the position should be designated at the high level.)
[2] Section 2.7(b) of EO 13467, as amended
[3] 5 CFR 1400.102(a)
[4] Section 2.7(b) of EO 13467, as amended ("Heads of agencies shall: (i) designate, or cause to be designated, as a 'sensitive position,' any position occupied by a covered individual in which the occupant could bring about by virtue of the nature of the position, a material adverse effect on the national security".  5 CFR 1400.201(a) ("the head of each agency must designate, or cause to be designated, a position within the department or agency [that the head of agency believes is a national security position pursuant to §1400.102(a)")
[5] 5 CFR1400.204(a) (Agency heads must assess, using relevant regulation and guidance "to determine whether changes in position sensitivity designations are necessary within 24 months of July 6, 2015" or later if a waiver is granted)

330 INDEPENDENCE AVENUE, SW      ROOM 3300      COHEN BUILDING      WASHINGTON, DC 20237      (202) 203-4545      FAX (202) 203-4568

U.S. Agency for Global Media
Def. App. 390

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

Based on that review, the Agency has determined that changes in current Agency position designations are not warranted at this time.  Accordingly, pursuant to that review, **the Agency will continue to consider every covered position at BBG a "National security position," given the ability of the occupant of each position to potentially bring about a material adverse effect upon the national security**.

As a result, all Agency positions will remain at a minimum as non-critical sensitive[6], while positions requiring Special-Sensitive and Critical Sensitive designations are assigned based on definitions provided under 1400.201 (see below).

This designation is consistent with BBG's longstanding practice.  As the Agency indicated back in 1991 to OPM, given our unique mission in the foreign affairs/national security space, we face risks of "hostile foreign intelligence services, which endeavor to place agents within [the Agency] to influence or alter the content of the broadcasts for disinformation purposes, to intimidate its personnel, or to otherwise disrupt the mission of the agency and the conduct of foreign affairs of the United States."  That practice is also consistent with the need that Congress has recognized for the BBG to investigate/assess whether any potential staff are subject to foreign influence/loyalty.  *See* 22 USC 1464b.[7] Protecting against these and similar risks is precisely the reason that the BBG established its current practice and seeks to continue this practice.

Per 5 CFR 1400.201(d) agencies may determine that national security positions may be designated at a higher level than non-critical sensitive, where warranted on the basis of criteria set forth in OPM issuances as described in 5 CFR 731.102(c).  Currently we have 81 critical-sensitive and 15 special-sensitive positions.

We wish to thank the Office of the Director of National Security for their insight and support of the Agency as we assessed 5 CFR Part 1400.

If you require any additional information about the BBG's current suitability and security programs, please do not hesitate to contact Ms. Marie Lennon at 202.203.4504.

Sincerely,

John F. Lansing
Chief Executive Officer and Director

---

[6] In accordance with 5 CFR 1400.201(d) a noncritical-sensitive position automatically initially carries with it a risk designation under 5 CFR 731.106 at the moderate level.
[7] *See* footnote 1, *supra*.

Privileged under Law Enforcement Privilege; Exempt from Disclosure under FOIA Exemptions 7E, 7F

## Attachment D – USAGM's Response to OPM Information Request



330 Independence Avenue SW | Washington, DC 20237 | usagm.gov

January 17, 2020

Attn: Mary Miltner and Tiffany Barnes
Ref: USAGM's responses to the information request dated January 8, 2020

USAGM believes the attached documents will demonstrate the significant progress we have made to bring USAGM's security operations into compliance, and to address recommendations made during OPM's and ODNI's 2018 inspection of USAGM's Suitability and Personnel Security Programs. USAGM hopes that the actions it has taken since the 2018 inspection demonstrate the Agency's commitment to improving its personnel security program; the Agency will diligently address any new recommendations that result from this review.

Please note that in response to item eight, referenced in the information request, USAGM will provide information related to the re-initiation of personnel security investigations since 2012, as that information is developed. USAGM is committed to re-initiating investigations for all personnel whose investigation was conducted under lapsed investigative authority. To accomplish this while prioritizing resources and minimizing impacts to Agency operations, USAGM has prioritized the issuance of Position Designation Records for existing positions while initiating investigations for current staff and new hires.  We are still in the process of identifying, prioritizing, and reinitiating investigations working backwards to 2012. Moreover, the USAGM Office of Security has successfully contracted, but has yet to procure a case management system to track, manage, and report on current and prior investigations. Implementing a case management system will significantly accelerate USAGM's efforts and improve our ability to provide requested documentation in the future.

Again, USAGM looks forward to demonstrating our progress on areas requiring improvement. If there is any further information we can provide your team, please do not hesitate to reach out.

Sincerely,

**Andrew Jansen**
Director, Office of Security
p. 202.382.7789
f: 202.382.7794

Voice of America | Radio Free Europe/Radio Liberty | Office of Cuba Broadcasting | Radio Free Asia | Middle East Broadcasting Networks