IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BREACH OF CONTRACT AND BID PROTEST)

| | |
|---|---|
| OPEN TECHNOLOGY FUND,<br><br>　　　　　*Plaintiff,*<br><br>　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　*Defendant.* | Case No. 20-cv-1047C<br><br>Senior Judge Wolski |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO MOTION TO DISMISS**

DEEPAK GUPTA
GREGORY A. BECK
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*
*greg@guptawessler.com*

JOSHUA D. SCHNELL
CORDATIS LLP
1011 Arlington Boulevard, Suite 375
Arlington, VA 22209
(202) 342-2550
*jschnell@cordatislaw.com*

October 22, 2020　　　　　　　　　　　　　　　　*Counsel for Plaintiff*

## TABLE OF CONTENTS

Table of authorities ................................................................................................................... ii

Argument .................................................................................................................................... 1

    I.      This Court has subject-matter jurisdiction over OTF's bid-protest claim. ................. 1

    II.     OTF has standing to bring its bid-protest claim. ........................................................ 4

    III.    OTF's complaint states a claim for USAGM's violation of the Economy Act. ......... 6

          A.      The Economy Act governs the agency's in-sourcing decision. ...................... 6

          B.      Nothing prevents USAGM from contracting for the services OTF provides. ............................................................................................................. 10

    IV.    OTF is likely to prevail on its claims. ....................................................................... 11

          A.      USAGM failed to make the findings required by the Economy Act ............ 11

          B.      USAGM's findings cannot survive rational basis review .............................. 11

          C.      The government's litigating position cannot salvage USAGM's lack of reasoned decisionmaking. .............................................................................. 12

Conclusion ................................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*135 Camp v. Pitts*,
  411 U.S. 138 (1973) ................................................................................................................ 12

*Agro Dutch Industries Ltd. v. United States*,
  508 F.3d 1024 (Fed. Cir. 2007) .............................................................................................. 9

*Alabama Aircraft Industries, Inc.–Birmingham v. United States*,
  586 F.3d 1372 (Fed. Cir. 2009) ............................................................................................ 13

*Boeing Co. v. United States*,
  968 F.3d 1371 (Fed. Cir. 2020) .............................................................................................. 2

*Bowen v. Georgetown University Hospital*,
  488 U.S. 204 (1988) .............................................................................................................. 12

*CMS Contract Management Services v. Massachusetts Housing Finance Agency*,
  745 F.3d 1379 (Fed. Cir. 2014) ..................................................................................... *passim*

*Dalton v. Cessna Aircraft Co.*,
  98 F.3d 1298 (1996) .............................................................................................................. 10

*Duncan v. Walker*,
  533 U.S. 167 (2001) ................................................................................................................ 9

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) .......................................................................................................... 11

*Halverson v. Slater*,
  129 F.3d 180 (D.C. Cir. 1997) ......................................................................................... 7, 10

*Hymas v. United States*,
  810 F.3d 1312 (Fed. Cir. 2016) .............................................................................................. 2

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
  238 F.3d 1324 (Fed. Cir. 2001) .............................................................................................. 6

*Loomacres, Inc. v. United States*,
  134 Fed. Cl. 779 (2017) .......................................................................................................... 5

*Loomacres, Inc. v. United States*,
  136 Fed. Cl. 331 (2018) .......................................................................................................... 5

*Mabus v. General Dynamics C4 Systems, Inc.*,
  633 F.3d 1356 (Fed. Cir. 2011) .............................................................................................. 3

*Magnum Opus Technologies, Inc. v. United States,*
  94 Fed. Cl. 512 (2010) ................................................................................................ 2, 5

*Maintenance Engineers v. United States,*
  749 F.2d 724 (Fed. Cir. 1984) ............................................................................................ 1

*McDonnell Douglas Corp. v. United States Department of the Air Force,*
  375 F.3d 1182 (D.C. Cir. 2004) ........................................................................................ 12

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co,*
  463 U.S. 29 (1983) ..................................................................................................... 11, 12

*Public Employees Retirement System of Ohio v. Betts,*
  492 U.S. 158 (1989) .......................................................................................................... 8

*Santa Barbara Applied Research, Inc. v. United States,*
  98 Fed. Cl. 536 (2011) ....................................................................................................... 5

*Savantage Financial Services, Inc. v. United States,*
  123 Fed. Cl. 7 (2015) ......................................................................................................... 5

*Securities Exchange Commission v. Chenery Corp.,*
  332 U.S. 194 (1947) ......................................................................................................... 11

*United States Telecom Association v. Federal Communications Commission,*
  227 F.3d 450 (D.C. Cir. 2000) ........................................................................................ 12

*Whittaker Electronic Systems, v. Dalton,*
  124 F.3d 1443 (Fed. Cir. 1997) ......................................................................................... 2

*Widnall v. B3H Corp.,*
  75 F.3d 1577 (Fed. Cir. 1996) ......................................................................................... 12

**Statutes**

5 U.S.C. § 101 ........................................................................................................................ 9

5 U.S.C. § 105 ........................................................................................................................ 9

22 U.S.C. § 6204(a)(10) ........................................................................................................ 8

22 U.S.C. § 6204(a)(16) ........................................................................................................ 9

31 U.S.C. § 1535(a) ........................................................................................................... 7, 8

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .................................................................................................. 9

GAO,
  *Principles of Federal Appropriations Law* (3rd ed. 2008) ..................................................... 7, 8

USAGM,
  *FY2020 Congressional Budget Justification*, https://perma.cc/PCT4-LZAD ..................................... 5

**INTRODUCTION**

What is most notable about the government's brief is its failure to provide any explanation for USAGM's decision to end its relationship with OTF and to take over the services that OTF has long provided. Although the government has now filed the core record on which USAGM's decision was based, it has provided nothing that sheds light on the agency's reasoning. The closest it comes are statements that the agency issued to the press long *after* its decision had already been made. But the *post hac* rationalizations of USAGM and its counsel do not provide a valid basis for upholding the agency's actions. Nor do the laundry list of arguments in the government's motion to dismiss provide any valid basis on which to avoid review. And once those arguments are disposed of, it is now clear that USAGM's action cannot survive any standard of review. The court should therefore grant OTF's motion for a preliminary injunction and deny the government's motion to dismiss.

**ARGUMENT**

**I.    This Court has subject-matter jurisdiction over OTF's bid-protest claim.**

**A.** The government begins by arguing that OTF has waived its ability to seek relief in this Court, or should be estopped from bringing its claim here, because it has in the past—particularly in its litigation against USAGM in the D.C. Circuit—referred to its contract with USAGM as a "grant" agreement rather than a procurement contract. Because the contract is titled "Grant Agreement," it is not surprising that OTF has referred to it that way. "Determination of the type of contract," however, "is a matter of law—not controlled by a label in the contract." *Maint. Eng'rs v. U.S.*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984); *see CMS Cont. Mgmt. Servs. v. Mass. Hous. Fin. Agency*, 745 F.3d 1379, 1385 (Fed. Cir. 2014). And if a contract's title is not controlling, mere references to that title cannot possibly be controlling either.

1

Nor did OTF waive this Court's jurisdiction by failing to object to the contract's characterization as a "grant" agreement at the time of contract formation. Waiver applies where a party is "challenging the validity of [a] contract" based on a "problem" that it "fail[ed] to raise" before execution. *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443, 1446 (Fed. Cir. 1997). But OTF is not challenging the validity of its contract with OTF or complaining about a problem in the contract's terms—including the contract's characterization as a grant agreement. *See Magnum Opus Techs., Inc. v. U.S.*, 94 Fed. Cl. 512, 535 (2010) (plaintiffs did not waive objections to a contract where "plaintiffs [did] not complain" about the allegedly waived issue). Rather, OTF is seeking to *enforce* the contract, and the question whether the contract is a grant or a procurement has become relevant to that claim only for purposes of determining whether this Court has jurisdiction. OTF cannot have been expected to object at contract formation to USAGM's characterization of the contract as a "grant agreement" just to preserve the possibility of jurisdiction over a future bid-protest claim that neither party reasonably could have anticipated.

Even if OTF had raised such an objection, it would have changed nothing. "Whether a contract is a procurement contract or a cooperative agreement" is not up to the agency, but "turns upon the principal purpose of the relationship." *Hymas v. United States*, 810 F.3d 1312, 1324, 1327 (Fed. Cir. 2016). The Federal Circuit in *CMS Contract Management*, for example, held that the agency contract at issue there was a procurement contract even where the parties agreed to expressly describe it as a cooperative agreement. 745 F.3d at 1385. A party cannot waive an issue that is not within its control. *See Boeing Co. v. U.S.*, 968 F.3d 1371, 1379–80 (Fed. Cir. 2020) (holding that waiver does not apply to a party's failure to object to a regulation that is "non-negotiable").

For basically the same reason, estoppel doctrine is also inapplicable here. OTF's acceptance of a contract titled "grant agreement" was not "misleading" because the nature of the contract is a legal question that the parties do not control *Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356,

2

1359 (Fed. Cir. 2011). Similarly, USAGM cannot reasonably rely on OTF's non-authoritative characterization of the contract's nature or suffer prejudice as a result. *See id.*

**B.** Setting aside waiver, the government also argues that the contract at issue is *in fact* a "grant agreement" because the bulk of the funds provided under the contract's terms are intended not for "USAGM's direct benefit," but for a broader "public purpose"—namely, the "purpose of promoting Internet freedom." Gov. Br. 22. But even assuming that USAGM's characterization of the contract's purpose is correct, that would not make the contract a grant agreement. That is because OTF is not the ultimate recipient of that funding, but just an "intermediary" charged with distributing the funds to third parties. *CMS Contract Mgmt. Servs*, 745 F.3d at 1384. In these circumstances, the proper characterization of a federal contract "depends solely on the principal federal purpose in the relationship *with the intermediary*"—not with the ultimate beneficiaries of the funds. *Id.* at 1384.

*CMS Contract Management* illustrates the point. There, HUD contracted with local public-housing agencies for the task of granting rent subsidies to landlords. HUD argued that the contracts were not procurement contracts because rental assistance—like the internet-freedom funding here—was for a "public purpose." *Id.* at 1384. But that, the court held, was "irrelevant" to the nature of the contract, because the housing agencies were not the ones receiving the assistance. *Id.* at 1386. Rather, HUD used the housing agencies "merely … to provide a service to *another* entity which is eligible for assistance." *Id.* For such an "intermediary relationship," the court held, "'the proper instrument is a procurement contract.'" *Id.*

The government tries to distinguish that holding on the ground that HUD had a "'legal obligation' to transfer housing assistance payments to landlords," *id.* at 1386, whereas USAGM has just a "general obligation to expend funds on Internet freedom programs." Gov. Br. 28. To the extent that that distinguishes the cases at all, the distinction is not material. HUD's "legal

3

obligation" was relevant in *CMS Contract Management* only because it established that the contracting housing agencies were intermediaries—HUD was "[t]ransferring funds to" them only "to transfer to the" landlords. 745 F.3d at 1386. Here, OTF's status as an intermediary is established instead by the contract itself, which requires OTF to use the vast majority of contract funds to support third-party internet-freedom projects. OTF is not free under the contract to simply keep the funds for its own purposes, even if—as the government argues—that purpose would have been consistent with its own internet-freedom mission.[1]

The government also relies on legislative history suggesting that "'intermediary' relationships can lawfully be reflected in a grant agreement, where the principal purpose of the agreement is to 'assist the intermediary' in 'producing a product or carrying out a service that is then delivered to an assistance recipient[.]'" Gov. Br. 29 (quoting S. Rep. No. 97-180, at 5 (1981)). But OTF is not using USAGM's internet-freedom funds to produce products or carry out services for delivery. It receives internet-freedom funds from USAGM not for the purpose of developing something, but solely to distribute to the internet-freedom projects that are the ultimate beneficiaries.

## II.     OTF has standing to bring its bid-protest claim.

The government next argues that OTF lacks standing because it has not shown that it was prejudiced by USAGM's decision. Gov. Br. 31. To show prejudice from an agency's in-sourcing decision, a plaintiff need not show that it would *definitely* have been awarded the contract absent

---

[1] It is this internet-freedom funding, used to support development of third-party internet-freedom projects, that OTF characterized in the D.C. Circuit as "indirectly" benefitting USAGM. Contrary to the government's assertion, that characterization is in no way inconsistent with OTF's position here. As explained, that funding—for which OTF is just an intermediary—is irrelevant to the nature of OTF's contractual relationship with the agency.

4

the challenged error, but only a "substantial chance" that it "would have received the contract award." *Loomacres, Inc. v. U.S.*, 136 Fed. Cl. 331, 338–39 (2018).

That standard is plainly satisfied in this case, given that USAGM has *already* repeatedly, over the course of ten years, awarded OTF the precise contract that the agency now seeks to in-source. Where, as here, a plaintiff currently provides the in-sourced services, prejudice "cannot be denied." *Santa Barbara Applied Research, Inc. v. U.S.*, 98 Fed. Cl. 536, 543 (2011) (holding that, where the plaintiff has "a track record of winning contracts for the work that the [agency] is now in-sourcing," nothing more is required for standing); *see also Loomacres, Inc. v. U.S.*, 134 Fed. Cl. 779, 783 (2017) (holding that a plaintiff had standing to challenge in-sourcing where it previously "performed the exact services being insourced"); *Savantage Fin. Servs., Inc. v. U.S.*, 123 Fed. Cl. 7, 30–31 (2015) (holding that the plaintiff had standing to challenge an agency's decision to in-source acquisition of financial software); *Magnum*, 94 Fed. Cl. at 532–33 (protestor "has shown that it engages in the type of business that is the subject of the contract, [and] has in fact successfully performed such contracts in the past …"). Indeed, USAGM recognized earlier this year that OTF has the "expertise necessary" and has been "demonstrably successful and an industry leader in identifying, soliciting, vetting, and fostering" internet-freedom projects using USAGM funds. USAGM, *FY2020 Congressional Budget Justification*, https://perma.cc/PCT4-LZAD.

Nevertheless, USAGM advances two reasons why it claims that OTF is not qualified to perform its longstanding role under the contract.

*First*, USAGM argues that "OTF has not demonstrated that it can perform this task without advance funding from USAGM." Gov. Br. 31. But there is no reason why OTF should need to do so, given that advance funding is already provided by its contract with USAGM. *See* Turner Decl. Ex. F at 3. Nor would requiring OTF to advance its own funds make any sense in the context of an agreement to distribute federal funding to third parties. As explained above, OTF's obligation

5

under the contract is to act as an *intermediary* in distributing and administering USAGM's appropriated internet-freedom funds—not to front the government $20 million in funding. *See CMS Contract Mgmt. Servs.*, 745 F.3d at 1386 (HUD was "[t]ransferring funds to" the contractor "to transfer to the" ultimate beneficiaries).

*Second*, the government argues that OTF has not demonstrated "a satisfactory performance record" because it "failed to comply with a material term" of the contract "by declining to provide USAGM with the information USAGM requested in a timely manner and in the format requested." Gov. Br. 32–33. As discussed in OTF's motion for a preliminary injunction, however, the claim that OTF breached its agreement by failing to provide all the information the agency requested is both unreasonable and pretextual. That correspondence is in the record, and it speaks for itself. *See* Turner Decl. 83, Exs. J–O; Defs.'s App. at 530, 584, 700–11. And even assuming that USAGM *could have* reasonably determined that OTF is not qualified to handle its contract based on its failure to provide information, there is no evidence that the agency did, in fact, make that determination. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337 (Fed. Cir. 2001) (holding that a contracting officer's finding of responsibility was not valid where the decision and reasoning were not apparent from the record). Although USAGM has repeatedly *threatened* to terminate OTF's contract, it has not yet done so.

## III. OTF's complaint states a claim for USAGM's violation of the Economy Act.
### A. The Economy Act governs the agency's in-sourcing decision.

The government next argues that OTF's claims do not allege a violation of the Economy Act. The Act, the government claims, "provides an *authority*" for an agency to obtain goods or services from another unit of the same agency, but "does not require agencies to do so." Gov. Br. 35. Because USAGM did not choose to "invoke[] its authority under the Economy Act" when it

6

in-sourced OTF's contract, the government argues, the Act's requirements do not apply here. *Id.* at 35–36. The government is wrong.

**1.** It is true that the Economy Act grants authority to agencies to "place an order with a major organizational unit within the same agency." 31 U.S.C. § 1535(a). But in granting that authority, Congress also expressly limited it—specifically, to cases where "the head of the ordering agency or unit decides" that (1) "the order is in the best interest of the United States Government," (2) "the agency or unit to fill the order is able to provide … the ordered goods or services," and (3) the "ordered goods or services cannot be provided by contract as conveniently or cheaply by a commercial enterprise." *Id.* § 1535(a)(2)–(4). To conclude that agencies may also choose to enter into such a contract *without* making those required findings—simply by refraining from invoking the Economy Act—would render those requirements meaningless and "violate[] the familiar doctrine that the Congress cannot be presumed to do a futile thing." *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997).

A holding that agencies cannot simply opt out of the Economy Act's requirements would not, as the government suggests, conflict with the GAO's view that "the authority to use the Economy Act is permissive rather than mandatory." GAO, *Principles of Federal Appropriations Law*, Third Ed., p. 12-29, https://perma.cc/V72U-U5PQ (2008). The Act is "permissive," as the GAO explains, in the sense that agencies are always free to avoid the Economy Act by procuring goods and services from a private contractor rather than a government agency. *Id.* "The Economy Act was never intended to foster an incestuous relationship in lieu of normal contracting with private business concerns," and it is for that reason that an agency, before invoking the Act, must first determine that it cannot obtain the goods or services "as conveniently or cheaply" from a private contractor. *Id.* "If the agency cannot make [that] determination," however, "use of the Economy Act is improper." *Id.* USAGM, in other words, was not required to in-source OTF's services to its

7

own Office of Internet Freedom. Having chosen to do so, however, the agency could not simply ignore the Economy Act's requirements.

Nor would application of the Economy Act here be inconsistent with the GAO's opinion that "an intra-agency agreement pursuant to the Economy Act requires that the two organizations within the agency are funded by different appropriations." Gov. Br. 36 (citing *Principles of Federal Appropriations Law* at 12-33). USAGM here is not just transferring funds from one agency department to another—it is taking funds away from an active procurement contract and giving it instead to a department of the agency. And that kind of decision, unlike a typical intra-agency reallocation, "goes to the essence of the Economy Act." *Principles of Federal Appropriations Law* at 12-27.

In any event, the separate-appropriations requirement that GAO reads into the Economy Act finds no support in the statutory language. The Act's plain language requires findings whenever an agency places an order for goods or services with "a major organizational unit within the same agency," 31 U.S.C. § 1535(a)—not a major organizational unit funded by a separate appropriation. Although this Court considers the GAO's views to be persuasive authority, "no deference is due to agency interpretations at odds with the plain language of the statute itself." *Pub. Emp. Ret. Sys. of Ohio v. Betts,* 492 U.S. 158, 171 (1989). Because USAGM is redirecting a procurement from a private contractor to its own Office of Internet Freedom, the transaction falls squarely within that language.

**2.** Even assuming that the government is correct that the Economy Act ordinarily allows agencies to opt out of its requirements, USAGM's authority to do so here would still be restricted by its organic statute—the International Broadcasting Act. Congress chose to exempt USAGM from compliance with almost all laws governing procurement contracts, giving it authority to procure services "notwithstanding any other provision of law relating to such acquisition, rental, or lease." 22 U.S.C. § 6204(a)(10). But there is one exception: Congress expressly required that the

8

agency's CEO must "procure … goods and services from other departments or agencies" "pursuant to section 1535 of title 31 (commonly known as the 'Economy Act')." *Id.* § 6204(a)(16). If USAGM enters such a transaction, it therefore must do so under the Economy Act.

The government disputes that reading of § 6204(a)(16), arguing that the words "department" and "agency" in the section refer to the definitions of "Executive department" under 5 U.S.C. § 101 and "Executive agency" under 5 U.S.C. § 105. Gov. Br. 36–37. Because USAGM's Office of Internet Freedom is not one of the fifteen principal departments of the U.S. government listed in § 101, the government argues, any procurement of services from that office would fall outside the scope of § 6204(a)(16). But § 6204(a)(16) does not say "Executive department"—it just says "department." In ordinary usage, a "department" is just a "division of a greater whole" or a "subdivision." *Department*, Black's Law Dictionary (11th ed. 2019). That ordinary meaning plainly encompasses the Office of Internet Freedom—a division of USAGM.

There is "nothing in the statute to suggest that Congress intended to depart from [that] ordinary definition." *Agro Dutch Indus. Ltd. v. U.S.*, 508 F.3d 1024, 1031–32 (Fed. Cir. 2007). And there is good reason to conclude otherwise. An "Executive agency" under 5 U.S.C. § 105 is already defined to include an "Executive department," which, under the government's reading, would render the word "department" in "department or agency" redundant. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.").

The government also argues that USAGM's authority under 22 U.S.C. § 6204(a)(6) to allocate funds within the agency is "distinct from and in addition to" its authority under § 6204(a)(16) to procure goods and services under the Economy Act. Gov. Br. 36. Thus, it claims, the agency can avoid the Economy Act's requirements just by invoking § 6204(a)(6). But, again, USAGM is not free to opt out of requirements imposed by Congress. An agency cannot rely on a general grant of authority to bypass requirements set forth in a "more specific (and limited)" grant. *Halverson*, 129

9

F.3d at 188–89; *see also Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (1996) (holding that if general and specific provisions are inconsistent, then the specific provision governs). Rather, the two grants of authority must be "read together so as to give effect to the Congress's evident intent in enacting both." *Halverson*, 129 F.3d at 189. Reading the two grants of authority together here means that USAGM under § 6204(a)(6) may generally redistribute appropriated funds within the agency without making the Economy Act's required findings. When it uses those funds for the specific purpose of procuring goods and services, however, § 6204(a)(16)'s plain language mandates that the Economy Act's requirements apply.

### B. Nothing prevents USAGM from contracting for the services OTF provides.

The government next argues that OTF's in-sourcing claim fails because it challenges USAGM's in-sourcing of "work that OTF may not perform under a procurement contract." Gov. Br. 40. Both the Federal Acquisition Regulation and its own policy, the agency argues, "prohibit USAGM from allowing contractors to perform inherently governmental functions such as awarding and administering Federal contracts." *Id.*

USAGM misconstrues the nature of the agreements entered by OTF when distributing internet-freedom funds. It is true that OTF's role is to "administer[] [USAGM's] internet-freedom program and related grants" by awarding and administering contracts with funding recipients. Am. Compl. ¶ 80. But, in doing so, OTF does not step into USAGM's shoes to enter contracts on the agency's behalf. OTF's contracts are between the funding recipient and OTF—not between the recipient and USAGM. *See* Turner Decl. ¶ 5. Under its contract with OTF, USAGM thus has no need to contract directly with funding recipients, because OTF has agreed to perform that contracting role. OTF, in other words, is neither awarding nor administering federal contracts.

10

## IV.     OTF is likely to prevail on its claims.

### A.     USAGM failed to make the findings required by the Economy Act.

OTF is likely to prevail on its claim that USAGM violated the Economy Act. The government, resting its argument on its contention that the Act does not apply to USAGM's decision to in-source OTF's services, does not even argue that the agency made the findings that the Act requires. Because this Court must judge the agency's decision "solely by the grounds invoked by the agency," USAGM's failure to identify any findings in the record ends the matter. "It is not the role of the courts to speculate on reasons that might have supported an agency's decision." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). "To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

### B.     USAGM's findings cannot survive rational basis review.

Given the government's failure to submit *any* record of its decisionmaking process, its decision cannot survive even rational basis review. The government argues that "USAGM rationally explained its decision to revive its Office of Internet Freedom" in a press release issued on August 18, 2020, and in a statement to a reporter on August 13. But the record shows that the government had already made its decision, and begun the process of in-sourcing OTF's services, well before that—by July 31, 2020, at the latest. Courts may not accept "*post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 50 (1983).

Even if credited, USAGM's post hac statements do not "rationally explain[]" the agency's decision. The government relies on a statement in its press release that its Office of Internet Freedom "has a track record of ensuring that U.S. taxpayer dollars allocated for internet freedom projects are maximized." Def. App. 531. And it points to a claim in its August 13 statement that the office has "performed the same task but far more efficiently [than OTF], saving millions of taxpayer

11

dollars by avoiding unnecessary overhead expenses." *Id.* at 523. Those statements, however, are conclusory. They neither identify nor rely on any evidence that might support the asserted conclusions, and no such evidence appears in the record. Courts "do not defer to [an] agency's conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1186–87 (D.C. Cir. 2004). To warrant deference, "an agency must cogently explain why it has exercised its discretion in a given manner, and that explanation must be sufficient to enable [the court] to conclude that the [action] was the product of reasoned decisionmaking.'" *U.S. Telecom Ass'n v. F.C.C.*, 227 F.3d 450, 460 (D.C. Cir. 2000). USAGM has not provided that explanation here.

## C. The government's litigating position cannot salvage USAGM's lack of reasoned decisionmaking.

In the absence of any explanation by USAGM for its in-sourcing decision, the government attempts to fill the gap by suggesting reasons on which the agency's decision could have been made. But, again, this Court must assess the agency's action on the grounds articulated by the agency, not on post hoc rationales suggested by counsel. *See State Farm*, 463 U.S. at 50; *Widnall v. B3H Corp.*, 75 F.3d 1577, 1580–82 (Fed. Cir. 1996). The "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *135 Camp v. Pitts*, 411 U.S. 138, 142 (1973). "Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988).

In any event, the government's purported explanations for the agency's decision themselves fail the rational-basis test.

**1.** First, the government argues that USAGM's press statements "are supported" by comparing the combined administrative budgets of OTF and USAGM's own Office of Internet Freedom in 2019 and 2020—before and after OTF took over virtually all of USAGM's internet-

12

freedom work. Gov. Br. 41–42. That comparison, the government claims, "indicates that OTF implement[ing] the internet freedom program in full … result[ed] in higher administrative expenses." *Id.*

The government's budget calculations, however, are egregiously flawed—they include the administrative costs of OTF, but not of the Office of Internet Freedom. As a result, the "higher administrative expenses" found by the government include all of the costs, but none of the savings, incurred when OTF took over the agency's internet-freedom work. *See id.* For example, the Office of Internet Freedom eliminated four staff positions when OTF took over, while OTF added only three—a net reduction of one staff member. Yet the government considers only the cost of adding the three new staff members, ignoring the savings from eliminating the other four. Not only that, but the government's "efficiency" analysis fails to take into account the fact that OTF's program budget more than doubled in 2020, suggesting that the organization was accomplishing substantially more with only slightly expanded staff.

No reasonable measure of efficiency considers only costs without corresponding benefits. If the government's efficiency analysis were truly the basis of USAGM's decision—and there is no reason to believe that it was—it would fall far short of providing a reasoned basis for that decision. The government's reasoning not only "runs counter to the evidence before the agency" but "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.–Birmingham v. United States,* 586 F.3d 1372, 1375 (Fed. Cir.2009).

**2.** The second justification the government offers fares no better. The government points to a 2015 Office of Inspector General report examining the practices of USAGM and Radio Free Asia. *See* Def. App. 6. Again, there is nothing in the record suggesting that USAGM actually relied on this five-year-old report.

Nor could the Inspector General's report have served as a rational basis for USAGM's decision to in-source OTF's services. The report was issued more than four years before OTF even existed as an independent nonprofit—when it was still a program of Radio Free Asia. The Inspector General concluded that USAGM and Radio Free Asia lacked policies to ensure that their grant agreements complied with federal procurement requirements. *See id.* at 16. As a consequence of that failure, the Inspector General found some cases where grant agreements were not subjected to sufficient competition, or where grantees were affiliated with Radio Free Asia officials in ways that might create the appearance of a conflict of interest. One grant, for example, was awarded to a foundation where a Radio Free Asia official had formerly served as a fellow. *See id.* at 28. "Although the official did not work for [the foundation] at the time of the contract awards, his recent employment for this organization [gave] the appearance of a conflict of interest that should have been considered before the awards were made." *Id.*

Although some of the problems the Inspector General identified affected OTF contracts, the report's recommendations related to policies of Radio Free Asia and USAGM itself—not to those of the OTF program, and certainly not to the independent OTF organization that exists today. Moreover, the Inspector General concluded that all issues related to OTF contracts were resolved in 2015, and USAGM continued after that to support OTF's work, both before and after its transition to an independent nonprofit in 2019. The government's suggestion that USAGM could have suddenly, five years after the issues in the report were resolved, relied on the report's findings as a basis for ending its relationship with OTF is not reasonable, and defies credibility.

## V.     The remaining preliminary-injunction factors strongly favor OTF.

The government acknowledges that USAGM is "moving forward" with its plan to use the remaining funds that the agency contracted to provide to OTF. Gov. Br. 49. Without the requested injunction, those appropriated funds will be lost to OTF forever. The resulting serious and

14

irreparable harms to OTF's mission, reputation, and operations will become permanent. This Court should grant the injunction to preserve the status quo until the case can be decided on the merits.

## CONCLUSION

The motion for a preliminary injunction should be granted, and the motion to dismiss denied.

October 22, 2020

Respectfully submitted,

*/s/ Gregory A. Beck*
DEEPAK GUPTA
GREGORY A. BECK
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*
*greg@guptawessler.com*

JOSHUA D. SCHNELL
CORDATIS LLP
1011 Arlington Boulevard, Suite 375
Arlington, VA 22209
(202) 342-2550
*jschnell@cordatislaw.com*

*Counsel for Plaintiffs*

15